UNITED STATES DISTRICT COURT
DISTRICT OF MAINE


UNITED STATES OF AMERICA           )
                                   )
           vs.                     )          CRIMINAL ACTION
                                   )
                                   )           Docket No.
                                   )          1:14-cr-00129-JAW
SIDNEY KILMARTIN,                  )
                                   )            JURY TRIAL
             Defendant.            )


VOLUME I OF VI

TRANSCRIPT OF PROCEEDINGS

        Pursuant to notice, the above-entitled matter came on

for JURY TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

District Judge, in the United States District Court, Bangor,

Maine, on the 3rd day of October, 2016, at 1:00 p.m.



APPEARANCES:

For the Government:                   Halsey B. Frank, Esquire

For the Defendant:                    J. Martin Ridge, Esquire



                    Melissa L. Merenberg, RPR
                     Official Court Reporter

Proceedings recorded by mechanical stenography; transcript
produced by computer.

INDEX OF PROCEEDINGS
(See below:)


INDEX OF WITNESSES

Page:

WILLIAM STEVENSON LOVING

    Direct Examination by Mr. Frank                    56

    Cross-Examination by Mr. Ridge                     83


JOHN FRANKLIN MITCHELL

    Direct Examination by Mr. Frank                    92

    Cross-Examination by Mr. Ridge                    103

    Redirect Examination by Mr. Frank                 108


INDEX OF EXHIBITS

| Government's Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 2 | Capricorn Group Invoice | 70 | 70 |
| 3 | Fisher Scientific Invoice | 74 | 74 |
| 4 | Certificate of Analysis | 79 | 80 |
| 4.5 | Business Record of Fisher Scientific | 96 | 96 |
| 5 | Certificate of Analysis | 101 | 102 |

1          (Counsel present in chambers.)

2              THE COURT:  All right.  We're here in the matter

3    again of United States v. Sidney Kilmartin.  What can I do for

4    you, gentlemen?

5              MR. FRANK:  Thank you, Your Honor.  I had a couple

6    of issues, I think, that still remained.  Most of them, I

7    think, have been addressed now.  I think you have ruled on all

8    the motions.  And I had a question about the rule on witnesses

9    and how it would apply, whether we'll be observing it

10   strictly.  I did talk to Marty about at least one witness in

11   my case, Mike Desrosiers, the former lead agent, and I don't

12   think Marty objected to his being in the courtroom.  He is the

13   former lead agent.  He is also a fact witness I am expecting

14   to call at trial.  I was also planning to have him operate the

15   computer while his -- while the current lead agent, Jeff

16   Taylor, testifies.  And I suppose if the rule on witnesses

17   were strictly applied to him, he could not do that.  But my

18   sense is that Marty is okay with that, and I just wanted to

19   air it with you.

20             THE COURT:  Sure.

21             MR. RIDGE:  I don't object to that, Your Honor.

22             THE COURT:  Okay.  If the defendant doesn't object,

23   that's fine with me.

24             MR. FRANK:  So in general it will apply, but not to

25   Desrosiers?

1          MR. RIDGE:  Right.

2          THE COURT:  Right.  And there are a couple of issues

3    surrounding the witnesses.  As I think everybody knows, some

4    of these witnesses are pretty fragile and I just --

5          THE COURT:  Right.

6          MR. FRANK:  -- I think that's obvious.  I am -- as I

7    discussed, I think I am going to release -- I haven't talked

8    to them yet -- but release two of them who were particularly

9    problematic, including I mentioned Derek Jorgensen is the

10   witness coming from the United Kingdom with a history of

11   suicide, serious attempts, some of which resulted in criminal

12   convictions, which required us to have as a condition of his

13   special parole 24-hour surveillance, but I am doing that with

14   the understanding that it's okay with Marty that I elicit from

15   Stu Quinn on the part of Derek Jorgensen just a brief

16   description of that history about he's been chronically

17   depressed, he has tried to commit suicide four or five times,

18   by way of explaining why he was seeking cyanide because that's

19   not otherwise before them.

20       And likewise, the other witness I am planning to release

21   at this point who has been particularly opposed to coming is

22   Stacey Williams from Colorado, and in that case, Jeff Taylor,

23   who went out and met with her, would describe her history

24   briefly of a bad marriage and a neighbor who killed her dog in

25   front of her in a car accident type of thing.  So those -- if

1    that's agreeable, then I will go ahead and release those two

2    is my plan.

3            MR. RIDGE:  That's agreeable, subject to my concern

4    that this information is not necessary at this point at all

5    because it's going to be reproving the scheme that

6    Mr. Kilmartin has admitted to.  And I don't know how that -- I

7    don't know how that adds to the ability to prove any element

8    of the remaining counts, and I can see it being prejudicial to

9    Mr. Kilmartin as this tidal wave of information and victims,

10   whose cases are not before the jury, testify to their

11   experiences and their misfortune.

12           THE COURT:  Right.  Well, I think the narrow issue

13   here is whether the Government can dismiss Mr. Jorgensen and

14   Ms. Williams on the ground that Stu Quinn and Jeff Taylor can

15   testify about them as described.  And you don't have --

16   assuming that it's admissible generally, their specific

17   testimony on the conditions of these two people will not be

18   called?

19           MR. RIDGE:  Assuming this information is admissible

20   generally, I do not object to Mr. Quinn summarizing his

21   understanding of what they have been through.

22           THE COURT:  Right.  Or Mr. Taylor?

23           MR. RIDGE:  Or Mr. Taylor, whoever is going to do

24   that.  But I am assuming we are not going to get any diagnoses

25   or --

1        MR. FRANK:  No, no diagnoses, just the kind of

2   testimony I would have elicited from them just to explain how

3   it was that they got to the place that they were, that they

4   were considering suicide and looking for cyanide.

5        MR. RIDGE:  That's fine.

6        THE COURT:  Okay.  I mean, I understand your

7   question about whether or not it's admissible in general, and

8   we will have to cross that bridge when we come to it.

9        MR. RIDGE:  Okay.

10        MR. FRANK:  I think we have already -- Judge Nivison

11   addressed publicity, I think, pretty strenuously, didn't he?

12        MR. RIDGE:  He did.

13        MR. FRANK:  And I have two demonstrative exhibits,

14   Your Honor, and I don't know what the court's position is

15   regarding those, for example, in opening statements.  One is a

16   map of sort of key locations in the case where most of the

17   activity took place in Maine.  And the other is a timeline of

18   key events.  Many of those are, I think, in the indictment or

19   otherwise admitted at this point -- I mean, as I think about

20   it now that the plea has been taken, I mean, there are a

21   couple -- so, for example, my thought was to have this

22   timeline up during the trial so that the jury could have a

23   framework within which to fit the facts that it hears as they

24   come in, and the type of events that are there are Kilmartin

25   living at 25 Village Drive and buying cyanide, corresponding

1   with people, sending them things, accepting payment from them.

2   And as I say, as I think out loud, I mean, I think a certain

3   amount of that has now been admitted.  There is -- I think

4   there are two of these uncharged incidents on that timeline,

5   the one involving Autumn Roland and the one involving Edith

6   Collins.  And, Your Honor, my position -- Marty and I have

7   talked about this.  I mean, my argument as to their

8   admissibility is, they really are sort of evidence of

9   disparate treatment that proves intent to retaliate and tamper

10  because Ms. Roland -- Mr. Denton complained to Mr. Kilmartin,

11  filed the complaint with the IC3, which is an FBI sub agency,

12  and told Kilmartin that he had done so.

13       These others -- Roland is an example of someone who

14  complained to Kilmartin directly via email, but did not

15  complain to the authorities and did not tell him so.  And then

16  Edith Collins actually filed a separate IC3 complaint against

17  Kilmartin on behalf of her granddaughter, whom she discovered

18  had corresponded with him about cyanide, but didn't tell

19  Kilmartin.  And Kilmartin didn't send -- they're both alive.

20  They didn't die.  They didn't get cyanide.

21       So I think that it is -- it is very probative, and it all

22  occurs within the -- the time of the scheme that is alleged

23  in the indictment, so.

24            THE COURT:  Right.  We don't need to resolve all the

25  issues you have just described here.  But the general rule on

1  demonstrative exhibits is that a demonstrative exhibit is

2  admissible to clarify the jury's understanding of the evidence

3  that has been admitted, but the underlying evidence has to be

4  admitted or admissible.  It may be marked.  It is -- but does

5  not actually go into the jury room itself.

6      The question of whether or not you can refer to it during

7  your opening either the map or the timeline depends solely on

8  Mr. Ridge.  If Mr. Ridge objects, then you will not be able to

9  refer to it.  If he doesn't object, then you will be allowed

10  to do so.  The same rule applies to the defendant.

11      MR. RIDGE:  I do object to those, Your Honor, on the

12  same basis that I have already raised.

13      THE COURT:  Okay.

14      MR. FRANK:  Then I won't refer to them.

15      THE COURT:  Then you should not refer to them in

16  your opening.

17      MR. FRANK:  To the exhibits?

18      THE COURT:  Refer to the -- well, yeah, we're

19  talking about the demonstrative exhibits.

20      MR. FRANK:  Okay.  We had discussed the idea of

21  saying something to the witnesses from the United Kingdom.  I

22  actually had drafted a letter, which Marty and I discussed,

23  and the genesis of this, Your Honor, is their system is

24  different from ours and particularly the law enforcement

25  officers have some experience -- I don't claim to know all the

1    differences.  I just know I have become aware of some of them.

2    I don't know at this point, I think I had aired it in-house in

3    my office, and, of course, we're all lawyers and we're afraid

4    that if we misstate something in an instruction or a letter

5    like that, it could be -- so I just -- just along the same

6    lines everybody was aware, I think, of the victims' fragility.

7    These aren't fragile, but they're -- they -- from what I

8    understand, their proceedings are different than ours in a

9    number of ways, and I don't begin to understand all of them.

10   I am not sure --

11            THE COURT:  You're talking around an issue, I don't

12   know what it is.

13            MR. FRANK:  Well, specifically I think there isn't a

14   rule against hearsay from what I can tell.

15            THE COURT:  There are all sorts of different rules.

16            MR. FRANK:  Well, that was -- that became apparent

17   as I -- yes, that was the one that prompted it.

18            THE COURT:  They don't have a Fifth Amendment over

19   there.

20            MR. FRANK:  No, no, they don't have a constitution.

21            THE COURT:  Right.

22            MR. FRANK:  So -- all right.  Well, I am not sure at

23   this point that --

24            THE COURT:  What do you want to do about that?

25            MR. FRANK:  I am not sure that --

1          THE COURT:  I mean, they're not going to be asked to

2    rule on any issues.  They're just going to be testifying as to

3    the facts.

4          MR. FRANK:  I think that's right.  I may be looking

5    for trouble.  I just --

6          THE COURT:  Do you have --

7          MR. RIDGE:  I don't have strong feelings one way or

8    the other about it, Your Honor.  I reviewed the letter Halsey

9    drafted.  I had no problem explaining to them the difference

10   if that was important, but I don't have --

11         MR. FRANK:  I think at this point I am going to

12   leave it alone.  I thought I would -- Your Honor may be more

13   aware than I of some of the differences.  That's the one that

14   I was struck by as I dealt with the witnesses.

15         THE COURT:  Well, the -- one of the big differences

16   is that the -- over there the judge comments on the witnesses.

17   I don't think you want me to do that.

18         MR. RIDGE:  Perhaps not, but it might be a pretty

19   interesting exercise.

20         THE COURT:  Yeah.  They go to the point of telling

21   the jury not to believe people and that they're bounders and

22   disgraceful human beings and not to be believed.  It's

23   quite -- it's quite amazing particularly coming from somebody

24   with a wig.

25         MR. RIDGE:  And they do that to the defendant

1   witness, as well?

2           THE COURT:  Both.

3           MR. FRANK:  Yeah.

4           THE COURT:  Whatever they think -- I don't think you

5   guys want me to follow that example.

6           MR. FRANK:  All right, Your Honor.  Thank you very

7   much for --

8           THE COURT:  Is there anything else?  Do you have

9   anything?

10          MR. RIDGE:  No -- actually, I have one question,

11  Your Honor, and it may go to perhaps the fact that I didn't

12  draft my motion regarding Mr. Denton's comments, statements,

13  emails that are admitted, and I understand that, and I am not

14  trying to re-argue that.  My question is, there are other

15  items, suicide notes written at various times that I am not

16  sure fall within the orbit of the motion that I filed and I

17  just wanted to know whether or not you believed that your

18  ruling would apply to those other items, as well.

19          THE COURT:  Well, having not seen them, it's hard

20  for me to make a --

21          MR. RIDGE:  Okay.

22          THE COURT:  -- judgment on them.  I'll re-review the

23  order and if you want me to take a look at the notes -- do you

24  have them in a binder somewhere?

25          MR. FRANK:  I do, Your Honor.  I -- hopefully, it's

```
 1   --
 2              THE CLERK:  They're on the bench.
 3              THE COURT:  They're on the bench.
 4              MR. FRANK:  The exhibits are in a binder, numbered
 5   and tabbed.
 6              THE COURT:  Okay.  Well, if you want me to review
 7   any particular exhibit that you object to and have a chance to
 8   cogitate about whether or not it gets in --
 9              MR. RIDGE:  Okay.
10              THE COURT:  -- let me know, and I will be glad to --
11   I will be glad to do that.  Just let me know which exhibit it
12   is.
13              MR. RIDGE:  All right.  And my last issue, Your
14   Honor, and I think maybe we addressed this this morning, but I
15   just wanted to be real sure about it, it is permissible for
16   either counsel to address the jury in opening statements about
17   Mr. Kilmartin's plea to other counts in the superseding
18   indictment?
19              THE COURT:  Yes.  I think -- I mean, I didn't make a
20   ruling that it was admissible, that any of those were
21   admissible.  I just thought I needed to warn him that it might
22   be.  I think I used the term may.  But do counsel object to
23   the admissibility of those?
24              MR. FRANK:  No, I think my feeling is they are
25   admissible, and that would be my position, so I don't think I
```

1     would be objecting to you, and I certainly wouldn't --

2              MR. RIDGE:  All right.

3              THE COURT:  So you would be referencing them?

4              MR. RIDGE:  Right.

5              THE COURT:  Yeah, I think they -- obviously, if he

6     takes the stand, they would be -- he would be subject to

7     cross-examination.

8              MR. RIDGE:  Right.

9              THE COURT:  But if he doesn't take the stand, it

10    would be a whole different matter, and if it's -- the other

11    way it might get in is under 404(b).

12             MR. FRANK:  Right.  I mean, I do think it has

13    implications.  Yeah, I think -- I think that if he's putting

14    his character at issue, you know, believe me when my attorney

15    tells you I didn't do -- you know, I'm just a fraudster, I am

16    not a killer, and he doesn't take the stand, that -- I mean, I

17    -- I don't know.  I have been -- I have thought about it a

18    bit.  I mean, I don't know whether that opens the door to me

19    to some sort of fair reply or curative admissibility, if he

20    doesn't take the stand, because I -- you know, I think that

21    is -- that's the fair implication of -- of taking credit for

22    the plea.

23             THE COURT:  Well, let's -- it sounds like Mr. Ridge

24    wants to raise it, so if -- I don't have any objection to your

25    raising it, certainly.

1          MR. RIDGE:  Okay.

2          THE COURT:  And if you had objected to his raising

3   it, it would be another matter.  I would have to think about

4   the parameters, but if you want to raise it, I have no problem

5   at all, Mr. Ridge.

6          MR. RIDGE:  Okay.  And lastly, Your Honor, this is

7   just kind of a housekeeping thing because I don't want to keep

8   jumping up and objecting on the same basis for the next couple

9   of days, how do you -- how would you suggest that I get my

10  objection to the scheme evidence -- I am not considering your

11  disparate treatment argument, Halsey, because I think that's

12  different, but the rest of the incidents and the rest of the

13  evidence that would have supported the mail fraud and wire

14  fraud against these four witnesses.  I don't want to keep

15  objecting.  I do object to its admissibility because I don't

16  think it's relevant to anything remaining in front of the

17  jury.  Should I get a standing objection -- put a standing

18  objection on the record early on, or do you prefer that I

19  stand up each and every time?

20         THE COURT:  No, I -- I don't want to put you in the

21  position -- sometimes the jury doesn't like it when the

22  defense lawyer or for that matter the prosecutor keeps

23  standing up and objecting and gets it overruled and they look

24  cross-eyed at the lawyers doing all the objecting and say,

25  what's he trying to hide from us?  And the judge has told him

1    no and he keeps persisting.

2         I think the rule in the First Circuit is that if you have

3    raised the objection appropriately even before trial and

4    you've gotten a ruling from the court that is definitive, then

5    you are not obligated to object at that point.  I am not quite

6    clear that I have issued what I would call a definitive ruling

7    on that.  So I am going to need at some point when you think

8    it's appropriate for you to raise it at trial so that I can

9    consider it in the context of the evidence that has been --

10             MR. RIDGE:  Okay.

11             THE COURT:  -- presented and hear argument on both

12   sides because I don't really think I've -- I've formally

13   ruled.  But once I do that, unless there is something

14   different about the argument, you won't need to continue to

15   raise it.

16             MR. RIDGE:  Okay.  Thank you.

17             THE COURT:  All right.

18             MR. FRANK:  And, Marty, didn't we address this in

19   writing to some degree?  I think we did.  I am not sure now.

20   I think you addressed it in your trial brief and that prompted

21   me to file a reply memo addressing your victims -- description

22   of the mental state, this uncharged fraud, and then --

23             THE COURT:  Well, I think you raised the question of

24   whether or not someone ought to be able to put in medical

25   diagnoses as a matter of hearsay.  I think you raised that.

1           MR. FRANK:  It may have been -- you may have -- my

2     response may have been more general than your objection.  I

3     was not particularly seeking to get their medical diagnoses

4     in.

5           THE COURT:  I thought that -- instinctively, I

6     thought that they would be able to say, I was depressed, I had

7     gone to a psychologist.  I had gone to a psychiatrist.  I was

8     on -- I was having ongoing treatment.  I was contemplating

9     suicide.  They would be able to say all that.  Whether they

10    would be able to say, I have a DSM III diagnosis of major

11    depressive disorder is a little bit different, but I would

12    have to hear exactly how it came out.

13          MR. RIDGE:  Right.  And I don't disagree with that

14    prior to the entry of the plea.  It's just the ongoing

15    introduction of information about the four victims whose

16    counts have now been admitted and pled to by Mr. Kilmartin.

17          THE COURT:  Right.  Okay.

18          MR. FRANK:  And we still have fraud counts involving

19    Denton, though, right?

20          MR. RIDGE:  Right, yes.

21          MR. FRANK:  We still have -- we still have three

22    fraud counts arising out of the same scheme?

23          THE COURT:  Right.

24          MR. RIDGE:  You're not going to hear much from me on

25    those, Halsey.

1        THE COURT:  Anyway, well, you know as I said in the

2   earlier order, the Government has a right to -- you can't

3   tell the Government how to prove its case, and the Government

4   has the highest burden under the law in order prove its case

5   so usually the rule is that unless the party, even perhaps if,

6   but certainly unless the parties agree to stipulate to an

7   element of the Government's case, then the Government has a

8   right to prove its case as it sees fit so long as it complies

9   with the rules of evidence.

10      So I take it your real objection is a 403 issue?

11        MR. RIDGE:  Right.

12        THE COURT:  Okay.  Very good.  Thank you.

13      (Proceedings concluded at 1:21 p.m.)

14      (Counsel and parties present in the courtroom at

15   2:10 p.m.)

16        THE COURT:  Are we ready for the jury?

17        MR. FRANK:  Yes, Your Honor.

18        MR. RIDGE:  Yes, Your Honor.

19        THE COURT:  Would you bring the jury in, please?

20      (The jury entered the courtroom at 2:10 p.m.)

21        THE COURT:  Good afternoon, ladies and gentlemen.

22   Good afternoon.

23        THE JURY:  Good afternoon.

24        THE COURT:  My name is John Woodcock, and I will be

25   the judge who is presiding during the course of this trial.

1   Initially, I would like to thank you all for agreeing to act

2   as members of the jury in this very important case.

3       At this time, I am going to ask counsel to reintroduce

4   themselves and the individuals sitting at their table.

5           MR. FRANK:  Thank you, Your Honor.

6       Good afternoon, ladies and gentlemen.  As I told you

7   earlier today, my name is Halsey Frank.  I'm an Assistant

8   United States Attorney here in the District of Maine.  And

9   with me at counsel table for this trial for most of the time

10  will be postal inspector, Jeff Taylor.  When Mr. Taylor is on

11  the stand, I expect that a colleague of mine at the U.S.

12  Attorneys Office, Mike Desrosiers, who used to be a postal

13  inspector, who was the lead on this case before Mr. Taylor

14  took his place, will be there at counsel table.

15          THE COURT:  Thank you.

16      Mr. Ridge.

17          MR. RIDGE:  Thank you, Your Honor.

18      Good afternoon, ladies and gentlemen.  My name, as I

19  introduced myself this morning, is Marty Ridge.  I practice

20  law in Portland.  I'm here today and will be throughout the

21  trial with Sidney Kilmartin, who is the defendant.  There

22  won't be anybody else at counsel table with us.

23          THE COURT:  Thank you very much.

24      At this time, I am going to ask the clerk to swear in the

25  jury.

1          THE CLERK:  Would each juror please stand and raise

2    your right hand?  Do you each of you solemnly swear that you

3    will well and truly try the issue between the parties at the

4    bar according to the laws and evidence given to you, so help

5    you God?

6          THE JURY:  I do.

7          THE CLERK:  Thank you.  Please be seated.

8          THE COURT:  In accordance with the request of the

9    parties, the Court is hereby ordering witnesses to be

10   sequestered.

11       Ladies and gentlemen, I'm going to give you at this time

12   what is called the preliminary jury instructions.  These

13   instructions are preliminary only, and they will not serve as

14   a memory test.  At the end of the trial, I will give you final

15   instructions.  And you will have a written set of those final

16   instructions with you to consult, not only during the course

17   of my instructions, but also during the course of your

18   deliberations in the jury room.  However, I'm going to give

19   these preliminary instructions to you so that you can

20   generally follow what is to ensue during the next few days

21   here at trial.

22       Ladies and gentlemen, you are now the jury in this case.

23   And I want to take a few minutes to tell you something about

24   your duties as jurors and to give you some instructions.  At

25   the end of trial, I will give you more detailed instructions

1   and those instructions will control your deliberations.

2       Duties of the jury.  It is your duty to find the facts

3   from all the evidence admitted in this case.  You, and you

4   alone, are the judges of the facts.  To those facts you must

5   apply the law as I give it to you.  The determination of the

6   law is my duty as the presiding judge in this court.  It is

7   your duty to apply the law exactly as I give it to you whether

8   you agree with it or not.  You must not be influenced by any

9   personal likes or dislikes, opinions, prejudices, or sympathy.

10  That means that you must decide the case solely on the

11  evidence before you and according to the law.  You will recall

12  you just took an oath promising to do so.

13      In following my instructions, you must follow all the

14  instructions and not single out some and ignore others.  They

15  are all equally important.  And you must not read into these

16  instructions or into anything I may say or do any suggestion

17  as to what verdict you should return.  That is a matter

18  entirely for you to decide.

19      Introduction to the case.  This criminal case has been

20  brought by the United States Government.  I will sometimes

21  refer to the Government as the prosecution.  The Government is

22  represented at this trial by an Assistant United States

23  Attorney Halsey Frank.  This case has been brought against

24  Sidney Kilmartin.  I will sometimes refer to him as the

25  defendant.  Mr. Kilmartin is represented by his attorney,

1    Martin Ridge.

2        The Government charges Mr. Kilmartin with violating

3    several federal laws, specifically he's charged with one count

4    of mailing injurious articles resulting in death, two counts

5    of wire fraud, one count of mail fraud, one count of witness

6    tampering, and one count of witness retaliation.

7        The charges against Mr. Kilmartin are contained in the

8    superseding indictment.  The superseding indictment is simply

9    a description of the charges against Mr. Kilmartin.  It is not

10   evidence of anything.  Mr. Kilmartin has pleaded not guilty to

11   the charges, and he denies committing the crimes.

12       Presumption of innocence.  It is a cardinal principle of

13   our system of justice that every person accused of a crime is

14   presumed to be innocent unless and until guilt is established

15   beyond a reasonable doubt.  The presumption is not a mere

16   formality.  It is a matter of the most important substance.

17   Mr. Kilmartin has the benefit of that presumption throughout

18   the trial.  And you are not to convict him unless all of you

19   unanimously find that the Government has separately proven his

20   guilt beyond a reasonable doubt.  The presumption of innocence

21   until proven guilty beyond a reasonable doubt means that the

22   burden of proof is always on the Government to satisfy you

23   that Mr. Kilmartin is guilty of the crimes with which he has

24   been charged beyond a reasonable doubt.

25       Preliminary statement of the elements of the crimes.  In

1    order to help you follow the evidence, I will now give you a

2    brief summary of the elements of the crimes charged.  To make

3    its case, the Government must prove each of these elements

4    beyond a reasonable doubt.  Count 1, the Government charges

5    Mr. Kilmartin with violating the federal statute making it

6    illegal to mail injurious articles resulting in death.  In

7    order for you to find Mr. Kilmartin guilty of this crime, the

8    Government must prove the following elements beyond a

9    reasonable doubt; first, that Mr. Kilmartin knowingly

10   deposited for mailing or delivery, or knowingly caused to be

11   delivered by mail; second, something declared nonmailable, in

12   this case, potassium cyanide; third, that Mr. Kilmartin did so

13   with the intent to kill or injure another; and fourth, the

14   injurious article mailed resulted in the death of any person,

15   in this case, Andrew Denton.

16        Counts 5 and 7.  The Government charges Mr. Kilmartin

17   with violating the federal statute making wire fraud illegal.

18   In order for you to find Mr. Kilmartin guilty of this crime,

19   the Government must prove the following elements beyond a

20   reasonable doubt:  First, that there was a scheme

21   substantially as charged in the indictment to defraud or to

22   obtain money or property by means of false or fraudulent

23   pretenses; second, that the scheme to defraud involved the

24   misrepresentation or a concealment of a material fact or

25   matter or the scheme to obtain money or property by means of

1  false or fraudulent pretenses involved a false statement,

2  assertion, half truth, or knowing concealment concerning a

3  material fact or matter; third, that Mr. Kilmartin knowingly

4  and willfully participated in this scheme with the intent to

5  defraud; and fourth, that the purpose of executing the scheme

6  or in furtherance of the scheme, Mr. Kilmartin caused an

7  interstate or foreign wire communication to be used or it was

8  reasonably foreseeable that for the purpose of executing the

9  scheme or in furtherance of the scheme, an interstate or

10  foreign wire communication would be used on or about the date

11  alleged.

12      Count 12.   The Government charges Mr. Kilmartin with

13  violating the federal statute making mail fraud illegal.   In

14  order for you to find Mr. Kilmartin guilty of this crime, the

15  Government must prove the following elements beyond a

16  reasonable doubt:   First, that there was a scheme

17  substantially as charged in the indictment to defraud or to

18  obtain money or property by means of false or fraudulent

19  pretenses; second, that the scheme to defraud involved the

20  misrepresentation or concealment of a material fact or matter

21  or the scheme to obtain money or property by means of false

22  and fraudulent pretenses involved a false statement,

23  assertion, half-truth, or knowing concealment concerning a

24  material fact or matter; third, that Mr. Kilmartin knowingly

25  and willfully participated in this scheme with the intent to

1   defraud; and fourth, that for the purpose of executing the

2   scheme or in furtherance of the scheme, Mr. Kilmartin caused

3   the United States mail to be used or it was reasonably

4   foreseeable that for the purpose of executing the scheme or in

5   furtherance of the scheme, the United States mail would be

6   used on or about the date alleged.   Count 14.   The Government

7   charges Mr. Kilmartin with killing Andrew Denton with the

8   intent to prevent a communication about the commission of a

9   federal offense to a federal law enforcement officer.   Federal

10  law prohibits killing a person in order to prevent a

11  communication about the commission of a federal offense to a

12  federal law enforcement officer.   In order for you to find

13  Mr. Kilmartin guilty of this crime, the Government must prove

14  the following elements beyond a reasonable doubt:   First, that

15  on or about the date alleged, Mr. Kilmartin killed Andrew

16  Denton; and second, that Mr. Kilmartin did so with the intent

17  to prevent a communication about the commission of a federal

18  offense to a federal law enforcement officer.

19       Count 15.   The Government charges Mr. Kilmartin with

20  killing Andrew Denton with the intent to retaliate against

21  Andrew Denton for providing to a law enforcement officer

22  information relating to the commission of a federal offense.

23  Federal law prohibits the killing of a person in retaliation

24  for providing to a law enforcement officer information about

25  the commission of a federal offense.   In order for you to find

1    Mr. Kilmartin guilty of this crime, the Government must prove
2    the following elements beyond a reasonable doubt:  First, that
3    on or about the date charged, Mr. Kilmartin killed Andrew
4    Denton; and second, that Mr. Kilmartin did so with the intent
5    to retaliate against Andrew Denton for providing information
6    to a law enforcement officer about the federal offense.
7         You should understand that what I have given you is only
8    a preliminary outline.  At the end of trial, I will give you
9    final instructions on these matters.  If there is any
10   difference between what I have just told you and what I tell
11   you in the instructions I give you at the end of trial, the
12   instructions given at the end of trial govern.
13        Evidence, objections, rulings, bench conferences.  I have
14   mentioned the word evidence.  Evidence consists of the
15   testimony of witnesses, documents, and other things received
16   as exhibits and any facts to which the parties have
17   stipulated, in other words, facts to which they have agreed.
18   There are rules of evidence that control what can be received
19   into evidence.  When a party asks a question or offers an
20   exhibit into evidence and the party on the other side thinks
21   it is not permitted by the rules of evidence, that party may
22   object.  This simply means that the objecting party is
23   requesting that I make a decision on a particular rule of
24   evidence, then it may be necessary for me to talk with the
25   parties outside your hearing.  Please understand that while

1   you are waiting, we are working.  The purpose of these

2   conferences is to decide how certain evidence is to be treated

3   under the Rules of Evidence and to avoid confusion and error.

4   We will, of course, do whatever we can to keep to a minimum

5   the number and length of these conferences.

6        Certain things are not evidence, and I will list some of

7   those things that are not evidence for you; one, statements,

8   arguments, questions, and comments by the Government's and

9   defendant's lawyers are not evidence.  Lawyers are not

10  witnesses.  They're not under oath, and they're not presenting

11  evidence to you; two, objections are not evidence.  Lawyers

12  have a duty to their clients to object when they believe

13  something is improper under the Rules of Evidence.  You should

14  not be influenced by an objection.  If I sustain an objection,

15  you must ignore the question or exhibit and must not try and

16  guess what the answer might have been or what the exhibit

17  might have contained.  If I overrule the objection, the

18  evidence will be admitted, but do not give it special

19  attention because there was an objection; three, testimony

20  that I strike from the record or tell you to disregard is not

21  evidence and must not be considered; four, anything you see or

22  hear about this case outside the courtroom is not evidence,

23  unless I specifically tell you otherwise during the -- during

24  the course of this trial; five, the superseding indictment is

25  not evidence.  Furthermore, a particular item of evidence is

1   sometimes received for a limited purpose only, that is you can

2   use it only for a particular purpose and not any other

3   purpose.  I will tell you when that occurs and instruct you

4   with regard to the purposes for which the item can and cannot

5   be used.

6        Finally, some of you may have heard the terms direct

7   evidence and circumstantial evidence.  Direct evidence is

8   testimony by a witness about what that witness personally saw

9   or heard or did.  Circumstantial evidence is indirect

10  evidence, that is it is proof of one or more facts from which

11  one can find or infer another fact.  You may consider both

12  direct and circumstantial evidence.  The law permits you to

13  give equal weight to both, but it is for you to decide how

14  much weight to give any of the evidence.

15       Credibility of witnesses.  In deciding what the facts are

16  you may have to decide what testimony you believe and what

17  testimony you do not believe.  You may believe everything a

18  witness says or only part of it or none of it.  In deciding

19  what to believe, you may consider a number of factors

20  including the following:  One, the witness's ability to see or

21  hear or know the things to which the witness testifies; two,

22  the quality of the witness's memory; three, the witness's

23  manner while testifying; four, whether the witness has an

24  interest in the outcome of the case or any motive, bias, or

25  prejudice; five, whether the witness is contradicted by

1    anything the witness said or wrote before trial or by any

2    other evidence; and six, how reasonable the witness's

3    testimony is when considered in light of other evidence which

4    you believe to be true.

5        Conduct of the jury.  To ensure fairness, you, as jurors,

6    must obey the following rules, which I will outline for you.

7    These rules are grounded on the premise that your verdict in

8    this case must be based solely on the evidence that is

9    admitted at trial and on the law as I give it to you.  First,

10   you must not consider any information that is not properly

11   before you.  Thus, for example, though most people have access

12   to a computer and to the internet, and you may be tempted to

13   consult with the internet, with dictionaries, or with other

14   reference materials, you must not use these resources to do

15   independent research on your own in the case.  To do so would

16   violate your oath as jurors in which you will recall you

17   promised to base your verdict solely on the evidence and on

18   the law.  Second, do not talk amongst yourselves about this

19   case or about anyone involved with it until the end of the

20   case when you go to the jury room to decide your verdict.

21   Third, do not talk with anyone else about this case or about

22   anyone involved with it until trial has ended and you have

23   been discharged as jurors, anyone else includes members of

24   your family and your friends.  You may tell them that you are

25   a juror, but do not tell them anything about the case until

1    after you have been discharged by me.  Fourth, do not let

2    anyone talk to you about this case or about anyone involved

3    with it.  If someone should try and talk to you, report it to

4    me immediately through the jury officer.  Fifth, during the

5    trial, do not talk or speak with any of the parties, lawyers,

6    or witnesses involved in the case.  You should not even pass

7    the time of day with them.  It is important not only that you

8    do justice in this case, but that you also give the appearance

9    of doing justice.  If a person from one side of the case sees

10   you talking to a person from the other side, even if it is

11   simply to pass the time of day, an unwarranted and unnecessary

12   suspicion about your fairness might be aroused.  If any

13   lawyer, party, or witness does not speak to you outside the

14   courtroom, it is not because they are being rude, it is

15   because they're not supposed to talk with you.  Six, do not

16   read any news stories or articles about the case or about

17   anyone involved with it or listen to any radio or television

18   reports about the case or about anyone involved with it.

19   Seventh, do not discuss the case or anyone involved with it or

20   your status as jurors on any social media or look up any of

21   the participants there.  Eighth, if you need to communicate

22   with me, simply give me a signed note through the jury

23   officer.  Ninth, do not make up your mind about what the

24   verdict should be until all the evidence has been received and

25   you've gone to the jury room to decide the case and you and

1   your fellow jurors have discussed the evidence.  Keep an open
2   mind until then.
3       Note-taking.  I am going to permit you to take notes in
4   this case.  The jury officer has distributed pens and binders
5   for your use.  However, I want to give you a couple of
6   warnings about taking notes.  Do not allow your note-taking to
7   distract you from listening carefully to the testimony that is
8   being presented.  If you would prefer not to take notes but
9   simply to listen, feel free to do so.  Please remember that
10  not everything you write down is necessarily what was said.
11  Thus, when you return to the jury room to discuss the case, do
12  not assume simply because something appears in somebody's
13  notes that it necessarily took place here in the courtroom,
14  instead it is your collective memory that must control as you
15  deliberate upon the verdict.  Please take your notebook with
16  you to the jury room at each recess.  Do not leave it in the
17  courtroom.  I will have the jury officer collect them at the
18  end of each day and place them in the vault.  They will be
19  returned to you each morning, and when the case is over, your
20  notes will be destroyed.  These steps are in line with my
21  earlier instruction to you that it is important that you not
22  discuss the case with anyone or permit anyone to discuss it
23  with you.
24      Outline of the trial.  The first step in the trial will
25  be the opening statements.  The Government's attorney in his

1   opening statement will tell you about the evidence he intends

2   to put before you so that you will have an idea of what the

3   Government's case is going to be.  Just as the superseding

4   indictment is not evidence, the opening statement is not

5   evidence either.  Its purpose is only to help you understand

6   what evidence the Government will be and what the Government

7   will try and prove.  After the prosecution's opening

8   statement, Mr. Kilmartin's counsel may also make an opening

9   statement.  Remember, at this point in the trial, no evidence

10  has been offered by either side.  Next, the prosecutor will

11  offer evidence that he says will support the charges against

12  Mr. Kilmartin.  The Government's evidence in this case will

13  consist of the testimony of witnesses and may include

14  documents and other exhibits.  After the Government's

15  evidence, Attorney Ridge may present evidence on behalf of

16  Mr. Kilmartin, but he is not required to do so.  I remind you

17  that Mr. Kilmartin is presumed innocent, and the Government

18  has the burden of proving him guilty beyond a reasonable

19  doubt.  Mr. Kilmartin does not have to prove his innocence.

20  After you have heard all of the evidence, the Government's

21  lawyer and Mr. Kilmartin's lawyer will each be given time for

22  their final arguments.  I just told you that the opening

23  statements by the Government's lawyer and Mr. Kilmartin's

24  lawyer are not evidence, the same applies to closing

25  arguments.  They are not evidence either.  In their closing

1    arguments, the Government's lawyer and Mr. Kilmartin's lawyer

2    will attempt to summarize and help you understand the evidence

3    that was presented during the course of trial.

4         The final part of this trial occurs when I instruct you

5    on the rules of law that you are to use in reaching your

6    verdict.  After hearing my instructions, you will leave the

7    courtroom together to make your decision.  Your deliberations

8    will be secret.  You will never have to explain your verdict

9    to anyone.

10        Now, before we hear the opening statement of the

11   Government's attorney, Juror Number 17, you are sitting in the

12   foreperson seat, and I am going to ask you to serve as the

13   foreperson of the jury.  I will have some more specific

14   instructions as to your role as foreperson during the course

15   of the final instructions.

16        Mr. Frank, would you like to give an opening statement at

17   this time

18             MR. FRANK:  Thank you, Your Honor.  I would.

19        May it please the Court, counsel.  Ladies and gentlemen

20   of the jury, good afternoon.  Ladies and gentlemen, Sidney

21   Kilmartin targeted vulnerable people, depressed and depressed

22   to the point of suicide people to take advantage of.  And when

23   one of those persons, a man by the name of Andrew Denton, who

24   lives or lived in a city called Hull in England -- when Andrew

25   Denton had the audacity to complain that he had been defrauded

1    and taken advantage of by Mr. Denton -- by Mr. Kilmartin,

2    Mr. Kilmartin killed him.

3         Now, the facts of this case are somewhat unusual to say

4    the least, but that's the essence of it, ladies and gentlemen,

5    that's what the Government expects after the case is done and

6    the evidence is in and you retire to your deliberations we

7    will have proved.  Whether it was for money or for spite or

8    for both, Sidney Kilmartin targeted these people, and you're

9    going to meet some of them.  And he offered them -- this

10   scheme is he offered them the relief that they were seeking.

11   I mean, they were at their wits end and looking to end their

12   lives.  And he presented himself as some sort of guardian

13   angel or angel of mercy to them.  He offered them potassium

14   cyanide to end their lives.  And instead, after they paid him

15   for it, he sent them Epsom salts.

16        Ladies and gentlemen, the -- a lot of the activity in

17   this case begins in September of 2012.  At that time,

18   Mr. Kilmartin was living at 25 Village Drive in Manchester,

19   Maine.  It's a -- it's sort of an apartment complex, a couple

20   of stand-alone buildings around a circle with apartments in

21   them.  And the -- most of the activity takes place in the

22   vicinity of 25 Village Drive.  The UPS Store where

23   Mr. Kilmartin got the delivery of the cyanide that he used is

24   up on Western Avenue.  The Hannaford supermarkets where he

25   took receipt of wire transfers of money, Western Union wire

1   transfers of money are up there close by, as is the post

2   offices that he used to mail packages to people, the

3   Manchester Post Office is right up there at the intersection

4   of Western Avenue and Readfield.   The Augusta Post Office is

5   towards town on Western Avenue.   All of these places are

6   within relatively close distance of where it was that

7   Mr. Kilmartin was living.

8        And he had -- he had a couple of bank accounts that

9   figure into this.   Most prominently his Maine State Credit

10  Union bank account where you can see the payment for the

11  cyanide.   He had -- and a bunch of the activity all takes

12  place around the middle of September of 2012.   He -- he opens

13  an account at Google.   You're probably familiar with Google.

14  And you will hear from a witness on behalf of Google,

15  describing the services that he signed up for as he's -- he's

16  preparing to execute this scheme that he's -- he's come up

17  with to take advantage of these -- these vulnerable people by

18  pretending to send them cyanide and instead sending them Epsom

19  salts.

20       He also set up a PayPal account to receive payment for --

21  for the supposed cyanide.   And on September 11, 2012, he

22  orders 100 grams of potassium cyanide through a company in

23  California called the Capricorn Group.   You'll meet the man in

24  charge of the Capricorn Group.   His name is Steve Loving.   And

25  Capricorn operates as a broker for a company, a very large

1    international company called Thermo Fisher.  And Thermo Fisher

2    is significant in this case in that they're actually the

3    source of the cyanide in this case.  They don't make it.

4    They're a broker too, but they're a very large broker, so

5    large that they won't deal with a small customer who's only

6    interested in 100 grams.  So they go through this smaller

7    broker out in -- out in California called the Capricorn Group.

8         And make no mistake, I mean potassium cyanide is -- is

9    deadly poison.  I expect that you'll hear testimony from

10   people who know, experts, in the form at least of a -- a woman

11   who is a forensic and clinical toxicologist for the FBI,

12   Dr. Cynthia Morris-Kukosky, that it's pretty deadly.  It has

13   what is known as at LD50 of 2 to 300 milligrams, and basically

14   what LD50 is a measure of the toxic -- the toxicity of a

15   substance, and LD50 that means that 50 percent of the people

16   who ingest that much of the substance are likely to die.  And

17   in the case of potassium cyanide, the LD50 is 2 to

18   300 milligrams, which means that 100 grams is somewhere

19   between 300 and 500 lethal doses of potassium cyanide.  And

20   that's why, ladies and gentlemen, it's not readily available

21   to the public.  It's somewhat regulated, and in particular

22   it's not legal for most people to mail potassium cyanide.  In

23   the postal services regulations, it is an injurious article

24   that is nonmailable.  Those are the -- those are the postal

25   service's terms for something that's illegal to mail.

1      You can't sell it to anyone.  There are certain

2 exceptions for legitimate bona fide, scientific and industrial

3 and academic uses, but the idea is you have to have a

4 legitimate need and in an effort to police that, the suppliers

5 of potassium cyanide try and do some diligence and make

6 efforts that, you know, not just anyone off the street can

7 call up and order potassium cyanide.  And, in fact, what

8 Mr. Kilmartin did in this case is he winds up posing as a

9 goldsmith business, interestingly enough he used the initials

10 S &, ampersand, K.  And he calls up Steve Loving out in

11 California with Capricorn Group, and they have more than one

12 conversation.  And eventually, negotiates to buy 100 grams.

13 There is some back and forth because Mr. Loving is doing

14 some -- some diligence, and he sees that the addresses that

15 Mr. Kilmartin are offering are residential addresses and

16 that's one of the precautions they try to take.  In order to

17 ensure that potassium cyanide doesn't wind up in the wrong

18 hands, it has to go to some sort of commercial address.  And

19 Mr. Kilmartin winds up proposing to use The UPS Store at 60

20 Western Avenue in Augusta, which is -- if you head up --

21 Village Drive is just off Pond Road, which runs along the lake

22 there in Manchester and you go up to Western Avenue and you

23 take a -- a right on Western Avenue and head towards Augusta,

24 you come to The -- The UPS Store amongst other things.  The

25 Augusta Post Office is down there, too.  And that's what

1  happens.

2      So Kilmartin uses his Maine State Credit Union card in

3  order to pay for the cyanide from Capricorn, and you will see

4  where that charge shows up on his monthly statement at the

5  credit union.  It's about $127 and change for 100 grams of

6  potassium cyanide.

7      And then Mr. Kilmartin starts advertising that he has for

8  sale potassium cyanide, and not just anywhere, mind you, but

9  it turns out that in -- on the internet, there are these blog

10 sites, these websites devoted to everything, but everything

11 includes people who are suicidal, and in particular

12 Mr. Kilmartin posted notice on one of these websites, it's no

13 longer up, but at the time it was up, and its location was at

14 Want Death Blogspot UK.com.  And amongst the forum on that

15 website were forums discussing various methods of committing

16 suicide.  Method number four of the committing suicide is

17 cyanide.  And it was there that Mr. Kilmartin started posting

18 notice that he had very pure, industrial grade cyanide for

19 sale.  And the evidence will show that that's the way that he

20 met a lot of his victims.  They visited the site, and they got

21 in touch with him.  They emailed with him.  They corresponded

22 with him.  And you'll see some of that -- some of that

23 correspondence.  And they discussed everything you might

24 expect when you're buying something, albeit in this case it's

25 a deadly poison, how it works, what -- how much it takes to

1   kill, what to do in order to accelerate or -- the action, take

2   it on an empty stomach with something acidic, how much of it

3   it takes to kill, how many milligrams, how much it costs, how

4   much Mr. Kilmartin is willing to sell it for.  He corresponds

5   with numerous persons around the country and around the world

6   about cyanide over these months of this conspiracy.  And he

7   accepts payments from numerous persons including payments via

8   PayPal, and I think I mentioned, if I didn't that he set up a

9   PayPal account in the middle of September, as well.

10      Most of the payments we're aware of and I expect to prove

11  to you occurred through Western Union wire transfer.  And

12  what's interesting about that, ladies and gentlemen, is there

13  are quite good records of Western Union wire transfers, that

14  the people on each end of these wire transfers have to fill

15  out forms, maybe you have done it yourself, and you can go in

16  the -- in the Augusta area near where Mr. Kilmartin lived, you

17  can go to the Hannaford stores, you can go to the Rite Aid

18  store up there, and you can send and you can receive money via

19  Western Union.  And you will see 15 or so Western Union

20  received forms that were received at the Hannaford stores

21  alone in which people buying cyanide from Mr. Kilmartin are

22  sending him a couple hundred -- between 100, $300 to pay for

23  cyanide so that they can end their lives.

24      And, you know, Western Union takes some care to make sure

25  that money goes where it's supposed to and amongst the things

1   that they do is they ask for identification when somebody is

2   receiving money.  And Mr. Kilmartin shows his Maine state

3   driver's license every time he collects these payments from

4   these fraud victims, these people he is defrauding.  And

5   that's noted on the receipt.  They record the driver's license

6   number signifying that that's -- you know, they check that

7   that's who it is before taking the money.

8        And then he mails -- then he mails packages to several

9   people, and we have -- we have records.  We have -- to varying

10  degrees, I expect there to be in evidence records of these

11  packages, those mailings, and those records will range from

12  postal service internal records where they can track packages,

13  and to the extent that we, in the course of the investigation,

14  were able to narrow down the time frame of the package, you

15  will hear testimony from Inspector Taylor that he would go out

16  and research the records and see if he could find the package

17  that went to the area of the fraud victim who got something

18  from Kilmartin.  So we have those kinds of records for a

19  number of these mailings.  Curiously, a number of these people

20  kept what it was that Mr. Kilmartin sent them and kept it for

21  a long time.  Perhaps it was some sort of security blanket,

22  but amongst the people who kept what it was that Kilmartin

23  sent them are Walter Cottle of Georgia, Stacey Williams of

24  Colorado, Derek Jorgensen also of the same city in Hull

25  England as Andrew Denton, the decedent in this case, and

1    Cynthia Kirschling of California.  And I expect that you will

2    learn a little bit of each of them.  Suffice it to say that

3    they all were severely depressed to the point of suicide.

4        Mr. Cottle was having a terrible time at work,

5    overwhelmed by the responsibility of running large hotels.

6    Stacey Williams' personal life was a mess.  She had gone

7    through a bad marriage and divorce, a car accident, and her

8    neighbor had shot her beloved dog.  She was depressed and

9    suicidal.  And Derek Jorgensen of Hull England had a long

10   history of suicide attempts over there.  Cynthia Kirschling of

11   California was also depressed and in pain because of a bad

12   back.  All of them found Mr. Kilmartin online, corresponded

13   with him, paid for cyanide from him, and got something from

14   him that they expected was cyanide, but was not.  It was Epsom

15   salts.

16       And after it was brought back here -- the inspectors went

17   out and collected these items from around the country brought

18   them back to Maine to the environmental testing laboratory in

19   Augusta, and you will hear from a chemist there by the name of

20   James Curlett, who tested all of these things and determined

21   that they were, in fact, Epsom salts.  And some people got

22   nothing, and I expect you may hear from some of them, as well.

23       Some -- and that brings us to Andrew Denton.  Andrew

24   Denton lived in Hull, England, the same city as Derek

25   Jorgensen, also like the others in this case, the other

1    victims in this case, chronically depressed, had a history of

2    harrowing suicide attempts that you will hear a little bit

3    about, none of which had succeeded as of 2012, but it wasn't

4    for a lack of trying.  And Denton met Kilmartin through the

5    suicide blog site Want Death Blogspot UK.com that I mentioned.

6    And they corresponded extensively in November and December of

7    2012.  And I expect that you will see a fair amount of that

8    correspondence.

9        And Denton -- Denton sends Kilmartin money via Western

10   Union, and Kilmartin goes to the Hannaford store and collects

11   it and signs the receipt and shows his driver's license for it

12   so he can get it.  And on November 16, 2012, he mails a

13   package to Denton, U.S. mail.  There are a couple of

14   interesting things about that package.  First of all, he uses

15   -- it's a handwritten package.  He uses the return address S.

16   Martin, 88 Pond Road, and you will see pictures.  I hope to

17   have a map to show you 88 Pond Road -- if you come out Village

18   Drive and you turn right and go up Pond Road toward Western

19   Avenue, you pass 88 Pond Road on the right.  It's a quite

20   prominent, attractive house.  Right across the road from the

21   house is a very prominent sign, number 88.  And I expect you

22   will see pictures of both of that.  So that's -- and why is

23   that interesting?  Well, he uses that same address on a number

24   of these mailers that we know of and have recovered because,

25   for example, Walter Cottle took a picture of the mailer that

1    Sidney Kilmartin sent him.  You can see it's handwritten in

2    the same fashion and appears -- bears the same return address.

3    Cynthia Kirschling keeps -- she doesn't keep the mailer, but

4    she tears off -- she tears off the upper left-hand corner of

5    the mailer so you can see that he used the same return address

6    there.  And we have both mailers recovered from England, the

7    first mailer mailed in the middle of November, November 16,

8    2012.  Again, beside the mailer you will have postal records

9    tracking its progress from Maine across to England, and then

10   it was recovered on the scene of Andrew Denton's death.

11       So Kilmartin mails Denton these Epsom salts in November,

12   and Denton tries to kill himself with them as he's tried

13   before other ways.  He checks into a hotel, and he -- you

14   know, he's -- he's made his peace with the world, and he

15   drinks what he expects is going to be his last drink, and

16   he -- he doesn't die.  He wakes up, and he is mad.  And he --

17   he is mad at Sidney Kilmartin.  And he starts corresponding

18   with Kilmartin and complaining to him.  And he is so mad he

19   actually files a complaint with -- with law enforcement, that

20   he's been defrauded by Mr. Kilmartin in this fashion.  As

21   remarkable as it may seem, ladies and gentlemen, and you will

22   see this complaint, he files a complaint with something called

23   IC3, and IC3 is sort of the FBI's online complaint referral

24   service.  And Andrew Denton fills out one of these forms

25   online and tells the FBI, you know, Sidney Kilmartin, you

1    know, defrauded me in this fashion, not only that, ladies and

2    gentlemen, he tells Sidney Kilmartin that.  And that prompts

3    Mr. Kilmartin to get a little nervous.  And he says, well,

4    he's going to make it up to Mr. -- he's going to make it up to

5    Mr. Denton.  And he is going to make good.  And you're right,

6    he is going to make good at that point because he's got a

7    problem because now the authorities are on to him.  And it's

8    not just -- it's not just Andrew Denton at that point,

9    remember, ladies and gentlemen, because it's -- he's been

10   executing this fraud with other people besides up until that

11   point that he is got to worry about.

12        So -- so Mr. Kilmartin is apologetic.  He offers to make

13   it good.  He even tells -- he even -- and he sends him the

14   real thing in December.  And to make sure that -- and to make

15   sure that Denton doesn't survive, he also, in another email,

16   tells Denton, by the way, I've never told anybody this, but I

17   got -- I got my cyanide from the Capricorn Group and got to

18   pose as a -- you know, they won't deliver to a residential

19   address.  You've got to pose as some sort of business.

20        It's the same sort of package, ladies and gentlemen.  We

21   have both packages.  Both were recovered from the scene of

22   Mr. Denton's death.  It's a mailer with the same 88 Pond Road

23   handwritten return address, same sort of packaging inside,

24   ladies and gentlemen.  All these substances to all these

25   people are packaged in the same way.  They're in a plastic

1   sandwich baggie in the corner that's been twisted into a sort

2   of a little ball.

3        So Kilmartin sends Denton the real thing and he asks him

4   before he goes on his journey if he won't destroy evidence of

5   their interaction because he's concerned that the FBI is on to

6   him.  And Andrew Denton uses what it is that Mr. Kilmartin has

7   sent him on this occasion, and it works.  It kills him.  And

8   he's discovered -- Mr. Denton is discovered on December 31,

9   2012, by his closest -- he really was a bit of loner by all

10  accounts, and I expect you will hear some description of his

11  life, but he was as close as -- to anyone to his niece and --

12  Gail Coates, whom you will -- whom you will meet.  And Gail is

13  the one who finds her uncle on the 31st.  She calls.  There is

14  no answer.  She gets an alarming voicemail message, goes into

15  the -- goes into the apartment and finds her uncle dead on the

16  bed, beaker at his bedside that he had used to drink the

17  potassium cyanide.

18       And the British authorities respond to the scene and

19  process it over the next day or two, and they discover some

20  remarkable things.  I mean, I have already mentioned that they

21  recovered the two mailers.  They recovered what's left of the

22  cyanide.  They test it over there using what is called a Smith

23  Detection Hazmat 360, which is a portable, as I understand it,

24  spectrograph that can, on the scene, identify hazardous

25  substances.  And they don't actually test it there on the

1   scene.  I expect you're going to hear some detailed testimony

2   about what happens in those days, how the paramedics respond

3   and pronounce him dead, how the police are on the scene and

4   talking to people and collecting evidence, how they

5   eventually, back at the station, test this substance that they

6   recovered in one of the mailers.

7       So they recovered the two mailers, the -- the November --

8   November 16th mailer and the December 11th mailer with

9   leftover cyanide in the December 11th mailer.  Inspector

10  Taylor, who is a colleague of Mike Desrosiers, goes over to

11  England and collects all these items, brings them back,

12  including that residue, and brings it to the same chemist at

13  the Maine lab, Jim Curlett, and he tests and he too -- he has

14  more elaborate -- it's not portable equipment, but he confirms

15  what they had already determined over there.

16      But amongst the items, ladies and gentlemen, that the

17  British authorities recover on the scene, Mr. Denton had

18  printed out excerpts of the Want Death Blogspot UK.com blog

19  site where he met Mr. Kilmartin in the first place.  So he

20  leaves that behind on the scene.  He leaves -- he's printed

21  out some of their correspondence and left that on the scene.

22  He has written a note -- there is a handwritten note

23  identifying Sidney Kilmartin by name on the scene.  There are

24  a number of items.  He leaves his two cell phones behind and

25  his Toshiba laptop.  It's a laptop.  Those items are -- are

1    analyzed by both computer forensics over there and here.  And

2    generally speaking, what they find is that most of -- that it

3    has erased -- there isn't -- most of the correspondence isn't

4    on those devices.  There are some remnants that they

5    recovered, in particular from one of the cell phones, an HTC

6    cell phone.  They find several messages, including one of the

7    messages about, please, you know, please destroy evidence of

8    our interaction.  I'm worried about the FBI.

9        One of those forensic examiners goes looking online to

10   see if he can find the Want Death Blogspot website.  It's

11   still up back in May of 2013, and he takes a web capture of it

12   from the web, so we have got that.  That wasn't found at the

13   scene.  That's found later.

14       But all this -- all this evidence against Sidney

15   Kilmartin is -- is found there on the scene of Mr. Denton's

16   death.  And as I say, Inspector Desrosiers -- Inspector

17   Desrosiers at the time, he is now a civilian, but he went over

18   and collected all that evidence and brought it back, so we

19   have it here for you to look at in the courtroom.

20       All right.  So what -- what does this all mean?  And His

21   Honor has already described the charges to you and his word is

22   the final definitive word on these, on the law generally, and

23   the charges in particular, but let me just speak to you a

24   little bit about them, if I can.  There is -- the superseding

25   indictment charges 15 counts.  My expectation is that this

1    trial is going to focus on only 6 of those counts, and I will

2    explain why in a minute.  But -- but there -- there's a group

3    of fraud charges, mail and wire fraud, those charges are

4    similar, they both involve some sort of a scheme to defraud.

5    The scheme to defraud here is to defraud people who want

6    suicide -- cyanide to end their lives by pretending to send --

7    sell them cyanide for money and instead sending them Epsom

8    salts.  The difference between mail and wire fraud is the

9    manner in which you execute it in the case of mail fraud,

10   there has to be some sort of use of mail, in this case that

11   would be the mailings that I have described, for example,

12   to -- to -- well, the one mailing in the middle of November of

13   Epsom salts didn't kill Denton, and the wire -- the wire --

14   the distinctive aspect of wire fraud is the use of the wires

15   to -- to try to execute your scheme and in this case, that's

16   using internet to communicate about cyanide with Mr. Denton

17   and then accepting payment from Mr. Denton by Western Union

18   wire transfer.

19        And then we have these three -- these three charges that

20   arise out of Mr. Denton's death, the -- the mailing injurious

21   articles, the tampering, and the retaliation.  And the first

22   thing I want to say about those is, you may be surprised that

23   there isn't a murder charge, but the federal Government

24   doesn't have a general murder -- murder charge available.

25   We're a government of limited powers, and it's really state

1    governments primarily that prosecute homicides and murders.

2    But these -- these are the charges that we have federally that

3    apply in this circumstance and His Honor's already described

4    to you the elements of the -- of mailing injurious

5    articles.  It's like it sounds, that you mail something

6    injurious, poison, that's declared nonmailable with the intent

7    to kill and that it does, in fact, kill.

8        The tampering and retaliation are similar and slightly

9    different.  I mean -- and, you know, the -- the common

10   elements to both in this case is that Mr. Kilmartin killed

11   Mr. Denton.  The difference between the two is in the case of

12   tampering, the intent is to prevent a witness like Mr. Denton

13   from cooperating with the authorities, with the FBI with

14   regard to a federal offense, like mail fraud and wire fraud.

15       Retaliation is slightly different in that Mr. Kilmartin

16   killed Mr. Denton to retaliate against him for having -- for

17   having provided information to IC3 about his fraud.  And

18   hopefully that makes sense, but that's -- that's the

19   difference between those charges.

20       So, ladies and gentlemen, the last point I want to

21   address here is that just before we began trial today,

22   Mr. Kilmartin pleaded guilty to 9 of the counts in this 15

23   count superseding indictment, and he drew a line between the

24   counts that involve Andrew Denton, and those are 6, there are

25   3 fraud counts and the mailing injurious articles, tampering

1    and retaliation count, and 9 counts that relates to his other

2    victims that are identified -- that were identified in the

3    superseding indictment, Walter Cottle, Stacey Williams, Derek

4    Jorgensen, and Cynthia Kirschling.  And I expect that you're

5    going to hear something about that plea during -- during

6    trial.

7         But this defendant is much more than a fraud, ladies and

8    gentlemen.  He is a killer.  The fraud was the motive for him

9    to kill Andrew Denton, his concern about being held

10   responsible for those federal fraud offenses.

11        After the evidence is in, ladies and gentlemen, I will

12   return and I will ask you to find him guilty of those

13   remaining six counts in this indictment.  Thank you.

14            THE COURT:  Thank you, Mr. Frank.

15        Mr. Ridge, would you like do your opening at this time?

16            MR. RIDGE:  I would, Your Honor.  Thank you.

17            THE COURT:  You may proceed.

18            MR. RIDGE:  Ladies and gentlemen, good afternoon.  I

19   expect my opening will be much briefer than Mr. Frank's.  I

20   will even agree with many of the assertions he made to you.

21   We will disagree on some very important and difficult issues

22   that will really, I think, form the meat of what's in dispute

23   here.  And as it plays out over the week, I think it will

24   become more clear.

25        Mr. Kilmartin is a 54-year-old man, and I want to give

1    you just a little bit of biographical information about him

2    quickly.  Mr. Kilmartin was born and raised in Portland.  He

3    was the third of four siblings, lived with his intact family,

4    went to a private Catholic high school and graduated in 1980.

5    In high school, he played several sports and was a regular

6    student.

7         At the end of his high school career, after graduation,

8    he began a 23-year career at Shaw's Supermarkets, working

9    himself up from the bottom, to assistant meat manager, I

10   believe, a number of promotions during that period of time.

11   He lived a good, stable life, just like the rest of us.

12        When he retired from Shaw's Supermarkets, he began his

13   own business as a -- kind of a contractor.  He would buy, fix

14   up, and sell houses.  I think we hear on cable table that it's

15   flipping houses, that's what it's called.  And that's what he

16   did.  He did that successfully for a number of years.

17        He also raised his own family.  He is married, although

18   now separated from his wife, Debbie.  They have three

19   children, two of them are in college, one of them is still in

20   high school.  And Sid has done things with his children like

21   many of us do who have children and, again, has lived a

22   regular life.  And so it is surprising to see him here today.

23        As I begin this, I would like to just take a second to

24   remind you of some of the principles that His Honor explained

25   to you before Mr. Frank's opening statement.  And those

1    principles and those protections come into play for

2    Mr. Kilmartin, just like they would for any criminal

3    defendant.   And one is the presumption of innocence.   The next

4    is that the Government has to overcome that presumption of

5    innocence by proof beyond a reasonable doubt.   And the third

6    is that Mr. Kilmartin has no obligation to present evidence or

7    to convince you of anything.   Those concepts are what make

8    criminal cases different from other cases because there is no

9    other type of case in our system that places that much of a

10   burden on one party or provides to the other party the benefit

11   of the presumption of innocence.   And these are very, very

12   serious and very real considerations.

13        I don't come before you today making these up or asking

14   that you provide to Mr. Kilmartin any more than should be

15   provided to any criminal defendant.   I just ask you to keep

16   those principles in mind as this case proceeds and assure

17   yourselves that the Government has provided proof beyond a

18   reasonable doubt before reaching a conclusion.

19        This particular case, just like all criminal cases, are

20   the same in terms of being based upon those principles that I

21   just described, all criminal cases, of course, are different.

22   And that's because each case tells a different story, involves

23   different individuals, and has a number of different facts.

24        And in this case, I would agree with Mr. Frank, is more

25   unusual than many cases for a number of reasons.   One of the

1  reasons is that it involves this type of scheme that has been

2  alleged, and Mr. Frank pointed out that Mr. Kilmartin pled

3  guilty to a number of counts in the superseding indictment and

4  that is absolutely true.  He pled guilty to the scheme.  He

5  pled guilty to the allegations that he engaged in a course of

6  conduct in which he negotiated for money from people and in

7  exchange for that money, he did not provide to them that which

8  the person thought he or she was purchasing, and that is

9  fraud, and Mr. Kilmartin has admitted to the scheme.  And that

10  scheme rolls over into the Andrew Denton counts, the nondeath

11  counts.  And the Government need only prove that Mr. Kilmartin

12  took the steps necessary to make Mr. Denton a victim in that

13  scheme of defrauding buyers.

14      Now, the fact that Mr. Kilmartin has pled guilty to those

15  counts doesn't deserve him any accolades or earn him any

16  accolades.  It doesn't mean that the conduct that he admitted

17  to is not terrible conduct, it's not horribly unfair and

18  criminal conduct because it is.  And he will be -- he will go

19  through the system with those guilty pleas and whatever will

20  happen will happen, but the pleas weren't made so that I could

21  say to you, Mr. Kilmartin is just a joker.  He is just

22  somebody who tricks people, but he is not a killer.  Don't

23  minimize it, and I don't mean to minimize the seriousness of

24  what he pled guilty to, but I will sign on for the other part

25  of that proposition and argue to you that he is not a killer

1    and that the Government's evidence is not going to prove that

2    he is a killer.

3        The allegation here is very similar to murder.  Mr. Frank

4    told us that the Federal Government doesn't have the ability

5    to prosecute a case called that, and he's right.  But killing

6    Mr. Denton is what Mr. Kilmartin is charged with doing.

7        I think the evidence will fail in several respects but

8    for a couple of examples, you must be convinced beyond a

9    reasonable doubt as to each and every element.  I think the

10   evidence will fall short when you examine it as to whether or

11   not Mr. Kilmartin actually received the package of potassium

12   cyanide from Fisher Scientific.  I think the evidence will

13   show that that is not conclusive whatsoever, nor will the

14   evidence show that Mr. Denton killed himself, and Mr. Denton

15   killed Mr. Denton, regardless of the problems that Mr. Denton

16   had during his life, and they were numerous, and it doesn't

17   mean that we don't feel sympathetic and sorry and sad for him,

18   but Mr. Denton made the decision to kill himself, regardless

19   of anything else.  Mr. Kilmartin did not kill Andrew Denton.

20       But I think that the evidence will fall short when you

21   examine what information is provided to you about the

22   substance that was left at Mr. Denton's home.  Now, I don't

23   claim to be a science guy, and I will probably stumble over

24   the pronunciation of some terms and words when dealing with

25   experts, but I think the information is going to show us that

1    it was not potassium cyanide that was taken from Mr. Denton's

2    home.  And that's what the charge is, ladies and gentlemen.

3        I think we are going to hear there are all kinds of

4    cyanides.  And as I understand it, cyanide will bond with

5    various types of metals, potassium is one, sodium cyanide is

6    another, copper cyanide.  The allegation is potassium cyanide,

7    and the Government bears the burden of convincing you beyond a

8    reasonable doubt that Mr. Denton killed himself with potassium

9    cyanide that was purchased by Mr. Kilmartin from Fisher

10   Scientific, mailed to Mr. Denton, and then ingested by

11   Mr. Denton.

12       And I suggest that you need to examine very, very

13   carefully the evidence that comes forward about what was found

14   at Mr. Denton's house.  If what was found was cyanide, that's

15   not potassium cyanide.

16       Mr. Kilmartin has done many, many bad things, terrible

17   things, unfair things, but he hasn't killed anybody.  He's not

18   a killer.  He defrauded a number of people.  He has said I

19   have defrauded a number of people, and he will take whatever

20   comes his way on account of that.

21       But much of what you heard this afternoon, and I suspect

22   much of what you will hear in the week upcoming, is the

23   Government proving and reproving and reproving again this

24   scheme involving a number of people to which Mr. Kilmartin has

25   said, I am guilty.  And the question is, to what extent does

1    it benefit your analysis of the -- the remaining allegations,

2    the death allegations, if you will?  How are you helped in

3    making your decision about the death claims by hearing and

4    rehearing information that is not in dispute about the scheme,

5    the PayPals, the Western Union, the internet, the Want Death

6    blog?  You need to decide whether that informs you

7    sufficiently to make a decision about the death claims or not,

8    and I would suggest that, I think, the evidence should focus

9    on the death claims and not the scheme.

10        This is a huge case in terms of the investigation and

11   acquisition of documents and information by the Government.

12   This investigation has been going on for four years and has

13   involved the FBI and the postal authorities and law

14   enforcement in the United States and in Great Britain, experts

15   in the United States and in Great Britain, and a number of

16   civilian victims and witnesses.  The Government has piles and

17   piles of documents that will prove the scheme.  The Government

18   has witness after witness, after witness who will prove the

19   scheme.  Mr. Kilmartin admits that he engaged in that scheme.

20   And I think it will be incumbent upon you as jurors to figure

21   out how much of the information belongs in the tidal wave of

22   scheme information and how much of the evidence really deals

23   with whether or not Mr. Kilmartin killed Mr. Denton.  They're

24   very distinct allegations and very distinct facts are needed

25   to support those different allegations.

1          The evidence at the end of this week, ladies and

2     gentlemen, will show that Mr. Denton committed suicide.  He

3     wasn't killed by Mr. Kilmartin.  Thank you very much.

4               THE COURT:  Thank you, Mr. Ridge.

5               Is the Government prepared to proceed with its fist

6     witness?

7               MR. FRANK:  Yes, Your Honor.

8               THE COURT:  You may do so.

9               MR. FRANK:  Government calls Steve Loving.

10              THE CLERK:  Please raise your right hand.  Do you

11    solemnly swear that the testimony you shall give in the matter

12    now in hearing shall be the truth, the whole truth, and

13    nothing but the truth, so help you God?

14              THE WITNESS:  I do.

15              THE CLERK:  Please be seated.  Please state your

16    name and spell your last name for the record.

17              THE WITNESS:  William Stevenson Loving, L-o-v-i-n-g.

18              MR. FRANK:  Thank you, Your Honor.

19    WILLIAM STEVENSON LOVING, having been duly sworn, was examined

20    and testified as follows:

21                         DIRECT EXAMINATION

22    BY MR. FRANK:

23    Q     Mr. Loving, how old are you?

24    A     Fifty-four.

25    Q     And where do you live?

1    A     I live in Camarillo, California.

2    Q     And as I understand it, you -- you flew out here

3    yesterday?

4    A     Yes.

5    Q     First class on the Government to be our witness --

6    A     Yes.

7    Q     -- correct?

8    A     Mm-hmm.

9    Q     And that's because -- the first class is because you

10   have some health issues, correct?

11   A     I had a heart attack four months ago, and I am on blood

12   thinners and just -- I have been traveling with my wife for

13   the last three or four months so coming alone, we thought that

14   might be good.

15   Q     All right.  But that was not the original arrangement,

16   you were going to fly regular class?

17   A     Correct.

18   Q     We made that exception for you because of your health --

19   A     Yes.

20   Q     -- did we not?  And I want to thank you for being here.

21   A     Thank you.

22   Q     Mr. Loving, can you tell us a little bit about your

23   background, your education?

24   A     Sure.  I grew up in Tennessee, ended up going to college

25   in Michigan.  I got a degree in marketing and management and

1   also physical education and psychology.  I was going to go

2   into teaching and coaching, but when I got out of school, it

3   was hard to find a position, and I needed to make money, so I

4   somehow staggered my way into sales, and I got a headhunter

5   and the next thing you know I was in the laboratory and clean

6   room business starting in about 1993.

7   Q     What is the laboratory and clean room business?

8   A     Well, we're a distribution company.  The company is in

9   my wife's name so we're a woman-owned minority small business,

10  and we help people like the California Department of Public

11  Health.  We've got accounts in just about every marketplace,

12  biotech, medical device, pharmaceutical, food, wastewater,

13  electronics, semiconductor, really everything.  So anybody

14  with an RMD, laboratory type situation, or manufacturing, we

15  have products that can help them.

16  Q     And what sort of products are you talking about?

17  A     Well, chemicals, safety, personal protection, equipment,

18  furniture, ergonomic chairs, to bar code readers.  I mean,

19  really anything that a company might need, they can come and

20  ask us for it.

21  Q     And do you make these things yourself?

22  A     We do not.  We don't buy or stock any products.  We --

23  we don't make or -- all we do is resell it, so we help people

24  consolidate their purchase orders for efficiency.

25  Q     What's the name of your company?

1    A    The Capricorn Group.

2    Q    All right.  And who actually supplies the items that you

3    broker and sell?

4    A    We're connected with well over 500 suppliers, more than

5    that probably.  We add suppliers almost every week based on

6    what our customers' needs are.  In this case, I worked with

7    the Fisher Scientific Company.

8    Q    And what is Fisher Scientific?

9    A    They are a global company owned by Thermo.  I think they

10   could be about $13 billion large.  And at one point, I did

11   work for them for two years, so I know them intimately and

12   because of my relationship with them, they provided leads for

13   me to help them with some of their smaller customers or call-

14   in type orders.

15   Q    Now, I was going to ask, why does a big company like

16   Fisher Scientific, Thermo Fisher need -- I mean, how big are

17   you?  How many employees, how many --

18   A    We're a couple of people and we do about 1 and a half

19   million to 2 million in a year.

20   Q    So why is a multi-billion dollar international company

21   like Thermo Fisher doing business with you?

22   A    I believe that they're doing it with us because of our

23   connection to Government-type accounts as well so that we're

24   -- our woman-owned minority status will help fill some

25   contracts, and also we can to get to know customers and take

1   credit card type orders, small orders that they don't want to
2   really dirty their hands with.  It's very cumbersome.
3   Q     Is that the big difference in that you handle smaller
4   orders than they're willing to handle?
5   A     I believe that's so.  They don't want to add more
6   accounts to their database unless they're going to, be you
7   know, tens of thousands of dollars generally speaking.
8   Q     All right.  And how does typically -- how does -- when
9   you broker a sale for Fisher Scientific, how does it -- with
10  Thermo Fisher, how does it typically happen?
11  A     Typically -- and this is not happening any longer.  I
12  don't get phone calls from Fisher saying, hey, call so and so,
13  they need your help.  In the past, they would refer to whoever
14  called in to them and say you should call the Capricorn Group
15  on the west coast or maybe a different company on the east
16  coast, and ultimately I would pick up the phone and say, can I
17  help you?  And they would say Fisher Scientific referred me to
18  you.
19  Q     So does that mean when a small customer that wasn't
20  worth Fisher -- Thermo Fisher's time contacted them, they
21  would refer -- that's one of the ways you would get business?
22  A     Right.  If they needed an immediate order for something,
23  even if they were a big company because I've actually turned
24  some of these leads from small companies into large companies
25  for us, simply because the first order they needed to do a

1   credit card and Fisher didn't want to take the time to help
2   them at that point.
3   Q    So you will take payment for small orders by credit
4   card, for example?
5   A    Yes.
6   Q    Okay.  Well, how about orders for chemicals that are
7   dangerous, I mean do you handle orders like that for Thermo
8   Fisher --
9   A    Well, I --
10  Q    -- or did you back in September of 2012?
11  A    I did at that point, but I also -- when I got the phone
12  call asking about the chemical in question, I Googled the
13  product to find out what it was used for and it seemed like a
14  legitimate use at the time.
15  Q    Okay.  Well, I think we're getting ahead of ourselves.
16  A    Okay.
17  Q    The chemical in question is what?
18  A    Potassium cyanide, I believe.
19  Q    Okay.  But in general, I take it in September of 2012
20  you did broker small sales of dangerous chemicals for Thermo
21  Fisher; is that fair to say?
22  A    I did, yes.
23  Q    All right.  And let's talk about that.  I mean, back
24  then how would that work?
25  A    Basically, someone would call in and ask for a chemical,

1   and unless it was coded not to be sold, then I would be able

2   to buy that and drop-ship it to the customer.

3   Q    All right.  And are there some chemicals you can't sell?

4   A    Some you can't sell because they're precursors to making

5   other more dangerous products.  So this one did not

6   necessarily fall into that category at the time.

7   Q    All right.  Well, are some not regulated at all, some

8   totally prohibited, and some in between; is that fair to say?

9   A    Correct, yes.

10  Q    And, again, we are talking about potassium cyanide,

11  right?

12  A    Right.

13  Q    Which category did that fall in back in September of

14  2012, do you recall?

15  A    It did not hit the radar to where it was going to be a

16  problem.  The only problem I foresaw was, what is this used

17  for because I'm just selling it to an individual, what do they

18  do?  When I found out it was to be working with jewelry or

19  gold, when I Googled the product just to make sure it was

20  legitimate for me to sell on my own principles, it checked

21  out.

22  Q    Okay.  Well, let's take it one step at a time.  I mean,

23  what happened?  You're talking generally.  Did you get a

24  specific referral from Thermo Fisher?

25  A    I only recall getting a phone call from the customer.

1   Q     Okay.  And who was the customer?

2   A     Mr. Kilmartin.

3   Q     Do you know his full name?

4   A     Sidney.

5   Q     Did he identify himself to you on the phone?

6   A     Yes.

7   Q     All right.  Well, tell us about this call.  Does it come

8   out of the blue, or is it a referral from Thermo Fisher, or do

9   you recall?

10  A     For me it's out of the blue, but I get the phone call

11  saying that I was recommended to call you because of -- I

12  called into Fisher first and they said, you should call Steve

13  Loving at the Capricorn Group.

14  Q     Okay.  And that's what Sidney Kilmartin said to you on

15  the phone --

16  A     Yes.

17  Q     -- that's your recollection?

18  A     Yes.

19  Q     Okay.  All right.  So what happens?

20  A     I ask him what he wants.  He says 100 grams -- I believe

21  it was 100 grams of potassium cyanide.

22        And I said, well, you know, what's your company?  What do

23  you do.

24        And at the time, it was S & K Goldsmith or something like

25  that.  So immediately I'm looking to place the order with

1   Fisher, but I'm also checking out the product and making sure

2   what I believe was the legitimate use of that product.

3   Q      Okay.  And you said S & K?

4   A      I believe so.

5   Q      All right.  And there are records with respect to this;

6   are there not?

7   A      Yeah, in my QuickBooks system.

8   Q      Well, besides that, you have an invoice, right?  You've

9   seen that invoice, right?

10  A      I got invoiced by Fisher and it drop-shipped to a

11  location we had discussed, which was not to be a residential

12  area.  It had to be a commercial building.

13  Q      Okay.  Let me stop you, though, because I -- you also

14  have an internal Capricorn Group invoice, right --

15  A      Correct, yes.

16  Q      -- besides the Fisher invoice?

17  A      Sure.

18  Q      And we'll get to that, but before we do, I mean let's

19  talk about -- so you get the call from Sidney Kilmartin.  He

20  wants potassium cyanide.  What do you do?  Are you concerned?

21  Do you research it?

22  A      I did research it.  I was concerned because any time I

23  see the word cyanide or acid, then I -- I'm -- I guess I'm a

24  junior detective for my own reasons and I want to know if

25  that's -- what it could be used for in their industry or what

1   -- are they a woodworker?  You know, is it a craft?  Is it a

2   hobby?  What is it?  And should I be selling this to him?

3   Q     Okay.  And why are you concerned about whether you

4   should be selling it to him?

5   A     Simply because of the nature of what that product is.

6   Q     What do you mean?  What was it about the product that

7   concerned you?

8   A     When I hear the word cyanide.

9   Q     Okay.  But why?  What is it about cyanide that causes

10  you concern?

11  A     It's -- for me it's one of those words like an acid or a

12  chemical, a corrosive.  It's something that is not always, you

13  know, platonic in its use.

14  Q     Okay.  It's poison, right?

15  A     Yeah.

16  Q     And you knew that, right?

17  A     I don't know if I knew it was a poison per se, but when

18  I hear the word cyanide it got me thinking and I wanted to

19  check out whether it was indeed being used in the right

20  industry.

21  Q     All right.  Well, Mr. Kilmartin wants cyanide, right?

22  A     Yes.

23  Q     How much?

24  A     I believe it was 100 grams, if I'm not mistaken.

25  Q     Okay.  And where did he want it sent?

1   A     He wanted it sent to him here in Maine.

2   Q     Do you remember where?

3   A     At the time he said S & K, and then he gave me an

4   address, which once we Google mapped it and figured out it was

5   a residential address, I told him, I go, I can't do that, it

6   needs to be to a business.

7   Q     Let me stop you.  So who Googled -- you Googled the

8   address?

9   A     I Googled it and also Fisher Scientific did, and so we

10  can't ship to a residential address.

11  Q     Okay.  And why not?  Why wouldn't you ship to a

12  residential address?

13  A     Well, that's one of their policies.  So I was adhering

14  to their policy at that point.

15  Q     All right.  So that's a directive that came from them?

16  A     Correct.

17  Q     All right.  Well, did you tell -- and do you remember

18  what that address was?

19  A     I don't.  It's probably logged into my system somewhere.

20  Q     Okay.

21  A     Because it's probably the bill to the credit card is the

22  bill to address and then the ship to would have been

23  overridden.

24  Q     Okay.  Let's not speculate, though.  And I'll turn to

25  the records in a minute.

1    A      Sure.

2    Q      All I'm asking now is if you have a recollection of the

3    address, and you may not.  That's fine.

4    A      I don't recall.

5    Q      Okay.  But you do recall that it was a residential

6    address?

7    A      Correct.

8    Q      And that that was a problem?

9    A      Correct.

10   Q      So did you tell Mr. Kilmartin that?

11   A      I did.

12   Q      And what was his response?  What happened?

13   A      He offered up an alternative address.

14   Q      Do you remember what that was?

15   A      We ended up shipping to a UPS Store.

16   Q      Did he -- did he offer more than one address until he

17   came upon The UPS Store or do you recall?

18   A      I believe he may have come up with one other one, but I

19   don't recall exactly.

20   Q      All right.  But eventually he proposes The UPS Store?

21   A      Correct.

22   Q      And was that acceptable to you and Thermo Fisher?

23   A      It was acceptable to Fisher, so we were allowed to do

24   it.

25   Q      All right.  Do you remember how much the hundred grams

1   cost?

2   A     It cost me somewhere in the neighborhood of about $60 or

3   so, and then there's hazmat fees and handling fees, and what

4   he ultimately paid was somewhere in the neighborhood of $127.

5   Q     And do you remember how he paid?

6   A     With a credit card.

7   Q     And did that charge go through?

8   A     It did.

9   Q     And was the order -- I mean, you don't fill the order,

10  right?  What do you do at that point?

11  A     I then, once Fisher agrees to it, they invoice me.  The

12  invoice comes to me.  I process the credit card.  And then I

13  send a copy of the paid invoice to the customer.

14  Q     All right.  And did you get paid by Sidney Kilmartin for

15  the cyanide?

16  A     Yes.

17  Q     And did he ever complain to you that he didn't get the

18  cyanide?

19  A     No.

20  Q     Ever hear from him again?

21  A     No.

22  Q     Okay.  Let me show you what's been marked as Exhibit 2

23  for identification.

24              MR. FRANK:  Your Honor, may I approach the witness?

25              THE COURT:  You may.

1  BY MR. FRANK:

2  Q    Mr. Loving, I'm showing you what's been marked as

3  Exhibit 2 for identification.  Can you take a look at that and

4  tell us if you recognize it, please?

5  A    Yes, this is one of our invoices.

6  Q    Okay.  There at the Capricorn Group?

7  A    Correct.

8  Q    All right.  And does it relate to any particular

9  transaction?

10  A    To the one in question with potassium cyanide.

11  Q    The one we have just been discussing?

12  A    Correct.

13  Q    Where Sidney Kilmartin bought 100 grams of potassium

14  cyanide for $127 and change, correct?

15  A    Correct.

16  Q    And is this the kind of record that you regularly make

17  there at the Capricorn Group --

18  A    Yes.

19  Q    -- based on personal knowledge, either you or your

20  employees?

21  A    Correct.

22  Q    And do you also regularly keep these records there?

23  A    Always.

24  Q    And is all of that for the purpose of the business that

25  you're in?

1   A      Correct.

2           MR. FRANK:  Your Honor, I'd move Government

3   Exhibit 2 into evidence.

4           THE COURT:  Any objection?

5           MR. RIDGE:  No objection, Your Honor.  Thank you.

6           THE COURT:  It's admitted.

7           MR. FRANK:  I request permission to publish it.

8           THE COURT:  You may.

9   BY MR. FRANK:

10  Q      So let me ask you some questions about this, if I can.

11  So this is the top of your invoice, right?

12  A      Correct.

13  Q      And over here on the left, that's your -- what is that

14  that I've circled there, the top left?

15  A      That's just our heading for our company information.

16  Q      Okay.  And how about top right here, what is that date?

17  A      That is the date of the actual shipment.

18  Q      Okay.  And this -- this here, working down the page on

19  the left-hand side in the box I've circled, labeled bill to,

20  what is that in that box?

21  A      That would be the address that Sidney had given me for

22  his bill to for his credit card.

23  Q      All right.  And do you remember what this address 174

24  Barnstable Street was, whether that was the residential

25  address that was unacceptable or whether that --

1    A     That's exactly correct.  It was a residential address

2    that Fisher would not accept for shipment.

3    Q     All right.  But that was -- that was -- that's the

4    billing address, I take it?

5    A     Correct.

6    Q     In this case.  Do you know who lives there?

7    A     No idea.

8    Q     Okay.  But you did Google it, right?

9    A     I did Google it.

10   Q     All right.  How about on the right here, the ship to

11   address, what is that?

12   A     That is the UPS location where the chemical was shipped

13   to.

14   Q     All right.  That was ultimately acceptable to Fisher and

15   to you as you've described?

16   A     Correct.

17   Q     All right.  And then if we scroll down -- I'm going to

18   -- if we scroll down in the item and description box, can you

19   explain -- and you too are able to annotate this if you touch

20   the screen with your finger.

21   A     Okay.

22   Q     But what is this here in the description box that I've

23   circled?

24   A     That's a brief description that Fisher will recognize

25   based on the part number P223 -- 3I or 3 -- I believe it's

1    31-100.

2    Q      Are you talking the item number in the left-hand column?

3    A      Right here.

4    Q      Okay.

5    A      That one.

6    Q      So that's the item number.  That's Fisher's item number?

7    A      Correct.

8    Q      And how about the description under the description

9    column?

10   A      Sometimes I will copy and paste out of theirs, off their

11   computer, and other times I would write it out myself.  And I

12   am not sure whether I did that or that's one of their

13   descriptions, but that's a good, solid description of what it

14   was.

15   Q      Okay.  And so where does this description come from,

16   poison pack 100 grams?

17   A      That would be part of their description.

18   Q      Fisher's description?

19   A      Correct.

20   Q      Okay.  And what's this haz material handling charge, can

21   you explain that?

22   A      Almost every chemical that goes through Fisher, they

23   slap a hazmat fee on it because UPS or FedEx or other carriers

24   impose a hazardous material fee.

25   Q      Okay.  And how was this shipped?

1   A      Shipped via UPS.

2   Q      Okay.  And if we could scroll down further.  How much

3   did you -- how much did you charge for this exactly?

4   A      I believe it was $83.

5   Q      Well, what is this -- what is this number down here in

6   the total line?

7   A      The total is everything.  I didn't charge tax because he

8   was out of state, but I charged for the product, the hazmat

9   fee.  I think there's a couple of fees involved in there.

10  Q      All right.  So the total charge to his card was that

11  number 127.56?

12  A      Correct.

13  Q      For this transaction?

14  A      Yes.

15  Q      Okay.  And then if we can take a look at Exhibit 3 for

16  identification.  I am showing you what's been marked as

17  Government's Exhibit 3 for identification.  I would ask you to

18  take a look at that and tell us if you recognize it, please.

19  A      This would be the invoice that I received from Fisher

20  detailing the charges.

21  Q      All right.  So this is their record, not your record?

22  A      This is their record.

23  Q      Okay.  Although you got a copy of it?

24  A      Yes.

25  Q      And you kept it in your records, correct?

1    A     Yes, I have it in my office.

2    Q     Okay.  And, in fact, you forwarded a copy to Inspector

3    Desrosiers, right?

4    A     Correct.

5    Q     Do you recall doing that -- and if you look at the

6    second page of this exhibit, that might refresh your

7    recollection.  Is that the email you used to forward that to

8    Mr. Desrosiers?

9    A     Yes, it is.

10   Q     All right.  So you incorporate this into your records;

11   is that fair to say?

12   A     Yes.

13   Q     And this also includes a handwritten notation on it;

14   does it not?

15   A     Yes.

16   Q     And do you recognize that handwriting?

17   A     That's my handwriting.

18   Q     All right.

19              MR. FRANK:  And, Your Honor, I would move Exhibit 3

20   into evidence, if I can?

21              THE COURT:  Any objection?

22              MR. RIDGE:  No objection, Your Honor.

23              THE COURT:  3 is admitted.

24              MR. FRANK:  Request permission to publish it.

25              THE COURT:  You may.

1  BY MR. FRANK:

2  Q     If I could just -- all right.  So you recognize this.

3  What is Exhibit 3?

4  A     Say that again.

5  Q     What is Exhibit 3?

6  A     It's the Fisher invoice to the Capricorn Group.

7  Q     For this particular transaction?

8  A     Correct.

9  Q     All right.  And you recognize the date there in the

10 middle under the -- in the box named INV dot date, right?

11 A     Invoice date.

12 Q     Same date as your invoice?

13 A     Correct.

14 Q     All right.  And same ship to address as on your invoice,

15 correct?

16 A     Sure.

17 Q     That's your -- in the middle, at the top; is it not?

18 A     Yes.

19 Q     Okay.  How about this -- this handwritten entry you --

20 you identified in your handwriting, what is that -- what's the

21 significance of that?

22 A     I write on there when I give the approval so that says

23 Visa approved, the 0004612 or whatever on 9/11/12, so I am

24 documenting when it actually was approved, the card was

25 approved.

1    Q     Meaning that the payment was good?

2    A     Yes.

3    Q     All right.  And then let me show you -- does the Fisher

4    invoice also include the UPS tracking number, do you know?

5    A     I don't know if it does.  If you scroll down, it could

6    be on there, but I don't recall.  Generally, it's not.  But

7    usually when I get a confirmation via email, sometimes it will

8    be on there or later on if a customer asks me if I can track

9    it, I call Fisher and they provide it.

10   Q     Do you know what they look like?

11   A     Always it has a 1Z number, 1 and then zebra and then a

12   long list of numbers for UPS.  I don't see it on there.

13   Q     Do you remember if Mr. Kilmartin called and asked for

14   that tracking number?

15   A     No.

16   Q     Meaning what, you don't recall or you recall and --

17   A     I don't recall him ever calling me and asking me if the

18   product got delivered, so at this point, I am going to assume

19   it always did.

20   Q     No, I understand that.  I think my question was slightly

21   different, though.  I take it you -- do you recall that he

22   never asked or you don't remember?

23   A     I don't recall him ever calling me after the

24   transaction.

25   Q     All right.

1        MR. FRANK:  Court's indulgence, Your Honor?

2   BY MR. FRANK:

3   Q    Let me show you what's been marked as Exhibit 4 for

4   identification and ask you to take a look at that and ask if

5   you recognize that, please?

6   A    Yes.

7   Q    What is 4 for identification?

8   A    This is a certificate of analysis, which breaks down the

9   chemical into various classifications and testing parameters.

10  Q    Okay.  And whose certificate is it?

11  A    Fisher Scientific.

12  Q    And what does it relate to?

13  A    It relates to potassium cyanide certified, the P223.

14  Q    Okay.  Any particular potassium cyanide?

15  A    I only would recognize it from the P223 number and the

16  description name, potassium cyanide certified.

17  Q    Okay.  Let me direct your attention to the second page

18  of this exhibit.  Do you recognize what that is?

19  A    That's an email from me and my office and the lady that

20  works with me --

21  Q    Okay.

22  A    -- giving a copy of the certificate of analysis for that

23  specific lot.

24  Q    Okay.  And what specific lot?

25  A    Lot number 115392.

1   Q      Okay.  But who did you provide this to you?  Who did you

2   email this to?

3   A      To Michael Desrosiers.

4   Q      Okay.  Who is Michael Desrosiers?

5   A      He was the first person to contact me from the postal

6   service.

7   Q      He was the postal inspector who was investigating this

8   matter, right?

9   A      Correct.

10  Q      And he was seeking this certificate of analysis with

11  respect to this particular lot that was sold to Mr. Kilmartin,

12  right?

13  A      Correct.

14  Q      That's what this is, that's why you forwarded it to him,

15  right?

16  A      Yes.

17  Q      Okay.  All right.  So this is -- this is a chemical

18  profile of that particular chemical; is that fair to say?

19  A      Exactly.

20  Q      Okay.  Now, it's not your record, you didn't create it,

21  right?

22  A      No.

23  Q      But do you routinely get these from Fisher in these

24  situations?

25  A      I do depending on --

1   Q     And why?

2               THE COURT:  Would you pull yourself up a little bit

3   --

4               THE WITNESS:  Oh, I'm sorry.

5               THE COURT:  -- closer to the microphone?  Thank you.

6   A     Yeah, I get these routinely because scientists and other

7   people want to know, validate the lot that they get as being

8   valid for what they're doing with it.

9   Q     It may be important to them to know exactly what they're

10  getting --

11  A     Purity levels.

12  Q     -- fair to say?

13  A     Yes.

14  Q     Okay.  So this is -- this is a -- the type of document

15  that you regularly deal with in your business?

16  A     Yes.

17  Q     And you dealt with in this particular situation,

18  correct?

19  A     Yes.

20  Q     And you provided it to inspector -- who was an inspector

21  at the time, Desrosiers in response to his request, correct?

22  A     Yes.

23              MR. FRANK:  I would move Exhibit 4 into evidence.

24              THE COURT:  Any objection?

25              MR. RIDGE:  No objection.

1           THE COURT:  4 is admitted.

2           MR. FRANK:  And I would request permission to

3  publish it?

4           THE COURT:  You may.

5  BY MR. FRANK:

6  Q     All right.  And this is what it looks like, correct?

7  A     Yes, sir.

8  Q     And, again, it's Fisher's document, right?

9  A     Fisher is the manufacturer.

10 Q     And the creator of this document as far as you know,

11 correct?

12 A     Yes.

13 Q     And it describes what it is, right -- there in the box

14 labeled description, correct?

15 A     Correct.

16 Q     All right.  And if we scroll down, what's your

17 understanding of what's in this table I've circled here in the

18 middle or towards the bottom of this certificate, what is

19 that --

20 A     Well, from the --

21 Q     -- information?

22 A     I would look first at what the assay level is, so it's

23 greater than 98 percent, which means it's pretty pure and --

24 Q     So -- I'm sorry.  Go ahead.

25 A     Everything else is just another ingredient within the

1    chemical and how it relates to the make-up of the overall

2    product.

3    Q    All right.  So there is some -- there is some other

4    minor constituents, but in the case of this, the major

5    constituent is 98 percent potassium cyanide; is that your

6    understanding?

7    A    It's the -- yeah, pure, almost pure.

8    Q    Now, I don't know if you -- if you know, and we will

9    have a witness from Fisher, but do you understand the

10   difference between the specification values and the test

11   values that I've circled there?

12   A    Honestly, I don't.

13   Q    Okay.  All right.  Fair enough.

14        But your understanding is that this is a description -- a

15   detailed description of the --

16   A    Correct.

17   Q    -- chemical profile of the substance that you sold to

18   Mr. Kilmartin, correct?

19   A    Correct.

20   Q    You mentioned earlier that you also have QuickBooks

21   records with respect to transactions like this?

22   A    Yes.

23   Q    Is there a QuickBooks record of this transaction?

24   A    Yes.

25   Q    Have you looked at it?  Did you look at in preparation

1   for your testimony?

2   A     I did look at it, yeah.

3   Q     Where did you do that?

4   A     I did it at my home before I came here.

5   Q     Okay.  So you -- you don't have a copy here, I take it?

6   A     I don't, but it's the same copies that you've shown me

7   again.

8   Q     When you say it's the same copies, do you mean it's the

9   same documents or the same information in different form?

10  A     The exact same QuickBooks record of my invoice.

11  Q     Mm-hmm.  Okay.  Was there any other information in there

12  that you recall?

13  A     No.

14  Q     Like you mentioned a third address, there may have been

15  a third address?

16  A     There may have been, but that would not have been

17  captured.  I would have overwritten that to put in The UPS

18  Store, so I really don't know if there was a third address or

19  just the second address.

20  Q     Does the address 25 Village Drive sound familiar?

21  A     Not right now.

22  Q     Okay.

23  A     It's been five years.  I'm sorry.

24        MR. FRANK:  Court's indulgence, Your Honor.

25     I have no further questions for this witness.

1          THE COURT:  Cross-examination, Mr. Ridge.

2          MR. RIDGE:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4   BY MR. RIDGE:

5   Q    Mr. Loving, good afternoon.

6   A    Good afternoon.

7   Q    Do you recall what day you had a telephone conversation

8   with Mr. Kilmartin?

9   A    It would have been just briefly before the 9/11 ship

10  date, so it had to be within two or three days, I would think,

11  before that.

12  Q    And did you have more than one conversation with him by

13  telephone?

14  A    I believe I did, yeah.

15  Q    Do you have any records or notes of the conversation

16  that you had with Mr. Kilmartin?

17  A    No, I vaguely remember, but I do remember some parts of

18  the conversation, but not -- I didn't take notes or anything

19  like that.

20  Q    When was the next time that you began to examine the

21  transaction that happened on September 11th of 2012?  And I

22  mean after that -- after the transaction was completed, when

23  was the next time you dealt with anybody about that?

24  A    Years later when I was contacted by Michael Desrosiers.

25  Q    Okay.  And did Mr. Desrosiers provide you information

1    that refreshed your recollection about the conversation, or

2    did you just remember a conversation that you had with

3    somebody years before?

4    A    He just brought up the name Sidney Kilmartin and I said

5    that name's not ringing a bell with me at the time.  And I

6    went back into my QuickBooks system and started snooping

7    around and recollected the S & K Goldsmith and that drew it

8    back together for me.

9    Q    Okay.  And you recollected the S & K Goldsmith because

10   that name appeared on Exhibit Number 2?

11   A    If that's the invoice, yes.

12   Q    Your invoice?

13   A    Yes.

14   Q    Okay.  Were you aware when you were speaking with

15   Mr. Kilmartin that potassium cyanide should not be sent

16   through the United States mail?

17   A    I, at the time, just kind of questioned why did he need

18   it and so what's this to be used for, and then he said he was

19   a goldsmith and then I Googled it and it all checked out to

20   me.

21   Q    But that's a little -- that's an answer to a different

22   question, I think.

23   A    Okay.

24   Q    I don't mean to be critical.  But were you aware, as you

25   spoke with Mr. Kilmartin, that potassium cyanide could not be

1  sent through the United States mail?

2  A    I didn't think about being sent through the mail.  I

3  thought about it being shipped by FedEx or UPS.  That's how we

4  ship all chemicals.

5  Q    Okay.  And why is that?

6  A    I think it's the protection of the companies that are

7  moving that product, that they want to go with somebody

8  reputable like that.  And I've never known of anything going

9  through the mail that's been a chemical that I've worked with

10 before.

11 Q    But that's not because it was nonmailable, it was just a

12 better procedure --

13 A    Better procedure probably.

14 Q    -- for the company?

15 A    Yes.

16 Q    Okay.  You were shown a certificate of analysis of the

17 product that was shipped, and that was Exhibit Number 4?

18 A    Yes.

19 Q    I didn't understand how you came in possession of that.

20 Could you --

21 A    What we did was we were contacted by Michael Desrosiers,

22 and I don't think I was even in the office.  He talked to my

23 assistant, Suzanne, who called Fisher and said, here's the lot

24 number, we need the certificate of analysis, which is a

25 general practice in our industry.

1    Q      Okay.  So that -- that document, Exhibit Number 4, came

2    from Fisher to Capricorn Group to the postal inspectors?

3    A      Correct.

4    Q      That's not something you kept in your --

5    A      No, we don't normally get those until we request them

6    when we order the product.

7    Q      Okay.  And are you really familiar with the chemical

8    make-up of that product?

9    A      No, absolutely not.

10   Q      You were asked some questions about it?

11   A      Yeah, I just know the name of it.  And when I see acid,

12   cyanide, corrosive, you know, there's some buzz words that I

13   know that I want to be critical of.

14   Q      Okay.  And when you see a big number across from assay

15   that says to you --

16   A      Purity.

17   Q      -- pretty pure?

18   A      Purity.

19   Q      But that's kind of the extent of your understanding?

20   A      That's a general knowledge of chemicals.  I didn't take

21   chemistry or anything like that.

22   Q      You had more than one -- strike that.

23          Did you have more than one conversation with

24   Mr. Kilmartin about where this chemical was going to be mailed

25   to?

1    A    Yes.

2    Q    Okay.  And is it fair to say or is it fair for me to

3  understand that when you would have a conversation with him

4  and he would provide you an address, you would then Google the

5  address, check with Fisher, and then he would call you back;

6  is that what happened?

7    A    If it was going to go through, it just would have gone

8  through, but I think there may have been a second address.

9  There was one the one for sure that we said we can't do it

10  there.  There may have been a second one, but then ultimately

11  we came up with The UPS Store, which he offered up.  And when

12  I sent that into Fisher, they approved it, so we said, your

13  chemical's shipping.

14    Q    Let me ask you this, Mr. Loving, did Mr. Kilmartin

15  suggest The UPS Store, or did you tell him it has to be a

16  business address like The UPS Store?

17    A    I did not say -- I just said it needs to be a business

18  address.

19    Q    Okay.  But you did not provide to him the methodology --

20    A    No.

21    Q    -- of getting the drug delivered -- the chemical

22  delivered to a business address?

23    A    I did not offer up any addresses at all.

24    Q    Okay.  And you're sure of that from your recollection of

25  the conversation but not from notes?

1   A      I'm certain of it, but not from notes.

2   Q      Okay.  Did your company have any policy about shipping

3   potassium cyanide or other chemicals?

4   A      Our policy mimics those that our suppliers offer, so if

5   they're willing to do it, it's because they have already been

6   through regulatory affairs, and if they come up with their

7   policy, which we adhere to.

8   Q      Okay.  And what type of due diligence did you exercise

9   to make sure that S & K goldsmith was a legitimate jewelry

10  business?

11  A      I basically took him for his word.

12  Q      Okay.  Did you check with Fisher Scientific about the

13  legitimacy of S & K?

14  A      No, I offered up the name of the company and the address

15  and the person we were sending it to, and they approved it

16  once we came up with that business address.

17  Q      Okay.  Were you, Mr. Loving, aware of any regulations

18  existing in 2012 that prohibited certain people from buying

19  potassium cyanide?

20  A      Was unaware, no.

21  Q      Okay.  So it wasn't -- and maybe I'm being repetitive

22  here, but I just want to make it clear, the reason it had to

23  go to a business address is because Fisher Scientific said,

24  that's where we send this kind of chemical?

25  A      They have regulatory and plenty of attorneys who have

1    deemed it inappropriate to send any chemical to a residential

2    address.  That's their policy.

3    Q    Do you know whether Fisher Scientific's policy includes

4    any investigation as to the recipient of the chemical whether

5    it's being mailed to a home address or a business address?

6    A    I don't know if they have a policy that's that intense.

7    Q    Did you have any understanding in September of 2012 as

8    to how readily available potassium cyanide is to an individual

9    citizen?

10   A    No.

11   Q    Okay.  And how much money did your company make on this

12   transaction, $68 or something like that?

13   A    It was 127 and we bought it at 69, so 31 and 27, $58

14   maybe, and then we paid fees or using Visa, MasterCard, or

15   American Express, as well, so.

16   Q    All right.  So it wasn't a big money deal for --

17   A    No.

18   Q    -- you?

19   A    No.

20   Q    Was it your testimony that Fisher Scientific employs or

21   uses -- utilizes facilities such as yours for smaller

22   transactions because they don't want to get involved in all

23   the paperwork?

24   A    I -- they must have a lot of different reasons, but over

25   the last three years, I really haven't done any business with

1    them, so.

2    Q      Thank you.   That's all I have.

3    A      Thank you.

4              THE COURT:   Redirect.

5              MR. FRANK:   Court's indulgence, Your Honor.   No,

6    Your Honor.

7              THE COURT:   Thank you.   You may stand down, sir.

8    Thank you very much.

9              I will see counsel at sidebar.

10                     SIDEBAR CONFERENCE

11             THE COURT:   Who do you plan to call next?

12             MR. FRANK:   Fisher's witness who is -- John Mitchell

13   is his name.

14             THE COURT:   Okay.   How long do you plan to go?

15             MR. FRANK:   I don't think it's going to be terribly

16   long.

17             THE COURT:   It's ten past four.

18             MR. FRANK:   I would -- when would Your Honor like to

19   finish?

20             THE COURT:   Well, I'm a little concerned about --

21   the jury's been here for quite a little while, and they didn't

22   expect to be here.

23             MR. FRANK:   I didn't either, Your Honor.

24             THE COURT:   Yeah.   What do you want to do?

25             MR. FRANK:   I'm happy to do either.   I'm happy to

1   put him on.  He's here and ready to go.

2            THE COURT:  Right.

3            MR. FRANK:  I think we could get him done.  How long

4   did that take, 20 minutes?

5            MR. RIDGE:  I don't know.

6            THE COURT:  I know he's probably from Texas or

7   someplace.

8            MR. FRANK:  I think he's from Pittsburgh.

9            THE COURT:  Pittsburgh.

10           MR. FRANK:  Yeah, he travels all over.  I would like

11  to try and get him on and off, if I could; is that all right?

12           MR. RIDGE:  That's fine.  I am out of gas, but

13  that's fine.

14           THE COURT:  Yeah, well --

15           MR. RIDGE:  One more witness is fine.

16           MR. FRANK:  I would like to, if that's all right?

17           THE COURT:  Yeah.  Okay.

18           (The sidebar conference was concluded.)

19           THE COURT:  Next witness.

20           MR. FRANK:  The Government calls John Mitchell.

21           THE CLERK:  Please raise your right hand.  Do you

22  solemnly swear that the testimony you shall give in the matter

23  now in hearing shall be the truth, the whole truth, and

24  nothing but the truth, so help you God?

25           THE WITNESS:  I do.

1           THE CLERK:  Please be seated.

2           THE WITNESS:  Thank you.

3           THE CLERK:  Please state your name and spell your

4    last name for the record.

5           THE WITNESS:  John Franklin Mitchell,

6    M-i-t-c-h-e-l-l.

7    JOHN FRANKLIN MITCHELL, having been duly sworn, was examined

8    and testified as follows:

9                      DIRECT EXAMINATION

10   BY MR. FRANK:

11   Q     Good afternoon, Mr. Mitchell.

12   A     Good afternoon.

13   Q     How are you employed?

14   A     I am the senior director of global security for Thermo

15   Fisher Scientific.

16   Q     What is Thermo Fisher Scientific?

17   A     We are the world's leader in serving science.

18   Q     What does that mean?

19   A     That means we serve science through selling multiple

20   products throughout the globe to science education,

21   universities, Governments, to make the world healthier,

22   cleaner, and safer.

23   Q     All right.  Does that include chemicals?

24   A     Yes, sir.

25   Q     What part of your business involves selling chemicals?

1    A     We have a global chemicals division.

2    Q     Okay.  And what kind of chemicals does it sell?

3    A     We sell A to Z in chemicals from acetones all the way up

4    through, you know, sodium NSAIDS, we -- pretty much any

5    chemical we sell.

6    Q     Right.  And how big a company is Thermo Fisher?

7    A     We are actually ranked 172 on the Fortune 500 List.

8    Q     So you're international?

9    A     We are a global company, yes, sir.

10   Q     Okay.  What did you do as director of security?

11   A     I am in charge of physical security and we also -- I

12   also liaison with different law enforcement groups throughout

13   the globe.

14   Q     All right.  And do you also testify to Fisher -- for

15   Fisher around the country?

16   A     Yes, sir.

17   Q     Conduct internal investigations?

18   A     Yes, sir.

19   Q     And how long have you been doing that?

20   A     Sixteen years, sir.

21   Q     Are you familiar with Fisher's records?

22   A     Yes, sir.

23   Q     Do you work with them regularly?

24   A     Yes, sir.

25   Q     In your experience, are they accurate and reliable?

1   A      Yes, sir.

2   Q      And does it keep -- what kind of records does it keep

3   with respect to transactions involving the sale of a chemical?

4   A      We keep records all the way through the first

5   conversation because that is a recorded conversation, and then

6   once the order is placed, we keep that record for a period of

7   time after, and generally that period of time is seven years.

8   Q      Okay.  Do you sell potassium cyanide -- does Fisher's

9   chemical group sell potassium cyanide?

10  A      Yes, sir.

11  Q      And how does it do that?  Can you walk us through?   I

12  mean, how does it sell a chemical like potassium cyanide?

13  A      Potassium cyanide is not one of our big sellers.  It's a

14  very unique chemical that is not something we generally sell a

15  lot of.  It is very -- again, it has very specific purposes.

16  Q      Are you familiar with its purposes?

17  A      Limited.

18  Q      What do you know about its purposes?

19  A      That I know that if it's mixed with any type of acid, it

20  can be become airborne and then it becomes an inhalation

21  hazard, also if it is ingested, it could be harmful.

22  Q      Is that sort of in keeping with your security

23  responsibilities that you know these things about it?

24  A      Yes, sir.

25  Q      And do you make potassium cyanide?

1    A      No, sir.

2    Q      How do you get it?

3    A      We get it from a vendor, sir.

4    Q      All right.  And so you're a broker or reseller?

5    A      Yes, sir.

6    Q      And do you sell to anyone?

7    A      No, sir.

8    Q      What sort of customers does Fisher sell to?

9    A      Usually the medical industry and also into the

10   metallurgy side of the house where people that would use it

11   for etching of material, metal materials.

12   Q      Okay.  And does Fisher sell directly to these people or

13   indirectly or does it depend?

14   A      Indirectly.

15   Q      And how so?

16   A      We sell it through -- the program called a reseller.

17   Q      Okay.  Why do you do that?

18   A      It just -- sometimes these orders are very small, and we

19   don't take those on, so we will offer it up to a reseller to

20   do.

21   Q      Okay.  And is that because you're a very big company and

22   it just isn't worth it to engage in these small sales?

23   A      That is correct, sir.

24   Q      Let me show you what's been marked as Exhibit 4.5.

25          MR. FRANK:  Well, actually why don't I just move

1    this into evidence at this point, Your Honor.  This is a

2    certified copy of a business record of Fisher Scientific.

3            THE COURT:  Any objection?

4            MR. FRANK:  Directly --

5            THE COURT:  Any objection to --

6            MR. FRANK:  -- regarding --

7            THE COURT:  When I'm talking, don't speak.

8            MR. FRANK:  I'm sorry.

9            THE COURT:  All right.  Any objection to 4.5?

10           MR. RIDGE:  Your Honor, if I could just have a

11   second --

12           THE COURT:  Certainly.

13           MR. RIDGE:  -- I will let you know the answer to

14   that.  No objection, Your Honor.

15           THE COURT:  4.5 is admitted without objection.  You

16   may proceed.

17           MR. FRANK:  Thank you, Your Honor.

18   BY MR. FRANK:

19   Q    I'm showing you what's been marked as Exhibit 4.5 and

20   actually the best way to do this maybe is to call it up seeing

21   it's in evidence.  So can I ask you to project Exhibit 4.5?

22   And we will scroll to the Fisher invoice, if we could please?

23        And just directing your attention to this page of this

24   multi-page exhibit.  Do you recognize this page, Mr. Mitchell?

25   A    Yes, sir.

1   Q      What -- what is this page?  I think it's about the fifth

2   page in.

3   A      This is an invoice through our boss system, sir.

4   Q      This is your own internal invoice there at Fisher with

5   respect to a particular transaction?

6   A      That is correct, sir.

7   Q      What transaction does it relate to?

8   A      It relates to the sell to Capricorn Group.

9   Q      All right.  And where is that -- you can -- you can

10  actually indicate by touching the screen with your finger.

11  Where is it indicated on this invoice who this item was sold

12  to?  That's in the sold to box on left at the top?

13  A      That is correct, sir.

14  Q      And who is the Capricorn Group?

15  A      They are a reseller for us, sir.

16  Q      All right.  For these type of small sales that you've

17  described?

18  A      Yes, sir.

19  Q      All right.  And who was this shipped to?

20  A      This was shipped to Sidney Kilmartin, sir.

21  Q      All right.  Did you have any personal involvement in

22  this transaction?

23  A      No, sir.

24  Q      All right.  But you know how to read these records as a

25  result of your experience?

1   A      That is correct, sir.

2   Q      What was it that was shipped to Kilmartin, can you tell

3   from this invoice?

4   A      Yes, we can right down here.

5   Q      If you scroll down a little -- well, maybe you don't

6   need to.  What is it?

7   A      Potassium cyanide that was certified for 100 grams.

8   Q      All right.  And can you tell where that cyanide came

9   from?  Do you know what I am asking?

10  A      Let's see.  It came from our CDC location.

11  Q      All right.

12  A      Right here, CDC.

13  Q      Okay.  What is that?

14  A      That's our central distribution center.

15  Q      And what is the central distribution center?

16  A      That is located in Florence, Kentucky where the product

17  was shipped from our national distribution warehouse in New

18  Jersey to that site to be shipped.

19  Q      All right.  And is it usual for you to ship things to a

20  UPS Store like this?

21  A      No, sir.

22  Q      And why not?

23  A      That is something that we do not do.  We try to -- when

24  found -- make sure that all products are sold to a business, a

25  verified business.

1   Q     And has that always been your policy?

2   A     It has not.  This has changed recently over the past

3   couple years.

4   Q     How about back in September of 2012, was that your

5   policy?

6   A     It was not in place at that time, sir.

7   Q     All right.  So at the time, I mean, was this -- was this

8   irregular or not or can you recall?

9   A     It was -- from the self perspective, it was not

10  irregular.  What was irregular was the address override.

11  Q     And what is an address override?

12  A     It is when the customer asks to have an address from a

13  business address shipped to another address that isn't a, from

14  our perspective, a business address to a UPS Store or a

15  mailbox, etc. or to a personal residence.  That would be an

16  address override.

17  Q     And who does an address override?

18  A     That would be the customer service agent, sir.

19  Q     At Fisher?

20  A     Yes, sir.

21  Q     Okay.  Do you know why the address was overrode in this

22  case?

23  A     I do not, sir.

24  Q     Let me show you what's been marked as -- let me ask you

25  one last question about this, can you tell how this was

1    shipped from your New Jersey distribution center to The UPS

2    Store in Sidney or on Western Avenue in Maine?

3    A    Can you -- could somebody scroll down a little further?

4    Q    You know, and I can -- do you have the -- the actual --

5    if it helps, the paper copy is there if that helps.

6    A    It would have gone by UPS.

7    Q    And how can you tell that?

8    A    One, there are just -- I know from our -- being our

9    normal -- we're third largest vendor of UPS, so that would be

10   my guess on this.

11   Q    Well, without guessing --

12   A    Without -- sorry, sir.

13   Q    Without guessing, is there a way to tell from this

14   invoice?

15   A    I am not seeing that on this, sir.

16   Q    All right.  Let me show you what's been marked as

17   Exhibit 5 for identification and ask you to take a look at

18   that and see if you recognize that, please?

19   A    Yes, sir.

20   Q    What is Exhibit 5 for identification?

21   A    That is a certificate of analysis.

22   Q    What is a certificate of analysis?

23   A    This is whenever we receive a product and specifically a

24   chemical, an analysis is done on that specific product to make

25   sure that it meets our standards because we sell into the

1    medical industry and it has to meet a very specific

2    certification analysis, which is an ISO 9001 certification,

3    that way the medical groups or the hospitals that we sell into

4    know that the product has been certified by us, by our quality

5    control people.

6    Q    And what does this certificate of analysis pertain to?

7    A    Potassium cyanide.

8    Q    Any particular lot?

9    A    Yes, sir.

10   Q    What lot or let me ask it this way, how does it relate

11   to the cyanide that is -- that was in the transaction

12   documented in Exhibit 4.5?

13   A    It's -- if you look at the invoice, it shows the lot

14   number on the invoice, that is compared to the lot number that

15   is on the certificate of analysis.

16   Q    All right.  And they're the same?

17   A    Yes, sir.

18   Q    So this is the certificate of analysis with respect to

19   that particular lot that was filled on that order; is that

20   fair to say?

21   A    That is correct, sir.

22   Q    All right.

23        MR. FRANK:  And can we project -- I would move

24   Exhibit 5 into evidence, if I haven't already.

25        THE COURT:  Any objection?

1          MR. RIDGE:  No objection.

2          THE COURT:  5 is admitted.

3          MR. FRANK:  I would ask that it be projected.

4    BY MR. FRANK:

5    Q    All right.  Where is the lot number here that identifies

6    it as the certificate that goes with the invoice --

7    A    Right there, sir.

8    Q    -- previously identified?  Okay.  And that's the number

9    that's matches on both?

10   A    That is correct, sir.

11   Q    All right.  And if we scroll down this, can you explain

12   to the jury what -- what this breakdown means here in this

13   table in the middle of the certificate of analysis?

14   A    I cannot, sir.

15   Q    All right.  But you know generally what it means?

16   A    Yes, sir.

17   Q    Okay.  It's a chemical description of that substance?

18   A    That is correct, sir.

19   Q    All right.  Were you asked to try and find the reference

20   sample from this lot?

21   A    That would be correct, sir.

22   Q    And what is a reference sample?

23   A    A reference sample is a sample that you keep from each

24   lot that way if you need to go back to it, you can reference

25   that to match it up to a certain product that was sold.

1   Q     So it's actually a little bit that you keep on hand?

2   A     That is correct, sir.

3   Q     And if there's some left, you can compare it and see if

4   they match --

5   A     That is correct, sir.

6   Q     -- is that fair to say?  Were you able to find any

7   reference sample left?

8   A     No, sir.

9   Q     Okay.  And who asked you to look for it?

10  A     You did, sir.

11        MR. FRANK:  I have no further questions for this

12  witness.

13        THE COURT:  Cross-examination.

14        MR. RIDGE:  Yes, Your Honor.  Thank you.

15                    CROSS-EXAMINATION

16  BY MR. RIDGE:

17  Q     Good afternoon, Mr. Mitchell.

18  A     Good afternoon, sir.

19  Q     My understanding, and correct me if I'm wrong, is that

20  you never -- you, yourself, never had any contact with the

21  purchaser who is identified in the various exhibits that

22  Mr. Frank has been showing to you?

23  A     That is correct.

24  Q     Okay.  Do you know who at Fisher or if anybody at Fisher

25  had any contact with that purchaser?

1    A    Yes.

2    Q    And who was that, do you know?

3    A    That would have been -- there was an individual whose

4    name -- the customer service agent that was at the top of the

5    form that would have spoke to Mr. Loving.

6    Q    You don't know that person's name?

7    A    I do --

8    Q    Let me ask you this, which exhibit will show you that

9    name?

10   A    It would be on the invoice, sir.

11        MR. RIDGE:   Your Honor, may I approach the witness?

12        THE COURT:   You may.

13        MR. RIDGE:   And I'm carrying Government's Exhibit

14   Number 3.

15   A    It doesn't have a name.

16   BY MR. RIDGE:

17   Q    You have to speak up.

18   A    Oh, usually it would -- this one does not have a

19   customer service rep name to it.

20   Q    Okay.  So you are unable to determine who at Fisher

21   Scientific spoke with Mr. Kilmartin in 2012?

22   A    From this, no, sir.

23   Q    Okay.  Is there some other way you could identify that

24   person?

25   A    We do have records of the phone calls that do come in.

1    Q     Okay.  Were you ever asked for those records?

2    A     I was not.

3    Q     Okay.  Thank you.

4    A     Yes, sir.

5    Q     Mr. Mitchell, when did you first become aware of the

6    September 11, 2012, transaction?

7    A     I would say approximately two years ago.

8    Q     And how did you come to be aware of it?

9    A     From an internal phone call from one of our attorneys

10   out of the Houston location.

11   Q     And were you asked to do something as a result of that

12   phone call?

13   A     I was asked to speak to one of the U.S. postal

14   inspectors.

15   Q     And who was that person?

16   A     The first name is Michael.

17   Q     Okay.  Mr. Desrosiers?

18   A     Yes, sir.

19   Q     Is potassium cyanide a regulated product?

20   A     It is not, sir.

21   Q     What does regulated product mean?

22   A     It means that you have to have a very specific license

23   to buy that product.

24   Q     Okay.  Is -- or was potassium cyanide in 2012 available

25   to the public?

1    A      Yes, sir.

2    Q      I'm sorry?

3    A      Yes, sir.

4    Q      Yes.   Okay.   And are you aware of any procedures that

5    Fisher Scientific employed in 2012 to make sure it was

6    familiar with the buyer of the potassium cyanide?

7    A      Yes, sir.

8    Q      And what were those policies or procedures?

9    A      Those policies -- we have what they call a suspicious

10   order policy.

11   Q      What is a suspicious order?

12   A      A suspicious order is anything that comes in that is

13   coded in our system as a suspicious material and that could

14   be -- there's multiple items that we sell that could be

15   considered suspicious.

16   Q      Is potassium or was potassium cyanide suspicious?

17   A      Not at that time, it was not coded.

18   Q      Okay.   Why then -- or strike that.

19          Did Fisher Scientific have a policy that limited the

20   delivery of potassium cyanide to business addresses only?

21   A      That I don't know, sir.

22   Q      Okay.   Did Fisher Scientific, if you know, make certain

23   assumptions about the qualifications of this buyer because

24   Capricorn was involved?

25   A      I can't speak for the company in that situation.

1    Q     Okay.  Mr. Mitchell, with regard to the certificate of

2    analysis that has been admitted as Government's Exhibit

3    Number 4, do you have copy of that, sir?

4    A     I do, sir.

5    Q     Oh, you have the original exhibit?

6    A     Yes.

7    Q     And what's the number on that one, Number 5?  All right.

8    Let's speak to Number 5 then, but I think we're looking at the

9    same document.  Is it fair for me to understand that this

10   certificate of analysis in the bottom of the middle third

11   identifies each and every element in the chemical that is

12   being shipped?

13   A     I would -- I would, yes.

14   Q     And if you know, would you agree with me that one of the

15   reasons for sending this certificate of analysis is so that

16   later on samples that may be recovered from wherever can be

17   matched to this particular lot of potassium cyanide?

18   A     That -- yes.

19   Q     Okay.  And would it be your understanding that tests can

20   be conducted that would identify, in fact, each element that's

21   listed in this certificate of analysis because otherwise the

22   certificate of analysis doesn't do us much good; is that

23   correct?

24   A     That's correct.

25   Q     Okay.  Mr. Mitchell, do you have any knowledge as to

1   what the packaging looked like or would look like containing

2   potassium cyanide when mailed from Fisher Scientific?

3   A     No, sir.

4   Q     No.

5           MR. RIDGE:  That's all I have, Your Honor.

6       Thank you very much, sir.

7           THE COURT:  Redirect.

8           MR. FRANK:  Briefly, Your Honor.

9                   REDIRECT EXAMINATION

10  BY MR. FRANK:

11  Q    Mr. Mitchell, on cross-examination by Mr. Ridge, you

12  were asked whether one of the purposes of the certificates

13  isn't to be used to identify a chemical like, say, a chemical

14  fingerprint.  Now, if I understood correctly your original

15  testimony was that the purpose of this certificate is to

16  guarantee the purity of the substance that you sell to your

17  users, correct?

18  A     Correct, sir.

19  Q     And so that they know exactly what it is that they're

20  getting, correct?

21  A     Correct, sir.

22  Q     Because many of your customers work in very --

23          MR. RIDGE:  Your Honor, I am going to object to the

24  leading nature of this redirect examination.  And I think he's

25  asking questions that have already been asked and answered if

1    I am understanding Mr. Frank's testimony correctly.

2              THE COURT:  All right.  Well, I'm going to overrule

3    the leading for now.  I usually allow -- give a fair amount of

4    leeway.  I will give the same to you, Mr. Ridge --

5              MR. RIDGE:  Thank you, Your Honor.

6              THE COURT:  -- in terms of leading.  And I am going

7    to overrule the objection to not proper redirect, but move

8    right along here, Mr. Frank.

9              MR. FRANK:  Thank you, Your Honor.

10   BY MR. FRANK:

11   Q    Are you a chemist, Mr. Mitchell?

12   A    No, sir.

13   Q    Do you -- do you work with chemicals?

14   A    No, sir.

15   Q    Do you make identifications of chemicals?

16   A    No, sir.

17   Q    But there are chemists who do, right?

18   A    That is correct, sir.

19   Q    Chemists who work for you at Fisher, right?

20   A    Yes, sir.

21   Q    And other places like state governments?

22   A    Yes, sir.

23   Q    Environmental testing labs?

24   A    Yes, sir.

25             MR. FRANK:  I have no further questions for

1    Mr. Mitchell.

2                THE COURT:  Anything further?

3                MR. RIDGE:  No, Your Honor.  Thank you.

4                THE COURT:  Thank you, Mr. Mitchell.  You may stand

5    down sir.

6                THE WITNESS:  Thank you, sir.

7                (The witness, John Franklin Mitchell, left the

8    witness stand.)

9                THE COURT:  Ladies and gentlemen, this --

10   Mr. Mitchell will be the last witness for the day.  I have

11   some remarks for you, which I'll make now.  I am not going to

12   repeat these every time we break, but I do have some advice

13   for you concerning how you handle yourself.  First, I strongly

14   suspect that I know what's going to happen when you get home,

15   someone will greet you and they will say, what happened?  And

16   you'll say, I am on a federal jury.  And that person will say,

17   tell me all about it.  I am all ears.  Tell me about the case.

18   Tell me about the witnesses.  Tell me about the lawyers.  Tell

19   me about the judge.  What about the courthouse?  How do you

20   like your experience?  And they will pepper you with

21   questions.  And you will say, other than telling them that

22   you're on a federal jury, you will say, I can't talk about it.

23        Now, the reason I'm telling you you have to say that is

24   not to test your self-restraint.  The reason I am telling you

25   you can't talk about that is because when you begin to talk

1    about this case with someone other than a member of the jury

2    you are deliberating, and you cannot deliberate except with

3    your fellow jurors and after the case is over.  So if you

4    begin to talk about the case with somebody other than a member

5    of the jury, you're violating your oath as a juror.  Now, if

6    they pester, if they won't take no for an answer, tell them to

7    give me a call, I'll be glad to explain it to them.

8        The other thing you should know is this, we go by this

9    schedule from 8:30 to 2:30 each day and we take a couple of

10   breaks during the day.  We find that jurors like that because

11   they can get out and attend to their own lives in the

12   afternoon.  However, it's a fairly tight schedule.  That means

13   couple of things.  First, it means that you will want to bring

14   something along to eat or to drink during the breaks because

15   it's a long time to go without any food, and I don't want you

16   to get distracted.  It's very important that you listen to the

17   evidence that's being presented and I want you to have your

18   blood sugars up.

19       The other thing that is really sort of unique to a jury

20   is that we cannot start unless you're all here and none of

21   you, I don't think, wants to be the one we're waiting for.  So

22   we like to start at 8:30.  Make sure you're here before 8:30

23   so that we can start promptly.

24       There are a couple of other things I need to advise you

25   of, and that is I have already intimated to you that you have

1    to base your verdict on the evidence that's being presented to

2    you.  We, in this country, pride ourselves on having a free

3    press.  And it may well turn out that an article about this

4    appears in the Bangor Daily News or in the Portland Press

5    Herald or one of the newspapers.  Don't read it.  It's not

6    that the article is improper in any way, but it may contain

7    information about the case that would otherwise be considered

8    evidence.  And you'll see that we go to a lot of trouble here

9    to make sure that you only get the evidence that's proper

10   under the Rules of Evidence.

11        Also, the lawyers here are very fine lawyers, as you've

12   already seen, might well object to the relevancy or the

13   prejudicial nature of the evidence that's contained in the

14   article, and they have a right to make certain that you have

15   -- what you know about the case is only proper.  The other

16   thing is that the evidence may be, frankly, inadmissible.  And

17   the last thing is that the lawyers, in order to frame their

18   arguments to you, have to know what you know about the case.

19   And if you were to know something about the case that they

20   don't know, then that would be wrong, it would be

21   inappropriate.  So if you happen to see an article, don't read

22   it.  You can read about the Red Sox.  You can read about the

23   Patriots.  You can read about anything you want, but just

24   don't read about this case.

25        The other thing that is really very vital that I'm going

1   to advise you on is not to go out and do independent research.

2   You know, don't get your curiosity up about cyanide and don't

3   get your curiosity up about the names of the individuals in

4   the case.  You can go research all sorts of stuff and you can

5   get a lot of information and you can get a lot of

6   misinformation from the internet.  You all know that.  And it

7   is really not fair.  What we are about here, what you are

8   about, and what I'm about, and what the lawyers are about, we

9   want to give these -- both the Government and the defendant a

10  fair and a just trial.  And not one of you would want to be

11  tried yourself on what is found in the internet.  So don't do

12  for these people what you wouldn't want for yourself.  Don't

13  research it.  And don't, for God's sake, go on social media

14  and see what you can find on social media because that is way

15  beyond what would be proper and fair and just.

16       Now, the reason I'm saying this in somewhat stern tones

17  is every jury all over this country gets this same admonition

18  from trial judges.  And it is astonishing how often they all

19  nod their heads and go out and do it anyway.  You don't want

20  to be one of those jurors.  And I am asking you not to do it.

21  I'm telling you not to do it.  I'm ordering you not to do it.

22  You will not do it.  After the case is over, you can research

23  it to your heart's content, but just don't do it while you're

24  a juror.

25       Now, with that, I'm going to release you, and I am going

1    to look forward to seeing you all again here no later than

2    8:30 tomorrow.  Thank you.

3              (The jury left the courtroom at 4:42 p.m.)

4              THE COURT:  I just want to mention on -- on leading

5    questions, I'm really pretty relaxed about leading questions.

6    That doesn't mean that there might not be some particular

7    point in the trial where a leading question would be

8    inappropriate.  There can be, given the particular nature of

9    testimony, if it's especially critical, I don't want to tell

10   you that every leading question that may be asked would be

11   overruled, but I do have -- I do have an old trial lawyer's

12   sense that leading questions are not as big a deal as they

13   sometimes seem to be made out to be by counsel on the other

14   side of the leading question.  So just to tell you where I go

15   on it, I'm going to give you leeway on it.

16        If it turns out that there is a particularly critical

17   witness and I get the feeling that the answer is being fed to

18   the witness by one of the lawyers and someone objects, I will

19   intervene and maybe I will intervene even if somebody doesn't

20   object.

21        Anything further before we break for the day?

22              MR. FRANK:  No, Your Honor, not from the Government.

23              MR. RIDGE:  No, Your Honor.  Thank you.

24              THE COURT:  Court will stand in recess.

25              (Court was recessed at 4:44 p.m.)

1                           CERTIFICATION

2          I certify that the foregoing is a correct transcript from

3     the record of proceedings in the above-entitled matter.

4

5

6     /s/ Melissa L. Merenberg                    2/14/2017
      Melissa L. Merenberg, RPR                   Date
7     Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25