1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF MAINE
2

3

4    UNITED STATES OF AMERICA        )
                                     )
5                                    )        CRIMINAL ACTION
              vs.                    )
6                                    )          Docket No.
                                     )        1:14-cr-00129-JAW
7    SIDNEY KILMARTIN,               )
                                     )          JURY TRIAL
8                  Defendant.        )

9

10                       VOLUME V OF VI

11                   TRANSCRIPT OF PROCEEDINGS

12        Pursuant to notice, the above-entitled matter came on

13   for JURY TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

14   District Judge, in the United States District Court, Bangor,

15   Maine, on the 7th day of October, 2016, at 8:35 a.m.

16

17

18   APPEARANCES:

19   For the Government:              Halsey B. Frank, Esquire

20   For the Defendant:              J. Martin Ridge, Esquire

21

22
                      Melissa L. Merenberg, RPR
23                     Official Court Reporter

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer.

1                    INDEX OF PROCEEDINGS
                        (See below:)
2

3                    INDEX OF WITNESSES
                                                            Page:
4   CHRISTOPHER COLLIER

5         Direct Examination by Mr. Frank                    734

6         Cross-Examination by Mr. Ridge                     741

7
    MICHAEL DESROSIERS
8
          Direct Examination by Mr. Frank                    747
9
          Cross-Examination by Mr. Ridge                     749
10
          Redirect Examination by Mr. Frank                  768
11
          Recross-Examination by Mr. Ridge                   775
12

13  CYNTHIA MORRIS-KUKOSKY

14        Direct Examination by Mr. Frank                    781

15
                     INDEX OF EXHIBITS
16  Government's
    Exhibit No.      Description          Offered    Admitted
17
         75        Body Stipulation          733        733
18
         77     Blood Sample Stipulation     733        733
19
        101    Description of B. Kelly Email 754        754
20
        105       Fingerprint Report         769        769
21
        106          DNA Report              769        769
22

23

24

25

1          (Defendant present with counsel in open court.)

2          THE COURT:  Good morning.  So I have begun to take a

3    look at these jury instructions, and another consideration on

4    the jury instructions is how the jury is instructed on the

5    last two counts, and I am going to ask counsel to do what they

6    can to help me get this right.  The provisions are very

7    similar, and they raise a pretty obvious question, and we're

8    talking about 18 U.S.C. Section 1512 and 1513.  And the issue,

9    the way I see it, is this, the statute in 1512 says, whoever

10   kills or attempts to kill another person with the intent to

11   prevent the attendance or testimony of any person in an

12   official proceeding, etc., etc.  And then on 1513, it has

13   similar language, whoever kills or attempts to kill another

14   person with the intent to retaliate against any person for the

15   attendance of a witness or party at an official proceeding,

16   etc., or providing to a law enforcement officer any

17   information.

18        The -- the issue I've -- I'm concerned about is the level

19   of intentionality on the killing element.  So if you compare

20   that to -- what I just read to 1512(b), it says, in (b),

21   whoever knowingly uses intimidation, threatens, or corruptly

22   persuades another, etc., etc.  So you have got the knowingly

23   as part of the intimidation.

24        Here, the question is whether the intent -- there is a

25   double intent here.  You have to intend to kill and you also

1   have to intend to prevent the attendance of -- or testimony of
2   any person, etc., or whether it's simply that if you kill
3   someone, regardless of your intention on the actual killing
4   part of it, if you -- if you intended to prevent the -- the
5   intentionality comes in at the intention to prevent the
6   testimony.  My instincts tell me that it's probably both, but
7   I would like to have counsel weigh in on that.

8       I -- I haven't been able to find anything thus far to
9   tell me -- to shed any light on it.  It's not that common a
10  crime.  I will say that this issue of intentionality has been
11  one of the highlighted issues at the Supreme Court and also in
12  the First Circuit.  So, for example, the United States v. Ford
13  case where I concluded that there was not a double requirement
14  of intentionality, the First Circuit flipped me on that and
15  said that there was.

16      So my -- my inclination would be to say that the
17  Government has to prove not only that he intended to basically
18  obstruct justice, but he also intended to kill.  Anyway, I
19  thought I would raise that with counsel so that you can mull
20  it over.  It's something we need to discuss.

21      All right.  Are we ready for the jury?

22          MR. FRANK:  Your Honor, I would like to put on the
23  record that I began providing Jencks this morning.  There was
24  just a small update from last night.

25          Also, Your Honor, I have revised further my order of

1  call, and I am only planning to call Christopher Collier and

2  Cynthia Morris-Kukosky this morning, two witnesses, and then I

3  expect to rest, subject to the admission of all the

4  Government's exhibits.

5          THE COURT:  All right.  Very good.  Yeah, the other

6  news is that Juror Number 32, whose been sitting in Seat 12,

7  got ill last night and was taken to the hospital, so he will

8  not be there, and that means that the second alternate will

9  now become a full juror.

10         MR. FRANK:  So am I correct that both alternates

11 are now jurors?

12         THE COURT:  That's right.

13         MR. FRANK:  Your Honor, it was also my intention --

14 I neglected to move two of the stipulations into evidence

15 yesterday, so I would do that at the outset.  I think I have

16 already read them.

17         THE COURT:  Yes, I think you have.  Thank you.

18     Well, I understand that one of the jurors hasn't arrived,

19 and the clerk thinks maybe they got confused about whether

20 they needed to be here at 10:00 today, although I thought I

21 was pretty clear.

22     Anyway, what we will do is take a recess and see if we

23 can track the juror down, and we will proceed as soon as we

24 have a full jury.

25         (Court was recessed at 8:43 a.m. and reconvened at

1    9:21 a.m.)

2            THE COURT:  On the intentionality issue that I

3    raised before, I did find the citation for the United States

4    v. Ford case, which may help you, it's 821 F.3d 63, a First

5    Circuit case decided in 2016.  And assuming for a moment that

6    it is correct that a level of intentionality has to be

7    demonstrated, the next question is what level of

8    intentionality will need to be demonstrated.  And the Ford

9    case suggests that a willful blindness instruction may be

10   appropriate, and it may well fit here.  So assuming for a

11   moment the instruction is that the defendant knowingly and

12   intentionally killed Andrew Denton with the intent, etc., then

13   we define knowing and intentional, but also willful blindness

14   namely that he deliberately closed his eyes to facts that had

15   he opened his eyes, he would have discovered.

16        So I'll leave it -- I am not sure which way to go on

17   that.  I haven't made up my mind, but the First Circuit seems

18   to say pretty strongly that if there is no level of

19   intentionality in a statute unless it's a regulatory or minor

20   statute, then the law will assume intentionality.  So, for

21   example, the way I'm thinking of it is the situation where

22   somebody does something to perhaps scare a witness, takes a

23   gun and shows it to the witness or jumps the witness or

24   something and the witness has a heart attack and dies, does --

25   is that killing within the meaning of the statute or does the

1    Government have to prove that he willfully -- or intentionally

2    or knowingly killed the individual?  And it seems to me that

3    the issue was raised pretty squarely here.

4         Anyway, I understand we now have a full jury.

5         Would you bring the jury in, please?

6              (The jury entered the courtroom at 9:22 a.m.)

7              THE COURT:  Morning, ladies and gentlemen of the

8    jury.

9              THE JURY:  Morning.

10             THE COURT:  We're usually in the position of making

11   you wait, but it's pretty clear that somebody was up late

12   watching the Red Sox lose.

13        Mr. Frank.

14             MR. FRANK:  Thank you, Your Honor.  Your Honor,

15   before I call my next witness, I move Government's Exhibits 75

16   and 77 into evidence.  I read them as stipulations yesterday.

17             THE COURT:  Any objection to 75 and 77?

18             MR. RIDGE:  No, Your Honor.

19             THE COURT:  Each is admitted.

20             MR. FRANK:  Thank you, Your Honor.  Then I would

21   call Christopher Collier.

22             THE CLERK:  Please raise your right hand.  Do you

23   solemnly swear that the testimony you shall give in the matter

24   now in hearing shall be the truth, the whole truth, and

25   nothing but the truth, so help you God?

1     THE WITNESS:  I do.

2     THE CLERK:  Please be seated.  Please state your

3  name and spell your last name for the record.

4     THE WITNESS:  My name is Christopher Collier, C-o-

5  double l-i-e-r.

6  CHRISTOPHER COLLIER, having been duly sworn, was examined and

7  testified as follows:

8                  DIRECT EXAMINATION

9  BY MR. FRANK:

10  Q     Good morning, Mr. Collier.

11  A     Good morning.

12  Q     Mr. Collier, where are you from?

13  A     I am from Humberside Police in England.

14  Q     And what do you do there?

15  A     I'm a digital forensic technician in the digital

16  forensic unit.

17  Q     What does that mean you do?

18  A     My -- my job is to examine mobile phones, tablets, any

19  kind of cellular device.

20  Q     And how do you do that?

21  A     We've got forensic tools, and we'll get the physical

22  device to us, download the data, and then interpret that with

23  forensics software.

24  Q     Is that what you mean by forensic tool, forensic

25  software?

1   A      Yes, yes.

2   Q      How does that -- what sort of things does that do?

3   A      And so it will recover the phone data in a binary --

4   bit-by-bit, extract everything, and then we work through that,

5   clone the phone to examine, interpret, pull back deleted data,

6   live data, images, videos, messages, application data.

7   Q      When you say clone, what do you mean?

8   A      So it's an exact identical copy, instead of working off

9   the live handset, we will use the copy handset.

10  Q      And why do you do that?

11  A      It's so we don't edit any data on the original.  The

12  original stays and that is in its original format.

13  Q      How do you get your assignments in Hull?

14  A      We have a pool of work, and we can either pick out the

15  next job in the queue or if it's an urgent job, we might be

16  assigned it.

17  Q      And what -- what is the job like, do you get a memo or

18  something that asks you to do something, or what's it like?

19  A      We'll get a form, and this is an authorization form, so

20  I will have authority from the officer in the case and then an

21  inspector will also authorize it.  It will give us a brief

22  summary of the job, what exhibits we've got in that job, what

23  data they're looking for to find on the phone, and we

24  interrogate the phones in relation to the job.

25  Q      And what sort of a product do you produce?

COLLIER - DIRECT EXAMINATION/FRANK

1    A    We will produce a report, database report, statement,
2    all depends on what data we're asked to recover.
3    Q    And do you also produce exhibits?
4    A    Yes, we produce exhibits.  Again, it depends on what
5    we're pulling back.  It can either be a report exhibit.  It
6    can be DVD with videos, pictures, that sort of thing.
7    Q    And what would be on those pictures or DVDs if you
8    produce them, just generally speaking?
9    A    It depends on the job.  It can be data we've pulled back
10   from the handset, so it can be videos the user's recorded
11   using the handset, downloaded images, same sort of thing.
12   Q    Could it include email that you find on the phone?
13   A    Emails, yeah.
14   Q    Okay.  Do you -- do you have special training to do this
15   work?
16   A    Yes, we have in-house training, and we also have
17   training from private companies, several -- over the years, I
18   have been to continuous training, as well, throughout the job.
19   Q    Ongoing?
20   A    Ongoing, yes.
21   Q    Okay.  How long have you been doing this work?
22   A    I have been doing this now nearly 10 years.  It will be
23   10 years next January.
24   Q    How did you get involved in the matter of examining the
25   decedent, Andrew Denton's, cell phones and digital media?

1   A      So this is job that Stuart Quinn, the detective

2   constable had put the authority for me for, highlighted it was

3   an urgent job, and came to me and asked that I do this

4   urgently.

5   Q      Did you know him otherwise?

6   A      Yes.

7   Q      You've worked with him before?

8   A      Yes, yes.

9   Q      Okay.  And what did you do?  What did you work on and

10  what did you do?

11  A      So there was the three exhibits and the main one was an

12  HTC Wildfire.

13  Q      What is that?

14  A      It's an HTC cellular phone.

15  Q      Okay.

16  A      Pulled all the data off, went through the data, and

17  produced a report with relevant data.

18  Q      Did you also produce exhibits from that phone?

19  A      Yes.

20  Q      Okay.  Did you do anything on any other devices?

21  A      Yes, there was a USB memory stick and an old Motorolla

22  flip phone.

23  Q      But you found relevant information on the HTC phone?

24  A      Yes.

25  Q      Can you describe that information for us?

1   A     There was emails relating to the user and an email

2   address Skiptin@gmail.com.

3   Q     Who was the user?

4   A     The user was Andrew Denton.

5   Q     Okay.  And can you describe the nature of these emails?

6   A     These emails were talking about pills, cyanide being

7   sent and taken and not working.

8   Q     Was it pills or powder or --

9   A     It was just cyanide.

10  Q     Okay.

11  A     Yeah.

12  Q     All right.  And where did you find these emails?

13  A     These had been deleted, so these -- when I recovered the

14  binary data from the handset, I was able to recover these

15  deleted emails.

16  Q     Let me show you what's been marked as Exhibit 83 -- 79.

17  BY MR. FRANK:

18  Q     Mr. Collier, I'm showing you what's been marked as

19  Government's Exhibit 79 for identification.  Could you take a

20  look at that and tell us if you recognize it, please?

21  A     Yes, that's the first examination report I created with

22  emails recovered from the handset.

23  Q     All right.  So this is a printout of emails that you

24  found on this HTC phone as you've described?

25  A     Yes.

1          MR. FRANK:  Your Honor, I would move Government's

2    Exhibit 79 into evidence.

3          THE COURT:  Any objection?

4          MR. RIDGE:  No, Your Honor.

5          THE COURT:  79 is admitted.

6          MR. FRANK:  And I request permission to publish it?

7          THE COURT:  You may.

8    BY MR. FRANK:

9    Q    Mr. Collier, this a multi-page exhibit.  Are all the

10   emails on here emails that relate between Andrew Denton and

11   Skiptin?

12   A    I believe the initial five could be.

13   Q    All right.  So if we can take a look at those.  They're

14   the ones numbered 1 through 5 at the beginning of the report?

15   A    Yes.

16   Q    All right.  And can you describe or read the pertinent

17   portion that you found there?

18   A    So this is an email sent on the 24th of December, 2012.

19   Q    Okay.  And you can annotate or you can direct our

20   attention by touching the screen with your finger, if that

21   helps.  So that's the date and time?

22   A    Date and time there.

23   Q    Okay.

24   A    And then we've got -- this is the sending user,

25   AndrewDenton35@gmail.com.  And the receiving user is listed as

1   Mr. Skip Martin, and that is Skiptin@gmail.com.

2   Q    All right.  And what did Andrew Denton say to Skip

3   Martin on this occasion?

4   A    So we've got the body of the message here, and it's hi,

5   on the 26th, I will delete all emails and my Gmail account.

6   It stays open for three months, I believe, but it won't let me

7   use or access it, so I can't get into it, and no one else can.

8   I have a Yahoo account now set up, but I have never used it to

9   contact you, so that will remain in use.  I do hope it works

10  this time.  If it does, I will be forever in your debt.  Thank

11  you in advance.  Have a nice holiday and take care.  No news

12  on my complaint.  Bye.

13  Q    Okay.  And let me direct your attention also to email

14  number 3 and ask you what -- who said what to whom there and

15  when?

16  A    This one was sent on the 20th of December, and this was

17  from Skiptin@gmail.com to Andrew Denton.  And the message

18  again -- the date is on here.  And the subject is titled, hard

19  drive.  And, again, this is another deleted email that's been

20  recovered.  The body, Andrew, is there any way I can get you

21  to do something with your hard drive before your event?  With

22  the FBI aware of my goings on, the last thing I need is to

23  give them more fodder as you and I have had extensive

24  conversations.  Can you give it to a friend or even discard

25  it?  You have me worried now.  Get back to.  Sid.

1           MR. FRANK:  I have no further questions for this

2   witness, Your Honor.

3           THE COURT:  Cross-examination, Mr. Ridge.

4           MR. RIDGE:  Yes, Your Honor.

5                   CROSS-EXAMINATION

6   BY MR. RIDGE:

7   Q     Morning, Mr. Collier.

8   A     Morning.

9   Q     Do you still have Exhibit 79 in front of you?

10  A     No.

11  Q     Let me give you a copy of it, if that's all right.  You

12  read a couple of these emails?

13  A     Yes.

14  Q     I would like you to read email number 5, which appears

15  on the second page of the exhibit.  I'm sorry I can't project

16  that because I don't know how to use this.

17  A     So this one's on the 15th of December from Skip Martin

18  to Andrew Denton, subject, all done.  Body, Andrew, thought

19  you might want to know I'm taking down the shingle and

20  deleting the website after getting to know you and what your

21  forth coming journey holds.  I won't even try to talk you out

22  of it as you are too smart for that.  Just thought you might

23  want to know, my court trial wound up in my favor, so you will

24  be on your own on this one.  I can also relate to your stay in

25  institutions as I've spent two years in one myself.  They're

1    certainly no fun, especially when you don't belong there.

2    It's been a pleasure getting to know you.  Someday we will

3    meet up again where we don't have an ocean between us.  Best

4    regards, Sid.  PS, I hope that parcel gets bogged down in

5    holiday mail.

6    Q     The last sentence again?

7    A     PS, I hope that parcel gets bogged down in holiday mail.

8    Q     Thank you.

9          Now, Mr. Collier, Exhibit 79 is not everything that you

10   were able to extract?

11   A     No.

12   Q     Okay.  There was a fairly significant amount of

13   information that you gathered from Mr. Denton's dealings not

14   only with Skiptin, but with others; is that fair to say?

15   A     There was some, but not -- not a massive amount compared

16   to some of our phones.

17   Q     I'm sorry?

18   A     Not a massive amount compared to some of our phones.

19   Q     Okay.  But you did find evidence of other emails -- I'm

20   sorry.  Let me ask it this way, the five emails that are in

21   Exhibit 79 are the only emails that you found on that phone?

22   A     No.

23   Q     Okay.  What other emails did you find on the phone?

24   A     I can't remember off the top of my head to be honest.

25   It will be on a further report with everything on it, but.

1   Q      Did you find emails between Mr. Denton and other

2   potential sources for cyanide?

3   A      No.

4   Q      Did you find searches or cookies that exhibited

5   Mr. Denton's efforts to find other sources for cyanide?

6   A      Not that I can recall, no.

7   Q      Okay.  Let me -- I've got what purports to be a copy of

8   your report, and that's a 162-page report?

9   A      Potentially, yes.

10  Q      Okay.  I am going to give you my whole binder here,

11  Mr. Collier.  I'll first ask you if you would flip through

12  that and identify that as the report that you created after

13  your examination of Mr. Denton's devices?

14  A      Yes.

15  Q      Okay.  Would you flip to page 47 of 162?

16  A      Yeah.

17  Q      Does that page show Mr. Denton searching for cyanide?

18  A      Yes, there is a Google search, potassium cyanide for

19  sale, retail.

20  Q      Okay.  And what's -- is there a date on that?

21  A      No.

22  Q      Okay.  And there's more than one item there, there are

23  five?

24  A      Five.

25  Q      Five items having to do with cyanide?  I'm sorry.

1  A     Yes.

2  Q     And there's a tab called 88 Pond Road?

3         MR. FRANK:  I'm sorry, I didn't hear that question,

4  Your Honor.

5         THE COURT:  He said, there's a tab called 88 Pond

6  Road.

7         MR. FRANK:  Thanks, Your Honor.

8         THE COURT:  Is that what you said, Mr. Ridge?

9         MR. RIDGE:  It is, Your Honor.  And I will be a

10  little more specific.

11  BY MR. RIDGE:

12  Q     Excuse me, sir.  It's on page 119 of 162.  On that page,

13  is there a search that Mr. Denton performed for 88 Pond Road?

14  A     Yes, so this is a Google search for 88 Pond Road,

15  Manchester, on the 4th of December, 2012.

16  Q     Okay.  And I would like you now to look at page 34 of

17  162.  What is that?  What's that page show, Mr. Collier?

18  A     That shows web bookmarks.

19  Q     What's a web bookmark?

20  A     These are bookmarks you'd save pages you'd want to go

21  back to.

22  Q     Okay.  And are there entries -- items number 6 to 11, do

23  these entries look like they are searches for Deb or Debbie

24  Kilmartin and family?

25  A     Yes.

1   Q     Okay.  And do you know when that happened?

2   A     No, these have been deleted by the user and it's on

3   partial data as recorded.

4   Q     Are those retrievable by you like the emails were

5   retrievable by you?

6   A     Yes.

7   Q     Okay.  But you were only instructed to retrieve deleted

8   items that were between Mr. Denton and Mr. Kilmartin?

9   A     No, these have been retrieved by me.

10  Q     They have been?

11  A     Yes.

12  Q     Okay.

13  A     They have been deleted by the user and when on my

14  examination, I pulled these files.

15  Q     Okay.  I misunderstood your answer.  I apologize.  What

16  was your assignment?

17  A     I was basically asked to recover all data and highlight

18  any data related to potassium cyanide and Skip Martin.

19  Q     Okay.  Thank you.

20        Mr. Collier, in your efforts to recreate data or to find

21  information pertaining to Mr. Denton and Mr. Kilmartin, do you

22  recall seeing an email dated 12/24/2012 from Brawn Kelly to

23  Mr. Denton saying, subject KCN, it will cost you 200 lira,

24  including transportation costs.  If that's fine by you, I will

25  require a delivery?

1  A    I don't recall that, no, but if it's in my report, it
2  was something I pulled back, yes.
3  Q    Okay.  I am not sure if it's in your report.  I just
4  wondered if you ever had a familiarity with that?
5  A    I don't recall it, no.
6  Q    Did you work with any other examiner in the United
7  Kingdom on the Skiptin/Andrew Denton case?
8  A    No, no.
9  Q    Okay.  And everything you did is in the -- everything
10 you found is in that 162 pages?
11 A    Yes.
12 Q    Okay.  Thank you.
13          MR. RIDGE:  That's all I have, Your Honor.
14          THE COURT:  Thank you, Mr. Ridge.
15      Redirect.
16          MR. FRANK:  No, Your Honor.
17          THE COURT:  Thank you.  You may stand down, sir.
18 Thank you.
19          THE WITNESS:  Thank you.
20      (The witness, Christopher Collier, left the witness
21 stand.)
22          THE COURT:  Next witness.
23          MR. FRANK:  The Government calls Michael Desrosiers,
24 Your Honor.
25          THE CLERK:  Do you solemnly swear that the testimony

1   you shall give in the matter now in hearing, shall be the

2   truth, the whole truth, and nothing but the truth, so help you

3   God?

4              THE WITNESS:  I do.

5              THE CLERK:  Please be seated.  Please state your

6   name and spell your last name for the record.

7              THE WITNESS:  Michael Desrosiers,

8   D-e-s-r-o-s-i-e-r-s.

9   MICHAEL DESROSIERS, having been duly sworn, was examined and

10  testified as follows:

11                      DIRECT EXAMINATION

12  BY MR. FRANK:

13  Q    Good morning, Mr. Desrosiers.

14  A    Morning.

15  Q    Mr. Desrosiers, what do you do for work?

16  A    I'm employed for the -- with the U.S. -- United States

17  Attorney's Office in Portland.

18  Q    What do you do there?

19  A    I wear a variety of hats, security manager, intelligence

20  officer, contract investigator, whatever they need me to do.

21  Q    And how long have you been doing that?

22  A    Since January of this year.

23  Q    What did do you prior to that?

24  A    I was employed -- unemployed for six months.

25  Q    And prior to that?

1    A    I was a United States postal inspector from January 1987

2    until my retirement in June 2015.

3    Q    And as part of your duties as a postal inspector, did

4    you participate in the investigation of the defendant, Sidney

5    Kilmartin, for various federal offenses, including mailing

6    injurious articles?

7    A    Yes.

8    Q    Did you arrest him on the original indictment?

9    A    I did.

10   Q    When did you do that?

11   A    November 5th of 2014.

12   Q    Tell us how did you that.

13   A    We knew Mr. Kilmartin lived in Windham.  We went to the

14   Windham post office, close by where he lived, and we set up

15   there and ended up arresting Mr. Kilmartin at a Planet Fitness

16   or some fitness place in Windham.

17   Q    Did he say anything or did you say anything to him when

18   you arrested him?

19   A    I told him he was under arrest for mailing cyanide.

20   Q    Did he say anything to you?

21   A    He said, I don't know what you're talking about.

22   Q    Do you see him here in the courtroom today?

23   A    I do.

24   Q    Can you identify him by an article of clothing he's

25   wearing and where he is located in the courtroom?

1   A     He's wearing a light shirt at the defense table next to

2   attorney Marty Ridge.

3             MR. FRANK:  And, Your Honor, I don't know what the

4   Court's preference is.  May the record reflect the

5   identification?

6             THE COURT:  The record reflects what the record

7   reflects.

8             MR. FRANK:  Very well, Your Honor.

9        I have no further questions for this witness.

10            THE COURT:  Thank you.

11       Mr. Ridge.

12            MR. RIDGE:  Thank you, Your Honor.

13                        CROSS-EXAMINATION

14  BY MR. RIDGE:

15  Q     Good morning, Mr. Desrosiers.

16  A     Good morning, Mr. Ridge.

17  Q     I have a few questions for you.  And the first is with

18  regard to the envelopes that were taken or were -- yeah, taken

19  from Mr. Denton's home or recovered from Mr. Denton's home.

20  A     Yes.

21  Q     Did you go to England and bring those back?

22  A     Yes.

23  Q     Okay.  And when I'm saying the envelopes, I'm talking

24  about the two mailer envelopes, one from November and one from

25  December?

1   A     Yes.

2   Q     Okay.  Do you know whether any analysis was done on

3   those two envelopes to seek or determine whether finger

4   presents or DNA or any other useful information could be

5   obtained from those?

6   A     Yes.

7   Q     When was that done?

8   A     I don't remember -- we brought them first to the health

9   and environmental testing lab in Augusta.  When they were done

10  with their analysis, they went to the Maine State Police Crime

11  Lab in Augusta.  I am not sure of the exact months that that

12  happened.

13  Q     Okay.  What year was it?

14  A     I brought those envelopes to the health and

15  environmental testing lab in July of 2013 -- 2014.  So it

16  would have been sometime after that.  It could have been 2014

17  or into 2015.

18  Q     And do you know what the results of that analysis was?

19  A     Which analysis are you asking me for?

20  Q     Well, let's start with fingerprints.

21  A     I don't -- they weren't -- they weren't identified with

22  anybody, that's what I recall.

23  Q     Okay.

24  A     I don't have the analysis with me.

25  Q     Anybody's DNA found on those?

1   A      Not to my knowledge.

2   Q      Any hairs or other substances found on the envelopes

3   that would have been of any help to anybody?

4   A      I -- I would have to look at the lab report, sir.

5   Q      Okay.  Do you have the lab report?

6   A      I don't.

7   Q      There has been marked an exhibit -- it's not an exhibit,

8   but it's marked as an exhibit for identification as

9   Government's 101.  I will tell you, Mr. Desrosiers, that this

10  is a page that I got in discovery from the Government, and

11  it's a page that not atypically has deletions on -- above and

12  below this particular entry or redactions I should say.

13  You're familiar that that's how information is conveyed to

14  defense counsel from the U.S. Attorney's Office, correct?

15  A      I am now.

16  Q      Okay.  You've never seen those pages that have blacked

17  out paragraphs?

18  A      I've seen a few.

19  Q      I'm sorry?

20  A      I've seen a few.

21  Q      You've seen a few.  How many years have you been a

22  postal inspector?

23  A      Twenty-eight years.

24  Q      You've seen more than a few?

25  A      I have only been in trial one time.

1    Q    Okay.  I'm not asking about going to trial.  I'm asking

2    about documentation of cases that you were investigating?

3    A    I've only seen it a couple of times.

4    Q    Okay.  This has an entry that says that English

5    authorities and Mark Scichilone of the USPIS.  What's the

6    USPIS?

7    A    It's the U.S. Postal Inspection Service.  It was my

8    agency.

9    Q    Okay.  Both conducted a search of Andrew Denton's

10   Toshiba laptop.  In Gmail web mail both found an email with

11   Brawn Kelly at hotmail.com and subject KCN.  And then it goes

12   on to say that on December 24th at 1:25, the following email

13   was posted, it will cost you 200 lira, including

14   transportation costs.  If that's fine by you, I will require a

15   delivery.

16        Are you familiar with that?

17   A    I would have written this.

18   Q    Okay.

19   A    I would have taken it from whatever document was

20   provided to me and put it in a chronological order document

21   that I generated.

22   Q    Okay.  December 24, 2012 was before Mr. Denton killed

23   himself, correct?

24   A    Yes.

25   Q    Mr. Denton did commit suicide?

1    A      To my knowledge, yes.

2    Q      And that would have been on December 31st?

3    A      Yes, 2012.

4    Q      Once this information became available to you, what was

5    done to follow up with this particular email?

6    A      I don't know what you're asking.

7    Q      Well, I'm asking -- well, let me start it over.

8           You had this information?

9    A      Mm-hmm.

10   Q      Was any effort made to investigate who the author of

11   that email was?

12   A      I don't think so.  I didn't follow up on this, to my

13   knowledge.  I just entered it into the record.

14   Q      Did you not deem it significant that a week before

15   Mr. Denton killed himself he received an email from a person

16   saying essentially I have some potassium cyanide available for

17   you, that wasn't significant in your investigation?

18   A      You know, at the time that I was running this, I was --

19   I think I was pretty much done the investigation, and I was

20   just writing it into the -- into the chronological order.

21   Q      Would it be fair to say that you folks locked onto

22   Mr. Kilmartin to the exclusion of others early on in this

23   investigation?

24   A      Well, I knew there was some analysis on the computer to

25   find out if there was any other sources, we did that.

1   Q      And this might be a result of that effort?

2   A      You would have to ask Mr. Scichilone if -- where that

3   came from.

4   Q      All right.  Let me just ask you, and I think maybe you

5   have already answered this, you didn't do anything to follow

6   up on that?

7   A      Not that I recall at this moment.

8   Q      And at the time -- let me ask you if you recall this, at

9   the time that you entered this, were you heading up this

10  investigation?

11  A      I believe I was, yes.

12  Q      Okay.

13         MR. RIDGE:  Your Honor, I don't know if I can offer

14  Government's Exhibit Number 101 or whether I should relabel it

15  as a defendant's exhibit.

16         THE COURT:  No, I -- Government's Exhibit Number 101

17  is -- has been referred to.  Do you have any objection to its

18  admission?

19         MR. FRANK:  No, Your Honor.

20         THE COURT:  Why don't we introduce it as

21  Government's Exhibit Number 101.  The label doesn't matter

22  that much.

23         MR. RIDGE:  Thank you, Your Honor.

24         THE COURT:  Thank you.

25         MR. RIDGE:  I apologize for having --

1   BY MR. RIDGE:

2   Q     Mr. Desrosiers, when did authorities find out or learn

3   that there was some substance at Mr. Denton's home that was

4   suspected to be cyanide?

5   A     I think we -- I think we knew that in the spring of 2013

6   when we first got the referral.

7   Q     Okay.  When I use the term authorities, let me kind of

8   define that.  There were authorities in England doing an

9   investigation, and then there were the authorities in the

10  United States, and I understand those two investigations

11  weren't on the same track, but would you agree with me that it

12  was learned very, very early on that there was suspected

13  cyanide at Mr. Denton's home?

14  A     I believe we knew that was the idea back in April of

15  2013 when we first got the referral.

16  Q     Okay.

17  A     I believe.

18  Q     And when did you first deal with the authorities in the

19  United Kingdom?

20  A     I didn't pick up the case until August of 2013, so I

21  didn't start -- I don't think I contacted them immediately,

22  but it would have been sometime after that.

23  Q     So in -- what month in 2013?

24  A     I began my -- I picked up the investigation in August of

25  2013.

1  Q     So in August of 2013, you would have learned that there

2  was some substance that had been identified in England as

3  containing cyanide?

4  A     Well, I'm aware -- I was aware of this case because it

5  was just the three of us in the office.  I knew of this case

6  in the spring of 2013.

7  Q     Okay.

8  A     I wasn't investigating it actively at the time.

9  Q     Okay.  When did you begin actively investigating?

10  A     August of 2013.

11  Q     August.  Okay.  I'm sorry.

12  A     Yeah.

13  Q     When did you first reach out to the authorities in

14  England to find out about this sample that was suspected or

15  had been confirmed to contain cyanide?

16  A     It would have been sometime after August of 2013.

17  Q     But you don't recall the date?  I mean, it's been three

18  years between then and now.

19  A     I don't.

20  Q     Was it early in the investigation?

21  A     I believe it was.

22  Q     Okay.  And was there an emphasis placed on trying to

23  figure out where that cyanide came from?

24  A     I think that was the nature of the investigation.

25  Q     Okay.  And at some point, it was learned that Fisher

1  Scientific had produced a certificate of analysis?

2  A     Yes, we did eventually find out that it was Fisher

3  that -- yeah.

4  Q     Do you remember when you found that out?

5  A     That Fisher --

6  Q     Right.

7  A     -- produced it?

8  Q     That Fisher produced a certificate of analysis for a

9  sample that it had mailed?

10 A     It was -- I think it was 2015.

11 Q     Okay.

12 A     Yes, 2015.

13 Q     And you then spoke with a person named Ed Hess, who was

14 the lab manager at Fisher Scientific?

15 A     I did.

16 Q     And that's the person that authored the certificate of

17 analysis, right?

18 A     Yes.

19 Q     And when we're talking about the certificate of

20 analysis, we're talking about Government's Exhibit Number 4.

21 Let me show that to you.  This exhibit has already been

22 admitted, Mr. Desrosiers.  And I've been looking at this

23 exhibit, and I can't find a date on it, and I wondered if you

24 could help me out with that.  And tell us when, to your

25 knowledge, that certificate was generated by Mr. Hess.

1   A     I assume the manufacturer's date of November 21, 2011.

2   Is what you're looking for?

3   Q     Yeah.  Where is that?

4   A     Manufacturer's date, November 21 --

5   Q     Okay.

6   A     -- 2011.

7   Q     Do you take that to mean that's when the lot was

8   created, the lot of potassium cyanide at Fisher Scientific?

9   A     That's -- that's -- I'm guessing that, sure.

10  Q     Okay.  Do you know what the recommended retest date

11  November 2016 means?

12  A     I don't.

13  Q     Okay.  When you spoke with Mr. Hess, did you talk with

14  him about the ability that Fisher Scientific would have to

15  analyze the substance that had been found in England?

16  A     I think we spoke about that.

17  Q     Okay.  And did the substance that was found in England

18  ever get transported to Fisher Scientific?

19  A     It did not.

20  Q     Why was that?

21  A     In order for the -- my recollection is that in order for

22  the sample to be tested by them, they would have to have

23  tested against a sample from the batch that it was

24  manufactured from, and they no longer had any cyanide from

25  that batch.

1    Q      Okay.  And when was that?

2    A      It would have been 2015.

3    Q      Okay.  So the cyanide was in the possession of

4    authorities either in England or in the United States from

5    December 31, 2012, and it wasn't until sometime in 2015 that

6    Fisher Scientific was asked if they could do an analysis?

7    A      The short answer is yes.

8    Q      Okay.  Did you ask Mr. Hess if Fisher Scientific could

9    do an analysis of the sample, not comparing it to a -- to the

10   lot, but an analysis, freestanding analysis to tell you what

11   was in that substance?

12   A      I am sure my conversation included that.

13   Q      And what did Mr. Hess say to you about that?

14   A      My only recollection is that they said the only way they

15   could do anything is if they still had a sample from the

16   original batch of cyanide, that's the only way they could do

17   it.  That's my recollection.

18   Q      Okay.  So your conclusion was that there was no way to

19   determine that the sample found in England came from the batch

20   at Fisher Scientific?

21   A      They said there was nothing they could do with it.

22   Q      Okay.  But if it had been delivered to Fisher

23   Scientific, they could have identified trace metals down to

24   one part per million?

25   A      I don't know what they could do, sir.

1  Q    Okay.  Let me -- I don't mean to jump you with something

2  that you don't have in front of you.  I apologize.

3            MR. FRANK:  Marty, can I have a reference?

4            MR. RIDGE:  Oh, sure.  This is an email written by

5  Mr. Desrosiers to Mr. Taylor, dated June 4.

6            MR. FRANK:  Okay.  So it's from the Jencks.  Okay.

7  From the Jencks we provided?

8            MR. RIDGE:  Yes.

9            MR. FRANK:  Okay.

10 BY MR. RIDGE:

11 Q    Was my question -- the answer is yes?

12 A    What's your -- please ask the question.  I apologize.

13 Q    Did Mr. Hess indicate to you that if Fisher Scientific

14 were provided the sample and they had some left from the lot

15 or the batch, that they could trace the contents of the sample

16 down to one part per million?

17 A    Based on what I'm saying here to Inspector Taylor that

18 if they could provide a sample from that batch to the health

19 and environmental testing lab, that that analysis could be

20 done.

21 Q    This is Mr. Hess that you're speaking to?

22 A    This email is going to Inspector Taylor.

23 Q    Right.  But you're referencing your conversation with

24 Mr. Hess?

25 A    Yes.

1   Q     Okay.  And Mr. Hess says that they would have -- under

2   the proper circumstances, they would have the capability of

3   identifying trace metals in the batch down to one part per

4   million?

5   A     But I think it said if he could provide the health and

6   environmental testing lab a sample, that the health and

7   environmental testing lab could do it, is what I recall from

8   the email.

9   Q     Did you think the health and environmental testing lab

10  could identify trace metals down to one part per million?

11  A     I believe I had a conversation with Jim Curlett.  The

12  chemist at the health and environmental testing lab, and he

13  said he would -- my recollection is he said he wouldn't be

14  able to do it.

15  Q     Would not be able to?

16  A     Didn't have the tools to do it.

17  Q     Okay.  That's because there's some machinery out there

18  that's not available to his laboratory that could have done

19  additional testing?

20  A     I can only presume.

21  Q     Okay.  Mr. Desrosiers, how did the sample that was found

22  in Mr. Denton's home that was tested in England and found to

23  have cyanide in it, how did that get transported back to the

24  United States?

25  A     I sent it myself by registered U.S. mail.

1   Q    Okay.   And did you have discussions with other -- strike

2   that.

3        Did you make special arrangements with the post office or

4   postal authorities to mail that --

5   A    I did not.

6   Q    -- material?

7   A    I did not.

8   Q    You did not.  Well, Mr. Kilmartin's charged with mailing

9   that same material?

10  A    Yes.

11  Q    You didn't make special arrangements with the post

12  office, and you mailed it to yourself registered mail, but

13  Mr. Kilmartin is charged with numerous offenses as a result of

14  allegedly mailing that same substance to England?

15  A    What's the question?

16  Q    Is that correct?

17  A    I mailed it to myself registered U.S. mail.

18  Q    Okay.  And we know Mr. Kilmartin is standing trial for

19  criminal offenses.  If Mr. Kilmartin or whoever the sender of

20  the package was had used UPS, do you understand that's a

21  violation of the law or not?

22  A    I don't know what UPS regulations are.

23  Q    But it's not a violation of the statute, correct?

24  A    I don't know what -- I don't know -- I don't know in

25  regards to UPS.

1    Q      Inspector Desrosiers, did your investigation alert you

2    to the fact that Andrew Denton had historically searched for

3    potassium cyanide via the internet prior to any connection or

4    communication with Skiptin?

5    A      I know he was searching for -- for potassium cyanide,

6    yes.

7    Q      And he continued to search after his communication with

8    Skiptin began, correct?

9    A      I think he did.

10   Q      Okay.  Well, we just saw that reference to the

11   December 24th --

12   A      December 24th, yes.

13   Q      Okay.  And there are sources for potassium cyanide out

14   there, correct?

15   A      I wouldn't know that.

16   Q      Do you know --

17   A      This case is the only one I've ever heard of of this

18   kind.

19   Q      Do you know that Amazon has transported potassium

20   cyanide or cyanide?

21              MR. FRANK:  I'll object, Your Honor.

22              MR. RIDGE:  I simply asked if he knew.

23              THE COURT:  He can answer whether he knows.

24        You may answer.

25   A      I don't know.

1    BY MR. RIDGE:

2    Q     Okay.  Inspector Desrosiers, the scene that was handled

3    in the United Kingdom at Mr. Denton's home, did it strike you

4    as odd that items were apparently left in the home on

5    December 31st after the police had been in there and removed

6    some items?

7    A     I don't know their protocol.

8    Q     If that were done here, do you believe that scene would

9    have been closed off?

10   A     Here we probably would have closed off the scene to keep

11   the public away from the crime scene certainly.

12   Q     And to keep family members away from the scene until it

13   was determined that they could enter again?

14   A     Depends on the situation.

15   Q     Okay.  Have you had -- well, strike that.

16         In this situation, family members clearly had access to

17   the building?

18   A     I know that the -- Gail Coates, the niece, was there.

19   Q     Because there were items taken by the police when they

20   were there on December 31st, then there were items delivered

21   to a police officer on January 1st from -- and was that from

22   Mr. Denton's home or was that from Ms. Coates' home, do you

23   know?

24   A     I believe an officer went to Mrs. Coates' home to

25   collect evidence that they didn't collect on the day that they

1    were there.

2    Q      Okay.  And did you inquire of that officer as to whether

3    or not that evidence had been found at Mr. Denton's home or at

4    Ms. Coates' home?

5    A      It had been found at -- it was at the victim's

6    residence, and Ms. Coates took it home, to my knowledge.

7    Q      Okay.  And then again on January 11, 2013, another item

8    was delivered, and this one was picked up at Ms. Coates' or

9    Ms. Dibnah's home?

10   A      There was another item of evidence that Ms. Coates said,

11   hey, you might be interested in this, and they sent an officer

12   to get it.

13   Q      Okay.  And that was one of the mailer envelopes, right?

14   A      Which date?

15   Q      The January 11, 2013?

16   A      That was the first envelope, the November envelope.

17   Q      Okay.

18   A      Yes.

19   Q      Okay.  Now, would it be fair to say that from the date

20   -- that first envelope, the November 16th envelope --

21   A      2012.

22   Q      Okay.  Eventually, at some point, I believe it was

23   November 30th, that arrived in England?

24   A      2012.

25   Q      We don't know who had access to that envelope from

1    November 30th to January 11, 2013; is that right?

2    A    It was delivered to Mr. Denton, other than that I don't

3    know.

4    Q    Okay.  Anybody could have handled it, anybody could have

5    removed what was inside of it --

6    A    I don't know --

7    Q    -- is that fair to say?

8    A    I don't know what precautions he took to secure it.  I

9    don't know.

10   Q    Okay.  And the same is true with the second envelope,

11   the one that was mailed on December 11th and received on

12   December 20th, fair to say?

13   A    What are you asking?

14   Q    Well, I'm asking whether or not it was ever determined

15   who may have had access to that envelope between December 20,

16   2012, and December 31, 2012?

17   A    I would have no idea, sir.

18   Q    Okay.  Do you know whether the envelope was opened when

19   the police arrived on January -- on December 31st?

20   A    Are you talking about the second envelope?

21   Q    Right.

22   A    It was photographed opened.

23   Q    Okay.  Would it be fair to say that the baggie that was

24   inside that envelope on that day may or may not be the same

25   baggie, if there was a baggie that arrived with the envelope

1    on December 20th?

2    A    I don't know that, sir.

3    Q    Okay.  Because we don't know who touched the envelope or

4    who opened the envelope or who removed whatever was in the

5    envelope or put the baggie into the envelope, right?

6    A    I wasn't there.

7    Q    Okay.  And fair to say we just can't know that because

8    nobody was there?

9    A    I don't know that.

10   Q    That we know of?  Okay.  And we don't know either

11   whether the baggie that was inside that envelope -- and is it

12   your recollection that that baggie was tied or untied inside

13   the envelope?

14   A    I don't remember.

15   Q    Okay.  But we don't know whether that baggie had been

16   removed, opened, and then retied and then reinserted into the

17   envelope?

18   A    I wasn't on the search team, sir.

19   Q    Okay.  Have you seen any report that addresses that

20   particular issue?

21   A    I don't recall.

22   Q    Is that a no?

23   A    I just don't know.

24   Q    Okay.

25        MR. RIDGE:  That's all I have, Your Honor.  Thank

1    you.

2              THE COURT:   Thank you.

3         Redirect.

4              MR. FRANK:   Thank you, Your Honor.   Court's

5    indulgence, Your Honor.   May I proceed, Your Honor?

6                   REDIRECT EXAMINATION

7    BY MR. FRANK:

8    Q    Good morning, Mr. Desrosiers.

9    A    Good morning.

10   Q    Mr. Desrosiers, on cross-examination by Mr. Ridge, you

11   were asked a series of questions about what -- whether

12   fingerprint and DNA analysis had been performed on these

13   mailers, correct?

14   A    Yes.

15   Q    And if so what results, and you were having trouble

16   recalling that, correct?

17   A    Yes.

18   Q    You -- you -- I think your testimony was you didn't

19   think that any fingerprint identification was possible based

20   on that analysis, correct?

21   A    That's correct.

22   Q    And that no DNA -- no usable DNA had been found,

23   correct?

24   A    Correct.

25   Q    And you weren't sure about the fiber evidence, correct?

1  A   Yes.

2  Q   Let me show you what's been marked as Exhibits 5 --

3  105 -- Government's Exhibits 105 and 106 for identification

4  and ask you to take a look at those and tell us if you

5  recognize them, please.

6  A   These are both lab reports provided by the Maine State

7  Police Crime Lab in Augusta.

8  Q   Right.  With respect to what?

9  A   To the two envelopes that were recovered from

10  Mr. Denton's residence.

11  Q   All right.  Well, is -- 105 is the -- is the fingerprint

12  report, right?

13  A   Yes.

14  Q   And 106 is the DNA report, correct?

15  A   That's correct.

16  Q   And 105 -- 105 reports that there were no usable prints

17  or the only one that was usable didn't match?

18  A   That's correct.

19  Q   Okay.  And 106, the DNA report, reports that there

20  wasn't any usable DNA, correct?

21  A   That's correct.

22          MR. FRANK:  I move 105 and 106 into evidence.

23          THE COURT:  Any objection?

24          MR. RIDGE:  No, Your Honor.

25          THE COURT:  Each is admitted.

1   BY MR. FRANK:

2   Q    And, Mr. Desrosiers, packages that move from the United

3   States to England, how many people handle packages like that,

4   a few or many?

5   A    Many in the postal system.

6   Q    Mr. Desrosiers, on cross-examination by Mr. Ridge, you

7   were asked a series of questions about the U.S. Attorney's

8   Office's redaction procedures regarding discovery provided in

9   criminal cases.  During the time of this investigation, you

10  didn't work at the U.S. Attorney's Office, right?

11  A    I did not.

12  Q    Right.  You're not an attorney, right?

13  A    I am not.

14  Q    You're not a legal assistant in that office?

15  A    I am not.

16  Q    You're not involved in the production of discovery in

17  criminal cases?

18  A    No.

19  Q    And you're not familiar with the U.S. Attorney's

20  Office's practices?

21  A    I am not.

22         MR. FRANK:  101 up here, Marty?

23         MR. RIDGE:  It is.

24  BY MR. FRANK:

25  Q    On cross-examination by Mr. Ridge, you were asked a

1   series of questions about this December 24, 2012, email found

2   on Mr. Denton's laptop with Brawn Kelly, correct?

3   A    Yes.

4   Q    All right.  Now, and you, as I recall, testified that

5   you did not follow up on that and see if you could figure out

6   who Brawn Kelly was, correct?

7   A    Correct.

8   Q    Did you have any indication that Brawn Kelly had

9   obtained potassium cyanide from Fisher Scientific in September

10  of 2012?

11  A    I had no idea.

12  Q    Did you have any -- the way you had evidence in this

13  investigation?

14  A    (No response.)

15  Q    I take it the answer is no, right?

16  A    No.

17  Q    Did you have any evidence that Brawn Kelly had mailed

18  things to people all over the world that was supposedly

19  cyanide?

20  A    I had no such information.

21  Q    Did you have any evidence in particular that

22  Mr. Kilmartin had -- that Brawn Kelly had mailed two packages

23  to Andrew Denton in the United kingdom?

24  A    I had no such information.

25  Q    On cross-examination, you were asked a series of

1   questions about how it was that you were able to mail cyanide

2   and Mr. Kilmartin wasn't.  What's the answer?

3   A       Postal regulations -- I was a federal law enforcement

4   agent.  Postal regulation allow me to do so.

5   Q       Postal regulations make certain exceptions to the

6   general prohibition, right?

7   A       They do.

8   Q       For bona fide governmental, scientific, and educational

9   purposes, right?

10  A       That's correct.

11  Q       And this is one of those, correct?

12  A       Yes, sir.

13  Q       You weren't intending to poison anybody with that

14  material, were you?

15  A       No.

16  Q       On cross-examination by Mr. Ridge, you were asked a

17  series of questions about how there was evidence in this

18  investigation that Mr. Denton continued to search for cyanide

19  even after he had met Mr. Kilmartin online, correct?

20  A       Yes.

21  Q       Well, there's nothing remarkable about that, right?  I

22  mean, as of December 24th, Mr. Denton was still alive, right?

23  A       Yes, he was.

24  Q       He had been fooled by Mr. Kilmartin once, right?

25  A       True.

1    Q      He didn't --

2                MR. RIDGE:  Your Honor, I understand the Court's

3    ruling about --

4                THE COURT:  Yeah, I think this is a little leading.

5                MR. FRANK:  I'm sorry, Your Honor.  I thought --

6    I'll move on.

7                THE COURT:  I'm not telling you -- I'm just telling

8    you to -- this is your witness.

9                MR. FRANK:  Yes, Your Honor.  I'm sorry.

10               THE COURT:  I told you you couldn't put words in the

11   witness's mouth and that's what you're doing, so.

12   BY MR. FRANK:

13   Q      Was it surprising to you that Mr. Denton continued to

14   look for cyanide even after the first mailing from

15   Mr. Denton -- from Mr. Kilmartin?

16   A      My knowledge is that Mr. Denton had many, many suicide

17   attempts in 2012, so it doesn't surprise me he was trying to

18   find other ways.

19   Q      On cross-examination by Mr. Ridge, you were asked a

20   series of questions about the -- how the two mailers were --

21   when and where they were recovered.  When was the second

22   mailer containing -- when and where was the second mailer

23   containing the cyanide recovered?

24   A      The day the first responders arrived at Mr. Denton's

25   residence, December 31, 2012.

1    Q      All right.  And when and where was the first mailer, the

2    earlier mailer in November, when and where was it recovered?

3    A      It was originally in the drawer side of the mantel.  It

4    was photographed there.

5           MR. RIDGE:  I'm going to object to that as being

6    nonresponsive to the question.

7           THE COURT:  Would you rephrase?

8    BY MR. FRANK:

9    Q      All right.  Well, I take that isn't when and where it

10   was recovered.  When and where was it recovered?

11   A      The police were -- the police were sent to Gail Coates'

12   residence on January 11, 2013, to recover that first envelope.

13   Q      And then on cross-examination, you were asked a series

14   of questions about whether the second envelope containing the

15   cyanide had been tampered with before the police seized it on

16   December 31, 2012.  How does that -- how does that envelope

17   compare to the other envelopes in this investigation that you

18   have recovered or that your investigation has been able to

19   recover?

20   A      My recollection is that they were all similar envelopes.

21   Q      Similar in what respects?

22   A      They were post envelopes that you could buy from the --

23   when you go into the post office, there are envelopes there

24   for sale, and they were those envelopes.

25   Q      Okay.  How about the -- the -- the handwriting on those

1    envelopes, did that appear -- how did that appear?

2    A    The handwriting was all similar, yes.

3    Q    How about the return addresses on all those envelopes?

4    A    They all contained 88 Pond Road, Manchester, Maine.

5    Q    And what about the baggies inside, how did they compare,

6    all the ones that you were able to recover?

7    A    All the ones I recovered the baggies were the exact same

8    texture, the exact same size.

9    Q    How about the way the material was packaged in them?

10   A    They were all similar, as well.

11         MR. FRANK:  Court's indulgence, Your Honor.  No

12   further questions from this witness, Your Honor.

13         THE COURT:  Recross.

14         MR. RIDGE:  Thanks, Your Honor.  I have a couple of

15   questions that I would like to ask.

16                    RECROSS-EXAMINATION

17   BY MR. RIDGE:

18   Q    Mr. Desrosiers, Mr. Frank asked you a number of

19   questions about the Brawn Kelly email and what you knew or

20   didn't know about Brawn Kelly?

21   A    Yes.

22   Q    Would it be fair to say that, of course, you didn't know

23   that, you didn't know anything about Brawn Kelly because no

24   effort was made to investigate who Brawn Kelly is, unlike the

25   massive investigation that was undertaken regarding

1   Mr. Kilmartin, fair?

2   A      You know, I may have emailed Brawn Kelly to solicit a

3   response, but I don't remember if I did that for sure.

4   Q      But in your response to the number of questions that you

5   didn't know, you know, did Brawn Kelly send cyanide to

6   Mr. Denton, did Brawn Kelly send two envelopes to Mr. Denton,

7   was he sending stuff all the over the world, you don't know he

8   -- you know he didn't send anything to Mr. Denton, but you

9   don't know what Brawn Kelly was doing because no effort was

10  made to find out who he is?

11  A      I don't know anything about Brawn Kelly.

12  Q      Okay.  And lastly, I just wanted to make sure I

13  understood your testimony about the baggie in the December

14  mailer.  Is it your testimony that the baggie as it appeared

15  in the mailer on December 31st was tied the same way as the

16  other baggies in other mailers that you saw in this case?

17  A      I'm not saying anything about tied.  I don't remember

18  tied.  I am just saying the consistency of the baggie and the

19  size of the baggie were all the same with all the mailers that

20  we recovered.

21  Q      You saw the photograph of the baggie taken by

22  Mr. Jordan, Colin Jordan, on December 31st, we had it next to

23  a ruler --

24  A      Yes.

25  Q      -- to see how big it was?

1   A      Yes.

2   Q      Was that tied the same way as the other baggies?

3   A      If I could see the picture, I would able to know.

4   Q      I was afraid you were going to ask me that.

5          MR. RIDGE:   Sorry for this delay, Your Honor.

6   BY MR. RIDGE:

7   Q      Mr. Desrosiers, here's a photograph of the baggie and

8   it's Government's Exhibit 59-11.

9   A      I see it.

10  Q      That looks -- does that look just like the other baggies

11  that you saw in this case?

12  A      Can I see pictures of the other baggies?

13  Q      Is there anything --

14  A      I don't recall the tying.  I recall the baggie itself.

15  Q      You don't have any recollection of what the tying of

16  other baggies looked like?

17  A      I don't.

18  Q      Okay.  So you can't tell us whether this appears to you

19  to have been opened and retied or simply tied and mailed?

20  A      I don't know.

21  Q      Okay.

22         MR. RIDGE:   That's all I have, Your Honor.   Thank

23  you.

24         THE COURT:   Anything further?

25         MR. FRANK:   No, Your Honor.

1          THE COURT:  Thank you.  You may stand down, sir.
2     Thank you.
3          (The witness, Michael Desrosiers, left the witness
4     stand.)
5          THE COURT:  Ladies and gentlemen, do you need to
6     take a break?  You can take a break if you need to.  I know
7     that sometimes nature calls.  If you're all set, we'll go
8     forward with the next witness.  It may take -- how long is
9     this next witness?
10         MR. FRANK:  Your Honor, this is my last witness, and
11    I -- you know, half an hour is my answer.
12         THE COURT:  Is that all right?  Okay.  Why don't you
13    proceed then.
14         MR. FRANK:  Thank you, Your Honor.  The Government
15    calls Dr. Cynthia Morris-Kukosky.
16         MR. RIDGE:  Your Honor, could we meet at sidebar
17    about this witness?
18         THE COURT:  Sure.
19                     SIDEBAR CONFERENCE
20         MR. RIDGE:  Your Honor, this is the witness that I
21    had raised -- in a motion in limine had raised an objection
22    to.
23         THE COURT:  Right.
24         MR. RIDGE:  And I think you indicated it wasn't
25    going to be -- that motion wasn't going to be acted on until

1      trial or at least I would have to revisit the issue, put it

2      that way.

3                   THE COURT:  Right.

4                   MR. RIDGE:  I don't think this witness adds anything

5      to this case because there is no issue generated but that

6      Mr. Denton died from ingesting cyanide.  There has been

7      testimony that the level of cyanide in his system was lethal.

8      There's been testimony about what a usual lethal dose of

9      cyanide is.  And I think this -- I think this witness is going

10     to testify not only to that, but to what cyanide does to shut

11     the body down.  I am not sure that's probative of any issue --

12     any issue in the case regarding Mr. Kilmartin and especially

13     because there is no dispute that he died from cyanide.  And I

14     think it's simply going to distract the jury from the real

15     issue and it sensationalizes Mr. Denton's death beyond what's

16     necessary for this case.

17                  THE COURT:  Well, I don't -- I really don't think

18     you're right on this one, Mr. Ridge.  As I said in the order

19     first, the Government bears the burden to prove the case

20     beyond a reasonable doubt.  And your assurance that there are

21     no issues doesn't mean that the Government isn't still

22     required to prove each of the elements including, among other

23     things, that your client actually killed Mr. Denton.  There

24     are ways that they can prove that.  It seems to me that he

25     could literally take cyanide, at least arguably the cyanide

1    might not be an efficient cause of the death, there might be

2    some other cause of the death.  He takes the cyanide, and

3    that's a precursor or it sets up death by heart attack or some

4    other means, for example, so I think that that Government has

5    the burden to establish that.

6         It also strikes me that your client, at least in some of

7    the emails, has indicated a relatively sophisticated knowledge

8    of how cyanide works and the doses that are necessary, when to

9    take it, how much to take, how it acts on the body, things of

10   that sort.  He's represented a fairly sophisticated amount of

11   knowledge.  And to the extent this expert, her testimony is

12   congruent with your client's knowledge, it serves to indicate

13   that he has done something knowing and intentionally in taking

14   the actions that he did.  So I think it -- that's the way I

15   see it.

16        What do you see, Mr. Frank?

17             MR. FRANK:  No, I agree, and I think it's also

18   circumstantial evidence of his identity as the killer, that he

19   knows these things and has said these things to others and

20   that they're true that -- that this witness can establish.

21             THE COURT:  Right.  That they're not figments of his

22   imagination, that actually an expert will confirm that his

23   understanding of cyanide and how it acts and its properties

24   is, in fact, accurate.  So I think it's relevant on both those

25   scores.  I understand there may be some prejudice from her

1    describing in gruesome detail exactly how the body reacts when

2    it takes cyanide, but that's part of the Government's burden.

3    So if it goes overboard, you certainly have a right to object,

4    but I suspect it won't.  All right?

5            MR. RIDGE:  Thank you, Your Honor.

6            MR. FRANK:  Thank you.

7            THE COURT:  Thank you.

8            (The sidebar conference was concluded.)

9            THE COURT:  You may proceed.

10           MR. FRANK:  Thank you, Your Honor.

11           THE CLERK:  Do you solemnly swear that the testimony

12   that you shall give in the matter now in hearing shall be the

13   truth, the whole truth, and nothing but the truth, so help you

14   God?

15           THE WITNESS:  I do.

16           THE CLERK:  Please be seated.  Please state your

17   name and spell your last name for the record.

18           THE WITNESS:  My name is Dr. Cynthia Lynn

19   Morris-Kukosky.  The last name is M-o-r-r-i-s hyphen

20   K-u-k-o-s-k-y.

21           MR. FRANK:  Thank you, Your Honor.

22   CYNTHIA MORRIS-KUKOSKY, having been duly sworn, was examined

23   and testified as follows:

24                        DIRECT EXAMINATION

25   BY MR. FRANK:

1    Q     Good morning, Doctor.

2    A     Good morning.

3    Q     Doctor, what sort of doctor are you?

4    A     I have a -- I'm a doctor of pharmacy.

5    Q     Okay.  And what are your specialties?

6    A     I have a BS in pharmacy, a doctor of pharmacy, and a

7    residency in clinical toxicology, and I am currently a

8    forensic toxicologist for the FBI.

9    Q     And what do you do as a forensic toxicologist for the

10   FBI?

11   A     I do many things at the FBI laboratory.  I receive

12   evidence, usually biologicals, but it could also be poisoned

13   food, and I test them for various drugs and poisons.  I also

14   receive medical records from patients to review to see whether

15   or not they have been poisoned with a particular substance.  I

16   analyze results, and I write reports and interpret those

17   results and when needed I testify in court.

18   Q     And this is all part of forensic as opposed to clinical

19   toxicology?

20   A     Correct.

21   Q     What is the science of forensic toxicology as opposed to

22   clinical toxicology?

23   A     Clinical toxicology, the difference being is as a

24   clinician, when I wear that hat, you work in a hospital.  Your

25   goal in your job there is to review medicines, decide whether

1   or not people need antidotes and what medicines do they need

2   to get them out of hospital.  That's clinical toxicology.

3       Forensic toxicology, there's two things, one forensic --

4   if you're a forensic toxicologist, you can be a clinical

5   toxicologist, meaning forensics you're just applying it to the

6   court of law.  Other times you're called a forensic

7   toxicologist because you're an analytical toxicologist so you

8   analyze samples, write reports, and then by going to court and

9   testifying you're considered a forensic toxicologist.

10  Q    So how long have you been a forensic toxicologist for

11  the FBI?

12  A    I've been a forensic toxicologist for the FBI since

13  2004.

14  Q    Okay.  When were you -- when -- where were you a

15  clinical toxicologist?

16  A    I was a clinical toxicologist, I started off as a poison

17  information specialist at Hennepin Regional Poison Center back

18  in 1989.  I then went to grad school back for Pharm. D. and

19  was a poison information specialist at the hotlines at -- in

20  Massachusetts down in Boston.  I received then my

21  certification as a poison specialist that you can do after you

22  had 2,000 hours and 2,000 cases.

23      After grad school, I worked at Hartford Hospital in

24  Connecticut where I was a critical care clinical pharmacist

25  and a toxicologist where I consulted on overdose cases and

1    helped with their assessment and treatment.  I also

2    moonlighted for the Connecticut Poison Center and then took

3    time off to actually become a diplomat of the American Board

4    of Applied Toxicology, and once I got that certification, I

5    actually entered the military.

6    Q    And did you work in the military as a toxicologist, as

7    well?

8    A    Yes, in the military, I worked -- my first duty tour I

9    worked as a critical care clinical pharmacist, as well as a

10   toxicologist, so I did detoxing alcoholics.  I got to see kids

11   that had overdosed or poisoned, people who tried to commit

12   suicide and needed antidotal therapy.

13        I then just switched hats on my second duty tour and was

14   sent to the drug screening laboratory where I was the

15   production manager of the drug screening lab and served as a

16   forensic toxicologist, analyzing specimens and testifying to

17   the results in court

18   Q    And what branch of the military was this for?

19   A    That was in the Navy.

20   Q    Do you have experience as an expert witness

21   toxicologist?

22   A    Yes, I do.

23   Q    And can you just give us a general idea, I mean how much

24   or how many --

25   A    I have been testifying since 1998.  It's well over 100

1    times, but I don't keep track.

2    Q    Are you familiar with potassium cyanide in particular?

3    A    Yes, I am.

4    Q    How so?  What sort of experience have you had with it?

5    A    Potassium cyanide is a lethal poison toxin.  Back when I

6    did my residency at Hennepin Regional Poison Center, we -- I

7    actually was part of the multi-center trial that was going to

8    obtain one of the new cyanide antidotes to get into this

9    country from France.  We also had to learn about cyanide in

10   general, not just potassium cyanide because smoke inhalation

11   victims -- not only do you get carbon monoxide when a -- when

12   you have a fire, but when plastics burn, you can liberate

13   cyanide gas.

14   Q    Is there an antidote for cyanide poisoning?

15   A    Yes, there is.

16             MR. FRANK:  Your Honor, I would offer

17   Dr. Morris-Kukosky as an expert in forensic and clinical

18   toxicology and cyanide poisoning in particular.

19             THE COURT:  I will see counsel.

20                      SIDEBAR CONFERENCE

21             THE COURT:  I don't think we do that.

22             MR. FRANK:  Okay.  All right.

23             THE COURT:  I mean, she -- if he objects to her

24   expertise --

25             MR. FRANK:  I'm sorry, I didn't know.

1    THE COURT:  I just want to tell you, you don't offer

2    her as an expert.  That's the old-fashioned way of doing

3    things.  We don't do it anymore.  It's up to the jury to

4    determine whether she's an expert and how to evaluate her

5    testimony.

6         MR. FRANK:  All right.

7         (The sidebar conference was concluded.)

8         MR. FRANK:  May I proceed, Your Honor?

9         THE COURT:  You may.

10   BY MR. FRANK:

11   Q    Doctor, were you asked to review the matter of Andrew

12   Denton's death in the United Kingdom and to explain how

13   potassium cyanide killed him?

14   A    Yes.

15   Q    Can you do that for us?

16   A    Sure.  Do you want me to start with signs and symptoms

17   or what would you like me to --

18   Q    Well, I defer to you, Doctor.  Do you -- well, let me

19   ask it this way, how generally does cyanide kill a person?

20   A    Okay.  Cyanide poisoning -- when someone takes cyanide,

21   basically you -- you're starving your body of oxygen so your

22   body goes from a state of you using and utilizing oxygen,

23   which is causing -- which is called an aerobic state to a part

24   of your body where you don't use oxygen, when is called an

25   anaerobic state.  What happens when your body no longer has

1   this -- has oxygen to deal with, your body starts to build up

2   toxins, and when it starts to build up these toxins, when we

3   look at your blood profiles, you wind up with what's called

4   lactic acidosis, metabolic acidosis, an anion gap, and an

5   increased venous oxygen saturation.

6        What that means for clinically, what are we going to see

7   because I can see the eyes going, yeah, that's all medical

8   terms.  I didn't go to medical school, and I don't look at

9   blood profiles.  When someone ingests cyanide, the first thing

10  that's going to happen is usually they develop -- they will

11  start to have a headache.  Then what happens is they go

12  from -- it's going to affect their brain and it's going to

13  affect their heart.  That's where cyanide is going to attack

14  for your symptoms.  You're first going to feel very anxious,

15  so you're going to get anxious.  You're going to be agitated.

16  Your blood pressure is going to go down.  Your heart rate is

17  going to go down.  Very quickly thereafter, the person becomes

18  lethargic, so they start to be a little bit off.  That

19  lethargy and mental disorientation proceeds to seizures.  At

20  that point what's going on in the heart is your blood pressure

21  and your heart rate will go up and very shortly thereafter you

22  die and you die as you go into a coma.  Your blood pressure

23  drops to nothing.  Your heart rate drops to nothing.  And you

24  stop breathing.

25  Q    And --

1    A      Something also very important to remember when you first

2    take it is if you ingest it, cyanide is also -- potassium

3    cyanide is corrosive so if you look at some of the textbooks,

4    they will actually say because of that corrosive nature, some

5    people will gasp from the corrosiveness as it burns from their

6    throat down to their stomach as it -- from swallowing it.

7    Q      How quickly can this happen?

8    A      It depends on how much the person took, the form of

9    cyanide, and the health of the person, but you can die within

10   minutes, and it may take up to about an hour.

11   Q      And can that action, that lethal action be accelerated

12   or retarded by any other factors?

13   A      Cyanide or potassium cyanide -- what is actually going

14   to cause the poisoning is hydrogen cyanide so you have to

15   liberate the gas, and we liberate potassium cyanide into

16   hydrogen cyanide by acid, so the stomach acid actually

17   converts the potassium cyanide into cyanide gas.  And that

18   actually causes the toxicity.  If you actually add more acid,

19   you can actually accelerate that reaction.

20   Q      And how could you add more acid?

21   A      You can ingest something acidic at the same time.

22   Q      Can you give us an example?

23   A      The poisoner's handbooks will say to have something like

24   lemon juice, citric acid, things like that.

25   Q      How lethal is potassium cyanide?

1   A    Potassium cyanide is very lethal.  A minimum lethal dose

2   is about 200 milligrams of potassium cyanide.

3   Q    Do you rate these things in toxicology, the lethality of

4   substances?

5   A    We do, and it's something that -- if I am going to work

6   with cyanide for the day and I have a cyanide case, the first

7   thing I do from my own safety is I will go down the hall and

8   let everybody know I am working with cyanide today.  Why?

9   Because if I hit the floor and something happens, I want

10  someone to know exactly what I am working with so I can get

11  the antidote immediately.

12  Q    And what is -- are you familiar with the term LD --

13  LD50, is that something that you work with?

14  A    I am.  I am not familiar -- with this particular case, I

15  wasn't asked to define the LD50.  LD50 just means it's the

16  dose that kills 50 percent of the population.

17  Q    All right.  But earlier you said that a lethal dose was

18  200 milligrams?

19  A    The minimum lethal dose, correct.

20  Q    The minimum lethal dose would be 200 milligrams?

21  A    Correct.

22  Q    All right.  And how many lethal doses would 100 grams of

23  potassium cyanide be?

24  A    Okay.  So if we do the math, just so you don't say why

25  -- how did you come up with a number out of thin air, 200

1   milligrams -- if you multiply 200 milligrams by 5, you get 1

2   gram.  So if you have 100 grams, 5 times 100 would be 500, so

3   that would be 500 minimum lethal doses.

4   Q     Are you aware of the concentration of cyanide that was

5   found in decedent Andrew Denton's blood?

6   A     Yes.

7   Q     What was that?

8   A     Seventeen microgram per milliliter or milligram per

9   deciliter, which is the same.

10  Q     And in your experience, how high or low is that?

11  A     That is consistent with the lethal level of cyanide.

12  Q     You've talked about what the lethal dose for ingestion

13  would be, is there also a lethal dose in the blood, a minimum?

14  A     Yes, basically, when we analyze blood samples in people,

15  we know what levels to expect what symptoms.  Smokers actually

16  can walk around with a cyanide level of .2 to .5, so low

17  levels of cyanide from smoking cigarettes.  People who have

18  levels above 2 and a half microgram per milliliter can be --

19  exhibit signs of coma.  People with levels greater than 3 can

20  be consistent with death and fatality.

21  Q     All right.  So 17 is much greater than 3?

22  A     Seventeen is greater than three, correct.

23  Q     Are levels like that dangerous to bystanders?

24  A     Yes.

25  Q     How could they be?

1    A     When someone works with cyanide, the bystanders need

2    to -- well, a bystander can get the off gas from the cyanide,

3    so if someone -- if a paramedic does CPR on someone who just

4    ingested cyanide, they potentially could actually wind up with

5    getting some of the hydrogen cyanide into them.  When medical

6    examiners or analytical chemists or toxicologists work with

7    the products themselves from the organs, they can actually get

8    levels of cyanide and hydrogen cyanide that gets liberated and

9    if they don't wear the right protective equipment, they could

10   actually puts themselves at risk.

11          MR. FRANK:  Court's indulgence, Your Honor.  I have

12   no further questions for this witness, Your Honor.

13          THE COURT:  Thank you.

14       Cross-examination.

15          MR. RIDGE:  I have no questions, Your Honor.

16          THE COURT:  Thank you.  You may stand down, ma'am.

17       (The witness, Dr. Cynthia Morris-Kukosky, left the

18   witness stand.)

19          THE COURT:  You indicated earlier, Mr. Frank, that

20   you wanted to check on the exhibits and make certain that the

21   exhibits that you wished to have admitted have actually been

22   admitted?

23          MR. FRANK:  Yes.

24          THE COURT:  Do you wish to take a break for this

25   that?

1             MR. FRANK:  Could I, please, Your Honor?

2             THE COURT:  Sure.  Ladies and gentlemen, we will

3    take a brief break.  I will bring you back as soon as I can.

4    Don't discuss the case.

5             (The jury left the courtroom at 10:48 a.m.)

6             THE COURT:  The Government is about to rest, and I

7    think I understood from you, Mr. Ridge, earlier that you were

8    not going to present any witnesses; is that right?

9             MR. RIDGE:  Correct, Your Honor.

10            THE COURT:  We may as well go forward then with my

11   colloquy with your client concerning his right to testify and

12   his decision not to testify.

13        All right.  Would you stand, Mr. Kilmartin?

14   Mr. Kilmartin, the Government has not formally rested.  It is

15   about to do so.  And the minute it formally rests, I will turn

16   to your lawyer and ask whether he has anything -- any

17   witnesses or evidence to present.  He's indicated to me that

18   he does not intend to call any witnesses including yourself.

19   Do you understand that to be the case?

20            THE DEFENDANT:  Yes, Your Honor.

21            THE COURT:  So you have decided not to testify; is

22   that right?

23            THE DEFENDANT:  That's correct, Your Honor.

24            THE COURT:  Mr. Kilmartin, you do have a

25   constitutional right to testify.  If you were to testify, you

1   would be under oath, you would be subject to the penalties of

2   perjury, you would be subject to cross-examination.  And once

3   you began to testify, you could not in the middle of your

4   testimony then assert the Fifth Amendment and selectively

5   testify as to what you want to testify and what you don't.  Do

6   you understand?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  Mr. Kilmartin, you also have a

9   constitutional right not to testify.  If you decide not to

10  testify, I will instruct the jury not to draw any negative

11  inference or suggestion of guilt from the fact you did not

12  testify.  Do you understand?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  Mr. Ridge, as you know, is a very fine

15  lawyer, and he's experienced in these matters, and you should

16  listen carefully to his advice, but ultimately the choice as

17  to whether to testify or not is not Mr. Ridge's, it is yours.

18  Do you understand?

19          THE DEFENDANT:  We've discussed it, Your Honor.

20          THE COURT:  Right.  My question for you, though, is

21  do you understand that even if he were to tell you, I don't

22  think you should testify, that you would have the right to

23  testify?  In other words, whether to testify or not is not his

24  choice, it is your choice.  Do you understand that?

25          THE DEFENDANT:  Yes, Your Honor.

1     THE COURT:  Now, without telling me what your lawyer

2  has said to you, you just indicated to me that you have

3  discussed this issue with Mr. Ridge and received his advice;

4  is that correct?

5     THE DEFENDANT:  That's correct, Your Honor.

6     THE COURT:  Now, Mr. Kilmartin, do you wish to

7  testify in this matter?

8     THE DEFENDANT:  No, I don't, Your Honor.

9     THE COURT:  All right.  You may be seated.

10    I have prepared an instruction, Mr. Ridge, that

11  contemplates -- I will instruct the jury that they are not to

12  draw any inference or suggestion of guilt from the fact your

13  client did not testify, and that will be included in the

14  instructions unless you ask me not to do so.

15    MR. RIDGE:  Thank you, Your Honor.

16    THE COURT:  I take it that you wish to have that

17  instruction given?

18    MR. RIDGE:  I do.

19    THE COURT:  All right.  I will take a recess and

20  allow counsel to review the exhibits.

21    And, Mr. Ridge, I'm going to ask you to review the

22  exhibits, as well, and make sure the things that you think are

23  in evidence are in evidence, and then we'll come back here,

24  the Government will close.  I will ask the defense whether or

25  not you wish to present any evidence.  The defense will close.

1   And then I will tell the jury to come back at 10:00 on Monday

2   -- Tuesday.  Thank you.

3           (Court was recessed at 10:51 a.m. and reconvened at

4   11:15 a.m.)

5           THE COURT:  Are we ready for the jury?

6           MR. FRANK:  Yes, Your Honor.

7           THE COURT:  Would you bring the jury in?

8           (The jury entered the courtroom at 11:13 a.m.)

9           THE COURT:  Mr. Frank.

10          MR. FRANK:  Thank you.  Thank you, Your Honor.  The

11  Government has checked with the defense and the clerk and

12  confirm its exhibits have been admitted and then rests, Your

13  Honor.

14          THE COURT:  Government rests.

15      Mr. Ridge.

16          MR. RIDGE:  The defendant rests, Your Honor.

17          THE COURT:  Ladies and gentlemen, both the

18  Government and the defendant have rested.  That means

19  effectively that all of the evidence has been presented to

20  you.  As I indicated to you yesterday, what we're going to do

21  is reconvene here on Tuesday at 10:00.  And at 10 o'clock, you

22  may anticipate that I will give you some jury instructions,

23  which you will be allowed to take with you into the jury room,

24  and you will hear the closing arguments of counsel.  Then I

25  will give you some final jury instructions about your

1    deliberations.  You can anticipate that the matter will be

2    handed over to you for deliberation probably before noon.  And

3    as I indicated to you earlier, you will take whatever time you

4    need to arrive at a fair, impartial, and unanimous verdict.

5        I am going to allow you to leave at this time with the

6    same admonition.  You may be a little tempted to start

7    discussing the case or doing something about the case now

8    because all of the evidence is closed.  I am going to, again,

9    ask you not to do that because you haven't heard the arguments

10   of counsel and you haven't heard the law, which will

11   necessarily be applied in your deliberations.

12       So with that, it looks like we're going to have a

13   wonderful weekend.  Enjoy the weekend.  We will see you back

14   here at -- by 10 o'clock on Tuesday.  Thank you.

15           (The jury left the courtroom at 11:16 a.m.)

16           THE COURT:  So in terms of the jury instructions, we

17   have the issues that I've suggested to counsel that I will

18   need your help on.  What I would like you to do, if you're

19   able to do it, is to make filings directly, any filings

20   directly with the CM/ECF system.  I will be working over the

21   weekend, and I will check the case periodically to make sure

22   that I get any filings that you have.

23       I would appreciate it if you don't wait until Tuesday

24   morning to tell me what you've discovered because that will be

25   too late.  I would like to have that information before me

1    sometime on Monday so that I can have a chance to review it

2    and understand what the positions of the parties is.

3        In terms of -- you ought to keep a look-out, as well, for

4    your case filing on this because what I'll do is I'll ask the

5    clerk to send out by the end of the day a set of revised

6    instructions, which will become the new draft instructions

7    that we're going to be working on.  I've already sort of

8    shortened them up so that I don't repeat myself unnecessarily

9    during the course of the instructions on issues such as the

10   definition of knowing and willful because the initial drafted

11   instructions had a lot of repetition in them.  Other than

12   that, they are right now the same.

13       What I'm thinking of doing is including for the last two

14   counts an instruction, which is consistent with my

15   understanding of United States v. Ford, and that is to say

16   that they have to -- the Government has to prove that the

17   defendant intentionally and knowingly killed Mr. Denton with

18   the intent, etc., etc.  And that -- it seems to me, and I'll

19   be convinced otherwise, but it seems to me that the willful

20   blindness instruction that the Court mentions in Ford may well

21   be applicable to this case, as well.  But I'll be guided by

22   counsel on that issue, as well.

23       Anyway, why don't you prepare -- what we're going to do

24   is we're going to need a little time to have the conference

25   and also to make all the copies before 10 o'clock, so why

1  don't you all -- why don't we all reconvene at 8:30 on Tuesday

2  and we will have a charge -- final charge conference at that

3  time.

4       Anything, Mr. Frank?

5           MR. FRANK:  No, Your Honor, not from the Government.

6           THE COURT:  Anything, Mr. Ridge?

7           MR. RIDGE:  No, Your Honor.  Thank you.

8           THE COURT:  Thank you.

9       Court will stand in recess.

10          (Court was recessed at 11:20 a.m.)

11                      * * * * *

12                   CERTIFICATION

13      I certify that the foregoing is a correct transcript from

14  the record of proceedings in the above-entitled matter.

15

16

17  /s/ Melissa L. Merenberg                    2/14/2017
    Melissa L. Merenberg, RPR                   Date
18  Official Court Reporter

19

20

21

22

23

24

25