1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MAINE

2

3

4   UNITED STATES OF AMERICA     )
                            )

5                         )      CRIMINAL ACTION
          vs.           )

6                         )       Docket No.
                         )    1:14-cr-00129-JAW

7   SIDNEY KILMARTIN,        )
                         )      JURY TRIAL

8              Defendant.     )

9

10                     VOLUME VI OF VI

11                TRANSCRIPT OF PROCEEDINGS

12     Pursuant to notice, the above-entitled matter came on

13  for JURY TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

14  District Judge, in the United States District Court, Bangor,

15  Maine, on the 11th day of October, 2016.

16

17  APPEARANCES:

18  For the Government:          Halsey B. Frank, Esquire

19  For the Defendant:           J. Martin Ridge, Esquire

20

21

22              Melissa L. Merenberg, RPR
               Official Court Reporter

23

24

25  Proceedings recorded by mechanical stenography; transcript
   produced by computer.

1          (Counsel present in chambers.)

2              THE COURT:  All right.  We're here on a charge

3      conference in the Sidney Kilmartin case.  The first question

4      for counsel is your closings, how long do you need?  And let

5      me tell you before you say it, I've never known a lawyer who

6      was a good estimator of his own ability to love his own voice.

7      So I'm very relaxed about it to a point.  If you tell me, oh,

8      Judge, I only need half an hour, then it strikes me as very

9      unfair to the next lawyer who thinks that he's going to get a

10     half an hour if you go on for an hour.  And I've had it happen

11     so often that it's a fair warning to you.  Lawyers always,

12     virtually always underestimate the amount of time they need,

13     so -- and I hate to interrupt a lawyer in a closing because

14     I've seen it -- I've never actually had it happen to me, but I

15     have seen it done and it's -- it upsets the flow of the

16     closing argument, and it doesn't serve a great purpose, I

17     don't think.

18          So what I'm going to say to you is if you tell me

19     something, you do bear the risk of having me poke in in the

20     middle of your argument if you have gone on.  The last time

21     somebody said a half an hour, they went on for 50 minutes.

22     And then I had to turn to the other party and say, well, if

23     you want the same amount of time, I will give it to you.  And

24     I don't want to be put in that position.

25          So with that, Mr. Frank, how long do you need?

1           MR. FRANK:  You're making me nervous, Your Honor.

2           THE COURT:  Well, I'm intentionally doing it.  The

3    problem is if you say I want an hour and then you go on for an

4    hour and a half, then Mr. Ridge has been disadvantaged because

5    he's planned for you to say -- to argue for an hour.

6           MR. FRANK:  Well, I was going to say an hour, and 15

7    for rebuttal.

8           THE COURT:  All right.

9           MR. RIDGE:  I don't need anywhere near that amount

10   of time, Your Honor.  And I really think approximately a half

11   is hour is what I am going to need.

12          THE COURT:  Okay.  Well, I'm going to give you the

13   same time that I give the Government.  So if you want an hour

14   and then 15 minutes for rebuttal, that's fine.

15       Have you had an opportunity to review the verdict forms?

16          MR. FRANK:  I did, Your Honor.

17          THE COURT:  And?

18          MR. FRANK:  They were acceptable to me.

19          MR. RIDGE:  Acceptable, Your Honor.

20          THE COURT:  Okay.  So let's go to the jury

21   instructions.  On Friday, I asked counsel to address two

22   issues, and the first was the defendant's argument to the jury

23   that the indictment alleges potassium cyanide and the evidence

24   will only show cyanide, not potassium cyanide, and what to do

25   about that.

1    The second issue was the question of double intent, the

2    witness tampering statute, for example, says, whoever kills

3    another person with the intent to prevent communication by any

4    person to a law enforcement officer of information related to

5    the commission of a federal offense.

6    And there's no specific indication that the statute

7    requires that the intent to kill be knowingly or the actual

8    killing be knowingly.  So I think of somebody who wants to

9    intimidate somebody and jumps out and points a gun at them and

10   they die of a heart attack, he intended to scare -- he

11   knowingly intended to scare the person, but he didn't

12   knowingly intend to kill the person.

13   The Government has sort of -- has filed a memo that sort

14   of wants it both ways, saying that you don't think it really

15   requires it, but you don't mind if I instruct the jury.  I did

16   find a number of cases directly on point, but there are no

17   First Circuit cases.  The first is United States v. Smalls,

18   which is 752 F.3d 1227, 12 -- 4748, a Tenth Circuit case in

19   2014, United States v. Rose, which is 362 F.3d 1059, an Eighth

20   Circuit case in 2014 or 2004, and United States v. Suggs,

21   S-u-g-g-s, 266 Fd. Appx. 258, a Fourth Circuit case in 2008.

22   All of them infuse a knowing requirement in this statute, what

23   the Government refers to as a double knowledge requirement.

24   And my view is that it's consistent with United States v.

25   Ford, which was the case I mentioned to you last Friday, 821

1    F.3d 63, a First Circuit case in 2016.  So my determination is

2    that I am going to instruct the jury on double intent in

3    accordance with the current phrasing of the instructions.

4         The next question is what the Court should instruct the

5    jury about the defendant's argument that the indictment

6    alleges potassium cyanide and the Government can prove only

7    cyanide or perhaps sodium cyanide.  The Government initially

8    responded that potassium cyanide is nonmailable by regulation,

9    which was not, at least directly, responsive to the issue, but

10   it does raise a separate question, and that is what the Court

11   should instruct the jury about whether potassium cyanide is

12   nonmailable.  And I read the Government's argument, but I

13   didn't see a proposed instruction, and I wasn't sure what the

14   Government was proposing in terms of what I should say, if

15   anything, to the jury concerning the question about the post

16   office regulation.

17             MR. FRANK:  Well, Your Honor, I propose -- I mean, I

18   think the statute makes all poisons that can injury or kill --

19             THE COURT:  I know the argument.  I know the

20   argument.  You made the argument.  What I am interested in is

21   not an argument.  This is instruction time.  What do you want

22   me to say to the jury?

23             MR. FRANK:  That as a matter of law, poison that can

24   injure or kill is nonmailable including all forms of cyanide,

25   potassium, sodium, or otherwise, and the only question of fact

1    for them is whether what Kilmartin mailed Denton is poison,

2    such as potassium cyanide, sodium cyanide, or cyanide.

3           THE COURT:  Well, I'm clearly not going to be

4    instructing them on what -- the only questions of fact for

5    them to resolve.  That's -- the way you phrased it is

6    argumentative.

7        What do you want me to do?

8           MR. RIDGE:  Well, Your Honor, I think it's

9    appropriate for the Court to instruct the jury that potassium

10   cyanide is nonmailable.

11          THE COURT:  Right.  So if I say the following, by

12   regulation the Court instructs the jury that potassium cyanide

13   is -- has been declared nonmailable by the United States

14   Postal -- by United States Postal Service regulation.  So let

15   me repeat that, by regulation the Court instructs the jury

16   that potassium cyanide has been declared nonmailable by the

17   United States -- by the United States Postal Service.

18          MR. RIDGE:  That's fine.  I'm fine with that, Your

19   Honor.

20          MR. FRANK:  That's fine.

21          THE COURT:  Okay.  So I'll add that in -- somewhere

22   in the descriptions of Count 1.

23       Then the next question is the one that I asked counsel to

24   weigh in on and other -- assuming that I instruct the jury as

25   I've described, what -- what, if anything, should I instruct

1    the jury about the second question about they didn't prove it

2    was potassium cyanide as opposed to pure cyanide or sodium

3    cyanide?  I do think that -- I reviewed the case that the

4    Government cited, which is Descamps, which is D-e-s-c-a-m-p-s,

5    v. United States, which is 133 Supreme Court 2376, and it does

6    go on at some length to describe the difference between a

7    statute which is more specific and a statute which is more

8    generic.  And it says, as the Government has quoted in its

9    memorandum that as long as the statute itself requires only an

10   indeterminate weapon, that is all the indictment must or is

11   likely to allege and all the jury instructions must or are

12   likely to mention.  And most important, that is all the jury

13   must find to convict the defendant.  The jurors need not all

14   agree on whether the defendant used a gun or a knife or a tire

15   iron or any other particular weapon that might appear in an

16   imagined visible statute because the actual statute requires

17   the jury only to find a weapon.

18       Here, I think the actual statute requires the jury to

19   find, as I've instructed here, something declared nonmailable,

20   but I have added here in accordance with the instruction

21   submitted by the Government in this case potassium cyanide.

22       So how do -- I do think that the way the statute -- the

23   statute doesn't read that it is prohibited to put potassium

24   cyanide in the mail.  It reads that it's prohibited to put

25   something nonmailable, which the statute effectively defines

1    as poisonous in the mail, and then you have regulations that

2    say potassium cyanide is nonmailable.

3        So what -- how do you -- how do you want me to approach

4    this?

5            MR. RIDGE:  Your Honor, my position would be that it

6    should be approached just as it's already worded in the

7    proposed instruction.  And I understand the language of the

8    statute for this particular case, not only did the Government

9    specifically allege potassium cyanide, but it introduced a

10   certificate of analysis and said this is the product that was

11   mailed to Kilmartin that he then sent to Denton.  And I think

12   it deprives me of whatever argument I may have about that to

13   at this stage in the proceeding change the potassium cyanide

14   to just a nonmailable element.

15           THE COURT:  Isn't the -- let's assume that the jury

16   were to find that the -- that your client sent him something

17   other than potassium cyanide, he sent him cyanide or sodium

18   cyanide, hasn't he still violated the statute?

19           MR. RIDGE:  Well, he has, but I think there is just

20   no evidence that he -- if he sent something, it was potassium

21   cyanide.  There's no evidence that he had possession of any

22   other element that could have been or substance that could

23   have been mailed.

24           THE COURT:  Right.  So you're not arguing that --

25   I'm trying to clarify the argument.

1          MR. RIDGE:  Okay.

2          THE COURT:  Because it seems to me it may or may not

3    trigger an instruction.  So you're arguing, for example, that

4    the Government hasn't demonstrated in the proof that it's

5    placed before the jury that potassium cyanide was the thing

6    that killed Mr. Denton, and you do have this alternative

7    person who said they had sent him some -- they at least talked

8    about sending him some type of poison that would affect his

9    death, and that it's more a matter of proof, it's a matter of

10   -- rather than instruction is the way I'm gathering it.

11         MR. RIDGE:  I think that's probably correct.  It is

12   correct.  You know, it's a -- my argument is going to be that

13   the Government selected the substance that it claims

14   Mr. Denton was killed with and it hasn't --

15         THE COURT:  As a matter of law, as matter of

16   evidence, but not --

17         MR. RIDGE:  Right.

18         THE COURT:  Let's take, for example, and I don't

19   know that there is any evidence of this, but they -- there was

20   evidence that he didn't send potassium cyanide, but he sent

21   sodium cyanide and it still killed him, that wouldn't -- it

22   wouldn't be a defense, would it?

23         MR. RIDGE:  No.

24         THE COURT:  Okay.

25         MR. RIDGE:  No, I agree with that.

1          THE COURT:  So is there anything I need to do?

2          MR. FRANK:  I'm not sure there is, Your Honor.  I

3   mean, I don't think there is any affirmative evidence of

4   sodium cyanide in the record.  If there were, I still think it

5   would be a tolerable variance of proof between the indictment

6   and trial.  Again, I don't think there is that evidence, but I

7   don't think this is a constructive amendment.  I don't think

8   it changes the crime.  I don't think it changes the elements.

9          THE COURT:  Yeah, I think what Descamps is talking

10  about is you don't -- if this were a gun case, that he used a

11  gun, it's not necessary -- sometimes they say he used a gun to

12  wit: a J9 or something like that, and let's assume that he

13  said I didn't use a J9, but the evidence was he used a Smith &

14  Wesson, I don't think that the defendant escapes the gun

15  indictment on that basis.

16          MR. RIDGE:  I agree with that.

17          THE COURT:  Okay.  So we'll just leave it alone.

18      Let me now talk about the next issue here, no affirmative

19  evidence of sodium cyanide in the record.  That's an argument.

20  It's not something I am going to rule on, I don't think.

21      You're not requesting a jury instruction to that effect?

22          MR. FRANK:  No, Your Honor.

23          THE COURT:  Okay.  Then the nonmailable matter must

24  be the but for cause of death.  I reviewed Burrage --

25          MR. FRANK:  Yes, Your Honor.

1           THE COURT:  -- and I also took a look at Judge

2    Torresen's instructions on but for, along with a more recent

3    case that came out of the First Circuit in United States v.

4    Alphas, which is A-l-p-h-a-s, 784 F.3d, 775, a 2015 case.

5    It's a fraud case, but it involves the same kind of issue

6    here.  And I think that the Government, although you didn't

7    propose, I don't think, a specific -- any specific language, I

8    agree that you are entitled, if you are requesting it, with an

9    instruction about what resulted in means.  And I have included

10   that on page 11 under the underlined portion of page 11.

11          MR. FRANK:  Yes, Your Honor.  I think that -- that

12   would be helpful, and I would request it.

13          THE COURT:  Okay.  I think that is the law.

14       What do you think, Mr. Ridge?

15          MR. RIDGE:  I can't argue that that's the law, Your

16   Honor.

17          THE COURT:  Can't argue that it isn't the law?

18          MR. RIDGE:  Can't argue that it isn't the law.

19          THE COURT:  Okay.  Let's then go to whether suicide

20   is a defense to mailing injurious articles.

21       You're not requesting a jury instruction on that?

22          MR. FRANK:  No, Your Honor.

23          THE COURT:  All right.  There's not enough evidence

24   to make an alternative suspect argument.  I'm just not going

25   to rule as a matter of law --

1          MR. FRANK:  No, I understand, Your Honor.  I was

2     just trying to anticipate things that I thought might be --

3     might occur based on the way the case has gone in.  I know you

4     didn't ask for that.  And I was just --

5          THE COURT:  Well, no, I appreciate you're bringing

6     it up, but I -- this isn't a directed verdict kind of case, so

7     I think Mr. Ridge is entitled to make an argument on behalf of

8     his client if it's justified by the evidence before the Court

9     and --

10         MR. FRANK:  I agree that's the standard.  I just --

11    I agree it's an argument.  I just figured rather than --

12    rather than make it during closing argument, I thought it

13    might happen, so I -- I was in on Saturday, I figured I would

14    --

15         THE COURT:  Okay.  All right.  Fine.  And then we

16    talked about double intent.

17       Willful blindness, I put the instruction in because

18    it's -- I think it was generated, but it's generally

19    considered favorable to the Government.  If you don't want it,

20    I won't give it unless the defense wants me to give it.

21         MR. RIDGE:  I don't want you to give it, Your Honor.

22         THE COURT:  I didn't think so.  I will strike it,

23    and I will strike all references to it.  I found the

24    references on page 10 where it first starts with Mr. Kilmartin

25    acted knowingly, which I defined in just one sentence, and

1    then where it says, in deciding whether the defendant acted

2    knowingly, you may infer, etc., etc., that's out.  I think the

3    generalized instructions about intent or knowledge may not

4    ordinarily be proven directly because there's no way directly

5    of scrutinizing the workings of the human mind.  That stays

6    in.

7              MR. FRANK:  I agree.

8              MR. RIDGE:  Yes, Your Honor.

9              THE COURT:  And then I've eliminated on page 12 it

10   comes up where it says knowingly for this count has the same

11   meaning that I earlier defined, including the willful

12   blindness instruction.  I will just say a period after

13   defined.  And then it comes up one other time, three more

14   times, one on the top of page 15 and where I say the same

15   definitions of knowingly and willful that I gave you earlier

16   apply to this count including, and I have struck the willful

17   blindness instruction and simply said, including the

18   instruction about scrutinizing the workings of the human mind,

19   and the same on the top of page 16 and the bottom of page 16.

20        Regarding the defense propensity argument --

21              MR. FRANK:  Yes, Your Honor.

22              THE COURT:  -- what do you want me to do about that?

23              MR. FRANK:  I was asking for -- I mean, again, it's

24   another one of these arguments I was anticipating might be

25   made and if it is made, I would like some opportunity to rebut

1   it with either or both of those points, either being able to

2   mention it in my argument, you know, you may have heard that

3   he assaulted an 80-year old man in 2007 and that he conspired

4   to obstruct justice in a shoplifting case in 2012, but, again

5   I'm just -- I'm flagging it.  I thought it might happen.  You

6   know, I don't think there's a basis for it so that I think

7   that the doctrines of curative admissibility and fair reply

8   would apply.  I concede the evidence is closed at this point,

9   but I don't think there's any -- I don't think there's any

10  evidence from which that argument can be made.  I think to the

11  extent the pleas and prosecution version are in this case,

12  they're in for the limited purposes you instructed and not for

13  his good character for law abidingness or peacefulness.

14              THE COURT:  Well, first, I think that if you wanted

15  to get that in, that should have been done before the evidence

16  closed.  I do agree that there was no way you could have known

17  what the defense was going to produce.  Mr. Ridge certainly

18  indicated that in all likelihood Mr. Kilmartin would not

19  testify, but you didn't really know.  He could have put

20  somebody else on or gotten some other way of getting the

21  evidence about his upbringing and his work at Shaw's for years

22  and going into the real estate business and things of that

23  sort that were mentioned in the opening, but once he didn't

24  produce any evidence, I think that was the time for you,

25  because the opening was already made, to ask the Court to put

 1    in further evidence and you decided not to.  So I'm not going

 2    to let you reopen the evidence at this stage.

 3         It does pose a question about what, if anything, should

 4    be done about the information that you conveyed, Mr. Ridge,

 5    about your client that really is not a matter of evidence now.

 6    And I think that I'm already going to instruct the jury that

 7    the statements by lawyers are not evidence, and -- which they

 8    aren't, so the jury -- if you want to make -- it's -- you're

 9    in a very tricky position on this, Mr. Frank, because you

10    can't imply that the defense has a burden.  And you certainly

11    can't imply that he should have taken the stand and testified

12    about the information that Mr. Ridge conveyed.  So you're in

13    an awkward position.

14         MR. FRANK:  Your Honor, I think my plan would be if

15    he -- if he argues it, I don't know that I would object, but I

16    would point out that there wasn't any evidence of his good

17    character in evidence at the very least.

18         MR. RIDGE:  Your Honor, maybe I can short-circuit

19    this a bit.  I have absolutely no intention of arguing

20    Mr. Kilmartin's good character or peacefulness, no intention

21    at all.

22         THE COURT:  Okay.  Well, let's see what we come up

23    with.  I do think it's a fair point that in the opening, you

24    made statements about who he was that really have not been

25    backed up by the evidence --

1          MR. RIDGE:  Correct.

2          THE COURT:  -- itself.

3          MR. RIDGE:  Correct.

4          THE COURT:  But I'm not going to let you reopen the

5    case and produce evidence of his bad character at this point.

6       So is there anything else?

7          MR. RIDGE:  I don't think so, Judge.

8          MR. FRANK:  I don't think so, Your Honor.

9          THE COURT:  All right.

10          MR. RIDGE:  Thank you.

11          THE COURT:  We will put together a final set of jury

12    instructions, and I'll see you all at 10:00.

13          (The chambers conference was concluded at 9:00 a.m.)

14          (Counsel and parties present in the courtroom at

15    10:05 a.m.)

16          MR. FRANK:  Good morning, Your Honor.

17          THE COURT:  Good morning.

18          MR. RIDGE:  Good morning, Your Honor.

19          THE COURT:  Would you bring the jury in, please.

20       (The jury entered the courtroom at 10:05 a.m.)

21          THE COURT:  Morning, ladies and gentlemen of the

22    jury.  I am going to ask the clerk to distribute the final

23    jury instructions, which I promised you would be in writing

24    that you would be able to take with you to the jury room.  I

25    am going to read those instructions to you as you read along.

1  And then after I'm done with the first couple of parts of the

2  instructions, you will hear the closing arguments of counsel,

3  and then I will have some final instructions for you

4  concerning your jury deliberations.

5      Would the clerk proceed?  The jury instructions you have

6  before you simply state at the very top the court that you're

7  in and the case caption.  Final jury instructions.  Members of

8  the jury, the evidence having been fully presented to you, it

9  is now my duty to instruct you as to the law applicable to

10 this case.  These instructions will be in four parts:  First,

11 the general rules that define and control your duties as

12 jurors; second, rules regarding the evidence that has been

13 presented to you; third, definitions of the elements of the

14 offenses charged in the superseding indictment -- in other

15 words, what the Government must prove to make its case; and

16 fourth, some rules for your deliberations in the jury room and

17 the return of your verdict.  You will have a copy of these

18 instructions with you in the jury room.

19     General rules concerning jury duties.  It is your duty to

20 find the facts from all the evidence admitted in this case.

21 To those facts you must apply the law as I give it to you.

22 The determination of the law is my duty as the presiding judge

23 in this court.  It is your duty to apply the law exactly as I

24 give it to you, whether you agree with it or not.  You must

25 not be influenced by personal likes or dislikes, opinions,

1    prejudices, or sympathy.  That means you must decide the case

2    solely on the evidence before you and according to the law.

3    You will recall that you took an oath promising to do so at

4    the beginning of the case.

5        In following my instructions, you must follow all of them

6    and not single out some and ignore others.  They are all

7    equally important.  And you must not read into these

8    instructions or into anything I may have said or done, any

9    suggestion as to what verdict you should return -- that is a

10   matter entirely for you to decide.

11       Presumption of innocence.  It is a cardinal principle of

12   our system of justice that every person accused of a crime is

13   presumed to be innocent unless and until guilt is established

14   beyond a reasonable doubt.  The presumption is not a mere

15   formality.  It is a matter of the most important substance.

16       The presumption of innocence alone is sufficient to

17   acquit Mr. Kilmartin unless you are satisfied beyond a

18   reasonable doubt of his guilt after considering all the

19   evidence.  Sidney Kilmartin, the defendant before you, has the

20   benefit of that presumption throughout the trial, and you are

21   not to convict him of a particular charge unless you are

22   persuaded of his guilt beyond a reasonable doubt.

23       Proof beyond a reasonable doubt.  In a criminal case, the

24   burden of proof is at all times upon the Government to prove

25   guilt beyond a reasonable doubt.  The Government's burden to

1  prove that Mr. Kilmartin is guilty of the crimes with which he

2  has been charged is a heavy burden.  The law does not require

3  that the Government prove guilt beyond all possible doubt.

4  Proof beyond a reasonable doubt is sufficient to convict.

5  This burden never shifts to Mr. Kilmartin.  It is always the

6  Government's burden to prove each of the elements of the

7  crimes charged beyond a reasonable doubt by the evidence and

8  the reasonable inferences to be drawn from that evidence.

9  Mr. Kilmartin has the right to rely upon the failure or

10  inability of the Government to establish beyond a reasonable

11  doubt any essential element of the crimes charged against him.

12  Before you may convict Mr. Kilmartin, the Government's

13  evidence must satisfy you beyond a reasonable doubt of his

14  guilt of the crimes charged.

15      If, after fair and impartial consideration of all of the

16  evidence, you have a reasonable doubt as to Mr. Kilmartin's

17  guilt of a particular crime, it is your duty to find him not

18  guilty of that crime.  On the other hand, if, after fair and

19  impartial consideration of all the evidence, you are satisfied

20  beyond a reasonable doubt of Mr. Kilmartin's guilt of a

21  particular crime, you should find him guilty of that crime.

22      A reasonable doubt does not mean a mere possibility that

23  Mr. Kilmartin may be not guilty, nor does it mean a fanciful

24  or imaginary doubt or one based upon groundless conjecture.

25  It means a doubt based on reason.  A level of proof that

1   requires you to indulge in conjecture, surmise, or suspicion

2   in order to reach a conclusion of guilt does not constitute

3   proof beyond a reasonable doubt.

4       Defendant's constitutional right not to testify.

5   Mr. Kilmartin has a constitutional right not to testify and no

6   inference of guilt or anything else may be drawn from the fact

7   he did not testify.  For any of you to draw such an inference

8   would be wrong; indeed, it would be a violation of your oath

9   as a juror.

10      Discussions out of the hearing of the jurors.  During the

11  trial, I held discussions out of your hearing from time to

12  time regarding questions of law and other matters solely for

13  my consideration.  This, as I have told you, is a usual and

14  regular procedure.  No prejudice or unfavorable inference

15  should be held by you because of this.  Do not discuss or

16  consider what you think transpired in these discussions.

17      Punishment.  The punishment provided by law for the

18  crimes charged in the indictment is a matter exclusively

19  within my province and should never be considered by the jury

20  in any way in arriving at an impartial verdict as to the guilt

21  or innocence of Mr. Kilmartin.

22      Instructions concerning evidence.  I come now to the

23  second part of my instructions, instructions concerning the

24  evidence that has been presented to you during this trial.

25      General rules regarding evidence.  The guilt of

1   Mr. Kilmartin of the offenses charged against him must be

2   established upon the evidence and the reasonable inferences to

3   be drawn from the evidence.   The evidence from which you are

4   to decide what the facts are consist of the sworn testimony of

5   witnesses, both on direct and cross-examination, regardless of

6   who called the witness; the exhibits that have been received

7   into evidence; and any facts to which the lawyers have agreed

8   or stipulated.

9       Although you may consider only the evidence presented in

10  this case, you're not limited to the bald statements made by

11  the witnesses or contained in the documents.   In other words,

12  you are not limited solely to what you saw and heard as the

13  witnesses testified.   In light of common sense and personal

14  experience, you are permitted to draw reasonable inferences

15  from the facts that you find to have been proven.

16      Credibility of witnesses.   Whether the Government has

17  sustained its burden of proof does not depend upon the number

18  of witnesses it has called or upon the number of exhibits it

19  has offered, but instead upon the nature and quality of the

20  evidence presented.   You do not have to accept the testimony

21  of any witness if you find the witness not credible.   You must

22  decide which witnesses to believe and which facts are true.

23  To do this, you must look at all the evidence drawing upon

24  your common sense and personal experience.

25      You may want to take into consideration such factors as

1    the witnesses' conduct and demeanor while testifying; their
2    apparent fairness or any bias they may have displayed; any
3    interest you may discern that they may have in the outcome of
4    this case; any prejudice they may have shown; their
5    opportunities for seeing and knowing the things about which
6    they have testified; the reasonableness or unreasonableness of
7    the events that they have related to you in their testimony;
8    and any other facts or circumstances disclosed by the evidence
9    that tend to corroborate or contradict their versions of the
10   events.

11       Impeachment by prior inconsistent statement.  You've
12   heard evidence that before testifying at this trial, certain
13   witnesses made statements concerning the same subject matter
14   as their testimony in this trial.  You may consider an earlier
15   statement to help you decide how much of a witness's testimony
16   to believe.  If you find that the prior statement was not
17   consistent with the witness's testimony at this trial, then
18   you should decide whether that affects the believability of
19   the witness's testimony at this trial.

20       Statements by the defendant.  You have heard evidence
21   that Mr. Kilmartin made statements in which the Government
22   claims he admitted certain facts.  It is for you to decide,
23   one, whether Mr. Kilmartin made the statements; and two, if
24   so, how much weight to give them.  In making those decisions,
25   you should consider all the evidence about the statements,

1  including the circumstances under which the statements may

2  have been made and any facts or circumstances tending to

3  corroborate or contradict the version of the events described

4  in the statements.

5      Cautionary and limiting instructions as to particular

6  kinds of evidence.  A particular item of evidence is sometimes

7  received for a limited purpose only.  That is, it can be used

8  by you only for one particular purpose and not for any other

9  purpose.  I have told you when that occurred and instructed

10  you on the purposes for which the item can and cannot be used.

11      Direct and circumstantial evidence.  There are two kinds

12  of evidence:  Direct and circumstantial.  Direct evidence is

13  direct proof of a fact, such as the testimony of an eye

14  witness.  Circumstantial evidence is indirect evidence, that

15  is, proof of a fact or chain of facts from which you can draw

16  the inference by reason and common sense that another fact

17  exists, even though it has not been proven directly.  You are

18  entitled to consider both kinds of evidence.  The law permits

19  you to give equal weight to both, but it is for you to decide

20  how much weight to give any evidence.

21      Stipulations.  The evidence in this case includes facts

22  to which the lawyers have agreed or stipulated.  A stipulation

23  means simply that the Government and Mr. Kilmartin accept the

24  truth of a particular proposition or fact.  Since there is no

25  disagreement, there is no need for evidence apart from the

1   stipulation.  You must accept the stipulation as fact to be

2   given whatever weight you chose.

3       Expert witnesses.  You have heard testimony from persons

4   described as experts.  An expert witness has special knowledge

5   or experience that allows a witness to give an opinion.  You

6   may accept or reject such testimony.  In weighing the

7   testimony, you should consider the factors that generally bear

8   upon the credibility of a witness, as well as the expert

9   witness's education and experience, the soundness of the

10  reasons given for the opinion, and all other evidence in this

11  case.  Remember that you alone decide how much of a witness's

12  testimony to believe and how much weight it should be given.

13      Similar acts.  You have heard evidence that Mr. Kilmartin

14  may have committed acts similar to those charged in this case.

15  You may not use this evidence to infer that, because of his

16  character, Mr. Kilmartin carried out the acts charged in this

17  case.  You may consider this evidence only for the limited

18  purpose of deciding:  One, whether Mr. Kilmartin had the state

19  of mind or intent necessary to commit the crimes charged in

20  the indictment; two, whether Mr. Kilmartin had the motive or

21  opportunity to commit the acts charged in the indictment;

22  three, whether Mr. Kilmartin acted according to a plan or in

23  preparation for commission of a crime; or four, whether

24  Mr. Kilmartin committed the acts for which he is on trial by

25  accident or mistake.

1    Remember, these are the only purposes for which you may

2    consider the evidence of Mr. Kilmartin's similar acts.  Even

3    if you find that Mr. Kilmartin may have committed similar

4    acts, this is not to be considered as evidence of character to

5    support an inference that Mr. Kilmartin committed the acts

6    charged in this case.

7        What is not evidence?  Certain things are not evidence,

8    and you may not consider them in deciding what the facts are.

9    I will list matters for you that are not evidence for you:

10   One, arguments and statements by lawyers are not evidence.

11   The lawyers are not witnesses.  What they say in their opening

12   statements, closing arguments, and other times is intended to

13   help you interpret the evidence, but it is not evidence.  If

14   the facts as you remember them differ from the way the lawyers

15   have stated them, your memory of them controls.  Two,

16   questions and objections by lawyers are not evidence.  The

17   lawyers have a duty to object when they believe a question or

18   exhibit is improper under the Rules of Evidence.  And you

19   should not be influenced by the objection or by my ruling on

20   it.  Three, anything that I have excluded from evidence or

21   ordered stricken and instructed you to disregard is not

22   evidence.  You must not consider such items.  Four, anything

23   you may have seen or heard when the court was not in session

24   is not evidence.  You are to decide the case solely on the

25   evidence received at trial.  Five, the superseding indictment

is not evidence.  You will have the superseding indictment

before you in the course of your deliberations in the jury

room.  The superseding indictment was returned by a Grand Jury

which heard only the Government's side of the case.  I caution

you, as I have before, that the fact that Mr. Kilmartin has

had an indictment filed against him is not evidence whatsoever

of his guilt.  The superseding indictment is simply an

accusation.  It is the means by which the allegations and

charges of the Government are brought before this court.  The

superseding indictment proves nothing.

Elements of the offenses charged.  I come to the third

part of my instructions, the elements of the offenses the

Government has charged and what it must prove to make its

case.  Count 1, the Government charges Mr. Kilmartin with

violating the federal statute making it illegal to mail

injurious articles resulting in death.  In order for you to

find Mr. Kilmartin guilty of this crime, the Government must

prove the following elements beyond a reasonable doubt:

First, that Mr. Kilmartin knowingly deposited for mailing or

delivery or knowingly caused to be delivered by mail; second,

something declared nonmailable, in this case, potassium

cyanide; third, that Mr. Kilmartin did so with the intent to

kill or injure another; and fourth, that the injurious article

mailed resulted in the death of any person, in this case,

Andrew Denton.

1      Mr. Kilmartin acted knowingly if he was conscious and
2 aware of his actions and realized what he was doing or what
3 was happening around him and did not act because of ignorance,
4 mistake, or accident.

5      Intent or knowledge may not ordinarily be proved directly
6 because there is no way of directly scrutinizing the workings
7 of the human mind.  In determining what Mr. Kilmartin knew or
8 intended at a particular time, you may consider any statements
9 made or acts done or omitted by Mr. Kilmartin and all other
10 facts and circumstances received in evidence that may aid in
11 your determination of Mr. Kilmartin's knowledge or intent.
12 You may infer, but you're certainly not required to infer,
13 that a person intends the natural and probable consequence of
14 acts knowingly done or knowingly omitted.  It is entirely up
15 to you, however, to decide what facts are proven by the
16 evidence received during this trial.

17      To find Mr. Kilmartin guilty of this charge, the
18 Government must prove beyond a reasonable doubt that the
19 injurious article resulted in Andrew Denton's death.  To prove
20 this element of this crime, the Government must prove beyond a
21 reasonable doubt that Mr. Denton's death was caused, in fact,
22 by the injurious article that the Government claims
23 Mr. Kilmartin mailed to him.  In other words, the Government
24 must prove beyond a reasonable doubt that Mr. Denton's death
25 would not have occurred but for Mr. Kilmartin's conduct.

1          By regulation, the Court instructs the jury that

2     potassium cyanide has been declared nonmailable by the United

3     States Postal Service.

4          Counts 5 and 7.  The Government charges Mr. Kilmartin

5     with violating the federal statute making wire fraud illegal.

6     In order for you to find Mr. Kilmartin guilty of this crime,

7     the Government must prove the following elements beyond a

8     reasonable doubt:  First, that there was a scheme

9     substantially as charged in the indictment to defraud or to

10    obtain money or property by means of a false -- or by means of

11    false or fraudulent pretenses.  Second, that the scheme to

12    defraud involved the misrepresentation or concealment of a

13    material fact or matter or the scheme to obtain money or

14    property by means of false or fraudulent pretenses involved a

15    false statement, assertion, half-truth, or knowing concealment

16    concerning a material fact or matter.  Third, that

17    Mr. Kilmartin knowingly and willfully participated in this

18    scheme with the intent to defraud.  And fourth, that for the

19    purpose of executing the scheme or in furtherance of the

20    scheme, Mr. Kilmartin used an interstate or foreign wire

21    communication to be caused -- let me go back.  I misread that.

22    Fourth, that for the purpose of executing the scheme or in

23    furtherance of the scheme, Mr. Kilmartin caused an interstate

24    or foreign wire communication to be used or it was reasonably

25    foreseeable for -- that for the purpose of executing the

1    scheme or in furtherance of the scheme, an interstate or
2    foreign wire communication would be used on or about the date
3    alleged.

4         A scheme includes any plan, pattern, or course of action.
5    It is not necessary that the Government prove all of the
6    details alleged in the indictment concerning the precise
7    nature and purpose of the scheme or that the alleged scheme
8    actually succeeded in defrauding anyone.  But the Government
9    must prove beyond a reasonable doubt that the scheme was
10   substantially as charged in the indictment.

11        The term defraud means to deceive another in order to
12   obtain money or property.  The term false or fraudulent
13   pretenses means any false statements or assertions that were
14   either known to be untrue when made or were made with reckless
15   indifference to their truth and that were made with the intent
16   to defraud.  The term includes actual, direct false
17   statements, as well as half-truths and the knowing concealment
18   of facts.

19        A material fact is a matter -- or matter is one that has
20   a natural tendency to influence or be capable of influencing
21   the decision of the decisionmaker to whom it was addressed.

22        Knowingly for this count has the same meaning I have
23   earlier defined.

24        An act or failure to act is willful if done voluntarily
25   and intentionally, and with the specific intent to do

1     something the law forbids, or with specific intent to fail to

2     do something the law requires to be done; that is to say, with

3     bad purpose either to disobey or to disregard the law.  Thus,

4     if Mr. Kilmartin acted in good faith, he cannot be guilty of

5     the crime.  The burden to prove intent, as with all the other

6     elements of the crime, rests with the Government.

7         The same instruction I previously gave you concerning

8     scrutinizing the workings of the human mind applies to your

9     consideration as to whether the Government has proven beyond a

10     reasonable doubt the knowingly and willful elements of this

11     count.

12         An interstate or foreign wire communication includes a

13     telephone communication from one state to another or between

14     the United States and a foreign country.  The term also

15     includes a wire transfer of funds between financial

16     institutions, as well as an email transmission or other

17     Internet communication.  The wire communication does not

18     itself have to be essential to the scheme, but it must have

19     been made for the purpose of carrying it out.  There is no

20     requirement that Mr. Kilmartin himself was responsible for the

21     wire communication, that the wire communication itself was

22     fraudulent or that the use of wire communication facilities in

23     interstate commerce was intended as the specific or exclusive

24     means of accomplishing the alleged fraud.  But the Government

25     must prove beyond a reasonable doubt that Mr. Kilmartin knew

1    or could reasonably have foreseen that the use of a wire

2    communication would follow in the course of the scheme.

3        Phone calls or emails designed to lull a victim into a

4    false sense of security, postpone injuries or complaints, or

5    make the transaction less suspect are phone calls or emails in

6    furtherance of a scheme to defraud.

7        Count 12.   The Government charges Mr. Kilmartin with

8    violating the federal statute making mail fraud illegal.   In

9    order for you to find Mr. Kilmartin guilty of this crime, the

10   Government must prove the following elements beyond a

11   reasonable doubt:   First, that there was a scheme

12   substantially as charged in the indictment to defraud or to

13   obtain money or property by means of false or fraudulent

14   pretenses; second, that the scheme to defraud involved the

15   misrepresentation or concealment of a material fact or matter,

16   or the scheme to obtain money or property by means of false or

17   fraudulent pretenses involved a false statement, assertion,

18   half-truth, or knowing concealment concerning a material fact

19   or matter; third, that Mr. Kilmartin knowingly and willfully

20   participated in this scheme with the intent to defraud; and

21   fourth, that for purposes -- for the purpose of executing the

22   scheme or in furtherance of the scheme, Mr. Kilmartin caused

23   the United States mail to be used, or it was reasonably

24   foreseeable that for the purpose of executing the scheme or in

25   furtherance of the scheme, the United States mail would be

1   used on or about the date alleged.

2       A scheme includes any plan, pattern, or course of action.

3   It is not necessary that the Government prove all the details

4   alleged in the indictment concerning the precise nature and

5   purpose of the scheme or that the alleged scheme actually

6   succeeded in defrauding anyone.  But the Government must prove

7   beyond a reasonable doubt that the scheme was substantially as

8   charged in the indictment.

9       The term defraud means to deceive another in order to

10  obtain money or property.

11      The term false or fraudulent pretenses means any false

12  statements or assertions that were either known to be untrue

13  when made or were made with reckless indifference as to their

14  truth and that were made with the intent to defraud.  The term

15  includes actual, direct false statements, as well as half-

16  truths and knowing concealment of facts.

17      A material fact or matter is one that has a natural

18  tendency to influence or be capable of influencing the

19  decision of the decisionmaker to whom it was addressed.

20      The same definitions of knowingly and willful that I gave

21  earlier apply to this count, including the same instruction

22  about scrutinizing the workings of the human mind.

23      The mailing does not itself have to be essential to the

24  scheme, but it must have been made for the purpose of carrying

25  it out.  There is no requirement that Mr. Kilmartin himself

1   was responsible for the mailing, that the mailing itself was

2   fraudulent, or that the use of the mail was intended as a

3   specific or exclusive means of accomplishing the alleged

4   fraud.  But the Government must prove beyond a reasonable

5   doubt that Mr. Kilmartin knew, or could reasonably have

6   foreseen, that the use of the mail would follow in the course

7   of the scheme, in furtherance of the scheme, or for the

8   purpose of executing the scheme.

9        Count 14.  The Government charges Mr. Kilmartin with

10  killing Andrew Denton with the intent to prevent a

11  communication about the commission of a federal offense to a

12  federal law enforcement officer.  Federal law prohibits

13  killing a person in order to prevent a communication about the

14  commission of a federal offense to a federal law enforcement

15  officer.  In order for you to find Mr. Kilmartin guilty of

16  this crime, the Government must prove the following elements

17  beyond a reasonable doubt:  First, that on or about the date

18  charged, Mr. Kilmartin knowingly killed Andrew Denton; and

19  second, that Mr. Kilmartin did so with the intent to prevent a

20  communication about the commission of a federal offense to a

21  federal law enforcement officer.

22       The same definition of knowingly that I gave you earlier

23  applies to this count, including the instruction about

24  scrutinizing the workings of the human mind.

25       The Government need not prove that Mr. Kilmartin had

 1   federal law enforcement officers particularly in mind.  But

 2   the Government must show that there was a reasonable

 3   likelihood that a relevant communication would have been made

 4   to a federal law enforcement officer.

 5       Count 15.  The Government charges Mr. Kilmartin with

 6   killing Andrew Denton with the intent to retaliate against

 7   Andrew Denton for the -- for providing to a law enforcement

 8   officer information relating to the commission of a federal

 9   offense.  Federal law prohibits killing a person in

10   retaliation for providing to a law enforcement officer

11   information about the commission of a federal offense.  In

12   order for you to find Mr. Kilmartin guilty of this crime, the

13   Government must prove the following elements beyond a

14   reasonable doubt:  First, that on or about the date charged,

15   Mr. Kilmartin knowingly killed Andrew Denton; and second, that

16   Mr. Kilmartin did so with the intent to retaliate against

17   Andrew Denton for providing information to a law enforcement

18   officer about the commission of a federal offense.

19       The same definition of knowingly that I gave you earlier

20   applies to this count, including the instruction about

21   scrutinizing the workings of the human mind.

22       Separate consideration of counts.  Mr. Kilmartin has been

23   charged with several violations of federal law and each

24   violation is charged in a separate counts in the superseding

25   indictment.  The number of counts in the superseding

1    indictment is not evidence of Mr. Kilmartin's guilt, and this

2    should not influence your decision in any way.

3         You must separately consider the evidence that relates to

4    each count and you must return a separate verdict for each

5    count.  Accordingly, you must separately decide whether the

6    Government has proven beyond a reasonable doubt Mr. Kilmartin

7    is guilty of each charged violation in Counts 1, 5, 7, 12, 14,

8    and 15.

9         Caution -- consider only the crimes charged.  You are

10   here to decide whether the Government has proved beyond a

11   reasonable doubt that Mr. Kilmartin is guilty of the crimes

12   charged.  Mr. Kilmartin is not on trial for any act, conduct,

13   or offense not alleged in the superseding indictment.  Neither

14   are you called upon to return a verdict as to the guilt of any

15   other person not on trial as a defendant in this case.

16        At this point, I come to the fourth part of the

17   instructions.  I am going to ask you put your written

18   instructions away.  After counsel have completed their final

19   arguments, I will ask you to retrieve the instructions, and I

20   will continue with the final part of the instructions.  Thank

21   you.

22        Mr. Frank, are you prepared to proceed with your closing?

23             MR. FRANK:  Yes, Your Honor.

24             THE COURT:  You may do so.

25             MR. FRANK:  Thank you, Your Honor.  May it please

1   the Court, counsel.  Ladies and gentlemen of the jury, good

2   morning.  Ladies and gentlemen, you may recall when we started

3   this case a little over a week ago, I told you that the

4   defendant, Sidney Kilmartin, targeted vulnerable people,

5   desperate to the point of suicidal vulnerable people and

6   defrauding them.  And that when one of them, Andrew Denton

7   complained to the authorities, to the FBI, he killed him.  And

8   ladies and gentlemen, I submit to you that that is exactly

9   what I have proved during last week's evidence.

10       Let's review that evidence together.  And I'm going to

11  make use of the overhead projector to put up some copies of

12  the evidence that is in the record and will be before you to

13  consider during your deliberations.  But it begins with the

14  defendant having devised a scheme like that described in the

15  superseding indictment, and you will have that back in the

16  jury with you to consider.  It describes that scheme as a

17  scheme to defraud suicidal persons and obtain money and

18  property by means of material, false, and fraudulent

19  pretenses, representations and promises, specifically by

20  pretending to sell such persons cyanide when, in fact, he was

21  selling them Epsom salts.

22       And, ladies and gentlemen, he -- he admitted that scheme

23  substantially, that scheme in his pleas of guilty to the nine

24  counts involving the non Denton victims, all of whom you met

25  during this trial.  And you will have that prosecution version

1    of events that he admitted to take back in the -- in the jury

2    to see what I mean.  And you will recall the details about how

3    he executed that scheme, including by using the wires in the

4    form of emails and wire payments in the form of Western Union

5    transfers and also by mail in the form of mailing Epsom salts,

6    including to Andrew Denton.

7        But you have more of those details, ladies and gentlemen.

8    You know how he bought the cyanide.  You know exactly what it

9    was composed of.  You got the certificate of analysis from

10   Fisher Scientific describing the lot from which this potassium

11   cyanide came.  And you will notice, ladies and gentlemen, that

12   they tested it and described how pure it was, 99.6 percent

13   pure, the test value in that certificate.  Why is that

14   significant, ladies and gentlemen?  Because Mr. Kilmartin

15   repeatedly describes the potassium cyanide that he is offering

16   for sale in exactly those terms.  He even used the term

17   assayed, which comes from assay, as it is chemically tested,

18   which comes from a certificate of analysis.  You know how he

19   ordered it.  You heard from Steve Loving of the Capricorn

20   Group in Camarillo, California, describe how he had phone

21   conversations with Mr. Kilmartin, how they discussed how he

22   would have to get around the requirement that it not be

23   shipped to a residential address and eventually came up with

24   the idea of shipping it to the UPS Store on Western Avenue in

25   Augusta.  And you have records corroborating all of that,

1   including Capricorn's invoice, which I've highlighted.  Your

2   copies won't have these highlights, but you can see where I've

3   highlighted it, where he posed as a goldsmithing business, and

4   he had it shipped to the UPS Store to his attention.  You know

5   how he paid for it.  You know he paid for it with his Visa

6   card on his Maine State Credit Union bank account.  And you

7   can see that evidence in Exhibit 3 where Steve Loving made the

8   handwritten notation that the Visa charge had been approved,

9   and you can also see it on the Maine State Credit Union

10  statement for September of 2012 there on September 12th.

11       And you may recall how the Maine State Credit Union

12  witness described how these transactions worked and the

13  difference in timing, how a debit transaction using the pin

14  is -- is posted to the account immediately, but a -- a credit

15  transaction there can be a delay.  You know how it got there.

16  You know how he had it shipped UPS to the UPS Store at 60

17  Western Avenue, and you know it was delivered to that store on

18  September 14, 2012, because you have the UPS corporate records

19  corroborating the testimony you heard from the UPS

20  representative showing how it was delivered and received at

21  the store by Jeff, you know that's Jeff Trimmer.  It was --

22  the driver was Don Fournier.

23       And, ladies and gentlemen, you know, even though there is

24  no evidence in the record, that he was there, that, in fact,

25  he was there, ladies and gentlemen.  You know that he was on

1   Western Avenue that day because there are charges on that same

2   Maine State Credit Union account for the 14th, the day that

3   his potassium cyanide was delivered, ladies and gentlemen.

4   You can see he was at Mulligan's that day, that's the last

5   charge on the first page of that Maine State Credit Union

6   statement.   You can see where these locations are on the map,

7   that's demonstrative evidence, Exhibit Number 44.   And, ladies

8   and gentlemen, you can see how he was at Subway that same day

9   on the second page where you can see a transaction that's

10  posted to the account on the 17th, but which occurred on the

11  14th.   Ladies and gentlemen, he was on Western Avenue that

12  day, and you can be sure that if he picked up his $5 footlong

13  at Subway, he picked up his $127 worth of deadly potassium

14  cyanide that he went to all that trouble to order.

15        You know that he opened a Google account in order to

16  execute this scheme.   You heard from the Google

17  representative, Sarah -- I can't remember her last name at the

18  moment, and you've got record of that.   This is on

19  September 15th, the day after, right?   This is the day after

20  he picked up the cyanide.   You can see that he opens this

21  Google account and makes sure he's got a Google email address,

22  Skiptin@gmail.com, that he goes on to use to communicate with

23  people about this cyanide.   And you can see that he also

24  subscribes to Google's blogger web publish feature.   And why

25  does he do that, ladies and gentlemen?   So that he can post

1   notice on Want Death Blogspot UK.com that he has potassium

2   cyanide for sale.  And you can see that in some of the later

3   exhibits, including the excerpt of that blog site that Andrew

4   Denton printed out and left behind on the scene of his death.

5   You can also see in the web capture that Leon Armstrong made

6   after he discovered the fragment inside Denton's computer and

7   went online looking for the website, which was still up as of

8   May -- of 2013.

9        You also know that as part of executing this scheme, he

10  opened a PayPal account so that he could accept the payment

11  for cyanide.  Amelia Kani told you about that, and you can see

12  that corroborated here and the PayPal business records of his

13  accounts.  It's really the first account in which all the

14  activity occurs, but you can see that he opened that on

15  September 19th.  So that's eight days after he orders the

16  cyanide on the 11th and five days after he picked it up at the

17  UPS Store on Western Avenue on the 14th.

18       And as I said before, you know he starts posting notice

19  at least as early as September 16th.  He starts posting notice

20  on Want Death Blogspot because you can see that on the second

21  page of Exhibit 47, the excerpt that Andrew Denton printed out

22  and left behind on the scene of his death -- I have got to

23  take my glasses off, and it's a little blurry, but right up

24  there, September 19th, you can see Skiptin@gmail.com is

25  commenting on that blog site and he is telling people that he

1   has potassium cyanide, 99.6 percent pure, just like it's

2   assayed in the certificate of analysis.

3       And you know he started communicating with people all

4   over the world about how he had this deadly poison for sale,

5   and you know that because you can see it in Exhibit 16, the

6   table that Inspector Taylor constructed from the proceeds of

7   the search warrant that the Government executed on Google in

8   order to get the contents of Sidney Kilmartin's Gmail account.

9   Take your time, ladies and gentlemen, read through it

10  carefully, and see exactly in what terms he discusses

11  potassium cyanide with all these people, ladies and gentlemen.

12  He consistently describes it as almost pure, industrial grade

13  potassium cyanide.  He guarantees Walter Cottle that that's

14  exactly what it is.  And this is Exhibit 20 -- whoops.  Let's

15  clear that.  Come on.  You will have Exhibit 20.  Walter, I

16  can guarantee you it's real and assayed as 99.6 percent

17  purity.   He talks to people about how much it takes to kill.

18  While I have highlighted here on a couple of pages of 16, you

19  will have the whole table back with you, but you can see all

20  the places where he's describing it is a nearly pure potassium

21  cyanide repeatedly, including later on he starts describing

22  how to pay by Western Union here at the bottom, this is page 2

23  of Table 16.  He's talking about pure potassium cyanide.  I

24  have plenty of U.S. made 99.6 percent pure PC available.

25  Page 3 of the same table, it's U.S. made nearly pure.  I have

1   U.S. made nearly pure, this time he calls it 98.6.  Entry 17,

2   I can help.  I have U.S. made nearly pure potassium cyanide.

3        He discusses with these people how much it takes to kill,

4   how to increase its effectiveness by taking it on empty

5   stomach with something acidic, just like Mr. Kukoski

6   explained.  They discuss how much it will cost, how to pay for

7   it, including how he accepts payment by Western Union, and how

8   to ship it so as not to attract attention.  He strikes deals

9   with some of these people.  You heard from four of them who

10  testified in person in front of you.  He accepted payments

11  from them via PayPal from Walter Cottle and Donalee Wolfe, and

12  you have that in Exhibit 21, you can see those charges.  I had

13  Amelia Kani explain to you how they worked.  He did that until

14  he got a problem with Donalee Wolfe, which you also see

15  documented in that Exhibit 21, after she reversed the charges,

16  and there's that note of the discussion between the service

17  rep at PayPal and Kilmartin calling on the phone, and you've

18  got that in 21 here.  You can see that described there at the

19  bottom where the seller is stating, well, you can read it for

20  yourself, but they tell him about how the U.S. Postal Service

21  has guidelines that don't allow this.

22       After PayPal -- he has a problem with PayPal, he starts

23  accepting payment by Western Union, and in Exhibit 33, you

24  have got the -- you have got the receipt, the money transfer

25  received forms that Mr. Kilmartin completed at the two

1   Hannaford stores, again, that you can see on the map,
2   Government's Exhibit 44 where they are in relation to where he
3   was living on Village Drive, just up Pond Road and hang a
4   right on Western Avenue and head toward Augusta.  And you can
5   see in his own handwriting how Mr. Kilmartin fills out those
6   forms in order to collect that money from these people, and
7   you heard from Western Union's representative how it's
8   their -- remember she was the woman the accent who spoke very
9   fast, Mrs. Kim Gilliam-Valdez, how it's their practice to make
10  somebody show ID to identify themselves when they collect
11  money like that, and how the printed receipts that are
12  associated with each of these handwritten Western Union money
13  receipts forms include a notation of Mr. Kilmartin's Maine
14  state driver's license confirming that they did, in fact,
15  identify him and you have the blue seal copy of Kilmartin's
16  Maine state driver's license records confirming that that
17  driver's license number was, in fact, assigned to him.

18        He mails Epsom salts to some of these people, including
19  the ones you meet, Mr. Walter Cottle, Stacey -- Walter Cottle,
20  who was in Georgia at the time, Stacey Williams, who was in
21  Colorado, Derek Jorgensen you didn't hear from, although Stu
22  Quinn described him for you.  He was also in Hull, England,
23  the same town as Andrew Denton, Cynthia Kirshling, whom I
24  believe testified was in California at the time she received
25  the material from Kilmartin, and, of course, Andrew Denton.

1    And he ships -- he emails, U.S. mails this white substance to

2    people in similar packages, ladies and gentlemen, and you have

3    various forms of evidence of those similar packages, including

4    the picture that Walter Cottle took of his, the package he

5    received, that's Exhibit 20A.  You will notice just how

6    similar it is to the others, in particular the packages that

7    were recovered from the scene of Andrew Denton's death.

8    You've got the return address that Cynthia Kirshling kept from

9    her mailer, similar as the return address on Walter Cottle's

10   and on the Denton mailers.  And, again, you understand how

11   that address relates to Mr. Kilmartin, 88 Pond Road is the

12   very distinctive house that he passed every day when he drove

13   up Pond Road to Western Avenue on the right-hand side, and you

14   have got a picture of that in Exhibit 45.  Not just the

15   mailers, but the handwriting on the mailers, ladies and

16   gentlemen, you can compare that to the other handwriting and

17   use your own judgment.  You're familiar enough with these

18   things.  You know, you can see examples of his handwriting on

19   those Western Union receipt -- many receipt forms that the

20   Hannaford stores verified his -- his identity with his

21   driver's license.  You've got the similar contents.  You've

22   got -- you actually have the little baggies, at least from

23   Cottle, from Kirshling, and you have got pictures of the

24   others, like this is a picture of Cottle's -- Cottle's little

25   baggy, 20B and 25 are pictures of that.  But you've also --

1    you can compare those to the pictures of Cynthia -- from

2    Stacey Williams, that's 31, you can see how similar they are.

3    And they all contained Epsom salts, as you know, from the

4    prosecution version in which Mr. Kilmartin admitted that

5    that's what was inside those bags.  And some people he mailed

6    nothing to, like Autumn Roland, whom you have heard from.

7         You know that Mr. Kilmartin has pled guilty to nine of

8    the counts in the superseding indictment, the nine counts

9    relating to defrauding Cottle, Williams, Jorgensen, and

10   Kirshling, the ones who kept what it was that he mailed them

11   and that the inspect -- the postal inspectors retrieved,

12   brought back to Maine and had tested at the environmental

13   testing lab here in Maine and determined that it was Epsom

14   salts.

15        He did not admit to defrauding others.  He did not plead

16   guilty to defrauding Mr. Denton, even though it's the same

17   scheme.  But what he pled to and what he admitted, ladies and

18   gentlemen, is not all that he did and not all that the

19   Government proved.  He defrauded Andrew Denton the same way

20   that he defrauded others.  And think about it, ladies and

21   gentlemen, this is not your average fraud scheme, ladies and

22   gentlemen.  This is really quite a distinctive scheme.  And

23   the details in which he defrauded Denton are the same as the

24   details that he defrauded Cottle, Williams, Jorgensen, and

25   Kirshling.  He met them online.  He corresponded with them by

1    Gmail, using his Skiptin@gmail address.  Except for Cottle,

2    they all paid him for Western Union.  And you know why the

3    change because of what happened with Donalee Wolfe, and he

4    mailed them all Epsom salts in the same kind of mailer, U.S.

5    mail.  You can trace -- you have the U.S.P.S. records.

6    Inspector Taylor explained to you how they work.  You can see

7    the progress of those packages to their various destinations,

8    including to Andrew Denton's destination.  You've got the --

9    you've got the -- in Exhibit 33 here's Andrew Denton's -- a

10   copy of the money transfer received form that Kilmartin filled

11   out at the Hannaford store for the payment from Andrew Denton

12   for the Epsom salt that the defendant sent him.  You can see

13   in Kilmartin's handwriting how he describes himself there in

14   Item 2, Sidney Kilmartin, living at 255 Village Drive, getting

15   money from Andrew Denton of North Humberside and Hull.  And

16   then the next page of this exhibit is that printed receipt

17   that Ms. Gilliam-Valdez described.  You can see

18   Mr. Kilmartin's signature at the bottom, and you can see here

19   where they noted his Maine state driver's license and

20   identified him as the person he claimed to be standing in

21   front of them to collect that money.

22       You know he mailed it to Denton because you've got --

23   well, in Exhibit 52, you've got the -- this is my copy, you

24   will have the actual form that Jeff Taylor recovered from the

25   post office, the customs declaration showing in Kilmartin's

1    handwriting how he -- how he directed this to Andrew Denton,

2    claimed it was cosmetic jewelry.  You've got in Exhibit 53

3    these postal service records of the mailing beginning with the

4    payment there at the post office here, but continuing on the

5    last page, you can actually track -- you can actually track

6    its progress from Maine to Great Britain with that last page

7    of that exhibit.

8         The difference, ladies and gentlemen, the difference

9    is -- the difference between Andrew Denton and the other

10   victims you met and know about is is that Denton actually took

11   what it was that Kilmartin sent him.  And you heard about that

12   and amongst others -- while you heard about that from Gail

13   Coates, who described how he had checked himself into the

14   hotel and drank it and how it didn't work.  I mean, you also

15   know it because you have emails from Denton, and Denton isn't

16   here to speak for himself, but you've got -- you've got many

17   of his emails that were recovered one way or another, either

18   from the Google search warrant production or printed out and

19   left behind on the scene of death, or from -- recovered from

20   Denton's HTC cell phone by Chris Collier.  And you know from

21   all those sources that it didn't work, and you know why it

22   didn't work, ladies and gentlemen, because it was Epsom salts,

23   ladies and gentlemen, like he had sent to all his other fraud

24   -- well, the other four fraud victims that you met and were

25   proved.

1          And you can see in some of these emails from Andrew

2     Denton when he complains to Kilmartin, you know, he describes

3     how it tasted terrible, it made him throw up, and it made him

4     mad, ladies and gentlemen, madder than Gail Coates' niece had

5     ever seen him.   That's really how you got to know Denton in

6     this case, through his niece, Gail Coates.   And you learned,

7     yes, I mean, he was -- he was see suicidal, ladies and

8     gentlemen.   He was an unhappy man.   Coates described him as

9     fixated on death, and she described his prior suicide

10    attempts, and in particular how he became more determined to

11    kill himself after his girlfriend, Joanne, died in July of

12    2012, and about how he told Coates how he had met a man,

13    Martin, in America, who had sent him the phoney cyanide in the

14    first place, and how mad he was about that, that he complained

15    to the authorities that he filed this IC3 complaint.   Remember

16    her reaction, she thought -- she thought he was crazy, but you

17    know that's exactly what he did, ladies and gentlemen, because

18    you've got copies of that IC3 complaint, both the copy that he

19    left on the scene, Exhibit 54, and that you can see in some of

20    those pictures that Colin Jordan took.   You can see it in the

21    drawer underneath the first mailer, the first -- the first

22    mailer in 59 -- anyway, you can see a picture of it there.

23         And in that IC3 complaint, I mean, he describes exactly

24    what happened between him and Sidney Kilmartin.   He identifies

25    Kilmartin by name.   At that point he knows who Kilmartin is,

1    and that he is using the 88 Pond Road address, the Skiptin

2    Gmail address.  And in his own words, in this complaint, you

3    can see how he looked for a site that was selling potassium

4    cyanide, and Sidney Kilmartin, Skiptin appeared on several.

5    He told me he had the chemical, and it was U.S. industrial

6    grade, 99 percent pure, and that it was $250 for a gram.  I

7    got his payment details, sent him the money via Western Union.

8    He even provides the money control number and other details.

9    And how the chemical he got was not potassium cyanide because

10   it didn't work.  And how due to the nature of what Kilmartin

11   was selling, people might be reluctant to complain to the

12   authorities, but not him.  Like his niece said, he didn't like

13   being ripped off, and that's why he was making this complaint,

14   as extraordinary as it is, to the -- to IC3.

15        And you know what IC3 is, ladies and gentlemen, because

16   you met Donna Gregory, who heads it up for the FBI.  It's the

17   online complaint referral service for the Federal Bureau of

18   Investigations here in the United States.  And you've got, in

19   Exhibit 55, a certified copy of their -- their copy, their

20   version that they have on file of this complaint confirming

21   that Denton did, in fact, send it as he said he did.

22        And you know from his emails with Sidney Kilmartin, the

23   ones recovered from Google and the ones Chris Collier

24   recovered from his HTC cell phone, that he complained to

25   Kilmartin about this and he told Kilmartin what he had done.

1   And you can see that in Exhibit 49.  I've re-organized these

2   emails to put them in a little bit more chronological order.

3   Take your time and read through them during your

4   deliberations.  You can see how mad he is on December 7th

5   where he writes, Kilmartin, what the hell is going on?  I took

6   the so-called potassium cyanide crystals in a hotel last

7   night, I'm still here.

8       Then Kilmartin claims that he's the first complaint he's

9   received.  Denton goes on the next -- the next page, this is

10  December 8th, he encourages Kilmartin to feel free to try the

11  batch you sent me, it didn't work, and it tastes awful.  I

12  had -- I had an empty stomach.  I need to speak to you more.

13      Again, on the 7th, Denton is writing Kilmartin and

14  threatens to file the FBI online complaint, how annoyed he is

15  with him for ripping him off, an how he is going to do his

16  best to see what is coming to him.

17      And Kilmartin's response about how he is trying to make

18  it up to him.  On December 8th, Kilmartin describes the

19  material as coming packed hazmat like, like it was radioactive

20  or something.  You can see in the invoices with Fisher how the

21  -- they packed the -- I think -- I can't remember what they

22  described it, but it is in some sort of hazardous material

23  packaging.

24      And see on the 8th where Kilmartin actually describes to

25  Denton how it was that he got the potassium cyanide in case

1  the second mailer doesn't get through, insuring that

2  Kilmartin won't -- that Denton won't be around, he tells him,

3  something I haven't told anyone else, try the Capricorn Group,

4  very important, you have to have it delivered to a commercial

5  address.  I used the UPS Store and paid the five bucks, just

6  like -- just like the UPS Store manager, Mr. Milliken said.

7       On the 9th, Denton tells Kilmartin how he actually did

8  take it and how mad he was and angry and how he had complained

9  to IC3, and how he appreciated that he was -- that Kilmartin

10 was telling him about his -- his supplier, the Capricorn

11 Group.

12      On December 10th, Denton tells Kilmartin that he's filed

13 the IC3 complaint form online, and he can't cancel it.

14 December 12th Kilmartin says that he's just mailed the second

15 package, and he is sending it 4 -- 3 to 4 grams, ladies and

16 gentlemen.  That's 20 -- that's as many as 20 lethal doses, 4

17 grams at 200 -- remember, how Dr. Kukoski said that the

18 minimum lethal dose was 200 milligrams, so 4 grams, ladies and

19 gentlemen, that's a lot of death and destruction.

20      On the 15th, Denton writes that before he took the last

21 log, he did his -- he said he would, Kilmartin asked him to,

22 and deleted all his emails.  And you know that's true, ladies

23 and gentlemen, because Armstrong and Collier couldn't find

24 emails on Denton's laptop and had trouble -- Collier had to

25 recover what emails he was able to find from the HTC phone.

1    You will have the full exhibit, Exhibit 49.  I encourage you

2    to read it thoroughly.  You will also have those emails that

3    Chris Collier was able to recover from the HTC phone.  Again,

4    on the -- and the dates are -- this is the European mode so

5    the day is first, this is December 21 there that I've

6    highlighted where Denton is telling Kilmartin that he did

7    delete all his emails from his hard drive and his history and

8    cookies.  You know that's true because you heard from

9    Armstrong and Collier that's in response to the item number 3

10   in this printout by Collier of what he found in the --

11   recovered in the HTC phone, that's the day before December 20,

12   2012, where Kilmartin asks Denton, Andrew, is there any way I

13   can get you to do something with your hard drive before your

14   event?  With the FBI aware of my goings on, the last thing I

15   need is to give them more fodder, as you and I have had

16   extensive conversations.  Can you give it to a friend or even

17   discard it?  You have me worried now.

18        You're right he was worried, ladies and gentlemen, and

19   not just because of what he had done to Denton, ladies and

20   gentlemen, but because of where Mr. Denton would lead to the

21   others that he had defrauded, whom you now know about, and to

22   the 100 grams of potassium cyanide that he had obtained, 500

23   lethal doses worth of potassium cyanide, ladies and gentlemen.

24   That's a lot to worry about it.

25        You know that he did what he could to destroy evidence of

1   their interaction you can see that in the gap in Exhibit 17

2   that Jeff Taylor made for you.  You know he was worried

3   because he told Denton he was worried, as I pointed out in

4   that last -- that last email because it makes sense that he

5   should be worried, ladies and gentlemen.  He had a lot to

6   worry about it.  And he asked Denton to destroy evidence of

7   their interaction and offered to make it up to Denton, and he

8   did, ladies and gentlemen, not out of the goodness of his

9   heart, let me tell you.

10      He mailed Denton the real thing, the same way he mailed

11  Epsom salts to the others, the same kind of mailer, the same

12  handwriting, the same return address.  You can trace the

13  passage of that second mailer in the U.S. Postal Service

14  records, their internal records, Exhibit 57.  You can see it's

15  the same kind of baggy inside as the Epsom salts was packaged

16  in.  And it wasn't -- it wasn't Epsom salts, ladies and

17  gentlemen.  It was potassium cyanide.  And Denton noticed the

18  difference, and you can see this in Exhibit 102.  This is

19  email that Jeff Taylor organized, that he found in the Andrew

20  Denton 35 Gmail account, but that last -- that last entry at

21  the bottom, you can see, by the way, your -- this is from --

22  this is from Denton to Kilmartin, you can see, by the way,

23  your package arrived yesterday.  Thanks.  It is a finer powder

24  this time.  The other was bigger crystals.

25      You can see what he means here.  There's the baggy that

1    was recovered inside the mailer.  This is a picture of it.

2    You won't actually have the baggy itself, ladies and

3    gentlemen, because it's poison, but you have got a picture

4    there, 59-11.  Colin Jordan described how he put the scale

5    next to it in the picture so you could see how big it is.  And

6    you know that Denton drank it, ladies and gentlemen.  You can

7    see the beaker or the glass that he used to dilute it by his

8    bedside there in his apartment in Hull.  You can see what the

9    effect it had for yourself, ladies and gentlemen, in the

10   picture, particularly 595 where he laid there, dead in his

11   bed, the second bedroom, how Coates -- Gail Coates found him

12   on the 31st.  You know, you heard from Grahame Kay how the

13   next day he tested some of that residue in that bag twice

14   using the hazmat 360 ID Smith Detection.  It's a portable

15   spectrograph, and how he and his partner, Tyson Truelove

16   compared it to the spectrum on board that portable device of

17   known substances and agreed that it was cyanide.  You heard

18   him explain how the machine can't distinguish between

19   potassium and sodium cyanide, how they sent the digital file

20   of their results as per their protocol.  Remember, they

21   followed their protocol in every respect, donning the hazmat

22   suits, two guys go in together in case one gets in trouble,

23   but they didn't test it three times.  They only tested it

24   twice because they want to save some for further analysis.

25   And they were satisfied that they had a good match.  They sent

1    a digital file off to Smith Detection.  They get a response

2    from Smith Detection.  That's Exhibit 73 in evidence, and you

3    can see the red -- the red graph is -- is the -- is the

4    unknown substance, the one in the middle is water.  You can

5    see where the water shows up, and then the cyanide is the two,

6    as I understand it, is -- I am not a chemist, but is those two

7    big peaks there.

8         But you know more than that, ladies and gentlemen.  I

9    mean, you also heard from Dr. David Alun Hutchings, the

10   toxicologist -- the clinical toxicologist over in Cardiff to

11   whom a sample of Denton's blood was brought, and how he tested

12   that blood quite extensively using more elaborate equipment,

13   tested it two different ways as I recall, and you may recall

14   that he determined that Denton's blood contained cyanide in a

15   concentration of 17 milliliters per liter.  Remember how he

16   said that was the highest he had ever seen?  I mean, it's your

17   recollection that controls, ladies and gentlemen, but that's

18   my recollection.  And that makes sense, doesn't it?  Because

19   you remember what Dr. Kukoski said about how death occurs at 3

20   milliliters per liter of blood.  That's what killed him,

21   ladies and gentlemen.  No doubt about it.  I mean, you heard

22   from -- from the people on the scene, how they, per their

23   procedures, looked for signs of foul play and didn't find any,

24   but you don't need -- there is so many circumstances to tell

25   you exactly what this was, you don't hardly need that.

1        Dr. Kukoski explained how it actually kills.  When you

2   drink it, how it goes down the stomach into the -- down the

3   throat into the stomach where it combines with stomach acid to

4   form a gas and that winds up binding to the blood and

5   preventing it from transmitting oxygen so that the body

6   suffocates from the inside out, and how it burns going down,

7   and people sometimes gasp.

8        And, ladies and gentlemen, if you look at this picture of

9   Mr. Denton in Exhibit 59-5, you can see him gasping from the

10  effects of cyanide going down his throat.  And, ladies and

11  gentlemen, that's why Andrew Denton isn't here to speak to you

12  today for himself or wasn't here last week, but he spoke

13  through his niece, ladies and gentlemen, and he spoke through

14  the items that he left behind on the scene of his death, and

15  you will have those with you in your deliberations.

16       Everyone agrees he was a meticulous man, you can see it

17  in the pictures of his apartment, how neat and tidy it is,

18  everything in its place.  You heard Gail talk about -- Gail

19  Coates talk about how he documented his prior suicide.  He

20  documented this one, ladies and gentlemen, meticulously.  He

21  left a roadmap and it leads to Mr. Kilmartin.  It begins with

22  a warning note that he left on the scene to warn others about

23  what he had done.

24       Please read this first.  Do not touch me.  I have taken

25  100 milligrams of potassium cyanide.  And it is very toxic.

1    And I am leaving you a sample.  I have a very large amount in

2    my body.

3        He left -- he left that excerpt from the Want Death blog

4    site that I showed you earlier, and in Exhibit 81, you have

5    the full version that Leon Armstrong was able to find online

6    and made this web capture of in May of 2013.  You've got the

7    printed email we have talked about already.  You've got a copy

8    of the IC3 complaint.  You've got a copy of the handwritten

9    note that Denton left, identifying Kilmartin by name, living

10   in Manchester, Maine, how much money Denton paid him, and how

11   he paid it by Western Union transfer, all confirming what you

12   know otherwise from the Western Union money transfer receipt.

13       And then you've got both mailers, ladies and gentlemen.

14   Here's a picture of the first mailer in the drawer on top of

15   the IC3 complaint, 5919.  You've got a closer view of it,

16   5920.  You have the actual mailer in evidence, and you can see

17   where the second mailer was.

18       You heard Michael Barrett explain how his partner, Robert

19   Colombari, who was relatively new, had moved it to the

20   mantelpiece.  You can see it there on the mantelpiece.  Here's

21   a closer view of it in 59-3 and 59-7, showing the same

22   handwritten address and return address and the customs form,

23   you have the postal service copy of.  You can see what the

24   insides look like, when they found it.  They cracked it open

25   in 59-10, and you can see that same distinctive, little baggy

1   inside.  You've already seen the closer view of that baggy,

2   59-11, and how similar it is to the other baggies in this

3   case.

4        What does it all prove, ladies and gentlemen?  What does

5   all this evidence prove?  It proves what I told you it was

6   going to prove at the beginning of this case, that this was

7   not just fraud for money, ladies and gentlemen.  This was

8   fraud for spite, ladies and gentlemen.  This was a

9   particularly mean-spirited fraud.  It's not -- it's not your,

10  you've won -- it's not -- it's your, it's too good to be true,

11  you've won the lottery, all you have to do is send me a

12  thousand bucks to collect your million.

13       Mr. Kilmartin targeted the most vulnerable people,

14  desperate suicidal people, ladies and gentlemen, and he toyed

15  with them, ladies and gentlemen.  Think about it, ladies and

16  gentlemen.  He always had Epsom salts on hand.  You can get

17  Epsom salts at the local Rite Aid.  He also had a hundred

18  grams of potassium cyanide.  He could have sent either to

19  anyone at any time, but he didn't, ladies and gentlemen.  He

20  chose who got life and who got death.

21       Think about what you heard from Autumn Roland in that

22  respect and read their email exchanges where you see him

23  string her along.  Think about it, ladies and gentlemen, what

24  he is doing to her.  This is a woman who wants to end her

25  life.  She told you how bad things had gotten, how she was

1    homeless, lost her job, out on the streets, struggling with

2    mental illness, how it begins, hey, I read your post.  I'm

3    looking for cyanide, can you help?

4        Autumn, yes, I can help.  I have nearly pure U.S. made

5    potassium cyanide for sale.  You will not be able to find this

6    chemical anywhere.  Autumn, 500 is enough for a small lady,

7    and, yes, shipping is included.

8        And then Autumn responding on November 28th, okay, it's

9    done, and he gives her the tracking number in response to his

10   earlier email about how he only accepts Western Union, how she

11   can do it online, how he is Sidney Kilmartin, Manchester,

12   Maine.

13       Autumn writes back on the 22nd, how she can see that he's

14   picked up his payment, how she's getting a little nervous

15   about not hearing from him.  On the 27th, it still hasn't

16   come, did you mail it?  Because I'm -- Kilmartin writes back,

17   give it a couple of days.  If it doesn't come, I will put

18   another in the mail.  29th it still hasn't come, Autumn writes

19   him.  She is about to move.  If you send it again, send it to

20   her new address.

21       December 1st, did you send it?  December 5, well, I don't

22   know what's going on, but I continue not to receive it.  I

23   would like you to wire my money back to me, please.  Kilmartin

24   responds, I sent it to Hollywood.  I will send you another.

25       On the 14th, Autumn writes, okay, we know you're not

1    mailing anything.  I would greatly appreciate my money back.

2    That's in response to his telling her it's in the mail.  She

3    wants her money back or she threatens to turn him into the

4    FBI.  We know that she didn't do that.

5        I don't know what game you're playing, on the 15th, where

6    he -- in response to him saying, I ran out -- I ran out,

7    ladies and gentlemen.  I ran out.  Come on.  He's got both

8    Epsom salts and potassium cyanide.  It will be in the mail --

9    it will be in the mail tomorrow.

10       The 18th, I'm sorry it took so long to get this to you,

11   but it took my supplier 10 days to get it to me.  Ladies and

12   gentlemen -- and on the 20th she says, I don't believe you.  I

13   want my money back.  And on the 27th, she gets mad at him.

14       Think about it, ladies and gentlemen, this is one mean-

15   spirited fraud.  What crimes does all this evidence prove,

16   ladies and gentlemen?  Well, let's start with the wire fraud

17   and the mail fraud against Andrew Denton.  It's the same

18   scheme as the scheme against Cottle, Stacey Williams, Derek

19   Jorgensen, Cynthia Kirshling.  It's a willful scheme, ladies

20   and gentlemen.  He knew it was wrong.  That's why he kills

21   Denton ultimately.  But along the way he is trying -- he is

22   making efforts to conceal his identity using the false return

23   address.

24       Is it a misrepresentation of material fact?  Well, it's

25   an odd material fact, ladies and gentlemen, but the material

1   fact here is I'm offering to sell you cyanide and instead I'm

2   sending you harmless or relatively harmless Epsom salts.  Does

3   it involve use of the wires?  Sure, it does.  It involves the

4   posting on the blog site.  That wasn't charged in the

5   indictment, but email exchange is -- charges the use of the

6   wires to execute the scheme, and the Western Union transfers

7   charged as a use of the wires to execute the scheme.

8       The mail fraud, again, mirrors the wire fraud.  The

9   difference -- you know, it's the same scheme, same evidence of

10  willfulness, same misrepresentation of material fact, the

11  difference is the use of the mail to execute the scheme.  You

12  know he personally mailed that first mailer.  You have got the

13  mailer.  You have got the records.  He used the mail to

14  execute it.

15      His identity of the -- as the fraud, again, you have got

16  the common scheme that tells you he is the guy who's doing

17  this, the common distinctive scheme.  And you know he

18  repeatedly identifies himself by name and location in various

19  emails in order to receive the payment for this fraud scheme.

20      And then you have got the money trail at PayPal, but also

21  at Western Union.  And you have got the prosecution version,

22  at least as regards to the first four victims, Cottle,

23  Williams, Jorgensen, and Kirshling where he admits that he was

24  the author and the executor of this scheme.

25      The tampering charge, ladies and gentlemen -- and the

1   Judge is the definitive word on the law and elements.   I'm

2   using my own terms here, but his words control.   But I mean,

3   did Mr. Kilmartin intend to kill Andrew Denton?   This was no

4   accident, ladies and gentlemen.   This was no mistake.   Look,

5   ladies and gentlemen, the use of deadly poison alone in itself

6   without anything more is proof of intent to kill.   You don't

7   send poison, you don't give poison to anyone unless you're

8   intending to kill them.   And he didn't give it to just anyone,

9   ladies and gentlemen, he gave it to someone he knew was

10  determined to kill themselves.   He -- think about this, ladies

11  and gentlemen, Kilmartin had tested Andrew Denton's resolve to

12  kill himself in this case with that first mailer, right?

13  Denton took it.   It didn't kill him.   He complained to

14  Kilmartin, it didn't kill me.   And you know what, beyond just

15  sending him the cyanide, ladies and gentlemen, he made doubly

16  sure that Denton died because you've got those emails where,

17  again, pretending to be a helpful friend, Kilmartin shares

18  that little bit of knowledge that he hadn't shared with

19  anybody else about he actually -- how he actually got the

20  cyanide from Fisher through Capricorn via UPS to the

21  commercial address.   Did the cyanide kill Andrew Denton?

22  You've got abundant evidence, but most of all you've got

23  Dr. Hutchings, the toxicologist over there who tested his

24  blood.   Kukoski explained to you how it does it.

25        Did he intend to prevent Denton from cooperating with

1    federal law enforcement?  Ladies and gentlemen, usually the

2    Government has to prove a mental state indirectly through

3    circumstantial evidence because as the Judge, I expect, will

4    instruct you, there's no way of seeing directly into the human

5    mind.  And you have circumstances here of that intent to

6    prevent Mr. Denton from providing -- from cooperating with

7    federal law enforcement.  You know, the fact that Kilmartin

8    had committed a serious fraud and Denton complained to FBI

9    through IC3, you know that Denton could have told them more

10   and where it would have led and how it was or why it was that

11   Kilmartin needed to get rid of Denton so that he couldn't do

12   that.  But, ladies and gentlemen, in this case, you actually

13   do have a window directly into his mind because you have his

14   words in his email where he tells Andrew Denton, I'm worried

15   about the FBI.  Please do something about your hard drive,

16   ladies and gentlemen.  It doesn't get any more explicit than

17   that.

18        Retaliation, ladies and gentlemen.  The distinctive

19   feature of retaliation is this intent to retaliate against

20   Mr. Denton for having provided information to law enforcement.

21   It's hitting back.  Well, you know that Kilmartin defrauded

22   Denton.  You know Denton complained to IC3.  You know that IC3

23   is the FBI's online complaint referral service.  You know that

24   Kilmartin killed Denton.  And, ladies and gentlemen, once

25   again, extraordinarily, you have evidence that Kilmartin did

1  not kill other people similarly situated as Denton in this

2  case, other people whom he had victimized, who could have

3  provided evidence against him, like Walter Cottle, Stacey

4  Williams, Derek Jorgensen, Cynthia Kirshling because he was

5  confident, ladies and gentlemen, that these people were so

6  demoralized that they would never stand up against him.  You

7  even have one in Autumn Roland, who actually did complain to

8  him in her email, and she didn't die.

9     You've got one who complained to a business, PayPal,

10  Donalee Wolfe, and there's no evidence she died.  And you have

11  got one in Edith Mae Collins, who actually did complain to

12  IC3, just like Andrew Denton did, except Kilmartin didn't know

13  it.

14     The only one of those, ladies and gentlemen, that Sidney

15  Kilmartin kills is Andrew Denton, and that's because he's the

16  only one he knew had actually complained to the FBI to federal

17  law enforcement.  Ladies and gentlemen, that's retaliation.

18     Ladies and gentlemen, when I opened over a week ago, I

19  told you that I would come back to you at this time and ask

20  you to find Sidney Kilmartin guilty of all the offenses, the

21  six offenses that remained outstanding against him in the

22  superseding indictment, and that is exactly what I am asking

23  you to do.

24          THE COURT:  Thank you, Mr. Frank.

25     Mr. Ridge, would you like to give your closing at this

1    time?

2              MR. RIDGE:  Yes, Your Honor.

3              THE COURT:  You may do so.  Good morning, ladies and

4    gentlemen.  I would like to begin my remarks by taking a

5    moment to thank you for your service during this trial.  Our

6    system of criminal justice or more broadly our system of

7    justice doesn't work if people, members of the community,

8    aren't willing to sacrifice their own time and their own

9    interests to come in and help us solve problems like this one,

10   and that's because you can do a better job than we can do in

11   terms of evaluating the evidence.  And it's because you bring

12   to this courthouse a collective experience and a collective

13   knowledge and a collective common sense that will allow you to

14   apply those things to the facts that you find to exist and

15   give a better verdict than the parties who are engaged in this

16   adversarial system where we each have our own interests and

17   our own read of the evidence that's presented.  And so I thank

18   you for that.  We impose a great responsibility upon you.

19        Obviously, Mr. Kilmartin is charged with very, very

20   serious offenses, and you're going to return a verdict about

21   him, and that verdict, whatever it is, will have a great

22   impact upon him one way or the other for the rest of his life.

23   And that's a very, very heavy burden.  And I appreciate that

24   it's very difficult for you to be taken out of your day-to-day

25   existence and come in here and hear this kind of information

1    and to be asked to make these kind of decisions, but that's

2    what we're doing, and I'm confident that you will do it to the

3    best of your ability and that's all that we can ask.

4        I have observed you during the past week or so and each

5    of you has paid attention, you've worked hard, and we

6    appreciate that, and I appreciate the effort that you will

7    give in your deliberations, whatever the result is.

8        Now, as the Court has told you, you have no choice in

9    terms of what law you apply to the facts, but you have a great

10   discretion in deciding what facts are important and what facts

11   are needed for you to make a decision.

12       The Court has explained reasonable doubt, and I don't

13   want to spend a lot of time doing that, but the concept is too

14   important to ignore at the outset of my remarks.  Proof beyond

15   a reasonable doubt is the heaviest burden that is imposed upon

16   any party in any case, any type of case coming before our

17   system of -- or in our system of justice and before juries,

18   and that's because every criminal defendant has the right to

19   the presumption of innocence.

20       Proof beyond a reasonable doubt doesn't mean proof to an

21   absolute certain or a mathematical certainty because we can't

22   be that sure of anything, but it's very heavy burden and it

23   means more than you being convinced that maybe Mr. Kilmartin

24   committed these crimes.  If that's the level of your

25   conviction, you must find him not guilty.  If you conclude,

1    after reviewing all of the evidence, that it's just as likely

2    as not that Mr. Kilmartin committed these crimes, that's still

3    not sufficient to get you over the hurdle of beyond a

4    reasonable doubt.  Lastly, if you believe that he probably did

5    what the Government says he did, that is still insufficient,

6    and you must find him not guilty if you get only to the point

7    where you believe that he probably did what he is charged with

8    doing.  You have got to be convinced to the point where there

9    is no nagging uncertainty or any doubt to which you can

10   ascribe a reason.  And that's an extremely heavy burden and

11   it's one that in contrast to Mr. Kilmartin's is extreme.

12   Mr. Kilmartin has no obligation to provide an alternative

13   theory or to provide to you an explanation of what happened

14   or to convince you of anything.  As the Court has told you,

15   Mr. Kilmartin need not testify, and you cannot use that fact

16   against him.

17        So the system is very clear in terms of which party

18   carries of burden of proof and which party need not carry any

19   burden of proof.  That is available to all of us, to any

20   criminal defendant, not just to Mr. Kilmartin.  So when I ask

21   you to hold the Government to its burden of proof, I'm not

22   asking you to do anything special for Mr. Kilmartin.  I'm

23   asking you merely to make the Government prove its case beyond

24   a reasonable doubt as that term is explained to you by the

25   Court.

1        In this case, there are six remaining counts, all
2   involving Mr. Denton.  Three of those counts, as Mr. Frank has
3   put forth, involve the scheme, the mail fraud and the wire
4   fraud, and three of the counts involve the death of
5   Mr. Denton.  As you know, and as I discussed with you in my
6   opening statement last week, Mr. Kilmartin, before this trial
7   started, pled guilty to the scheme.  He pled guilty to
8   defrauding people by convincing people that he would send
9   potassium cyanide, accepting their money and then mailing
10  Epsom salts.  He did that, and he admitted to it, and there is
11  an exhibit in evidence that you can read all about it.  It's
12  the prosecution version that was read to you late last week,
13  the prosecution version that Mr. Kilmartin agreed is accurate
14  when he entered his plea of guilty.

15       Mr. Denton was also a victim of that scheme.  And I'm not
16  going to stand here today and deny that that is so, and I
17  can't deny that the Government has proven that, and that is
18  consistent with what Mr. Kilmartin admitted to last week.  And
19  so I don't want to spend a lot of time talking about the
20  scheme, but I do want to comment on some of the evidence
21  introduced in this case.

22       There were many witnesses, many exhibits that, in my view
23  and the view of the defense, simply proves and reproves the
24  scheme that Mr. Kilmartin agreed he had participated in, had
25  created, and had executed prior to the time this trial

1  started.  Now, the Court, throughout this case, and in its

2  instructions to you today, has cautioned you that some of the

3  evidence introduced against Mr. Kilmartin that Mr. Kilmartin

4  committed similar acts of those charged against him that you

5  will be considering, cannot be used by you to prove that he is

6  a person of bad character.  Now, that's a very important

7  consideration.  I know the Judge has told you that several

8  times.  But you cannot convict Mr. Kilmartin of the remaining

9  counts against him because you believe he's a person of bad

10  character, having committed other acts and those acts that he

11  admitted to.

12      So just to be clear, the evidence presented by the

13  Government related to Stacey Williams, Walter Cottle, Derek

14  Jorgensen, and Cynthia Kirshling had already been admitted by

15  Mr. Kilmartin, he pled guilty to it.  The evidence of the

16  other non-named victims, that you have had heard about, was

17  also previously admitted, although not pled guilty to, but the

18  non-named victims, he admitted that course of conduct in the

19  prosecution version and the plea agreement.

20      So that leaves us with the three counts involving the

21  death of Mr. Denton.  I want to recite the evidence to the

22  same extent Mr. Frank did.  I am going to try to focus on

23  those parts of the evidence that we would contend create

24  reasonable doubt as to the defendant's guilt.  And the first

25  of those has to do with the fact that the Government created

1    its own standard, okay, in the superseding indictment, which I

2    understand is not evidence, but you will read it, the

3    superseding indictment the Government says Mr. Kilmartin sent

4    potassium cyanide to Mr. Denton, then the Government produced

5    a lot of information about the actual product that Fisher

6    Scientific mailed to the UPS Store in Augusta.

7        The Government has alleged, and its theory of the case,

8    is that Mr. Kilmartin received that package from Fisher

9    Scientific that contained the substance defined in the

10   certificate of analysis, that Mr. Kilmartin then mailed that

11   to Mr. Denton, and it is that substance that Mr. Denton

12   ingested and died from ingesting.

13       There are a number of considerations about this, ladies

14   and gentlemen, that I would like to just run through for you.

15   At the beginning of this case, the Government presented the

16   testimony of Mr. Loving from Capricorn Group and Mr. Mitchell

17   from Fisher Scientific.  And as I understand it, Fisher

18   Scientific is a very big company, I think Mr. Mitchell told us

19   it was -- ranked somewhere in the Fortune 500, but it's a big

20   company.  Apparently, it doesn't do small deals with

21   individual purchasers.  It uses the Capricorn Group as kind of

22   a middleman, so the purchaser makes the arrangements with the

23   Capricorn Group, Capricorn Group accepts the money, and then

24   sends its order to Fisher, then Fisher sends the product to

25   the buyer.

1        And what happened in this case is apparently after some

2    back and forth with Mr. Kilmartin, which included providing

3    more than one residential address before coming up with a

4    business address at the UPS Store, the order was placed and it

5    was paid for with the Maine State Credit Union card.   The

6    paper trail of that transaction, as you've heard, has been

7    introduced into evidence, and you will see it.

8        I found it odd no vetting of Mr. Kilmartin by either of

9    the companies that sold this product.   Nobody apparently did

10   anything to confirm the existence of S & K goldsmith or to

11   determine that it was a legitimate business at all.   I find

12   that odd.   I don't know what you can make of it, but it's a

13   fact that is a little disturbing.

14       So we know that an order was placed with Capricorn Group,

15   and we know what was sent from Fisher Scientific to Mr.

16   Kilmartin at the UPS Store.   We know exactly what was sent,

17   and I think it's Exhibit Number 4, the certificate of

18   analysis, that tells us exactly the scientific makeup of the

19   product that was mailed by Fisher Scientific.   And I think as

20   we follow this through in terms of the Government proving to

21   you that this is the product that Mr. Kilmartin sent to

22   Mr. Denton, that Mr. Denton then killed himself with, don't

23   forget this is a suicide, ladies and gentlemen.   Mr. Denton

24   killed himself.   But it's important to keep in mind that the

25   content of the certificate of analysis and how long the

1    Government had the substance from Mr. Denton and what was done

2    with that.

3        I don't recall any information and as Mr. Frank said to

4    you, it's not our recollection of the evidence that matters,

5    it's your recollection of the evidence that really matters.

6    But I don't recall any indication from either Mr. Loving or

7    Mr. Mitchell that the certificate of analysis was delivered or

8    inserted within the package that was mailed to the UPS Store.

9    So all of this finding it online with Mr. Kilmartin the

10   percentages and 98 or 99 or 96, there's no evidence before you

11   as to where that came from because there's no evidence that

12   Mr. Kilmartin ever would have received that certificate of

13   analysis.

14       So the package goes from Fisher Scientific to the UPS

15   Store.  We know from the tracking information from Michelle

16   Tyne, the UPS security worker, we know that the package got on

17   the truck and that the truck got to the UPS Store in Augusta,

18   but it's here where things become less clear.  It's less clear

19   because UPS told us that there were three packages delivered

20   to the UPS Store at about 10:30 in the morning on

21   September 14th.  And there's an exhibit that will list the --

22   that shows that there were three packages.  The package

23   apparently is signed for by a worker named Jeff, Jeff Trimmer

24   I think is his name, the clerk at the UPS Store on

25   September 14th.  Now, the signature page -- and I believe the

1  testimony was that Jeff had to sign for that.  The signature

2  page is missing, and there isn't any record at the UPS Store

3  that Jeff received the package.  There is a document from the

4  UPS Store that shows the number of packages that were

5  delivered to the UPS Store on September 14th, and it shows

6  that there were two packages at about 10:30 and another

7  package at about 2:30 in the afternoon.  The missing package

8  was the package from Fisher Scientific.

9       Now, Mr. Milliken is the owner of the UPS Store in

10  Augusta, and he told us about how the UPS Store deals with

11  what he called, I believe, a package customer, and that means

12  somebody who doesn't have a usual account with UPS and doesn't

13  rent a box, and who wasn't routinely in and out of that store,

14  doing business with the UPS Store.  And he told us that a

15  package customer is advised that there is a fee that needs to

16  be paid, the $5 fee that you heard about earlier this morning.

17  The customer is advised of that at the time the customer asks

18  the UPS Store whether a package can be delivered to that

19  store, addressed that to customer.

20       He also told us that the precautions that -- precautions

21  are taken to assure that when a package comes off the truck,

22  the UPS truck, and gets delivered to his UPS store in Augusta,

23  they want to make sure that they preserve the package, number

24  one, and, number two, they want to make sure that they deliver

25  the package to the person who is supposed to receive the

1  package.  So when somebody comes in and says to Jeff, Jeff,

2  I'm here to pick up a package, Jeff requires, or any clerk,

3  requires the production of identification, a signature, and

4  payment.

5       Now, the transaction that allegedly occurred on

6  September 14, 2012, has no such documentation.  There is no

7  signature from the recipient.  There is no proof that

8  identification was provided.  There is no proof of a $5

9  payment.  Mr. Kilmartin's Maine State Credit account card,

10  when you look at that, and Mr. Frank talked to you about that

11  exhibit, but when you look at that, you will notice that he

12  used, and I believe it's Number 9, Exhibit Number 9,

13  Mr. Kilmartin used that debit card for very small purchases,

14  sandwiches, coffee, whatever.  There are a lot of 2, 3, $4

15  purchases, and he did go to Mulligan's on that.  And it's not

16  a surprise that Mr. Kilmartin was on Western Avenue because,

17  as I understand it, you have to go on Western Avenue to get

18  almost anyplace in Augusta.  And so the fact that

19  Mr. Kilmartin may have been on Western Avenue some time during

20  the day on September 14th hardly proves that he was at the UPS

21  Store in Augusta at about 10:30.

22       There is no record of Mr. Kilmartin or anybody else

23  picking up the package that Fisher Scientific mailed to the

24  UPS Store, and that's a problem.  It's not reasonable, I would

25  suggest, to conclude that Mr. Kilmartin somehow showed up and

1    took the package from the secure location at the UPS Store and

2    refused to sign for the package, refused to provide

3    identification, and refused to pay.  That just doesn't make

4    any sense.  The UPS Store, as a matter of routine, uses these

5    precautions to make sure that the package goes to the person

6    who is supposed to get the package.

7         Now, did the package ever get inside the store?  Who

8    knows.  We know that there was an occasion when packages

9    didn't get from one truck to another truck at that location.

10   Different circumstances and different facts surrounding that

11   event, but, nonetheless, things can happen as Mr. Milliken

12   told us.

13        But Jeff Trimmer worked at the store at UPS until, my

14   recollection, is three or for months ago, until earlier in the

15   summer of 2016.  The Government has been investigating this

16   case for years.  It's been a huge investigation.  We've seen

17   witnesses from the United Kingdom, from California, from

18   Nevada, from Florida, every single piece of paper related to

19   this event has been gathered and produced.  What we didn't see

20   was a piece of paper from Augusta, Maine, documenting

21   Mr. Kilmartin picked up package at the UPS Store in Augusta.

22   If Mr. Trimmer was working at that store while the Government

23   was doing its investigation, where was Mr. Trimmer during this

24   case?  Why wasn't Mr. Trimmer here saying, oh, yeah, right

25   there.  He ran into the store, grabbed the package, and ran

1    out.  You don't think Mr. Trimmer's been interviewed?  You

2    don't think Mr. Trimmer's been shown a photograph of

3    Mr. Kilmartin?  You don't think somebody didn't ask

4    Mr. Trimmer, didn't you see this guy here on September 14th?

5    The investigation has been far too thorough to have missed

6    that particular point, yet we didn't see Mr. Trimmer.  And I

7    suggest for you to conclude that Mr. Kilmartin somehow, some

8    way got by the procedure that the UPS Store implements daily

9    and uses daily is just not supported by the evidence.  It

10   isn't.  I think you can conclude that Mr. Kilmartin did not

11   get that package.  If you use the evidence that's in the

12   record about the delivery of that package, you can easily

13   conclude that he did not receive that package.

14        I request of you, ladies and gentlemen, that you hold the

15   Government to its burden of proof, and you make the Government

16   prove what it alleges against Mr. Kilmartin.  And one of those

17   allegations is the possession of this potassium cyanide, not

18   just any potassium cyanide, but the potassium cyanide that

19   came from Fisher Scientific.  Close enough isn't good enough

20   in this particular competition.

21        Because the package got to Augusta doesn't mean

22   Mr. Kilmartin got the package.  So there is no record of

23   Mr. Kilmartin coming into possession of the package sent by

24   Fisher Scientific that contained the potassium cyanide that

25   the Government claims Mr. Denton killed himself with.

1          Related to this particular issue, ladies and gentlemen,

2     is the Government's inability to prove that what was ingested

3     by Mr. Denton was potassium cyanide from the package sent by

4     Fisher Scientific and addressed to Mr. Kilmartin at the UPS

5     Store.  We know exactly what was in the substance mailed by

6     Fisher Scientific.  We know that Mr. Denton ingested cyanide,

7     of that there is no quarrel and no doubt.

8          I, too, would ask you to remember Mr. Kay's testimony,

9     the person who did the hazmat examination of the sample that

10    was left by Mr. Denton at the time of his death.  And Mr. Kay

11    told us that he did two tests instead of three because there

12    wasn't enough -- he was worried there was not enough left and

13    he said that it was potassium cyanide.  And then I asked him

14    how he could be sure that there was potassium in the potassium

15    cyanide.  And I think he agreed with me, and your recollection

16    will carry the day, but I think he agreed that the potassium

17    in the substance would not have absorbed the light that was

18    used in the mechanism that tried to identify the substance.

19    That substance was like compared to some library

20    spectrographs, as I understand it, and the closest one was

21    potassium cyanide.  But the cyanide can be identified.  The

22    potassium can't be identified.  And the Government has said

23    that it's potassium cyanide from Fisher Scientific that

24    Mr. Kilmartin used to mail to Mr. Denton.  And I think the

25    Government needs to prove that to you beyond a reasonable

1    doubt.

2         It's cyanide that killed Mr. Denton.  Is it potassium

3    cyanide?  There was no evidence to that effect.  There was the

4    spike, but I think Mr. Kay told us -- now, that's the cyanide

5    spike.  I can't tell you that there was potassium in there.

6         Mr. Hutchings, who tested Mr. Denton's blood, testified

7    that there were -- was potassium overdose -- excuse me -- a

8    cyanide overdose consumed by Mr. Denton and that's what killed

9    him.  He didn't comment on whether it was potassium cyanide,

10   some other kind of cyanide, or just plain cyanide.  He simply

11   said, he had cyanide in his body and that's why he died.  And

12   Ms. Morris-Kukoski also testified to the impact of cyanide on

13   the body.  But nobody has told us that potassium cyanide from

14   Fisher Scientific is what killed Mr. Denton.  And we know that

15   could have been done because Mr. Desrosiers told us about his

16   conversation with a man named Ed Hess, who was the author of

17   the certificate of analysis from Fisher Scientific.  And I

18   believe that testimony was to the effect that if any of the

19   potassium cyanide left from the lot that Fisher Scientific had

20   and -- from which it -- sent the sample to Mr. Kilmartin, if

21   anything was left of that lot, oh, sure, we can compare that

22   to the sample that was in England, and we can tell you down to

23   one part per million whether that's the same substance or not,

24   but that test was never done.

25        The authorities in England had this package, this

1    substance of the remaining package from December 31, 2012.
2    It's now 2016.  And Mr. Hess told the Government, I believe in
3    2015, that, no, we only keep it for three years, so we don't
4    have anything left that we can use to test against the
5    substance that came from Mr. Denton's house.  And yet the
6    Government wants you to take the leap and just believe that
7    it's the same stuff.  Three years they had to have that test
8    done, and if no test was done, they could have confirmed what
9    that substance was.  That ought to be held against the
10   Government.  And I suggest it's more appropriate to do that
11   than for you to conclude that, well, you know, everything
12   seems to point to Mr. Kilmartin, forget the fact that we could
13   have proven it scientifically, but we didn't do that.
14        There's no way to scientifically conclude that the
15   substance in Mr. Denton's home came from the package that was
16   mailed by Fisher Scientific to Mr. Kilmartin at the UPS Store.
17   You cannot rely upon a close enough is good enough.  Looks
18   like potassium cyanide, kind of fits that mold, well, no,
19   that's just cyanide.  We don't know that it was potassium
20   cyanide, ladies and gentlemen.
21        If you are convinced, however, that Mr. Kilmartin,
22   despite the facts that I have been discussing with you,
23   actually did receive potassium cyanide from Fisher Scientific,
24   and if you are convinced that he mailed that to Mr. Denton, I
25   believe there are still some facts that you need to consider

1    before you begin to pass judgment on the three counts

2    involving Mr. Denton's death.  One of those facts is that the

3    package mailed by Mr. Kilmartin on December 11, 2012, arrived

4    in England on December 20, 2012.  Mr. Denton killed himself on

5    December 31st.  That's 11 days.  We don't know what happened

6    to that package, who had access to the package, whether the

7    package was opened, whether the baggy was opened, whether the

8    baggy was taken out and another baggy put in that contained

9    cyanide, we don't know.  There is a gap of 11 days where it is

10   unclear what was happening to that package.  And I think

11   Mr. Desrosiers confirmed that there's just no way for anybody

12   to know what happened to that.  That's reasonable testimony by

13   Mr. Desrosiers because nobody does know.  But it's a large

14   block of time.

15        The emails from Mr. Kilmartin -- you know, and I'm not --

16   I think the package was mailed on December 11th, got there on

17   the 20th, and Mr. Denton died on the 31st.  A lot of

18   conversations being had between Mr. Denton and Mr. Kilmartin

19   occurred after the package is mailed.  And I don't know how

20   those conversations could have impacted a desire on the part

21   of Mr. Kilmartin to tamper or to retaliate or to kill

22   Mr. Denton.

23        We know also that Mr. Denton was actively searching for

24   cyanide on the Internet, as was Mr. Kilmartin.  You will see

25   that in the exhibits.  As was Mr. Kilmartin.  He was actively

1  seeking for potassium cyanide on the Internet, at least since

2  August 29th of 2012.  And I believe the testimony of

3  Mr. Collier and Mr. Armstrong were consistent with that.  It

4  was one day when there was a number of entries, I think that

5  day was August 29, 2012.

6      We know also that there was at least one email to -- one

7  email found to Mr. Denton, and this was dated December 24,

8  2012, from an address called Brawn Kelly offering to sell

9  Mr. Denton KNC, which is the symbol for potassium cyanide, and

10 he quoted how much it would cost, and I believe that's

11 Exhibit Number 101, and you will see that when you examine the

12 exhibits in your deliberations.  Apparently, there's not been

13 any follow up on that email.  Is that a potential source of

14 potassium cyanide for Mr. Denton?  Sure, it is.  And I think

15 you will see when you look at the website printout of the

16 website Want Death blog, that there were many entries where

17 people are saying, I can sell this or I can sell that, I can

18 sell cyanide.  There's much discussion about how cyanide

19 should be taken and how it kills.  That information is not

20 unique to Mr. Kilmartin at all.  It just isn't.

21     We have no idea what Mr. Denton did with the package or

22 its contents or whether anything was left over that had been

23 mailed by Mr. Kilmartin.  We don't know what was in the

24 envelope because it wasn't -- it hasn't been established that

25 was the potassium cyanide from Fisher Scientific.

1      What we do know is that when Mr. Denton opened the

2  envelope, he didn't die.  The envelope didn't explode.  When

3  he opened the package nothing -- no poison wafted out of the

4  envelope or came out of the baggy.  And I think one of the

5  witnesses mentioned anthrax last week.  You know, that would

6  be capable of killing Mr. Denton unsuspectingly by surprise,

7  making him an innocent victim of a killing.  That's not what

8  happened.  That's not what even is alleged in this case.

9      Mr. Kilmartin, we all know, is across the ocean from

10 Mr. Denton.  We know, even if Mr. Kilmartin -- if you accept

11 that Mr. Kilmartin mailed the package that contained cyanide,

12 potassium cyanide to Mr. Denton, we can all agree he took no

13 further steps to end Mr. Denton's life.  We also know that the

14 mailing and the receipt of the package and the opening of the

15 package didn't result in Mr. Denton's death.

16     Mr. Denton's death didn't happen, if you assume that

17 Mr. Kilmartin sent that package, did not happen until

18 Mr. Denton opened the envelope, opened the package, opened the

19 baggy -- I mean, emptied the baggy or used the contents of the

20 baggy to mix with water and then to drink.  Mr. Denton

21 intentionally and voluntarily consumed the contents of the --

22 of what was in the beaker.  He killed himself, knowingly,

23 voluntarily, and intentionally.  The mailing of the item to

24 Mr. Denton did not directly kill Mr. Denton.  There were a

25 number of intervening events that had to happen before

1    Mr. Denton died.

2        Mr. Denton wasn't ambushed.  He wasn't tricked.  He

3    wasn't attacked.  He wasn't shot.  He wasn't beaten to death.

4    Mr. Denton died in the exact manner in which he wished to die.

5    Mr. Denton's death was caused by Mr. Denton's actions.

6        Ms. Coates told us that Mr. Denton was absolutely

7    committed to killing himself.  And when I say this, I'm not

8    speaking ill of Mr. Denton.  I'm not speaking critically of

9    Mr. Denton.  I'm simply trying to indicate to you the facts

10   that we think are important in evaluating how Mr. Denton died.

11   Ms. Coates told us that it wasn't a matter of if he would die

12   by suicide, it was a matter of when and how he would die by

13   suicide.

14       Mr. Denton had, for a number of years, tried to kill

15   himself, and you heard the methods that he attempted last

16   week, and some of those are very bizarre ways to attempt to

17   kill one's self, but that's what Mr. Denton was.  Mr. Denton,

18   according to his niece was going to kill himself.

19       Now, absent the intentional intervening acts by

20   Mr. Denton, nothing Mr. Kilmartin -- nothing that

21   Mr. Kilmartin did could have caused his death.  And this is

22   where I ask you to examine these facts in light of your own

23   common sense.  Does it make sense to label the sender of an

24   item a killer when we know that the receipt of what he mailed,

25   even the opening of what he mailed, would not have killed

1    anybody?  As I mentioned, it didn't blow up, no anthrax or

2    anything else came out of the envelope that would have killed

3    the unsuspecting victim.  Common sense would say that

4    Mr. Denton killed Mr. Denton.

5        Now, with that as background, I would like to briefly

6    touch upon the three counts involving Mr. Denton's death, the

7    mailing injurious articles resulting in death is Count 1.  And

8    the government must prove Mr. Kilmartin knowingly caused to be

9    mailed potassium cyanide with the intent to kill or injure

10   Mr. Kilmartin and that the injurious article resulted in

11   Mr. Denton's death.

12       Mr. Kilmartin, if he did everything the Government says

13   he did, did no more than provide a means by which Mr. Denton

14   could accomplish what he had long wished to accomplish.  Could

15   it be viewed as an assist?  I don't know what we would call

16   it, but it's not the death of Mr. Denton, and that's because

17   Mr. Denton did the things that we know he did.  Mr. Kilmartin

18   may have provided, in the worst case scenario, a possible

19   means for Mr. Denton to kill himself, but that's all.

20       Mr. Denton, in the 11 days between getting the package

21   and killing himself -- as I mentioned, we don't know what he

22   did with the contents of the package, but it was his actions,

23   planned and carried out during that period of time, that

24   resulted in his death.  Mr. Denton alone caused his death and

25   died in the manner and pursuant to the means that he had long

1    sought.

2         Now, Counts 14 and 15 are a little bit different because

3    they allege a killing of Mr. Denton.  As you will notice, the

4    wording, if you read the Court's instruction, but resulting in

5    death is Count 1.  Killing is Count 14 and Count 15.

6    Count 14, the witness tampering, the Government must convince

7    you that Mr. Kilmartin actually killed Mr. Denton, and he did

8    so to prevent a communication about the commission of a

9    federal offense to a federal law enforcement officer.

10        You'll see when you review the evidence that Mr. Denton

11   had already made a complaint.  We all know that.  We all know

12   he made a complaint.  And in tracking that complaint to the

13   extent that he was able to do that, you will see in the second

14   exhibit, the one that came from the FBI woman who testified,

15   Donna Gregory, Ms. Gregory brought in an exhibit that has an

16   additional part on page 4 of the exhibit where Mr. Denton

17   said, you know, we've squared up, and I don't want to pursue

18   this complaint anymore.

19        I don't know what communication could have been prevented

20   by Mr. Kilmartin.  Mr. Denton had already withdrawn his

21   complaint to the extent he could do that.  There was no known

22   upcoming communication.  There was no investigation.  There

23   was no trial.  There wasn't anything going on with this

24   complaint.  And I think Ms. Gregory told us that nothing ever

25   happened to the complaint, nothing ever would have happened to

1    the complaint.

2        So what we know is that Mr. Denton died as a result of

3    suicide, and that was after his first communication with the

4    FBI when he was so angry, when he said, I will make sure you

5    pay for this, or something to that effect in an email to

6    Mr. Kilmartin.  That was earlier in December.  And then he

7    withdrew the complaint and committed suicide.  There was no

8    upcoming communication with any federal law enforcement

9    officer.

10       The last count, Count 15 alleges a retaliation against

11   the witness.  And the allegation here, I guess, is that

12   Mr. Denton filed an IC3 complaint so Mr. Kilmartin killed him.

13   But, again, we know how Mr. Denton died.  We know there was a

14   complaint.  We know there was a retraction.  And once again, I

15   don't want to belabor this, ladies and gentlemen, but

16   Mr. Kilmartin took no step to kill Mr. Denton.

17       If you accept the fact that he mailed the package, that

18   mailing did not accomplish the death of Mr. Denton.  And you

19   just can't overlook the fact that Mr. Denton knowingly,

20   voluntarily, and willingly killed himself.

21       Common sense would tell us that to kill somebody requires

22   some effort at snuffing out somebody's life or taking

23   somebody's life.  It isn't providing something that a party

24   may or may not decide to use to take his own life.  It's got

25   to be an active role in the killing, would be a commonsensical

1    way to look at this.  And, again, Mr. Kilmartin was in Maine

2    and Mr. Denton was in the United Kingdom.

3        You must consider the events that intervened between the

4    mailing of the package and the death of Mr. Denton, you have

5    to.  And those events were all the result of decisions made by

6    Mr. Denton and actions taken by Mr. Denton.  He is a victim of

7    his own conduct and of his own decisions and of his own desire

8    to die.

9        I think if you examine all of the Government's -- all of

10   the Government's evidence, focusing on the three death counts,

11   you will need to conclude that Mr. Kilmartin did not kill or

12   cause the death of Andrew Denton.  Andrew Denton caused his

13   own death.

14       For listening to me today and the attention you have

15   provided to us over the past week, I thank you very much.

16           THE COURT:  Thank you, Mr. Ridge.

17       Brief rebuttal, Mr. Frank.

18           MR. FRANK:  Ladies and gentlemen, in his closing,

19   the defense argues that Sidney Kilmartin didn't kill Andrew

20   Denton, Andrew Denton killed himself, that Sidney Kilmartin

21   took no step to kill Andrew Denton.  Ladies and gentlemen,

22   that's not true.  He did take -- he did take a step.  He sent

23   him deadly poison, ladies and gentlemen.  Without that deadly

24   poison, Andrew Denton would not have died on December 31,

25   2012.  That's how Sidney Kilmartin killed Andrew Denton on

1    that day.  It was automatic, ladies and gentlemen.

2        Mr. -- you're right, Andrew Denton was determined to die.

3    He was suicidal, there is no question about that.  But that --

4    that's not a defense to these charges, and that doesn't mean

5    that Sidney Kilmartin didn't kill him and wasn't the but for

6    cause of Andrew Denton's death.

7        Remember, it's almost mechanical in this case.  It's

8    almost as if there is no volitional element on the part of

9    Andrew Denton because he is so fixated, so determined to kill

10   himself, and because Sidney Kilmartin knows that, because he's

11   tested Andrew Denton's resolve and Andrew Denton has proven to

12   Sidney Kilmartin that he would kill himself.  There is no --

13   there is no intervening cause here that breaks that chain of

14   causation in this case.

15       Mr. Ridge argues that there is no evidence that the

16   cyanide that killed Andrew Denton is the cyanide that Sidney

17   Kilmartin got from Fisher Scientific.  You were here last

18   week, ladies and gentlemen.  The Government doesn't have to

19   prove this beyond all doubt or to a scientific certainty.  The

20   evidence is abundant from beginning to end that that's exactly

21   what killed Andrew Denton.  You know where it came from,

22   Fisher.  You know how Kilmartin got it.

23       This idea -- this idea that Sidney Kilmartin didn't pick

24   it up from the UPS Store, come on, ladies and gentlemen.  He

25   ordered it.  He paid $127 for it.  He was expecting it.  He

1    went to great trouble to find it, to make arrangements to get

2    it delivered to the UPS Store.  He was on Western Avenue that

3    day.  You can see it in the credit union statements, the other

4    two charges on Western Avenue.  He didn't complain that he

5    didn't get it.  You heard from UPS that the corporate from --

6    from -- from Mr. Milliken, nobody -- Sidney Kilmartin didn't

7    complain, I didn't get my potassium cyanide I was expecting, I

8    paid for.  And nobody else complained that they got somebody

9    else's potassium cyanide that they weren't expecting.

10        You know he advertised he had it.  He described it as

11   potassium cyanide in great detail repeatedly in the same

12   terms, the same exact terms as in the certificate of analysis.

13   That alone is evidence that he had seen the certificate of

14   analysis.  And most of all, you know he got it because he had

15   it to send to Andrew Denton.

16        In my view, as regards to the -- the other two counts,

17   the tampering and retaliation, the Government doesn't even

18   have to prove -- I mean, all the Government has to prove is

19   that Kilmartin killed Denton, that whatever was in that

20   package killed Denton.

21        And that -- that brings up another point, ladies and

22   gentlemen.  The Government is only required to prove beyond a

23   reasonable doubt the elements of the offense that His Honor

24   instructs you on.  There is proof that he paid $5 to pick up

25   the package at the UPS Store.  It's in his email to Andrew

1   Denton where he tells -- hey, I am going to tell you something

2   else I have not told anyone, you know, this is how I got it,

3   from Fisher -- from Capricorn.  And I had it delivered to the

4   UPS Store, and I paid $5 to pick it up.

5       Mr. Ridge -- on the one hand, the Government didn't

6   investigate on -- on one hand, we overdo things.  We prove

7   things we have already proved to you.  I submit to you that

8   you learned a lot of value of hearing from people like Walter

9   Cottle, Stacey Williams, Cynthia Kirshling, Autumn Roland,

10  things that you would not have learned or could not have

11  learned just from the prosecution's version.

12      And then on the other hand, we should have done more.  We

13  should have -- we should have gotten a reference sample, we

14  tried, you heard Inspector Desrosiers describe how we tried,

15  and I think we learned about the existence of sample --

16  samples, but there was none left.

17      We should have investigated Brawn Kelly.  Ladies and

18  gentlemen, there's no evidence that Brawn Kelly -- who Brawn

19  Kelly is, whether it's even a real person, that Brawn Kelly

20  sent anything to anyone, much less Andrew Denton.  Contrast

21  that to the evidence here with regard to Sidney Kilmartin, the

22  abundance of evidence that Kilmartin sent Denton potassium

23  cyanide.

24      And think about this too, there's no way that Sidney

25  Kilmartin is going to send a second mailer to Andrew Denton

1   that has anything else in it than something that's going to

2   put an end to Andrew Denton.  He's already made that mistake

3   once, ladies and gentlemen.  He sent him Epsom salts and look

4   at the trouble it brought for him, a complaint to the FBI.

5   That's why -- you know, there's no way he is going to send him

6   Epsom salts again.  Imagine what Denton would have done if

7   that's what Kilmartin had sent him.  No, ladies and gentlemen,

8   Sidney Kilmartin sent Andrew Denton deadly cyanide, potassium

9   cyanide in that second mailer.  You don't need to be a chemist

10  to know that.  Yes, it may be that the hazmat ID 360 can't

11  distinguish between -- can't see potassium, but the

12  significant part of potassium cyanide, ladies and gentlemen,

13  is the cyanide part.  And as I said, yeah, use your common

14  sense.  All the circumstances prove that's what that was that

15  killed Andrew Denton.

16      Ladies and gentlemen, this case is what I told you it

17  would be about, a man, Sidney Kilmartin, who devised this

18  malicious scheme to take advantage of the most vulnerable

19  people and who, when one of them had the audacity to complain

20  to the authorities about it, killed him.  Don't let him get

21  away with murder, ladies and gentlemen.  Hold him accountable

22  for everything that he did.

23      THE COURT:  Thank you, Mr. Frank.

24      Ladies and gentlemen, I'm going to ask you to retrieve

25  your jury instructions and turn to page 17 of those

1    instructions.  I'm also going to be referring to the verdict

2    form, which I am going to ask you retrieve, as well.

3        Jury deliberations.  I come now to the last part of the

4    instructions, the rules for your deliberations.  When you

5    retire, and here I'm talking about the foreperson's role in

6    unanimity.  When you retire, you will discuss the case with

7    the other jurors to reach agreement if you can do so.  You

8    shall permit your foreperson to preside over your

9    deliberations and your foreperson will speak for you here in

10   court.  Once again, your verdict must be unanimous, both as to

11   each count and as to each element of each count.

12       Consideration of evidence.  Your verdict must be based

13   solely on the evidence and on the law as I have given it to

14   you in these instructions.  However, nothing I have said or

15   done is intended to suggest what your verdict should be --

16   that is entirely for you to decide.

17       Reaching agreement.  Each of you must decide the case for

18   yourself, but you should do so only after considering all the

19   evidence, discussing it fully with the other jurors, and

20   listening to the views of the other jurors.

21       Do not be afraid to change your opinion if you think you

22   are wrong, but do not come to a decision simply because other

23   jurors think it is right.  This case has taken time and effort

24   to prepare and try.  There is no reason to think it could be

25   better tried or that another jury is better qualified to

1  decide it.  It is important, therefore, that you reach a

2  verdict if you can do so conscientiously.  If it looks at some

3  point as if you may have difficulty in reaching a unanimous

4  verdict, and if the greater number of you are agreed on a

5  verdict, the jurors in both the majority and the minority

6  should reexamine their positions to see whether they have

7  given careful consideration and sufficient weight to the

8  evidence that has favorably impressed the jurors who disagree

9  with them.  You should not hesitate to reconsider your views

10 from time to time and to change them if you are persuaded that

11 this is appropriate.

12      It is important that you attempt to return a verdict,

13 but, of course, only if each of you can do so after having

14 made your own conscientious determination.  Do not surrender

15 an honest conviction as to the weight and effect of the

16 evidence simply to reach a verdict.

17      I want to read to you now what is called the verdict

18 form.  This is simply a written notice of the decision you

19 will reach in this case.  And here, I am going to ask you to

20 turn to the verdict form.  Again, at the top is the court and

21 the case caption.  Jury verdict form.  Count 1, mailing

22 injurious articles resulting in death.  We, the jury, find the

23 defendant, Sidney Kilmartin, not guilty, or guilty beyond a

24 reasonable doubt of the crime charged in Count 1 of the

25 superseding indictment.

1    Then we turn to Count 5, wire fraud, Count 7, wire fraud,

2    Count 12, mail fraud, Count 14, witness tampering, and

3    Count 15, witness retaliation.  All of these questions are the

4    same, and you will -- the foreman will indicate which of --

5    what your verdict is on this form and sign it and date the

6    form once you have arrived at a verdict.

7    After you have reached unanimous agreement on a verdict,

8    your foreperson will fill in the form that has been given to

9    you, sign and date it, and advise the jury officer outside

10   your door that you are ready to return to the courtroom.

11   After you return to the courtroom, your foreperson will

12   deliver the completed verdict form as directed in open court.

13   I should point out here that despite these instructions,

14   occasionally the jury foreman will include the verdict, the

15   actual verdict in the note to me.  That is not appropriate.

16   You will simply let the jury officer know that you have

17   arrived at a verdict, and send a note to me to that effect.  I

18   do not get a sneak peek at your verdict.  And I will hear the

19   verdict at the same time as everyone else in open court.

20   Turning back to the instructions here.  Drug exhibits.

21   As you know, a number of exhibits containing drugs have been

22   admitted into evidence.  As members of the jury, you have the

23   right to actually see and review all of the evidence that has

24   been admitted.  This includes the drugs.  You are not required

25   to inspect these exhibits beyond what you have already done.

1    I am not suggesting one way or the other whether you as

2    members of the jury should ask to inspect these exhibits.

3        In an excess of caution, unlike the other exhibits, these

4    drug exhibits will not be brought into the jury room.  If you

5    desire to review one or more of these exhibits, please let me

6    know by sending a note to me.  If you are able to specify

7    which exhibit you wish to review, please do so.  If you are

8    unable to specify, all exhibits will be brought to you in

9    accordance with court procedures.  A law enforcement officer

10   will present the exhibits to you for your inspection and will

11   remove them once the inspection is complete.

12       Please remember not to discuss the case at all while the

13   law enforcement officer is present.  This is because jury

14   deliberations are strictly confidential and no discussions may

15   take place in the presence of an individual who is not a

16   member of the jury.

17       Communications with the court.  If it becomes necessary

18   during your deliberations to communicate with me, you may send

19   a note through the jury officer, signed by your foreperson or

20   by one or more members of the jury.  No member of the jury

21   should ever attempt to communicate with me on anything

22   concerning the case except by a signed writing, and I will

23   communicate with any member of the jury on anything concerning

24   the case only in writing or orally here in open court.

25       If you send out a question, I will consult with the

1    parties as promptly as possible before answering it, which may

2    take some time.  Here, I can tell you that it will take some

3    time.  I have to review the note, I have to gather the

4    attorneys.  I have to consult with the attorneys about the

5    appropriate response, we have to prepare an appropriate

6    response, and send it back to you.  So if you send out a note,

7    please do not expect that we will be able to turn around a

8    quick response to you, but we will respond.  You may continue

9    with your deliberations while waiting for the answer to any

10   question.  Remember that you are not to tell anyone, including

11   me, how the jury stands numerically or otherwise until after

12   you have reached a unanimous verdict or have been discharged.

13        Please remember not to discuss the case at all while the

14   law enforcement officer is present.  This, again, is because

15   the jury deliberations are strictly confidential and no

16   discussions may take place in the presence of an individual

17   who is not a member of the jury.

18        I will speak with counsel briefly at sidebar.

19                        SIDEBAR CONFERENCE

20        THE COURT:  Any objection to the instructions as

21   given from the Government?

22        MR. FRANK:  No, Your Honor.

23        THE COURT:  Any additions?

24        MR. FRANK:  No, Your Honor.

25        THE COURT:  Any objections to the instructions on

1     the part of the defendant?

2               MR. RIDGE:  No, Your Honor.

3               THE COURT:  Any additions?

4               MR. RIDGE:  No.

5               THE COURT:  Thank you.

6               (The sidebar conference was concluded.)

7               THE COURT:  Ladies and gentlemen of the jury, I am

8     now going to issue what is called the order of committal.  I

9     order that this jury be and it is hereby committed to the

10    care, custody, and safekeeping of the United States Marshal

11    for the District of Maine and of his authorized Deputy

12    Marshals and of the duty sworn jury officers of the court for

13    the period of their deliberation in the matter now before the

14    court.  I further order that said officers shall attend

15    diligently upon the jury, shall see that no one shall

16    communicate with them, nor they with others except upon and in

17    accordance with an order of this court, and their needs be

18    speedily attended to for such period of time as they shall

19    require.

20         Ladies and gentlemen of the jury, I herewith commit this

21    case to you for deliberation and decision.  I commend you to

22    your verdict.  You may retire.

23         (The jury leaves the courtroom at 12:35 p.m.)

24               THE COURT:  I would ask counsel to make certain with

25    the clerk that the exhibits have been admitted into evidence

1    are known and are properly submitted to the jury with the

2    exception of the drug exhibits.

3        And with that, Court will stand in recess.

4            (Court was recessed at 12:36 p.m. and reconvened at

5    3:17 p.m.)

6            THE COURT:  We received a note from the jury

7    foreperson that they have arrived at a verdict.

8        Would you bring the jury in?

9            (The jury entered the courtroom at 3:18 p.m.)

10            THE COURT:  Mr. Foreperson, I understand you have

11    arrived at a verdict?

12            THE FOREPERSON:  Yes, we have.

13            THE COURT:  I am going to ask the clerk to retrieve

14    the verdict.  I am going to ask the clerk to announce the

15    verdict.

16            THE CLERK:  United States District Court, District

17    of Maine, United States of America v. Sidney P. Kilmartin,

18    Case Number 1:14-cr-00129-JAW.  Jury verdict form, Count 1,

19    mailing injurious articles resulting in death.  Question 1,

20    we, the jury, find the defendant, Sidney Kilmartin, guilty

21    beyond a reasonable doubt of the crime charged in Count 1 of

22    the superseding indictment.

23        Count 5, wire fraud.  Question 2, we, the jury, find the

24    defendant, Sidney Kilmartin, guilty beyond a reasonable doubt

25    of the crime charged in Count 5 of the superseding indictment.

1        Count 7, wire fraud.  Question 3, we, the jury, find the

2    defendant, Sidney Kilmartin, guilty beyond a reasonable doubt

3    of the crime charged in Count 7 of the superseding indictment.

4        Count 12, mail fraud.  Question 4, we, the jury, find the

5    defendant, Sidney Kilmartin, guilty beyond a reasonable doubt

6    of the crime charged in Count 12 of the superseding

7    indictment.

8        Count 14, witness tampering.  Question 5, we, the jury,

9    find the defendant, Sidney Kilmartin, guilty beyond a

10   reasonable doubt of the crime charged in Count 14 of the

11   superseding indictment.

12       Count 15, witness retaliation.  Question 6, we, the jury,

13   find the defendant, Sidney Kilmartin, not guilty of the crime

14   charged in Count 15 of the superseding indictment.

15       Dated October 11, 2016, signed the jury foreperson.

16       Mr. Foreperson, is this your verdict as I have read it?

17           THE FOREPERSON:  Yes, it is.

18           THE CLERK:  Ladies and gentlemen of the jury, is

19   this your verdict as I have read it?

20           THE JURY:  Yes.

21           THE COURT:  Would either party like the jury polled?

22           MR. FRANK:  Not from the Government, Your Honor.

23           MR. RIDGE:  No, Your Honor.  Thank you.

24           THE COURT:  First, I would like to thank counsel for

25   their very excellent and professional presentations during the

1  course of this trial.  It was in accordance with the highest

2  standards of legal profession, and so I thank you.

3      Ladies and gentlemen, I have some parting words for you.

4  I think it's clear during the course of this trial, and this

5  was not a short trial, it was also a fairly complicated trial,

6  that you as members of the jury listened carefully to the

7  evidence.  You also listened carefully to the instructions I

8  gave you at the end of trial, the closing arguments, and the

9  presentation of the witnesses.  You deliberated carefully, and

10  you have arrived at a verdict.  Under the law, that verdict is

11  entitled to respect, and I'm sure -- I can assure you it will

12  be given the respect that the law requires.

13      There are very few rights, ladies and gentlemen, that we

14  have as American citizens that we rely on others to give to

15  us.  Usually, we think of the rights as Americans as things we

16  can or cannot do by ourselves.  We either speak or do not

17  speak.  We worship or do not worship.  And we engage in civil

18  discourse or we do not.  It's up to us.

19      There are two very fundamental rights that go to the very

20  heart of our Bill of Rights that we rely on others to give to

21  us, one, is the right to counsel.  And we have seen that very

22  professionally and properly displayed during the course of

23  this case.

24      The other ladies and gentlemen is the right to trial by

25  jury.  That is a fundamental right under our judicial system

1    that we rely on others to give to us.  What you have done by

2    participating in this trial, by sitting and listening

3    carefully to the evidence and by rendering a verdict, is you

4    have breathed life into the Bill of Rights of the Constitution

5    of the United States of America.  And in doing so, you have

6    acted in accordance with the highest standards of American

7    citizenship.

8         On behalf of the parties, on behalf of the Court, but

9    most particularly on behalf your fellow American citizens, I

10   thank you.

11        The jury is hereby discharged.

12            (The jury leaves the courtroom at 3:24 p.m.)

13            THE COURT:  Mr. Kilmartin, would you stand, sir?

14   Mr. Kilmartin, I'm sure you're disappointed with the verdict,

15   but I can also assure you you have no reason to be

16   disappointed in the efforts of your counsel.  Mr. Ridge tried

17   very hard for you.  He gave you a very fine defense.

18        What's going to happen next in your case is that someone

19   from the probation office will come by, and he or she will

20   meet with you, and they will interview you.  They will

21   interview you to give me more background to help me understand

22   not only what you did, but also who you are so that I can

23   impose a sentence on you that is both fair to you but also

24   just for society.

25        You will have an opportunity to review the report.  I am

1    going to urge you to review the report and review it carefully

2    to make sure it's accurate because I do not want to sentence

3    you on the basis of any inaccurate information.

4         Mr. Ridge is a very fine lawyer, but he has not led your

5    life, so we're all going to be relying on you to make certain

6    that the contents the presentence report are accurate.  Do you

7    understand?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  After any issues of the report have been

10   resolved, the matter will be set back here in this courtroom

11   for the imposition of sentence.  Do you understand what's

12   going to happen next?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Now, I take it that Mr. Kilmartin has

15   been detained; is that correct?

16             MR. FRANK:  Yes, Your Honor.

17             THE COURT:  And what's the Government's pleasure?

18             MR. FRANK:  That he continue to be detained.

19             THE COURT:  Mr. Ridge.

20             MR. RIDGE:  No objection, Your Honor.

21             THE COURT:  Mr. Kilmartin, as a final matter, you

22   will continue to be detained pending imposition of sentence.

23        Anything further on the part of the Government?

24             MR. FRANK:  No, Your Honor.

25             THE COURT:  Anything further on the part of the

1    defense?

2              MR. RIDGE:  No, Your Honor.  Thank you.

3              THE COURT:  Again, I would like to thank counsel for

4    their professionalism during the course of the trial.

5         The defendant is hereby remanded to the custody of the

6    United States Marshal for the District of Maine.  He is to be

7    held in that custody pending further order of the court.

8         Court will stand in recess.

9              (Court was recessed at 3:27 p.m.)

10                         *  *  *  *  *

11                         CERTIFICATION

12        I certify that the foregoing is a correct transcript from

13   the record of proceedings in the above-entitled matter.

14

15

16   /s/ Melissa L. Merenberg            2/14/2017
     Melissa L. Merenberg, RPR              Date
17   Official Court Reporter

18

19

20

21

22

23

24

25