1                  UNITED STATES DISTRICT COURT

2                     DISTRICT OF MAINE

3

4   UNITED STATES OF AMERICA    )
                             )

5                       )         CRIMINAL ACTION
          vs.             )

6                       )  Docket No. 1:14-cr-00129-JAW-1
                       )

7   SIDNEY P. KILMARTIN,       )       JURY TRIAL
                       )

8             Defendant.   )

9

10                    VOLUME II OF VI

11                TRANSCRIPT OF PROCEEDINGS

12     Pursuant to notice, the above-entitled matter came on

13  for JURY TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

14  in the United States District Court, Bangor, Maine, on the

15  4th day of October, 2016, at 8:35 a.m.

16

17

18  APPEARANCES:

19  For the Government:              Halsey B. Frank, Esquire

20  For the Defendant:              Martin Ridge, Esquire

21

22

23              Julie G. Edgecomb, RMR, CRR
                Official Court Reporter

24

25  Proceedings recorded by mechanical stenography; transcript
    produced by computer.

1                           <u>INDEX OF PROCEEDINGS</u>
                                                              Page:
2
    Testimony:  (see below)
3
    Discussion of Rule 404(b) Evidence:                        195
4
                           <u>INDEX OF WITNESSES</u>
5                                                             Page:

6   MICHELLE TYNE  (called by Mr. Frank)

7   Direct Examination by Mr. Frank                            120
    Cross-Examination by Mr. Ridge                             148
8
    WILLIAM MILLIKEN  (called by Mr. Frank)
9
    Direct Examination by Mr. Frank                            153
10  Cross-Examination by Mr. Ridge                             170

11  CYNTHIA BARNES  (called by Mr. Frank)

12  Direct Examination by Mr. Frank                            175
    Continued Direct Examination by Mr. Frank                  207
13  Cross-Examination by Mr. Ridge                             211

14  SARAH RODRIGUEZ  (called by Mr. Frank)

15  Direct Examination by Mr. Frank                            216

16  LEON ARMSTRONG  (called by Mr. Frank)

17  Direct Examination by Mr. Frank                            240
    Cross-Examination by Mr. Ridge                             254
18
    JEFFREY TAYLOR  (called by Mr. Frank)
19
    Direct Examination by Mr. Ridge                            266
20

21

22

23

24

25

1                                    INDEX OF EXHIBITS

Government's
2      Exhibit No.        Description                    Offered      Admitted

| 3 | 6 | UPS Records of Shipment from Fisher to Augusta Store | 133 | 133 |
| 4 | 7 | Augusta UPS Store Records of Deliveries for 9/14/12 | 163 | 163 |
| 5 | 8 | 5/5/10 Kilmartin Application for Maine State Credit Union Account | 179 | 179 |
| 6 | 9 | 9/2012 Kilmartin Maine State Union Statement | 185 | 186 |
| 7 | 10 | 11/2012 Kilmartin Maine State Credit Union Statement | 195 | 205 |
| 8 | 10.5 | Postal Records of Mailing from Manchester, Maine to Utah | 324 | 324 |
| 9 | 12 | Data of Gmail Accountholders andrewdenton35 and skiptin | 225 | 225 |
| 10 | 13 | Search Warrant Return for E-Mail Accounts of skiptin@gmail.com and andrewdenton35@gmail.com | 233 | 237 |
| 11 | | | | |
| 12 | 14 | Google Cover Letter and Certificate of Authenticity to CD of Data | 233 | 237 |
| | 15 | CD of Data | 233 | 237 |
| 13 | 16 | Inspector Taylor's Table of Results of Keyword Search of skiptin@gmail.com | 283 | 284 |
| 14 | 17 | Inspector Taylor's Screen Shot of E-Mails | 322 | 322 |
| 15 | 18 | Donalee Wolfe E-Mail | 325 | 325 |
| | 19 | Walter Cottle E-Mail | 298 | 299 |
| 16 | 24 | Postal Service Records of Mailing from Manchester, Maine to St. Marys, Georgia | 312 | 313 |
| 17 | | | | |
| 18 | 29 | Postal Service Records of Mailing from Manchester, Maine, to Phippsburg, Colorado | 321 | 321 |
| 19 | 36 | Postal Service Table of Mailings | 276 | -- |
| | 37 | Postal Service Records of Mailing | 327 | 327 |
| 20 | 52 | Customs Declaration for 11/16/12 Mailer at Augusta Post Office | 271 | 272 |
| 21 | 53 | Postal Service Records for 11/16/12 Mailer | 329 | 329 |
| 22 | 57 | Postal Service Records for 12/11/12 Mailer | 336 | 337 |
| 23 | 81 | 5/10/13 Web Capture of wantdeathblogspot | 253 | 254 |
| 24 | 87 | 1/2013 Kilmartin Maine State Credit Union Statement | 210 | 210 |
| 25 | 93 | Social Security Administration Certificate | 212 | 212 |

1          (Defendant present with counsel in open court.)

2                    THE COURT:  Good morning, counsel.

3                    MR. FRANK:  Good morning, Your Honor.

4                    MR. RIDGE:  Good morning, Your Honor.

5                    THE COURT:  Would you bring the jury in, please.

6                    MR. FRANK:  Your Honor, may I just put something on

7     the record briefly?

8                    THE COURT:  Well, you can talk to me.

9                    MR. FRANK:  Or talk -- may I talk to you?

10                   THE COURT:  Yes.

11                   MR. FRANK:  Your Honor, I just wanted to note that I

12    have provided -- consistent with our ongoing duty to

13    supplement discovery, I have been providing defense counsel

14    with Jencks material at the beginning of each day.

15         That Jencks material is supplemental in the respect that

16    we continue to do some preparation the night before trial.

17    So, for example, this morning, I produced a couple of pages of

18    Jencks with respect to one of the witnesses I intend to call

19    today, Leon Armstrong.

20         I'm also, as a courtesy, providing the defense with an

21    additional set of the Jencks that has been produced

22    previously, consistent with the court's scheduling order, but

23    I just wanted to note that.

24                   THE COURT:  All right.  Do you have any issue --

25                   MR. RIDGE:  No.

1            THE COURT:  -- Mr. Ridge?

2            MR. RIDGE:  No, Your Honor.

3            THE COURT:  Would you bring the jury in, please.

4        (Jury entered at 8:37 a.m.)

5            THE COURT:  Good morning, ladies and gentlemen.

6            THE JURY:  Good morning.

7            THE COURT:  Mr. Frank, next witness?

8            MR. FRANK:  Thank you, Your Honor.  The government

9    calls Michelle Tyne.

10            THE CLERK:  Please raise your right hand.  Do you

11   solemnly swear that the testimony you shall give in the matter

12   now in hearing shall be the truth, the whole truth, and

13   nothing but the truth, so help you God?

14            THE WITNESS:  Yes.

15            THE CLERK:  Please be seated.  Please state your

16   name and spell your last name for the record.

17            THE WITNESS:  Michelle Tyne, T-y-n-e.

18            MR. FRANK:  Thank you.

19   MICHELLE TYNE, having been duly sworn, was examined and

20   testified as follows:

21                        DIRECT EXAMINATION

22   BY MR. FRANK:

23   Q     Good morning, Ms. Tyne.

24   A     Good morning.

25   Q     Ms. Tyne, how are you employed?

1    A      I am employed at UPS.

2    Q      What is UPS?

3    A      UPS is a shipping company.

4    Q      Does --

5    A      They deliver packages --

6    Q      Does UP --

7    A      -- ship and deliver packages.

8    Q      I'm sorry for interrupting you.

9           Does UPS still stand for something?  In other words,

10   does -- does -- the acronym are the initials?

11   A      Correct, United Parcel Service.

12   Q      And do you still -- is it still known as that, as well,

13   or is it just UPS?

14   A      Old school is United Parcel Service.  We've kind of

15   streamlined it to UPS.

16   Q      All right.  But you always have been in the package

17   delivery business; is that --

18   A      Yes.

19   Q      Okay.  And what do you do there?

20   A      I am the security investigator for the state of Maine.

21   Q      What does that mean you do?

22   A      I investigate internal and external theft, claims,

23   damages, and I work with law enforcement with their

24   investigations or I bring investigations to them.

25   Q      And how many locations are you responsible for, do you

1   have here in the state of Maine?

2   A      There are nine centers in the state of Maine.

3   Q      What do you mean by centers?

4   A      So that would be a UPS package center where drivers are

5   dispatched out of to deliver packages.

6   Q      Okay.  But I take it you have more drivers than nine,

7   correct?

8   A      Oh, yes, yes, there are nine buildings.

9   Q      Yeah.

10  A      And, ah, there's plenty of drivers dispatched out of

11  every building.

12  Q      And where do those drivers take these packages?

13  A      To locations, to either residential houses or

14  businesses, and they also pick up packages in the evenings at

15  their daily stops or call-in stops where people want to ship a

16  package and they'll pick up, and they bring those back to the

17  building.

18  Q      Are there also what are known as UPS Stores?

19  A      Yes.

20  Q      What are UPS Stores?

21  A      Those are actually franchises, and it's a place where

22  people can go to ship packages, or they can go to pick up

23  packages, as well.

24  Q      All right.  And when you say franchises, what do you

25  mean?

1   A    They carry our name, but they're owned -- they're

2   owner-operated separately.

3   Q    Okay.  But do they -- they follow UPS procedures?

4   A    Primarily, yes.

5   Q    Okay.  And how long have you been doing this work?

6   A    I've been working for UPS for 20 years.

7   Q    All the time as a security investigator, or have you

8   done other things, as well?

9   A    The first eight months, I was in international key

10  entry, brokerage, and customs information for international

11  packages.

12  Q    And do you have special training to be a -- a security

13  investigator?

14  A    I do have my degree in criminology, and UPS does special

15  schools and training to help us with our skills -- interview

16  skills and -- and other resources that our internal systems

17  carry that we can do claims analysis, etc.

18  Q    Now, does UPS have different levels of service?

19  A    Yes, they do.

20  Q    What -- what do you mean by that?

21  A    It depends on how quickly your package wants to get from

22  point A to point B.  So you can ship it overnight, and,

23  actually, there's an early a.m. service to get there before

24  8:30, and there's an overnight service by 10:30.  There's

25  another Next Day Air Saver service by end of day.  And then it

1   can go two-day, it can go ground, and then there's also

2   services that we work with USPS, the post office, and it's --

3   we deliver to the post office and they do the last leg of the

4   journey and deliver it to people's houses.

5   Q     And how does the price vary amongst those services?

6   A     That -- the -- through the post office, that's basically

7   the cheapest, and overnight early a.m. would be the most

8   expensive.

9   Q     So the fastest is the most expensive?

10  A     Correct.

11  Q     Does UPS keep records of these services that it

12  provides?

13  A     As far as deliveries, tracking?

14  Q     Well, in -- how about in general, does --

15  A     Well, yes, yeah, definitely, we -- we track our packages

16  throughout their journeys.

17  Q     Okay.  And -- and why is that?

18  A     For -- for my job, it would be -- be about claims, if

19  people want to make sure their package was delivered.  If

20  people -- if we deliver it and it gets delivered incorrectly,

21  there might be a claim, and we have to follow up on that

22  within seven days to figure out where it actually went.

23        It would be -- we -- if you're a shipper, you can set up

24  your system so you can find out if your package was delivered

25  by the end of the day or -- or through the service -- the

1    specific service that you utilized.  So the -- the tracking

2    system -- and -- and if we don't do that finally delivery

3    scan, that could be a claim, and people can come after UPS to

4    -- to say, hey, you didn't deliver our package.  So the

5    tracking's very important to us as a company.

6    Q     Okay.  Is it fair to say that some of the records you

7    keep are to ensure that your service is performed as -- as

8    promised and paid for?

9    A     Yes.

10   Q     And how does that tracking system work?  I mean, can you

11   -- can you give us an example of a package -- you know, a

12   hypothetical package that moves through the system?

13   A     Sure.  So you're Joe customer -- say you're a daily

14   small business owner and you have a number of packages that

15   you want to ship that day, you create the labels, plug in the

16   addresses where they're supposed to be going, you know, with

17   the weight and the dimension, etc., and what service level you

18   want, and you create all the labels, put them on the boxes,

19   and then you press your end of day basically and that will

20   provide a manifest for your business with all the packages

21   you're shipping out.

22         And if you're a business where we have a daily pickup,

23   the driver has a scheduled time where they will come and take

24   your packages and bring them back to the specific building the

25   driver's dispatched out of, and then they get -- they enter

1   the system from there and get their first scan in at the

2   origin.

3   Q    What do you mean by scan?  What are you talking about?

4   A    A scan would be a -- either a hand-held scanner where we

5   scan the bar code of the package --

6   Q    Okay.

7   A    -- which --

8   Q    And that's at the first -- that's after pickup at this

9   small hypothetical business --

10  A    Yeah.

11  Q    -- and at the first stop in your system?

12  A    Correct, in our -- in our UPS facility.

13  Q    Okay.  And how about from there on?

14  A    So throughout its journey, it would -- if it gets put in

15  a tractor-trailer and it goes through -- sometimes it never

16  leaves the tractor-trailer.  The tractor-trailer will stop at

17  another location, but the tractor-trailer doesn't get opened

18  and the packages don't get handled.  We'll see one type of

19  scan, like it's just a -- an exception scan that shows the --

20  the packages just at a building.  But if the package gets

21  physically touched, it does get scanned again and say it gets

22  put in a different trailer to head north or south, etc.  So it

23  gets tracked and scanned wherever it gets physically touched

24  in different buildings along -- along the way.

25  Q    And how about at destination?

1   A      So then it arrives at the destination building where the

2   driver is going to be putting it on, where it gets put on the

3   driver's car, so it gets scanned in that building, and,

4   actually, a -- a small label gets put on -- on that package at

5   the destination building, and it shows our employee to load

6   the package cars, what shelf to put on it (sic), and what belt

7   it goes on -- what car to go on it (sic), and what shelf it

8   goes on, and then the driver delivers it and -- and makes that

9   final delivery scan.

10  Q      Okay.  To whatever location it's going?

11  A      Yes.

12  Q      All right.  And that's in the case of a hypothetical

13  small business.  Is that also true of a really big

14  international business?

15  A      Absolutely, same system goes.  They do their end of day,

16  the packages gets scanned at the first UPS facility, and it

17  goes and gets scanned throughout its journey.

18  Q      And was that the case back in 2012, that system in

19  place?

20  A      That's -- that's how our system worked in 2012.

21  Q      How did you get involved in this matter, this -- this

22  matter involving Sidney Kilmartin?

23  A      I received a phone call from the postal inspector at the

24  time, Michael Desrosiers, and --

25  Q      Were you familiar with him otherwise?

1    A     Yes, I've worked with him on previous cases.

2    Q     Okay.  And what happened?

3    A     It was in early December of 2013, and he said, hey, I

4    got an e-mail, I'm going to forward you an e-mail, there's a

5    tracking number on it.  Would you mind tracking that

6    information for me?  And I said, sure.

7    Q     So tracking with respect to what, a package?

8    A     Tracking -- yeah, the tracking number would be a -- a

9    tracking number from a certain package.

10   Q     Okay.  Do you remember what that package was?  If you're

11   not sure, that's fine, but --

12   A     Well, I found out later, you know, after I tracked it

13   for him.

14   Q     What was it?

15   A     It was a package from -- I've -- I've lost it -- the

16   first word, but the -- the second word of the company is

17   Scientific.

18   Q     Okay.  And we have -- we have --

19   A     Just trying to picture --

20   Q     I'm sorry.

21   A     Yeah.

22   Q     Anything more you want to say there?

23   A     No, I was just trying to picture the first word, but I

24   -- all I can see is the Scientific word as the second.

25   Q     Okay.

1    A      Yeah.

2    Q      And we have your records.

3    A      Yes, oh, yeah.

4    Q      And I'll be showing those to you in a minute and that

5    name will appear on there, correct?

6    A      Yes, oh, yeah, for sure.

7    Q      All right.  So you -- you were able to locate the -- the

8    package in your system using --

9    A      Yes.

10   Q      -- using the bar code that Inspector Desrosiers provided

11   you?

12   A      Yes.

13   Q      All right.  And what -- what -- what do you remember,

14   anything else about it besides it originated with a company

15   that had Scientific in the name?

16   A      Yes, when I did track it, it just had the delivery scan

17   on this particular package.  Um --

18   Q      What does that mean?

19   A      It means the length of time -- the package was actually

20   delivered in 2012, in the -- in the fall of 2012, but because

21   time -- you know, a year and a couple months had gone by, our

22   system delivers so many packages, we kind of lose the middle

23   information of -- of like the internal scans along its way,

24   but the final destination delivery scan was still there for

25   that particular package, where I was able to obtain everything

1    needed.

2    Q    Okay.  And let me stop you and make sure I understand

3    correctly what you mean.  So I take it you -- your system has

4    a retention policy for the information --

5    A    Yes.

6    Q    -- that it collects in this way that you've described?

7    A    Yes.

8    Q    And over time, you start eliminating some of the

9    information from the system?

10   A    Correct.

11   Q    Because you do so much business, you have so much

12   information, you need to clear it out?

13   A    Correct.

14   Q    All right.  But you -- you retain the most important

15   information the longest?

16   A    Correct.

17   Q    And that's the start and end of -- of deliveries like

18   this?

19   A    Correct, for this package, it just had the end.

20   Q    Okay.  And at the time that you queried the system in

21   response to Agent Desrosiers' inquiry as you've described.

22   A    Yes.

23   Q    Okay.  And where was it delivered?

24   A    It was delivered to The UPS Store in Waterville, Maine.

25   Q    Do you know the address offhand?  If you don't,

1    that's --

2    A    No, I don't.

3    Q    Okay.  Again, is that the type of thing that's still on

4    the record, that survived on the record?

5    A    Yes.

6    Q    Okay.  Or who in particular received it there?

7    A    It was signed for by an employee at The UPS Store.

8    Q    Okay.

9    A    I cannot recall his last name.

10   Q    Okay.

11   A    But that signature was there.

12   Q    So why don't I do that now.  Let me show you what has

13   been marked as Government Exhibit 6 for identification.

14        Ms. Tyne, I'm showing you what's been marked as

15   Government's Exhibit 6 for identification.  Could you take a

16   look at that and tell us if you recognize it, please?

17   A    Yes, I do recognize this.

18   Q    What is Government Exhibit 6 for identification?

19   A    This is the -- a copy of when I tracked the package in

20   our tracking system, based on the tracking number that was

21   provided to me by Mr. Desrosiers, this is what came up.

22   Q    So --

23   A    So this shows the final delivery.

24   Q    This was what was left in your system as you've

25   described?

1    A    Yes.

2    Q    All right.  And -- and this is the kind of record that

3    you there at UPS -- not you personally, but -- but the

4    business in general -- makes around the time of the events in

5    question, in this case, back in September of 2012, isn't it?

6    A    December 2013.

7    Q    I'm sorry.  The -- the record was made -- and I may have

8    misspoken.  The record was made with respect to a delivery

9    that occurred when?

10   A    The delivery was 9/14/2012.

11   Q    Okay.  So in September of 2012, right?

12   A    Correct.

13   Q    And that record was initially input into your system

14   around that time, correct?

15   A    Yes.

16   Q    That's your standard practice, right?

17   A    Yes.

18   Q    For the business purposes you described earlier, right?

19   A    Yes.

20   Q    Okay.  And -- and it stayed in your system, you kept it

21   there for business purposes, right?

22   A    Yes.

23   Q    Albeit, over time, some of the information with respect

24   to that delivery was being, whatever, eliminated, overwritten,

25   correct?

1    A     Correct.

2          MR. FRANK:  All right.  Your Honor, I'd move

3    Exhibit 6 into evidence.

4          THE COURT:  Any objection?

5          MR. RIDGE:  No objection, Your Honor.

6          THE COURT:  It's admitted.

7          MR. FRANK:  And request permission to publish it?

8          THE COURT:  You may.

9    BY MR. FRANK:

10   Q     I'm going to leave that copy with you, but it's going to

11   appear on the screen in front of you, Ms. Tyne, as we talk

12   about it, and I would ask -- and, actually, if you touch the

13   screen, you should be able to highlight items, if it would be

14   helpful to your testimony.

15   A     Sure.

16   Q     But can you just describe it generally?  What are we

17   looking at here at the top of the first page?  This is a

18   two-page exhibit, right?

19   A     Yes.

20   Q     Okay.  So what are we looking at here at the top of the

21   -- the first page?

22   A     Okay.  So top left it says, ETT view package movement.

23   ETT is --

24   Q     That's this right here in the top left-hand corner?

25   A     Yes.

TYNE - DIRECT EXAMINATION/FRANK

1  Q    Okay.  What -- what is that?  What does that mean?

2  A    Another UPS acronym, Electronic Tracking and Tracing

3  Movement.

4  Q    All right.  And what is that, the name of your system?

5  A    Correct.

6  Q    Okay.  How about -- let me clear that.

7  A    Yeah.

8  Q    And ask you, what's this number here?

9  A    Okay.  So that's the tracking number that Mr. Desrosiers

10 e-mailed me after our conversation and asked me to track.

11 Q    All right.  And what does that relate to?

12 A    That is related to a shipper, so how we find that out is

13 the tracking number all -- 90 percent of tracking numbers

14 begin with the letter 1Z -- or the No. 1 and the letter Z.

15     The next six digits after the 1Z are a shipper's

16 identification, that's their shipper number, and then the rest

17 -- the -- so 45X874 belongs to a specific shipper.

18 Q    Do you want to bracket that?  Can you -- can you draw

19 brackets around it with your finger for the -- so the jury can

20 -- can see exactly what you mean?

21 A    So -- (witness complying) -- that.

22 Q    Okay.  So that -- that number stands for the shipper, in

23 this case, the company that ended in Scientific?

24 A    Correct.

25 Q    Okay.

1    A    And then I covered the 03, but the 03 is -- is a service

2    level.

3    Q    A service level.

4    A    So --

5    Q    So what -- what do you mean by service level?

6    A    So that shows -- and -- and you can actually see below,

7    it says, service level ground, so the 03 is just a code that

8    it's a ground package.

9    Q    All right.  So this is somewhere -- is it somewhere

10   between the postal -- you've described a range of services

11   between next morning and -- fastest and the -- the arrangement

12   with the postal service at the slowest, correct?

13   A    Correct.

14   Q    Where -- where does this fit in that scheme?

15   A    So 01 would be a next-day air; 02 would be -- or I

16   should say 0 -- 01 next-day air; 02 is a second-day air; and

17   03 is a ground.

18   Q    All right.  So this is sort of intermediate level

19   service?

20   A    Correct.

21   Q    How -- how fast is ground service?

22   A    It depends.  If you're within New England, it actually

23   gets there overnight.  However, you know, I --

24   Q    Don't mean to cut into your profit margin.

25   A    Yeah, yeah, I know, sorry, but it's true.  But it could

1    be five days, you know, across the country, depends.

2    Q    Okay.  All right.  And how about continuing on with this

3    code past the 03?

4    A    The rest is just random numbers that create an

5    individual tracking number.

6    Q    Okay.  For what purpose?

7    A    For individuality to track your packages, to make it

8    individual.

9    Q    Okay.  So when you say individuality, you mean it --

10   it's what links this number to a particular package?

11   A    Correct.

12   Q    Okay.  All right.  So how about -- anything else that is

13   significant about that number?  It basically identifies the

14   package in the system, correct?

15   A    Yes.

16   Q    Okay.  So how about moving down this exhibit, what --

17   what -- what --

18   A    Okay.  So on the left-hand side, it says, type, and it

19   has DEL, so right here --

20   Q    So if I circle that --

21   A    Yeah.

22   Q    -- or you've underlined it.  Yeah, what does that stand

23   for?

24   A    So that's the delivery scan.

25   Q    Okay.  What -- meaning what?

1   A     That that's the scan the driver made when he was at

2   60 Western Ave., Augusta, Maine.

3   Q     All right.  That was the destination where it was

4   delivered?

5   A     Correct.

6   Q     Okay.  So if we -- that -- reading across left to right,

7   that's the type of the scan, is that -- is that what you mean?

8   A     Yes, that's the type of scan, a delivery scan.

9   Q     And then there's a check mark, why is there a check mark

10  there?

11  A     I created that -- I didn't -- when I clicked on it to

12  provide information that we'll probably talk about later, the

13  system filled that in.

14  Q     Okay.  All right.  And how about the next item on this

15  line?

16  A     The next item is the shipper number, so, again, you

17  know, if you compare the two from here to up here -- oops,

18  sorry, you made one, too -- those two numbers will match.

19  Q     All right.  So let me help there.  So this -- this is

20  the shipper you've previously identified at least partially,

21  right --

22  A     Yes.

23  Q     -- right there and the line that you've been reading

24  across, and that I take it is the same as a portion of the

25  tracking number above, correct?  Have I -- have I correctly

1  described that?

2  A    Yes.

3  Q    Okay.  And I'm going to erase that.  But -- okay.  And

4  then the next item under the heading address/location, what is

5  that?

6  A    That's the location where this package was delivered,

7  60 Western Ave., Augusta, Maine.

8  Q    All right.  And do you know what that location is?

9  A    Yes, I do.  I've been there before.

10  Q    What is it?

11  A    It's a UPS Store.

12  Q    One of these franchises you've described earlier?

13  A    Yes.

14  Q    Okay.  How about reading across, the next line date?

15  A    That's the actual delivery date, 9/14/2012.

16  Q    Okay.  And the next line may be obvious, but if you

17  wouldn't mind, what is the next line under time?

18  A    That's the time stamp when the driver scanned the

19  package.  It was at that exact time, 10:34.

20  Q    Okay.  When he handed -- when the driver handed it off;

21  is that correct?

22  A    Yes.

23  Q    All right.  And how about the next line, status?  I'll

24  circle it.

25  A    So --

1   Q     What's -- what's that about?

2   A     So when he obtained a signature from an employee, the

3   employee signed the package, and the driver entered that

4   person's name.

5   Q     Okay.  And whose employee is that?  Is that yours or the

6   franchisee, or do you know?

7   A     That would be a franchisee, so an employee of The UPS

8   Store.

9   Q     All right.  And how about the last entry on this line,

10  which reads receiver.  What -- what does that mean?  What's

11  the significance of that?

12  A     So that would be just the name of the person, that

13  receiver -- I think there's other options, too, that the

14  driver can put in --

15  Q     Is that --

16  A     -- maybe like dock.  It just depends -- you know, it was

17  that he was in an office, and he was the receiver that

18  received those packages.

19  Q     So how does that description relate to the status line

20  Jeff, is that a description of Jeff, or do you know?

21  A     To put it simple, yes, he received the packages.

22  Q     Okay.  All right.  And then that's all that appears on

23  this first page of the exhibit, correct, the rest of the page

24  is blank if you scroll down?

25  A     Correct.

1   Q     And then that takes us to the second page?

2   A     Yes.

3   Q     And we can't fit the whole thing on all at once, so

4   we'll start at the top.  And just ask you, I mean, how does

5   the second page relate to the first page?

6   A     Okay.  So if you scroll back up to the first page, what

7   I do is I click on this dot right here, and it's blue when I'm

8   in the computer, but I click on that blue arrow at the

9   delivery and that pops up, the page -- you can scroll back

10  down, that pops up.

11  Q     The second page?

12  A     The second page.

13  Q     Okay, yeah.

14  A     So now I look at the second page, and here's a little

15  more specifics on that delivery scan.

16  Q     Okay.  The --

17  A     So it gives me better details.

18  Q     Okay.  So that -- these were details that were still in

19  the system when you queried it, even though other details had

20  been eliminated, correct?

21  A     Correct.

22  Q     All right.  So let's -- let's start at the top again.

23  And can you -- can you tell us what these numbers at the top

24  are?

25  A     It's the tracking number.  That's the inquiry search

1    that I did, which matches the tracking number, and, again, it

2    says the ground level, so the -- you know, the three things

3    I'm talking about right there.

4    Q    Yeah, okay.

5    A    And then --

6    Q    And that -- that was the top of the page.  And then

7    moving down?

8    A    Moving down, it gives me a little more information on

9    what 60 Western Ave. was, so it does say that it was -- whoops

10   -- The UPS Store.

11   Q    Right there.  I've circled it, correct, correct?

12   A    That it was delivered, not an attempt of delivery, like

13   the store was closed.

14   Q    Okay.  So meaning it actually got to Jeff.

15   A    Correct.

16   Q    All right.

17   A    The date once again, the time once again, the receipt,

18   you know, Jeff, so kind of a repeat of what we had already

19   gone through, and that a signature was obtained.

20   Q    All right.  And whose signature?  Do you know?

21   A    Jeff's signature.

22   Q    All right.  Because he's -- is that what you would

23   expect in this situation?

24   A    For businesses, yes.

25   Q    Okay.  Now, how about if the package is going to an

1   individual, would that -- an individual at a UPS Store, do you

2   -- do you know what I mean?

3   A     Yes.

4   Q     Would that signature -- I mean, if they got a signature,

5   would that necessarily appear in your system?

6   A     If we delivered it to the individual, it -- we would get

7   a signature, as well.  But we would deliver to employees --

8   Q     At a store.

9   A     -- of the store.

10  Q     That's your standard practice in this situation?

11  A     Correct.

12  Q     Okay.  All right.  If we could continue, is -- now, the

13  next line at the left begins shipper name.  I've circled that,

14  right?

15  A     Yes.

16  Q     And what is that?

17  A     That's the full name of the shipper.

18  Q     Okay.

19  A     So Fisher Scientific.

20  Q     Does this refresh your recollection as to who --

21  A     Yes, it does.

22  Q     -- the shipper was in this case?

23  A     Yes.

24  Q     Okay.  All right.  And -- and how about reading across,

25  we see more numbers.

1   A     So --

2   Q     Shipper number?

3   A     Again, it repeats the shipper number.

4   Q     Okay.  And --

5   A     And --

6   Q     And how about stop type, what -- what do you mean by

7   stop type on the right?

8   A     So it was a -- a business stop, rather than a

9   residential.

10  Q     And does that make sense to you?

11  A     Yes, it does.

12  Q     Why?

13  A     Because The UP -- UPS Store is a business.

14  Q     Okay.  All right.  How about if we scroll down further?

15  A     Okay.  This is more information on the -- the driver

16  himself, and so, you know, the monetary -- we do deliver COD

17  packages, so that's -- that there's nothing there.

18  Q     Okay.  Can you -- let me stop you.  What do you mean by

19  that?  What -- what does that mean?

20  A     A COD package would be if a shipper wants UPS to collect

21  money at delivery, cash on delivery.

22  Q     Okay.

23  A     And we still do that.  It's checks now only, but this

24  was not the case for this package.

25  Q     That's the significance of this entry here under the

1   heading monetary?

2   A     Yes.

3   Q     Okay.  All right.  How about the next line down that --

4   that starts I -- the DIAD detail, what's that about?

5   A     Okay.  That's DIAD, that's our driver's brown board that

6   they carry, Delivery Information Acqui -- Acquisition Device,

7   I think that's the acronym for that particular, but that's

8   what the drivers carry when they scan the packages at final

9   delivery.  We call it a DIAD.

10  Q     Okay.  So it's a -- a little computer that includes a

11  scanner?

12  A     Correct.

13  Q     And -- and, what, they scan the bar code of the package?

14  A     Correct.

15  Q     And -- and in this case, that signifies that they

16  delivered it to their destination?

17  A     Yes.

18  Q     Okay.  All right.  Can you tell who the driver was?

19  A     Yes, driver's last name was Fournier.

20  Q     Okay.  And that appears right there below DIAD detail?

21  A     Correct.

22  Q     All right.  And how about the other information here,

23  what's that about?

24  A     So if we move to the right, that's his employee number.

25  Q     Corresponds with his name and identity?

1 A  Yes.

2 Q  Okay.  How about vehicle number?

3 A  Vehicle number.  All package cars -- the trucks that

4 they drive -- have the number on it for DOT purposes and our

5 own purposes of tracking.  So that's his number.

6 Q  All right.  And how about scrolling down further?

7 A  Um, data source, I don't know what that means.

8 Q  Okay.

9 A  The DIAD ID is the specific brown delivery device that

10 he carries, that's the ID of that.

11 Q  It has a -- what, a code number on it?

12 A  Correct.

13 Q  Okay.

14 A  Defined area is -- there are blocks of areas that a

15 driver delivers, and so, you know, just if -- picture city

16 blocks or, you know, neighborhood blocks, so --

17 Q  What is it, a geographic area of responsibility?

18 A  Correct.

19 Q  Okay.

20 A  So that's what that specific area, according to -- you

21 know, 4 -- 4307 is -- means something for UPS.

22 Q  Like a zip code?

23 A  Yeah, to make it simple.

24 Q  Okay.

25 A  Yes.  So the -- the slip or location is our -- the

TYNE - DIRECT EXAMINATION/FRANK

1  driver was based out of the Waterville building.  0490 is an

2  internal UPS code for Waterville.  So that's where the driver

3  was dispatched out of.

4  Q    Okay.

5  A    The upload date/time is when the driver came back to the

6  building and plugged his DIAD into the wall unit and

7  throughout the -- you know, at 1910 that night, the computer

8  system purged the information from that DIAD.

9  Q    Or downloaded from the --

10 A    Or downloaded.

11 Q    Downloaded from the -- the hand-held device that he

12 carried into your system?

13 A    Correct.

14 Q    Okay.  At the end of his -- of his shift or his route?

15 A    Correct.

16 Q    Okay.

17 A    And it looks like at 1916 that same night it became

18 stored, you know, the download was complete.

19 Q    Okay.

20 A    And then --

21 Q    Sorry.

22 A    Sorry.

23 Q    And then anything more about the stored date or time?

24 A    No.

25 Q    Okay.  So that's when it first entered your system in

1    its full detail?

2    A    Correct.

3    Q    Okay.  And the -- how about the last line on this page?

4    A    So this is specific information on the driver's day.  So

5    this was stop No. 24 of his day.

6    Q    Okay.  Let me stop you.  What is that -- what do you

7    mean by 24?

8    A    So the driver had made -- this was the driver's 24th

9    stop.

10   Q    Okay.

11   A    So then the --

12   Q    Can you tell how many stops he had that day in total?

13   A    Correct.  That's the next one over, total delivery stop

14   count, so he had 102 that day.

15   Q    Okay.  And how about the last entry on this last line of

16   the second page?

17   A    So that shows the amount of packages he delivered to The

18   UPS Store.

19   Q    At that time?

20   A    At that time.

21   Q    So that's -- at what time is that?  Do we have to scroll

22   back up?

23   A    Yes, it was at 10:34.

24   Q    All right.  And if he had made another stop that day,

25   there would be another entry; is that fair to say?

1   A     If it was at a different time.

2   Q     Okay.  All right.  Ms. Tyne, did you ever receive a

3   complaint or a claim about this package not being delivered?

4   A     No.

5             MR. FRANK:  I have no further questions for

6   Ms. Tyne.

7             THE COURT:  Cross-examination?

8             MR. RIDGE:  Yes, Your Honor.  Thank you.

9                     CROSS-EXAMINATION

10  BY MR. RIDGE:

11  Q     Ms. Tyne, good morning.

12  A     Good morning.

13  Q     My name is Marty Ridge, and I represent Mr. Kilmartin in

14  this matter.  I have just a few questions.  I'm going to try

15  not to reengage you in the same questions that you've already

16  been asked because I think I understand what your answers

17  were.

18        But you don't have any -- is it correct to conclude that

19  you and the UPS recordkeeping system has no indication of what

20  happened to this package after Jeff signed for it?

21  A     Correct.

22  Q     Okay.  Is there a procedure that UPS encourages or

23  mandates its franchisees to use when packages are delivered

24  with regard to making sure that the package gets to the person

25  to whom it is addressed?

1    A    It was addressed to The UPS Store.

2    Q    Okay.  You don't know anything more particular than

3    that.  It was just, from your perspective, this package was

4    going from wherever it was picked up to The UPS Store in

5    Augusta.

6    A    Correct.

7    Q    Is there a signature of Jeff that's available?

8    A    One was not obtained at that time --

9    Q    Why would that be?

10   A    -- or when I pulled the records.

11   Q    Does that mean it's not generally available, or it just

12   wasn't available in this instance?

13   A    It's available normally, but I didn't pull it up when --

14   the year and two months later.

15   Q    Okay.  So there may be a signature -- an actual

16   signature, but we don't have that.

17   A    Correct.

18   Q    Okay.  And you have no information as to the person or

19   the business that was anticipated to receive this package

20   beyond The UPS Store in Augusta.

21   A    No.

22   Q    Okay.  Is there a general UPS policy that franchisees

23   are requested to use regarding how they document the receipt

24   -- the ultimate receipt of the package by the individual

25   awaiting the package?

1   A      I don't know if UPS Stores have a policy they need to

2   follow.

3   Q      Okay.  Can individuals who do not generally do business

4   with The UPS Store -- and by that, I mean, they don't have a

5   -- a box that they -- that they receive packages in on a

6   regular basis -- can they accept packages at The UPS Store,

7   just one-time events?

8   A      I don't know the rules for The UPS Store really because

9   they're franchises.

10  Q      Okay.  So the -- the bigger company doesn't prescribe

11  rules for the individual franchisee about that?

12  A      Not that I'm aware of.

13  Q      Okay.  So you would not be the person to ask -- and I

14  think I -- I get this -- you would not be the person to ask

15  about, if I'm a customer, what happens when I go in The UPS

16  Store to claim my package.

17  A      No, I'm not the person to ask.

18  Q      Thank you.  Have there been other problems at -- strike

19  that.

20         Have there been any instances that you have investigated

21  at this UPS Store in Augusta where packages have gone missing?

22  A      No.

23  Q      What about in April of 2015 when 52 packages of

24  pharmaceuticals addressed to the Veterans Administration were

25  not delivered?

1    A      What's your question?

2    Q      Are you aware of that incident?

3    A      I'm aware of that incident.

4    Q      Okay.  And that -- that did not fit the category of an

5    investigation or an issue at this store that I asked you

6    about?

7    A      You're comparing two different situations.  This --

8    Q      Well -- go ahead.  I'm sorry.

9    A      You can --

10   Q      What happened in April of 2015?

11   A      That was regarding packages that were supposedly left at

12   this UPS Store for a meet point for a different driver, and

13   they were -- it's an ongoing investigation still, and it was

14   not concluded if the packages were picked up or not picked up

15   at this particular UPS Store.  They could have been picked up

16   and then they went missing after.  It's still an ongoing

17   investigation.

18   Q      Okay.  So there is at least one other -- one instance in

19   which a package got to that store and then didn't get

20   delivered after it was at that location?

21   A      Well --

22          MR. FRANK:  I'm going to object to the

23   characterization.

24          THE COURT:  Overruled.  You may answer if you can.

25   A      Those packages weren't there for delivery.

1    BY MR. RIDGE:

2    Q     What were they for?

3    A     A meet point for another driver.

4    Q     Okay.  So another driver was going to meet the first

5    driver at The UPS Store in Augusta, and those packages were

6    going to be moved -- and correct me if I'm stating this

7    wrong --

8    A     Hm-hmm.

9    Q     -- I don't want to be wrong -- they were going to be

10   transferred from one truck to another truck and then moved on?

11   A     Yes.

12   Q     And what happened?

13   A     It's an ongoing investigation.  It's not concluded.

14   Q     The packages didn't end up on the second truck; is that

15   correct?

16   A     I'm not sure if the packages were even left at The UPS

17   Store.  It's still an ongoing investigation.

18   Q     Okay.  Would the -- would your record system at the U --

19   the big UPS store generally receive a confirmation of the

20   ultimate delivery to a consumer, or is the -- the information

21   that you've provided to us today about this transaction as far

22   as your records go?

23   A     This is the end --

24   Q     Okay.

25   A     -- as far as UPS is concerned.

1  Q     Were you ever asked to obtain the signature of Jeff?

2  A     No.

3            MR. RIDGE:  Thank you, Ms. Tyne.  I appreciate it.

4            THE COURT:  Redirect?

5            MR. FRANK:  No, Your Honor.

6            THE COURT:  Thank you.  You may stand down, ma'am.

7  Thank you.

8       (The witness left the witness stand.)

9            THE COURT:  Next witness?

10           MR. FRANK:  The government calls Bill Milliken.

11           THE CLERK:  Please raise your right hand.  Do you

12 solemnly swear that the testimony you shall give in the matter

13 now in hearing shall be the truth, the whole truth, and

14 nothing but the truth, so help you God?

15           THE WITNESS:  Yes, I do.

16           THE CLERK:  Please be seated.  Please state your

17 name and spell your last name for the record.

18           THE WITNESS:  William Milliken, M-i-l-l-i-k-e-n.

19 WILLIAM MILLIKEN, having been duly sworn, was examined and

20 testified as follows:

21                      DIRECT EXAMINATION

22 BY MR. FRANK:

23 Q    Good morning, Mr. Milliken.  Mr. Milliken, what do you

24 do for work?

25 A    I am the owner of UPS Stores.

1    Q      More than one?

2    A      Yes, three.

3    Q      And where are they located?

4    A      In Augusta, Maine, in Waterville, Maine, and in

5    Brunswick, Maine.

6    Q      And where is the store in Augusta located?

7    A      At 60 Western Avenue.

8    Q      And how long have you owned and operated that store?

9    A      A little over six years.

10   Q      And what services do you provide there?

11   A      We provide packing and shipping and mailbox rentals and

12   copying and printing.

13   Q      Okay.  No -- no goldsmithing business there, right?

14   A      No, there's no goldsmithing businesses.

15   Q      All right.  And how big an operation is it?

16   A      You mean in like gross sales?

17   Q      Well, any way you want to describe it.  Number of

18   employees?

19   A      I have two employees besides myself.  We have gross

20   sales of a little over 200,000.

21   Q      And has that been the case for the six years -- five or

22   six years that you've owned it?

23   A      Yes.

24   Q      And what are these two employees, what do they do?

25   A      They interact with the public -- um, processing

1   shipping, packing items for shipping, sorting mail, putting

2   mail into the mailboxes, receiving packages.

3   Q    And what is your relationship with the larger company

4   United Parcel Service, UPS?

5   A    Well, UPS is the -- our primary shipper when we ship

6   things for our customers.  The UPS is also the master

7   franchisor for The UPS Stores.

8   Q    Okay.  So can you describe that relationship?  I mean,

9   do they have certain requirements for you?

10  A    Yes, they do.  They have standards of operation, yeah.

11  Q    What sort of standards of operation do they have?

12  A    Um, to keep the store neat and clean appearance.  When

13  we're shipping something, to -- you know, to -- to pack things

14  in a -- in a -- you know, a specific way so to avoid any

15  damages, claims, things like that.

16  Q    What do you mean by claims?

17  A    In case something gets damaged after we ship it.

18  Q    If some -- so what would happen?

19  A    If something was damaged, somebody would file a claim,

20  we would inspect it to see that it was packed correctly, and

21  if it was and the damage was the result of -- of some kind of

22  trauma during shipping, then we would pay the claim or they

23  would.

24  Q    Does UPS also require any standards regarding

25  documentation of deliveries?

1   A     When we receive a package for our mailbox customers, we

2   scan it into our electronic log that notifies our customer

3   that they have received a package.  That is not necessarily a

4   requirement of UPS.

5   Q     That's just your local practice?

6   A     It's highly encouraged we do that.

7   Q     Who -- by who?

8   A     By The UPS Store, Inc., our franchise owner.

9   Q     All right.  And what -- what are these mailbox customers

10  that you've been referring to, what -- what are they?

11  A     Well, it's similar to a post office box, but, um,

12  instead of at the post office, it's at our location.  Our

13  location has longer hours, and we can receive packages for

14  various carriers, not just postal customers.

15  Q     And is that a service people pay for?

16  A     Yes.

17  Q     And how many mailbox customers do you have at that

18  60 Western Avenue location?

19  A     Approximately 50.

20  Q     And has that been the case for the five or six years --

21  A     Yeah, pretty much.

22  Q     -- that you've owned and operated it?

23  A     Yeah, yeah.

24  Q     All right.  And -- but it doesn't sound like there are

25  any mandatory requirements imposed upon you by your

1    franchisor, UPS, specifically with respect to documenting the

2    receipt of packages; is that fair to say?  They're just

3    encouraged?

4    A      That's correct.

5    Q      And that's been the case for the five or six years that

6    you've owned the -- the store there?

7    A      That's correct, yeah.

8    Q      So can you tell us a little bit more -- and before I get

9    there, do you -- do you have different levels of service for

10   packages there at the store?

11   A      What do you mean?  I don't understand.

12   Q      Well, I believe you've spoken to us about full-service

13   customers and package-only customers and special-delivery

14   customers.

15   A      Yes, if -- if a customer would -- requests that they --

16   that we receive a package for them, but they do not have a --

17   a mailbox with us, then that is a service that we will --

18   Q      And what do you call those customers?

19   A      Package-only customers.

20   Q      Package-only?

21   A      Right.

22   Q      So on a one-time basis?

23   A      A one-time basis, yeah.

24   Q      And how does that differ from full-service customers?

25   A      Well, it's to receive a specific package.

1   Q     All right.  And are the full-service customers, are

2   those the same as the mailbox owners?

3   A     Right, right.

4   Q     They can get mail and packages?

5   A     They get their mail there, and they also get their

6   packages there.

7   Q     All right.  And how -- how does the -- the one-time or

8   package-only delivery work?  Can you walk us through that how

9   -- how that would work?

10  A     Well, ideally, the customer would notify us prior to the

11  delivery of their package that it's coming.  Then we would be

12  on the lookout for it.  But --

13  Q     And why is that?  Would you otherwise know it's coming?

14  A     No, we wouldn't.  I mean, we wouldn't know until it

15  arrived.

16  Q     Uh-huh.  But -- but, presumably, the -- the customer --

17  the one-time customer would?

18  A     Right, he -- the customer would know that it's coming to

19  our location because he would have had the package addressed

20  to us or he would have had the shipper -- instructed the

21  shipper to address it to our location.

22  Q     All right.  And we're talking about the usual case, the

23  one-time delivery case?

24  A     Right.

25  Q     That the customer knows it's coming and lets you know

1   it's coming -- it's coming so you can be on the lookout for

2   it, correct?

3   A      Correct.

4   Q      That's your testimony thus far?

5   A      Correct, yes.

6   Q      All right.  And do you know, I mean, is there a way that

7   a customer can track the process of a package like that

8   through the system to your store?

9   A      Sure.

10  Q      What is that?  What is that?

11  A      If they've ordered something from a company, the company

12  could provide them with a tracking number with a -- if it was

13  shipped through UPS or FedEx or even the postal system now has

14  tracking, and then the customer can track the package through

15  its journey until it's delivered.

16  Q      All right.  Just following up, so -- so the customer

17  typically in these situations lets you know it's coming, so

18  you're on the lookout.  What happens when it arrives

19  typically?

20  A      When it arrives, we -- typically, we scan it in and set

21  it aside waiting for the customer to come pick it up.

22  Q      All right.  And what happens when they come and pick it

23  up?

24  A      When they come in to pick it up, they -- they show us

25  ID, they sign for the package, and they pay us the $5 fee, and

1    we give them the package.

2    Q      Okay.  And do you make -- do you, generally speaking,

3    make records of those events?

4    A      Generally, when we -- they come in and they're scanned,

5    and then when they -- when they leave, they sign for it.  We

6    have those records, yes.

7    Q      Okay.  And those are records that you make as a normal

8    part of your business?

9    A      That's correct.

10   Q      Keep as a normal part of your business?

11   A      Yeah.

12   Q      Okay.  And was that the case back in September of 2012?

13   A      Generally, yes.

14   Q      Okay.  Why do you say generally?

15   A      Well, we don't have any record of the package for

16   Mr. Kilmartin.

17   Q      In this case.

18   A      In this case.

19   Q      All right.  You've -- you've met with agents before and

20   discussed these matters previously, right?

21   A      That's correct, yeah.

22   Q      Although you do have some records, correct?

23   A      Well, there's a record that it was delivered to our

24   store, yes.

25   Q      All right.  But not that it was picked up by

1    Mr. Kilmartin.

2    A     Right.

3    Q     All right.

4    A     It was -- apparently it was not scanned in when it

5    arrived, and there's no record of him picking it up.

6    Q     All right.  And when you say scanned in when it arrived,

7    scanned in by who?

8    A     By the clerk on -- that was working that day.

9    Q     For you.

10   A     Right.

11   Q     Who was that clerk?

12   A     Jeff Trimmer.

13   Q     Does he still work for you?

14   A     No, he doesn't.

15   Q     And when -- how long did he work for you?

16   A     Three or four years.

17   Q     Okay.  And when did he stop working for you?

18   A     This summer.

19   Q     All right.  And did you ask him what happened to this

20   package?

21   A     Yeah.

22   Q     And what did he tell you?

23         MR. RIDGE:  Objection, Your Honor.  I think that's

24   asking the witness to elicit -- to deliver hearsay testimony.

25         THE COURT:  Is that hearsay?

1          MR. FRANK:  Your Honor, I think that it explains

2    what -- what -- what happened here.  It's not so much for the

3    truth of the matter asserted as that Mr. Kilmartin picked up

4    the package by implication.  But I can move on, Your Honor.

5          THE COURT:  All right.  Objection's sustained.

6    BY MR. FRANK:

7    Q    Let me show you -- well, before I show you the records,

8    I mean, can you -- can you describe Mr. Trimmer at all?  I

9    mean, do you know where he grew up, where he went to school,

10   any of that?

11   A    He lived in southern Maine, in the South Portland area.

12   Q    But I take it you don't -- you don't recall any specific

13   details about him?

14   A    Nothing special.  He had worked in other UPS Stores --

15   Q    Okay.  Was he a good --

16   A    -- when I hired him.

17   Q    I'm sorry.

18   A    I said, when I hired him, he'd previously worked in our

19   UPS Stores.  He had four or five years experience doing that.

20   Q    Okay.  And was he generally a good and reliable employee

21   for you?

22   A    Yeah.

23   Q    Okay.  Let me show you what's been marked as Exhibit 7

24   for identification, ask you to take a look at that, and tell

25   us if you recognize it, please.

1  A     Yes, this would be a -- the package receiving report for

2  the -- the day in question.

3  Q     Okay.  And what is that day?

4  A     September 14th, 2012.

5  Q     All right.  And -- and is this the type of record you

6  previously described that you -- you regularly make there at

7  The UPS Store?

8  A     Yes, it is.

9  Q     Or -- or one of your two employees?

10  A     Hm-hmm, that's right.

11  Q     Based on -- based on knowledge around the time of the

12  event in this case, around the middle of September?

13  A     Yes, that's correct.

14  Q     All right.  And that you -- that you keep as a part of

15  your business?

16  A     Yes.

17  Q     All for the purpose of keeping track of packages like

18  this?

19  A     Yes, we keep track of it, yeah.

20         MR. FRANK:  I'd move Government's Exhibit 7 into

21  evidence.

22         THE COURT:  Any objection?

23         MR. RIDGE:  No, Your Honor.  Thank you.

24         THE COURT:  7 is admitted.

25         MR. FRANK:  And request permission to publish it?

1      THE COURT:  You may.

2      MR. FRANK:  And could we project 7, please?

3  BY MR. FRANK:

4  Q    Can you -- can you make this out on the screen in front

5  of you, Mr. Milliken?

6  A    Can I what?

7  Q    Can you make it out?  Can you see it clearly?

8  A    Yeah, clearly, yeah.

9  Q    Okay.  Can you describe it for us?  What are we looking

10 at here?

11 A    Well, there -- on this day, there are three packages

12 that we received.

13 Q    Okay.

14 A    The box number would be the -- the reference to the

15 mailbox.

16 Q    I'll tell you what.  Let me stop you for a minute and

17 let me -- let me do it this way.  Let's start at the top, and

18 I'm going to circle the entry in the center.  What is that?

19 A    That's the name of our store and the address.

20 Q    Okay.

21 A    The name of the report.

22 Q    And the name of the report, package receiving report?

23 A    Correct.

24 Q    Okay.  What is a package receiving report?

25 A    It's a report of the packages that were received that

1   day.

2   Q      Okay.  And what day are we talking about?

3   A      The 14th of September, 2012.

4   Q      All right.  And where -- where is that indicated on

5   this?  And if you touch the screen in front of you, you can --

6   you can highlight things with your finger, if that helps.

7   A      That would be this column here.

8   Q      Okay.  So if I clear that column, that's the column

9   headed received?

10  A      That's correct.

11  Q      And there are three entries below it?

12  A      Right.

13  Q      Correct?

14  A      That's correct.

15  Q      And -- and they -- they're in day and time format,

16  correct?

17  A      That's right, yeah.

18  Q      And -- and is that what -- what indicates to you that

19  three packages were received that day?

20  A      That's correct.

21  Q      All right.  And at what times?  Can you tell?

22  A      Yeah, two of them were at 10:35-10:36 time frame, and

23  another one was at 2:42 in the afternoon.

24  Q      All right.  So what's the significance of that?  How

25  many stops were made that day by UPS?  Can you tell?

| | |
|---|---|
| 1 | A     It -- I would say two -- |
| 2 | Q     Based on the different times? |
| 3 | A     -- to deliver packages, yes. |
| 4 | Q     All right.  And what packages were delivered that |
| 5 | morning around 10:36? |
| 6 | A     Two packages for the Xerox tech team. |
| 7 | Q     Okay.  And so -- so we're now reading the first line? |
| 8 | A     Yes, this one here and this one here. |
| 9 | Q     Okay.  I'm -- you've confused me.  Can we just -- are |
| 10 | you talking about both morning packages or just one of them? |
| 11 | A     Both of those were received in the morning, yes. |
| 12 | Q     Okay.  Both were received in the morning.  Did they both |
| 13 | go to the same recipient? |
| 14 | A     No, there were two different techs who received those. |
| 15 | Q     What -- |
| 16 | A     Both -- both of those techs work for the same company. |
| 17 | Q     Okay.  You're familiar with these customers? |
| 18 | A     Yes. |
| 19 | Q     Personally familiar with them? |
| 20 | A     Yes. |
| 21 | Q     And why are you familiar with them? |
| 22 | A     Because they were long-term customers who came in |
| 23 | daily -- |
| 24 | Q     Okay. |
| 25 | A     -- to pick up packages. |

1   Q      And have you been referring to them as techs?

2   A      That's correct, yes.

3   Q      T-e-c-h-s?

4   A      That's correct.

5   Q      What do you mean by techs?

6   A      They are technicians for the Xerox company, at least

7   they were in 2012.

8   Q      Okay.

9   A      And they received repair parts for their -- their Xerox

10  product at our location.

11  Q      Okay.  All right.  And -- and it sounds like you're

12  pretty familiar with them.

13  A      Yes.

14  Q      Is that fair to say?

15  A      Yes.

16  Q      You know them by sight?

17  A      I would have back then I would think, yes.

18  Q      Know them by name?

19  A      Yeah.

20  Q      Back -- you're saying back then --

21  A      Right.

22  Q      -- in September of 2012?

23  A      Yes.

24  Q      Okay.  Are they -- are they no longer customers?

25  A      They -- they made other arrangements, so they are no

1  longer customers with -- with our location.

2  Q     All right.  And then how about the third entry for this

3  day, the afternoon delivery?

4  A     Yes, the afternoon delivery for Box 244, Todd Tolhurst,

5  yeah, he is a normal box holder.

6  Q     Another regular customer?

7  A     Yes, right.

8  Q     Who has both mail and -- and package delivery service

9  there?

10  A     That's correct.

11  Q     All right.  And how did these entries get in your

12  system?

13  A     When they arrive, we scan them into our system, we scan

14  their bar -- their -- their tracking number.

15  Q     Okay.  Who would have done that?

16  A     At -- on that day, it would be the clerk who's working

17  that day.

18  Q     All right.  Do you know who was working that day?

19  A     Yeah, it was Jeff Trimmer, yes.

20  Q     Okay.  You know that from this investigation I take it?

21  A     Right, he was scheduled to work that day, and he was --

22  he was there that day.

23  Q     All right.  But it's not apparent on this record, right?

24  A     No, it's not.

25  Q     Okay.  And you know that a third package was delivered

1    by UPS that morning, correct?

2    A     We know that because the tracking from UPS says that it

3    was delivered to our location, yes.

4    Q     All right.  Do you know what happened to that package?

5    A     Specifically, no.

6    Q     Okay.  Occasionally do packages get picked up without

7    getting signed for?

8    A     It can happen, yes.

9    Q     Okay.  Did you ever receive a complaint about this

10   package or a claim that it wasn't received?

11   A     No.

12   Q     Are you familiar with the defendant, Sidney Kilmartin?

13   A     No.

14   Q     I take it he is not a regular customer of yours there?

15   A     No.

16   Q     Hasn't been?

17   A     I do not recognize him.

18           MR. FRANK:  The court's indulgence, Your Honor?

19           THE COURT:  Yes.

20           MR. FRANK:  I have no further questions of this

21   witness, Your Honor.

22           THE COURT:  Mr. Ridge?

23           MR. RIDGE:  Thank you, Your Honor.

24                       CROSS-EXAMINATION

25   BY MR. RIDGE:

1    Q     Good morning, Mr. Milliken.

2    A     Good morning.

3    Q     Mr. Milliken, when did you first become aware of the

4    package that was delivered to your store on September 14th,

5    2012, for which there is no record?

6    A     I would -- it would approximately be a year later.

7    Q     And how did you find out that that glitch had occurred?

8    A     There was an investigation into the -- what happened to

9    the package from the, um -- well, I don't recall whether it

10   was the postal inspector or some other investigation.

11   Q     And how many times have you had contact with the folks

12   that are investigating this issue?

13   A     Three times.

14   Q     Okay.  And have they provided information to you --

15   additional information each time you speak with them?

16   A     Not really, no, no, they -- they provided me with a

17   tracking number originally -- well, they asked me if we had a

18   -- I take -- no, they did -- they -- they did come back and

19   provide us with a tracking number on the second time they

20   contacted me.

21   Q     Let me ask you this as you raised that point.  Does your

22   store generally maintain a record of the tracking number of

23   deliveries that are made to your store by UPS?

24   A     Yes, that's what this package tracking report would

25   show.

1    Q     Okay.  And when you say this package tracking report,

2    what exhibit number are you looking at?

3    A     7.

4    Q     Okay.  So Exhibit 7 does not have the tracking number

5    for the article shipped by Fisher Scientific.

6    A     Correct.

7    Q     Okay.  And you know -- I think you testified when you

8    were talking to Mr. Frank that you've seen the -- the printout

9    from UPS indicating that three packages were delivered at

10   about 10:30 in the morning?

11   A     That's correct, yeah.

12   Q     And it also indicated that Jeff was the receiver of the

13   package whose tracking number matched the one sent by Fisher

14   Scientific.

15   A     That's correct.

16   Q     What -- when -- when Jeff receives the package, does he

17   sign for it, or does he scan it in somehow?

18   A     Well, he should do both.  He would sign for receiving it

19   from UPS, and then he should scan it into our package

20   receiving system.

21   Q     Okay.  And was it scanned -- it was not scanned into

22   your system.

23   A     It was not.

24   Q     Does the signature stay at your location, or does the

25   signature go back to UPS?

1   A      The signature, which signature?

2   Q      Jeff -- I'm sorry.  Jeff's signature.

3   A      Jeff's signature goes to UPS.

4   Q      All right.  So you would not ordinarily have a record of

5   that.

6   A      Correct.

7   Q      Now, let me just back up a little bit.  Mr. Kilmartin

8   has been described as a package customer?

9   A      A package-only customer.

10  Q      Package-only customer.  And that means if it was me, I

11  could walk in off the street and indicate I'd like to have a

12  package delivered to your store?

13  A      Yes, you could.

14  Q      All right.  And do I pay for that in -- I pay for that

15  from the shipper?

16  A      No, you would pay -- you would pay to receive it at our

17  store, the $5 fee, you would pay us.

18  Q      Okay.  And when I come back when the package is there,

19  how does the -- how does your store assure that I am the

20  person who should get delivery of that package?

21  A      Well, you would show ID.

22  Q      Okay.

23  A      And then you would sign for it.

24  Q      And do you maintain at your store the record of the ID

25  shown and the signature of the person who accepts delivery

1   ultimately of a package?

2   A    Normally we keep record of the signature, not the ID

3   that's shown.

4   Q    Okay.  And there is no signature for Mr. Kilmartin.

5   A    We have no record of the signature.

6   Q    Who is the person -- is it -- let me start over.

7        Is it the clerk that would deal with Mr. Kilmartin and

8   -- or -- or me and obtain a signature and see an ID before I

9   am given a package?

10  A    That's correct.

11  Q    And that clerk was Jeff.

12  A    Jeff was on that day, yes.

13  Q    Okay.  Now, when the UPS truck arrives at your store,

14  where does it go?  Does it go out around back?  Does it park

15  out front?  Do you know where it goes?

16  A    He goes -- he parks out front.

17  Q    Parks out front.  And brings in each package that's to

18  be delivered to your store?

19  A    That's right.

20  Q    Do you know whether he locks the truck up, pulls the

21  door down so people can't scurry in and grab --

22  A    That would be a UPS question whether they do that or

23  not.

24  Q    Okay.

25  A    That's what their policies are.

1    Q      All right.  Once an item gets delivered to your store

2    and is signed for by a clerk, usually it is scanned in, as

3    well as signed for.

4    A      Correct.

5    Q      And then what happens to the package?  If the customer

6    isn't there, how do you await pickup?

7    A      We put it in a -- on the back counter or the back -- in

8    the back room with the -- on a shelf.

9    Q      Okay.  And it would be fair to say that these packages

10   are not kept where somebody else could walk in the door and

11   grab the package, could they?

12   A      That's correct.  Yeah, yeah, they're kept in a -- in a

13   secure location.

14   Q      Okay.  And we presume that's what happened in this case

15   because that's what usually happens.

16   A      That is what we presume, yes.

17              MR. RIDGE:  Thank you, Mr. Milliken.

18              THE COURT:  Redirect?

19              MR. FRANK:  The court's indulgence?  No further

20   questions, Your Honor.

21              THE COURT:  Thank you, sir.  You may stand down.

22        (The witness left the witness stand.)

23              THE COURT:  Next witness?

24              MR. FRANK:  Is Cynthia Barnes.

25              THE COURT:  Do you have an exhibit up there?

1          MR. FRANK:  I'll collect it, Your Honor.

2          THE COURT:  Thank you.

3          THE CLERK:  Do you solemnly swear that the testimony

4    you shall give in the matter now in hearing shall be the

5    truth, the whole truth, and nothing but the truth, so help you

6    God?

7          THE WITNESS:  I do.

8          THE CLERK:  Please be seated.

9          THE WITNESS:  Thank you.

10         THE CLERK:  Please state your name and spell your

11   last name for the record.

12         THE WITNESS:  Cynthia Barnes, B-a-r-n-e-s.

13   CYNTHIA BARNES, having been duly sworn, was examined and

14   testified as follows:

15                    DIRECT EXAMINATION

16   BY MR. FRANK:

17   Q    Good morning, Ms. Barnes.

18   A    Good morning.

19   Q    How are you employed?

20   A    I work for the Maine State Credit Union in Augusta,

21   Maine.

22   Q    And what is the Maine State Credit Union?

23   A    It is a financial institution.

24   Q    What sort of services do you provide?

25   A    A variety of services -- deposit products, loan

1  products, credit card products, debit card products -- the

2  whole gamut.

3  Q    And what's distinctive about a credit union as opposed

4  to a bank or other similar financial institution?

5  A    A credit union is owned by its members, where a bank has

6  a board of directors and those types of things.  It's a

7  for-profit organization, and a credit union is not.

8  Q    Okay.  And how long have you been assistant vice

9  president for member services?

10 A    I've worked for the credit union about 17 years,

11 probably assistant vice president of member services for 13 of

12 those 17 years.

13 Q    All right.  And what do you do as vice president for

14 member services?

15 A    I troubleshoot any and all deposit product troubles; or

16 I coordinate a department of 13 people that runs a phone bank;

17 we see members in person; I do electronic services through

18 e-mail and mobile banking.

19 Q    Okay.

20 A    Everything.

21 Q    So can you give us an example?  I mean, when you say

22 troubleshoot, what -- how would you get involved, what might

23 happen?

24 A    A member may have difficulty logging into their account

25 for one reason or another, either they forgot their password

1    or their computer doesn't have the browser requirements

2    capable of operating our system, so we help folks get on --

3    online.

4    Q    All right.  How about a problem with a transaction?

5    A    Problem with a transaction, yeah.  We do -- I take

6    disputes -- credit card disputes, debit card disputes.

7    Q    You mean when somebody pays for something and they don't

8    get it, for example?

9    A    Yes.

10   Q    Okay.  And do you have other experience in the banking

11   industry besides?

12   A    Yes.

13   Q    Where and when was that?

14   A    I've been in the banking industry since 1988.  I started

15   out as a teller, so I'm familiar with the teller function.  I

16   worked my way up to supervisory position, branch manager

17   position.

18   Q    Okay.

19   A    So I'm familiar with pretty much the entire operation,

20   including lending.

21   Q    All right.  Are you also familiar with the credit

22   union's recordkeeping practices?

23   A    Yes.

24   Q    And what sort of records does it keep?

25   A    It keeps statement of accounts, a monthly statement of

1   accounts, it -- everything.

2   Q     Okay.

3   A     I mean --

4   Q     And a particular -- how about -- how about the documents

5   that somebody uses to open an account?

6   A     Yes.

7   Q     Are you familiar with those?

8   A     Yes.

9   Q     All right.  Are those the kind of things that are -- are

10  regularly made in the course of the bank's business?

11  A     Correct, yes.

12  Q     By someone with -- with knowledge like a, what, a

13  customer service representative?

14  A     Exactly, yes.

15  Q     At the time an account is opened?

16  A     Yes.

17  Q     Or a teller at the time a transaction is incurred?

18  A     Correct.

19  Q     And -- and is some of your services automated, ATMs and

20  that sort of thing?

21  A     Yes.

22  Q     Okay.  Are those records also, at least automatically,

23  electronically kept -- made and kept?

24  A     Yes.

25  Q     And you work with those records regularly?

1   A     Yes, I do.

2   Q     In your experience, are they fair and accurate?

3   A     Yes.

4   Q     Let me show you what's been marked as Government

5   Exhibit 8 for identification.

6              MR. FRANK:  And, actually, I'll -- I'll move it

7   directly into evidence, Your Honor.  I believe it's -- it's a

8   certified authentic record.

9              MR. RIDGE:  No objection, Your Honor.

10             THE COURT:  Government's 8 is admitted without

11  objection.

12  BY MR. FRANK:

13  Q     And I will show you, if I may --

14  A     Yes.

15  Q     -- Exhibit 8 and ask you to take a look at that and tell

16  us if you recognize it, please.

17  A     Yes, that is a new account application.

18  Q     All right.  And what -- what are these used for?

19  A     To establish an account or a membership with the Maine

20  State Credit Union.

21  Q     And who does this account pertain to?

22  A     Sidney P. Kilmartin.

23  Q     All right.

24             MR. FRANK:  And can I ask that it be projected now,

25  Exhibit 8, if we could, please?

1    BY MR. FRANK:

2    Q    All right.  And so this is the -- the top of the first

3    page of this exhibit, is it not?

4    A    Yes.

5    Q    All right.  And -- and what can you -- what can you tell

6    about this as we scroll down it?  At the top, this first

7    field, No. 1, field of membership, what does that mean?

8    What's that about?

9    A    In order to join the Maine State Credit Union, you have

10   to be someone who lives, works, or worships in the Somerset or

11   Kennebec County areas or related to somebody who does.  So the

12   first thing is we -- we make sure that they qualify for

13   membership, and in this case, the person lived, worked, or

14   worshipped in Kennebec County and also was employed by Pen's

15   Cafe in Augusta, Maine.

16   Q    All right.  So let's scroll down further.

17   A    Hm-hmm.

18   Q    All right.  And -- and let's talk about the next section

19   of information on -- on this form.  Number 2, general

20   information, what's here?

21   A    This would be the personal information supplied by the

22   applicant at the time of account opening.  So we'd have their

23   full name, their social security number, the physical address

24   at the time the account was opened, home phone number,

25   employment information, date of birth, e-mail address,

1    mother's maiden name, and telephone password for obtaining

2    information over the phone.

3    Q    All right.  And, again, if we just stop there for a

4    minute, I mean, what -- whose is this account?

5    A    This is Sidney P. Kilmartin's account.

6    Q    All right.  And who provided this information?

7    A    Sidney provided it to the person that opened it, and the

8    person who opened it initials are up in the top right corner.

9    Q    Okay.  So if we scroll back up to the top, if I circle

10   this here, is that what you're referring to?

11   A    Yes.

12   Q    What -- are you familiar with that handwriting?

13   A    I am.

14   Q    Do -- who is that?

15   A    That's Kim Perry.

16   Q    All right.  And who is she?

17   A    She is one of the MSRs at Maine State Credit Union.

18   Q    And MSR stands for?

19   A    Member service representative.

20   Q    Okay.

21   A    Equivalent to a customer service representative in a

22   bank.

23   Q    All right.  And then if we scroll back down, I mean, you

24   also routinely obtain the social security number of -- of your

25   -- your applicants, your customers, right?

1    A    Yes, hm-hmm.

2    Q    And that's been provided and entered there, correct?

3    A    Yes, yes.

4    Q    All right.  And date of birth is down below, correct?

5    A    Yes, hm-hmm.

6    Q    And do you require identification to verify that that's

7    actually the person?

8    A    Yes, we do.

9    Q    What's your practice in that regard?

10   A    They have to have -- it's an -- the rule is it's an un

11   -- how does it go -- an unexpired, government-issued photo ID.

12   Q    That -- that's what you require?

13   A    Yes.

14   Q    Okay.  And scrolling down to the bottom, how about --

15   what's the significance of this handwritten entry there?  Do

16   you know?

17   A    At the bottom?

18   Q    I'll circle it.

19   A    Yeah.

20   Q    It's Sidney dash something.  What's that about?

21   A    It says, Sidney-VCC and then 456133, and it's got the

22   initials of Lisa, who is another MSR on 5/10/10 and that

23   refers to a debit card that was ordered for that account, and

24   the last six numbers recorded are the debit card number

25   assigned to that membership or account.

1   Q    Okay.  If we scroll to the next page, what sort of

2   information is here and --

3   A    It tells what type of accounts were opened and in what

4   capacity they were held.  So in this case, in order to become

5   a member of the credit union, you have to open a share

6   account; a share account is a savings account.  It was opened

7   individually, so there were no other owners.  An advantage

8   checking account was also opened; a Visa check card was issued

9   or a debit card.  They requested to have online banking

10  services, and they requested to have their statements

11  delivered by e-mail.

12  Q    Okay.  And what's this Visa check parentheses debit

13  card -- I'll circle that -- what -- what -- what is that?

14  A    It's a debit card that you can use to access your

15  checking account to make purchases and/or cash withdrawals at

16  an ATM.

17  Q    Okay.  And if we scroll to the third page, what -- what

18  information is here on the third page in items 4 and 5?

19  A    4 and 5?

20  Q    Well, how about just 5 then?

21  A    Just 5.  That's basically an agreement that you're

22  agreeing to -- that you've received the disclosures provided

23  by the credit union and that you read them and that the social

24  security number that you provided is accurate and that you, as

25  an individual, are not subject to backup withholding.

184

1  Q     Okay.  And how about at the bottom of page 3?

2  A     Those are the verifications that we use.

3  Q     What do you mean?

4  A     Well, in this situation, Sidney was an existing member.

5  He had another account with us, which is listed 7 -- the

6  67400, so in that --

7  Q     That's right -- that's right here in the middle at the

8  bottom?

9  A     Yes.

10  Q     Okay.

11  A     Yeah.  And then we provide -- we do a nondocumentary ID

12  sort of verification, and we use a product called ChexSystems

13  and -- or eFunds, as we call it, and we just -- it's a

14  consumer report that tells how an individual behaved at past

15  financial institutions.

16  Q     Okay.  And how about here, what's -- under the line --

17  above the line primary member's signature and date, what is

18  that?

19  A     That is a signature by Sidney P. Kilmartin, dated

20  5/5/2010.

21  Q     All right.  And what does that mean?

22  A     It means the day that the application was signed and the

23  information was provided to the credit union and the account

24  was opened.

25  Q     Okay.  And if we could scroll to the fourth page of this

1    exhibit?

2    A    That's the identification that was provided at the time

3    of account opening.

4    Q    And what was that?  Can you tell?

5    A    Um, I don't have my glasses on -- I'm sorry -- but it

6    appears to be a Maine state driver's license.

7    Q    All right.  And is it your -- I'm sorry.

8    A    Like I said, I -- my glasses are back there, but -- and

9    then there was also a temporary license.  So, again, I can't

10   read it, but I'm assuming that the top one may have been

11   expired, so they went and got it -- the paper copy, and we had

12   the two to verify.

13   Q    All right.  And -- and this is all to verify that the

14   person is who they claim to be who's opening this account?

15   A    Correct.

16   Q    All right.  And that's part of your standard opening

17   practices?

18   A    Yes.

19   Q    All right.  Let's turn to, if we could, Exhibit 10 for

20   identification.

21        MR. FRANK:  Got ahead of myself.

22   BY MR. FRANK:

23   Q    Showing you --

24        MR. FRANK:  Well, actually, I'd move 9 into evidence

25   as another certified authentic record of the credit union.

186

1      THE COURT:  Any objection to 9?

2      MR. RIDGE:  No, Your Honor.

3      THE COURT:  It's admitted.

4    BY MR. FRANK:

5    Q    And let me show you what's been marked Exhibit 9 for

6    identification, if I can.

7    A    Hm-hmm.

8    Q    And ask you to take a look at that and tell us if you

9    recognize it.

10   A    Yeah, that is the format of a monthly statement that's

11   issued by the Maine State Credit Union.

12   Q    All right.  With respect to any particular account?

13   A    Yes.

14   Q    What --

15   A    The account -- whoops, sorry.

16   Q    What account?

17   A    The account of Sidney P. Martin, numbered -- what is it

18   -- 701.

19   Q    Would you like me to get your glasses?

20   A    Yeah, they're in my pocketbook.

21   Q    Where -- where is your pocketbook?  May I do that?

22   A    That back purse on the back -- very back --

23   Q    In the back row?

24   A    Yes.

25   Q    Why don't I just bring it to you.

1   A     Okay.  Thank you.  Sorry.  Thank you.

2   Q     All right.

3   A     It's the account of Sidney P. Kilmartin, account

4   numbered 70187.

5   Q     All right.  And is that the same count -- is it the same

6   account that was opened using Government's Exhibit 8?

7   A     Yes.

8   Q     Okay.  All right.  And -- now, earlier you testified

9   that Mr. Kilmartin opted for electronic statements, right?

10  A     Yes.

11  Q     What -- so -- so did -- this is a paper copy of -- of an

12  electronic statement; is that fair to say?

13  A     Yes.

14  Q     The -- is it -- the format the same, electronic and

15  paper?

16  A     Yes.

17  Q     All right.  But this came from your system, and he would

18  have gotten a copy of this as a matter of routine --

19  A     Yes.

20  Q     -- general practice?

21  A     Yes.

22  Q     E-mailed to him --

23  A     Yes.

24  Q     -- as he requested?

25  A     Yes.

1    Q    Okay.  All right.  And what -- I can't remember, did I

2    ask you what -- what -- what month or period of time does it

3    relate to?

4    A    This -- this statement reflects the September 1st, 2012,

5    to the September 30th, 2012 transaction period.

6    Q    All right.  So it would have covered September 11th, 12,

7    14, correct?

8    A    Yes.

9    Q    All right.

10                MR. FRANK:  I ask that it be published.

11   BY MR. FRANK:

12   Q    All right.  And it may be familiar, but let me just ask

13   you a couple of general questions about it.  What's -- what's

14   the information in the top right-hand box on the first page of

15   this exhibit?

16   A    The top right-hand box includes the account number or

17   the member number of that particular statement for that

18   particular member and the statement period that it covers.

19   Q    Okay.  And then moving down and to the left from there,

20   how about this information here that I've circled, Sidney P.

21   Kilmartin, what's that?

22   A    That's the account number information and --

23   Q    And how about -- I'm sorry.

24   A    -- and the address we had on file at the time.

25   Q    At the time.  Because this is a different address than

1  the one on the application.  I don't know if you noticed that.

2  A     Correct, yep.

3  Q     All right.  I take it people can change the address

4  affiliated with their -- their accounts?

5  A     Yes.

6  Q     As -- as --

7  A     As needed, as necessary.

8  Q     If they move, for example?

9  A     Hm-hmm, yeah.

10  Q     All right.  And at least at this time in September, that

11  was the address that was listed with respect to this account.

12  A     Yes.

13  Q     And I take -- you have no personal knowledge of what

14  that address is or how it relates to Mr. Kilmartin, correct?

15  A     No.

16  Q     All right.  Let's -- let's scroll down to the entry for

17  September 12th, and let's see if I can find it there and let

18  me -- let me circle it and ask you what the significance of

19  this entry is here.  What is that?  Can you describe that for

20  the jury?

21  A     The transaction of September 12th is a debit card

22  purchase.

23  Q     Okay.  What -- what debit card?  It may be obvious, but

24  what debit card is this that made that transaction?

25  A     I'm trying to find the number.  Sorry.

1   Q     Okay.  How about generally speaking, how does it relate
2   to this account?
3   A     That was the card that was hooked to this account as far
4   as the pur -- for the purposes of making purchases and
5   electronic withdrawals from the account.
6   Q     Okay.  All right.  And -- and the entry is dated
7   September 12th, right?
8   A     Correct, yes.
9   Q     And it reads, withdrawal debit card?
10  A     Correct.
11  Q     Correct?  What does that mean?  What does withdrawal
12  debit card mean?
13  A     It means that the -- the member initiated a credit-based
14  transaction with their debit card.  There are two ways that
15  you can process debit card transactions:  One is PIN-driven.
16  So if you're there in person and you can enter your PIN number
17  in the PIN pad, the transaction posts to your account
18  automatically.
19        When a debit card is processed as a credit card, the
20  transaction date is noted when the transaction was conducted,
21  which was on 9/11, but --
22  Q     How do you -- how do you know that?
23  A     Because it says so in the descriptive when it talks
24  about the transaction.  Some of the description --
25  Q     Okay.  Let me stop you for a moment.

BARNES - DIRECT EXAMINATION/FRANK

1  A     Sure.

2  Q     And in the first instance, how can you tell that this

3  was -- that this is a non-PIN, nondebit transaction; is that

4  right?

5  A     Yes, because it has an effective date on it of 9/11.

6  Q     Okay.  But that's what indicates that it's -- that it's

7  a credit transaction?

8  A     Correct, yes.

9  Q     Why?  How?

10  A     Um, again, with the debit card trans -- with a debit

11  card PIN-driven transaction, the minute you enter your PIN,

12  that purchase price is withdrawn from your account

13  immediately.

14        When you process it as a credit transaction, it has to

15  work through the Visa system and settle overnight most of the

16  time; sometimes it may take up to 72 hours to settle.

17  Q     All right.  So do I understand correctly that the reason

18  you know that this is a credit transaction is because the date

19  of the transaction is different from, what, the date it --

20  A     It posted.

21  Q     -- that you post --

22  A     Yeah.

23  Q     -- that you posted it to the account?

24  A     Correct.

25  Q     And that date is September 12th.

1    A      Correct.

2    Q      But the transaction date is the day before,

3    September 11th.

4    A      Correct.

5    Q      Okay.  And we -- we've been reading the second line of

6    this -- of this entry about this transaction beginning with

7    the -- the No. 09/11 for the date September 11th, correct?

8    A      Correct.

9    Q      How about reading across, what -- what other information

10   is there in your system about this transaction?

11   A      There's just some reference numbers regarding the

12   transaction that we can refer to in our electronic records and

13   that indicates the merchant at -- where the purchase was made

14   and the phone number to contact the merchant and the state

15   that the merchant resides.

16   Q      And in this case, what was that merchant phone number

17   and state?

18   A      The merchant was the Capricorn Group, and the number was

19   (805)491-8222 out of California.

20   Q      CA is the -- the abbreviation for California?

21   A      Hm, I would assume, yes.

22   Q      Okay.  And what was the amount of the transaction?

23   A      The amount of the transaction was for $127.56.

24   Q      Did you ever have any complaints about that or claims

25   about that transaction?

1    A      Nope, not that I'm aware of, no.

2    Q      Let's turn to -- let's turn to the transaction further

3    down on -- on September 14th.  Let me direct your attention

4    here.  I believe that's the last transaction on this -- on

5    this first page of this Exhibit 9, correct?

6    A      Correct.

7    Q      All right.  And can you describe that transaction for

8    us?  What was that about?

9    A      That was a withdrawal, again, made by the debit card,

10   for $6.69.  It was a POS transaction, so that means

11   point-of-sale.  A debit card was used, and a PIN number was

12   provided for that transaction, and it was done at --

13   Q      Okay.  Let me stop you.  Let me stop you.  Okay.  So

14   what does that mean?  Does that mean somebody's actually at a

15   keyboard in person entering that PIN number?

16   A      Yes.

17   Q      Okay.  And, presumably, that would be the cardholder who

18   holds the card and knows the PIN, right?

19   A      Yes.

20   Q      That's the whole idea of this system, is it not?

21   A      Correct.

22   Q      All right.  And can you tell where that transaction was

23   conducted on this date?

24   A      Yeah, at Mulligan's on 1036 Western Avenue in

25   Manchester, Maine.

1    Q     Okay.  And -- and -- and reading across, then you have

2    the amount as 6.69 that you've already testified to, correct?

3    A     Correct.

4    Q     Are you -- you're not familiar with that location, are

5    you, on Western Avenue?

6    A     Mulligan's?

7    Q     The Mulligan's?

8    A     Yes.

9    Q     You are.

10   A     Yeah.

11   Q     You've been there?

12   A     Yeah.

13   Q     Do you -- do you know how far it is from the -- The UPS

14   Store down the road at 60 Western Avenue?

15   A     I can guess.

16   Q     Okay.  Do -- are you also familiar with The UPS Store?

17   A     Yes.

18   Q     Okay.

19   A     The location on Western Avenue, yes.

20   Q     Okay.  You head towards Augusta on Western Avenue, don't

21   you?

22   A     Hm-hmm.

23   Q     And you come to it on your right?

24   A     Hm-hmm, yeah.

25   Q     Within a mile; is that fair to say?

1    A      Probably a few miles.

2    Q      More than a mile?

3    A      Yeah.

4    Q      Okay.  Let me show you what's been marked as Exhibit 10

5    for identification.

6           MR. FRANK:  Actually, again, I'm going to move 10

7    directly into evidence, Your Honor.  It's all part of the

8    certified records.

9           THE COURT:  Any objection?

10          MR. RIDGE:  Your Honor, I do have an objection to

11   No. 10, and I can either make it from here or at sidebar,

12   whichever you prefer.

13          THE COURT:  Well, why don't we go to sidebar.

14      (At sidebar on the record.)

15          THE COURT:  Yes, sir.

16          MR. RIDGE:  My objection is not to the authenticity

17   of the document at all, but as I understand No. 10, it is to

18   explain to the jury that Mr. Kilmartin paid a -- sent money to

19   a woman in Utah named Donalee Wolfe, who is a person part of

20   the larger scheme not charged, but part of the larger scheme,

21   and I don't believe that's relevant, and that would be my

22   objection.

23          MR. FRANK:  Your Honor, actually, the reason I'm

24   interested in this exhibit is it documents a payment at the

25   post office for the mailing to Derek Jorgensen, so it's the --

1    it's the November 5th -- as I understand it, it's the

2    November 5th entries at the post office here, which Inspector

3    Taylor traced to payment for the mail -- the mailing to

4    Jorgensen, which -- which is charged, although pleaded to.

5           MR. RIDGE:  It's -- my objection would be the same,

6    Your Honor.  I was going off the description on your list as

7    the postage to Utah, Donalee Wolfe.

8           MR. FRANK:  All right.

9           THE COURT:  Anyway, is this a good time to have them

10   take a break and then hear the argument on the question of

11   whether or not these other incidents will get in under

12   Rule 404(b)?

13          MR. FRANK:  I think it could be, Your Honor, sure.

14          MR. RIDGE:  Sure.

15          THE COURT:  Well, why don't -- why don't -- go

16   ahead.

17          MR. FRANK:  I'm sorry.  Your Honor, I mean, I -- I

18   guess what is now 404(b) evidence as re -- I mean, my -- I'll

19   argue it.

20          THE COURT:  Okay.  Good.  Why don't I have them take

21   a break, and I'll tell them it'll be a little bit longer

22   because we have a matter we need to resolve.

23          MR. RIDGE:  Thank you, Your Honor.

24      (End of discussion at sidebar.)

25          THE COURT:  Ladies and gentlemen, I'm going to ask

1    you to take your first morning recess at this time.  The

2    recess is usually maybe 15 or 20 minutes, but it will be a

3    little bit longer today because I have a matter I need to

4    resolve outside of your hearing.  So enjoy your break, don't

5    discuss the case, and we'll see you back here as soon as I can

6    get you back here.

7         (Jury exited at 10:15 a.m.)

8              THE COURT:  You may stand down, ma'am.  You may

9    stand in the back of the courtroom.

10             THE WITNESS:  Oh, okay.

11             THE COURT:  Thank you.

12             THE WITNESS:  Thank you.

13        (The witness left the witness stand.)

14             THE COURT:  So we, I think for the first time, are

15   confronted with a question of the admissibility of evidence of

16   either of two sets of facts:  One, evidence of the defendant's

17   engaging in sales of Epsom salts under the guise of selling

18   potassium cyanide, either to people who were not charged in

19   the superseding indictment or, alternatively, people who were

20   charged in the superseding indictment to which he's pleaded

21   guilty.  And the question comes down to on what basis that

22   evidence would get in, and I'll hear Mr. Frank as to what

23   basis you feel the evidence of other sales or his engaging in

24   other types of similar activity would be admissible.

25             MR. FRANK:  And, Your Honor, just to clarify -- and

1    let me confirm.  So, Your Honor, just to clarify, I misspoke.

2    This -- this charge at the post office is a charge we've

3    associated with a mailing -- it's not a payment to Ms. Wolfe;

4    it's a mailing to -- to Ms. -- to Ms. Wolfe in Utah and --

5            THE COURT:  Okay.  So this is uncharged conduct.

6            MR. FRANK:  This is uncharged conduct.  Jorgensen is

7    charged, but pleaded-to conduct.

8            THE COURT:  Right.

9            MR. FRANK:  And --

10           THE COURT:  And Ms. Wolfe's full name is?

11           MR. FRANK:  Well, there are two names associated

12   with the transaction.  They're mother and daughter; Donalee

13   and Jessica Wolfe are the -- are the names.

14       And, Your Honor, in the first instance, my position is

15   that this is not other crimes evidence.  I mean, this is

16   direct evidence of charges that are still outstanding,

17   elements of those charges, beginning with the fraud charges

18   involving Mr. Denton, which involve a scheme to defraud, as to

19   the nine charges to which Mr. Kilmartin has pleaded, and it's

20   the same scheme, but that scheme is broader than just the

21   charged -- the charged victims.  It's considerably broader.

22       And so in the first instance, it's not other crimes.  It

23   is direct evidence of a charged scheme that remains

24   outstanding to be proved as regards Mr. Denton as a victim.

25           THE COURT:  Well, I mean, I hear you on that, but

1    the -- the charge that is now before the court on Count 1 --

2    and this is the one we're talking about, correct?

3        MR. FRANK:  Well, they're -- I think 1 is a mailing

4    injurious articles --

5        THE COURT:  Right.

6        MR. FRANK:  -- count, so I'm -- I mean, as regards

7    the mailing injurious articles count, Your Honor, this is also

8    common scheme or plan evidence of ID.  ID is always an issue

9    in any criminal charge.  It's particularly an issue in this

10   case where the defense has intimated -- well, I think it's

11   argued --

12       THE COURT:  Well, yeah, let's -- I'm -- I need to

13   have you focus here.  The -- Count 1 -- which count do you

14   allege that this information about his potentially engaging in

15   an attempt to defraud Donalee and Jessica Wolfe apply?

16       MR. FRANK:  Well, I -- I was speaking of -- and I'm

17   sorry I -- it's the -- it's the wire and mail fraud counts

18   that relate to the first mailing to Denton --

19       THE COURT:  Okay.

20       MR. FRANK:  -- which -- which is Count 7, 6 --

21   6, 7 --

22       THE COURT:  Well, it's Count 5, right, e-mail

23   correspondence?

24       MR. FRANK:  I'm sorry.  I misspoke, Your Honor, yes,

25   it's 5.  I -- I misspoke.

1              THE COURT:  5 and 7.

2              MR. FRANK:  5, 7, and 12.

3              THE COURT:  Okay.  So -- but the -- the -- the point

4    I was raising is that in Count 1, which sets out sort of the

5    facts --

6              MR. FRANK:  Oh, I'm sorry, Your Honor.

7              THE COURT:  -- the background --

8              MR. FRANK:  Yes.

9              THE COURT:  -- for all of these, it then goes to

10   Counts 2 through 13, and it says on paragraph 4, between

11   April of 2012 and May 2013 --

12             MR. FRANK:  Yes.

13             THE COURT:  -- the defendant, Sidney Kilmartin,

14   devised a scheme to defraud suicidal persons and obtain money

15   and property --

16             MR. FRANK:  Yes.

17             THE COURT:  -- by means of materially false and

18   fraudulent pretenses, etc., etc., which is essentially the

19   scheme to which he admitted as against other individuals.

20             MR. FRANK:  Yes.

21             THE COURT:  All right.  So your -- your thought is

22   that you can get in -- let's say you have -- we're -- we've

23   basically winnowed, for purposes of the charge before the

24   jury, the -- all the other allegations in the superseding

25   indictment to which he has actually pleaded guilty.  That --

1   those aren't directly in front of the jury as a charge,

2   correct?

3            MR. FRANK:  The non-Denton fraud victims are not.

4            THE COURT:  Okay.  So if in the ordinary case -- and

5   I realize this is a little bit complicated -- but in the

6   ordinary case, if you charge somebody with fraud and engaging

7   in a scheme, wouldn't the fact that he engaged or she engaged

8   in a similar scheme with somebody else come under 404(b)?  Why

9   would that be direct evidence?  I'm not -- I'm not sure that I

10  follow that one.

11           MR. FRANK:  Well, I think the question is --

12           THE COURT:  Look, think of it this way, Mr. Frank.

13           MR. FRANK:  Hm-hmm.

14           THE COURT:  It seems to me, to cut to the chase

15  here, that under 404(b)(2), there would be a permitted use,

16  and the permitted use would be -- this evidence -- this is

17  evidence of other crimes, wrongs, or other acts -- that the

18  permitted use would be to show motive, opportunity, intent,

19  preparation, plan, knowledge, identity, absence of mistake, or

20  lack of accident.

21       Now, it seems to me that those are exactly what 404(b)

22  contemplates, that if the person has engaged in a series of

23  similar actions, then you can introduce those series of

24  similar actions for purposes of demonstrating that it was

25  intentional and it was not by mistake and that it was part of

1   a larger scheme, as you've alleged.  That seems to me almost

2   like a textbook description of permitted uses under 404(b)(2).

3      Now, the -- the difference is that if it comes in under

4   404(b) -- (b)(2), then I -- I will, upon request of the -- by

5   the defendant, give an instruction to the jury that the

6   defendant is not on trial for engaging in any misconduct

7   related to Donalee and Jessica Wolfe, nor can this information

8   -- this evidence be used for the jury to -- to conclude that

9   Mr. Kilmartin is a person of bad character who would, as a

10  consequence of the fact that he engaged in this action with

11  Donalee and Jessica Wolfe, be -- have -- be the kind of person

12  who would likely commit this type of crime.

13     So it can't be used for character evidence, and it has to

14  be used on a restricted basis only for really the itemized,

15  listed uses under 404(b).  That's the way I see it.  It has --

16  under the rule, I have to make a determination that it has a

17  special relevance, and it seems to me that it clearly has a

18  special relevance under the First Circuit authority.

19     But that's the way I -- I've initially seen it.  I -- I

20  want to focus you on this because it doesn't seem to me that

21  you introduce somebody else's -- some other fraud in order to

22  prove the fraud in this case as direct evidence.  I just don't

23  think it's going to get in that way.

24     But why don't I hear from Mr. Ridge.  You're the one who

25  raised the objection, Mr. Ridge.

1          MR. RIDGE:  Well, Your Honor, my -- excuse me.  Your

2    Honor, my objection is as to relevance.  I hear the court and

3    I don't disagree with your analysis of 404(b), and if that

4    type of instruction is going to be given, I really don't have

5    the same objection to this information, as I had when it was

6    coming in, to prove not directly, as Mr. Frank's called it.

7        My -- my thought is that the only thing needed to be

8    proven for Mr. Denton at this point is the exchange of the

9    e-mails, that's one of the counts; the payment of money by

10   Mr. Denton, that's another of the counts; and the mailing by

11   Mr. Kilmartin.  All other facts surrounding the scheme have

12   been admitted to and are usable against him, and so it is

13   reproving that which he's already admitted.

14          THE COURT:  Right.  Well, he hasn't -- he hasn't

15   admitted anything as far as Mr. Denton is concerned, and that

16   -- and as I said earlier in the earlier order, that the

17   defendant doesn't really have any right to say, well, this is

18   the way the government should prove its case.

19          MR. RIDGE:  Understand, understand, Your Honor.

20          THE COURT:  And that's the -- that's the nub.  But

21   if he -- it would be a different situation if he had admitted

22   these underlying frauds, for example, but he hasn't.  So they

23   have to prove the -- the mail fraud and the wire fraud counts,

24   but even if they were able to prove the -- even if you -- he

25   had pleaded guilty to those underlying mail and wire fraud

1    counts, it seems to me that the government would still have

2    the ability to say this was not a mistake when he mailed --

3    actually mailed off the potassium cyanide to Mr. Denton in

4    Hull, and I think that's one of their obligations to prove

5    that his actions were intentional and knowing.

6        So I think it gets in.  Again, I'd be glad to hear

7    anything further you have to say on it.  I think it gets in; I

8    think it gets in under 404(b).  And I do think that the

9    information about other individuals and the other counts gets

10   in with the instruction that they are not to use it as

11   character evidence and that he's not on trial for any of those

12   other actions.

13           MR. RIDGE:  Fine.  Thank you, Your Honor.

14           THE COURT:  All right?

15           MR. RIDGE:  Thank you.

16           THE COURT:  Anything further on this?

17           MR. FRANK:  No, Your Honor.

18           THE COURT:  Okay.  We'll stand in recess.  We'll

19   come back -- I think everybody needs a break.  We'll come back

20   about quarter of 11:00.

21           MR. FRANK:  Thank you, Your Honor.

22           THE COURT:  Thank you.

23       (Court recessed from 10:30 a.m. to 10:50 a.m.)

24           THE COURT:  On that last point, I -- although it

25   wasn't raised specifically, I do believe -- or I have come to

1    the conclusion that the other acts evidence under 404(b) is

2    also admissible under Rule 403, that it has obviously some

3    degree of prejudice to the defendant, but the probative value

4    exceeds the prejudicial impact, particularly in view of what I

5    anticipate doing in terms of an instruction limiting the

6    jury's use of that evidence.

7              MR. RIDGE:  Thank you, Your Honor.

8              THE COURT:  Would you bring the jury in, please.

9         (Jury entered at 10:50 a.m.)

10             THE COURT:  Now, ladies and gentlemen, I have some

11   instructions for you concerning the evidence that the

12   government is seeking to introduce here, which I am admitting.

13   You may recall that during my preliminary instructions, I told

14   you that there are times when evidence might be admitted for a

15   limited purpose only, and this is one of those times.

16        What I anticipate is that evidence may be presented by

17   the government that reflects some transactions that the

18   defendant may have had with two people by the name of Donalee

19   and Jessica Wolfe.

20        Now, you will recall, because I informed you at the

21   outset and the attorneys have also discussed it, that the

22   charge that is before you does not involve any of the actions

23   directly that Mr. Kilmartin may have taken with Donalee and

24   Jessica Wolfe.  It involves Andrew Denton.  So the defendant

25   is not on trial for engaging in any conduct or misconduct with

1    either Donalee or Jessica Wolfe.

2         You may, however, consider the evidence that the

3    government presents for limited purposes, and those purposes

4    may include proving motive or opportunity, intent,

5    preparation, plan, knowledge, identity, absence of mistake, or

6    lack of accident.

7         Now, in addition, I need to warn you how -- I've just

8    told you how you can use this evidence.  There's also a way

9    that you may not use the evidence, that it is impermissible

10   for you to use the evidence, and that is you may not use the

11   evidence to conclude anything about Mr. Kilmartin's character.

12   In other words, you may not use the evidence to conclude that

13   he's the type of person who would commit a crime based on the

14   fact that you have received this evidence and have evaluated

15   it.  That would be impermissible.  We don't indict people for

16   being who they are.  We indict them for what they do, and we

17   charge them for what they do.  So it would be impermissible

18   for you to use this evidence to say anything about

19   Mr. Kilmartin's character and whether a person of a particular

20   character would do a particular thing.

21        Finally, of course, all of these instructions assume that

22   it is your obligation as members of the jury to evaluate any

23   evidence that comes before you and to make that determination

24   yourself.  So how you evaluate the evidence, the weight you

25   give the evidence is fully within your province.

1          Mr. Frank?

2               MR. FRANK:  Thank you, Your Honor.

3                    CONTINUED DIRECT EXAMINATION

4    BY MR. FRANK:

5    Q    And, Ms. Barnes, before we broke, I was about to show

6    you Exhibit 10, which I believe is in evidence.

7               MR. FRANK:  But I'll move into evidence again to

8    make sure.

9               THE COURT:  I don't believe it's in evidence, and I

10   am admitting 10 over the objection of the defendant.

11   BY MR. FRANK:

12   Q    And I'd ask you to take a look at this and tell us if

13   you recognize it, please.

14   A    Yes, again, there's a statement from the Maine State

15   Credit Union disclosing account activity on 70187 from

16   November 1st, 2012, through November 30th, 2012.

17   Q    All right.  The same account that we've been talking

18   about --

19   A    Yes.

20   Q    -- in those previous exhibits, correct?

21   A    Yes.

22   Q    All right.

23               MR. FRANK:  And I'd ask that it be projected.

24   BY MR. FRANK:

25   Q    And just, again, at the top here, the account number,

1    where is that?  And if you -- if you touch the screen, it'll

2    -- it'll highlight for us.

3    A    Oh, okay.

4    Q    Where is that account number, again?

5    A    The account number's right here.

6    Q    Top right-hand?

7    A    Yeah.

8    Q    And who does it pertain to?

9    A    Sidney P. Kilmartin.

10   Q    Where is that indicated here?

11   A    On the -- downward on the page on the left.

12   Q    Okay.  And do you want to circle it?

13   A    Oh, okay.

14   Q    And where -- where was he living at the time?

15   A    At the time, 25-5 Village Drive, Manchester, Maine

16   04351.

17   Q    Are you familiar with that area?

18   A    I'm familiar with Manchester, not the street.

19   Q    Not that particular location.

20   A    Correct.

21   Q    Okay.  All right.  Very good.  Now, I wanted to ask you

22   about a particular transaction on this statement.  If we could

23   scroll down to November 5th, and I wanted to ask you -- I'm

24   going to circle it or -- or box it in and ask you about this

25   transaction here on November 5th, beginning with the line

1    withdrawal POS number sign 000802.  Can you tell us what --

2    what -- what that is there, those two entries for

3    November 5th?

4    A     Yep, it -- they were purchases at the United States Post

5    Office on Readfield Road in Manchester, Maine.  One purchase

6    was for 1.19.  The other purchase was for $3.48.  And it was

7    done with a debit card using a PIN number to process the

8    transaction, so it posted immediately to the account.

9    Q     All right.  So no difference in the date of transaction

10   or posting?

11   A     Correct.

12   Q     Correct?  And, again, this -- this indicates to you that

13   -- that someone -- that the accountholder was actually there

14   punching the PIN number into the keypad in order to complete

15   this transaction, correct?

16   A     Yes.

17   Q     All right.  And you -- do you know where this -- are you

18   familiar with this post office?

19   A     I am not.

20   Q     Okay.

21   A     Vaguely.

22   Q     All right.  You were familiar with the Mulligan's, so I

23   thought I'd ask.

24   A     Yeah.

25   Q     Okay.  Very good.  Let me show you what's been marked

1    as --

2              MR. FRANK:  Your Honor, I -- I'll move Government's

3    Exhibit 87 into evidence.  It's another statement -- certified

4    record of Maine State Credit Union on this account.

5              THE COURT:  Any objection to 87?

6              MR. RIDGE:  No, Your Honor.

7              THE COURT:  87's admitted.

8    BY MR. FRANK:

9    Q    And, Ms. Barnes, I'm showing you what's been marked as

10   Government's Exhibit 87 in evidence, ask you to take a look at

11   that, tell us what it is.

12   A    Again, it's a statement on the account No. 70187 for the

13   statement period January 1st, 2013, through January 31st,

14   2013.

15             MR. FRANK:  And I'd ask that it be published.

16   BY MR. FRANK:

17   Q    And I want to direct your attention to a transaction

18   toward the bottom of the page dated January 15th.  Again, I'll

19   box it in, and it begins, withdrawal POS 001523.  Do you see

20   where I'm indicating?

21   A    Yes.

22   Q    Can you describe what that transaction is for us?

23   A    Again, that's a purchase at the United States Postal

24   Service on Readfield Road in Manchester, again, transaction

25   for 1.95.

1   Q     Okay.  And what type of transaction?  Can you tell

2   whether it's a credit or a debit transaction?

3   A     It's a debit transaction because POS is -- precedes

4   the --

5   Q     All right.  So in the same manner as the previous ones

6   with the PIN number and the card?

7   A     Yes, PIN-driven transaction.

8            MR. FRANK:  The court's indulgence, Your Honor?  I

9   have no further questions for this witness.

10           THE COURT:  Cross-examination, Mr. Ridge?

11           MR. RIDGE:  Thank you, Your Honor, and very briefly.

12                         CROSS-EXAMINATION

13  BY MR. RIDGE:

14  Q     Ms. Barnes, good morning.

15  A     Good morning.

16  Q     I just have one clarifying question for you about the --

17  the specific transaction that Mr. Frank asked you about that

18  happened at Mulligan's on September 14th --

19  A     Okay, sure.

20  Q     -- and I guess some other examples, also.  But

21  point-of-sale means that we buy something at Mulligan's --

22  that's a convenience store, has a Dunkin' Donuts, and sells

23  sandwiches and gas?

24  A     Hm-hmm.

25  Q     And so this is the purchase of something and you use

1   your debit card and you punch in a PIN?

2   A     Correct.

3   Q     Okay.  It's not a cash withdrawal.

4   A     No, it is not.

5             MR. RIDGE:  Thank you.  That's all I have.

6             THE COURT:  Anything further?

7             MR. FRANK:  No, Your Honor.

8             THE COURT:  Thank you.  You may stand down, ma'am.

9   Thank you.

10            THE WITNESS:  Thank you.

11       (The witness left the witness stand.)

12            THE COURT:  Next witness?

13            MR. FRANK:  Your Honor, at this time, I'd move

14  Government's Exhibit 90 -- 93 in evidence.  It's a -- a

15  certified record of the Social Security Administration under

16  seal, which I think is admissible.

17            THE COURT:  Any objection?

18            MR. RIDGE:  No, Your Honor.

19            THE COURT:  93 is admitted.

20            MR. FRANK:  And, Your Honor, may I just read the

21  relevant portion of it?

22            THE COURT:  Any objection?

23            MR. RIDGE:  No, Your Honor.

24            THE COURT:  You may do so.

25            MR. FRANK:  Thank you, Your Honor.

1           And that is on the second page, where Carol A. Rozen

2    hereby declares and states that the -- according to their

3    records, social security No. 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 is assigned to Sidney

4    Phillip Kilmartin.

5           THE COURT:  Thank you.

6           MR. FRANK:  And then, Your Honor, I would call -- I

7    call Sarah Rodriguez.

8           UNIDENTIFIED SPEAKER:  She's outside.  She came in

9    and then she just left.  Would you like me to get her?

10          MR. FRANK:  No, if I may, I'll step out, Your Honor.

11          THE COURT:  I'll see counsel briefly at sidebar

12   before the witness is sworn.

13       (At sidebar on the record.)

14          THE COURT:  I don't see Ms. Rodriguez's name listed

15   here.  Was she presented to the jury during voir dire?

16          MR. FRANK:  Your Honor, Sarah Rodriguez is a records

17   custodian from Google.

18          THE COURT:  Right.

19          MR. FRANK:  They don't tend to identify their --

20   their witnesses until the last minute, so she, I don't think,

21   has been identified by name, but she's from California --

22          THE COURT:  Yeah.

23          MR. FRANK:  -- California.

24          THE COURT:  What do you want me to do?

25          MR. FRANK:  I'm happy if you would ask if anyone

1    knows her.  I --

2            MR. RIDGE:  I don't have any objection to that, Your

3    Honor.  I guess my question is whether it's even necessary to

4    do that.

5            THE COURT:  Whatever you --

6            MR. RIDGE:  I don't think it is.

7            MR. FRANK:  I don't know that it is, Your Honor.  I

8    -- I don't object, and it couldn't hurt, it seems to me.

9            THE COURT:  Well, somebody --

10           MR. FRANK:  Well, it's always hard to anticipate.

11           THE COURT:  Right.  Well, if you're asking for it,

12   I'll do it.  If you didn't ask for it, I don't think I would.

13   I just wanted to be -- make certain that counsel were aware of

14   it.

15           MR. RIDGE:  I am.

16           MR. FRANK:  I'm not asking, Your Honor.

17           THE COURT:  Okay.

18           MR. RIDGE:  Your Honor, could I ask -- raise one

19   more issue now that we're here?

20           THE COURT:  Sure.

21           MR. RIDGE:  I didn't want to come back over here.

22   I'm presuming that your ruling about the other evidence

23   involving the Wolfes is going to be consistent with your

24   additional rulings.

25           THE COURT:  Yes.

1          MR. RIDGE:  And yesterday we talked about getting a

2   definitive ruling so that I don't keep jumping up and being

3   overruled and I don't want to interrupt the trial.  I don't

4   want to be in that position.

5          THE COURT:  Right.  The only -- the only thing I

6   would ask is I'm not sure I'm going to know exactly when I

7   should give a cautionary limiting instruction, and I will give

8   it on your request.  If I -- if other evidence comes in or

9   evidence of other wrongs comes in, I'll give it at your

10  request.  I may do it sua sponte, but if I don't do it and you

11  don't ask me to do --

12         MR. RIDGE:  Right, exactly.

13         THE COURT:  -- then it won't be done.

14         MR. RIDGE:  Right.

15         THE COURT:  So I'll either do it sua sponte, or I'll

16  ask you to alert me that you would like it done.

17         MR. RIDGE:  All right.  Thank you.

18         THE COURT:  All right?  Thank you.

19         MR. FRANK:  Thank you.

20      (End of discussion at sidebar.)

21         THE COURT:  Would you swear the witness, please.

22         THE CLERK:  Please raise your right hand.  Do you

23  solemnly swear that the testimony you shall give in the matter

24  now in hearing shall be the truth, the whole truth, and

25  nothing but the truth, so help you God?

1              THE WITNESS:  I will.

2              THE CLERK:  Please be seated.

3              THE WITNESS:  Thank you.

4              THE CLERK:  Please state your name and spell your

5    first name and your last name.

6              THE WITNESS:  Sarah Rodriguez, S-a-r-a-h

7    R-o-d-r-i-g-u-e-z.

8              MR. FRANK:  Thank you, Your Honor.

9    SARAH RODRIGUEZ, having been duly sworn, was examined and

10   testified as follows:

11                         DIRECT EXAMINATION

12   BY MR. FRANK:

13   Q    Ms. Rodriguez, how are you employed?

14   A    I work for Google, Inc.

15   Q    What is Google, Inc.?

16   A    Google is an Internet services company.

17   Q    What sort of services does it provide?

18   A    We provide free e-mail services, like Gmail, and as well

19   as search through Google Search.

20   Q    All right.  And others besides?

21   A    That's correct.

22   Q    And when you say Internet, this may seem obvious, but

23   what -- what do you mean by Internet?

24   A    Basically, you know, computers are connected all over

25   the world through the Internet, and we provide those services

1    that users can access online.

2    Q     And is the -- it fair to describe the Internet as a

3    network of computers that are linked by wires and wireless

4    signals?

5    A     I believe so, yes.

6    Q     Okay.  And what -- how long have you worked there?

7    A     I've worked at Google for five years.

8    Q     And what do your job responsibilities entail?

9    A     As a custodian of records for Google, I respond to law

10   enforcement requests for user data.

11   Q     And what kind of data are we talking about?

12   A     We're talking about content within a user's e-mail

13   account, potentially their search history, files contained

14   within their Drive, Google Drive, things like that.

15   Q     What's a Google Drive?

16   A     Google Drive's an online storage system, and it can

17   store files that a user creates or files that a user uploads.

18   Q     And where is that sort of file stored?

19   A     Online.

20   Q     On -- online?

21   A     That's correct.

22   Q     Okay.  At -- at computers hosted by Google?

23   A     Yes.

24   Q     Does Google also have a blogging service?

25   A     We do.

1    Q      What -- what -- what do we mean by a blogging service?

2    A      So we have a service called Blogger, and it allows users

3    to basically provide e-mail -- or provide content -- create

4    content to distribute to readers.  It's a weblog.

5    Q      What is a weblog?

6    A      It's sort of like an online journal.  A user can create

7    any sort of editorial content, be able to edit it, and post it

8    online for other individuals to read.  In some cases, an

9    individual could edit and repost that -- that same content, as

10   well.

11   Q      So is there different levels of -- of Blogger service,

12   some higher than others?

13   A      It's basically access levels, so the service would

14   pretty much be the same, but users can access the content in

15   different ways.

16   Q      All right.  And I'm not sure it's clear yet.  So, I

17   mean, what different ways?  Have you already described -- do

18   some -- do some users of Blogger have greater access and

19   authority with respect to blogs than others?

20   A      That's correct.

21   Q      All right.  And what's the difference in their level of

22   access or authority?

23   A      So if you're a Blogger administrator, you can have, you

24   know, a wide variety of access levels, both to edit the

25   content, as well as to edit settings about the blog.

1    If you're just a reader, then you may not have that high

2  level of access to be able to even edit content or settings

3  within the blog, but you would be able to actually access the

4  content of the blog --

5  Q    I see.

6  A    -- and -- and review it and read it.

7  Q    Okay.  So you've described two levels, right,

8  administrator and reader?

9  A    Hm-hmm.

10  Q    Can a reader add or post to a blog?

11  A    A reader may be able to do so if the administrator

12  allows that setting, enables that setting within their

13  specific blog.  There are, you know, private and public blogs,

14  and so the administrator determines the level of access that

15  readers, you know, can access within each of their blogs.

16  Q    All right.  Now, as part of Blogger, does Google also

17  host blogs?

18  A    That is the service, yes, that's the primary function of

19  the service.

20  Q    Okay.  But that's -- you haven't talked about that yet,

21  right?  So far, we've talked about administrators and -- and

22  -- and readers, right?  I mean, what -- what are -- what do

23  you mean when you say that Google hosts blogs?

24  A    So that's where the administrator can actually create

25  content to post onto their blog.

1   Q     Okay.  And where would that blog be kept or -- or --

2   A     All of the Blogger service information would be

3   accessible through the Internet, online.

4   Q     Okay.  That's how it's accessible.  But where -- is it

5   kept on Google computers?

6   A     That is correct.

7   Q     All right.  And -- and when we use the term host, that's

8   what it means to host a blog, right, doesn't it?

9   A     Google is a subdo -- sorry -- Blogger is a subdomain of

10  Google.  So, yes, so Google allows for -- hosts that content

11  to be displayed and -- and accessible throughout the Internet.

12  Q     Okay.  And just -- I don't mean -- I'm not trying to be

13  difficult.  I just want to make sure the record is clear in

14  this regard.

15  A     Hm-hmm.

16  Q     These are on Google computers, right --

17  A     Google servers.

18  Q     -- around the world?

19  A     That's correct, Google servers.

20  Q     And they can be accessed through the Internet --

21  A     That's correct.

22  Q     -- these blogs?

23        And is there a particular place or a domain or URL that

24  these blogs -- that these blog or blogs hosted by Google

25  reside?

1   A     So blogspot.com is the, you know, higher-level domain,

2   but there may be specific domains within a region or a

3   country.

4   Q     And how about according to topics?

5   A     And, yes, in -- in some cases, an administrator may be

6   able to have what we consider a vanity URL, so it may not

7   actually say blogspot within the URL, they can create their

8   own and have it, you know, redirect to our actual back-end

9   service of Blogger.

10  Q     Okay.  If I understand you correctly, so there -- there

11  are subdomains for different geographic locations, correct?

12  A     That's correct.

13  Q     And how are they designated?

14  A     Generally by a signifier for the country code.

15  Q     And -- and can you give us an example?  I mean, what

16  would UK be a -- a signifier for?

17  A     It would be for the United Kingdom, so like a

18  blogspot.co.uk would be a general domain within that country.

19  Q     All right.  And then within that general domain there

20  might be blogs devoted to specific substantive topics of

21  discussion; fair to say?

22  A     That's fair, yes.

23  Q     And then those might also be identified in the -- the --

24  the domain name, the location?

25  A     Right, if -- if the administrator signifies that within

1  their -- their URL, then that -- that is an option, yes.

2  Q     All right.  And does Google keep records of these type

3  of services that they provide?  You're records custodian.

4  Does it keep records of things like Gmail service and Blogger

5  service and --

6  A     That's correct.

7  Q     And what sort of records does it keep?

8  A     We retain registration information for each subscriber.

9  We also retain e-mail content that's stored on our servers and

10 accessible; as we described before, Drive content files that

11 are stored within Drive, things like that.

12 Q     What do you mean by registration information?

13 A     So when a user signs up for a Google account, they are

14 required to provide certain pieces of data.  For a standard

15 e-mail account, they may be required to provide a username,

16 password to access that account, things like that.

17 Q     Does Google make any effort to identify who these people

18 are in reality or verify that identification?

19 A     When an account's created, we -- we don't make an effort

20 to verify the individual's identity.

21 Q     So you just rely on whatever it is they tell you about

22 themselves.

23 A     That's correct.

24 Q     How about -- how about the -- the Gmail accounts, what

25 sort of stuff gets kept in -- in those account records?

1   A     So we would have, you know, correspondence, e-mails that

2   a user sent or received, and that information is -- is

3   retained indefinitely unless the user takes an action on their

4   account to -- makes an effort to delete that information.

5   Q     What happens if a Google e-mail user deletes an e-mail

6   from their account, what happens to it?

7   A     So that e-mail would go to their trash folder, and

8   depending on the user's settings or the actions that they may

9   take within their account, that trash folder is retained for

10  -- you know, anywhere from 30 to 60 days, at which time we --

11  Google may still have access to that deleted information.

12  However, once it's completely removed from their trash folder,

13  we would then no longer have access to that data.

14  Q     And, again, it may seem obvious, but Gmail is a form of

15  e-mail, correct, it's Google's brand name of e-mail; is that

16  right?

17  A     That's correct.

18  Q     And what is e-mail?

19  A     So electronic mail, electronic correspondence.

20  Q     That's sent over the Internet which you previously

21  described?

22  A     That's correct.

23  Q     How about -- how about these Blogger blog sites,

24  Google-hosted blog sites, blogspot, blog sites, what sort of

25  records does Google keep of them?

1   A      Google maintains similar information, so registration

2   information for the administrator that created the blog.  We

3   may have information about a user's interaction with that blog

4   even if they're not an administrator.

5   Q      And how about the content on the blog, like the content

6   in an e-mail account, do you also keep records of that?

7   A      It -- it's -- that's correct.  It's similar retention

8   period for Blogger information, but if a user takes action on

9   that after a certain period of time, Google would no longer

10  have access to that if -- if it's deleted.

11  Q      All right.  So if a blog is deleted or taken down,

12  eventually it -- it disappears from Google's records, as well?

13  A      The content -- the content of the blog.  The

14  registration information we may have access to for a longer

15  period of time, but the actual content of that blog, if it's

16  deleted, would be subject to complete purge from our system.

17  Q      All right.  And -- and these records that you've

18  generally described, is it fair to say that these are records

19  that Google makes in the ordinary course of its business?

20  A      Yes, that's correct.

21  Q      I mean, based on information in its possession, they're

22  individuals or electronically?

23  A      That's correct.

24  Q      And -- and keeps in the regular course of its business?

25  A      Yes.

1   Q      All as part of its business?

2   A      That's correct.

3   Q      Let me show you what's been marked as Exhibit 12 for

4   identification.

5              MR. FRANK:  And, actually, again, Your Honor, this

6   is a certified business record.  I move it into evidence --

7   the record -- if I may.

8              THE COURT:  Any objection to 12?

9              MR. RIDGE:  No, Your Honor.

10             THE COURT:  12 is admitted.

11  BY MR. FRANK:

12  Q      And, Ms. Rodriguez, would you take a look at that and

13  tell us if you recognize it, please?

14  A      Yes.

15  Q      What is 12 in evidence?

16  A      So the first pages are certificate -- Google certificate

17  of authenticity, which we provide with any production

18  materials that we provide to law enforcement in response to

19  legal process, and the following pages appear to be two

20  subscriber records for two different Gmail accounts.

21  Q      And what two Gmail accounts is that?

22  A      So the first is skiptin, s-k-i-p-t-i-n, @gmail.com, and

23  the second is andrewdenton35@gmail.com,

24  a-n-d-r-e-w-d-e-n-t-o-n-3-5, @gmail.

25  Q      Okay.

1          MR. FRANK:  And I request permission to publish

2    Exhibit 12.  Is it coming up?  Ah, okay, all right.

3    BY MR. FRANK:

4    Q     So what is this that we're looking at here?  This is the

5    first page of the exhibit.  You've previously described this?

6    A     That's correct.  This is the certificate of authenticity

7    that Google provides with production records.

8    Q     Okay.  And then if we scroll to the second page of this

9    exhibit, let's stop there at the top, can you -- and I'm going

10   to circle this, and, Ms. Rodriguez, if it would be helpful as

11   you testify, you can -- you can highlight items just by

12   touching the screen with your finger -- but what is this

13   information here at the top under the heading Google

14   subscriber information?

15   A     So this is information both that the user may have

16   provided when they registered for the account, as well as

17   service registration information and information related to

18   the account that Google has stored in its system.

19   Q     All right.  So let's take the first line there -- name,

20   colon.  What is -- what is that name?

21   A     So the name is what the user provides when they register

22   for an account or at some point thereafter, and that's edited

23   by the user.

24   Q     All right.  And in this case, that's Skip Martin,

25   correct?

1   A      That's correct.

2   Q      And, again, you've previously testified that you -- you

3   -- Google doesn't make an effort to confirm that identity,

4   right?

5   A      That's correct.

6   Q      How about the next line, e-mail, colon, what is that?

7   A      So that's the actual unique username that the user

8   selected when they created their account.

9   Q      All right.  And -- and so that would be the account they

10  use to e-mail other people and receive e-mail?

11  A      That's correct.

12  Q      All right.  And where their e-mail would be kept if they

13  didn't delete it; is that fair to say?

14  A      That's fair.

15  Q      All right.  And then the third line, services, colon,

16  what are -- what -- what does Google mean by services here?

17  A      So these are -- this is a list of services that the user

18  enabled and either accessed or -- or signed up for through use

19  of their account.

20  Q      All right.  And there are a number listed here, correct?

21  A      That's correct.

22  Q      All right.  More than you've previously described,

23  correct?

24  A      Correct.

25  Q      All right.  But I think the one we're most interested in

1   is the first one, Blogger, which I've circled there, correct?

2   A    Hm-hmm.

3   Q    What does that signify that amongst the services that

4   this user signed up for was Blogger?

5   A    Correct, so the user has had some access or -- or use of

6   the Blogger service.

7   Q    Can you tell what level of access, whether

8   administrative or reader?

9   A    No, not from this record.

10  Q    All right.  But there would be other records that would

11  indicate that?

12  A    There should be, yes.

13  Q    All right.  At a minimum, what does it indicate?

14  A    At a very minimum, it indicates that the user has had

15  some access to or use of Blogger.

16  Q    All right.  As a reader?

17  A    It's possible, yes.

18  Q    All right.  Why do you say possible?  I mean, is there

19  some lower level of access?

20  A    No, but there could be an additional level of access.

21  They could be an administrator and not just a reader.

22  Q    All right.  So at the very least, they would be a

23  reader?

24  A    Yes.

25  Q    Okay.  And then how about this line created on that I've

1    indicated with an arrow, what -- what -- what does that mean?

2    A     So that corresponds to either the creation date of the

3    account or the -- when the user actually accepted Google's

4    terms of service.  Those two dates are generally the same, but

5    in some cases, they may not be.

6    Q     All right.  And is that the earliest date that the user

7    could have made use of these services; is that a fair

8    interpretation of that, or not?

9    A     For the most part, that would be the case, yes, and

10   depending on when the user created the account, we didn't

11   force them to accept the terms of service prior to their use

12   of -- of their e-mail account, so that's why there -- there

13   could be some delay in some -- in some accounts, but this

14   account would be generally when -- when the user accepted

15   those terms of services.

16   Q     And do you allow users to use your services before

17   they've accepted your terms of service?

18   A     There's a way for them to create an account.  The use of

19   the service would come thereafter.  So they may initiate the

20   creation process without requiring the terms of service

21   acceptance, so the account could be created and then the terms

22   of service accepted at some point thereafter.

23   Q     But it's only after the terms of service are accepted

24   that they can use it; is that the case?

25   A     Generally, yes.

1    Q      Okay.  How about the next line?

2    A      The IP?

3    Q      Yes.

4    A      So that is the IP address that Google captured at the

5    time of the terms of service acceptance --

6    Q      All right.

7    A      -- or the creation date.

8    Q      And how about the information in table form beneath

9    that, what is that?

10   A      So this is a list of IP addresses and time stamps that

11   are associated with log in or log out activity for this

12   account.

13   Q      In reverse chronological order?

14   A      That's correct.

15   Q      What's an IP address?

16   A      So an IP address is a unique identifier that's assigned

17   to a computer, and usually it's -- it's something that's

18   assigned by the service -- the Internet service provider.

19   Q      Okay.  Ms. Rodriguez, one of the services on the skiptin

20   account is Drive sync invite.  Are you familiar with that?

21   A      In a limited way, yes.

22   Q      What is Drive sync invite?

23   A      So when Google was launching our storage service known

24   as Drive, we invited users to start using that service and

25   provided them with a, you know, sort of enhanced free -- free

1   gigabytes in order to drive people to actually use the

2   service.

3   Q     So this is -- this is part of that -- that Google Drive

4   service?

5   A     Yes, it would -- it would be.

6   Q     Okay.  Let me show you what's been marked as Exhibit 15

7   for identification.  Could you take a look at that and tell us

8   if you recognize it, please?

9   A     Yes.

10  Q     What is 15 for identification?

11  A     This is a copy of the production materials that Google

12  produced in response to a search warrant.

13  Q     Okay.  And let me show you what's been marked as

14  Exhibit 13 for identification.  What is Exhibit 13 for

15  identification, if you know?

16  A     This looks to be a copy of the search warrant related to

17  these production materials --

18  Q     Okay.

19  A     -- on the CD.

20  Q     And what was -- what was produced on that disc, what

21  materials were produced?

22  A     We have e-mail contacts, calendar information, as well

23  as subscriber information.

24  Q     All right.  For what accounts?

25  A     For the two accounts -- skiptin@gmail.com and

1   andrewdenton35@gmail.com.

2   Q     And -- all right.  And how do you know that?  Have you

3   looked at that disc and confirmed that recently?

4   A     Yes, I reviewed the disc yesterday.

5   Q     All right.  But besides that, let me show you

6   Government's Exhibit 14 for identification, ask you to take a

7   look at that, tell us if you recognize it, please.

8   A     Yes, this is the production letter, certificate of

9   authenticity, and hash value attachment that corresponds to

10  the production CD.

11  Q     All right.  So all of these go together -- the search

12  warrant return, the disc of material, and the letter

13  certifying --

14  A     That is correct.

15  Q     -- the disc of material?

16  A     That is correct.

17  Q     And when you say hashtag value, what is that?

18  A     So when Google produces any records, we assign a hash

19  value -- it's a unique identifier -- to each individual file

20  that we produce, so that we can reauthenticate those files

21  should we have to testify to them at a later date.

22  Q     It's a -- is it fair to describe that as a type of

23  guarantee of their authenticity?

24  A     That's correct.  If those hash values match, we can

25  confirm that the files on the CD were unaltered from the

1    original files Google produced.

2    Q    All right.

3         MR. FRANK:  And I'd move Exhibit 12 -- what is it --

4    13, 14, and 15 into evidence.

5         THE COURT:  I think 13 and 15.

6         MR. FRANK:  I think I also -- did I have her

7    identify the --

8    BY MR. FRANK:

9    Q    You identified the certificate, 14, as well, did you

10   not?

11   A    That -- that's correct.

12        THE COURT:  All right.

13        MR. FRANK:  Yeah, so I -- I'd move all three if I

14   could, please.

15        THE COURT:  Any objection?

16        MR. RIDGE:  Your Honor, the only potential objection

17   is to No. 15, which I believe contains information similar to

18   the information that I objected to earlier.

19        THE COURT:  Okay.  I'm going to have to see counsel

20   at sidebar to figure that out.

21      (At sidebar on the record.)

22        THE COURT:  So the description here is skiptin@gmail

23   and also andrewdenton35 accounts?

24        MR. FRANK:  Yes, Your Honor.

25        THE COURT:  And skiptin at e-mail (sic) is what?

1          MR. FRANK:  What is in there?  The contents of his

2    Gmail account is on that disc and that was analyzed by

3    Inspector Taylor and --

4          THE COURT:  Okay.  I don't need all that detail.  So

5    why isn't that -- what -- what is it towards?

6          MR. RIDGE:  If it's limited to Denton -- I guess I

7    was perhaps confused as to the content of that disc.  I

8    thought it was a broader examination of the skiptin account

9    because the skiptin account has many reach-outs to folks

10   beyond --

11         THE COURT:  You don't need to whisper because they

12   have the white noise over there.

13         MR. RIDGE:  Oh, okay.

14         THE COURT:  Yeah.

15         MR. RIDGE:  All right.  It's not limited -- his

16   account is not limited to correspondence with Denton.  If this

17   exhibit is limited to Denton only --

18         MR. FRANK:  No, it's not.

19         MR. RIDGE:  Okay.  All right.

20         MR. FRANK:  This exhibit is the contents of both

21   those Gmail accounts.  What Google was able to find on their

22   system when the search warrant was executed in May of 2013,

23   and as I understand it, it's everything that was in there in

24   both those Gmail accounts.

25         Now, none of that is readable without a computer and the

1    Thunderbird application, but it is the raw data from which

2    Inspector Taylor prepared the table which is Exhibit 16.  What

3    he did was he searched the contents of the skiptin account for

4    -- with the keyword cyanide for instances of e-mail which in

5    some way referenced cyanide.  That's what I'm working toward

6    here.

7                THE COURT:  Right, but just focus.  So the -- the

8    issue here is, as I understand it, whether you get into

9    evidence e-mails, even though Denton sent them or received

10   them, that relate to -- I don't mean Denton -- I mean, even

11   though your client -- is it -- is it Denton that --

12               MR. RIDGE:  No.

13               THE COURT:  Are we talking Denton here, or are we

14   talking about Kilmartin?

15               MR. RIDGE:  We're talking skiptin -- talking the

16   skiptin account, which is Kilmartin.

17               THE COURT:  And skiptin is Kilmartin.

18               MR. RIDGE:  Right.

19               THE COURT:  So let me -- let me be -- see if I can

20   get it then.  The question here is, do these exhibits reflect

21   other acts as we've already described that, or is this simply

22   correspondence between Denton and the defendant?

23               MR. FRANK:  It is more than correspondence --

24               MR. RIDGE:  Right.

25               MR. FRANK:  -- than between Denton and the

1    defendant.  In fact, there is little correspondence from

2    Denton and the defendant because most of that correspondence

3    was erased from these records.

4        What there is in the skiptin account is e-mails from

5    other persons, some of them charged, like Walter Cottle, some

6    of them mentioned, like Donalee Wolfe, and others around the

7    world, e-mailing skiptin in search of cyanide.

8                THE COURT:  Okay.  So the instruction on character

9    evidence and other crimes would be appropriate for these --

10               MR. RIDGE:  I think it would be.

11               THE COURT:  -- exhibits, correct?

12               MR. RIDGE:  I think it would be, yes.

13               THE COURT:  Okay.  And how should I -- I don't know

14   what the exhibit actually contains.  How should I frame it in

15   terms of describing what the information is that has a limited

16   purpose?  What do you suggest?

17               MR. FRANK:  Can I make a suggestion here?  Because

18   this raw data, nobody's ever going to see this because it's

19   not readable in the format.  I just understood that in order

20   to lay the basis for the summary, Exhibit 16, I needed to put

21   into evidence the raw material from which it was constructed.

22   But 16 is really relatively accessible.  I mean, it's -- it's

23   narrative e-mails between e-mailers, correspondence, and

24   Kilmartin discussing, you know, how much do I need, how much

25   to pay for it, how does it work, that type of thing, so that

1    might be the point at which the instruction would make the

2    most sense, Your Honor, if I may suggest.

3              THE COURT:   What do you want me to do?

4              MR. RIDGE:   Well, 16 is the product of the one

5    that's unreadable.

6              THE COURT:   Right.

7              MR. RIDGE:   And I think at the time 16 is offered,

8    you can make a general instruction that covers the source of

9    the information for 16, as well.

10             THE COURT:   Okay.

11             MR. RIDGE:   I think that would work.

12             THE COURT:   Very good.   Okay.

13             MR. FRANK:   Your Honor, can I just say?   I mean,

14   that disc also contains the contents of the Andrew Denton

15   account.   I just -- there's nothing in there that I'm -- I'm

16   expecting to use.   What I -- what I was interested in is the

17   contents of the skiptin account.

18             MR. RIDGE:   Right.

19             MR. FRANK:   Just so you know what's -- what's there.

20             THE COURT:   All right.

21        (End of discussion at sidebar.)

22             THE COURT:   13, 14, and 15 are each admitted.

23   BY MR. FRANK:

24   Q    All right.   And, Ms. Rodriguez, correct me if I'm wrong,

25   but that -- that disc, No. 15, represents the contents of the

1   skiptin@gmail account and the andrewdenton35 Gmail account as

2   of the time that Google searched its records and produced them

3   in response to the subpoena, correct?

4   A    To the search warrant, that's correct.

5   Q    I'm sorry.  Did I say subpoena?  I misspoke.

6        And when was that?  Do you remember, or can you tell?

7   A    Yeah, so our production letters have the date of the

8   issuance, as well as the date of our response.  So the search

9   warrant was issued in May of 2013.  Our response was made in

10  June of 2014 -- or -- sorry -- 2013.

11  Q    And would -- and, therefore, it wouldn't have contained

12  any e-mail after June, right?

13  A    That's correct.

14  Q    It would have all been -- all been prior, to the extent

15  that it was still on your -- your servers, your computers,

16  correct?

17  A    That's correct.

18            MR. FRANK:  The court's indulgence, Your Honor?

19            THE COURT:  Yes.

20            MR. FRANK:  Your Honor, if I may?  I have one

21  further question.

22  BY MR. FRANK:

23  Q    And if I may, Ms. Rodriguez, this -- this entry here on

24  the Google subscriber information for the name Skip Martin,

25  it's the last line opposite SMS, colon, what is that number?

1  A      So that is a -- usually a telephone number, a cell phone

2  number that the user can provide.  In some circumstances, that

3  number can be used to recover their account if they get locked

4  out, if they forget their password.

5  Q    All right.  Presumably, though, that's their phone

6  number that they're providing there?

7  A      Correct, but that's not information we verify unless

8  they sign up for a recovery service.

9  Q    All right.  Again, none of this is -- is verified,

10  correct --

11  A    That's correct.

12  Q    -- that comes from the user?

13              MR. FRANK:  I have no further questions for this

14  witness, Your Honor.

15              THE COURT:  Mr. Ridge?

16              MR. RIDGE:  Your Honor, I have no questions for this

17  witness.

18              THE COURT:  Okay.  Thank you, ma'am.  You may stand

19  down.

20              THE WITNESS:  Thank you.

21        (The witness left the witness stand.)

22              THE COURT:  Next witness?

23              MR. FRANK:  Yes, Your Honor.  The government calls

24  Leon Armstrong.  And, Your Honor, this witness is being taken

25  out of order because he has commitments.

1          THE CLERK:  Please raise your right hand.  Do you

2   affirm that the testimony you shall give in the matter now in

3   hearing shall be the truth, the whole truth, and nothing but

4   the truth, and that you do this under the pains and penalties

5   of perjury?

6          THE WITNESS:  Yes, I do.

7          THE CLERK:  Please be seated.  Please state your

8   name and spell your last name for the record.

9          THE WITNESS:  Full name is Leon Stace Armstrong, and

10  the spelling of Armstrong is A-r-m-s-t-r-o-n-g.

11         THE COURT:  Could you pull yourself up to the

12  microphone, sir, so we can all hear you?

13         THE WITNESS:  Certainly.

14         THE COURT:  Thank you.

15  LEON ARMSTRONG, having been duly sworn, was examined and

16  testified as follows:

17                    DIRECT EXAMINATION

18  BY MR. FRANK:

19  Q    Good afternoon -- well, I guess it's still morning.

20  Good morning, Mr. Armstrong.

21  A    Yeah, good morning -- afternoon.

22  Q    It may be afternoon for you, I suppose.  Mr. Armstrong,

23  where are you from?

24  A    From Leeds, West Yorkshire, England.

25  Q    Okay.  And how long have you lived in Leeds?

1    A      All my life, 45 years.

2    Q      And what do you do -- that's in the United Kingdom, is

3    it not?

4    A      It is, yeah.

5    Q      Okay.  And what do you do in -- in Leeds for work?

6    A      For work, I'm a digital investigator for North East

7    Counter Terrorism Unit, the Hull's force, being West Yorkshire

8    police.

9    Q      Okay.  And what does the North East Counter Terrorism

10   Unit do?

11   A      The Counter Terrorism Unit on the whole, obviously,

12   investigates any cases to do with terrorism.  The digital

13   investigations unit that I work for, we do work for seven

14   local forces, so this can be counterterrorism jobs or what we

15   call divisional jobs, which is like a local force job, we

16   examine those, as well.

17   Q      So can you give us an example of what a divisional job

18   would be as opposed to a counterterrorism job?

19   A      Ah, probably the easiest example would be to do with

20   child abuse images.  So, occasionally, we do child abuse

21   images jobs.

22   Q      Is it fair to describe the division job as sort of work

23   on a common crime as opposed to a terrorist incident?

24   A      Yeah, that'd be correct, yeah.

25   Q      Okay.  And you mentioned that you work with seven local

ARMSTRONG - DIRECT EXAMINATION/FRANK

1  forces in your -- in your regional unit?

2  A    Uh-huh, correct.

3  Q    What are those seven local forces?

4  A    You've got West Yorkshire, South Yorkshire, Humberside,

5  Northumbria, Northumberland -- sorry, is that six?  I'm

6  struggling to remember every single one, but --

7  Q    You're operating on little sleep, aren't you?

8  A    I am, sir, yes.  It's --

9  Q    When did you arrive?

10  A    Sunday evening around about half past 11:00.

11  Q    And -- and you flew from -- from --

12  A    From Manchester in England.

13  Q    How long did it take you?

14  A    22 hours.

15  Q    And you -- you actually arrived in Maine when?

16  A    Arrived in Maine around half 10:00 and then got to the

17  hotel and checked in about 11:30.

18  Q    And was that last night?

19  A    No, sorry, that was Sunday.

20  Q    Sunday.  Okay.  All right.  So you're -- is it fair to

21  say that you're a bit jet-lagged?

22  A    Slightly, yeah.

23  Q    Okay.

24  A    About seven hours sleep in two days, I think, so --

25  Q    All right.  And I understand you have a commitment that

1   you have to leave later today to get back to?

2   A    Correct, yeah.

3   Q    Okay.  And one of the seven local forces that you

4   identified was Humberside, correct?

5   A    Correct, yeah.

6   Q    And how does the Humberside force relate to the city of

7   Hull?

8   A    It's the -- what we'd call -- probably call the local

9   police force, where you'd have the Bangor police in the -- as

10  the local force for Hull.

11  Q    So Humberside is the force for Hull?

12  A    Humberside would cover all the different like districts

13  in Hull, if you like, so Hull, Beverley, and, you know, the

14  local town centers.

15  Q    All right.

16  A    If you -- if you like, probably best comparison I could

17  make is Humberside would be a state, and Hull would be a town

18  within that state, like Bangor.

19  Q    All right.  And as part of your duties as a digital

20  investigator with the Counter Terrorism Unit for the northeast

21  region, you provide services to Humberside.

22  A    Correct, yeah.

23  Q    Would that be correct?

24  A    Yeah.

25  Q    And services with respect to -- did you call them

1    divisional --

2    A     The divisional is sort of the term we would use, yeah,

3    for local forces.

4    Q     For local crime?

5    A     Yeah.

6    Q     Okay.  All right.  How about your duties as a digital

7    investigator, I mean, what -- what -- what do you do as a

8    digital investigator?

9    A     It's quite varied really.  Um, any, ah, job that comes

10   in that requires examination of digital media, so computers

11   and computer towers, laptops, mobile phones, USB sticks, so

12   any kind of digital storage comes to us for examination.

13   Q     And what do you do with those digital devices?

14   A     Um, depends on the job.  We would normally get what we

15   call a task in, so we have a sort of brief on the job -- what

16   it entails, what we're looking for, and -- and then we sort of

17   tailor the examination to suit that.

18   Q     And who would give you that brief or those instructions

19   for what -- what sort of investigation to do?

20   A     That would be the senior investigating officer for that

21   job.

22   Q     And when you say job, you mean a case or --

23   A     For the case, yeah.

24   Q     -- investigation?

25         All right.  And -- and what type of things might you do?

1    Let's take a hypothetical laptop computer that is the --

2    involved in some sort of investigation.  What would you do as

3    a digital investigator?

4    A      Okay.  Generally, a laptop, obviously, the storage would

5    be the hard drive, so we'd be focusing on the hard drive.

6           And the exhibit would come in bagged and sealed.  We'd

7    take photographs throughout the examination.  Take the laptop

8    out of the bag, photograph the laptop, remove the hard drive,

9    create what we call a forensic image, which is a -- a digital

10   copy of the hard drive, and we work on the copy rather than

11   the original.

12   Q      Why do you do that?

13   A      Um, we work under a set of guidelines called the ACPO

14   principles, and the initial principle of ACPO is that we don't

15   change the original data, so --

16   Q      So you leave that alone as you --

17   A      Yeah.

18   Q      -- as you found it?

19   A      Uh-huh, correct.

20   Q      And you work on a copy?

21   A      We work on a copy.

22   Q      Okay.  And what sort of work do you perform on that

23   copy?

24   A      Again, it depends on what the senior officer is looking

25   for in the job.  It can range from just exporting out

1   documents, images, any sort of media, to looking for e-mails

2   or, you know -- as I say, it depends what the senior officer

3   is actually looking for.

4   Q    So you're -- you're mostly taking direction from a

5   senior officer about what to look for; is that fair to say?

6   A    Yeah, and, again, going back to the ACPO principles, the

7   principle is that the senior officer is always in charge of

8   the investigation, so, you know, anything that we do shall be

9   directed by the senior officer.

10  Q    Okay.  And what do you do with the work -- or what do

11  you produce?  What's your product?  You get -- you get a

12  device, a hard drive.  You perform work at instruction of the

13  senior officer.  What's the end result?

14  A    The end result, we create what we call digital exhibits,

15  so -- sorry.  I thought you were going to ask me another

16  question.

17       Yeah, we create a digital exhibit.  So in the case of

18  multimedia, we'd create a multimedia exhibit and that would

19  either go on a disc or some kind of digital media and be given

20  back to the senior officer for review.

21  Q    Let me stop you for a minute.  Can you give us an

22  example of what one of these exhibits would be?

23  A    Sorry.  Explain the question?

24  Q    Well, you talked about how you would create exhibits --

25  A    Uh-huh.

1    Q    -- as part of this -- this examination process, and I

2    was wondering if you could give us an example, just help the

3    jury understand.  What's -- what's an example of an exhibit

4    you might --

5    A    Okay.  So we may run a process that we call File

6    Extractor, so that would look for documents, images, movies,

7    and then we create the -- so it's like a copy, if you like, of

8    the original documents, and I think gives you all the like --

9    where -- the information about each individual file, so the

10   file path, where the file actually lives on the computer, and

11   times and dates for the files, things like that, so it gives

12   the -- the officer the file and all the relevant information

13   about the file we've given him.

14   Q    Okay.  And the file might be a text file or a picture

15   file?

16   A    It could be anything, let's say, from multimedia through

17   to e-mails, recovered Web pages, or -- yeah, it's -- it's

18   incredibly varied.

19   Q    Do you -- do you testify as a digital investigator over

20   there?

21   A    I do.  I've done it twice before.

22   Q    In what sort of situations or cases?

23   A    Um, child abuse images and what we call right-wing --

24   excuse me -- right-wing extremism, so animal rights case.

25   Q    Okay.  How long have you been doing this work?

1    A       Um, 2005-'6, so, yeah, nearly 11 years.

2    Q       Do you have special education and training to do it?

3    A       The stipulation for the job when I applied for the job

4    was formal degree or equivalent experience.  I've had five

5    years experience prior to that working for the West Yorkshire

6    Police IT Department, so that was deemed relevant experience.

7    Subsequently got the post that -- what was then the Forcita

8    (phonetic) Crime Unit, and -- and then took qualifications,

9    classes -- that were actually asked for to be taken through

10   ACPO.

11   Q       Okay.  As part of your duties as a digital investigator,

12   were you asked to conduct an examination of Andrew Denton's

13   laptop recovered from the scene of his -- his death in -- in

14   Hull in December of 2012?

15   A       Yes, I was.

16   Q       Can you describe for us what you did?

17   A       Um, from memory -- obviously, it's three and a half

18   years ago -- um, the process that I explained earlier, so the

19   laptop would come in.  I do recall it was -- it was what we

20   call biohazard, so it was double-bagged; it had biohazard tape

21   on it.  And there was notes on our electronic system to

22   receive authorization and -- prior to examining it due to the

23   biohazard and problem with that.  That was granted, I think,

24   by what we call DSTL, which is like the chemical section of

25   the Armed Forces, and so it was deemed okay to examine.

1      And so I would have performed the -- the regular sort of
2  examination on the laptop.  So take it out of the bag, take
3  photographs and contemporaneous notes as I do the examination,
4  so everything we do is -- is noted so that it can -- it'll
5  obviously be audited at a later date, and then, you know, the
6  occasion such as this where you're asked questions three years
7  later so you can actually recall what you've done.
8      And the hard drive was taken out, a forensic image was
9  made of that and worked on, and, again, from memory, I do
10  recall taking out all the -- the documents, multimedia and
11  producing it on electronic media and doing what we call some
12  keyword searches of the device, which were case-specific to
13  that actual job.
14  Q    What sort of keyword searches do you -- did you run?  Do
15  you remember?
16  A    Um, again, from -- from memory, I knew the job was to do
17  with cyanide, so my initial keyword was cyanide.  Excuse me.
18  On looking at the report and there were further keywords run
19  at a later date, and I can only surmise at this point that
20  that would have been a list given to me from the -- the
21  investigating officer, which I think included things like
22  murder and death and -- I can't recall.  I'd have to have a
23  look at my -- my report for that.
24      But there were certainly case-specific keywords.  The
25  initial one was cyanide because I knew it was a cyanide job,

1    and then there were extra keywords run.  I think there were

2    some PayPal keywords run and something to do with the actual

3    cost of the chemical that Mr. Denton had bought, so

4    210 pounds, I think that was a keyword that we run.  So it was

5    case-specific.

6    Q     Okay.  Do you remember what -- what you found?

7    A      Initially, I think the cyanide was -- was the main thing

8    that brought the results back.  What I found was, along with

9    the keywords were -- if I can just explain.  When we run a

10   keyword search, it runs over the whole computer, and -- and

11   then it brings us back a result, and then we can look at where

12   the keyword is on the computer and look at the data around it.

13        So around the cyanide keyword results, then you'd see

14   things like murder and death, and it also appears in the same

15   area, and you can look at what that piece of data could be, so

16   it might have the appearance of Internet code, so you can

17   start recovering Web pages.  And it might have the appearance

18   of a document, so that you can -- if it's a deleted document,

19   then you can recover that.

20   Q     Do you remember locating any Web pages in connection

21   with your searches?

22   A      Yes, there was one specific Web page that was recovered,

23   and it was from a blogsite called wantdeath.  There was a --

24   almost complete, what we call a cached Web page, and cached

25   being -- is when a user's looking at the Internet, the page is

1    brought down to the computer and stored on the computer so

2    that if that user then goes back at a later date to look at

3    that same page, it just speeds up the browsing because the --

4    the page is being loaded from the computer rather than the

5    Internet.   So there was a cached page for the

6    wantdeathblogspot on Mr. Denton's computer.   That file was

7    still live.

8         And then there were numerous other what we refer to as

9    fragments of files, so it was -- all the pieces of the same

10   Web page from the deleted area on the computer.

11   Q    Were you familiar with that blogsite?

12   A    Not personally, no.

13   Q    Did you do any investigating of it at the time back in

14   May of 2013?

15   A    Um, yes, I -- as part of our examination, if we do

16   recover any sort of Web pages, we generally go on the Internet

17   and we see if we can recover the -- there are certain sites on

18   the Internet that we can use that -- what we call archives, so

19   that you can look at a date near as possible to when that file

20   was created and try and get the page that resembles the same

21   page that was viewed.

22   Q    Were you able to do that?

23   A    I can't recall if I managed to get one from the same

24   date, but I know I visited the page on the actual day that I

25   looked at it online, so viewed the page and then used some

1   software that we have to actually capture the page.  I can't

2   recall the exact date that that was done.

3   Q     Did you make an exhibit of it?

4   A     Yes, I did.

5   Q     Is that -- what would you call that, a Web capture?

6   A     Um, yeah, I think it was, from memory, a Web capture of

7   wantdeathblogspot.

8   Q     Did you find any evidence in the Denton computer of the

9   skiptin@gmail.com e-mail address?

10  A     Yeah, from looking at the cached page that was stored on

11  Mr. Denton's computer, I didn't read every single piece of the

12  thread that was there, was just kind of looking down and the

13  e-mail addresses sort of jump out, and the one that jumped out

14  to me was skiptin, reason being because every time you kind of

15  saw skiptin on the -- on the thread of conversation, it was

16  regarding supplying of cyanide.

17        There were several e-mail addresses where people were

18  sort of discussing who was the most trustworthy, if you like,

19  person to actually supply the cyanide, and the individual

20  skiptin did actually keep stating, I think it was something

21  like I have industrial-grade cyanide, e-mail me at this

22  address, and it was the skiptin e-mail address.

23  Q     Okay.  And did you find -- did you find that inside the

24  Denton computer or on the -- the Weblog, the Web capture?

25  A     It was both.  It was on the -- the cached page from

1    Denton's computer and from the Web capture, as well.  It was

2    -- it was fairly comparable when you -- you pulled the two

3    files side by side.  They were almost -- when I say identical,

4    you could see the -- the same thread of conversation on both.

5    Q    Did you find any evidence inside the Denton computer

6    that Mr. Denton had obtained cyanide from anybody else?

7    A    I think the only thing that I found regarding actually

8    obtaining the cyanide were two, I think, off the top of my

9    head, Gmail read messages, and it was regarding -- the subject

10   was something like my order, and nothing that was -- from

11   memory, that was the only two things I found.

12   Q    And were those related to skiptin?

13   A    Sorry.  Say again?

14   Q    Were they related to skiptin?

15   A    Yeah, the sender address, as I recall, was skiptin.

16   Q    Okay.  Let me show you what's been marked as Exhibit 81

17   for identification, ask you to take a look at that, and tell

18   us if you recognize it, please.

19   A    Yes, it's a printed version of the Web capture I did.

20   Q    That you -- that you made as you've described?

21   A    The blog, yeah, correct.

22   Q    You went online and found the wantdeathblogspot Weblog?

23   A    Yeah, and located the page titled top 20 suicide methods

24   and the method of suicide cyanide.

25            MR. FRANK:  Your Honor, I'd move Exhibit 81 into

1    evidence.

2              THE COURT:  Any objection?

3              MR. RIDGE:  No, Your Honor.

4              THE COURT:  81's admitted.

5    BY MR. FRANK:

6    Q    Hold that with you for a moment.  This copy is -- is

7    somewhat difficult to read, is it not?

8    A    It is, and, unfortunately, because of my tiredness, it's

9    making it worse, as well, so --

10   Q    All right.  But -- but this is where you saw some of

11   these entries from skiptin that you've described?

12   A    Yeah, correct.

13             MR. FRANK:  I have no further questions for this

14   witness, Your Honor.

15             THE COURT:  Cross-examination.

16             MR. RIDGE:  Thank you, Your Honor.

17                       CROSS-EXAMINATION

18   BY MR. RIDGE:

19   Q    Good afternoon, Mr. Armstrong.

20   A    Good afternoon -- or morning.

21   Q    I -- my name is Marty Ridge, and I represent

22   Mr. Kilmartin in this case, and I don't have a lot of

23   questions for you, just a few, and I hope they're -- I hope

24   they make sense.  I'm not very conversant with much of what

25   you've spoken of.

1    Your examination of Mr. Denton's laptop was not
2    restricted to just trying to find skiptin and Mr. Denton
3    communication; is that right?
4    A    Um, I recall that the nature of the examination was to
5    attempt to find out where Mr. Denton had actually obtained the
6    chemicals from.
7    Q    Okay.  Who told you that he obtained chemicals from
8    Mr. Kilmartin?
9    A    That would have been the senior officer.  That would
10   have been the senior officer on -- on the electronic system
11   that we use for booking in.  When items are booked in, we do
12   put notes on there to say what the job is regarding and then
13   any sort of --
14   Q    Do you remember what the period of time was that you
15   were able to examine Mr. Denton's computer for?  When did it
16   begin?  When did it end?
17   A    I would have to see a copy of the contemporaneous notes.
18   I think it was a matter of weeks, but exact timing I can't say
19   from memory.
20   Q    Do you recall that you made an entry on your report that
21   indicated that on August 29th, 2012, after doing a keyword
22   search for cyanide, there were 56 hits, the majority on
23   August 29th, 2012?
24   A    A keyword hit for -- for which word?
25   Q    Cyanide.

1   A     On cyanide.  Again, not -- not off the top -- I'd have

2   to look at my case notes for that.

3   Q     Do you have those notes?

4   A     Not in front of me, no.

5   Q     Can you retrieve them so maybe they can help refresh

6   your recollection?

7   A     I did give them -- I was given a copy earlier on --

8   outside the courtroom, but I can't recall.  I'm sorry.  If

9   somebody could give me a copy of it, I --

10  Q     Why did you use the e-mail address skiptin?

11  A     For -- for what, sir?  I didn't --

12  Q     You were searching for skiptin within Mr. Denton's

13  laptop?

14  A     Okay.  I sort of explained earlier that initially I ran

15  a keyword search for cyanide, and -- and then around that

16  keyword you see other things appear.

17  Q     Hm-hmm.

18  A     So cyanide, death, etc., and start recovering the file.

19  And it's around that data and the place where

20  skiptin@gmail.com, I think was the address, that appeared

21  within that data.

22  Q     Okay.  Do you recall reading an e-mail to Mr. Denton

23  from December 24th of 2012 from somebody, not skiptin, writing

24  to him with available cyanide?

25  A     I don't recall that, no.

1    Q     You don't recall that.

2    A     No.

3    Q     Okay.

4          MR. RIDGE:  May I approach the witness, Your Honor?

5          THE COURT:  You may.

6          MR. FRANK:  Can I -- can I see the exhibit, Marty?

7    I just -- I just don't know which one you're -- you're

8    referring to.

9          MR. RIDGE:  Number 80.

10         MR. FRANK:  Okay.  Those are his notes.

11         MR. RIDGE:  That's why I was bringing them to him.

12         MR. FRANK:  Okay.

13   BY MR. RIDGE:

14   Q     Mr. Armstrong, as we were chatting, I have looked at --

15   I have looked at Exhibit No. 80.

16   A     Yeah.

17   Q     Are those -- those your notes?

18   A     Those -- yes, that's a printed copy of the

19   contemporaneous notes.

20   Q     Okay.  Let me ask you just to review this page and ask

21   whether that refreshes your recollection about the -- the date

22   where there were many -- you discovered many hits for the term

23   cyanide.

24   A     (Witness complying.)  Okay.  So 29th of April, carried

25   out keyword search for cyanide, 56 hits.

1    Q      Was that 56 hits on that day?

2    A      No, sorry, that's 56 -- right.  Yeah, so the search was

3    carried out on the 29th of the fourth for that keyword

4    cyanide, and there were 56 hits on files with a time around

5    29th of the eighth.

6    Q      Okay.  So that would -- the answer to my question of

7    whether or not there were a number of hits on August 29th of

8    2012 for the term cyanide would be yes?

9    A      Yeah, that'd be correct, yes.

10   Q      Okay.

11   A      The 29th of eighth was 56 hits, and those -- any files

12   relating to those 56 hits were then exported out to a report

13   to give to the senior officer.

14   Q      Okay.  So just so I'm clear, the search was done on

15   April 29th of 2013.

16   A      Yes.

17   Q      But the date that the numerous hits for cyanide showed

18   up was August 29th --

19   A      29th.

20   Q      -- 2012.

21   A      Yes.

22   Q      Thank you.

23   A      Okay.

24   Q      Your notes and exhibits do not reprint the content of

25   the e-mails between Mr. Denton and anybody else; is that fair

1    to say?

2    A    I'm sorry.  The notes that you've just given me there?

3    Q    This is all that you have?  And I don't mean -- this is

4    the product of your examination.

5    A    Right.  No, the -- I think there were seven electronic

6    exhibits produced and given to -- I think it was DC Precious

7    (phonetic) I think was the -- the officer that picked them up.

8    Q    Okay.  Were you constrained in terms of time for the --

9    for your search?  Were you requested to do only a certain

10   period of time to examine Mr. Denton's computer, or was that a

11   -- a wide range of search?

12   A    Not that I recall that there was any sort of time

13   constraints put on the -- the area to look for, and it was

14   more a case, from memory, as I say, that the senior officer

15   wanted to know -- the purpose of the examination was to try

16   and find out where and -- and how -- how much Mr. Denton had

17   paid for the cyanide.

18   Q    Okay.  Would you agree with me that there were other

19   individuals identified in Mr. Denton's computer besides

20   skiptin?

21   A    Claiming to have cyanide?  Um, yeah, there was -- there

22   was others on the -- the cached page that was found and the

23   comparable Web capture that I did, and from memory, what I

24   seem to recall is that people were discussing, as I say, who

25   was the most -- the comment was trustworthy person and who

1    would actually be able to produce the -- the real chemical.

2    Um, I think there were others -- individuals in India that

3    were claiming to have it, and I remember discussions about

4    don't trust this person because, you know, they'll just take

5    your money and not send you anything.

6         And I do recall one comment about somebody saying that

7    skiptin hooked me up, and I can't remember the individual who

8    made that comment, but it's somewhere in the -- the thread.

9    Q    Okay.  Have you reproduced that thread?

10   A    That's the -- the Web capture.

11   Q    Okay.  So --

12   A    Yeah.

13   Q    Okay.  That's the Web capture that you took of

14   wantdeath.blog?

15   A    Wantdeathblogspot.

16   Q    Blogspot?

17   A    Yeah.

18   Q    Okay.  And that's kind of an area where folks interested

19   in obtaining cyanide converse.

20   A    Ah, not just cyanide.  Obviously, that -- the page

21   there, top 20 suicide methods, so there are different methods

22   on there about how to commit suicide, and the page that I have

23   captured there was the same page that was on Mr. Denton's

24   computer, methods of suicide -- sorry -- method 4 of suicide

25   cyanide, so it was specific, so it was like a thread within

1   the blog just relating to cyanide.

2   Q    Did Mr. Denton's computer have on it that entire

3   exhibit, or did it have a page and you went out and --

4   A    Right, okay.  The best way I can explain that, the way

5   Internet cache works, as I say, it downloads the page to the

6   computer so it speeds up browsing at a later date, and what

7   the computer does is actually split the page up into all its

8   different elements, it'll have the text in -- in one part and

9   the multimedia, if there's images on there, or videos, it'll

10  store them somewhere else.

11       So the actual cached page and I recall from Mr. Denton's

12  computer is just the textual element only.  It doesn't contain

13  any of the icons or -- or media or anything else.  But as I

14  say, when you compare the -- the text cached page to the Web

15  capture that I've done and the live Web capture, the text is

16  the same text.

17  Q    Okay.  There are just other options when you --

18  A    Yeah, yeah, so when you look at the -- the cached page,

19  it'll just have some black spaces where maybe pictures should

20  be or icons.

21  Q    And is that exhibit as complete a picture as you can

22  give us of that wantdeathblogspot?

23  A    It is at this point.  It is possible, with a lot of

24  work, to rebuild Web pages from deleted data, but you can

25  imagine that you've then got to try and recover deleted

1    pictures and -- and decide where they actually go back on the

2    Web page.

3    Q     Okay.  Thank you.

4    A     It is possible to do, but it wasn't done with this one.

5              MR. RIDGE:  Thank you very much.

6              THE WITNESS:  Okay.

7              MR. RIDGE:  I have no further questions, Your Honor.

8              THE COURT:  Redirect?

9              MR. FRANK:  The court's indulgence?  No, no, Your

10   Honor.

11             THE COURT:  Thank you, sir.  You may stand down.

12             THE WITNESS:  Okay.  Thank you.

13        (The witness left the witness stand.)

14             THE COURT:  Why don't you give that to Mr. Frank,

15   please.

16        Why don't we take our second recess.  Ladies and

17   gentlemen, we'll take about a 15- or 20-minute recess.  Don't

18   discuss the case.  I'll see you back here then.

19        (Jury exited at 12:13 p.m.)

20             THE COURT:  So before we break, Mr. Frank, I checked

21   with the other judges about the policy that you indicated the

22   government was following concerning custodial witnesses, which

23   is basically you don't reveal the name of the custodial

24   witness until the witness is basically called and you don't

25   reveal it at the time of the voir dire.

1        First of all, nobody's ever heard of such a policy and,

2    and I agree with the other judges that I've consulted that if

3    the government knows the name of a custodial witness, the

4    government should reveal the name at the time of voir dire.

5    The only exception might be when the government really doesn't

6    know who the wit -- the custodial witness likely is going to

7    be, in which case, I understand there may be some leeway there

8    saying custodian of a given record.

9        The problem, obviously, is that in the remote possibility

10   -- if -- if there is a remote possibility of someone on the

11   jury knowing the custodial witness, that juror might well

12   write a note and then say, I know this person, what do I do

13   about it?  And it seems to me that it's not an appropriate

14   policy not to run the name, if you know it, by the jury at the

15   time of voir dire.

16            MR. FRANK:  Your Honor, if I -- if I said I thought

17   it was a court policy, I misspoke.  That's not -- that's not

18   what I meant.

19       No, I mean, it -- it is particularly difficult for us to

20   get a witness like this from these Internet service providers,

21   and we weren't sure who it was going to be.  I mean, no, I --

22   I -- I didn't mean to suggest that that was some sort of court

23   policy.  I just -- I just --

24            THE COURT:  No, no, I thought you meant it was the

25   government's policy.

1          MR. FRANK:  No, no, no, it's not our -- no, it's not

2    our policy.  It's just that these companies are particularly

3    difficult -- I mean, just getting a witness from Google is a

4    monumental task, and then to have them identify them far in

5    advance is an additional monumental task.

6       So although we did have contact with Ms. Rodriguez -- I

7    -- I don't remember -- I mean, maybe -- it wasn't very long

8    ago -- whether she was actually going to be the witness they

9    would produce, all of that is very much -- and that's true of

10   PayPal.  I mean, we did -- we do know and I have disclosed.  I

11   didn't mean to suggest that there was any sort of policy.

12          THE COURT:  Oh, okay.

13          MR. FRANK:  And I apologize if I was -- if I

14   misspoke.  No.

15          THE COURT:  Okay.

16          MR. FRANK:  And it is my intent to disclose any

17   witness I -- I'm not hiding the ball there.  I just -- that

18   was a lapse on my part.

19          THE COURT:  Okay.  Well, that's fine.  I just wanted

20   to assure myself there wasn't such a policy on the part of the

21   government because I -- if it were the government's policy, I

22   think it's a policy that should be changed.

23          MR. FRANK:  It -- it is not, Your Honor.  It is not

24   the policy.

25          THE COURT:  And I think actually she was more than a

1    custodial witness.  She testified to more than simply these

2    are the records of Google.

3              MR. FRANK:  No, she absolutely did, Your Honor,

4    although that is what -- that is what they offer us.  She is a

5    self-described records custodian.  I, of course, wanted

6    someone who could actually explain to the jury what these

7    services were, but --

8              THE COURT:  Right.

9              MR. FRANK:  -- they're very hard to come by.

10             THE COURT:  Okay.  Fair enough.  Thank you.

11        (Court recessed from 12:17 p.m. to 12:41 p.m.)

12             THE COURT:  Would you bring the jury in, please.

13        (Jury entered at 12:42 p.m.)

14             THE COURT:  Next witness?

15             MR. FRANK:  Thank you, Your Honor.  The government

16   calls Jeff Taylor.

17             THE CLERK:  Please raise your right hand.  Do you

18   solemnly swear that the testimony you shall give in the matter

19   now in hearing shall be the truth, the whole truth, and

20   nothing but the truth, so help you God?

21             THE WITNESS:  I do.

22             THE CLERK:  Please be seated.  Please state your

23   name and spell your last name for the record.

24             THE WITNESS:  My name is Jeffrey Taylor, last name

25   spelled T-a-y-l-o-r.

 1              MR. FRANK:  Thank you, Your Honor.

 2    JEFFREY TAYLOR, having been duly sworn, was examined and

 3    testified as follows:

 4                        DIRECT EXAMINATION

 5    BY MR. FRANK:

 6    Q     Good afternoon, Mr. Taylor.

 7    A     Good afternoon.

 8    Q     Mr. Taylor, how are you employed?

 9    A     I'm a United States Postal Inspector.

10    Q     And how long have you been -- or why don't you describe

11    your law enforcement experience for us.  Would you do that?

12    A     Sure.  I have ten years experience with the postal

13    inspection service.  I also have five years experience with

14    the U.S. Postal Service, Office of Inspector General.  Both

15    are federal law enforcement agencies affiliated with the

16    United States Postal Service.

17    Q     Do you have other work experience with the postal

18    service besides?

19    A     I do.  From 1986 to 1994, I was a part-time employee

20    with the postal service.  I was a letter carrier and a rural

21    carrier.

22              In 1994, I was hired full-time as a letter carrier,

23    ended up being a customer service supervisor prior to being

24    hired as a federal law enforcement officer.

25    Q     Do you have special training to be a postal inspector?

1   A     I do.  We go to a -- a three-month academy in Potomac,

2   Maryland, put on by the U.S. Postal Inspection Service, and I

3   also have individualized training in my certain assignments,

4   such as mail fraud, prohibited mailings, narcotics, and

5   dangerous mail investigations.

6   Q     So that was going to be my next question.  What are your

7   duties as a postal inspector?

8   A     Currently I'm assigned as a mail fraud inspector, DMI

9   inspector, dangerous mailings inspector.  I also cover

10  robberies and burglaries.

11  Q     What do you mean by -- or what do you mean by dangerous

12  mailings?

13  A     Dangerous mailings, it all -- the program bore out of

14  the anthrax mailings back in 2001, so we created a response

15  unit to handle any leaking parcels or items that shouldn't be

16  -- or nonmailable.

17  Q     And what do we mean by non -- what do you mean by

18  nonmailable items?

19  A     Meaning that they're prohibited by U.S. Postal Service

20  regulations.

21  Q     As part of your duties as a postal inspector, were you

22  involved in the investigation of Sidney Kilmartin for various

23  offenses, including mailing injurious articles?

24  A     I was.  I originally got information regarding this

25  investigation in March of 2000 -- excuse me -- beginning of

1   April 2013.  Information was forwarded to me by an inspector

2   out of Florida who had received it from homeland security, who

3   had received a request from UK authorities for assistance in

4   their investigation.

5   Q     And what was that lead or referral?

6   A     I'm sorry?

7   Q     What was it?  What was the substance, the nature of that

8   -- that -- it's a lead, a referral, right?

9   A     Correct.  The substance was that there was a package

10  that had been delivered to an Andrew Denton in Hull, England.

11  Mr. Denton subsequently committed suicide, and he had left

12  notes and e-mails at the scene identifying potassium cyanide

13  as what had -- what he had taken and that -- identifying the

14  sender of that package from Manchester, Maine.

15  Q     Okay.  And anybody in particular there?

16  A     Yeah, it was S. Martin, 88 Pond Road, Manchester.

17  Q     All right.  And that's how your involvement began?

18  A     Correct.

19  Q     And can you just give us a general overview of your

20  involvement since you first got involved in -- in 2013,

21  because it's changed, right?

22  A     Yes, it has.  So from April of 2013 to the end of

23  June 2013, I was the lead case inspector.  In -- very first

24  week of July 2013, I went on a detail to Potomac, Maryland, as

25  a supplemental instructor at our academy, and the case was

1    transferred to Postal Inspector Mike Desrosiers.  He

2    maintained the case until July 1st of 2015, when he retired.

3    Q    And --

4    A    And then I assumed the role of lead investigator again.

5    Q    Okay.  And do you see Mr. Desrosiers here in the

6    courtroom?

7    A    I do.

8    Q    Where -- where is he?

9    A    He is sitting at the prosecution table.

10   Q    Where you have been sitting previously?

11   A    Correct.

12   Q    Okay.  All right.  Well, let's go back then.  Before you

13   got transferred to the academy as you described, what did you

14   do on the case?

15   A    So once I received the information, the information

16   contained a date of mailing and an office of mailing, which

17   was the Augusta post office, and since it was mailed

18   internationally, I knew that we may have a customs form

19   associated with that.  So I went to the Augusta post office to

20   search through their records to see if I could locate the

21   item, the record of mailing.

22   Q    And were you able to do that?

23   A    I did -- did locate the record of mailing for the item

24   that was mailed November 16th, 2012.

25   Q    And when you say, record of mailing, what are you

1   referring to now?

2   A      So when a customer comes in to a mail an international

3   parcel, they fill out a customs form; it's a small white slip.

4   I think customs refers to as a CN22; I think for the post

5   office it's PS Form 2976.

6          And so the customer fills that out, gives it to the

7   postal clerk.  They enter that information into the system,

8   and then that's uploaded to customs, and then they retain the

9   copy of that CN22 for at least 30 days.

10  Q      And is that what you -- you found?

11  A      Correct.

12  Q      And where did you find it?

13  A      I found it in a supervisor's office, along with all the

14  other customs forms that they had.

15  Q      At what post office?

16  A      The Augusta post office, Augusta, Maine.

17  Q      Let me show you what's been marked as -- let's see.

18  Could we -- let me ask you, do we have the physical original

19  of that, 52?

20  A      We do.  That may be in the --

21  Q      And is that in the -- in the --

22  A      What number is it, Halsey?

23  Q      -- the locker?  52.

24              MR. FRANK:  I may need your help to find this.

25          I'm sorry, Your Honor.  May I -- may I -- may I have the

1   witness' assistance?

2            THE COURT:  You may.

3            MR. FRANK:  You've organized these materials.

4       (The witness left the witness stand.)

5            MR. FRANK:  And I'm going to ask you, does it make

6   sense to have this up there with you so that you can help me

7   find these as they come up?

8            THE WITNESS:  If that'll expedite things.

9            MR. FRANK:  Your Honor, may -- may I have the

10  court's permission to proceed that way?

11           THE COURT:  Sure.

12      (The witness returned to the witness stand.)

13           MR. FRANK:  May I approach, Your Honor?

14           THE COURT:  You may.

15  BY MR. FRANK:

16  Q    Inspector, I'm showing you what's been marked as

17  Government's Exhibit 52 for identification.  I ask you to take

18  a look at that and tell us if you recognize it, please.

19  A    Correct.  This is the PS Form 2976 customs declaration.

20  Q    All right.  And that you've described locating?

21  A    Correct.  This is the item I located at the Augusta post

22  office.

23  Q    All right.  It's actually in a black plastic seal,

24  correct?  Could --

25           MR. FRANK:  Well, Your Honor, I'd move Government's

1  Exhibit 52 into evidence.

2           THE COURT:  Is there any objection to 52?

3           MR. RIDGE:  No, Your Honor.

4           THE COURT:  52's admitted.

5           MR. FRANK:  All right.  And then if it will help --

6  why don't you hold it up, take it out of its sleeve, just so

7  the jury can see what we're talking about, and then maybe

8  we'll proceed with the --

9  BY MR. FRANK:

10 Q    Okay.  So it's a 3 by 5 card-sized document; fair to

11 say?

12 A    Correct.

13 Q    A customs declaration associated with an international

14 mailing, correct?

15 A    Correct.

16          MR. FRANK:  And if we could project that Exhibit 52,

17 please, publish it?

18 BY MR. FRANK:

19 Q    All right.  Well, you know what?  I'm going to use the

20 document camera.  I'm going to -- okay.

21      So using the document camera, if I can -- all right,

22 Inspector, and I -- I think that we can annotate this -- yes

23 -- okay.  So if it would help during your testimony to

24 indicate with your finger what it is we're talking about,

25 please do.

273

1    But this is the customs declaration you've -- you've

2  described, correct?

3  A    Correct.

4  Q    And how did this relate to the -- to the investigation?

5  A    This matched the information that they forwarded to me

6  from the parcel.

7  Q    All right.  And what was your understanding that parcel

8  represented?

9  A    This was the mailing that was discovered at Andrew

10  Denton's residence.

11  Q    Was more than one discovered?

12  A    Correct.

13  Q    Okay.  Which one was this?

14  A    This was the mailing from the Augusta post office.

15  Q    On what day?

16  A    November 16th, 2012.

17  Q    All right.  And which of the two mailings is this?

18  A    This is the first mailing.

19  Q    All right.  And this is the customs form that relates to

20  that mailing.

21  A    Correct.

22  Q    And how do they relate?  Why is there a customs form

23  with regard to this -- this mailing?

24  A    Well, anytime a customer mails an international package,

25  they have to declare the contents and the value.  So this is

1    their documentation that they're -- of what they're declaring,

2    and the post office enters that into the customs manifest.

3    Q    All right.  And who's the -- who's the sender in this --

4    in this instance?

5    A    In this one, it's S. Martin, 88 Pond Road, Manchester,

6    Maine.

7    Q    And who's the recipient?

8    A    Andrew Denton, 17 Holland Street, Holderness Road, Hull,

9    North Humberside, UK.

10   Q    All right.  And what -- what's the description of the

11   item?

12   A    It's described as a gift of cosmetic jewelry with a

13   value of $50.

14   Q    All right.  And does it also contain a signature?

15   A    It does, on the bottom left corner --

16   Q    All right.

17   A    -- of S. Martin, 11/16/12.

18   Q    All right.  And how about in the bottom right-hand

19   corner, what is the -- what is that stamp there?

20   A    That's what the postal employee, the clerk that mails

21   the package for the customer, will what we call round-date it.

22   So that's their receipt, as well.  So they would have gotten a

23   copy of this.

24   Q    Okay.  All right.  Now, did you take any other

25   investigative actions before you transferred to the academy?

1  A     I did.   I actually received information from our

2  headquarters.   Based on an Interpol request, that information

3  was forwarded to me by Michael Conrad, who is a -- with the

4  U.S. Postal Inspection Service, a program manager at the time,

5  and he sent me information relating to other known mailings

6  from 88 Pond Road or S. Martin.

7  Q     So can you explain that?  I mean, who is -- who is this

8  person who is --

9  A     Michael Conrad is a postal inspector --

10 Q     Okay.

11 A     -- working at our headquarters in Washington, D.C., and

12 he received information -- or a request from Interpol -- or

13 information from Interpol that a mailing had been made that

14 allegedly contained cyanide, and based on that information,

15 they did a query of the customs and border patrol manifest

16 that the postal service enters this data into and searched by

17 88 Pond Road, as well as the last name S. -- or S. Martin.

18 Sorry.

19 Q     So looking for other similar mailings?

20 A     Correct.

21 Q     All right.  And -- and I take it they found some?

22 A     They did.

23 Q     And those were forwarded to you for further

24 investigation?

25 A     Correct.

1   Q      Okay.   And let me show you what's been marked as

2   Government's Exhibit 36 for identification.   Showing you

3   what's been marked as 36 for identification, ask you to take a

4   look at that and tell us if you recognize it.

5   A      I do.

6   Q      What is 36 for identification?

7   A      This is the spreadsheet that Michael Conrad forwarded to

8   me on -- I believe it was like May 7th of 2013.

9   Q      All right.   For additional mailings?

10  A      Correct.

11  Q      For further investigation?

12  A      That is correct.

13          MR. FRANK:   Your Honor, I'd move Government's

14  Exhibit 36 into evidence.

15          THE COURT:   Any objection?

16          MR. RIDGE:   I do have an objection, Your Honor.

17          THE COURT:   All right.   I'll see counsel.

18      (At sidebar on the record.)

19          THE COURT:   Yes.

20          MR. RIDGE:   My first objection is my usual

21  objection, that is, it identifies a number of recipients other

22  than Mr. Denton.

23          THE COURT:   Right.

24          MR. RIDGE:   Secondly, I think that this is a product

25  of somebody else's work.

 1            THE COURT:  Somebody --

 2            MR. RIDGE:  Somebody else's work.

 3            THE COURT:  Right.

 4            MR. RIDGE:  It wasn't created by this witness, and

 5    it's just a hearsay document.

 6            MR. FRANK:  I think it's explaining his

 7    investigative efforts.  I mean, I can move on, but I -- I

 8    think it explains some of the efforts that were taken

 9    subsequently.  And the -- there are four mailings here:  One

10    of them is the other Denton mailing; and then there's the

11    Jorgensen mailing; and a fourth international mailing to

12    Jeremy Katzmier.  There is other evidence linking these; so,

13    for example, this leads to the discovery of postal records of

14    those mailings, which I think are admissible --

15            THE COURT:  Right.

16            MR. FRANK:  -- and to Western Union records of

17    payments from Jorgensen and Katzmier, for example.  So I'm --

18    I'm explaining how we got there, but I -- I can do it

19    otherwise if I -- I must.

20            THE COURT:  Right.  The objection is to hearsay, and

21    I don't see that this witness is qualified to place it into

22    evidence.

23            MR. FRANK:  Okay.

24            THE COURT:  He didn't -- he might -- it's possible

25    you could qualify him, but this was created for this purpose,

1    right, and not -- or for purposes of the investigation?

2              MR. FRANK:  Yes, yes, it's a documentation of the

3    lead, please go look into these.

4              THE COURT:  Right, right.  I think it is hearsay

5    unless you can put it in through somebody else.

6              MR. FRANK:  Okay.

7              THE COURT:  All right?

8              MR. FRANK:  Yeah.

9              THE COURT:  Thank you.

10             MR. RIDGE:  Thank you.

11         (End of discussion at sidebar.)

12             THE COURT:  The objection to 36 is sustained.

13   BY MR. FRANK:

14   Q    Did you and your colleagues follow up on -- on those

15   leads?

16   A    Yes, we did.

17   Q    Those -- and what -- what was done in response?

18   A    Well, based on the information I received regarding the

19   e-mails that were left at the scene, we had the e-mail address

20   of skiptin@gmail.com and andrewdenton35@gmail.com, so we

21   applied for a search warrant for the contents of their

22   accounts.

23   Q    At -- at Google?

24   A    Yes.

25   Q    All right.  And we've previously heard testimony about

1    the -- the production that was made in response to that search

2    warrant, correct?

3    A    Correct.

4    Q    Did you do anything else before you transferred to the

5    academy?

6    A    I did not.

7    Q    Okay.  And how about in regards to the other two -- what

8    other mailings were a part of that lead from headquarters?

9    A    Well, there was a second mailing to Andrew Denton in

10   December.  That was actually out of the Manchester, Maine post

11   office, so I went to that office.

12   Q    Different -- different post office?

13   A    Correct.

14   Q    Okay.

15   A    So I went to that post office to see if I could locate

16   the customs form for that --

17   Q    And were --

18   A    -- particular parcel.

19   Q    And were you able to?

20   A    I was not.

21   Q    Why not?

22   A    They had purged their older slips.

23   Q    Okay.  How about -- now, there were two other mailings,

24   right, on that -- that referral?

25   A    Correct.

1   Q    What were they?

2   A    Both were made from the Manchester, Maine post office

3   going to different addresses.

4   Q    Okay.  Who, where?

5   A    There was one going to a Derek Jorgensen in Hull,

6   England, as well.

7   Q    Okay.

8   A    And a Jeremy Katzmier in Canada.

9   Q    And were you able to locate records of those mailings?

10  A    I was not -- not the customs form, no.

11  Q    How about other records?

12  A    I did locate other U.S. Postal Service business records

13  of the mailing.

14  Q    All right.  But that was later, wasn't it?

15  A    Correct.

16  Q    Okay.  So we'll get -- we'll return to those in the

17  chronological order.

18  A    Yeah.

19  Q    How about when you returned, once you get back in, what

20  is it, October of 2013?

21  A    Correct.

22  Q    What role do you play in the -- in the investigation

23  going forward?

24  A    Inspector Desrosiers maintained being the primary

25  investigator, and I assisted him as needed.

1   Q     And how so?

2   A     I helped him for searching for people that we were -- we

3   knew of payments to Sidney Kilmartin.

4   Q     Did you also pick up on those earlier leads to Jorgensen

5   and Katzmier, for example?

6   A     Yes, I -- I did go in and -- and review USPS business

7   records to locate any information that might still be

8   available for those mailings.

9   Q     All right.  And how about as regards the production from

10  Google, did you do work on that?  Google produced a CD of

11  material in response to your search warrant, did it not?

12  A     Correct.

13  Q     Okay.  And what did you do?  You personally worked on

14  that, correct?

15  A     I assisted with that, yes.  I did personally work on it.

16  Q     Okay.  What sort of work did you -- did you do on that?

17  A     We had to download a program to be able to view the

18  contents of the disc.  It wasn't just readily available.  So

19  we had to download Mozilla Thunderbird to be able to read

20  those e-mails.

21  Q     What is Mozilla Thunderbird?

22  A     It's an e-mail program that actually Google and -- and

23  other Internet providers suggest that we use to download those

24  e-mails, and it's a process of downloading the program to your

25  computer, and it acts like any other e-mail system, but it's

1    -- it's separate from our business-related e-mail on our

2    computers.

3    Q    Okay.  And previously to that, had you -- had you or

4    your colleagues been able to access this information?

5    A    No.

6    Q    All right.  And once you were able to access the

7    information in the skiptin@gmail account, what did you find

8    there?

9    A    Well, we saw quite a few e-mails regarding people

10   requesting information about cyanide or to purchase cyanide

11   and responses from skiptin regarding the potential for sale of

12   cyanide.

13   Q    And did you organize that material in any way?

14   A    I did.

15   Q    How so?

16   A    I created a table of e-mails that I could work with.  On

17   Mozilla Thunderbird, if you try to do a keyword search, it's

18   only going to search what's in the subject or the e-mail

19   address.  So I had to individually go through each e-mail and

20   locate any e-mails that referenced cyanide or other keyword

21   searches, and I downloaded those to an Excel spreadsheet.

22   Q    And how many e-mails did you discover that referenced

23   cyanide in there?

24   A    Approximately 484 that referenced cyanide or were

25   e-mails related to or mentioned people that we knew had -- had

1    sent money.

2    Q     Otherwise from the investigation?

3    A     Correct.

4    Q     All right.  Let me show you what's been marked as

5    Exhibit 16 for identification.  I'm showing you what's been

6    marked as Exhibit 16 for identification, ask you to take a

7    look at that and tell us if you recognize it, please.

8    A     I do.  This is a printed copy of the table that I made.

9    Q     All right.  Originally you made it in electronic form?

10   A     Correct.

11   Q     All right.  And --

12              MR. FRANK:  Your Honor, I'd move Exhibit 16 into

13   evidence.

14              THE COURT:  Any objection to 16?

15              MR. RIDGE:  Yes, Your Honor, and I think it was the

16   subject of a sidebar conversation earlier this morning.

17              THE COURT:  All right.  So are you requesting the

18   limiting instruction?

19              MR. RIDGE:  Yes, Your Honor.

20              THE COURT:  Ladies and gentlemen, you'll recall that

21   a little while ago, I told you that some of the evidence --

22   that one involving Donalee and Jessica Wolfe -- were

23   admissible, but only for -- or was admissible only for a

24   limited purpose only, and Exhibit 16 is in a very similar

25   category.  You will recall that this case is about the

1    allegation that the government has made, which it must prove

2    beyond a reasonable doubt, that Mr. Kilmartin's actions had

3    something to do with Andrew Denton, and when you see

4    Government's Exhibit No. 16, you will see individuals other

5    than Mr. Denton, and, again, the purpose of introducing that

6    evidence is limited.  The defendant, as I will remind you, is

7    not on trial before you for any activity that he may have done

8    related to persons other than Mr. Denton; that's first.

9          Second, you are not to take this evidence in any way as

10   character evidence.  I've already told you not to do that.

11   And I have told you earlier that the permitted uses of this

12   evidence include, as you deem appropriate, evidence of motive,

13   opportunity, intent, preparation, plan, knowledge, identity,

14   absence of mistake, or lack of accident only, and it is up to

15   you to determine how to evaluate any evidence, including this

16   evidence, as to whether or not it sustains the government's

17   proof beyond a reasonable doubt.

18         Thank you.

19              MR. FRANK:  Thank you, Your Honor.  I'd request

20   permission to project Exhibit 16.

21              THE COURT:  Yes, 16 is admitted, and you may project

22   it.

23              MR. FRANK:  Thank you, Your Honor.

24   BY MR. FRANK:

25   Q    So, Inspector Taylor, can you describe this table for

1   us?

2   A      Yes.

3   Q      What -- let -- and I can't tell how clearly this is

4   legible.  It's -- can you make it out?

5   A      Ah --

6   Q      It's a little blurry, isn't it?

7   A      Yeah, it is.  I don't know if making it bigger will

8   help.

9             MR. FRANK:  I wonder if I use --

10  BY MR. FRANK:

11  Q      Well, let's start anyway just by talking about it

12  generally.  I mean, what do the -- what -- what do the columns

13  across the top represent?  Let's start with that.

14  A      So I listed -- this is the information that was

15  available on the e-mails in -- in the header, as well as the

16  body of the e-mails, so --

17  Q      Let me stop for a minute because I -- let's just -- I

18  understand that this is a table that organizes in some fashion

19  the contents of Mr. -- or of the skiptin@gmail account,

20  correct?

21  A      Correct.

22  Q      All right.  So -- and on the top left-hand corner is the

23  heading date, correct, column A is -- is headed date?

24  A      Correct.

25  Q      What -- what does that column represent with regard to

1   each of these e-mails?

2   A    That was the date listed on the individual e-mails.

3   Q    All right.  And how about the time, the next column B is

4   time, correct?

5   A    Correct, that's also what was listed on the individual

6   e-mails.

7   Q    All right.  Because commonly e-mails include that

8   information in the header, correct?

9   A    Correct.

10  Q    All right.  How about the third column C, what -- what

11  is -- what information's contained there?

12  A    That -- that's the sender's e-mail address.

13  Q    All right.  And column for D?

14  A    That's the recipient's e-mail address.

15  Q    Okay.  And then, finally, column F, what -- what is --

16  what did you put in column F with respect to each of these

17  e-mails?

18  A    In column F is the content of the e-mail.  So when I

19  opened up the e-mail, I just cut and paste the actual e-mail

20  into column F.

21  Q    So this is what the sender wrote to the recipient?

22  A    Correct.

23  Q    Okay.  All right.  Now, what does -- is the table

24  color-coded in -- in some fashion?

25  A    Yes.

1    Q     Okay.  And I noticed that the first color is green,

2    appears to be green?

3    A     Correct.

4    Q     What -- what does the color green signify on this table?

5    A     As I mentioned before, if it matched a name that we knew

6    to have sent money to Sidney Kilmartin, I color-coded that

7    green.

8    Q     Can you give us an example of someone that you knew had

9    sent money to Mr. Kilmartin and therefore you colored their

10   e-mail with him green?

11   A     Sure.  The very first one, we had a wire transfer from

12   Donalee Wolfe and on the date of these e-mails or around the

13   date of those e-mails.

14   Q     What type of wire transfer?

15   A     That one was a PayPal transfer.

16   Q     Were you aware of other forms of payment between Donalee

17   Wolfe and -- and Sidney Kilmartin?

18   A     Between Donalee, no.  Between Jessica --

19   Q     Okay.  But other people.  Okay.

20   A     Yeah.

21   Q     All right.  So that's what green represents?

22   A     Correct.

23   Q     All right.  And if we scroll down, there -- there --

24   there are some that are color-coded -- I think the next one is

25   yellow.

TAYLOR - DIRECT EXAMINATION/FRANK

1   A      Correct.

2   Q      What does yellow signify?

3   A      Yellow, because the -- some of these e-mails were so

4   long in Excel, you can only put so many characters into one of

5   the boxes.  So at whatever point it cut off the e-mail, I

6   created another line and continued the e-mail.  So there might

7   be three separate lines for one e-mail.

8   Q      Or boxes?

9   A      Correct.

10  Q      Okay.

11  A      Or rows.

12  Q      Or pages?

13  A      Three separate rows, yeah.

14  Q      Okay.  All right.  And how about the color red, what --

15  what -- some of these entries are coded red.  Why are they

16  coded red?

17  A      Because they're e-mails that -- so the very first one --

18  I don't know if you can read it or not -- but there's one --

19  Q      Let me stop you for a minute.

20  A      Yeah.

21  Q      Okay.  You're talking about the first set of e-mails,

22  one, two, and three?

23  A      Line No. 4 -- row No. 4 -- excuse me -- row No. 4.

24  Q      Row No. 4.  Okay.  Which is both green and the text is

25  in red.

1    A    Correct.

2    Q    Okay.  So green meaning somebody from whom you in your

3    investigation developed --

4    A    Yes.

5    Q    -- had paid Kilmartin, right?

6    A    Correct.

7    Q    But, also, red why?

8    A    Because that particular portion of the e-mail was no

9    longer available as a regular e-mail on Mozilla Thunderbird

10   from the Google search warrant.

11   Q    What do you mean?

12   A    Well, if we could make out the first one, it'd be a lot

13   easier to explain.  It states that there was a -- an e-mail

14   from Skip Martin, skiptin@gmail.com, a date of Tuesday,

15   November 6th, at 8:38 p.m., and then the body of that e-mail,

16   so we have other e-mails.  We have an e-mail from -- in row 2,

17   which is November 4th, and an e-mail in row 3 and row 4 that

18   are November 6th, but that e-mail is no longer there.

19   Q    Okay.  So let me see if I can -- e-mails often occur in

20   strings, correct?

21   A    Correct.

22   Q    A string of more than one e-mail on more than one

23   occasion, correct?

24   A    Yes.

25   Q    And do I understand correctly that in the case of

1   e-mails that you have coded red, you didn't find the earlier

2   e-mail, but you found that earlier e-mail in a later string?

3   A     That's correct.

4   Q     So that -- that's the significance of red?

5   A     Yes.

6   Q     Okay.  And -- and what's the implication of that?

7   A     It appeared to me that the e-mail had been deleted.

8   Q     The original e-mail.

9   A     The original e-mail.

10  Q     You couldn't find the original one, but you found it

11  embedded in the later string.

12  A     Correct, the portion that's in red appeared to have been

13  a prior e-mail that had been deleted.

14  Q     How many entries in this table?

15  A     Total entries, including the additional lines for

16  e-mails that were too long, came to 513.

17  Q     Okay.  But earlier you said there were 484?

18  A     Correct, I -- I counted the individual e-mails that were

19  on Mozilla Thunderbird that related to either cyanide or

20  somebody that we knew to have sent money.  So when I subtract

21  out all the yellow lines, I came up with 484.

22  Q     So the -- the yellow lines being the continuations?

23  A     Correct.

24  Q     So is 484 the number of separate e-mails or e-mail

25  strings that you found?

1    A    Yes.

2    Q    But they may have occupied more than one box in the

3    table.

4    A    That's correct.

5    Q    What -- what are these e-mails about?

6    A    They're people searching for cyanide.  There's dialogue

7    back and forth about the cost of cyanide, how it'd be mailed,

8    how much it cost.

9    Q    Do you know how many times cyanide is mentioned in these

10   e-mails?

11   A    I don't have a count of the number of times cyanide was

12   mentioned.

13   Q    All right.  Did you search it for the number of

14   occurrences of keywords like cyanide?

15   A    Yes, I did.

16   Q    And -- and is it fair to say that it occurs frequently?

17   A    Yes.

18   Q    Many times?

19        Did you count how many separate e-mail addresses were --

20   were represented in those 484 e-mail strings?

21   A    I did.  I counted approximately 274 different e-mail

22   addresses.

23   Q    And did these people identify who they were or where

24   they were?

25   A    Some identified the country that they were in.  They

1   were asking specifically, can you mail to a certain country?

2   Q     And what sort of countries were represented there?

3   A     We had Nigeria, Australia, South Africa, India, UK or

4   Great Britain, Canada, and various states in the United

5   States.

6   Q     Did you find any e-mails in this Google production

7   between Mr. Kilmartin and Andrew Denton of the United Kingdom?

8   A     I did.

9   Q     How many?

10  A     I located a total of four, I believe it is.

11  Q     Okay.  And can you describe those?

12  A     I can.  They were conversations from skiptin to

13  andrewdenton35 regarding what appeared to be a second package

14  that was going to be mailed and mentioning the Capricorn Group

15  and how to pay for it and get it at a UPS Store.

16  Q     Do you remember what number e-mails those were?

17  A     They are 20 through to -- 20 to 23.

18  Q     So if we could scroll down to 20 to 23.  We'll see how

19  legible these are.

20          MR. FRANK:  You know what?  I'm going to try using

21  the document camera instead, see --

22          THE WITNESS:  Okay.

23          MR. FRANK:  -- if that's more legible.

24  BY MR. FRANK:

25  Q     All right, Inspector.  Are these the e-mails that you're

1    referring to?

2    A    They are.

3    Q    Okay.  And can you describe them for us, starting with

4    No. 20?

5    A    Sure.  It's an e-mail that was sent on December 8th,

6    2012, at 5:57 p.m. from skiptin@gmail.com to

7    andrewdenton35@gmail.com with the subject of scamming PC.

8    Q    Okay.  And what's the body of that e-mail?

9    A    It says, Andrew, if all else fails, my parcel gets

10   picked off by customs, order your own through the Capricorn

11   Group.  They are right online.  I will reimburse you the cost.

12   Although the is misspelled.  Very important, you must have it

13   delivered to a commercial address.  I used The UPS Store and

14   aid (sic) their 5 bucks.  Only thing is their minimum order is

15   100 grams.  Please keep this to yourself as I have never told

16   anyone this.  Get back to me if need be, Skip.

17   Q    All right.  And then it appears that this same -- a

18   similar message is in No. 22, correct?

19   A    Correct, approximately 40 minutes later, so at 12/8/2012

20   at 6:38 p.m., skiptin@gmail.com sent an e-mail addressed to

21   andrewdenton35@gmail.com with a subject line of PC and states,

22   Andrew, if all else fails and the second parcel doesn't clear

23   customs, I will tell you something I've never told anyone

24   about getting it yourself.  Try the Capricorn Group.  They

25   have a Web site.  Very important though, you must have it

1    delivered to a commercial address.  I used The UPS Store and

2    paid the 5 bucks.  Please keep this to yourself as if they get

3    -- sorry.  Please keep this to yourself as if they get deluged

4    with calls, it will ruin the golden egg.  Get back to me if

5    you have any questions, Skip.

6    Q    All right.  And how about the -- the fourth message on

7    this occasion?

8    A    Correct, so December 8th of 2012 at 6:53 p.m.,

9    skiptin@gmail.com e-mailed andrewdenton35@gmail.com, subject

10   PC.  One other thing I forgot to mention is their minimum

11   order is 100 grams, about 100 times more than you need, Skip.

12   Q    Okay.  And then there -- there's a -- an e-mail without

13   any content, correct, that's item No. 21?

14   A    Correct, row 21, yeah.

15   Q    Between the same two correspondents?

16   A    Correct.

17   Q    Were you able to locate any other e-mail between

18   Kilmartin and Denton in the Google production?

19   A    Yes, on the andrewdenton35@gmail.com account.

20   Q    Okay.  That's not in this table, correct?

21   A    Correct.

22   Q    Okay.  What sort of e-mail were you able to locate

23   there?

24   A    There was e-mails back and forth in this case from

25   skiptin asking andrewdenton35 to destroy his hard drive, that

1    the FBI -- didn't want the FBI to get ahold of it, or words to

2    that effect, and there was some discussion between the two of

3    them about how best to destroy the hard drive.

4    Q    Okay.  And was that correspondence found elsewhere in

5    the investigation?

6    A    Correct, on the e-mails found at the scene of Andrew

7    Denton's death.

8    Q    Okay.  Print -- were they printed out?

9    A    Correct.

10   Q    Were you -- did you recognize some of the other

11   correspondence in this -- in this -- in this table of

12   production by Google?

13   A    I did.  There were several other people who had sent

14   money via Western Union or PayPal to Sidney Kilmartin that had

15   e-mails in this table.

16   Q    About cyanide?

17   A    About cyanide, correct.

18   Q    Can you give us a -- the names of some of them?

19   A    Walter Cottle is one.

20   Q    All right.  Do you remember any of those e-mails in

21   here, where they're located?

22   A    I do, and a lot of his were in yellow because there was

23   a lot of discussion back and forth.

24   Q    Can you --

25   A    There was old e-mails.

1    Q      If you'll give me a number, I'll try and find --

2    A      Okay.

3    Q      -- the e-mail on a more legible copy of the table.

4    A      Row 369, and it's continued on through row 372.

5    Q      All right.  So starting from 369 -- and who -- who is

6    Walter Cottle?

7    A      Walter Cottle is a gentleman who we've actually spoken

8    to who wired money to Sidney Kilmartin for cyanide.

9    Q      All right.  And this -- this particular e-mail string,

10   when and -- when does it occur and what is it about?

11   A      Well, the e-mail that -- that I recorded was May 16th,

12   2013, at 8:18 p.m. from skiptin@gmail.com to

13   waltercottle@gmail.com, and it's regarding potassium cyanide.

14   Q      All right.  And what -- what -- what do they discuss in

15   this string?  Can you summarize it for us?

16   A      This is regarding the cost and the purity.  There was

17   discussion back and forth.

18   Q      Okay.

19   A      And --

20   Q      If I -- if I scrolled down, I notice that there's a

21   paragraph that begins Walter, I have been away, but I am back

22   now.

23   A      Correct.

24   Q      I can ship the -- did Mr. Cottle have earlier

25   interaction with Mr. Kilmartin about cyanide?

1    A    Yes, he did.

2    Q    And this is a second occasion?

3    A    Correct.

4    Q    And is his earlier interaction with Mr. Kilmartin also

5    documented in this table in places?

6    A    Yes, it is.  Oh, I'm sorry.  Hold on.  Yes, it is.

7    Q    Can you give us an example?

8    A    Row 101.

9    Q    And is the table in chronological order?

10   A    Yes.

11   Q    So 101 would represent an earlier exchange between the

12   two?

13   A    Correct.

14   Q    I'm showing you -- projecting 101.  When -- when -- when

15   did this exchange occur -- that's not really legible, is it?

16   A    This was February 28th of 2013, 11:24 p.m.

17   Q    I'm going to try and improve the focus, if I can.  That

18   didn't improve it.  Well, I think it's -- I think the

19   combination of the green and the red is particularly difficult

20   to read.

21       Can you -- can you describe generally this exchange?

22   A    Well, it starts out with the -- looks like a reply from

23   Walter Cottle saying how quickly can you ship, need by

24   Tuesday, and it's sent from my iPad.  The remaining is in red

25   because I didn't have record of the -- the other e-mails in

1    the string.  And --

2    Q     And --

3    A     -- it goes all the way back dated to -- the oldest

4    e-mail in that string is October 6th, 2012.

5    Q     The earliest one?

6    A     Correct, at 10:28 a.m.

7    Q     That you found in the -- in the Google production

8    between Cottle and Kilmartin?

9    A     Correct, and that's in row 103.

10   Q     Let me do this.  Let me show you what's been marked as

11   Exhibit 19 for identification, ask you to take a look at that

12   and tell us if you recognize it, please.

13   A     (Witness looking at exhibit.)  Yes, these are e-mails

14   between Walter Cottle and Skip Martin.

15   Q     Okay.  And where did they come from?

16   A     These came from Walter Cottle.  Oh, I'm sorry.  No.  I'm

17   sorry.  These are the printouts from Mozilla Thunderbird.

18   Q     Okay.  So is this a copy -- a set of all the e-mails

19   that you found in the Google production -- not -- so same

20   thing that's in the table, but printed out altogether in one

21   package?

22   A     Correct, so if you click on the e-mail in Mozilla

23   Thunderbird, you can hit print and keep a hard copy.

24   Q     All right.

25         MR. FRANK:  And I'd move Exhibit 19 into evidence.

1    THE COURT:  Any objection?

2    MR. RIDGE:  No, Your Honor.

3    THE COURT:  It's admitted.

4  BY MR. FRANK:

5  Q    Now, you also -- you started to say that these came from

6  Walter Cottle.  Did you also get copies or did your colleague

7  get copies of many of these e-mails from Walter Cottle?

8  A    Yes, when Inspector Desrosiers initially made contact

9  with Walter Cottle, he described that he may still have some

10  of the e-mails, as well as pictures.

11  Q    Okay.  And, in fact, did he forward them to Desrosiers?

12  A    He did.

13  Q    Okay.  All right.  So 19 is a -- is a collection of all

14  of the -- the Cottle-Kilmartin e-mails that were found in the

15  Google production, correct?

16  A    Correct.

17  Q    And may be more legible than the -- the version we've

18  been working with in the table, correct?

19  A    Correct.

20  Q    How about other -- other persons, did you find other

21  persons with whom --

22  A    Ah, yeah, we found --

23  Q    -- from whom he received payment?

24  A    Yes, Noel Heim.

25  Q    And who is -- who is Noel Heim?

1   A     Noel Heim is another individual who sent or wired money

2   to Sidney Kilmartin.

3   Q     And do you remember which -- which e-mail in the table

4   is between Heim and Kilmartin?

5   A     There was quite a few e-mails between the two of them.

6   Q     All right.  Do you remember any one in which

7   Mr. Kilmartin identified himself to Heim?

8   A     I do, and --

9   Q     If I direct your attention to e-mail --

10  A     Please.

11  Q     -- No. 447, does that refresh your recollection?

12  A     Correct, that's Noel Heim identifying himself and his

13  address.

14  Q     Okay.  Were there others?

15  A     I'm not recalling any others at this time.

16  Q     You don't recall the names of any others who sent him --

17  Mr. Kilmartin payment?  Okay.

18  A     Not on this.

19  Q     Do you remember if Stacey Williams is in here?

20  A     Her name does appear in here.  It appears to be

21  something related to Google Docs.  It's something that was

22  shared.

23  Q     Or a Sunnie Kim, do you remember if she's in there?

24  A     Yes, there was an e-mail with her identifier in there.

25  Q     Okay.  And is she another person from whom you

1    discovered had paid Mr. Kilmartin money?

2    A    Yes.

3    Q    Did -- did these people discuss with Mr. Kilmartin how

4    it was that they found him?

5    A    Quite a few mention the wantdeathblogspot or that they

6    found him on a blog.

7    Q    And can you give us an example of one such e-mail or any

8    such e-mail?  Let's -- let me -- let me try this.  This table

9    is searchable, is it not?

10   A    Yes, it is.

11   Q    And we could actually conduct a -- a search -- I don't

12   know how legible it's going to be.  Can we --

13   A    Well, we can conduct a search and find the row.

14   Q    All right.

15        MR. FRANK:  With the court's permission, Your Honor,

16   I will ask Mr. Desrosiers to conduct a search for --

17   BY MR. FRANK:

18   Q    Shall we say wantdeath?

19   A    Yes.

20        MR. FRANK:  And maybe we can call up that table

21   while you do that and illustrate the point that way.

22   BY MR. FRANK:

23   Q    All right.  All right.  So we've come up with one.  Is

24   that No. 100?  So let me -- I'm going to use the document

25   camera because I think it's more legible.  So -- so is e-mail

1   No. 100 an example of one of these e-mails where the

2   correspondent identified wantdeathblog -- wantdeath.com as the

3   means by which they located Mr. Kilmartin?

4   A      This one is, yes.

5   Q      Okay.  And there were others besides?

6   A      Yes.

7   Q      Do you know how many times wantdeathblogspot was

8   mentioned in particular as the -- the means that people found

9   Kilmartin?

10  A      I recall four.

11  Q      Okay.

12          MR. FRANK:  If you scroll through, can you tell how

13  many times, Mr. Desrosiers?  One at 100.  I mean, if you -- if

14  you -- if you hit the search.

15          THE WITNESS:  We're on the document.

16          MR. FRANK:  This is the same -- I'm looking at the

17  same.  Oh, I'm sorry.  So we have to switch back to the

18  computer as the source.

19  BY MR. FRANK:

20  Q      And -- and this is e-mail No. 114, is it not?

21  A      Correct.

22  Q      Okay.  And if you -- if you'd search again.  This is

23  e-mail -- can you -- 128?  Are there more instances?  What's

24  this one?  Can you -- can you read it, Inspector?  What number

25  e-mail is that?

1  A     Is that 159?

2  Q     159?

3  A     Let me confirm that on this.  Yes.

4         MR. FRANK:  Can you -- can you search again?

5  BY MR. FRANK:

6  Q     And how about this one, what e-mail number is this?

7  A     292.

8  Q     What is that, 292?

9  A     Yes, 292 has wantdeath.blogspot.com and it's got e-mail

10 content.

11 Q     Okay.  Were there e-mails in here in which Mr. Kilmartin

12 identified -- identified himself?

13 A     Yes.

14 Q     And can you give us an example of one of those?

15 A     Well, in the essence of time, if we can search

16 Kilmartin.

17 Q     Okay.

18        MR. FRANK:  I can't tell where -- oh, I see.

19 BY MR. FRANK:

20 Q     That's -- that's in the column C.  Can you -- can you --

21 A     Correct, it looks like No. 397.  It's actually an e-mail

22 from skiptin to helmneil, which I know to be for Noel Heim.

23 Q     Okay.  Who you've previously described?

24 A     Correct.

25 Q     Okay.  And where -- well, maybe -- maybe I'll put up --

1    this is 39 --

2    A    397.

3    Q    397.

4         MR. FRANK:  So if I -- if we switch to the document

5    camera.

6    BY MR. FRANK:

7    Q    So 397 is an example of one of these e-mails in which

8    Mr. Kilmartin identifies himself?

9    A    Correct.

10   Q    Is that correct?  And where is that?

11   A    In the body of the e-mail content where he says, Neil, I

12   will be needing your mailing address and the WU MTCN number.

13   Q    What -- what do you understand that to be?

14   A    Western Union tracking number.

15   Q    Okay.

16   A    My information that you will need is Sidney Kilmartin,

17   Manchester, Maine, USA 04351.  Shipping will take place the

18   same day as payment confirmation.  Get back to me, Skip.

19   Q    Are there e-mails in here in which he discusses the

20   quality or purity of the cyanide that he's offering?

21   A    Yeah, there were several that mentioned 99.6 percent or

22   U.S. grade.

23   Q    Were there e-mails in which he discussed how much it

24   takes to kill?

25   A    I'm trying to recall if that's one of the e-mails that's

1   in here, Halsey.

2   Q    Let me direct your attention to e-mail No. 476 and see

3   if that refreshes your recollection.

4   A    That's a discussion that 5 grams is a large quantity of

5   PC.

6   Q    All right.  How about 506 through 7, the top of the

7   page, 507?

8   A    Right, there -- there is a question.  Is 500 milligrams

9   lethal?  Are you sure you can die from it?  I don't want to

10  take any chances of surviving.

11  Q    That's at the top of 506?

12  A    That's -- that's on 506.

13  Q    Okay.

14  A    And then there's a response on 507.

15  Q    What's the response?

16  A    It's from skiptin@gmail to that same e-mail address,

17  where he states, I'm 5 foot 9 inches and I'll be using 1,000

18  milligrams.  Get back to me, Skip.

19  Q    Are there e-mails in which he discusses how to increase

20  the lethality of cyanide or make it more effective?

21  A    I don't recall if that's in here.  I know I've seen it,

22  but I don't want to say it's in this table.

23  Q    Okay.  You've seen it elsewhere in e-mails?

24  A    Correct.

25  Q    Discussions of how much it would cost or how it would be

1    shipped?

2    A    Numerous discussions of how much it would cost.

3    Q    How to pay for it?

4    A    Correct.

5    Q    What manners of payment were discussed?

6    A    PayPal, Western Union, MoneyGram was mentioned.

7    Q    Was there discussion of how to -- how to package it?

8    A    There was --

9    Q    Were there discussions of that?

10   A    Yeah, there was questions from people who were

11   attempting to purchase it whether it'd be discreet, and the

12   responses that it would be in a plain manila envelope.

13   Q    Responses from who?

14   A    From skiptin.

15   Q    Okay.  Let me show you what's been marked as Exhibit 17

16   for identification and ask you to take a look at that and tell

17   us if you recognize it, please.

18   A    Yes, I do.

19   Q    What is 17 for identification?

20   A    17 is a screen shot from Mozilla Thunderbird for the

21   account skiptin@gmail.com.

22   Q    Okay.  And what does -- what does it represent -- what

23   do you -- who took the screen shot?

24   A    I did.

25   Q    And why, what were you trying to illustrate with this?

1    A     I was trying to illustrate that there's a gap in the

2    e-mails between December 10th, 2012, and January 11th, 2013.

3    Q     Okay.  What do you mean by a gap?

4    A     Meaning that the date of the last e-mail, there's --

5    there's no e-mails between December 10th, 2012, and

6    January 11th, 2013, available on this.

7    Q     In the production from Google?

8    A     Correct.

9    Q     All right.  And indicating what to you?

10   A     It appears that either the account was not used for that

11   period of time, or they were deleted.

12          MR. RIDGE:  Your Honor, I'm going to object to the

13   latter part of that answer because I'm not sure this witness

14   has established the qualifications to speculate that a gap in

15   time between e-mails is attributable to deletion.

16          THE COURT:  Would you like to establish a

17   foundation?

18   BY MR. FRANK:

19   Q     Well, do you have experience with e-mail and e-mail

20   accounts like this?

21   A     I do.

22   Q     And what sort of experience have you had?

23   A     Personally and professionally using e-mail to send and

24   receive.

25   Q     Okay.  So do you know how e-mail can be removed from an

1   account?

2   A     I do.

3   Q     I mean --

4   A     I personally delete it if I don't need the e-mail

5   anymore.

6   Q     All right.

7              MR. FRANK:  Your Honor, I don't have any more to

8   offer in that regard.

9              THE COURT:  The objection is sustained.

10             MR. FRANK:  Very well, Your Honor.

11             THE COURT:  Ladies and gentlemen, the testimony you

12  heard about the gap that he testified to is, in the view of

13  the court, beyond his competence, and I am striking that

14  response.  You are not to consider it.

15  BY MR. FRANK:

16  Q     Did you also obtain the contents of the

17  sidkilmartin@hotmail.com --

18  A     We did.

19  Q     -- e-mail account?

20        And did you find any e-mail in there relating to

21  cyanide?

22  A     We did not.

23  Q     What did that account appear to be used for?  Can you

24  tell?

25  A     Most of what I saw on that was real estate listings,

1    e-mails regarding real estate listings and seemed to be

2    personal use.

3    Q    Okay.  How about the -- you've already talked about the

4    denton30 -- andrewdenton35 account, correct?

5    A    Correct.

6    Q    Okay.  All right.  I want to return now to the follow-up

7    investigation you did looking for postal records of -- of some

8    of these mailings you suspected.  Tell -- tell us how you did

9    that --

10   A    Well, a lot of --

11   Q    -- generally speaking.

12   A    Sure.  A lot of it depended on how the -- what

13   information we had to begin with.  So, for instance, with

14   Walter Cottle, he'd taken a picture of his package.  So from

15   the picture of the package, I could see a tracking number, and

16   I could also see the post office that it was mailed at.

17   Q    All right.  And let me show you what's been marked as --

18   let me show you what's been marked as Exhibit 20 for

19   identification, ask you to take a look at that, and tell us if

20   you recognize it, please.

21   A    (Witness looking at exhibit.)  Right, these are copies

22   of the e-mails between Inspector Michael Desrosiers and Walter

23   Cottle.

24   Q    Okay.  When -- let me stop you for a minute.  Is that

25   what they are, or are they copies of e-mails between Walter

1    Cottle and Sidney Kilmartin that Walter Cottle forwarded to

2    Inspector Desrosiers?

3    A    I'm sorry.  That is correct.  Michael -- these are

4    printouts from Michael Desrosiers' e-mail account of e-mails

5    that Walter Cottle forwarded to Michael Desrosiers.

6    Q    Okay.  And they are similar as -- you previously alluded

7    to those in your testimony when you were talking about

8    Exhibit 19, did you not?

9    A    Correct.

10   Q    The set that -- that you found in the Google production,

11   correct?

12   A    Yes.

13   Q    Okay.  And do these e-mails that Cottle forwarded to

14   Desrosiers include the pictures that you just described as an

15   example of the lead that led you to postal records of a

16   mailing from Kilmartin to Cottle?

17   A    That's correct, the first four pages are two e-mails

18   that Walter Cottle sent to Michael Desrosiers, each one

19   containing one photo.  There's a photo of a U.S. mailer, and

20   then there's a photo of a -- a bag that appears to have a

21   substance in it.

22   Q    Okay.  All right.  So let's -- because that was the

23   starting point for your investigative efforts to locate the --

24   the postal service records of that mailing, correct?

25   A    Correct.

311

1   Q     What sort of records does the postal service keep of --

2   of mailings like these -- what do you call these?  These are

3   -- they're not letters, right?  They're --

4   A     These are small parcels.

5   Q     They're about 8 and a half by 11 in size, correct?

6   A     Correct, some are smaller than that, some are larger.

7   Q     All right.  And what sort of records does the postal

8   service keep of these type of mailings?

9   A     Well, we keep tracking records.  We also keep accounting

10  records for when the parcel is mailed, the type of payment,

11  date, time, place.

12  Q     All right.  And all of those are regularly kept in --

13  well, made in the first instance, right, by the postal

14  service?

15  A     Correct.

16  Q     Based on knowledge of someone at the post office or --

17  and their systems?

18  A     Correct.

19  Q     And -- and that's all for postal business of making sure

20  the mail gets where it's supposed to go?

21  A     That's correct.

22  Q     And if it doesn't, it can be tracked and --

23  A     Yes.

24  Q     -- properly --

25  A     You can follow the parcel through the system.

1   Q     And, also, is that why the postal service keeps these

2   records?

3   A     Yes.

4   Q     All right.  So those are the kinds of records that you

5   -- you were -- you were searching to see if you could find?

6   A     Correct.

7   Q     Okay.  And let me show you what's been marked as

8   Exhibit 24 for identification.  What -- what is 24 for

9   identification?

10  A     The first page is --

11  Q     Well, how about generally speaking?

12  A     Oh.  So --

13  Q     What is 20 -- what is this exhibit?  What -- these are

14  postal records?

15  A     These are U.S. Postal Service business records, yes.

16  Q     All right.  With respect to any particular mailing?

17  A     Correct, this is in reference to the mailing that went

18  to St. Marys, Georgia, delivered to Walter Cottle.

19  Q     All right.  The records that you tracked down starting

20  from the -- the -- the tracking number on the Cottle package?

21  A     That's correct.

22  Q     Okay.

23        MR. FRANK:  Your Honor, I'd move Exhibit 24 into

24  evidence.

25        THE COURT:  Any objection?

1          MR. RIDGE:  No, Your Honor.

2          MR. FRANK:  And request permission to project it?

3          THE COURT:  24 is admitted.  You may publish.

4          MR. FRANK:  24.

5    BY MR. FRANK:

6    Q    All right.  Can you explain what this first page of this

7    -- of this five-page exhibit is?

8    A    Yeah, this is the record of the parcel being delivered.

9    It was mailed -- the start-the-clock date, it was mailed on

10   October 13, 2012.

11   Q    Okay.  And that's the first column of this --

12   A    That's column 1, correct.

13   Q    -- here?

14   A    Yes.

15   Q    That -- that entry there that's highlighted in yellow?

16   A    Correct.

17   Q    What does that pertain to?

18   A    That's the date that it was mailed.

19   Q    Okay.  But the row itself pertains to this package?

20   A    Correct.  I'm sorry.  The -- the row highlighted in

21   yellow pertains to this package.

22   Q    All right.  And -- and the first entry in that row is

23   the start-the-clock date?

24   A    Correct.

25   Q    And what does that signify?

1   A     In this instance, it's the date of mailing.

2   Q     All right.  And how about reading across left to right,

3   can you describe what's -- what's -- what information is -- is

4   provided there?

5   A     Sure.  The next column is the zip code that it was

6   mailed at, 04351.  The next column after that is Manchester,

7   Maine, which is 04351.

8   Q     Okay.

9   A     Destination of 31558, which just is the zip code for

10  St. Marys, Georgia.  The 03112550000154367315 is the tracking

11  number off the package.

12  Q     Okay.  So that's the number that you used to find this

13  record?

14  A     Correct.

15  Q     Okay.  And then how about the next three columns, what

16  are they?

17  A     That it was mailed first class, and then the postage and

18  the weight.

19  Q     Okay.  And then if we scroll to the second page of this

20  exhibit?  Oh, boy.

21  A     Yeah.

22  Q     Can you read that?

23  A     I can read it on the paper.  I can't read it on the

24  screen.

25  Q     You have the paper copy.  Can you just describe for us

1   what -- what -- what information is there reading left to

2   right?

3   A      Right.  So you -- you have the date, which, again, is

4   October 13th, 2012.

5   Q      And use your -- use your finger, if you can, to circle

6   what it is you're talking about because we can't read it that

7   clearly.

8   A      All right.  So that's the date.

9   Q      Hm-hmm.

10  A      That line there is the SSA number, which is the -- the

11  clerk.

12  Q      Okay.  So that's the second column?

13  A      Correct.  The third column is a -- it's a visit number.

14  That means all those -- those three lines associated with one

15  transaction.  And then line item is just how many lines are in

16  the item -- 0, 1, and 2.  Tender type is cash.  That means

17  cash was paid for this.

18  Q      Okay.  Where are you now in the table?

19  A      I just -- just did that one there, which it says cash.

20  Q      Okay.

21  A      There is a column for the stamp, but it's not filled in.

22  Product, it says a postal service code for -- in the first

23  line instance, you'll see the next thing is first class.

24  Second line down, I'm not having much trouble -- luck with

25  that -- is domestic tracking.  At that time, you had to pay

1  for the tracking.  And then the PVI, which is the actual

2  postage that's put on the upper right-hand corner of the

3  package.

4  Q     Okay.  Let me stop you for a minute.  What -- what -- if

5  you pay for tracking, what does that buy you?

6  A     Buys you the ability to track the parcel to see where it

7  is in the system and if it was scanned as delivered.

8  Q     Okay.  Continuing on?  I'm going to clear this.  Where

9  are we now?

10  A     So we're now on that column, which is, again, the

11  tracking number.

12  Q     Is that the heading of the column at the top?

13  A     The heading at the column top, it says serial number.

14  Q     Okay.

15  A     There's a blank column for metrics.  Then there's a

16  start time of October 13th, 2012, at 9:10.

17  Q     What does that signify?

18  A     That's the time that the transaction started, when the

19  postal employee presses the button to signify a new customer.

20  That would be the time that the transaction started, so the

21  date and time was October 13th, 2012, it started at 9:10 a.m.

22  and 38 seconds.  Next column is end time, which is

23  October 13th, 2012, at 9:11 a.m. and 7 seconds.

24  Q     Meaning what?

25  A     Meaning that the transaction took about 45 seconds.

1   Q     So that's the -- just the time of the transaction?

2   A     Correct.  Next column is walk-in revenue, so that's the

3   postage, and then we have nothing until we get over to this

4   column, which is the face value, which would mean the total.

5   And then the tender amount here was $3, and that was the

6   change, which was 20 cents.

7   Q     The change made?

8   A     Correct.

9   Q     Okay.  And how about if we scroll down to the last two

10  pages of this exhibit?  Keep going.  Okay.  So this is -- this

11  is page 4 of the exhibit also numbered 1 of 2 at the bottom.

12  And what is this?

13  A     This is the header for when I ran the tracking

14  information for this parcel, so you'll see at the very bottom,

15  down here, is the tracking number again.

16  Q     Okay.

17  A     That's the value that I entered.

18  Q     All right.  And was that to produce tracking

19  information?

20  A     Correct.

21  Q     Okay.  If we scroll down to the next page, what is this

22  about?  This is the last page of this exhibit?

23  A     Correct, this is the actual tracking information for the

24  package all the way through the system.

25  Q     Can you explain it, reading left to right and top to

TAYLOR - DIRECT EXAMINATION/FRANK

1   bottom?

2   A     Sure.  Left to right is the label number, again, the

3   tracking number.  The label ID pound URL is if this was in the

4   -- like the last 60 days, you could -- you could click on that

5   and see the parcel live.

6   Q     Okay.

7              MR. FRANK:  Let me stop you for a minute, let me

8   stop you for a minute and ask if we can switch to the document

9   camera in the hopes that that's more legible.

10  BY MR. FRANK:

11  Q     Okay.  And if you could pick up --

12  A     Sure.  So as -- as I said, the first column is tracking.

13  Q     So that's the number on the package?

14  A     Correct.

15  Q     Okay.

16  A     Then we have the -- what I call the PTR link.  Again, if

17  it was in the last 60 days, you could click on that and see

18  live information.  Then there's an event code, and then the

19  next line is accept or pickup, and then the date and time of

20  that, again, was October 13th, 2012, 9:10 a.m. --

21  Q     Meaning what?

22  A     -- 39 seconds.  Meaning that's when the parcel was

23  scanned as accepted at the Manchester post office.

24  Q     So that's when it was presented to them for -- for

25  mailing?

1   A      Correct.

2   Q      Okay.

3   A      And that corresponded to the previous pages that showed

4   the actual cash transaction.

5   Q      Okay.

6   A      Again, the zip code where it started, 04351.  The city

7   associated with that is Manchester, Maine, posting time, and

8   then in this column, it is scanned for that first line.  That

9   means the parcel was physically scanned.

10  Q      So that's what gets it into the system in the first

11  place; is that right?

12  A      Correct.

13  Q      Okay.

14  A      So that's why we had the start-the-clock date on that

15  first page.

16  Q      All right.  And then what -- what's documented as you

17  read down this -- this table?

18  A      Well, the documentation is the departure from the post

19  office on the same date.

20  Q      Okay.  That's the second line --

21  A      Correct.

22  Q      -- on the PTS event code column; is that right?

23  A      Correct.

24  Q      Okay.

25  A      After that, it was sent to Nashua, New Hampshire.

1   Q    And just for the record, I'm -- I'm drawing an arrow at

2   the column that you're reading down, correct?

3   A    Correct.

4   Q    Okay.

5   A    So it processed through USPS sort facility, and if you

6   look over here, it'll tell you this -- that's where the city

7   or -- or town that that happened.  So it was processed through

8   Nashua, New Hampshire, left there on October 14th.  It arrived

9   in Jacksonville, Florida, on October 15th.  Departed the

10  Jacksonville, Florida sort facility on October 15th.  It

11  arrived in St. Marys that same day, October 15th.  Was out for

12  delivery and then delivered at 4:25 p.m. on October 15th.

13  Q    And where is that indicated?

14  A    That's in the very bottom.

15  Q    All right.  Now, you -- you found records like this with

16  several -- with respect to several of -- of the mailings,

17  correct?

18  A    Yes.

19  Q    Let me show you what's been marked as Exhibit 29 for

20  identification.  I show you Exhibit 29 for identification, ask

21  you to take a look at that, and ask you if you recognize it,

22  please.

23  A    Yeah, this is the U.S. postal business records that I

24  located referencing a delivery to Phippsburg, Colorado.

25  Q    And who was in Phippsburg, Colorado?

1   A      Stacey Williams.

2   Q      One of -- another one of these persons who paid

3   Kilmartin and received a substance from him, a mailing?

4   A      Correct, via Western Union, yes.

5   Q      Paid via Western Union?

6   A      Paid via Western Union, received it through the U.S.

7   Mail.

8   Q      All right.  And this is the same sort of record as the

9   one you previously described for the jury --

10  A      That's correct.

11  Q      -- 24?

12         MR. FRANK:  I'd move Government's Exhibit 29 into

13  evidence, Your Honor.

14         THE COURT:  Any objection to 29?

15         MR. RIDGE:  No, Your Honor.

16         THE COURT:  29's admitted.

17  BY MR. FRANK:

18  Q      All right.  And it's the same sort of information in the

19  same sort of format, is it not?

20  A      Correct.

21  Q      That documents everything from the presentation of the

22  -- the package for mailing here in Maine, correct?

23  A      Correct.

24  Q      And delivery in Phippsburg, Colorado, correct?

25  A      Correct.

1          MR. FRANK:  20 is not in; am I correct, Jenn?

2          THE CLERK:  That is correct.

3          MR. FRANK:  But, otherwise, 17, 24, and 29 are?

4          THE CLERK:  I don't have that 17 is.

5          MR. FRANK:  Okay.  I don't -- did the -- did I move

6   17?

7          THE CLERK:  No.

8          THE COURT:  I don't have it as --

9          MR. FRANK:  I moved --

10         THE COURT:  -- in evidence.

11         MR. FRANK:  I know there was an objection about the

12  gap -- the testimony about the gap, but I'd move 17 into --

13  into evidence if I haven't already.

14         THE COURT:  Is there any objection?

15         MR. RIDGE:  I'm sorry, Your Honor.  I need to find

16  17 again.

17         THE COURT:  Sure.

18         MR. FRANK:  17 is the screen shot showing the -- the

19  gap in dates.

20         MR. RIDGE:  Oh, no objection to the document.

21         THE COURT:  17's admitted.

22         MR. FRANK:  And, Jenn, otherwise, everything's in?

23         THE COURT:  Well --

24         MR. FRANK:  I'm sorry.

25         THE COURT:  -- you can't ask her a question like

1    that.

2              MR. FRANK:  I'm sorry.

3    BY MR. FRANK:

4    Q    Let me show you what's been marked as Exhibit 10.5 for

5    identification, ask you to take a look at that, and tell us if

6    you recognize it, please.

7    A    (Witness looking at exhibit.)  Yes, these are, again,

8    postal business records relating to a mailing to Jessica Wolfe

9    -- or Donalee Wolfe -- I'm sorry -- Donalee Wolfe.

10   Q    Okay.  And who is Donalee Wolfe or Jessica Wolfe?

11   A    Donalee Wolfe initially sent a payment via PayPal that

12   was then reversed, and Jessica Wolfe sent a payment,

13   approximately five days later, via Western Union to Sidney

14   Kilmartin.

15   Q    All right.  And then did that eventually lead you to --

16   to records of a mailing from --

17   A    Yes, it did.

18   Q    -- Manchester to --

19   A    Yes.

20   Q    -- to Utah?

21   A    Correct.

22   Q    And is that what's documented here?

23   A    Correct.

24   Q    And is that where the Wolfes live?

25   A    That's where the Western Union money was sent from.

1    Q      Okay.  And are these the same type of records as the

2    previous ones that you've been describing?

3    A      Yes, they are.

4    Q      Documenting the progress of that mailing through the

5    system to its destination?

6    A      Correct.

7                  MR. FRANK:  I'd move Exhibit 10.5 into evidence.

8                  THE COURT:  Any objection?

9                  MR. RIDGE:  Your Honor, just the same objection I've

10   had to other documents for non-Denton individuals.

11                 THE COURT:  All right.  Ladies and gentlemen, I'm

12   going to admit 10.5, and that earlier instruction I gave you

13   about the limited use and how you can and cannot use the

14   exhibit is applicable to 10.5, as well.

15   BY MR. FRANK:

16   Q      Let me show you what's been marked as Exhibit 18 for

17   identification.  I'm showing you what's been marked as

18   Government Exhibit 18 for identification, ask you to take a

19   look at that, and tell us if you recognize it, please.

20   A      (Witness looking at exhibit.)  Right, these are

21   printouts of the e-mails from Mozilla Thunderbird that are

22   actually referenced in my table.

23   Q      Okay.  They're e-mails between who?

24   A      Donalee Wolfe and skiptin@gmail.com.

25   Q      About what?

1   A      There is a reference to a Western Union online, and

2   there is a reference to skiptin -- skiptin telling Donalee

3   Wolfe to remember to have them taken on an empty stomach.

4   Q      Okay.  And where were these found?

5   A      These were from the Google search warrant proceeds.

6   Q      And -- and who found them?

7   A      I did.

8          MR. FRANK:  Your Honor, I'd move Exhibit 18 into

9   evidence.

10         THE COURT:  Any objection to 18?

11         MR. RIDGE:  Well, Your Honor, if it's subject to the

12  same limiting instruction, I have no objection.

13         THE COURT:  All right.  Ladies and gentlemen, again,

14  I'm admitting 18 subject to that same limiting instruction as

15  to how you can and cannot use the evidence.

16  BY MR. FRANK:

17  Q      And, Inspector Taylor, how does -- how does the -- the

18  Wolfe e-mail and postal records of the mailing between

19  Manchester and Utah associated -- relate to the Maine State

20  Credit Union statement that Ms. Barnes identified for November

21  of 2012 during her testimony?

22  A      That transaction was paid for with a debit card.

23  Q      Documented in that -- that monthly statement?

24  A      Correct.

25  Q      And let me show you what's been marked as Exhibit 37.

1    Showing you what's been marked as Exhibit 37 for

2    identification, ask you to take a look at that, and tell us if

3    you recognize it, please.

4    A      (Witness looking at exhibit.)  Yes, this is postal

5    business records relating to a parcel sent to Derek Jorgensen.

6    Q      All right.  And how did you find these?

7    A      This was based off the records received from customs.

8    Q      Okay.  When you say customs, earlier you identified a

9    lead from headquarters --

10   A      Correct.

11   Q      -- as Exhibit 36.  It documented four international

12   mailings, correct?

13   A      That's correct.

14   Q      All right.  Is that what you're referring to?

15   A      Yes, when -- when the postal employee receives that

16   CN22, they enter the information from that label into the

17   postal service system, that's uploaded to customs.

18   Q      All right.  And that was documented in the lead that

19   came to you from headquarters?

20   A      Correct.

21   Q      And caused you to go out and look for the records of

22   that mailing?

23   A      That is correct.

24   Q      All right.  And is that with what this -- this exhibit

25   is?

1   A     This is, yes.

2   Q     All right.  Same sort of records with respect to this

3   mailing --

4   A     Yeah.

5   Q     -- as the others that you've -- you've previously

6   identified?

7   A     Correct, and this was a cash transaction.

8   Q     Meaning what?

9   A     Meaning the customer, when they mailed the parcel, paid

10  cash.

11  Q     All right.  And where -- where did that happen?

12  A     This was at the Manchester, Maine post office.

13  Q     All right.  And where did the parcel ultimately go?

14  A      It -- well, postal service records show that it left

15  Jamaica, New York, which is the International Service Center.

16  It was destined, according to the information supplied by the

17  customer, it was going to Hull, England.

18  Q     Okay.

19          MR. FRANK:  And, Your Honor, I'd move Exhibit 37

20  into evidence.

21          THE COURT:  Any objection?

22          MR. RIDGE:  Subject to the limiting instruction,

23  there is no objection.

24          THE COURT:  All right.  Thank you.

25      Again, ladies and gentlemen, 37 is being admitted subject

1   to that same limiting instruction as to how you may and may

2   not use the exhibit.

3   BY MR. FRANK:

4   Q    Were you able to find records of the mailing to Jeremy

5   Katzmier in Canada?

6   A    I believe the only thing I found for that was tracking

7   information.

8   Q    Okay.  So you weren't --

9   A    But --

10  Q    -- you weren't able to find the same sort of postal

11  records with respect to that one?

12  A    Not that I recall.  I don't -- I don't recall with that

13  one --

14  Q    Okay.  That was --

15  A    -- at this time.

16  Q    That was one of the four that came in the lead from

17  headquarters, correct?

18  A    Correct.

19  Q    All right.  Let me show you what's been marked as

20  Exhibit 53 for identification.  What is Exhibit 53 for

21  identification?

22  A    This is postal business records relating to the first

23  mailing to Andrew Denton on November 16th, 2012.

24  Q    And the same sort of records as you've described with

25  respect to the prior mailings?

1    A      Correct.

2           MR. FRANK:  Your Honor, I'd move Exhibit 53 into

3    evidence.

4           THE COURT:  Any objection?

5           MR. RIDGE:  Your Honor, I just have a clarifying

6    question.  I got confused about what the exhibit is.  Is it

7    the November 16th, 2012 mailing?  And then there was a

8    reference to a prior exhibit.

9    A      Right.  This one is November 16th, 2012.

10          MR. RIDGE:  Okay.  No objection to that, Your Honor.

11          THE COURT:  It's admitted.

12          MR. FRANK:  And request permission to publish?

13          THE COURT:  You may.

14          MR. FRANK:  Let's see how legible this is -- 53.

15   Let's try -- I'm going to try the -- the hard copy, if I can,

16   using the document camera because I think that's too small.

17   Okay.

18   BY MR. FRANK:

19   Q      All right.  So, again, what -- I can enlarge this.  What

20   is this table?

21   A      This is records of the transaction at the window unit of

22   the Augusta post office.  So when somebody comes in to mail

23   something and the clerk enters it -- enters it into our system

24   and they pay for it, this is the data that is generated from

25   that.

1    Q     Okay.  And how was it that you were able to locate in

2    here the Denton November 16th mailing, 2012?

3    A     Well, based on the information I received initially, I

4    had the date of mailing, as well as a tracking number from the

5    customs form, so I was able to run the tracking first, find

6    the date and time and the post office, and then located it in

7    the accounting records.

8    Q     All right.  And is that what these are?

9    A     Yes.

10   Q     All right.  And where in here is the Denton mailing, is

11   it highlighted?

12   A     Yes, it is.

13   Q     Okay.  So it's the second page?

14   A     Correct.

15   Q     Highlighted in yellow?

16   A     Yes.

17   Q     And what sort of information is contained in this?

18   A     Well, again, it's the date and time of the transaction,

19   that cash was paid.

20   Q     Okay.  Let me stop you.  So we're reading left to right

21   across the page in this table?

22   A     Yep.

23   Q     Okay.

24   A     So November 16th, 2012 is the date of the transaction.

25   Q     That's in the far left-hand corner?

1   A      Correct.

2   Q      Okay.

3   A      The next column is -- relates to the employee who was

4   conducting the transaction.

5   Q      All right.

6   A      There's the transaction number, and you see it's

7   sequential.

8   Q      Okay.

9   A      There's other indications of -- or two -- two line

10  items, cash.  And as we move across, again, more postal codes

11  regarding the -- or, basically, AIC numbers, accounting

12  identification numbers, so you have the first class parcel,

13  and the PVI is the second line, that's the actual postage that

14  the employee will print out and put on the package.

15  Q      And I'm circling that there in that column in the middle

16  of the page?

17  A      Correct.

18  Q      That's where you are at this point?

19  A      Yes.

20  Q      Okay.  Moving across the page.

21  A      I would have to see the -- the column header for the

22  next column.

23  Q      All right.

24  A      But --

25  Q      Well, how about -- how about -- do you know what the

1   other entries are on the far right?

2   A     Yeah, well, you have the date and time that the

3   transaction started and ended.

4   Q     Yeah.

5   A     And then the amount, and then if we kept going to the

6   right, total paid $10 and re -- received $7.71 in change.

7   Q     Okay.  So that -- that -- that's the financial

8   transaction --

9   A     Correct.

10  Q     -- documented there?  Okay.  And then if we flip ahead,

11  we get to this similar heading we've seen before, correct?

12  A     Correct.

13  Q     What is this?  Is this the tracking information as

14  before?

15  A     Yes, so, again, this -- this will be related to that

16  customs form number.

17  Q     Okay.  And if we turn to the second page of the tracking

18  information, what -- what is it that's --

19  A     It's showing that it was accepted at the Augusta post

20  office.  It departed the Augusta post office on the same day,

21  arrived at the Scarborough, Maine processing facility, and

22  then departed the Scarborough, Maine processing facility on

23  November 21st, 2012.

24  Q     And -- and headed where?

25  A     It would go through the International Service Center

1   headed for Hull, England.

2   Q     Okay.  And then the next page, what is this?  And I'm

3   going to -- I'm going to zoom back out.  What is -- what is

4   this page?

5   A     This is another form of the tracking information.  When

6   I initially ran this, it was still in the system, so as I

7   talked about that PTR link in the other document, that if it

8   was still live, you might be able to see a more detailed

9   report.

10  Q     And you were able to get this additional detail because

11  it was still in the system, it hadn't been --

12  A     Correct.

13  Q     -- erased?

14  A     Correct.

15  Q     Okay.  And this -- this page is headed U.S. Postal

16  Service Track/Confirm, correct?

17  A     Yes.

18  Q     All right.  And -- and what sort of information is here?

19  A     Well, again, it's telling you the country it's going to,

20  which is Great Britain, at the very top its destination.

21  Well, it starts with a tracking number again.  The destination

22  was Great Britain.  The origin is the Augusta post office.

23  That it is an international letter weighing approximately an

24  ounce, postage of $3.  And you can see the date that I

25  restored the record.

1   Q     What does that mean?

2   A     So when you -- as I mentioned earlier, if it's still

3   live in the system, you can get it by clicking on the link.

4   If it archives it for a certain period, at that time, we were

5   able to click on the archived version and that brings this up.

6   So it shows I did that on April 9th, 2013.

7   Q     All right.  And at some point, is it lost from the

8   system entirely?

9   A     It's -- it varies depending on the volume.  I've seen

10  anywhere from being able to recover something three years ago

11  to five years ago, and sometimes within a year, it's gone.

12  Q     Okay.  What do you mean varies according to volume?

13  A     Depending on the type of service.  So in this form -- in

14  this manner, it's a customs form, so it's a smaller tracking

15  number.  There's too many variables to try to figure out.  I

16  -- I -- I can't testify to why the system has stuff there

17  longer than others.

18  Q     Okay.  But it -- in your experience, it does?

19  A     Yeah.

20  Q     Okay.  And in any event, this information was still

21  available when you went looking for it.

22  A     Correct.

23  Q     All right.  And -- and -- okay.  What more does it tell

24  you about the progress of this package?

25  A     Well, in this case, it's -- it's in reverse order from

1   the other document that we saw, so the accept is at the bottom

2   this time.

3   Q    Okay.  So if we push down to the bottom there?

4   A    Yeah.

5   Q    Where -- where is that?

6   A    So you've got the date and time, again, October 16th,

7   2012, at 10:32 at the Augusta post office.  It's scanned as

8   leaving, although it's a system-generated scan, which means

9   it's a batch, so anything mailed at the Augusta post office

10  outgoing that day would receive that same scan.

11  Q    Okay.  So does that mean that each package wasn't

12  separately scanned?

13  A    No, since it says system generated, that means the

14  parcel was not scanned individually at that time.

15  Q    Okay.  Which is a yes answer, correct?

16  A    Correct.  I'm sorry.

17  Q    Yes, it was not individually scanned.  It went out as a

18  batch.  Okay.  Very good.  And -- and where does it go?

19  A    It goes to the Scarborough, Maine processing facility.

20  It's sorted on a small parcel bundle sorter at 8:30 at night

21  that same night.

22  Q    Okay.  Where is that indicated?

23  A    (Witness indicating.)

24  Q    Okay.

25  A    And then, again, there's a system-generated scan on

1    November 21st that says the parcel has left the facility.

2    Q    Okay.  Is that the top event in that box?

3    A    Correct.

4    Q    All right.  And where was it headed?

5    A    Again, it was headed to Great Britain.

6    Q    Let me show you what's been marked as Exhibit 57 for

7    identification.  I'm showing you what's been marked as

8    Exhibit 57 for identification, ask you to take a look at that,

9    and tell us if you recognize it, please.

10   A    (Witness looking at exhibit.)  Yes, this is postal

11   business records relating to the second parcel mailed to

12   Andrew Denton.

13   Q    And when was that mailed?

14   A    December 11th, 2012.

15   Q    Okay.  And are these the same sort of records as the

16   previous postal records regarding mailings that you've been

17   describing?

18   A    Yes, I had the same records as the first mailing.

19   Q    And -- and not only the first mailing, but -- to Denton,

20   but others of these mailings, correct?

21   A    Correct.

22   Q    Okay.

23            MR. FRANK:  Your Honor, I'd move Government's

24   Exhibit 57 into evidence.

25            THE COURT:  Any objection?

1              MR. RIDGE:  No, Your Honor.  Thank you.

2              THE COURT:  It's admitted.

3              MR. FRANK:  And request permission to publish?

4              THE COURT:  You may.

5    BY MR. FRANK:

6    Q    All right.  And, again, Inspector, starting with page 1,

7    can you describe what's -- and I'll try and zoom it here --

8    what is documented here in this record?

9    A    That's correct.  Again, reading left to right is

10   December 11th, 2012.

11   Q    Okay.  So this is the highlighted line --

12   A    Yes.

13   Q    -- toward the bottom of the page?

14   A    Correct.

15   Q    Okay.  Are these the same sort of accounting records?

16   A    Yes.

17   Q    Doc --

18   A    Yes.

19   Q    Doc --

20   A    Exactly the same.

21   Q    Documenting the financial aspect of this transaction?

22   A    Yes.

23   Q    Okay.  And what's -- what's documented there, if you

24   could just read across, summarize for us what happened.

25   A    Sure.  So in the first column is December 11th, 2012.

1    The second column is the employee.  Third column is the ID

2    visit.  The fourth column, again, is coding.  Fifth column is

3    how the transaction was paid for, which was cash.  Next two

4    columns, again, are postal coding.  And then there's a

5    description that it's a first class package international

6    service, and the second line is highlighted as PVI, again,

7    that's the postage that the employee puts on, again, the PVI

8    number, and then we get to the date and time of the

9    transaction, the amount, what was paid, and the -- the change

10   that was given again.

11   Q     Okay.  And then if we flip forward, we get to the -- the

12   -- the tracking records again?

13   A     Correct.

14   Q     And this is the -- the last three pages of this exhibit,

15   correct?

16   A     Yes.

17   Q     All right.  So the third-to-last page is what, what's

18   documented there?

19   A     Again, that's the information that I put in, the

20   tracking number ending in 048US.

21   Q     Okay.  And where did that come from?

22   A     That came from the -- a couple places, from the customs

23   information that postal headquarters forwarded to me.

24   Q     In that table No. 36?

25   A     In the table, correct, as well as from the second

1   package that was recovered at the scene of Denton's death.

2   Q     All right.  Both -- both packages recovered and these --

3   these identifying numbers were on them?

4   A     Correct.

5   Q     Okay.  All right.  And if we flip to the next page, the

6   second-to-last page of this exhibit, this is the same sort of

7   tracking information, is it not?

8   A     Yes.

9   Q     And what's documented there?

10  A     Again, that the parcel was accepted at the Manchester,

11  Maine post office on December 11th, 2012.  It gives the time

12  that it -- that it was done, which is 9:33:57, and that it was

13  scanned.

14  Q     Okay.  That's the column headed input indicator --

15  A     Correct.

16  Q     -- D --

17  A     That means that the parcel is physically scanned, then

18  received a system-generated scan in the second -- second line

19  where it departed the post office, third line where it arrived

20  at the Scarborough post office, fourth line where it left the

21  Scarborough post office, system-generated, and then the scan

22  at the International Service Center in Jamaica, New York.

23  Q     And that's the last entry in the United States, right --

24  A     Correct.

25  Q     -- before it goes overseas?

1    A     Yep.

2    Q     Okay.  And then the last page of this exhibit, and,

3    let's see, this version has a sticky on it, but it just -- it

4    doesn't obscure anything, does it?

5    A     No.

6    Q     All right.  So what -- what information's documented

7    here?

8    A     Well, again, we have the tracking number at the top, and

9    then we have the country of origin, which is United Kingdom.

10   We have the postage and --

11   Q     That's the country of origin or destination?

12   A     I'm sorry.  Destination.  Country of destination was

13   United Kingdom.

14   Q     Okay.

15   A     And then the postage, the weight, and then we go --

16   scroll down and we get to the tracking.  And on this form, it

17   actually has the scan for the delivery.

18   Q     In the United Kingdom.

19   A     Correct.

20   Q     At the top of that box at the bottom.

21   A     Correct.

22   Q     And when was it scanned as delivered?

23   A     It looks -- I'm having a hard time reading, but it

24   appears to be December 20th, 2012.

25   Q     Okay.  At -- at 1526?

1    A      Correct.

2    Q      Now, do you know why this -- this tracking information

3    includes that final delivery information?

4    A      This one was more current than the previous one that you

5    saw.

6    Q      Okay.  When -- when you mean -- what do you mean by more

7    current?

8    A      The previous page to this, where it's the scan detail by

9    label, that was run after this one was, so that information

10   was still available.

11   Q      All right.  So there was more information available in

12   your record system at the time that you made this query or

13   search?

14   A      Correct.  I think at the bottom of this page is the date

15   that I made the query.

16   Q      Okay.  All right.  So if I -- if I slide down --

17   A      Yep.

18   Q      -- is -- is that the date?

19   A      So -- yes, May 13th, 2013.

20   Q      May 13th, 2013.  Okay.  So at that point in time, there

21   was more information available in your system and that's why

22   it appears in this exhibit?

23   A      Correct.

24              THE COURT:  Is this a good time to break?

25              MR. FRANK:  Yes, Your Honor.

1          THE COURT:  You may stand down, sir.

2          THE WITNESS:  Thank you.

3          THE COURT:  Thank you.

4      (The witness left the witness stand.)

5          THE COURT:  Ladies and gentlemen, you know the

6  drill.  You know what you can and can't do.  I'm not going to

7  repeat it.  You already know it.  I thank you for complying

8  with my orders earlier and not doing what you weren't supposed

9  to do and also arriving promptly.

10     We'll see you all tomorrow at no later than 8:30.  Thank

11  you.

12     (Jury exited at 2:30 p.m.)

13          THE COURT:  Court will stand in recess.

14     (Proceedings concluded at 2:30 p.m.)

15                      CERTIFICATION

16     I certify that the foregoing is a correct transcript from

17  the record of proceedings in the above-entitled matter.

18

19

20  /s/ Julie G. Edgecomb_____        February 14, 2017___
    Julie G. Edgecomb, RMR, CRR         Date
21  Official Court Reporter

22

23

24

25