1              UNITED STATES DISTRICT COURT

2                    DISTRICT OF MAINE

3

4    UNITED STATES OF AMERICA     )
                                  )
5                                 )          CRIMINAL ACTION
             vs.                  )
6                                 )   Docket No. 1:14-cr-00129-JAW-1
                                  )
7    SIDNEY P. KILMARTIN,         )          JURY TRIAL
                                  )
8                  Defendant.     )

9

10                    VOLUME III OF VI

11                TRANSCRIPT OF PROCEEDINGS

12        Pursuant to notice, the above-entitled matter came on

13   for JURY TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

14   in the United States District Court, Bangor, Maine, on the

15   5th day of October, 2016, at 8:35 a.m.

16

17

18   APPEARANCES:

19   For the Government:                  Halsey B. Frank, Esquire

20   For the Defendant:                   Martin Ridge, Esquire

21

22

23               Julie G. Edgecomb, RMR, CRR
                    Official Court Reporter

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

1
<u>INDEX OF PROCEEDINGS</u>
Page:

2
Testimony:  (see below)

3
Discussion of Government's Exhibit No. 84:          358

4
Stipulation:                              426, 463, 502

5
<u>INDEX OF WITNESSES</u>

6
Page:

7
JEFFREY TAYLOR  (called by Mr. Frank)

8
Continued Direct Examination by Mr. Frank          347
Cross-Examination by Mr. Ridge                     377

9
Redirect Examination by Mr. Frank             391, 404
Recross-Examination by Mr. Ridge                   402

10
WALTER COTTLE  (called by Mr. Frank)

11
Direct Examination by Mr. Frank                    408

12
Cross-Examination by Mr. Ridge                     424

13
AMELIA KANI  (called by Mr. Frank)

14
Direct Examination by Mr. Frank                    427

15
STACEY WILLIAMS  (called by Mr. Frank)

16
Direct Examination by Mr. Frank                    450

17
KIMBERLY VALDEZ  (called by Mr. Frank)

18
Direct Examination by Mr. Frank                    464

19
STUART DANIEL QUINN  (called by Mr. Frank)

20
Direct Examination by Mr. Frank                    480

21
CYNTHIA KIRSCHLING  (called by Mr. Frank)

22
Direct Examination by Mr. Frank                    491

23
AUTUMN ROLAND  (called by Mr. Frank)

24
Direct Examination by Mr. Frank                    503

25

INDEX OF EXHIBITS

| Government's Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 20 | Cottle E-Mail with Kilmartin | 419 | 420 |
| 20-A | Picture of Package | 421 | 421 |
| 20-B | Picture of Baggie Inside Package | 421 | 421 |
| 21 | PayPal Records of Kilmartin | 430 | 430 |
| 23 | TD Bank Records of Kilmartin | 449 | 449 |
| 26-A | Epsom Salts that Cottle Received from Kilmartin, Bag, Paint Can Lid | 423 | 423 |
| 26-B | Epsom Salts that Cottle Received from Kilmartin, Bag, Paint Can Lid | 423 | 423 |
| 26-C | Epsom Salts that Cottle Received from Kilmartin, Bag, Paint Can Lid | 423 | 423 |
| 28 | Western Union Form with Williams' Payment to Kilmartin | 460 | 460 |
| 30-A | Epsom Salts that Williams Received from Kilmartin, Baggie, and Tube | 462 | 462 |
| 30-B | Epsom Salts that Williams Received from Kilmartin, Baggie, and Tube | 462 | 462 |
| 31 | Williams' Picture of Baggie | 461 | 461 |
| 33 | Delhaize America/Hannaford Records of Western Union Payments | 467 | 467 |
| 34-A | State of Maine Bureau of Motor Vehicles' Records of Kilmartin | 479 | 479 |
| 34-B | State of Maine Bureau of Motor Vehicles' Records of Kilmartin | 479 | 479 |
| 34-C | State of Maine Bureau of Motor Vehicles' Records of Kilmartin | 479 | 479 |
| 35 | Epsom Salts that Jorgensen Received from Kilmartin | 489 | 489 |
| 39-A | Epsom Salts that Kirschling Received from Kilmartin, Return Address, and Bottle | 501 | 501 |
| 39-B | Epsom Salts that Kirschling Received from Kilmartin, Return Address, and Bottle | 501 | 501 |
| 39-C | Epsom Salts that Kirschling Received from Kilmartin, Return Address, and Bottle | 501 | 501 |
| 40 | Kirschling's Picture of Bottle | 500 | 500 |
| 45 | Two Pictures of Manchester, Maine | 371 | 371 |
| 46 | Roland's E-Mail with Kilmartin | 511 | 511 |
| 73 | Smiths Detection Printout | 405, 406 | -- |
| 102 | Taylor's Analysis of Denton's E-Mail Account | 396 | 396 |
| 103 | Copy of Government Exhibit No. 49 | 398 | 398 |

1          (Defendant present in open court.)

2              THE COURT:  A couple of matters, counsel.

3       First, we received word -- or the clerk's office received

4    word from our foreperson that she had a medical issue that she

5    felt she had to attend to, so she has -- she's not going to be

6    here.  I'm moving the next juror, who's Juror No. 103, over to

7    the foreperson's seat and will ask him to act as the

8    foreperson and that also means that Alternate No. 1 will be

9    part of the jury panel, meaning we only now have one

10   alternate.

11      The second point of information is that we have prepared

12   a draft set of final jury instructions and a draft jury

13   verdict form.  I am asking my judicial assistant to give

14   counsel copies of both the verdict form and the final jury

15   instructions at one of the breaks and to e-mail them to you.

16   These aren't set in stone, but they'll be a working draft from

17   which we can resolve any issues with the final jury

18   instructions.

19      Is there anything before we bring the jury in?

20              MR. FRANK:  Your Honor, only that again this morning

21   I supplemented Jencks with last night's notes of conversations

22   with witnesses.  They're very brief.

23              THE COURT:  All right.  Thank you.

24      Mr. Ridge?

25              MR. RIDGE:  Nothing, Your Honor.  Thank you.

1          THE COURT:  Thank you.

2      Would you bring the jury in, please.

3      (Jury entered at 8:36 a.m.)

4          THE COURT:  Good morning, ladies and gentlemen.

5          THE JURY:  Good morning.

6          THE COURT:  Now, you'll notice that you have one

7  fewer juror.  Something came up with our foreperson, and she

8  was not able to be here today.  So, Juror No. 103, I basically

9  moved you into the foreperson's seat, and I'll ask you to

10  serve as the foreperson on this jury.  Again, I'll give some

11  instructions at the end of trial as to what your role will be.

12      Are you ready to proceed?

13          MR. FRANK:  I am, Your Honor.  Thank you.

14      (Jeffrey Taylor returned to the witness stand, and the

15  following proceedings transpired.)

16          THE COURT:  You remain under oath.

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  Thank you.

19      Mr. Frank?

20          MR. FRANK:  Thank you, Your Honor.

21                    CONTINUED DIRECT EXAMINATION

22  BY MR. FRANK:

23  Q     Inspector Taylor, when we broke yesterday, my

24  recollection is you had finished talking about postal records

25  of various mailings, including the -- the two mailings to

1    Andrew Denton in Hull, England, correct?

2    A      Correct.

3    Q      Let me show you what has been marked -- well, admitted

4    as -- into evidence as Exhibit 53 and what has been marked as

5    Exhibit 51 for identification, and, actually, I'm going to get

6    52, as well.

7              THE COURT:  You're sort of mumbling.

8              MR. FRANK:  I'm sorry.

9              THE COURT:  It's -- it's hard to pick you up.

10   BY MR. FRANK:

11   Q      Okay.  I -- Inspector, I want to show you what is

12   admitted in evidence as 53 and what has been marked for

13   identification as 51 and I think also what has been admitted

14   as 52 and ask you to -- well, let's start with what is marked

15   for identification as 51.  If you could take a look at that

16   and tell us if you -- if you recognize it, what it is.  And is

17   it 51, do I have the right one?

18   A      (Witness looking at exhibit.)  Yes, it's 51.

19   Q      Okay.  What is 51?

20   A      This is the mailer that was mailed at the Augusta post

21   office on November 16th, 2012, from S. Martin, 88 Pond Road,

22   Manchester, Maine, to Andrew Denton, 17 Holland Street,

23   Holderness Road, in Hull.

24   Q      Okay.  And recovered over in England and brought back to

25   the United States?

1    A       Correct.

2    Q       Okay.  And what is 52 for iden -- 52 in evidence?

3    A       52 is the customs form that I recovered at the Augusta

4    post office.

5    Q       Okay.  And what is 53 in evidence?

6    A       53 is the USPS postal business records, indicating the

7    records that we have of the mailing.

8    Q       Okay.  How do these three exhibits relate?

9    A       The information in all three matches.

10   Q       Okay.

11   A       So on the --

12   Q       What information matches?

13   A       So on the customs declaration form, the tracking number

14   is LC542345434US.  The tracking number on the parcel is

15   LC542345434US.  The from on the customs form matches the

16   information for the sender on the parcel, as well as the

17   information for the recipient or addressee on the customs form

18   matches the addressee on the parcel.

19           And on the postal business records, it shows it was

20   mailed at the November -- excuse me -- the Augusta post office

21   November 16th, 2012, and the PVI number matches the PVI

22   machine that was used at the postal service.

23   Q       What is the PVI number and machine?

24   A       So when the postal employee is at a workstation, so in

25   Augusta, there's at least three workstations, so there can be

1    three clerks working at one time, each workstation has their

2    own PVI machine so that prints the postage out, and each

3    machine has a code associated with it.

4         So if you were to look at the postal business records,

5    you would see that on the 16th, the clerk who -- and the clerk

6    is in column 2 here, they would be associated with the PVI

7    label number, which would be here in column 1, 2, 3, 4, 5, 6,

8    7, 8 -- 9.  That PVI number would match the PVI number here

9    under the postage amount.

10   Q    All right.  So is it fair to say that the -- all go

11   together and the records are the records of the mailing of the

12   parcel itself?

13   A    Correct.

14   Q    And then let me show you what has been marked as

15   Exhibit 57 -- 56 and 57.  And I don't know that we can do this

16   other -- I can't project them side by side.

17        So, again, let me show you what's been admitted into

18   evidence as 57, and let's start with what has been marked for

19   identification as Exhibit 56.  Let me stop you for a minute.

20        Before you do that, do you want -- do you want to put 51

21   back together before we go any further?

22   A    (Witness complying.)

23   Q    All right.  And would you please explain what 56 for

24   identification is?  Do you recognize it?

25   A    Yes, 56 is the parcel that was mailed from the

1    Manchester, Maine post office on December 11th, 2012, from

2    S. Martin, 88 Pond Road, Manchester, Maine, to Andrew Denton,

3    17 Holland Street, Holderness Road, in Hull, and it has

4    tracking No. LC468117048US.

5    Q    All right.  And is this the second package that was

6    retrieved over in England and brought back to the United

7    States?

8    A    That is correct.

9    Q    Part of all the physical evidence that was brought back

10   here that way?

11   A    Correct.

12   Q    All right.  How do these two exhibits relate?

13   A    Again, we have the postal --

14   Q    50 --

15   A    -- business records -- sorry.

16   Q    57 are postal business records.

17   A    Correct, of the mailing on December 11th, 2012, at the

18   Manchester, Maine post office.

19   Q    Okay.  Let me stop you.  Is it fair to say that those

20   are the records of that package?

21   A    Correct.

22   Q    The postal records of that package.  Okay.

23   A    Yes, it is.

24   Q    All right.  And how do you know that?

25   A    I know based on the tracking number and the PVI label

TAYLOR - CONTINUED DIRECT EXAMINATION/FRANK

352

1    that match that that's the mailing.

2    Q    Okay.  Did you visit Cynthia Kirschling as part of

3    your --

4    A    I did.

5    Q    -- duties in this case?  Who is Cynthia Kirschling?

6    A    Cynthia Kirschling was another person we identified as

7    wiring money to Sidney Kilmartin via Western Union.

8    Q    All right.  And when and why did you go visit her?

9    A    When we first contacted Cynthia Kirschling, she stated

10   that she recalled ordering cyanide and that she still

11   possessed what she had ordered.

12   Q    Okay.  So that's why you went to go see her?

13   A    Correct.

14   Q    Where was she?

15   A    She was in Washburn, Wisconsin.

16   Q    Okay.  And when did you go see her?

17   A    Physically went to see her in March of 2015.

18   Q    All right.  What did you do there?

19   A    I recovered the evidence that she had turned into the

20   Bayfield County Sheriff's Office when she initially spoke with

21   postal inspectors and informed us that she still had the

22   substance that she had received through U.S. Mail.  She --

23   inspectors contacted Bayfield County Sheriff's Office.  They

24   went to the residence.  She turned it into them.  They took it

25   into evidence.

1      So when I went to Bayfield County Sheriff's Office, I

2   recovered the evidence from them and met with Cynthia

3   Kirschling.

4   Q      And can you describe that evidence?

5   A      That evidence was a -- a small plastic pill bottle and

6   -- that had the word poison written on the side of it in -- in

7   what looked like a Sharpie.   There was -- when -- inside of

8   that pill bottle was a small clear plastic bag with a white

9   substance in it and a torn-off return address off of a mailer.

10             MR. FRANK:   And if you can provide me Exhibits 39.

11   BY MR. FRANK:

12   Q      Showing you what has been marked as Exhibits 39-A, B,

13   and C for identification, ask you to take a look at those and

14   tell us if you recognize them, please.

15   A      Yes, this is the pill bottle that I recovered from the

16   Bayfield County Sheriff's Office and showed to Cynthia

17   Kirschling, who identified it as what she had turned into

18   Bayfield County.

19   Q      All right.   Did you recover more than just the pill

20   bottle?

21   A      Yes.

22   Q      What else did you recover?

23   A      As I said, inside the pill bottle was a clear plastic

24   bag with a substance inside of it and a return address off of

25   a mailer that had been torn.

354

1    Q      Are those there in that exhibit?

2    A      Inside of the pill bottle is what's marked as a --

3    39-B --

4    Q      Okay.

5    A      -- which is the substance that she turned into Bayfield

6    County.

7    Q      All right.  Is 39-C also there?

8    A      No.

9    Q      Is 39-C -- I'm going to show you what's been marked as

10   39-C for identification, ask you to take a look at that, tell

11   us if you recognize it.

12   A      Yes, this is the torn return address from the mailer

13   that is S. Martin, 88 Pond Road, Manchester, Maine 04351.

14   Q      All right.  And what did you do with those items after

15   you retrieved them in Wisconsin?

16   A      I transported them back to Maine and took them to the

17   Health and Environmental Testing Lab in Augusta, Maine, for

18   testing.

19   Q      Who in particular there?

20   A      Jim Curlett.

21   Q      And who is he?

22   A      He's a chemist at the HETL.

23   Q      As part of your investigation, did you also visit Stacey

24   Williams?

25   A      I did.  I visited her in Colorado.

1   Q     Who is Stacey Williams?

2   A     Stacey Williams is another person that we identified as

3   wiring money to Sidney Kilmartin.

4   Q     I'm going to stop while you replace that in.

5   A     (Witness working with exhibit.)

6   Q     What did you do there?

7   A     Again, I went to visit with Stacey Williams and

8   recovered the item that she had turned into the Routt County

9   Sheriff's Office.

10  Q     And when was that that you made that visit?

11  A     That was in May of 2015.

12  Q     And what was that item?

13  A     It was a small clear plastic bag with a substance inside

14  of it.

15  Q     And what did you do with that?

16  A     Again, I brought it back to Maine, took it to the Health

17  and Environmental Testing Lab in Augusta, again, with Jim

18  Curlett, a chemist there.

19  Q     Let me show you what's been marked as Exhibit 30 for

20  identification, ask you to take a look at that, tell us if you

21  recognize it, please.

22  A     Yes, this is the evidence tube that Routt County had

23  placed the substance in when they recovered it from Stacey

24  Williams.

25  Q     Okay.  Can you describe it from the outside in what

1    you're holding?

2    A    Sure.  Again, it's a small clear plastic bag --

3    Q    Okay.  That's the inside out it sounds like, right?

4    A    Yes.

5    Q    All right.  So let's go inside out.  What's -- what's

6    inside?

7    A    In -- there's a clear plastic tube containing a small

8    clear plastic bag with a white substance.

9    Q    Okay.  And where did the plastic tube come from?

10   A    That is Routt County's evidence tube.

11   Q    All right.  And how about the bag inside?

12   A    That is what Stacey Williams turned into Routt County.

13   Q    Maybe I can --

14   A    Yeah.

15   Q    Did you meet with Ms. Williams and confirm that that, in

16   fact, was the substance that she had received?

17   A    I did.  After I received it from Routt County, I met

18   with Stacey Williams.  She identified it as the substance that

19   she had turned into Routt County.

20   Q    Did you learn of an additional IC3 complaint relating to

21   Mr. Kilmartin as part of your investigation?

22   A    I did.  When I spoke with IC3, they then checked their

23   records and related a second IC3 complaint that was related to

24   skiptin@gmail.com.

25   Q    This is aside from the Denton complaint.

TAYLOR - CONTINUED DIRECT EXAMINATION/FRANK

357

1   A       Correct.

2   Q       And who made that complaint?

3   A       Edith Mae Collins.

4   Q       And did you correspond with Ms. Collins?

5   A       I did.  I spoke with Ms. Collins over the phone.

6   Q       And also correspond with her?

7   A       I did via e-mail.

8   Q       And what was it that she sent you?

9   A       She sent me a copy of an e-mail that her granddaughter,

10  who was living with her at the time, had conversed with

11  skiptin@gmail.com regarding purchasing cyanide.

12  Q       All right.  And did she send you anything else besides?

13  A       She sent me a copy of the e-mail.

14  Q       How about her complaint, did she also forward that to

15  you?

16  A       She did forward me portions of the complaint that she

17  had from IC3 -- that she had filed with IC3.

18  Q       And let me show you what's been marked as 84 for

19  identification, ask you to take a look at that, and tell us if

20  you recognize it, please.

21  A       (Witness looking at exhibit.)  Yes, this is the e-mail

22  from --

23          MR. RIDGE:  Your Honor, I do object to the use of

24  this exhibit and the discussion about the content of the

25  e-mail from a third party who hasn't been here, hasn't

1    testified to what happened.  So I think that particular

2    exhibit at this point is objectionable.

3             MR. FRANK:  Your Honor, I think that it is

4    admissible as an exception -- if this is a hearsay

5    objection --

6             MR. RIDGE:  Hm-hmm, yes.

7             MR. FRANK:  -- for a variety of reasons -- as a

8    verbal act, but also to explain the motive to retaliate here,

9    and it -- that's this disparate treatment theory.

10            THE COURT:  All right.

11            MR. FRANK:  And perhaps I should approach at

12   sidebar.

13            THE COURT:  Yeah.  I think, ladies and gentlemen,

14   rather than my hunching over and talking to the lawyers, I

15   think I'll ask you to go into the jury room for a moment while

16   we sort this out.  Thank you.

17       (Jury exited at 8:57 a.m.)

18            THE COURT:  Okay.  Let's start with what the exhibit

19   actually contains.  What are you -- what are you proposing to

20   introduce here?

21            MR. FRANK:  This is an e-mail -- a copy of an e-mail

22   between Shanda Collins and Sid -- well -- skiptin about

23   cyanide that her grandmother, with whom she was living,

24   discovered and filed an IC3 complaint about.

25            THE COURT:  Okay.

 1            MR. FRANK:  And her grandmother is on the witness

 2  list.  I was planning to call her.  And I think its relevance

 3  -- this evidence's relevance, to begin with, is this --

 4            THE COURT:  I get the relevance.

 5            MR. FRANK:  I'm sorry, Your Honor.

 6            THE COURT:  Yeah, I do get the rel --

 7            MR. FRANK:  I'm sorry.

 8            THE COURT:  The relevance is pretty clear.

 9            MR. FRANK:  I'm sorry.

10            THE COURT:  Yeah.

11            MR. FRANK:  And I do expect Ms. Collins herself to

12  testify later.

13            THE COURT:  Okay.  So the question really is whether

14  it's hearsay.

15            MR. FRANK:  Well, I think there's an argument that

16  it's not so much for the truth of the matter asserted because

17  ultimately what I --

18            THE COURT:  What did the e-mail say?

19            MR. FRANK:  I don't have it in front of me.  Hey, I

20  read your post on the suicide Web site, and I'm done with

21  life.  Please help me out, man.  And then the response -- do I

22  have this in the correct order?  Yes, and then the response

23  is, Shanda, I am a supplier of potassium cyanide.  It is fast,

24  reliable, and painless.  Get back to me for more info, skip.

25       So I think --

1          THE COURT:  Doesn't -- doesn't -- isn't this the

2    same issue you raised in your motion in limine about a string

3    of e-mails -- an e-mail string?

4          MR. RIDGE:  Similar, Your Honor.  I think my -- my

5    motion went to the e-mails with Mr. Denton.

6          THE COURT:  Right.

7          MR. RIDGE:  This is a nonnamed victim.  It's an

8    e-mail written by somebody who we have not and I think will

9    not see.  It's not an e-mail that has been admitted into

10   evidence like the Google things were admitted into evidence,

11   with the representative indicating the authenticity and then

12   telling us what it meant.

13         THE COURT:  Okay.

14         MR. RIDGE:  And I -- the other exhibits that were

15   discussed earlier today I will object to, but on a different

16   basis.  Those were at least exhibits related to people who

17   were named victims to whom -- you know, for which

18   Mr. Kilmartin has pled guilty.

19         THE COURT:  Right.

20         MR. RIDGE:  But this is after the fact.  I don't

21   know who wrote that.  If it's not offered for the --

22         THE COURT:  Let's -- let's just separate -- separate

23   your objections.

24      The first -- the first objection is an objection to

25   foundation, right?

1          MR. RIDGE:  Yes.

2          THE COURT:  And the second objection is an objection

3  to hearsay?

4          MR. RIDGE:  Correct.

5          THE COURT:  So the second objection contains

6  statements -- assuming -- taking the foundational issue aside

7  for a moment, as I just heard it, the second -- the -- your

8  client's response basically confirms that -- it could be

9  interpreted by the jury as confirming that he has actual

10  cyanide that he's willing to sell.  And why isn't that then an

11  admission and the earlier statement by Shanda Collins the

12  context for your client's admission?

13          MR. RIDGE:  I think it would be if the statement

14  were known to be attributed to Shanda Collins.

15          THE COURT:  Right.  But that's a foundational issue.

16          MR. RIDGE:  Right.

17          THE COURT:  I'm going to -- I'm going to deal with

18  the foundational issue in a moment.

19      Let's assume for a moment that he's able to establish

20  appropriate foundation, that he confirms Shanda -- who Shanda

21  Collins is and that she wrote this e-mail to the following

22  e-mail address foundationally.  Okay?  I'm just skipping that

23  and going right to the issue of hearsay.  It sounds to me as

24  if it's an admission by your client that he actually does

25  possess -- or could be interpreted as an admission that he

1    actually does possess cyanide and is willing to sell it.

2              MR. RIDGE:  I would agree with that.

3              THE COURT:  Okay.  So let's then go to the

4    foundational issue, and I agree with you that this witness has

5    not established an appropriate foundation for the admission of

6    the e-mail.  Now, the grandmother may be able to do that or

7    may not be able to do it.  I don't know what she's going to be

8    able to say.

9        I understand, Mr. Frank, that from what you represented

10   earlier that she found out somehow about this e-mail

11   correspondence between her granddaughter and a person we know

12   under the screen name who is the defendant or you've given

13   evidence that he is the defendant.

14             MR. FRANK:  Yes, Your Honor, that's my expectation.

15             THE COURT:  So whether or not her knowledge of her

16   granddaughter's e-mail is sufficient to get that into evidence

17   I don't know; we'll have to wait and see.  But it strikes me

18   that this witness is not in a position to lay a foundation for

19   the e-mail unless I'm missing something.

20             MR. FRANK:  I think I'll be able to complete any

21   missing link for foundation with Ms. Collins.  I think what I

22   can establish through Inspector Taylor is -- is what I have

23   established, that he learned of an additional complaint from

24   IC3, reached out to the complainant, and she forwarded -- she

25   e-mailed him both a copy of the -- this e-mail and her

1   complaint.

2       But as I say, I was planning to call her, as well as a

3   representative of IC3, who I expect will be able to -- well, I

4   think they're already certified -- those records -- of --

5   their own records, the other side of these complaints.

6           THE COURT:  Okay.  Well, it strikes me that you --

7   he can lay some of the foundation, but he can't lay enough of

8   it to get it in.

9           MR. FRANK:  I -- I wasn't going to try and -- as I

10  haven't tried to admit the -- the mailers, I wasn't going to

11  try and admit this now.  I was just trying to lay that start.

12          THE COURT:  Okay.  Are we all set?

13          MR. RIDGE:  Yes.

14          THE COURT:  So at least to the extent -- I

15  understand you're not moving them into evidence at this time?

16          MR. FRANK:  I wasn't planning to at this point, Your

17  Honor.

18          THE COURT:  Okay.  Thank you.

19      Would you bring the jury back in, please?

20      (Jury entered at 9:04 a.m.)

21          MR. FRANK:  The court's indulgence, Your Honor?

22  BY MR. FRANK:

23  Q    Inspector Taylor, I think you've -- you've identified

24  84, correct?

25  A    Correct.

1   Q     Okay.  How about 85, do you recognize 85?

2   A     Correct, this is the IC3 complaint form that was filed

3   by Edith Mae Collins.

4   Q     A copy of it?

5   A     Correct.

6   Q     Okay.  Let me show you what's been marked as Exhibit 44

7   for identification.  What is Exhibit 44 for identification?

8   A     44 is a map and pictures of some of the locations that

9   we've discovered in this case, including the Manchester, Maine

10  post office; the Augusta, Maine post office; two of the

11  Hannafords -- 29 Whitten Road in Augusta and 118 Cony Street

12  in Augusta; the 88 Pond Road address; the 25-5 Village Drive

13  address; the 936 Western Avenue address, which is Mulligan's;

14  943 Western Ave., which is Rite Aid; 865 Western Ave. in

15  Manchester, which is a Subway; and The UPS Store on 60 Western

16  Ave. in Augusta.

17  Q     All right.  And does it include pictures of those --

18  A     It does.

19  Q     -- locations?

20        MR. FRANK:  And, Your Honor, I believe this,

21  strictly speaking, is a demonstrative exhibit, so I don't

22  think I can move it into evidence, but I'd request permission

23  to publish it to the jury for further examination of Inspector

24  Taylor.

25        THE COURT:  Any objection?

1          MR. RIDGE:  My only objection, Your Honor, is I

2    don't think it adds anything to the case.  I don't think it

3    has any relevance.  I mean, the fact that there are

4    photographs of locations in the area where Mr. Kilmartin was

5    living I don't think moves the case forward at all, and so for

6    that -- for that sole reason, I would object.

7          THE COURT:  All right.  I'm going to allow the

8    government to present this to the jury as a demonstrative.

9      You may proceed.

10          MR. FRANK:  Thank you, Your Honor.  And I have a

11    blowup on this easel.

12    BY MR. FRANK:

13    Q    And, Inspector -- let me step back here -- let's start

14    with 25 Village Drive.  Can you explain on this map where it's

15    located and what icon is a picture of 25 Village Drive?  And

16    I --

17          MR. FRANK:  Do we have a pointer?  No.  Okay.

18    Maybe -- you don't have a mic.

19    BY MR. FRANK:

20    Q    Can you -- can you describe then -- or if it would help,

21    step down to the easel maybe and point it out to the jury?

22    A    25-5 Village?

23    Q    Yeah, let's start there, please.

24    A    This is a picture of the residence and this indicates

25    where it is on the map.

1    Q     All right.  Whose residence?

2    A     Sidney Kilmartin.

3    Q     During the period of -- that was the subject of your

4    investigation?

5    A     Correct.

6    Q     All right.  And how about The Augusta UPS Store at 60

7    Western Avenue, is that on this map?

8    A     Yes, it is.

9    Q     Where?

10   A     It is located here, and this is a picture of The UPS

11   Store.

12   Q     All right.  And all of this is -- is -- is written on

13   this exhibit, correct?  So --

14   A     Correct.

15   Q     -- above the picture of The UPS Store is a caption that

16   -- that explains its address, right?

17   A     Correct, 60 Western Ave., Augusta, Maine.

18   Q     All right.  And what happened there?

19   A     That is where the parcel from Fisher Scientific UPS

20   records show it was delivered.

21   Q     Okay.  And how about this -- the Mulligan's, what is

22   Mulligan's?

23   A     Mulligan's is one of these convenience stores that is a

24   gas station.  There is also food and a convenience store all

25   located in one location.

1   Q    All right.  And where was that located?  You've actually

2   -- have you visited these locations?

3   A    I have.

4   Q    Personally?

5   A    Yes.

6   Q    All right.  Where -- where is the Mulligan's located on

7   this map?

8   A    Mulligan's is located at this intersection of Pond Road

9   and Western Avenue.

10  Q    All right.  And what -- what's the address?

11  A    936 Western Avenue.

12  Q    Okay.  But that's not the address that appears in the

13  bank record of the transaction there, is it?

14  A    Correct.

15  Q    What address appears in the bank record?

16  A    1036 Western Avenue.

17  Q    And do you know why the difference?

18  A    When we visited Mulligan's, they said the owner lives at

19  1036 Western Avenue and all documents go there.

20  Q    Where is the Mulligan's physically located?

21  A    The Mulligan's is physically located at 936 Western

22  Avenue.

23  Q    All right.  And what happened at Mulligan's?

24  A    Mulligan's is where Sidney Kilmartin used his Maine

25  State Credit Union debit card on September 14th, 2012.

1   Q     And what's the significance of September 14th, 2012?

2   A     That's the same date UPS records indicate the parcel was

3   delivered to The UPS Store from Fisher Scientific.

4   Q     Now, there -- there's another -- let's see.  All right.

5   So how about the Hannaford stores, where -- where are the

6   Hannaford stores located on this map?  And why don't you take

7   them one at a time, beginning with the one that is closest to

8   25 Village Drive.

9   A     The closest is 29 Whitten Road in Augusta, and we had

10  six Western Union wire transfers that were picked up by Sidney

11  Kilmartin at that location.

12  Q     Okay.  How about the other Hannaford store?

13  A     The other is located at 118 Cony Street in Augusta, the

14  far end, across the river, and I believe there was two Western

15  Union wire transfers picked up by Sidney Kilmartin there.

16  Q     Are -- in fact, we have certified copies of Hannaford's

17  records of those transactions, correct?

18  A     Correct.

19  Q     They're not yet been identified or in evidence, but

20  you've seen them, right?

21  A     Correct, I have.

22  Q     And that's the best evidence of how many transactions

23  and where they occurred; is that fair to say?

24  A     Yes.

25  Q     All right.  But at any rate, in terms of this map, those

TAYLOR - CONTINUED DIRECT EXAMINATION/FRANK

369

1   are the two locations --

2   A     Correct.

3   Q     -- that Hannaford had records of these wire receipts, as

4   you've described?

5   A     Yes.

6   Q     Okay.  How about -- where is the Manchester post office

7   located?

8   A     The Manchester post office is lo -- located across the

9   intersection of Western Ave.  So if you were to travel down

10  Pond Road, you would hit Western Ave., and you'd go straight

11  across, and I believe it's the second building up from Western

12  Ave. on Readfield Road.

13  Q     Do you know the address at Readfield Road?

14  A     It's 31 Readfield Road.

15  Q     And what's the significance of that post office?

16  A     That's where we have mailings coming -- going to Andrew

17  Denton, as well as other people we've identified in this.

18  Q     All right.  And some of those records are already in

19  evidence, as you've explained, correct?

20  A     Correct.

21  Q     All right.  How about -- how about 88 Pond Road, where

22  is that located?

23  A     88 Pond Road is located right here.

24  Q     Okay.

25  A     Pond -- Pond Road coming -- if we were traveling from

1    25-5 Village to Western Avenue, you would pass it, it would be

2    on your right coming down from Village Drive.

3    Q    And what's the significance of 88 Pond Road?

4    A    That was the address used on the parcels that we were

5    able to recover or see pictures of.

6    Q    The return address?

7    A    The return address.

8    Q    Okay.  Let me show you what's been marked as Exhibit 45

9    for identification, ask you to take a look at that, tell us if

10   you recognize it, please.  We're not done with the map, but --

11   A    Okay.

12   Q    What is 45 for identification?

13   A    This is a Google maps photo of 88 Pond Road.

14   Q    Okay.  It's two --

15   A    It's two pictures.  One -- I'm sorry.

16   Q    Okay.  How many pictures is it?

17   A    Two pictures.

18   Q    Okay.  Don't show it to the jury yet.  What's the first

19   picture?

20   A    The first picture is a picture of the mailbox across the

21   street from the house.

22   Q    Okay.  What --

23   A    It's identified as 88.

24   Q    Okay.  What's the second picture?

25   A    Is a picture of 88 Pond Road, the house.

1   Q      The house itself?

2   A      Correct.

3   Q      And you know this how?

4   A      I've personally been there.

5   Q      Are those fair and accurate pictures of it?

6   A      Yes.

7              MR. FRANK:  I'd move them in evidence, Your Honor.

8              THE COURT:  And that's which exhibit?

9              MR. FRANK:  45, Your Honor.

10             THE COURT:  45.  Any objection to 45?

11             MR. RIDGE:  No, Your Honor.  Thank you.

12             THE COURT:  45's --

13             MR. FRANK:  And request per --

14             THE COURT:  Wait.

15             MR. FRANK:  I'm sorry.

16             THE COURT:  45's admitted.  You may proceed.

17             MR. FRANK:  Thank you.  And request permission to

18  publish them?

19             THE COURT:  You may.

20             MR. FRANK:  Thank you, Your Honor.

21  BY MR. FRANK:

22  Q      And, Inspector, which is this that we're looking at, the

23  first page of 45?

24  A      This is the first picture.  This is a picture of the

25  mailbox that's located on the opposite side of the road from

1  the actual residence of 88 Pond Road.

2  Q    Can -- can you circle it for us?

3  A    (Witness complying.)

4  Q    Okay.  And as you're heading up Pond Road from Village

5  Drive toward Western Avenue, what side of the road is this on?

6  A    Coming from Village Drive to Western Avenue, it would be

7  on the left -- that mailbox would be on the left side of the

8  road.

9  Q    Where is it relative to the house?

10  A    Directly across the street from the house.

11  Q    Okay.  And if we could scroll down to the second page,

12  what is the second page a view of?

13  A    That is a picture of the house at 88 Pond Road in

14  Manchester.

15  Q    Okay.  All right.  So picking up where we left off at

16  the map, let me ask you if you can point out where on the map

17  the Augusta post office appears.

18  A    The Augusta post office is here, signified by the green

19  dot.

20  Q    Okay.  And what's the address of that post office?

21  A    That is 40 Western Avenue in Augusta, Maine.

22  Q    And what's the significance of that post office?

23  A    That is where the first parcel to Andrew Denton was

24  mailed from.

25  Q    There's another address that has been -- that's appeared

1    in some of the exhibits thus far, but isn't on this map,

2    174 Barnstable Road, South Portland.  Do you know what that

3    address is?

4    A    That's an address in South Portland that -- where Sidney

5    Kilmartin's wife resides.

6    Q    Okay.  And how do you know that?  Do you have

7    personal --

8    A    I have been to that residence and spoken with his wife.

9    Q    Okay.  Thank you.  Did you and your colleagues make

10   efforts to locate the device that Mr. Kilmartin used to e-mail

11   with Mr. Denton and others about cyanide?

12   A    We did.

13   Q    What -- what efforts did you make?

14   A    Well, initially, in December of 2013, we had reached out

15   to Sidney Kilmartin's wife, Debbie Kilmartin, to try to speak

16   with her about our concerns and trying to locate devices, as

17   well as cyanide.

18   Q    Okay.  And have you made several attempts with her?

19   A    We have.

20   Q    Did you eventually get permission from her to search at

21   least some places?

22   A    Yes, we got permission to search her garage, where she

23   had told us that she had some of Sidney Kilmartin's

24   belongings.

25             MR. RIDGE:  Your Honor, I'm going to object to the

1    statements being repeated and -- and attributed to Deborah

2    Kilmartin.  I think those are hearsay, and although certainly

3    the inspector can speak about his investigation in general, I

4    think those specific types of statements should be excluded as

5    hearsay.

6              THE COURT:  Mr. Frank?

7              MR. FRANK:  Your Honor, I -- I'm really not

8    interested in them for the truth of the matter asserted.  I'm

9    only trying to explain the efforts that were made to try and

10   locate this item.

11             THE COURT:  Right.  Well, I think it's better if you

12   avoid -- or the witness avoids saying what other people have

13   said.

14             MR. FRANK:  Very well, Your Honor.

15   BY MR. FRANK:

16   Q    So what places did you search in that -- you or your

17   colleagues search in that effort?

18   A    We searched the garage at 174 Barnstable Road.

19   Q    Okay.  Were you able to search any other locations?

20   A    No.

21   Q    Did you make efforts to?

22   A    Yes.

23   Q    Did you eventually obtain a device that was attributed

24   to Mr. Kilmartin?

25   A    We did.

TAYLOR - CONTINUED DIRECT EXAMINATION/FRANK

1   Q      And what was that?

2   A      We obtained a laptop from John Ruminski.

3   Q      Who is John Ruminski?

4   A      John Ruminski is Debbie Kilmartin's brother.

5   Q      And how did you get that from Mr. Ruminski, did you need

6   to use process?

7   A      Correct, we obtained a search warrant for his residence

8   and obtained the laptop from his residence.

9   Q      And approximately when was that?

10  A      That was in September of 2015.

11  Q      Agent, where -- where is that Ruminski lap -- the laptop

12  that you got from Mr. Ruminski now?

13  A      That's with the other evidence that's downstairs.

14  Q      Okay.  So it's not in this box.

15  A      Correct.

16  Q      Okay.  You've -- you've examined that physically

17  recently, haven't you?

18  A      Yes.

19  Q      When did you examine that most recently?

20  A      This past weekend.

21  Q      Okay.  Did you submit it for analysis?

22  A      I did after we recovered it in September of 2015.

23  Q      To whom?

24  A      To Mark Scichilone, who's our computer forensics

25  examiner, in Boston.

TAYLOR - CONTINUED DIRECT EXAMINATION/FRANK

1   Q     Can you describe it physically for us?  What kind of a

2   laptop is it?

3   A     I believe that's an HP laptop.

4   Q     Similarly, Inspector, have you made efforts to recover

5   the rest of the hundred grams of potassium cyanide?

6   A     Right, despite -- or in addition to speaking to Debbie

7   Kilmartin and John Ruminski, I also tried to locate Sidney

8   Kilmartin's family -- his sisters.

9         My initial efforts -- I located actually a cousin with

10  the same name, who advised me that one of his sisters might be

11  living with the mother.  So I went to the mother's house to

12  attempt to talk to them, but wasn't able to talk to them.

13  Q     Okay.  And that was going to be my -- my ultimate

14  question.  Were you ever able to find the rest of the cyanide?

15  A     No, I've not.

16  Q     And so how much of the hundred grams are you able to

17  account for at this point?

18  A     Approximately 5 grams.

19  Q     Meaning how much remains outstanding and unaccounted

20  for?

21  A     Approximately 95.

22             MR. FRANK:  The court's indulgence, Your Honor?

23             THE COURT:  Yes.

24             MR. FRANK:  I have no further questions for this

25  witness, Your Honor.

TAYLOR - CROSS-EXAMINATION/RIDGE

1          THE COURT:  Cross-examination, Mr. Ridge?

2          MR. RIDGE:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. RIDGE:

5    Q     Good morning, Inspector.

6    A     Good morning.

7    Q     Let me just ask a question about where we finished with

8    Mr. Frank -- or where you finished with Mr. Frank.

9          The cyanide that you are referring to is the cyanide

10   that was delivered by UPS to The UPS Store, but that cannot be

11   -- it cannot be established that Mr. Kilmartin picked that up.

12   A     The only cyanide that I'm aware of is the cyanide that

13   was ordered from Fisher Scientific.

14   Q     So the discussion is based upon the assumption that Mr.

15   -- Mr. Kilmartin picked up cyanide at The UPS Store, despite

16   the fact that the records at the UPS store do not indicate

17   that; is that correct?

18   A     Correct.

19   Q     Okay.  In terms of the search at 44 Barnstable, you

20   could have obtained process, a search warrant, if there were

21   facts sufficient to justify the issuance of a search warrant,

22   couldn't you?

23   A     At which address?

24   Q     Barnstable.

25   A     174?

TAYLOR - CROSS-EXAMINATION/RIDGE

1   Q      I'm not sure what the number is.

2   A      Yeah, we obtained a consent search.

3   Q      But your testimony seemed to indicate that your efforts

4   were thwarted somehow, and my point is, you could have

5   obtained a search warrant if there had been sufficient facts

6   to justify the issuance of a search warrant.

7   A      Correct.

8   Q      Okay.  The mailers that you identified, Inspector, from

9   Mr. Denton, did you pick up those mailers?

10  A      I did not.

11  Q      Okay.  Who did pick up the mailers?

12  A      Inspector Desrosiers --

13  Q      Okay.

14  A      -- picked them up from UK authorities.

15  Q      And you are relying upon his reports and his information

16  in indicating that they were found at Mr. Denton's home and

17  sort of short -- shorthanded the investigation?

18  A      No, I was just comparing the U.S. postal business

19  records to the items that were recovered from UK authorities.

20  Q      Okay.  I think you told us yesterday morning -- or

21  yesterday afternoon that your information was that Mr. Denton

22  had committed suicide; is that correct?

23  A      Correct.

24  Q      And what's your understanding of how he committed

25  suicide?

TAYLOR - CROSS-EXAMINATION/RIDGE

1   A      There -- that's my -- all I was told initially was that

2   he had committed suicide.

3   Q      Did you learn something else after the fact?

4   A      That he had used cyanide.

5   Q      Cyanide?

6   A      Correct.

7   Q      Okay.  Nobody ever told you that he used potassium

8   cyanide, correct?

9   A      I don't believe so.  I don't recall if they did.

10  Q      Okay.  Inspector Taylor, did you ever speak with a man

11  named Ed Hess?

12  A      The name is familiar, but I don't recall speaking to

13  him.

14  Q      Do you recall receiving an e-mail from Inspector

15  Desrosiers in which he told you that he had spoken with

16  Mr. Hess?

17  A      I'm not recalling an individual e-mail right now from

18  him.

19  Q      Let me indicate to you that Mr. Hess is the author of

20  the certificate of analysis from Fisher Scientific regarding

21  the potassium cyanide that was mailed from Fisher Scientific

22  to The UPS Store.

23  A      Okay.

24  Q      Do you recall that e-mail now?

25  A      I recall seeing a certificate of analysis.

1   Q     Okay.  But you don't recall Inspector Desrosiers telling

2   you that he had spoken with Mr. Hess and that Mr. Hess could

3   match a sample of the lot with an unknown sample?

4   A     That's not my recollection of it, no.

5   Q     Down to one part per million?

6   A     I'm not recalling the e-mail you're referencing.

7   Q     All right.  Let me ask you if the substance that was

8   picked up at Mr. Denton's home was ever sent to Fisher

9   Scientific for analysis?

10  A     Not that I'm aware of.

11  Q     Do you know why it was never sent?

12  A     I do not.

13  Q     Okay.  So you don't -- do not know -- I take it you

14  didn't ask Fisher Scientific if -- if it could do a match, and

15  you don't know whether anybody else ever made that inquiry

16  either.

17  A     We made inquiries to determine if it might be possible

18  to make a match.

19  Q     Okay.  Did you ever make an inquiry about a possible

20  analysis of the substance only, forget the match bit, but just

21  an analysis of the substance from Mr. Denton's home?

22  A     Do you mean the analysis by the HETL?

23  Q     No.  Did you ever inquire of Fisher Scientific if it

24  could do an analysis of the sample that you had obtained from

25  England?

TAYLOR - CROSS-EXAMINATION/RIDGE

1   A       I don't believe I did.

2   Q       Okay.  Do you know if anybody else did?

3   A       I don't have personal knowledge of that, no.

4   Q       Okay.  Have you reviewed the Gmail account of

5   Mr. Denton?

6   A       I did.

7   Q       Okay.  And within that review, did you see an e-mail to

8   Mr. Denton from an author named brawnkelly@hotmail.com dated

9   December 24th, 2012?

10  A       I don't recall a specific e-mail address.

11  Q       Okay.  Do you recall seeing an entry indicating that an

12  e-mail was found from Brawn Kelly on 12/24/2012, indicating

13  the cost of potassium cyanide to Mr. Denton?

14  A       I don't recall that, no.

15  Q       Okay.  Let me just --

16          MR. RIDGE:  May I approach the witness, Your Honor?

17          THE COURT:  You may.

18          MR. FRANK:  May I see the exhibit, Marty?

19  BY MR. RIDGE:

20  Q       Inspector Taylor, I just want to ask if this refreshes

21  your recollection as to whether you've ever seen that.  Do you

22  know?

23  A       (Witness looking at document.)  No, I don't recall that

24  at all.

25  Q       You don't recall it?

TAYLOR - CROSS-EXAMINATION/RIDGE

1   A      No.

2   Q      Would you -- I'll represent to you that this came from

3   the government, and I guess it's -- everything else has been

4   whited-out, and that's consistent with the policy of the U.S.

5   Attorney's Office, as you are aware, isn't it, providing only

6   the information on a particular page that is relevant to the

7   particular case?

8   A      Correct.

9   Q      You've reviewed the e-mails between Mr. Denton and

10  skiptin@hotmail.com?

11  A      No.

12  Q      Gmail.  I'm sorry.  Gmail.

13  A      Okay.

14  Q      I apologize.

15  A      I've reviewed what was returned by Google in response to

16  the search warrant.

17  Q      Okay.  And that included a statement from Mr. Denton to

18  Mr. -- to skiptin, indicating I will do my best to see you get

19  what's coming to you?  Do you recall that?

20  A      I don't recall the specific statement.  I do recall

21  there was e-mails between the two of them, yes.

22  Q      Okay.  And do you recall that Mr. Denton's tone may have

23  been threatening at some point?

24  A      It's tough to tell from an e-mail what somebody's intent

25  is.

1   Q     Do you recall when the last e-mail correspondence

2   between Mr. Denton and skiptin was?

3   A     Which one -- which --

4   Q     The last --

5   A     Which account are you referring to, on andrewdenton35 or

6   on skiptin?

7   Q     Either.

8   A     The last one?

9   Q     The last one.

10  A     I -- I couldn't tell you.  I've looked at so many

11  e-mails I don't recall what the last one was.

12  Q     Do you recall seeing an e-mail from Andrew Denton to

13  skiptin dated Friday, December 7th, 2012?  And let me show it

14  to you and see if this will refresh your recollection.

15  A     (Witness looking at document.)  This appears to be one

16  of the e-mails that was recovered at the scene.

17  Q     Okay.  And does that e-mail contain the statement that I

18  referenced?

19  A     And what was the date again that you were referencing?

20  Q     Well, let me look at it.  It's Friday, December 7th,

21  2012.

22  A     Yes.

23  Q     Thank you.  You have introduced or have identified -- I

24  apologize.  You've identified two mailing envelopes that were

25  recovered at Mr. Denton's home; is that right?

1  A     Correct.

2  Q     Okay.  Isn't there a third envelope, as well, that was

3  turned over to the United Kingdom authorities?

4  A     There were several envelopes turned over.  Are we --

5  what type of envelope are we discussing?

6  Q     Well, I'm not sure.  Are you aware of an envelope that

7  was turned over on January 11th, 2013, to Constable Holly

8  (sic), I believe?

9  A     I believe so, yes, yep.

10  Q     Okay.  Where is that envelope?

11  A     I'm not sure what that exact envelope is, but as I

12  recall, there was an envelope turned over to DC Cowley.

13  Q     Did you ever see that envelope?

14  A     Again, without knowing what the -- what that envelope

15  is, I couldn't tell you if I actually saw that envelope.

16  Q     It's identified as an empty brown Jiffy padded envelope

17  inside plastic zip-top bag, and the exhibit reference number

18  was HEC/1?

19  A     Again, I -- I don't know -- without seeing the

20  envelope --

21  Q     I don't have the --

22  A     -- and I don't have it in front of me, so I don't know

23  which envelope we're discussing.

24  Q     You introduced -- or there was introduced through you,

25  and I believe it's No. Exhibit 16, which is the multipage

1    exhibit where you had -- I'm sorry -- where you had identified

2    each and every e-mail referencing cyanide?

3    A    Are you referring to the table I created?

4    Q    Yes.

5    A    I do.

6    Q    Did you do -- what was the source of that table?

7    A    The source of that table was the e-mails that we

8    received from the Google search warrant for the account

9    skiptin@gmail.com and andrewdenton35@gmail.com.

10   Q    Is that different from the Web history, parentheses,

11   Android browser, end of parentheses?  Did you ever review the

12   Web history of Mr. Denton's devices other than -- well, let me

13   just ask you that.

14   A    I didn't personally, no.

15   Q    Okay.  Did -- you reviewed the product of the

16   examination of the laptop?

17   A    No, I reviewed the Google search warrant results.

18   Q    Okay.  And did the Google search warrant results contain

19   Web history or cookies of Mr. Denton's device?

20   A    No, it wasn't an analysis of his device.  It was a

21   response from Google.

22   Q    Okay.  Do you know who did the analysis of Mr. Denton's

23   devices?  Would that have -- do you know who that was?  Was

24   that Mr. Collins (sic)?

25   A    There was Mr. Armstrong --

TAYLOR - CROSS-EXAMINATION/RIDGE

386

1    Q    Hm-hmm.

2    A    -- who did the laptop computer for the UK, and I believe

3    Chris Collier who did the phones.  Collier --

4    Q    I apologize -- I apologize for forgetting his name.

5    A    That's okay.

6    Q    Have you reviewed any of Mr. Collier's work product?

7    A    I've seen it.  I haven't done an analysis on it.

8    Q    Did you see the inquiries that Mr. Denton had made about

9    Mr. Kilmartin's family or the efforts he made to locate

10   Mr. Kilmartin's family via the Internet?

11   A    I recall seeing some searches I believe is what was

12   presented.

13   Q    And those searches were looking for Deborah Kilmartin

14   and family?

15   A    I believe so.  I think there was addresses.

16   Q    Okay.  Mr. Denton was, for a fairly significant period

17   of time, searching for cyanide on the Internet; is that a fair

18   statement?

19   A    I don't know about significant.  I don't know what --

20            MR. FRANK:  Your Honor --

21   A    -- what you'd term significant.

22   BY MR. RIDGE:

23   Q    Well, you heard at least as far back as August of 2012;

24   would you agree with that?

25   A    Yes.

TAYLOR - CROSS-EXAMINATION/RIDGE

1   Q     Okay.  And did you review correspondence or inquiries

2   that he had either made or were made of him that were from

3   sources other than skiptin@gmail.com?

4   A     What do you term inquiries?  I'm not sure what you mean

5   by inquiries.

6   Q     Do you have cyanide available, can I purchase from you,

7   or, on the other hand, I have cyanide available, it will cost

8   you X amount of dollars?

9   A     I don't recall any inquiries.

10   Q     Do you re -- do you recall responses or -- or e-mails to

11   Mr. Denton indicating sources and price?

12   A     I recall there was a similar chat room or blog.

13   Q     Skiptin was not the only potential source of cyanide

14   that Mr. Denton had searched for.

15   A     There were other sources available on the

16   wantdeathblogspot --

17   Q     Okay.

18   A     -- I guess is the best way I would answer that.

19   Q     That's fair.

20           MR. RIDGE:  Your Honor, if I could just have a

21   moment.

22   BY MR. RIDGE:

23   Q     Inspector Taylor, the e-mail that I was referencing

24   earlier from Inspector Desrosiers is dated June 4th, 2015, and

25   let me show it to you.

TAYLOR - CROSS-EXAMINATION/RIDGE

1    A    Okay.

2    Q    See if that -- just take a moment and read it --

3    A    Yes, please.

4    Q    -- and see if that refreshes.

5    A    Okay.  (Witness complying.)  Okay.  I do recall it now,

6    yes.

7    Q    You do recall it?

8    A    I do.

9    Q    And does this e-mail say essentially, as I've summarized

10   it for you, that Mr. Hess, who's the lab manager at Fisher

11   Scientific and who was the author of the certificate of

12   analysis, correct?

13   A    Right.

14   Q    And the best way to do this -- and by this, it would

15   mean identifying the substance at Mr. Denton's -- would be to

16   get some potassium cyanide from that batch, send it to the

17   HETL, and have them compare it with the PC from Hull.

18   A    Correct.

19   Q    Okay.  He said it is possible because they can trace

20   metals in the batch down to one part per million.  However, he

21   does not think they still have any PC left from that batch.

22   A    Correct.

23   Q    And the date of this e-mail is June 4th, 2015.

24   A    Correct.

25   Q    My question is, when was the suspected potassium cyanide

TAYLOR - CROSS-EXAMINATION/RIDGE

1  found at Mr. Denton's home?

2  A    I believe it was on December 31st, 2012.

3  Q    Okay.  And is it your understanding that that particular

4  sample was in the possession of law enforcement authorities

5  consistently from December 31st, 2012, actually, until the

6  present?

7  A    That's my understanding, if I'm recalling correctly.

8  Q    Do you know why it took from December 31st, 2012, to

9  June 4th, 2015, for somebody to locate Mr. Hess and find out

10  that Fisher Scientific could do that type of analysis?

11  A    I'm not sure I can comment on other people's efforts in

12  the case prior to my taking over the case.

13  Q    Would it be your understanding that by the time these

14  efforts were considered, it was too late to do it?

15  A    I'm not a chemist, so I don't know how long something

16  will last, I don't know if it's the day after it degrades or

17  ten years.  I don't know.

18  Q    Okay.  Do you remember reviewing a document -- I believe

19  it was between Inspector Quinn --

20  A    DC Quinn, I believe, yeah.

21  Q    -- and a superior of his in the United Kingdom, where

22  Mr. Quinn suggested an analysis of the substance found at

23  Mr. Denton's, only to be told that that exercise should be

24  done by the American authorities because it's their case.  Do

25  you recall reading that?

TAYLOR - CROSS-EXAMINATION/RIDGE

1   A      I don't recall that one, no.

2   Q      Do you recall efforts or suggestions made by Mr. Quinn

3   that the substance be tested as soon as it was found?

4   A      I don't recall.

5   Q      Okay.  Some of the testimony that you offered regarding

6   Derek Jorgensen and Ms. Kirschling and Ms. Williams involve

7   people who were victims of the scheme to sell Epsom salts

8   advertised as potassium cyanide, correct?

9   A      They were attempting to purchase potassium cyanide.

10  That's my understanding.

11  Q      And they were later identified as victims in the

12  superseding indictment.

13  A      I wasn't -- I assume so.  I don't know --

14  Q      You know -- you know that they were.

15  A      Well, I wasn't in the room when -- I'm not sure what

16  counts he pled to, so I'm sorry, sir.

17  Q      Are you aware that Mr. Kilmartin pled guilty to all

18  counts involving all identified victims other than Mr. Denton?

19  A      Okay, yes.

20  Q      Okay.  And some of the folks that you were speaking

21  about today were named as victims in the superseding

22  indictment?

23  A      Yes.

24  Q      And some of the folks were not identified as victims in

25  the superseding indictment, but just participated in

1    correspondence with Mr. Kilmartin.

2    A    Correct.

3    Q    Okay.

4         MR. RIDGE:  That's all I have, Your Honor.  Thank

5    you.

6         THE COURT:  Redirect?

7         MR. RIDGE:  Thank you, Inspector.

8         THE WITNESS:  Thank you.

9         MR. FRANK:  Yes, Your Honor.

10        The court's indulgence, Your Honor?

11                      REDIRECT EXAMINATION

12   BY MR. FRANK:

13   Q    Inspector Taylor, on cross-exam -- Inspector Taylor, on

14   cross-examination by Mr. Ridge, you were asked a line of

15   questioning about why you didn't do more searching,

16   particularly at Barnstable Road.

17        First of all, how much searching did you do?

18   A    At Barnstable Road?

19   Q    Yep.

20   A    We searched the entire garage.

21   Q    All right.  And on what basis did you conduct that

22   search?

23   A    On a consent search signed by Debbie Kilmartin.

24   Q    All right.  Why didn't you search any more of that

25   property?

1    A      Because that's what she limited it to.

2    Q      All right.  And were you trying to search other

3    properties besides based on her consent?

4    A      Yes, we were.

5    Q      What other properties?

6    A      38 Elderberry Lane in Windham.

7    Q      What property was that?

8    A      That was where Sidney Kilmartin was residing at the time

9    he was arrested.

10   Q      All right.  And why couldn't you -- I mean, at that

11   point in time, how -- how far after the events in this case

12   were those efforts?

13   A      This was in September of 2015.

14   Q      All right.  So we're talking two years at least --

15   A      Correct.

16   Q      -- after the events?

17          Now, I mean, one of the bases for getting a search

18   warrant is having fresh information, correct?

19   A      Correct.

20   Q      All right.  Is that one of the reasons you felt that you

21   couldn't get a search warrant at that point?

22   A      Yes.

23   Q      On cross-examination by Mr. Ridge, you were asked

24   questions about this item.

25          MR. FRANK:  Why don't I mark it as 101 for

1   identification.

2   BY MR. FRANK:

3   Q     A description of an e-mail from Brawn Kelly, correct?

4   A     Correct.

5   Q     All right.  But that's not an e-mail, right?  That's not

6   a -- that --

7   A     No, it appears just to be a paragraph.

8   Q     It's not in e-mail format, is it?

9   A     No, it is not.

10  Q     It appears to be someone else's description of an

11  e-mail, right?

12  A     Correct.

13  Q     Okay.  On cross-examination, you were asked questions

14  about your review of Mr. Denton's e-mail account, correct?

15  A     Correct.

16  Q     That's andrewdenton35@gmail.com, right?

17  A     That's correct.

18  Q     That was part of the production from -- from Google,

19  right?

20  A     Correct.

21  Q     Google produced the contents of both skiptin@gmail and

22  andrewdenton35@gmail, right?

23  A     Correct.

24  Q     Okay.  Now, your table, Exhibit 16, what does that

25  represent?

1    A    That represents only e-mails I located in

2    skiptin@gmail.com.

3    Q    It doesn't represent any analysis of andrewdenton35,

4    correct?

5    A    No, it does not.

6    Q    Although you have looked in the contents of

7    andrewdenton35, right?

8    A    I have.

9    Q    And you described some of what you saw there earlier in

10    your direct testimony, correct?

11    A    Correct.

12    Q    And let me show you what's been marked as Exhibit 102

13    for identification.  I'm showing you what's been -- been

14    marked as Exhibit 102 for identification, ask you to take a

15    look, and tell us if you recognize that.

16    A    Yes, this is a similar -- similar analysis that I did on

17    the andrew -- andrewdenton35@gmail.com account.

18    Q    The contents of that account.

19    A    Correct.

20    Q    For what?  What were you looking for in there?

21    A    I was looking for, again, anything that was in reference

22    to cyanide or conversations with skiptin.

23    Q    And what did you find?

24    A    I found a total of six e-mails -- or five e-mails -- I'm

25    sorry -- five e-mails that referenced conversations with

1    skiptin or an e-mail from IC3 regarding receipt of a complaint

2    and also a hotel reservation from -- or acknowledgment of a

3    hotel reservation from December 1st, 2012.

4    Q    All right.  And the two -- the last two that you've

5    described referencing the IC3 complaint and the hotel

6    reservation, whose e-mails were those -- do they appear to be,

7    at least from the address?

8    A    They were both to andrewdenton35.

9    Q    Hm-hmm.

10   A    And the reservation was from The Louvre Hotel for a

11   reservation at Campanile Hull, City Centre.

12   Q    Okay.  And do you know how that relates to this

13   investigation?

14   A    Yes, that's the hotel that Andrew Denton checked into

15   and attempted suicide with the first mailing.

16   Q    Okay.  And how about the other -- the other e-mail

17   you've referenced, the IC3 e-mail, who's that between?

18   A    That's between ic3.gov and andrewdenton35@gmail.com, and

19   it's regarding the IC3 complaint, and it gives a complaint ID

20   and a password for the recipient.

21   Q    All right.  And then the other four e-mails are between

22   Mr. Denton and -- and skiptin, as far as you can tell?

23   A    Correct.

24        MR. FRANK:  Your Honor, I -- at this point, I'd move

25   this exhibit into evidence.

1        THE COURT:  You're talking this exhibit meaning --

2        MR. FRANK:  I'm sorry, Your Honor.

3        THE COURT:  -- Government's 102?

4        MR. FRANK:  102, yes, Your Honor.

5        THE COURT:  Any objection?

6        MR. RIDGE:  No, Your Honor.

7        THE COURT:  It's admitted.

8        MR. FRANK:  And request permission to publish it?

9        THE COURT:  You may.

10       MR. FRANK:  This is not electronic, so I'm going to

11  use the --

12  BY MR. FRANK:

13  Q     All right.  And let's just start at the top here.  Okay.

14  The first e-mail, which one is that?

15  A     That's the one for -- for the reservation at the

16  Campanile Hull City Hotel.

17  Q     That you've previously described?

18  A     Correct.

19  Q     How about the second one down from the top, which e-mail

20  is that?

21  A     The second is the receipt from -- or the e-mail from

22  IC3.

23  Q     Okay.  And what's IC3 in case you haven't previously

24  identified it?

25  A     It's the Internet Crimes Complaint Center.

1   Q      And who is it affiliated with?

2   A      The FBI operates it.

3   Q      That's -- that's our Federal Bureau of Investigation --

4   A      Correct.

5   Q      -- here in the United States?

6   A      Yes.

7   Q      Okay.  How about the third e-mail down, what's this

8   e-mail about?

9   A      That is an e-mail from skiptin to

10  andrewdenton35@gmail.com.

11  Q      All right.  And when was that e-mail sent?  Can I --

12  shall I scroll across the page?

13  A      Please.  December 20th, 2012, 6:35 p.m. from

14  skiptin@gmail.com to andrewdenton35@gmail.com, the subject is

15  hard drive.

16  Q      All right.  And what's the substance of that e-mail?

17  A      It says, Andrew, is there any way I can get you to do

18  something with your hard drive before your event?  With the

19  FBI aware of my goings-on, the last thing I need is to give

20  them more fodder as you and I have had extensive

21  conversations.  Can you give it to a friend or even discard

22  it?  You have me worried now.  Get back to, Sid.

23  Q      This -- Inspector Taylor, I'm showing you what I've

24  marked as Government's Exhibit 103.  It also is a -- it's a

25  copy that bears the sticker Government Exhibit 49.

1        You were asked questions about this document on

2   cross-examination by Mr. Ridge, right?

3   A     That is correct.

4   Q     What -- what is it?

5   A     It is an e-mail string between andrewdenton35@gmail.com

6   and skiptin@gmail.com.

7   Q     All right.  It's a printed copy of that e-mail string,

8   correct?

9   A     Correct.

10  Q     And do you know what -- where this was found and in what

11  format?

12  A     This was found printed out at the residence of Andrew

13  Denton upon his death.

14        MR. FRANK:  And, Your Honor, I'd move 103 into

15  evidence.

16        THE COURT:  Any objection?

17        MR. RIDGE:  No, Your Honor.

18        THE COURT:  It's admitted.

19  BY MR. FRANK:

20  Q     On cross-examination by Mr. Ridge, you were asked a

21  series of questions that assumed that there was a third

22  mailer, correct?

23  A     Yes.

24  Q     And that Mr. Ridge identified, among other ways, as

25  labeled HBC/1, correct?

1    A     Correct.

2    Q     Do you know what HBC/1 stands for?

3    A     That's the initials for Helen Cowley.

4    Q     Who is Helen Cowley?

5    A     She is one of the constables from the United Kingdom

6    that assisted on this case.

7    Q     And do you know the significance of those initials, why

8    -- why they appear on that?

9    A     That would be her marking it as receiving the evidence.

10   Q     I think I'm going to give this to you to do because --

11   can you find which of these two mailers that refers to here?

12   A     (Witness complying.)  Yeah, that -- sorry.  That is

13   associated with the envelope dated November 16th, 2012, mailed

14   at the Augusta post office.

15   Q     All right.  HEC -- it's HEC/1, correct?

16   A     Correct, HEC/1.

17   Q     For Helen E. Cowley, correct?

18   A     Correct.

19   Q     Okay.  So there's no third mailer, is there?

20   A     Not a third mailer that I'm aware of, no.

21   Q     On cross-examination by Mr. Ridge, you were asked a

22   series of questions about why the government didn't get a

23   reference sample from Fisher Scientific to use to compare to

24   the residue recovered from the scene of Andrew Denton's death,

25   correct?

TAYLOR - REDIRECT EXAMINATION/FRANK

1   A      Correct.

2   Q      All right.  The government did make efforts, correct?

3   A      That's correct.

4   Q      And why wasn't the government able to retrieve that

5   reference sample?

6   A      Fisher Scientific was not able to locate a reference

7   sample.

8   Q      Okay.  They didn't have any left?

9   A      Correct.

10  Q      Did Mr. Mitchell from Fisher, was he amongst the people

11  who was contacted?

12  A      Yes.

13  Q      On cross-examination by Mr. Ridge, Mr. Ridge asked a

14  series of questions about why it wasn't tested sooner, why it

15  wasn't -- and how it was left to the Americans to test,

16  correct?

17  A      Correct.

18  Q      Well, were tests conducted by the British authorities in

19  England at the time?

20  A      There was a preliminary test done on the substance.

21  Q      Okay.  So the answer is yes.

22  A      Correct.

23  Q      What sort of test was done?

24  A      The first responders tested it while it was in evidence

25  in the UK on a Smiths Detection HazMatID.

TAYLOR - REDIRECT EXAMINATION/FRANK

1   Q    How soon after it was recovered did they do that?

2   A    I believe it was the following day.

3   Q    What's a HazMatID 360?

4   A    HazMatID 360 is a device that we use to make a

5   preliminary identification of a substance.

6   Q    Okay.  You have some personal experience with this, do

7   you?

8   A    Correct, we also use it in our DMI Program.

9   Q    Okay.  So you -- you yourself have been trained on it?

10  A    Correct.

11  Q    And it's a portable spectrograph; is that right?

12  A    I believe that's correct, yes.

13  Q    Okay.  And you know that that analysis was done, as

14  you've described --

15  A    Correct.

16  Q    -- within a day of recovery, correct?

17  A    Correct.

18  Q    And how did their conclusion compare with the conclusion

19  reached by Mr. Curlett, the chemist here in Maine?

20  A    It was confirmed by Mr. Curlett.

21  Q    Finally, Inspector, on cross-examination by Mr. Ridge,

22  you were asked a series of questions about other possible

23  sources Mr. Denton might have had for potassium cyanide.  And

24  as a result of your investigation, are you aware of anyone

25  else that Mr. Denton paid for cyanide?

TAYLOR - REDIRECT EXAMINATION/FRANK; RECROSS-EXAMINATION/RIDGE

1  A     I am not.

2  Q     Or anyone else from whom Mr. Denton received two

3  packages supposedly containing cyanide?

4  A     No.

5  Q     Or anyone else with whom Mr. Denton had such extensive

6  e-mail correspondence --

7  A     No, I'm not.

8  Q     -- about cyanide?  I take it the answer is no?

9  A     No.

10         MR. FRANK:  I have no further questions for this

11  witness, Your Honor.

12         THE COURT:  Recross?

13         MR. RIDGE:  I just have a couple of questions.

14  Thank you, Your Honor.

15                    RECROSS-EXAMINATION

16  BY MR. RIDGE:

17  Q     Inspector, you were asked about the field test, if I can

18  call it that, the preliminary test --

19  A     Sure.

20  Q     -- done in England?

21  A     Yes.

22  Q     And then the test done by Mr. Curlett?

23  A     Correct.

24  Q     Isn't it fair to say that the conclusion of both of

25  those tests was that Mr. Denton consumed a substance of

TAYLOR - RECROSS-EXAMINATION/RIDGE

403

1    cyanide?

2    A      That's not what I understand, no.

3    Q      What do you understand the field test to have shown?

4    A      The field test -- I don't know what the field test said.

5    I know it was cyanide.  I'm not sure exactly what it was --

6    it's a preliminary test.  It's not --

7    Q      Okay.

8    A      -- conclusive.

9    Q      It said cyanide.

10   A      Correct.

11   Q      And Mr. Curlett's certificate of analysis issued the day

12   he did the test also identifies cyanide, correct?

13   A      On the certificate of analysis, yes.

14   Q      Okay.  So I understand this envelope issue, there were

15   more than two envelopes, but only two mailers; is that your

16   understanding?

17   A      When -- when you say envelope, there were other

18   envelopes found, not mailers.

19   Q      Okay.  And the November 16th mailer, which you

20   identified as HEC/1, and did that have HEC/1 on its label?  I

21   don't mean --

22   A      Yeah.

23   Q      You don't need to dig it out if you can recall.

24   A      Yes, but it was handwritten on there.

25   Q      Okay.

1    A      Correct.

2    Q      And was it also indicated that that particular envelope

3    was delivered to Ms. Cowley on January 11th of 2013?

4    A      I believe that's correct.

5    Q      Okay.

6            MR. RIDGE:  That's all I have.  Thank you.

7            THE COURT:  Anything further?

8            MR. FRANK:  The court's indulgence, Your Honor?

9         May I approach the witness, Your Honor?

10           THE COURT:  You may.

11                       REDIRECT EXAMINATION

12   BY MR. FRANK:

13   Q      Inspector -- Inspector Taylor, I'm showing you what has

14   been marked as Exhibit 73 for identification.  I forgot my

15   glasses.  What is Exhibit 73 for identification?

16   A      Exhibit 73 is what we will see on our Smiths Detection

17   -- or HazMatID Smiths Detection.  It's a graph that will show

18   up to help us try to make a preliminary determination of what

19   substance we might be dealing with.

20   Q      Okay.  And is it any particular spectrograph on any

21   particular HazMat 360?

22   A      I'm not sure if I understand the question.

23   Q      Well, do -- do you recognize this?  Do you -- do you

24   know whose printout this is?

25   A      I believe this is the one that Tyler Truelove and

1   Grahame Kay produced the day they tested it in the UK.

2   Q     Okay.

3              MR. FRANK:  I'd move Exhibit 73 into evidence.

4              THE COURT:  Any objection to 73?

5              MR. RIDGE:  Well, Your Honor, I'm not sure that the

6   witness has -- by speculating or presuming that it came from a

7   particular place, I don't think he has shown us exactly what

8   that exhibit is sufficient to allow its admission into

9   evidence.

10             THE COURT:  Mr. Frank?

11             MR. FRANK:  Well, Your Honor, I -- I expect Mr. Kay

12  to testify that that's what this is.  If this is not

13  sufficient at this point to get it in, I --

14  BY MR. FRANK:

15  Q     I mean, can you -- is there any other way?  I mean, is

16  this dated, Inspector Des --

17  A     It is --

18  Q     -- Inspector Taylor?  I'm sorry.

19  A     That's okay.  It is dated.

20  Q     What's the date?

21  A     January 3rd, 2013, at 12:42 p.m.

22  Q     Do you recall seeing this before?

23  A     Yes, I have.  This is actually dated January -- yeah,

24  it's Sample No. 010113, and it's dated January 3rd.  It says

25  sample spectrum --

1    Q      Yeah, not yet because it's not in evidence.

2    A      I'm sorry.

3    Q      But -- but -- but, I mean, does that refresh your

4    recollection as to what particular spectrograph printout this

5    is?

6    A      Yes.

7    Q      What is it?

8    A      This is the results that the UK authorities received on

9    their HazMatID, which they subsequently sent to ReachBack ID

10   for additional analysis.

11   Q      All right.  Well, let's not -- let's not go there at

12   this point.

13              MR. FRANK:  I'd move 73 into evidence.

14              MR. RIDGE:  Same objection, Your Honor.

15              THE COURT:  I don't think he's the witness who's

16   capable of putting this in.

17              MR. FRANK:  Very well.

18              THE COURT:  He's not the foundational witness, so

19   I'm going to sustain the objection at this time.

20              MR. FRANK:  Thank you.  I have no further questions

21   for this witness, Your Honor.

22              THE COURT:  Anything further?

23              MR. RIDGE:  No, Your Honor.  Thank you.

24              THE COURT:  You may stand down, sir.

25              THE WITNESS:  Thank you.

1          THE COURT:  Thank you.

2      (The witness left the witness stand.)

3          THE COURT:  Ladies and gentlemen, it's an ideal time

4  to take our first break.  We'll take a break for about

5  20 minutes.  Don't discuss the case, and we'll see you back

6  here in about 20 minutes.

7      (Jury exited at 10:13 a.m.)

8          THE COURT:  Court will stand in recess.

9      (Court recessed from 10:13 a.m. to 10:34 a.m.)

10          THE COURT:  Would you bring the jury in, please.

11      (Jury entered at 10:34 a.m.)

12          THE COURT:  Mr. Frank?

13          MR. FRANK:  Thank you, Your Honor.  The government

14  calls Walter Cottle.

15          THE CLERK:  Please raise your right hand.  Do you

16  solemnly swear that the testimony you shall give in the matter

17  now in hearing shall be the truth, the whole truth, and

18  nothing but the truth, so help you God?

19          THE WITNESS:  I do.

20          THE CLERK:  Please be seated.  Please state your

21  name and spell your last name for the record.

22          THE WITNESS:  Walter Cottle, C-o-t-t-l-e.

23          MR. FRANK:  Thank you, Your Honor.

24  WALTER COTTLE, having been duly sworn, was examined and

25  testified as follows:

1                    DIRECT EXAMINATION

2   BY MR. FRANK:

3   Q     Good morning, Mr. Cottle.

4   A     Good morning.

5   Q     How old are you?

6   A     42.

7   Q     Where do you live?

8   A     In Miami, Florida.

9   Q     And what do you do there for work?

10  A     General manager of a hotel.

11  Q     And what do you do as general manager?

12  A     Oversee the day-to-day operations, responsibility of

13  staff, financials.

14  Q     And how long have you been working for that hotel?

15  A     In -- a little over two years.

16        THE COURT:  Could you -- could you pull yourself up

17  a little bit, sir --

18        THE WITNESS:  Oh, sorry.

19        THE COURT:  -- so we can all hear you?

20        THE WITNESS:  Yeah.

21        THE COURT:  Thank you.

22  BY MR. FRANK:

23  Q     Mr. Cottle, where did you grow up?

24  A     St. Marys, Georgia.

25  Q     And what education do you have?

COTTLE - DIRECT EXAMINATION/FRANK

1    A     I have an associate's degree.

2    Q     In a particular area?

3    A     Just in general.

4    Q     General studies?

5    A     Yep.

6    Q     All right.  So you're a high school graduate?

7    A     Yep.

8    Q     And you have a -- is it a two-year degree?

9    A     Two-year degree.

10   Q     Okay.  And what have you done for -- what have you --

11   and where'd you get that degree?

12   A     Georgia Military College.

13   Q     And when did you get that degree?

14   A     '94.

15   Q     Do --

16   A     1994.

17   Q     Did you -- have you had other higher education?

18   A     None.

19   Q     Okay.  And what have you done for work in the past after

20   you -- after you got your degree?

21   A     Ah, worked at a hotel as a desk clerk, worked my way up

22   to a supervisor of a resort in Amelia Island.

23   Q     Where is that?

24   A     Amelia Island, Florida.

25   Q     And what is Amelia Island?

1   A      It's a resort, privately owned.  It's over 50 acres.

2   Q      And how many -- how many people does it accommodate?

3   A      Probably about 5,000 people.

4   Q      And what was your role there?

5   A      I was the front desk supervisor.

6   Q      What does that mean you did there?

7   A      Oversaw the front desk operations of all the desk clerks

8   and the bellmen.

9   Q      Okay.  How about from there, after Amelia Island, where

10  -- where did you go and what did you do?

11  A      I opened the Adam's Mark Hotel in downtown Jacksonville,

12  Florida.

13  Q      And how big a hotel is that?

14  A      A thousand rooms.

15  Q      And what was your role there?

16  A      Guest service manager.

17  Q      What does that mean you did?

18  A      Oversaw several departments, from parking, front desk,

19  PBX, reservations, bellmen.

20  Q      And how did -- how did that job end?

21  A      9/11 happened, so, of course, they cut staff and found a

22  position elsewhere.

23  Q      And where was that?

24  A      That was at the Chateau on the Lake in Branson,

25  Missouri.

COTTLE - DIRECT EXAMINATION/FRANK

1   Q     And what is the Chateau on the Lake?

2   A     A privately owned resort, about 300 rooms, four-star --

3   four-diamond resort.

4   Q     And what was your role there?

5   A     Front office manager.

6   Q     And what does that mean you did?

7   A     Oversaw the front desk, gift shop, bellmen -- engine

8   room -- reservations.

9   Q     And -- and how long were you there?

10  A     One year.

11  Q     And where'd you go next?

12  A     I went to Las Vegas to Mandalay Bay.

13  Q     And what is Mandalay Bay?

14  A     Resort, casino, hotel.

15  Q     And how big is it?

16  A     It is 5,000 rooms.

17  Q     And what was your role there?

18  A     Hotel manager.

19  Q     What does that mean you did?

20  A     Oversaw day-to-day operations of housekeeping, laundry,

21  PBX, bellmen, valet, front desk, reservations, and concierge.

22  Q     Sounds like a lot of responsibilities.

23  A     A lot.

24  Q     When was this?

25  A     I'm not good with dates, so --

COTTLE - DIRECT EXAMINATION/FRANK

1   Q     Okay.  Is this around the time that you -- you had a

2   breakdown and you were seeking cyanide?

3   A     Yes, it was.

4   Q     It was while you were working at the Mandalay Bay?

5   A     Yes.

6   Q     And why?  What was going on with you in your life at

7   that point?

8   A     Um, through the years, stress of doing what I did,

9   opening hotels, being at Mandalay Bay, over 5,000 rooms, um,

10  just overwhelming.

11  Q     And how bad did it get?

12  A     It got bad enough that I didn't want to see my wife, I

13  didn't want to see my child.  I was crying probably 20, 25

14  times a day for no reason.

15  Q     Did you have any help to cope with this?

16  A     Not really.

17  Q     How about a doctor, any doctor's care?

18  A     Yes, one doctor in general.

19  Q     Who was that?

20  A     Dr. Tice.

21  Q     Okay.  But I take it that wasn't helping.

22  A     No.

23  Q     So what -- I mean, what happens?  How -- how is it that

24  you get to the point that you're -- you're seeking cyanide to

25  end your life?

COTTLE - DIRECT EXAMINATION/FRANK

413

1   A      With being depressed that much, um, you're looking for a

2   way out.

3   Q      So where did you look for that way out?

4   A      Um, I went online and started looking.

5   Q      What were you looking for?

6   A      Cyanide to be able to end my life.

7   Q      And why cyanide?

8   A      In general, it was just one of those things that I knew

9   that to open -- I think to most people, it would be a way to

10  end.

11  Q      And were you able to find it, at least did you think you

12  were able to find it?

13  A      Yes.

14  Q      And how?

15  A      Um, went through a blog Web site corresponding.

16  Q      Do you remember the name of the blog site?

17  A      No, I don't.

18  Q      Can you describe it for us at all?

19  A      All I remember is like a dark black screen.

20  Q      What was it about that blog?

21  A      Different ways for people to try to find ways to commit

22  suicide.

23  Q      And who did you find there?

24  A      Um, a guy that was online.

25  Q      Do you remember what e-mail address he used or any names

1    he used?

2    A      No.

3    Q      Okay.  What'd you do?

4    A      Corresponded back and forth.

5    Q      About what?

6    A      About purchasing cyanide.

7    Q      Okay.  Did you eventually reach an agreement?

8    A      Yes.

9    Q      Do you remember what that agreement was?

10   A      I think it was for a certain amount for $250 or

11   something like that.

12   Q      And do you remember how you paid for it?

13   A      Through PayPal.

14   Q      What -- what is PayPal?

15   A      Just an online exchange --

16   Q      All right.

17   A      -- it's called.

18   Q      And did you get something in return?

19   A      Yes.

20   Q      What did you get?

21   A      I got a package with a white substance wrapped in a --

22   like a little baggie.

23   Q      Can you describe the package?

24   A      Ah, it was a manila envelope, probably about 4 by 6.

25   Q      Do you remember where it came from?

1    A      No.

2    Q      What'd you do with it?

3    A      Um, I had it.  I kept the substance on me, the baggie,

4    inside of some other plastic bag in my backpack.

5    Q      Can you describe what was inside the manila envelope,

6    the -- the brown envelope?

7    A      Just the -- a baggie, white substance, probably about

8    the shape of quarter-size.

9    Q      What kind of baggie?

10   A      Clear, just like a little -- not quite like a sandwich

11   bag, but just a clear bag.

12   Q      Why'd you keep it with you?

13   A      I think that was my security blanket, honestly, so --

14   Q      What happened to that -- that baggie?

15   A      I went to my doctor.

16   Q      Is this the same Dr. Tice or someone else?

17   A      No, got another doctor.

18   Q      Do you remember their name?

19   A      Dr. Galliano-Pardo.

20   Q      Okay.  Where are you living by this time?

21   A      Jacksonville, Florida.

22   Q      And how did you get there from Las Vegas?

23   A      Um, moved back after being in the hospital.

24   Q      Out in Las Vegas?

25   A      Yeah.

COTTLE - DIRECT EXAMINATION/FRANK

1    Q    And when you say back, where -- where do you mean by
2    back?

3    A    Um, I had lived there before.

4    Q    Yeah.

5    A    I was born and raised in Jacksonville.

6    Q    Jacksonville.  Where is Jacksonville relative to St.
7    Marys, Georgia?

8    A    About 30 miles south.

9    Q    Okay.  All right.  And I -- you were starting to tell us
10   what happened to the baggie, and you told us something about
11   your doctor, Galliano-Pardo?

12   A    Yeah.

13   Q    What happened?

14   A    I went for a session with her, um, and admitted that I
15   had purchased something and had it.

16   Q    Did you admit what that something was?

17   A    Yeah, I told her that I had purchased cyanide and --

18   Q    What did she do about it?

19   A    She gave me the option that she would either commit me
20   now or turn the substance over to her.

21   Q    What'd you do?

22   A    I went and got the substance out of my backpack out of
23   my car.

24   Q    And what'd you do with it?

25   A    I gave it to her.

COTTLE - DIRECT EXAMINATION/FRANK

417

1    Q     Was that the end of your dealings with this person that

2    you had met on this blog site?

3    A     Um, I went through another time when I gave that up,

4    went looking for another.

5    Q     Poison?

6    A     Hm-hmm, yes.

7    Q     So after you gave this bag to your doctor, you went back

8    looking for poison again?

9    A     Yes.

10   Q     And did you go to the same person or a different person?

11   A     Same person.

12   Q     And what happened that time?

13   A     I didn't follow through.

14   Q     Do you recall being contacted by a postal inspector

15   about this matter?

16   A     Yes, I do.

17   Q     What do you recall about that?

18   A     I was working in Orlando, and I saw an e-mail from the

19   postal inspector.

20   Q     Okay.  And did you correspond with that postal

21   inspector?

22   A     Yes, I did.

23   Q     Did you send that postal inspector things?

24   A     Yes, I did, I believe.

25   Q     What do you think you sent?

1  A    Um, I had had a picture of the package that was sent to

2  me and a picture of what was inside of it.

3  Q    Did you also have some of the e-mails between you and

4  that person?

5  A    Yes.

6  Q    And did you forward those to the inspector?

7  A    Yes, I did.

8  Q    Let me show you what has been marked as Exhibit 81.  Let

9  me show you what's been marked as Exhibit 81 in evidence, ask

10  you to take a look at that, and tell us if you recognize it,

11  whether that looks familiar.

12  A    (Witness looking at exhibit.)  Yes.

13  Q    What does this look like to you?

14  A    Ah, this was the blog, I believe, I was on.

15  Q    Okay.  Mr. Cottle, I'm showing you what's been marked as

16  Exhibit 20 for identification.  I'd ask you to take a look at

17  that, and if you'd -- if you'd flip through the pages, tell us

18  if you recognize what that is.

19  A    (Witness complying.)  Correspondence between the postal

20  inspector.

21  Q    Is this the -- the -- the e-mail and the pictures you

22  described earlier forwarding -- that you forwarded to the

23  postal inspector?

24  A    Yes.

25  Q    And there -- there's some initials on one of the pages.

1    Whose are those initials?

2    A    That's my initials.

3    Q    Okay.  When did you put those initials there?

4    A    Um, March 19th, '15.

5    Q    And -- and why?  What was going on?  Had the postal

6    inspector come to see you?

7    A    Yes.

8    Q    He showed these to you then?

9    A    Yes.

10   Q    Asked you if you recognized them?

11   A    Yes.

12   Q    And is that why you put your initials on them?

13   A    Yes.

14           MR. FRANK:  Okay.  Your Honor, I'd move Exhibit 20

15   into evidence.

16           THE COURT:  It says here 20-A and B.  Are they

17   separate?

18           MR. FRANK:  Not yet, Your Honor.  That's -- this is

19   just 20.

20           THE COURT:  Okay.  20.  Any objection to 20?

21           MR. RIDGE:  Well, Your Honor, I think it's what I've

22   been trying to maintain as a standing objection to this type

23   of information because of the status of the claims against

24   Mr. Kilmartin vis-a-vis Mr. Cottle, and I would ask for the

25   instruction -- the limiting instruction that you were

COTTLE - DIRECT EXAMINATION/FRANK

1    providing yesterday.

2         THE COURT:  Sure.

3    Ladies and gentlemen, this is another example of the

4    limiting instruction I've given you periodically.  I won't

5    repeat the whole thing, but you are aware of the limited

6    purposes for which you may use this exhibit and the

7    permissible purposes for the use of the exhibit.  You're also

8    aware of the ways you cannot use the exhibit.  You cannot use

9    the exhibit to demonstrate or as evidence of the defendant's

10   character, nor can you use this exhibit as an indication of

11   his propensity to commit a crime, but you can use the exhibit,

12   as I've indicated earlier, for purposes of knowledge and plan

13   and the other factors that I've already indicated to you.

14   Thank you.

15        MR. RIDGE:  Thank you, Your Honor.

16        MR. FRANK:  May I proceed, Your Honor?

17        THE COURT:  Yes.  The -- Exhibit 20 is admitted.

18   BY MR. FRANK:

19   Q    And, Mr. Cottle, I'm showing you what's been marked as

20   Exhibits 20-A and 20-B, ask you to take a look at those, and

21   tell us if you recognize them, please.

22   A    (Witness looking at exhibits.)  Yes, both of them.

23   Q    What -- what are they?

24   A    The package that I received in the mail and the

25   contents.

COTTLE - DIRECT EXAMINATION/FRANK

421

1   Q    Okay.  These are pictures of the package?

2   A    Yes.

3   Q    And you took these pictures?

4   A    Yes.

5   Q    And 20-A is a picture of the package, correct?

6   A    Yes.

7   Q    And 20-B is a picture of the baggie that was inside the

8   package that you've described; is that correct?

9   A    Yes.

10          MR. FRANK:  I'd move Exhibits 20-A and 20-B into

11   evidence.

12          THE COURT:  Any objection to A and B?

13          MR. RIDGE:  No, Your Honor.

14          THE COURT:  A and B are admitted.

15          MR. FRANK:  And I'd request permission to publish

16   the pictures 20-A and 20-B.

17          THE COURT:  You may.

18   BY MR. FRANK:

19   Q    So, Mr. Cottle, beginning with 20-A, you recognize this?

20   A    Yes.

21   Q    And this address here, Walter Cottle, 102 Pine Street,

22   St. Marys, Georgia, what -- what address is that?

23   A    That was my wife's address at the time.

24   Q    Okay.  Were you living there with her at the time?

25   A    Yes.

1    Q    Okay.  Because previously you said you were living in

2    Jacksonville.

3    A    Yeah.

4    Q    Were you -- what's the difference or --

5    A    I became homeless during that one time period --

6    Q    Okay.  But --

7    A    -- and was able to go there.

8    Q    To your -- to your -- where your wife was living?

9    A    Yes.

10   Q    Okay.  And how about 20-B, is this the way the -- the

11   contents of the package looked when it got to you?

12   A    Yes.

13   Q    Mr. Cottle, let me show you Exhibit 26.  I don't know --

14   well, we can take it apart a bit.  I'm showing you what's been

15   marked as 26 for identification.  It's marked on the outside

16   evidence bag.  Inside there is a large Ziploc bag.  Inside the

17   Ziploc bag, there is a smaller Ziploc bag.  Inside that Ziploc

18   bag, there is a -- sort of a shopping bag with the Exhibit

19   No. 26-B on it and a sticky.  Do you recognize that sticky

20   with -- with handwriting on it?

21   A    Yes.

22   Q    What -- what is that?

23   A    That's my initials and date.

24   Q    Okay.  And -- and why did you put your initials here?

25   A    Um, when I was probably giving it over as -- that it was

1   mine at that time.

2   Q      When you met with Inspector Desrosiers, as you've

3   described --

4   A      Yes.

5   Q      -- previously?

6   A      Yes.

7   Q      And then inside that bag is yet another large Ziploc

8   bag.  Inside that bag, there is a smaller Ziploc bag, and

9   inside the smaller Ziploc bag is a -- for -- a small clear

10  plastic bag with the exhibit sticker 26-C, containing a white

11  substance.  Do you recognize this?

12  A      Looks -- yes.

13  Q      Looks like what?

14  A      It looks like what was -- I was given.

15  Q      What you got in the mail --

16  A      Yeah.

17  Q      -- as you've described?

18  A      Yeah.

19          MR. FRANK:  Your Honor, if I haven't already, I'd

20  move 26-A, B, and C into evidence.

21          THE COURT:  Any objection?

22          MR. RIDGE:  No, Your Honor, subject only to the

23  instruction you've already given to the jury.

24          THE COURT:  Okay.  Thank you.  26-A, B, and C are

25  admitted.

1      And, again, ladies and gentlemen, this is exactly the

2  same thing I've told you before the limited purposes and

3  permissible purposes of this evidence.

4           MR. FRANK:  The court's indulgence, Your Honor?  I

5  have no further questions for this witness.

6           THE COURT:  Cross-examination?

7           MR. RIDGE:  Thank you, Your Honor.

8                     CROSS-EXAMINATION

9  BY MR. RIDGE:

10  Q     Good morning, Mr. Cottle.

11  A     Good morning.

12  Q     My name is Marty Ridge, and I'm representing

13  Mr. Kilmartin in this matter, and I'm not going to ask you any

14  questions at all about your dealings with Mr. Kilmartin.  No

15  questions about that.

16      I just want to ask you whether or not, in the course of

17  your reading this Web site and looking for ways to obtain

18  things to kill yourself, did you ever or do you recall that

19  there were other people indicating they had potassium cyanide

20  available for people who wanted it?

21  A     I don't recall.

22  Q     You don't recall?  If I show --

23           MR. RIDGE:  May I approach, Your Honor?

24           THE COURT:  You may.

25  BY MR. RIDGE:

1   Q     Mr. Cottle, during the discovery phase of this case, I

2   was provided this document, and I wondered if you could look

3   at it and ask you if that refreshes your recollection about at

4   least one other source of potassium cyanide on the Internet.

5   A     (Witness looking at document.)  Not that I can recall,

6   but it is my e-mail.

7   Q     It is addressed to you?

8   A     Yes.

9   Q     And it's dated October 16th, 2012?

10  A     Yes.

11  Q     And that is an ad from a fella named Brian Doyle?

12  A     Yes.

13  Q     Asking you if you were still interested in purchasing

14  potassium cyanide?

15  A     Yes.

16          MR. RIDGE:  Thank you very much.  That's all I have.

17          THE COURT:  Redirect?

18          MR. FRANK:  No, Your Honor.

19          THE COURT:  Thank you.  This witness is excused.

20  Good luck.

21      (The witness left the witness stand.)

22          MR. FRANK:  Your Honor, I have a stipulation if I

23  could read at this point?

24          THE COURT:  Yes.

25          MR. FRANK:  And it's marked as Exhibit 27, Your

1    Honor.

2              THE COURT:  All right.  Do you have any objection to

3    this?

4              MR. RIDGE:  No, Your Honor.

5              THE COURT:  You may proceed.

6              MR. FRANK:  Thank you.

7         And the stipulation reads that, the parties hereby agree

8    and stipulate that on February 21st, 2013, Dr. Aliano --

9    Dr. Alina Galliano-Pardo of Jacksonville Beach, Florida, took

10   from Walter Cottle a plastic baggie containing a white powdery

11   substance.  Dr. Galliano-Pardo took the baggie to the

12   Jacksonville Beach Police Department located at 101 Penman

13   Road South and met with Patrol Officer Trainee Misty Kulcsar.

14        The police department called the fire department.

15   Jacksonville Beach Fire Lieutenant Richard Dallis Hunter

16   responded to the police department, retrieved the plastic

17   baggie, placed it in a paint can, sealed it, and brought it

18   back to the Jacksonville Beach Fire Department located at

19   325 Second Avenue South.

20        At the fire department, Lieutenant Hunter placed the can

21   in Fire Marshal Steve Sciotto's office.  Sciotto kept the can

22   in his office.  On March 28th, 2015, United States Postal

23   Inspector Michael Desrosiers took custody of the paint can

24   containing the plastic baggie from Fire Marshal Sciotto.

25        And with that, Your Honor, the government calls Amelia

1    Kani.

2            THE CLERK:  Please raise your right hand.  Do you

3    solemnly swear that the testimony you shall give in the matter

4    now in hearing shall be the truth, the whole truth, and

5    nothing but the truth, so help you God?

6            THE WITNESS:  Yes.

7            THE CLERK:  Please be seated.  Please state your

8    name and spell your last name for the record.

9            THE WITNESS:  Amelia Kani, K-a-n-i.

10           MR. FRANK:  Thank you, Your Honor.

11   AMELIA KANI, having been duly sworn, was examined and

12   testified as follows:

13                    DIRECT EXAMINATION

14   BY MR. FRANK:

15   Q    Ms. Kani, how are you employed?

16   A    I am employed as a global law enforcement lead for

17   PayPal.

18   Q    Okay.  And what is PayPal?

19   A    PayPal is an online Web site, and it allows people to

20   send money back and forth using an e-mail address, and those

21   transactions are backed by a funding source, usually a bank

22   account or a credit card number.

23   Q    And what do you do as global law enforcement lead?

24   A    I prepare records for law enforcement in relation to

25   criminal cases.  This includes responding to subpoenas,

KANI - DIRECT EXAMINATION/FRANK

1    letterhead requests, and court orders.

2    Q    And what kind of records does -- well, let's start with

3    what kind of services PayPal offers.

4    A    What do you mean?

5    Q    Just a pay service?  Any others?

6    A    Ah, mostly a pay service.  We also offer a credit card,

7    different debit card solutions, business solutions.

8    Q    Okay.  And what sort of records does PayPal keep of

9    those services?

10   A    We typically keep and maintain in the normal course of

11   business account records, account information, transaction

12   information, and activity information.

13   Q    So what would -- what would account information be?

14   A    Account information would include the information that's

15   used to register the PayPal account -- names, addresses, phone

16   numbers, funding sources.

17   Q    And does PayPal make any effort to verify or confirm

18   that information?

19   A    No.

20   Q    How about the funding sources?

21   A    We do attempt to confirm the funding source, the bank

22   specifically.

23   Q    Okay.  How about -- what other records do you keep?  You

24   said history of the activity in the account; is that it?

25   A    Yes, so this is IP activity, log-ins and log-outs of the

1    account, and then what happens during those log-ins and

2    log-outs.

3    Q    All right.  And how about the transaction information

4    that you keep records of, what's that?

5    A    The transaction information will show money moving in

6    and out of the account, payments sent, payments received, and

7    withdrawals to bank accounts.

8    Q    And is there also a category of information, claim

9    information or --

10   A    Yes.

11   Q    What is that?

12   A    Anytime a transaction is disputed, then the counterparty

13   can file a claim.

14   Q    And what does PayPal do about that, generally?

15   A    PayPal will speak to the buyer and the seller and make a

16   determination on if the claim should be found in one of their

17   favors.

18   Q    And it makes records of that activity, as well?

19   A    Yes.

20   Q    And are all these records made by PayPal at about the

21   time of the events that they document?

22   A    Yes.

23   Q    Either personally or electronically?

24   A    Electronically, yes.

25   Q    Okay.  And are they regularly kept by PayPal all for

1    business purpose?

2    A    Yes.

3    Q    Let me -- and are you -- you're familiar with those

4    records, you work with them regularly?

5    A    Yes.

6    Q    Find them to be accurate and reliable?

7    A    Yes.

8    Q    Let me show you --

9         MR. FRANK:  You know, Your Honor, I'm going to move

10   Exhibit 21 directly into evidence on the basis of its

11   certificate of authenticity.

12        MR. RIDGE:  No objection, Your Honor.  Thank you.

13        THE COURT:  21's admitted.

14   BY MR. FRANK:

15   Q    And, Ms. Kani, I'm showing you Exhibit 21 for

16   identification.  Can you take a look at that and tell us if

17   you recognize it, please?

18   A    (Witness looking at exhibit.)  Yes.

19   Q    What is 21 for identification?

20   A    These are PayPal account records that were requested

21   from us.

22   Q    By the government?

23   A    Yes.

24   Q    And what are they records of?

25   A    They're records of an e-mail address --

1    Q      When you say --

2    A      -- account being held by a specific e-mail address.

3    Q      Okay.  Correct me if I'm wrong, but -- so the -- the

4    records were requested in terms of an e-mail address?

5    A      Yes.

6    Q      What was that e-mail address?

7    A      S-k-i-p-t-i-n@gmail.com.

8    Q      Skiptin@gmail.com?

9    A      Yes.

10   Q      Is that one of the ways that you organize and access the

11   records that you've described?

12   A      Yes.

13   Q      By the e-mail address that the -- that the accountholder

14   has provided in connection with that account?

15   A      Yes.

16   Q      All right.  And how many different accounts are -- are

17   -- are there records of here?

18   A      Three.

19   Q      And what -- what's the difference between the three

20   accounts?

21   A      The difference between the three accounts is the account

22   type.

23   Q      What are the types?

24   A      Personal verified -- there's a lot here.

25   Q      Maybe I can --

1   A      Yeah.

2   Q      Two of them are duplicates, right?

3   A      Yes, two of them duplicates.

4   Q      What is a duplicate?

5   A      So a duplicate account occurs when the PayPal account is

6   linked to an e-mail address, but it's not necessarily a fully

7   verified PayPal account.

8   Q      Okay.  And the first of these accounts is fully verified

9   as you verify any account.

10  A      Yeah.

11  Q      Is that correct?

12  A      Correct.

13  Q      And all three of these accounts were accessed according

14  to the address skiptin@gmail.com?

15  A      Yes.

16         MR. FRANK:  So let me ask to be projected or

17  published Exhibit 21, if I may.  All right.  And if we can

18  scroll down to the first page beyond the certificate.

19  BY MR. FRANK:

20  Q      And, Ms. Kani, both you and I can highlight items on

21  this screen by touching it with our finger, and if that would

22  help, I invite you to do so.

23         But let me -- let me ask you, so what is this page about,

24  this first page of this exhibit?

25  A      This is the registration information that was used to

1  create the PayPal account.

2  Q    All right.  And what is -- all right.  It's pretty

3  self-explanatory, right?

4  A    Yes.

5  Q    I mean, how about DOB, what does that represent there in

6  that line, the -- the fourth line down from the top?

7  A    7 May '62.

8  Q    Okay.  And what is that?  That's a date of birth?

9  A    That's the date of birth provided by the person who

10 registered the account.

11 Q    All right.  And the e-mail, the sixth line?

12 A    Skiptin@gmail.com.

13 Q    That's the e-mail that the user provided when they set

14 up this account?

15 A    Yes.

16 Q    All right.  And then if we scroll down further, what --

17 what's the significance of account status?

18 A    The account status is the status of the PayPal account.

19 It says that it's open, which means that it is free to

20 transact money.

21 Q    All right.  Open as of when?

22 A    As of when the records were pulled.

23 Q    All right.  And can you tell that from this exhibit?

24 A    Yes, at the top, you can see the date that the records

25 were provided.

KANI - DIRECT EXAMINATION/FRANK

434

1    Q     Okay.  So if we scroll back up, what date was that?

2    A     Monday, August 29th, 2016.

3    Q     All right.  Circling it there, correct?

4    A     Yes.

5    Q     Meaning that it was -- it was active and could be used,

6    correct?

7    A     Yes.

8    Q     But not necessarily used, correct?

9    A     Correct.

10   Q     And if it had been used, there would be evidence of its

11   use --

12   A     Yes.

13   Q     -- in these records?

14   A     Yes.

15   Q     Okay.  If we could scroll back down.  What about this --

16   this line here, time created, what's the significance?  What

17   is that -- the meaning of that line?

18   A     That was the date and time that the PayPal account was

19   activated for the first time.

20   Q     And what does that mean?

21   A     It means that that was the date that someone went to

22   paypal.com.  They said that they wanted to create a PayPal

23   account, and then they created the PayPal account with this

24   information.

25   Q     All right.  And how about the -- the line SSN here at

1    the bottom of this table on the -- the -- the second --

2    strictly speaking, it's the second page after the certificate,

3    the first page of the actual substantive exhibit, what -- what

4    is -- what is SNN -- SSN?

5    A    That is the social security number that the

6    accountholder provided to register the account.

7    Q    Okay.  If we could scroll to the next page, please.  All

8    right.  And how about this next page of information, what's --

9    what's provided here?

10   A    E-mail address, any aliases that were provided, phone

11   numbers, addresses, auctions, mobile payments, and you can

12   just see the top of the financial information.

13   Q    All right.  And, again, all of this is information that

14   comes from the -- the user, the accountholder, the subscriber?

15   A    Yes.

16   Q    But is unconfirmed; is that correct?

17   A    Correct.

18   Q    What -- how about up here, what's the significance of

19   these entries, the top right, primary, confirmed, active?

20   What -- what do they mean?

21   A    So they're in relation to the e-mail address.  The

22   primary e-mail address true means that this is the e-mail

23   address that the accountholder has said is the main e-mail

24   address that they want to use for the account.

25        The fact that it says true confirmed means that they

1   have linked their e-mail address to the PayPal account.  An

2   e-mail -- an e-mail is sent to the e-mail account.  They have

3   to go in and click confirm; that links the e-mail address to

4   the PayPal account.

5        And the fact that it's active means that they're -- they

6   have told us that it is still their current e-mail address

7   that they would like to use.

8   Q    All right.  And then how about down here, the middle of

9   the page on the left, what I've circled there, what is that

10  information?

11  A    This is the name and address that was used to register

12  the account.

13  Q    Okay.  In this case, that's Sidney Kilmartin,

14  25-5 Village Drive, correct?

15  A    Yes.

16  Q    And how about the opposite end of that line, what --

17  what -- what's -- what does date entered mean there?

18  A    That is the date that the accountholder provided this

19  address to their PayPal account --

20  Q    All right.  And --

21  A    -- 9/19/2012.

22  Q    And in this case, that's the same day as the date it was

23  created, correct?

24  A    Yes.

25  Q    Okay.  And if we could scroll down a little bit.  And

1    then what -- whoops, if we could scroll to the next page.

2         And how about the information here, what -- on this

3    third page of substantive information, what -- what is here?

4    A    This is the funding sources that have been added to the

5    PayPal account to back any transactions.

6    Q    All right.  And what was that in this case?

7    A    There is a bank account and a credit card.

8    Q    And where are they indicated on this?

9    A    The bank account is here, and the credit card is there.

10   Q    And what type of bank account is that?  Can you tell?

11   A    It's a TD Bank account.

12   Q    In whose name?

13   A    In Sidney Kilmartin.

14   Q    And where is that apparent?

15   A    Right here.

16   Q    Okay.  And below that is a box that says confirmed.

17   A    Yes.

18   Q    Correct?  What's the significance of that?

19   A    So it says, confirmed, and I kind of scrolled over it,

20   but confirmed by random deposit.  What that means is that we

21   have deposited one penny into the bank account to make sure

22   that it is an active bank account.

23   Q    And is -- was that, in fact, confirmed?

24   A    Yes.

25   Q    That's what that means?

1   A     Yes.

2   Q     Okay.  Let's scroll down further, if we could.  Well,

3   let's -- all right.

4         Before we -- before we leave that page, just had another

5   question about the last entry there.  Oh, sorry, yeah.  How

6   about this -- this first used, it all appears to be the same

7   date as -- as opened and --

8   A     Yes, this is an IP summary snapshot.

9   Q     Hm-hmm.

10  A     So it typically will show the -- the most common IP

11  activity on the account, and the first used IP on this account

12  was Wednesday, September 19th, 2012.

13  Q     All the same day.

14  A     Yes.

15  Q     Okay.  And then continuing to the next page, if we

16  could.  Let's scroll past that -- okay -- and stopping here.

17        What -- this is a -- this appears to be a separate

18  section or category of information, correct?

19  A     Yes.

20  Q     But is it about the same account?

21  A     Yes.

22  Q     And how can you tell?

23  A     Because the account number is the same.

24  Q     All right.  And where is that?

25  A     Right there.

1    Q    All right.

2    A    Ending in 2267.

3    Q    All right.  And what -- what category of information is

4    this about that account?  Do we need to scroll down further --

5    A    Yes.  Can you scroll down, please?

6    Q    -- to the next page?

7    A    This is the activity log, which shows the IP activity.

8    Q    Okay.  Meaning what?  What is -- what is -- what is

9    displayed here?

10   A    So what is displayed is that every time the PayPal

11   account is accessed, the IP address is captured.  Also, what

12   is captured is what is happening on that account at the time

13   of the access.

14   Q    All right.  So, for example, if we scroll down to, for

15   example, the fourth page and the fifth page of this exhibit --

16   well, let me stop you there.

17        So, for example, just give us an example -- let me

18   circle that which reads customer phone update, Web phone add.

19   A    Yes.

20   Q    What -- what does that mean?

21   A    So it means that on June 25th, 2016, the account was

22   accessed, and the phone number was updated through the Web

23   site.

24   Q    And scrolling further down, and is this in reverse

25   chronological order?

KANI - DIRECT EXAMINATION/FRANK

440

1    A     Yes.

2    Q     Okay.  And then if we could go to activity on

3    September 19th, 2012, the same day as --

4    A     Yes.

5    Q     -- activated and confirmed, and let's scroll to the next

6    page, if we could.

7          All right.  And can you describe what -- what's

8    happening here on this first day of activity in this -- in

9    this account?

10   A     Sure.  So starting from the bottom of the page, you can

11   see that the account was accessed for the first time.  The

12   e-mail address was added to the account.

13   Q     And it might help --

14   A     Yeah.

15   Q     -- if you could just touch the screen --

16   A     Sure.

17   Q     -- so the jury knows where -- where it is that these

18   items are -- are documented.

19   A     So right here is where the account was accessed for the

20   first time.  The user agreement was accepted right here.  And

21   would you like me to explain the user agreement?

22   Q     Sure.

23   A     The user agreement is that thing that we all say that we

24   have read and accepted that explains the policies and

25   procedures in relation to owning a PayPal account.

1   Q     Okay.

2   A     The account was created here.  The e-mail -- sorry --

3   the physical address was added here.  Phone number --

4   Q     Where -- where do you see that?  Let me clear this

5   and --

6   A     Yeah, clear it.  Thanks.

7   Q     -- show us where the physical address was added.

8   A     Right there.

9   Q     Okay.  And that's the address right opposite?

10  A     Yes.

11  Q     Okay.

12  A     So you can see the specifics of the address that was

13  added.

14  Q     All right.

15  A     The e-mail and the phone number were added here --

16  Q     Okay.

17  A     -- which are going to be on this side here, and you can

18  see it's all on the same day, within seconds of each other.

19  Q     Okay.  All right.  And then why don't I scroll up and --

20  and just ask you a question about -- I think that gives the

21  idea.

22        But how about this, what's -- at the top of that page,

23  there's an entry that begins hold initiated, what's that

24  about?

25  A     So that means that money went into the account, and a

KANI - DIRECT EXAMINATION/FRANK

442

1    payment hold was initiated.

2    Q    And what's a payment hold?

3    A    Typically, when we have a brand-new account, we

4    determine that -- we don't necessarily want all of the money

5    to be able to be accessed immediately in case there's any

6    claims or disputes, so we hold the funds until we can show

7    delivery of the item.

8    Q    All right.  So that's just -- that's just a standard

9    practice, correct?

10   A    Yes, for all new accounts.

11   Q    All right.  Now, let's scroll up to October 13, if we

12   can, 2000 -- I'm sorry.  Did I misspeak?  No, I think that's

13   right.  It's in the vicinity of October 13th because I wanted

14   to ask you about another hold in here about October 12th.  Do

15   you see where I'm indicating?

16   A    Yes.

17   Q    Is that a different kind of hold?  Can you read it?  Is

18   it legible?

19   A    Um, I'm not sure.  It --

20   Q    Okay.

21   A    -- looks like it.

22   Q    It looks like a different kind of hold?

23   A    Yes.

24   Q    I mean, what other kinds of holds could there be besides

25   the initial hold that you've described?

KANI - DIRECT EXAMINATION/FRANK

1    A     There could also be a hold on the funds when a claim or

2    dispute is filed in relation to a specific transaction.

3    Q     All right.

4    A     We would hold the money.

5    Q     And you've previously talked about that a bit, have you

6    not?

7    A     Yes.

8    Q     All right.  Let's scroll to the next category, the third

9    category of information, with regard to this account, if we

10   could.  It has the same sort of header.  Stop there, if we

11   could.

12         All right.  And, again, how do we know that this relates

13   to the same account?

14   A     Because the account number is the same, ending in 2267.

15   Q     All right.  And if -- if we scroll down to the next page

16   of this section of information, what -- what -- what kind of

17   information is this in this -- in this section of these

18   records with respect to this account?

19   A     This is the transaction log.  It shows the money moving

20   in and out of the account.

21   Q     All right.  So if -- let me ask you about -- let's work

22   down from the top.  How about items 3 through 8 or so.  Can

23   you -- can you describe what's going on there?

24   A     Sure.  So 3 through 8, so right here, the -- a PayPal

25   credit, payment was made to the account.  The name of the

1   other counterparty was Donalee Wolfe --

2   Q     Okay.

3   A     -- see here.  And there was a hold placed on the funds.

4   Q     Can you tell why that hold was placed there from this

5   record?

6   A     No.

7   Q     Okay.  Well, what happened, going -- going forward in

8   time?

9   A     Once the hold cleared, it looks like --

10  Q     Meaning what, it was -- it was released?

11  A     Yes, the hold -- yeah, it looks like money was withdrawn

12  to the bank account.

13  Q     Okay.  The one linked to this account in the first page?

14  A     Yes.

15  Q     Okay.  And then what happened?

16  A     And then the funds were reversed --

17  Q     And --

18  A     -- which means that the money went back to the

19  counterparty.

20  Q     And how does that happen?  Is that -- is that possible

21  with a -- a PayPal account, to -- to pull back money that's

22  been transferred?

23  A     Yes, it usually happens in relation to a dispute.

24  Q     Okay.  All right.  And let me clear that and ask you

25  about this series of entries at the bottom of this page,

1   roughly items 12 through 16.  If you could describe for us

2   what's going on there.

3   A     Sure.  So a payment was made by -- it looks like --

4   Walter Cottle.  The payment was pending here.  And then the

5   payment completed, and this all happened within a day or two

6   of each other.

7   Q     Okay.  And you're reading up from the bottom of the --

8   the --

9   A     Yes --

10  Q     -- the page?

11  A     -- up from the bottom.  And then once the payment

12  cleared and the payment was completed, then the funds were

13  withdrawn to a bank account, and the bank account is here,

14  TD Bank ending in 6424.

15  Q     Okay.  Let's scroll forward in this exhibit, if we

16  could, keep going, further, please.  I want to go still

17  further to the claim information, and it's oriented correctly.

18  Great.

19        Okay.  So we're looking at a different category of

20  information here.  This is -- this -- this is a one-page, sort

21  of two windows, one on top of the other, correct?

22  A     Yes.

23  Q     And -- and the top of the page reads, PayPal attack?

24  A     Yes.

25  Q     Correct?  What is this category of information?

1    A    This is the record of a claim or a dispute that was

2    filed, and this is the view of a case management system to

3    record and monitor those claims.

4    Q    I'm not sure I understand that.  When you say this is a

5    view?

6    A    Yes, this is a view that PayPal agents can access that

7    helps them manage and review claim and dispute details.

8    Q    All right.  So if somebody is trying to resolve this,

9    this is the type of information they could access --

10   A    Yes.

11   Q    -- as part of that effort?

12   A    Yes.

13   Q    Is that fair to say?  Okay.  All right.  And what is

14   this about?

15   A    So it looks like a user, Donalee Wolfe, here, filed a

16   dispute on a transaction that was made.

17   Q    All right.  Can you tell when the -- the -- what

18   transaction, when, or when the dispute was filed?

19   A    Hard to see.  Let's see.

20   Q    And there's more information below.

21   A    Yeah, there's more information below.

22   Q    Should we scroll down to that?

23   A    Yes, please.

24   Q    So what's going on here?  Can you tell?

25   A    Yeah, so these are different subjects -- different notes

1   back and forth based on the status of the claim.  They were

2   all made in and around 11 -- it looks like 11/6/2012.

3   Q    Okay.  All right.  And -- and what is this information

4   here at the bottom?

5   A    This is a note that was made by the agent who received a

6   phone call in response to the claim that was filed.

7   Q    All right.  And what's the substance of that?

8   A    Would you like me to read it?

9   Q    Yeah, I mean -- please.

10  A    Sure.  So this is the -- a call from the seller.  Seller

11  states that the payment was for goods.  However, the details

12  show as a service payment.

13  Q    So what's the difference?  What -- what's the difference

14  between --

15  A    So when you say that a payment is for goods, it means

16  that you're purchasing something.  If it's for services, then

17  you are also purchasing something, but it may not be a

18  tangible item.

19  Q    Okay.  All right.  And what else does the seller say?

20  A    Seller states that he shipped -- sorry.  Can you clear

21  the --

22  Q    Yep.  Sorry.

23  A    Thanks.  He shipped USPS and previously gave PayPal the

24  tracking, but there is no tracking noted.  When asked what

25  type of product was sold, the seller stated, what does it

1    matter, it's none of your business.  I advise we needed to

2    know to ensure it was allowed under our terms of use.

3         Caller then stated it was a chemical being sold.  USPS

4    has strict guidelines for chemicals.  When I advised the

5    seller that certain items could not be sold with PayPal or

6    shipped with USPS, he stated then -- he stated -- excuse me --

7    item was potassium.  The -- this is considered a hazardous

8    material and cannot be shipped through USPS.

9    Q    All right.  And what is -- what does PP stand for there?

10   A    PayPal.

11   Q    Whoops.  And what does UPS stand -- USPS stand for?

12   A    U.S. Postal Service.

13             MR. FRANK:  The court's indulgence, Your Honor?

14             THE COURT:  Yes.

15   BY MR. FRANK:

16   Q    Let me scroll back up and just ask you a question about

17   that last bit of activity in the account in 2016.

18        Do you see where -- where I am now, the activity on

19   June 25th?

20   A    Yes.

21   Q    And can you tell who -- I mean, it's -- it's apparently

22   from the IP address 0000?

23   A    Yes.

24   Q    Is that significant?

25   A    That means that it's an automatic PayPal action.

1    Q      Not a customer action?

2    A      Yes.

3    Q      That -- that -- that IP code, that's what that means?

4    A      Yes, it means the system has generated it.

5    Q      Okay.

6           MR. FRANK:  I have no further questions for this

7    witness, Your Honor.

8           THE COURT:  Cross-examination?

9           MR. RIDGE:  None, Your Honor.  Thank you.

10          THE COURT:  Thank you.  You may stand down, ma'am.

11   Thank you very much.

12        (The witness left the witness stand.)

13          THE COURT:  Next witness?

14          MR. FRANK:  Your Honor, I'd move Government's

15   Exhibit 23 into evidence.  Those are certified records of

16   TD Bank.

17          THE COURT:  Any objection?

18          MR. RIDGE:  No, Your Honor.

19          THE COURT:  They're admitted.

20          MR. FRANK:  And then I would call Stacey Williams.

21          THE CLERK:  Please raise your right hand.  Do you

22   solemnly swear that the testimony you shall give in the matter

23   now in hearing shall be the truth, the whole truth, and

24   nothing but the truth, so help you God?

25          THE WITNESS:  Yes, I do.

1          THE CLERK:  Please be seated.  Please state your

2    name and spell your last name for the record.

3          THE WITNESS:  Stacey Williams, W-i-l-l-i-a-m-s.

4          MR. FRANK:  Thank you, Your Honor.

5    STACEY WILLIAMS, having been duly sworn, was examined and

6    testified as follows:

7                      DIRECT EXAMINATION

8    BY MR. FRANK:

9    Q     Good afternoon, Ms. Williams -- oh, it's still morning.

10   Good morning.

11   A     Good morning.

12   Q     I'm losing track of time.

13         Ms. Williams, where do you currently live?  Just the

14   town and the state.

15   A     Near Nathrop, Colorado.

16   Q     Okay.  And how long have you been living in Colorado?

17   A     Um, 25 years.

18   Q     And what do you do there?

19   A     Actually -- I apologize -- um, I've lived there for

20   13 years.

21   Q     Okay.

22   A     And I'm a writer and marketing consultant.

23   Q     Okay.  Where did you grow up?

24   A     Salt Lake City.

25   Q     Utah?

WILLIAMS - DIRECT EXAMINATION/FRANK

451

1   A    Yes.

2   Q    And how about your education, can you tell us a little

3   bit about your education?

4   A       Um, I started out at the University of Utah, didn't like

5   it very much, dropped out.  Was in the Air Force for four

6   years and worked in the Air Force as a Russian transcriber

7   analyst at the National Security Agency.

8   Q    When was that?

9   A    That was from '80 to '84.

10  Q    Okay.

11  A    And then I went to Stanford after that.

12  Q    All right.  And what did you do there?

13  A    I did -- it's called science, technology, and society.

14  It's an interdisciplinary degree.

15  Q    Okay.  And did you get your degree from Stanford?

16  A    Yes, I did.

17  Q    When was that?

18  A    That was '87.

19  Q    And what did you do after that?

20  A    I worked in high-tech marketing in Silicon Valley, and

21  then I went back for a Ph.D. at Stanford.

22  Q    And what did you get your Ph.D. in?

23  A    Organizational behavior at the business school.

24  Q    And what -- did you work after that?

25  A    I did.  I started -- I did marketing consulting and

1    writing again.  I started doing that again.  I did it kind of

2    to make my way through my Ph.D. and liked it a lot, so I've

3    been doing that ever since.

4    Q    How did you wind up in Colorado?

5    A    Um, I first went to Utah.  I did high-tech marketing and

6    was a fly-fishing guide on the Green, kind of grew up

7    fly-fishing.  So I was a fly-fishing guide on the Green and --

8    Q    The Green is a river?

9    A    The Green River, yes.

10   Q    Yeah, okay.

11   A    Just south of -- by Flaming Gorge, Utah, and went

12   through a divorce and moved near to the ranch -- near

13   Steamboat Springs, Colorado.

14   Q    Okay.  And when about was that?

15   A    Um, it would have been around '97, '98.

16   Q    Okay.  And have you been in Colorado since?

17   A    Yes.

18   Q    All right.  And how is it, Ms. -- well, I mean, tell us

19   just -- what have you been doing in Colorado during that time?

20   A    Same thing, high-tech marketing.

21   Q    Okay.

22   A    I can do it with a phone and an Internet connection,

23   so --

24   Q    You can do it pretty much from anywhere?

25   A    Hm-hmm.

1   Q     Okay.  As long as you have those connectivity?

2   A     Yes.

3   Q     All right.  How is it that you became so -- so depressed

4   in 2012 that you were -- you were looking for cyanide?

5   A     Um, I was going through a terrible divorce.

6   Q     Is this a second divorce?

7   A     This was my second divorce, yeah.

8   Q     Okay.

9   A     My husband would not look for a job or work.  He smoked

10  pot from about 4:00 in the morning until 11:00 at night, no

11  exaggeration, and I was paying for it, and I was under a lot

12  of financial pressure.

13       Um, then we were living in ranch country, and we had a

14  black lab who ran over by my neighbor's -- he basically got

15  into my neighbor's chicken coop, and he was coming back toward

16  me, I was calling him, but the neighbor shot him right in

17  front of me.

18  Q     That was upsetting to you?

19  A     (Nodding head up and down.)

20  Q     Were there other events besides?

21  A     Um, and then I -- I -- the brakes went on my car, and I

22  got in a very terrible car accident.  I rolled twice and got

23  the recall notice about four days later.

24  Q     So let me stop you there, Ms. Williams.  It's not my

25  purpose to upset you, so I just -- I mean, how did you find

1    cyanide?

2    A    Um --

3    Q    Do you remember?  Or why -- why were you looking for it?

4    A    Well, I knew that I didn't have the courage to shoot

5    myself, and, um, I knew I didn't have the courage to cut

6    myself.  And I saw a movie, um -- I don't know -- it's with

7    Adrien Brody and -- I mean, it was called Detached or

8    Detachment, something like that, and it's about a, um, um,

9    substitute teacher whose student falls in love with him, and

10   he correctly rejects her, and, um, they have a bake sale, and

11   she has white brownies, and there's one black brownie, and,

12   um, at the end of the bake sale, she eats the -- the black

13   brownie, and it has cyanide in it.

14        And in the movie, it was just like, you know, it -- I'm

15   -- I'm sure it's not as easy as it looked in the movie, but

16   that's how I got the idea.

17   Q    All right.  And -- and where did you go looking for

18   cyanide?

19   A    Um, on the Internet.  I --

20   Q    And did you -- I'm sorry.

21   A    Yeah, just on the Internet.

22   Q    And did you think you found it there?

23   A    I went into several chat rooms and, um, several places

24   on the Internet where people were talking about different ways

25   of -- of committing suicide.  And then someone from -- I can't

WILLIAMS - DIRECT EXAMINATION/FRANK

1   remember the name of the chat room, but someone from a chat

2   room then approached me.

3   Q      And said that they could provide --

4   A      Provide it, yes.

5   Q      All right.  Did you correspond with that person?

6   A      Yes.

7   Q      And do you remember anything about this chat room, what

8   it looked like or -- if you don't, that's fine.  I --

9   A      I don't.

10  Q      All right.  Do you remember anything about this person

11  that you corresponded with?

12  A      Um, well, I only learned the person's name when I sent

13  money.

14  Q      So did you eventually reach an agreement with this

15  person?

16  A      Yes.

17  Q      To buy cyanide?

18  A      Yes.

19  Q      What was that agreement?  Do you remember?

20  A      It was, um, $250 via Western Union.

21  Q      Okay.  Do you remember anything about this person?  Did

22  they tell you anything about themselves during your

23  correspondence with them?

24  A      Um, he said that he was also in trouble -- he was in

25  trouble for some kind of legal matter, and he was also

1    depressed.

2    Q    Okay.  And you said that eventually he gave you his name

3    and information so that you could pay him?

4    A    Hm-hmm.

5    Q    Do you remember what that name was?

6    A    Sidney Kilmartin.

7    Q    And anything more about the information he provided?  Do

8    you remember where he was?

9    A    (Shaking head side to side.)

10   Q    No.  Okay.

11   A    I don't.

12   Q    All right.  But how did you pay him?

13   A    By Western Union.

14   Q    And how did you do that?

15   A    Um, I believe I just went to a local grocery store.

16   Q    Okay.

17   A    And they -- they had a customer service counter.

18   Q    All right.  Did you get something in return?

19   A    I did.

20   Q    What did you get?

21   A    I got a brown padded envelope and -- with a white baggie

22   in it, like a, you know, little white baggie with a tie on it.

23   Q    Okay.  Was the baggie white or clear or what?

24   A    It -- the baggie was clear.

25   Q    Okay.  What was white?

WILLIAMS - DIRECT EXAMINATION/FRANK

1   A      The -- the powder was white.

2   Q      Inside the baggie?

3   A      Yes.

4   Q      All right.  Do you remember anything about that package,

5   anything more?  And if you don't, that's fine.

6   A      I -- I don't.

7   Q      Okay.

8   A      And I didn't keep it.

9   Q      All right.  Do you remember how it came, whether it came

10  by U.S. Mail or UPS or --

11  A      It was U.S. Mail.

12  Q      Okay.  What'd you do with this?

13  A      Um, I put it in a box.

14  Q      Okay.  Why?

15  A      Because I had lost my nerve, and then I finally got

16  divorced and started seeing a counselor, and I also have --

17  I'm a big dog lover, and I have a 20-year-old dog who's still

18  alive, and I just --

19  Q      That all helped, I take it --

20  A      (Nodding head up and down.)

21  Q      -- you -- you to feel better and get in a better frame

22  of mind?

23  A      (Nodding head up and down.)

24  Q      Is that fair to say?

25  A      Yeah, and I -- I couldn't leave him.

WILLIAMS - DIRECT EXAMINATION/FRANK

458

1    Q    You're talking about the dog?

2    A    The dog.

3    Q    Right, I understand.  And, again, it's not my purpose to

4    upset you.

5    A    No, I know.

6    Q    Let me move on.

7    A    It's okay.

8    Q    Did there come a time when a postal inspector contacted

9    you?

10   A    Yes.

11   Q    When -- who was that?

12   A    Michael Desrosiers.

13   Q    Okay.  And did you tell him about these -- these

14   matters?

15   A    Yes.

16   Q    And did you also send him things by e-mail?  Do you

17   recall?

18   A    I sent him the -- a copy of the Western Union receipt.

19   Q    How is it that you had that?

20   A    Um, I have Gmail and keep -- I mean, just because of my

21   profession, I keep everything on Gmail, I mean everything.

22   Q    Okay.  Did you also send him a picture?

23   A    Um, yes, the authorities in my nearby town came and took

24   -- I -- I didn't really want to touch it because I wasn't, you

25   know, absolutely sure -- I didn't want to -- at that point, I

1   didn't want to touch it.  So some authorities from my local

2   town came and -- and took pictures and took it from me.

3   Q    All right.  Is that the picture that -- is one of those

4   the pictures that -- the picture that you sent to --

5   A    Yes.

6   Q    -- Inspector Desrosiers?  Okay.

7        Let me -- let me show you what has been marked as --

8   okay.  So, Ms. Williams, I'm showing you what's been marked

9   for identification as Government's Exhibit 28.  Could you take

10  a look at that and tell us if you recognize it, please?

11  A    (Witness looking at exhibit.)  Yes.

12  Q    What is 28 for identification?

13  A    This would be a copy of the -- the Western Union money

14  transfer receipt.

15  Q    Okay.  Do you have any doubt?  I mean, look it over, and

16  if it helps, look at the -- the following pages.

17  A    (Witness looking at exhibit.)

18  Q    Does that -- does that help?

19  A    Yes.

20  Q    What -- what is -- what is 28?

21  A    So it's -- it's the money transfer receipt from Western

22  Union and plus the correspondence between Mr. Taylor and me,

23  um, just talking about him coming to --

24  Q    Without going into the substance of it, is it the e-mail

25  that you --

1    A     Yes.

2    Q     -- forwarded the copy of the receipt as you've

3    described?

4    A     Yes, yes, it is.

5    Q     And is this a copy of the receipt that you've described

6    for your payment for the cyanide?

7    A     Yes.

8          MR. FRANK:  I'd move Exhibit 28 into evidence.

9          THE COURT:  Any objection?

10         MR. RIDGE:  Your Honor, with regard to this

11   particular exhibit and any others coming through this witness,

12   I would just simply ask for the same cautionary instruction to

13   the jury.

14         THE COURT:  All right.  Ladies and gentlemen, I've

15   -- I've already informed you about the purposes you can and

16   cannot use this type of information, and those prior

17   instructions control on the use of this exhibit, as well.

18         MR. FRANK:  Thank you, Your Honor.

19   BY MR. FRANK:

20   Q     And let me show you what's been marked as Exhibit 31 for

21   identification, ask you to take a look at that, and tell us if

22   you recognize it, please.

23   A     (Witness looking at exhibit.)  Um, yes, this would be

24   the bag that I received.

25   Q     All right.  Is that a picture of the baggie that you

1    received as you've described?

2    A    Yes.

3    Q    A copy of the picture that you've described one of the

4    -- the -- was it, a sheriff's office employee taking?

5    A    Yes.

6    Q    All right.  And that you previously described forwarding

7    to the postal inspector?

8    A    Yes.

9         MR. FRANK:  I'd move Government's Exhibit 31 into

10   evidence.

11        THE COURT:  Any objection to 31?

12        MR. RIDGE:  Subject to the same caution, Your Honor,

13   no objection.

14        THE COURT:  Okay.  Thank you.

15        Again, ladies and gentlemen, the same instruction applies

16   to Exhibit No. 31.

17   BY MR. FRANK:

18   Q    And then, lastly, let me show you what's been marked as

19   Exhibit 30-A and B, and these are inside two plastic bags.

20   30-A is a clear plastic tube, and 30-B is a small baggie.  Let

21   me show you 30-B.  Do you recognize 30-B?

22   A    Yes.

23   Q    What is 30-B?

24   A    That's what it -- what I received in the mail.

25   Q    All right.

1          MR. FRANK:  Okay.  Your Honor, I'd move 30-A and B

2     in evidence.

3              THE COURT:  Any objection?

4              MR. RIDGE:  Just the same request, Your Honor.

5              THE COURT:  Okay.  And the same limiting

6     instruction.

7              MR. RIDGE:  Thank you.

8              THE COURT:  30-A and B are admitted.

9     BY MR. FRANK:

10    Q     Do you remember Inspector Taylor coming out to see you

11    in Colorado?

12    A     Yes.

13    Q     And what did he do?

14    A     He, um, took the bag.

15    Q     The baggie that you've --

16    A     The baggie.

17    Q     -- just identified?

18             MR. FRANK:  Thank you.  I have no further questions

19    for this witness, Your Honor.

20             THE COURT:  Cross-examination?

21             MR. RIDGE:  None, Your Honor.  Thank you.

22             THE COURT:  Thank you.  You may stand down, ma'am.

23    Thank you.

24        (The witness left the witness stand.)

25             THE COURT:  Next witness?

1          MR. FRANK:  Your Honor, I have a chain of custody

2   stipulation as regards this, if I may.

3          THE COURT:  Yes.

4          MR. FRANK:  That should be Exhibit 32.

5      Ladies and gentlemen, the parties hereby agree and

6   stipulate that on about May 7th, 2015, Routt County Colorado

7   Sheriff Patrol Deputy Aaron Arsenault collected from Stacey

8   Williams in Phippsburg, Colorado, a plastic baggie containing

9   a white powdery substance.  Deputy Arsenault brought the

10  baggie back to the sheriff's office in Steamboat Springs,

11  Colorado, and booked it into evidence with Evidence Custodian

12  Dawn Smith.  On about May 14th, 2015, United States Postal

13  Inspector Jeffrey Taylor took custody of the baggie from

14  Evidence Custodian Smith.

15      Thank you, Your Honor.

16          MR. FRANK:  The government calls Kim Gilliam-Valdez.

17          THE CLERK:  Please raise your right hand.  Do you

18  solemnly swear that the testimony you shall give in the matter

19  now in hearing shall be the truth, the whole truth, and

20  nothing but the truth, so help you God?

21          THE WITNESS:  I do.

22          THE CLERK:  Please be seated.  Please state your

23  name and spell your last name for the record.

24          THE WITNESS:  Kimberly Valdez, V-a-l-d-e-z.

25          MR. FRANK:  Thank you, Your Honor.

1    KIMBERLY VALDEZ, having been duly sworn, was examined and

2    testified as follows:

3                          DIRECT EXAMINATION

4    BY MR. FRANK:

5    Q     Ms. Valdez, how are you employed?

6    A     I work for Delhaize America, which owns Hannaford

7    Brothers grocery store.

8    Q     And what do you do for Delhaize America?

9    A     I'm a store payments and AML compliance manager.

10   Q     And what does that mean that you do?

11   A     For the store payment side, I reconcile and handle all

12   of the electronic payments, like your debit card, credit card,

13   work with credit card fraud, and those types of things.

14         For AML compliance, I handle all of the money service

15   business things, like your Western Union, money orders, money

16   transfers, and utilities.  We handle the reconciliation, the

17   income, and the paperwork.

18   Q     So does Hannaford offer Western Union services at its

19   stores?

20   A     Yes.

21   Q     How does it do that?

22   A     Um, they have what they call a customer service center.

23   A customer comes into the store.  They want to send a money

24   transfer transaction.  They go to the counter.  They get out a

25   form, which is a send form, meaning if you're wanting to send

VALDEZ - DIRECT EXAMINATION/FRANK

465

1   money to someone, or a receive form, meaning you're picking up

2   money in our store.  They complete the form and hand it to one

3   of our associates.  Our associate then enters it into the

4   Western Union terminal, and the transaction takes place.

5           If they're -- if they're picking up the money, then they

6   have to know who the money's coming from and all that's

7   entered on the form, it matches in the system, so they can do

8   the payout at our store.

9           If they're sending money, then they enter the

10  information to whoever they're receiving, could be in the same

11  town or another country.  They just enter all the data into

12  the Western Union terminal.

13  Q     Okay.  And in the case of people who are receiving

14  money, do -- do -- does Hannaford make any effort to make sure

15  that they're the right person getting the money?

16  A     Yes, if they receive money, if it's a thousand dollars

17  -- or if it's less than a thousand dollars, they have to show

18  an ID to pick up the money or answer a test question.

19  Q     What's a test question?

20  A     Say if I didn't have an ID, I could send money, and I

21  could say where's my favorite place to go, and the answer to

22  that could be, say, Disney World.  And so when I'm sending

23  that money to the person, I would have to know what that test

24  question is and what the answer that's supposed to be provided

25  so that it can match in the system.

VALDEZ - DIRECT EXAMINATION/FRANK

466

1   Q     All right.  And then the -- the receiver goes to the

2   store and provides the -- the answer to the test question --

3   A     Yes.

4   Q     -- to prove -- to prove that they're the intended

5   recipient?

6   A     Yes.

7   Q     Does Delhaize/Hannaford keep records of these

8   transactions?

9   A     Yes, at the end of the week, the store sends in all of

10  the physical forms that are completed by the person sending

11  the transaction.  We also get a download every month from

12  Western Union.  That's where the corporate office does the

13  back-end monitoring because we look at all of the

14  transactions.

15  Q     All right.  And is that all part of Hannaford's -- it's

16  a small part of Hannaford's business, right?

17  A     Yes, very small.

18  Q     But it's a regular part of their business?

19  A     Yes.

20  Q     And so are these records?

21  A     Yes.

22  Q     And do they keep those records?

23  A     Yes, for five years.

24  Q     Where do they keep them?

25  A     They have -- um, at the corporate office, they keep them

1    in a locked room for six months, and then they're sent to a

2    storage facility.  They're at the warehouse office, at the

3    office -- office that's part of the warehouse, and that's

4    where they're maintained for five years.

5    Q    Let me -- let me show you what's been marked -- well,

6    actually, I think it's certified.

7              MR. FRANK:  So let me just move Exhibit 33 into

8    evidence if I may, Your Honor, certified records of Delhaize

9    America.

10             THE COURT:  Any objection?

11             MR. RIDGE:  No, Your Honor.  Thank you.

12             THE COURT:  It's admitted.

13             MR. FRANK:  And request permission to publish them?

14             THE COURT:  You may.

15             MR. FRANK:  Thank you, Your Honor.

16   BY MR. FRANK:

17   Q    Ms. Valdez, I'll leave you with a paper copy, but we're

18   -- let's proceed with the screen in front of you, and if at

19   some point you think it would be helpful to look at the paper

20   copy, we can do that.  Okay?

21   A    Okay.

22   Q    But I want to ask you some questions about -- about

23   these records, and if we could scroll -- if we could -- well,

24   hm.  That first page of substantive information is pretty

25   small.  Can you scroll down to that, please?

VALDEZ - DIRECT EXAMINATION/FRANK

1      I don't know.  Can you see that or otherwise do you know
2  what this is?
3  A    This is a download of transactions that we received from
4  our Western Union terminal.  We put it into an Excel
5  spreadsheet, and it's a copy of all of the transactions that
6  we submitted with the subpoena.
7  Q    All right.  So you produced these records in response to
8  a subpoena, correct?
9  A    Correct.
10 Q    And this first page is, what, a summary of all those
11 transactions?
12 A    Correct.
13 Q    Albeit a difficult-to-read one because it's so small.
14     So let's -- but the fol -- in the following pages are
15 the actual copies of the -- the -- the handwritten forms,
16 correct?  Do -- is that correct -- well, let's scroll down to
17 the first one.  Do you rec -- well, let's not go that far.
18 No, no, no.  Let's start at the top.
19     So what is this?  What -- this is one of these forms in
20 your record system, right?
21 A    Correct.
22 Q    What type of form is this?
23 A    This is a send form.  It's located at the top right
24 underneath money transfer.  There is the word send right
25 there, meaning that someone came to our store to send money.

1   Q       Okay.  And can you tell from this form who that was, if

2   we scroll down?

3   A       Sidney Kilmartin.

4   Q       And that's indicated in the box No. 2 labeled sender

5   information?

6   A       Correct.

7   Q       And -- and -- and there Mr. Kilmartin has given

8   information about himself, correct?

9   A       Correct.

10  Q       Including his physical address, correct?

11  A       Correct.

12  Q       Phone number?

13  A       Correct.

14  Q       And an e-mail contact?

15  A       Correct.

16  Q       And then in 4, what -- is that his signature, item 4?

17  A       That's the signature of the person that signed, yes.

18  Q       All right.  So that's an example of a send form,

19  correct?

20  A       Correct.

21  Q       How about the second page of this exhibit, if we scroll

22  to that, let me ask you what that is.  What is this?

23  A       That is the receipt that prints from the terminal when

24  we enter the information that -- the -- like an electronic

25  copy of everything that's keyed into the system.

VALDEZ - DIRECT EXAMINATION/FRANK

470

1    Q    All right.  And that's associated with that particular

2    send form?

3    A    Yes.

4    Q    And what information is on this?  Can you -- again, it's

5    a bit difficult to read, isn't it?  But, I mean, can you tell

6    us generally -- like what's this item here that I've circled?

7    What is that?

8    A    That's a money transfer control number.  Once the

9    information is sent into the Western -- or entered into the

10   Western Union terminal, this number is captured on the first

11   form that we looked at.  The store writes that money control

12   number down on that form.  This is saying that Western Union

13   has approved it.  It's going through.

14   Q    Okay.  And then how about scroll down to the bottom of

15   this receipt, could we, and there's signatures -- signatures

16   at the bottom.  Whose signatures are those?

17   A    On the first line is the agent's signature, which would

18   be our associate that conducted the transaction.  The second

19   line is the customer's signature.

20   Q    Okay.  Let's scroll to the next pair of forms, if we

21   could.  Stop here.

22        So what type of -- what type of form is this?  Is this

23   the other type of form?

24   A    Yes, this is considered a receive form, and it's listed

25   at the very top under the word money transfer.  It says,

VALDEZ - DIRECT EXAMINATION/FRANK

471

1    receive, meaning someone's coming to our store to pick up

2    money.

3    Q     And in -- in the case of this receive form, who is that

4    person?

5    A     In box No. 2, that is the sender's information -- I

6    mean, the receiver's information.

7    Q     All right.  And, again, if it would help, if you touch

8    the screen with your finger, you can circle it or -- or

9    indicate.

10   A     (Witness complying.)

11   Q     Okay.  So that's -- that's the receiver's information

12   there?

13   A     Correct.

14   Q     Okay.  And if we scroll down further, what is -- what is

15   -- what is this information in box 3?

16   A     That's the sender, the person sending the money.

17   Q     And in this case, who was that?

18   A     Stacey Williams.

19   Q     All right.  And -- and that information comes from the

20   sender, correct?

21   A     Correct.

22   Q     All right.  And how about item 5, what is item 5?

23   A     The signature of the person receiving the money.

24   Q     All right.  And then if we scroll to the -- the

25   associated receipt, is -- how do you know that this is the

VALDEZ - DIRECT EXAMINATION/FRANK

472

1    receipt for that transaction and send form?

2    A      You have a money transfer control number here.

3    Q      Okay.

4    A      And that number, if we could scroll back to the first

5    page, is listed here.

6    Q      All right.  So they match?  That's how you know?

7    A      Yes.

8    Q      Okay.  All right.  And then what information is here in

9    the receipt?

10   A      In this box here, you have on the first line, sender's

11   name.  The second line is your receiver's name.

12   Q      All right.  And how about the line that is headed

13   identification, what's -- what's that about?

14   A      The identification line, the first set of numbers that

15   starts with a 207 is a phone number.

16   Q      Okay.  Is that right here?

17   A      Yes.

18   Q      Okay.  I'm going to clear it.  Okay.  How about reading

19   on from there, what -- what other information is there?

20   A      It says, Village Drive, Apartment 5, Manchester, Maine.

21   Q      Okay.

22   A      The next set of numbers here is a little hard to read,

23   but that's the zip code.

24   Q      Okay.

25   A      And it says, USA.  Number 1 is representing the type of

VALDEZ - DIRECT EXAMINATION/FRANK

473

1   ID that was represented.  A one is usually like a driver's

2   license.

3   Q     Okay.

4   A     And then the next set of numbers, I can't really read

5   them to make them out, but that is a driver's license number.

6   Q     Can you circle those numbers, even if you can't read

7   them, to show where they are?

8   A     (Witness complying.)

9   Q     Okay.  All right.  And how about the last line of that

10  entry, what's the meaning of that?

11  A     That's the state of the ID, which is Maine.

12  Q     All right.  And can you tell where this track -- where

13  this receive -- where this money was received?  Is that also

14  here?  Let me -- let me -- let me ask you --

15  A     Yes.

16  Q     -- what the significance of that information is.

17  A     Yeah, that's the Hannaford store.  It looks like 8239,

18  and then that's the address of the Hannaford supermarket store

19  that the money was picked up at.

20  Q     Okay.  And let's scroll down to the bottom.  And, again,

21  we have two signatures.  Whose signatures are those?

22  A     The first line is our associate's signature.  The second

23  line is the person picking up the money.  And it states that

24  it's a receiver here.

25  Q     Okay.  Let's scroll ahead to a form invol -- involving

VALDEZ - DIRECT EXAMINATION/FRANK

1  $249.01, if we could.  There we go.

2       All right.  And how about this one -- and all of these

3  forms are in the same format, right?

4  A    Correct.

5  Q    Okay.  How about this one, what does this form relate

6  to?

7  A    This is a receive transaction; it's stated here.  The

8  dollar amount is listed here, and the receiver is on No. 2,

9  which is Sidney Kilmartin.

10 Q    Okay.  And if we scroll down, what do we learn about the

11 sender?

12 A    The sender that is sending the money is on No. 3.  The

13 person that sent the money was Andrew Denton.

14 Q    Okay.  And where does that information come from?  Do

15 you know?  Does that come from the receiver in the store, or

16 can you tell?

17 A    Yeah, the receiver at the store would have had to

18 complete the form, stating who was sending the money to him in

19 order for it to match in the system in order to do a payout.

20 Q    All right.  So, presumably, all this handwriting is in

21 the handwriting of that receiver?

22 A    It'd be in the handwriting of the person that completed

23 the form, correct -- that received the money.

24 Q    That received the money.

25 A    Correct.

VALDEZ - DIRECT EXAMINATION/FRANK

1   Q    You're not familiar with that person or their

2   handwriting; I understand.

3   A    No, sir.

4   Q    Okay.  All right.  And if we scroll down to the

5   associated receipt with this transaction, we see the same sort

6   of information, don't we?

7   A    Correct.

8   Q    The money control number matching the receipt form to

9   know that it's the receipt that goes with the -- the

10  handwritten receipt, correct?

11  A    Correct.

12  Q    And, again, what can we tell about -- in this section

13  about what effort Hannaford made to identify that -- that

14  person, the receiver?

15  A    Again, on the line that reads identification, it gives

16  the phone number, the address, the zip code, and then the ID

17  that was presented to pick up the money, and then it's the

18  state of Maine.

19  Q    Okay.  And can you tell, was that a No. -- was that

20  another No. 1?

21  A    It's hard to read, but there at the very end, it does

22  appear to be a one.

23  Q    And -- and what follows is the -- the number of that ID;

24  is that right?  Is that your understanding?

25  A    Yes.

VALDEZ - DIRECT EXAMINATION/FRANK

476

1    Q    What is this here?

2    A    That would be the ID number.

3    Q    Yeah.  And, I mean, does -- is it Hannaford policy that

4    the -- the clerk in the store make sure that that match, that

5    the person in front of them, you know, is that person?

6    A    Correct.

7    Q    Look -- look at the photograph on the driver's license

8    and make sure it matches?

9    A    That's correct.

10   Q    Let's scroll to one in the amount of $250, if we could

11   scroll ahead.  How about 382, can you find the money control

12   number ending in 382?  That's it.  Okay.

13        Let's stop there.  Again, what is this?

14   A    This is a receive form as stated there.

15   Q    All right.  For how much money?

16   A    There is two amounts listed.  It looks like 255 and then

17   237.79.

18   Q    Right.  And can you make sense of that?  Do you know why

19   there would be two amounts there?

20   A    I can make an assumption.

21   Q    Well, let's not make an assumption.  Is it fair to say

22   that a certain -- well, would it help if we look at the

23   associated receipt?

24   A    Yes, the receipt will tell you the exact amount that was

25   paid out.

VALDEZ - DIRECT EXAMINATION/FRANK

1   Q      Okay.  So if we scroll down -- it's not the most

2   legible -- can you make it out there or no?

3   A      Can we scroll down a little bit more?

4   Q      Having trouble?

5   A      Yeah, it should be right there, but I can't -- I can't

6   make it out.

7   Q      Okay.  So let me see if the -- well, I don't know how

8   much better it is, but I'll show you the paper copy,

9   Exhibit 33.  Is that -- is that the paper version of -- of

10  these records?

11  A      Yes, this is the paper copy.

12  Q      And is the paper copy of the receipt any -- any more

13  legible?  Can you make out whether it's -- whether it's 250 or

14  $237.97 in this case?

15  A      Ah, yes, on the receipt copy, it -- I can make out the

16  -- the No. 2 and then the .79 cents.

17  Q      All right.  So if we scroll back up then, is it fair to

18  say that this appears to be a receipt for $237.79?

19  A      Yes.

20  Q      By whom?

21  A      By Sidney Kilmartin.

22  Q      Okay.  Indicated in item 2, correct?

23  A      Correct.

24  Q      Okay.  And then if we scroll down, who -- who did it

25  come from?  Is that in item 3?

VALDEZ - DIRECT EXAMINATION/FRANK

1    A      Jeremy Peter Katzmier.  I'm not sure if I'm saying that

2    last name right.

3    Q      Okay.  And where -- where was that person located

4    according to the sender -- the receiver who filled out this

5    form in their handwriting?

6    A      Richmond Hill.

7    Q      And in what country?

8    A      Canada.

9    Q      Okay.

10           MR. FRANK:  The court's indulgence, Your Honor?

11           THE COURT:  Yes.

12           MR. FRANK:  Your Honor, I have no further questions

13   of this witness.

14           THE COURT:  Cross-examination?

15           MR. RIDGE:  No questions, Your Honor.  Thank you.

16           THE COURT:  Thank you.  You may stand down, ma'am.

17           THE WITNESS:  Thank you.

18       (The witness left the witness stand.)

19           THE COURT:  Is this a good time to take our second

20   break?

21           MR. FRANK:  Yes, Your Honor.

22           THE COURT:  Ladies and gentlemen, we'll take our

23   second break today.  Don't discuss the case.  We'll be back

24   here in about 20 minutes.  Thank you.

25           (Jury exited at 12:11 p.m.)

1          THE COURT:  Court will stand in recess.

2      (Court recessed from 12:11 p.m. to 12:38 p.m.)

3          THE COURT:  Would you bring the jury in, please.

4      (Jury entered at 12:38 p.m.)

5          THE COURT:  Mr. Frank?

6          MR. FRANK:  Thank you, Your Honor.

7      Your Honor, before I call my next witness, I'd like to

8  move Government's Exhibits 34-A, 34-B, and 34-C into evidence.

9  They are blue seal copies of driver's license records of

10 Sidney Kilmartin.

11         THE COURT:  Any objection?

12         MR. RIDGE:  No objection, Your Honor.

13         THE COURT:  Each is admitted.

14         MR. FRANK:  Thank you.

15     Your Honor, with that, the government calls Stu Quinn.

16         THE CLERK:  Please raise your right hand.  Do you

17 solemnly swear that the testimony you shall give in the matter

18 now in hearing shall be the truth, the whole truth, and

19 nothing but the truth, so help you God?

20         THE WITNESS:  Yes, I will.

21         THE CLERK:  Please be seated.  Please state your

22 name and spell your last name for the record.

23         THE WITNESS:  I'm Stuart Daniel Quinn,

24 Q-u-i double n.

25         MR. FRANK:  Thank you, Your Honor.

1    STUART DANIEL QUINN, having been duly sworn, was examined and

2    testified as follows:

3                         DIRECT EXAMINATION

4    BY MR. FRANK:

5    Q     Good afternoon, Mr. Quinn.

6    A     Good afternoon, sir.

7    Q     Mr. Quinn, how are you employed?

8    A     I'm a detective with the major crime team, Humberside

9    Police, in England.

10   Q     And as a detective, what do you do there?

11   A     Primarily the major crime team deals with homicides and

12   unexplained suspicious deaths.

13   Q     Okay.  And what is Humberside?

14   A     Humberside is a county in the northern England East

15   Yorkshire.

16   Q     And how does Humberside relate to the city of Hull?

17   A     The city of Hull is the main city within the county of

18   Humberside.

19   Q     How long have you been a -- a law enforcement officer

20   with the Humberside force?

21   A     It will be 13 years in January.

22   Q     And all of that time as a detective, or have you done

23   other things besides?

24   A     No, sir, as with all police officers, the first two

25   years of my career was in uniform.  Soon after that two years,

1    I then became a detective -- or started detective training is

2    more precise.

3    Q    What sort of training do you receive to be a detective

4    there?

5    A    I had to pass an exam.  I had to be tutored.  I had to

6    do crime reduction projects and constantly keep updated with

7    interviewing and investigative techniques and skills.  It's a

8    constant, ongoing progress, and I hold the initial crime

9    detective's development portfolio qualification.

10   Q    So that the port -- the portfolio is the initial

11   qualification?

12   A    Yes, sir.

13   Q    Do I understand correctly?  But is there continuing

14   education throughout your career?

15   A    It's just continue -- refresher training is probably the

16   most precise word to explain it.  We have to submit statements

17   we've taken from victims and witnesses or interviews we've

18   given with suspects that get evaluated to ensure that we are

19   still hitting criteria.

20   Q    To make sure that your skills are -- are up to

21   standards; is that fair to say?

22   A    Yes, sir, that's fair.

23   Q    Have you always been a major crimes detective, or have

24   you other detective experience?

25   A    No, sir, as -- as with any job, I suppose, you

QUINN - DIRECT EXAMINATION/FRANK

482

1    specialize as time goes on, as your skills develop.  When I

2    first became a detective, I was dealing with mid-level violent

3    crimes -- burglaries, robberies, what we refer to in England

4    as volume crimes.

5         And as my career and experience progressed, I moved on

6    to critical investigations, which in England means dealing

7    with organized crime groups -- drugs trafficking, so on and so

8    forth.

9         And eventually in April last year, I -- in April 2015, I

10   joined the major crime team.

11   Q    All right.  So back in December of 2012, what position

12   were you in?

13   A    I was a detective in the critical investigation team.

14   Q    All right.  And in connection with your duties there,

15   did you have -- did you participate in the investigation of

16   the death of Andrew Denton?

17   A    Yes, sir, I did.

18   Q    What was your role in that?

19   A    My role was being the officer in the case, and that just

20   means the lead investigator in relation to the investigation

21   of Mr. Denton's death.

22   Q    What does a lead investigator do or a lead officer?

23   A    I would gather evidence, review evidence, and see what

24   further could be done with that evidence or to develop

25   evidence, such as the seizure of laptops and telephones,

QUINN - DIRECT EXAMINATION/FRANK

1   sending them off to specialist experts who can obtain,

2   retrieve data and review the data.

3   Q    Were you -- were you actually on the scene of Denton's

4   death?

5   A    No, sir.

6   Q    How -- so how soon after did you become involved?

7   A    I became involved in the case at some point in

8   February 2013.

9   Q    Okay.  As part of that involvement, did you go to see a

10  man over there by the name of Derek Jorgensen?

11  A    Yes, sir, I did.

12  Q    How did that happen?

13  A    I was informed by Mr. Desrosiers of the name of Derek

14  Jorgensen, and I was given an address within the city of Hull.

15  He no longer resided at that address, and our police

16  intelligence systems showed him at an alternative address in a

17  small village called Hedon, which sits on the outskirts of

18  Hull, is a suburb of the city of Hull.  I attended that

19  address and spoke with Mr. Jorgensen there.

20  Q    Okay.  Let me stop you.  Were you otherwise familiar

21  with Mr. Jorgensen?

22  A    I had never heard of the male in my life.

23  Q    All right.  But as a result of this investigation, do

24  you know a bit about him and his background?

25  A    Yes, sir, he's -- I reviewed his intelligence profile

QUINN - DIRECT EXAMINATION/FRANK

1   held by Humberside police.  I've also visited him, seized

2   items from him, and spoke personally to him, and I took a

3   statement from him in relation to his involvement in these

4   matters.

5   Q    So can you tell us a little bit about him?  I mean, what

6   sort of a -- a man is he?  What -- what --

7   A    Mr. Jorgensen, when I spoke to him on the 19th of April,

8   2015, is quite an articulate man.  However, from reviewing --

9   and an intelligent man.  However, from reviewing his

10  intelligence profile, I could say that 20 years ago, he

11  entered a public house, a bar, where people were drinking and

12  identified four males that had bullied him while he was at

13  childhood school and continued to bully him into young adult

14  -- adulthood.

15       And Mr. Jorgensen was armed with a shotgun.  He walked

16  into the public house and discharged the shotgun at the people

17  who had bullied him, fortunately, missing all of them.  He

18  then ran out of the public house, placed a shotgun into his

19  mouth, and discharged it.  Fortunately, the cartridge of the

20  firearm left the right cheek of his face and didn't go up into

21  the brain.  He required extensive facial surgery as a result,

22  and he also had to stay in a secure hospital, which is a more

23  appropriate way of dealing with a criminal with severe mental

24  issues rather than putting them into a prison, a mainstream

25  prison.

QUINN - DIRECT EXAMINATION/FRANK

485

1  Q     Did Mr. Jorgensen have a history of suicide attempts

2  that you know of from your --

3  A     Yes, sir, he did.  When I spoke with him, he spoke at

4  length and seemed to be at peace and have come to terms with

5  his mental issues.

6        He disclosed to me that previously he had set in trees

7  with a noose tied around his neck willing himself to jump.  He

8  was a keen swimmer in his youth, that he'd often attend

9  beaches on the coast, strip naked, and swim out to sea, and

10 his intention was always to swim and swim and swim until

11 tiredness got the better of him and he drowned.  He tried on a

12 number of occasions and always come to his senses partway

13 through the swimming journey.

14 Q     Now, you described how you located Mr. Jorgensen in

15 response to a request from Inspector Desrosiers here in the

16 United States.  Why?  What was your purpose in going to him on

17 that particular occasion?

18 A     Because of the nature of the investigation, I was of the

19 belief that Mr. Jorgensen had purchased or attempted to

20 purchase potassium cyanide from a person in Maine, United

21 States.

22       The purpose of my visit was to ask him that specific

23 question, and if he was still in possession of any such white

24 powders, I would seize them as evidence for his safety and to

25 assist in the investigation.

QUINN - DIRECT EXAMINATION/FRANK

486

1    Q     So what happened?

2    A     I attended his house on that Sunday the 19th of April,

3    2015.  The time was about 1500 hours.  I was knocking at his

4    front door without reply, and Mr. Jorgensen attended his

5    address from walking his dog.  From his facial disfigurements,

6    I identified him to be Jorgensen immediately, and he confirmed

7    this to me.

8          I was allowed access to his house.  I directly asked him

9    if he'd made any purchases from a person in Maine, United

10   States.  He said he had.  He said he'd purchased potassium

11   cyanide, and his intention was to ingest the potassium cyanide

12   to take his own life.

13         I then asked him if he still had possession of what he

14   believed was potassium cyanide.  He went upstairs to a -- I

15   presume to his bedroom, and he came down with a glass coffee

16   jar with capsules within that he told was potassium cyanide.

17   Q     And can you describe the cyanide?  How was it packaged?

18   A     The coffee jar was a standard -- or in England at least,

19   standard glass coffee jar size, about so big, with a glass lid

20   that you press down into it.  It was difficult to actually see

21   what was inside at the given time because he padded it out

22   with newspaper, and he said the reason he had done that was

23   because he was of the belief if potassium cyanide got

24   contaminated by water or moisture, it would decrease its

25   potency, so he placed newspaper within the glass coffee jar to

QUINN - DIRECT EXAMINATION/FRANK

1   stop moisture getting at what he believed was cyanide.

2   Q    Did he say that otherwise the cyanide was packaged as he

3   received it or differently?

4   A    He had received it in a different manner.  He -- he

5   placed the white powder, what he believed was potassium

6   cyanide, into separate small capsules, an inch or so big, into

7   different wraps, so he could presumably take them at a future

8   date.

9   Q    What did you -- what did you do with the glass coffee

10  jar and contents?

11  A    I immediately seized it as evidence for two reasons:

12  One, for -- one, for Mr. Jorgensen's safety, so he couldn't

13  take it and consume it; and, two, for evidence of the offense

14  that was under investigation, and I gave it a police exhibit

15  number of SDQ/100.

16      And in England, all that means is, because my name's

17  Stuart Daniel Quinn, the exhibit becomes my initials, SDQ, and

18  I used the number 100 because how you're supposed to do it in

19  an investigation is each and every item you seize, the first

20  item you seize becomes 1, the second one becomes 2, 3

21  sequentially.

22      Because of the adult nature of what had happened, I

23  didn't anticipate I would be seizing any white powder, and

24  because I didn't know what number I was up to, I knew I hadn't

25  seized a hundred exhibits, so I used the number 100 to be sure

1    I wasn't using SDQ2 twice, for example.

2    Q    All right.  And where did you take the -- the jar?

3    A    That was taken directly to the major crime team office

4    at Bransholme Police Station in Hull.

5    Q    And what happened to it?

6    A    It was left in a secure location overnight, and because

7    of the nature of our work, the major crime team office is --

8    the Bransholme Police Station is a secure building -- police

9    building surrounded by a metal fence.  The major crime team

10   office within there is a secure office in its own right for

11   our own purposes for our office to use, and the exhibit store

12   where SDQ/100 was retained overnight is also a secure office

13   within a secure office within a secure police building, so to

14   speak.

15   Q    Do you know what happened to it from there?

16   A    It remained in the temporary store overnight, and the

17   following day, I recovered SDQ/100 from that store, and I took

18   it to our permanent property store, which is a police station

19   named Clough Road, which is probably a mile away from

20   Bransholme, and that's in accordance with Humberside police's

21   force policy.  All evidence is to be secured and retained at

22   that main station.

23   Q    And did you meet with Inspector Desrosiers in person

24   about this matter?

25   A    Yes, I did, in June that year.

1   Q     And did he take possession of that item and others?  Do

2   you know?

3   A     That physical item, SDQ/100, no, he didn't.  That was

4   mailed to Mr. Desrosiers -- Inspector Desrosiers at his

5   request.

6   Q     Okay.  Let me show you what's been marked as

7   Government's Exhibit 35 for identification, ask you to take a

8   look at this, and tell us if you recognize it, please.

9   A     Yes, sir, that's SDQ/100.

10              MR. FRANK:  Your Honor, I'd move Exhibit 35 into

11   evidence.

12              THE COURT:  Any objection?

13              MR. RIDGE:  Well, just I would request the same

14   cautionary instruction, Your Honor, that you've been giving

15   previously.

16              THE COURT:  All right.  Ladies and gentlemen, I will

17   not repeat all the detail of that instruction.  You should

18   know that if you have any confusion about the specifics of the

19   instruction, during the course of the final instructions, I am

20   going to be giving you a written set of final instructions,

21   and the limited purposes for which you may and -- may use this

22   evidence will be set forth in detail in those final

23   instructions.

24       However, I am instructing you with this exhibit you are

25   to consider the exhibit only for the limited purposes which

1   I've indicated earlier and not for any purposes I've told you

2   you cannot use the exhibit.

3          MR. FRANK:  I have no further questions for this

4   witness, Your Honor.

5          THE COURT:  Cross-examination, Mr. Ridge.

6          MR. RIDGE:  None, Your Honor.  Thank you.

7          THE COURT:  Thank you.  You may stand down, sir.

8          THE WITNESS:  Thank you, Your Honor.

9      (The witness left the witness stand.)

10         THE COURT:  Next witness?

11         MR. FRANK:  Cynthia Kirschling.

12         THE CLERK:  Please raise your right hand.  Do you

13  solemnly swear that the testimony you shall give in the matter

14  now in hearing shall be the truth, the whole truth, and

15  nothing but the truth, so help you God?

16         THE WITNESS:  I do.

17         THE CLERK:  Please be seated.  Please state your

18  name and spell your last name for the record.

19         THE WITNESS:  Cynthia Kirschling,

20  K-i-r-s-c-h-l-i-n-g.

21         THE COURT:  Could you pull yourself closer to the

22  microphone, ma'am?  Thank you very much.

23      Mr. Frank?

24         MR. FRANK:  Thank you, Your Honor.

25  CYNTHIA KIRSCHLING, having been duly sworn, was examined and

1    testified as follows:

2                         DIRECT EXAMINATION

3    BY MR. FRANK:

4    Q     Good afternoon, Ms. Kirschling.

5    A     Hi.

6    Q     Ms. Kirschling, where do you live?

7    A     Gillett, Wisconsin.

8    Q     Okay.  And where did you grow up?

9    A     Around the same area -- Gillett, Shawano area by Green

10   Bay, Wisconsin.

11   Q     How much education have you had?

12   A     I have three degrees:  Occupational therapist; teacher

13   of the visually impaired; and my first was clothing, textiles,

14   and design.

15   Q     And when and where did you get those degrees?

16   A     Ah, the clothing, textile, design was Stout, Menomonie,

17   Wisconsin, and the teaching of the visually impaired was

18   Silver Lake College, Manitowoc, Wisconsin, and OT was out of

19   Milwaukee, Wisconsin.

20   Q     And what years generally are we talking about?  Can you

21   say?

22   A     Oh, let's see, the -- the first one, the clothing,

23   textiles was '79, and my -- the teacher of the visually

24   impaired was like -- I don't know -- more along 2002, 2004.

25   The teacher -- or the OT was '91, I think it was.

KIRSCHLING - DIRECT EXAMINATION/FRANK

492

1    Q    Okay.  Well, what have you done for work with -- with

2    that education or degrees?

3    A    Mostly I work in the school systems, work with kids with

4    multiple handicaps, anything from autism, learning disabled.

5    I also have done PRN, as needed, in nursing homes.  I've done

6    hand therapy.

7    Q    What is PRN?

8    A    Oh, sorry.  As needed, if they need someone to fill in

9    for the weekend or whatever.  I wanted to keep my skills up in

10   the medical knowledge versus just the educational aspect.

11   Q    Is that a form of nursing, or is that --

12   A    Occupational therapy as compared to physical therapy,

13   physical therapy generally works with ambulation, the lower

14   extremities, your legs.  Occupational therapy does upper

15   extremities, hand therapy, visual perceptional, work with the

16   kids in school, get them access on to computers, just -- OTs

17   are a jack-of-all-trades, so --

18   Q    Okay.  And where -- where have you done that work?

19   A    Mostly I've done contract work.  In Wisconsin, they're

20   call CESAs, cooperative educational service agencies, because

21   schools cannot afford to hire out therapists for like two days

22   a week at one school, three at another, so we're contracted

23   out, so mostly different school districts.  But to keep --

24   like I said, I worked at a hospital doing rehab, hand therapy,

25   and then nursing home, working with the elderly.

1    Q    And is all of that in Wisconsin?

2    A    I've traveled.  I've traveled to Illinois.  I did work

3    there for a year and a half and California for almost a year.

4    Q    Okay.  And are you doing any of that work now?

5    A    Not right now.  I just left my last job a week ago.

6    Q    Okay.

7    A    So --

8    Q    Are you between jobs at the moment?

9    A    Yes.

10   Q    Were you doing it up until about a week ago?

11   A    Yes.

12   Q    All right.  Well, Ms. Kirschling, let me ask you, I

13   mean, how is it that you became so -- so depressed that you

14   were seeking to end your life in the beginning of 2013?  Can

15   you explain that for us?

16   A    Um, I've always suffered from major depression.  I'm

17   usually able to pull myself out, but every so often, I go into

18   a very deep depression.  And I think out in California, I

19   didn't have family; I started having real bad back problems.

20   I had to carry all my stuff.  It's a different system out in

21   California compared to Wisconsin.  I had to basically provide

22   all my own equipment to go from school to school, and I

23   carried it, and within a few months, I could hardly walk.  I

24   had to walk with a cane.  Um, they said I needed surgeries,

25   and it just -- yeah, I just started going downhill because I

1    couldn't do my job and just in constant pain.

2    Q    Why were you looking for -- for cyanide?

3    A    I wanted to just end it, end my suffering.  When you

4    suffer from depression, the pain, you just want it to end.

5    Q    And why cyanide?

6    A    I was looking up online trying to find what is the

7    quickest, most painless method and --

8    Q    And that's what you found?

9    A    Hm-hmm.

10   Q    Did you find cyanide online or at least did you think

11   you had?

12   A    Yes.

13   Q    Tell us about that.  How did you do that?

14   A    I was just Googling best way to commit suicide and ended

15   up on different blog sites and just -- I guess I was trying to

16   relate to what others were saying, their experiences, what

17   their -- and then in the midst of all this, then it was

18   advertised that Mr. Kilmartin would sell cyanide.

19   Q    Did you know him as Mr. Kilmartin?

20   A    Not on the Web site I don't believe.

21   Q    Is that where you met him, though, on a Web site?

22   A    Yes.

23   Q    Do you remember the name of the Web site?

24   A    No.

25   Q    Can you describe what it looked like?

1    A      All I remember is that, like I said, it was, um, more

2    like conversations going on, people responding with their

3    ideas, what they've experienced, what they've had in the past,

4    and --

5    Q      Did you correspond with them?

6    A      Not any of them.

7    Q      How about Mr. Kilmartin?

8    A      Yes.

9    Q      And what about?

10   A      I guess I didn't believe at first that he could really

11   be selling this online, but my curiosity got the better of me,

12   and plus I was so down, I just thought if I have something in

13   hand, that would just make me feel better to know that I had a

14   way out, and that's why I pursued it further.

15   Q      Did you eventually come to an agreement with him?

16   A      Yes.

17   Q      What was that agreement?

18   A      That he would send me -- I don't exactly remember what

19   the dose was, but that he would send me some cyanide.

20   Q      And did you pay for it?

21   A      Yes.

22   Q      How much?

23   A      I don't -- I think it was like around 150.  I don't

24   quite remember, but I remember I thought it was really cheap

25   for --

1   Q     How -- do you remember how you paid for it?

2   A     Through Western Union.

3   Q     And how -- how did you do that?

4   A     I had to correspond with him a couple of times because I

5   never had done that before, so I didn't really understand the

6   process.

7   Q     Did he explain it to you?

8   A     Yes.

9   Q     Do you remember what he said or what he wrote?  If you

10  don't --

11  A     Not details, no.

12  Q     Okay.  Did he provide you with information about

13  himself?

14  A     Just his name and, I guess, address, and I was

15  surprised.  I thought that had to be a fake name and address,

16  but we were able to get through the process, and he got my

17  money, so --

18  Q     How do you know he got your money?

19  A     Because he sent me the product.

20  Q     And how did you get it?

21  A     In the mail.

22  Q     The U.S. Mail?

23  A     Yes.

24  Q     Can you describe the package it came in?

25  A     I believe it was just a regular like U.S. postal

KIRSCHLING - DIRECT EXAMINATION/FRANK

1    mailing.  I think it was like white packaging.  Um, I actually

2    had to pick it up at my apartment complex office building, so

3    it didn't even get directly to me.  I actually had to go

4    through where they drop off the mail.

5    Q    Okay.  And what was inside that mailer?

6    A    The packet of so-called cyanide.

7    Q    Can you describe what it looked like?

8    A    It was just a little plastic bag tied-up or taped-up.  I

9    don't quite remember.

10   Q    Do you remember what color the bag was?

11   A    It was a clear bag, but the product was white.

12   Q    Okay.  What'd you do with it?

13   A    Oh, I checked it out at first.  I looked online like for

14   the actual physical properties because I was wondering if this

15   was really the real thing.  Again, I didn't believe it could

16   be really.  So I just Google looked it up the different --

17   what it should look like and stuff, but I never opened the

18   actual plastic bag.

19        But eventually I ended up just putting it away and

20   marking it because I didn't want anyone else to accidentally

21   get it if it was the real thing.

22   Q    Okay.  Did there come a time when a postal inspector got

23   in touch with you?

24   A    Yes.

25   Q    Do you remember that?  What do you remember about that?

KIRSCHLING - DIRECT EXAMINATION/FRANK

498

1   A      Um, I just remember that they got ahold of me through my

2   daughter, and I had to call back, and then someone got ahold

3   of me, and then we met, and I interviewed.

4   Q      In person?

5   A      Yes.

6   Q      Do you remember who that was that you met with?

7   A      No, I'm horrible with names.

8   Q      Okay.  What happened to the pill -- the little bag with

9   the white powder and the pill bottle that you had?

10  A      An -- an officer came and picked it up and took it.

11  Q      Was that -- was that the postal inspector or someone

12  else, or do you remember?

13  A      Ah, a police officer, deputy.

14  Q      Somebody from the local force there --

15  A      The local.

16  Q      -- in Wisconsin?

17  A      Yeah, yes.

18  Q      Ms. Kirschling, I'm showing you what's been marked as

19  Exhibit 40 for identification.  I'd ask you to take a look at

20  that and tell us if you recognize it, please.

21  A      (Witness looking at exhibit.)  Yes, that --

22  Q      What -- what is 40 for identification?

23  A      Um --

24  Q      Is it a picture?

25  A      Yes, it's a picture of an empty Pristiq bottle, that was

1    an antidepressant that I was on, and I put it in that bottle,

2    along with I kept his -- the return address part of the

3    mailing.

4    Q    Okay.  So the first page of 40 is a picture of the --

5    the bottle that you put the substance you received?

6    A    Yeah.

7    Q    And the picture also contains the torn-off return

8    address label on the mailer; is that fair to say?

9    A    Yes.

10   Q    How about the second page of this two-page exhibit, what

11   is that a picture of?

12   A    That shows, again, the -- the bottle and how I marked it

13   poison so no one would even think of opening it, and then the

14   little bag of powder that I received.

15   Q    And also the return address?

16   A    And the return, yes.

17   Q    All three and the top to the bottle are in this picture?

18   A    In -- yes.

19   Q    And who took this picture?

20   A    Um --

21   Q    Do you know?

22   A    I don't -- I guess I did.

23   Q    Okay.  Is it a fair --

24   A    I don't remember if I did.

25   Q    I'm -- I'm sorry.  Is it a fair and accurate picture of

1    these items --

2    A    Yes.

3    Q    -- as you described them?

4    A    Yes.

5    Q    And -- and is that the way you received the -- the

6    little clear plastic baggie, was it tied in that manner or

7    differently, or do you remember?

8    A    No, that's the way I received it.  I did not touch it or

9    open it.

10   Q    Okay.

11        MR. FRANK:  I'd move Exhibit 40 into evidence, Your

12   Honor.

13        THE COURT:  Any objection?

14        MR. RIDGE:  Well, just request the same cautionary

15   instruction, Your Honor.  Other than that, none.

16        THE COURT:  Sure.

17   Ladies and gentlemen, as with this evidence, the same

18   instruction applies as to the limited uses that you can use

19   this evidence and also what you can and cannot use the

20   evidence for.

21   Thank you.

22        MR. FRANK:  Thank you, Your Honor.

23   BY MR. FRANK:

24   Q    Ms. Kirschling, I'm showing you what's been marked as

25   Exhibit 39-A for identification.  I don't know if it's open

1    yet.  Oops, it is.

2         And I'll open it and just lay it in front of you and ask

3    you if you recognize these items.  So do you recognize 39-A?

4    A    Yeah.

5    Q    What is 39-A?

6    A    It's my empty bottle of Pristiq.

7    Q    And 39-B?

8    A    Is the -- is the original bag, but in rough shape.

9    Q    I apologize for that, and I'm concerned that I've -- and

10   then 39-C -- let's see -- yes -- and then 39-C, do you

11   recognize that, 39-C?

12   A    Yes, that's the return label.

13   Q    That you tore off the mailer as you've described?

14   A    Yes.

15        MR. FRANK:  And, Your Honor, I don't now remember,

16   if they're not already in evidence, I'd move them at this time

17   -- 39-A, B and C.

18        THE COURT:  I don't have them in evidence.

19      Same objection?

20        MR. RIDGE:  Yes, Your Honor.  Thank you.

21        THE COURT:  Again, the same limiting and cautionary

22   instruction as to its proper use and nonuse.

23        MR. FRANK:  The court's indulgence, Your Honor?

24        THE COURT:  Yes.

25        MR. FRANK:  I have no further questions for this

1    witness.

2              THE COURT:  Cross-examination?

3              MR. RIDGE:  No questions, Your Honor.

4              THE COURT:  Thank you.  You may stand down, ma'am.

5         (The witness left the witness stand.)

6              THE COURT:  Next witness?

7              MR. FRANK:  Your Honor, I have two stipulations to

8    read, if I may.

9              THE COURT:  Yes.

10             MR. FRANK:  They are 41 and 94.  And they read, the

11   parties hereby agree and stipulate that on about

12   February 19th, 2015, Bayfield, Wisconsin Sheriff Patrol

13   Sergeant Anthony Budreau collected from Cynthia Kirschling in

14   Washburn, Wisconsin, a pill bottle containing a plastic baggie

15   containing a white powdery substance and an address label.

16        Sergeant Budreau brought the bottle back to the sheriff's

17   office in Washburn, Wisconsin, and booked it into evidence

18   with Evidence Custodian Brent Bratley.

19        On about March 17th, 2015, United States Postal Inspector

20   Jeffrey Taylor took custody of the baggie from Custodian

21   Bratley.

22        And then Exhibit 94, Your Honor, reads, the parties

23   hereby agree and stipulate that between about November 2011

24   and about February of 2013, the defendant, Sidney P.

25   Kilmartin, lived at 25-5 Village Drive in Manchester, Maine.

1      And with that, Your Honor, the government calls Autumn
2  Roland.
3           THE CLERK:  Please raise your right hand.  Do you
4  solemnly swear that the testimony you shall give in the matter
5  now in hearing shall be the truth, the whole truth, and
6  nothing but the truth, so help you God?
7           THE WITNESS:  I do.
8           THE CLERK:  Please be seated.  Please state your
9  name and spell your last name for the record.
10          THE WITNESS:  Autumn Roland, R-o-l-a-n-d.
11          MR. FRANK:  Thank you.
12 AUTUMN ROLAND, having been duly sworn, was examined and
13 testified as follows:
14                     DIRECT EXAMINATION
15 BY MR. FRANK:
16 Q    Good afternoon, Ms. Roland.
17 A    Good afternoon.
18 Q    Ms. Roland, where are you living?
19 A    In Fort Lauderdale.
20 Q    Florida?
21 A    Hm-hmm.
22 Q    And you've traveled here for trial with a friend of
23 yours named Chad, correct?
24 A    Yes.
25 Q    And the government agreed to pay for Chad's travel to

ROLAND - DIRECT EXAMINATION/FRANK

504

1   keep you company, correct?

2   A     Yes.

3   Q     And has that been a comfort to you?

4   A     Yes.

5   Q     Ms. Roland, what do you do in -- in Florida?

6   A     Currently I'm drawing social security disability

7   benefits.

8   Q     Okay.  Where did you grow up?

9   A     California.

10  Q     And can you tell us about your education?

11  A     Well, I received my GED in Los Angeles Job Corps in

12  1995, and I received my associate's degree in respiratory care

13  in July of 2004.

14  Q     And what have you done for work at this point?

15  A     Since graduating in 2004, I was and still am technically

16  a registered respiratory therapist.

17  Q     And what does that mean you do?

18  A     Respiratory therapists initiate and manage life support

19  systems, treat pulmonary disease, and, um, well, there's a --

20  a lot of things.

21  Q     And where have you done that work?

22  A     Um, I graduated in 2004 in St. Petersburg, Florida.  I

23  worked in Pinellas County, and then I started doing contract

24  work, going state to state for contracting at hospitals.

25  Q     And how did -- how does that work?

ROLAND - DIRECT EXAMINATION/FRANK

1   A      Well, you sign up with an agency and that agency employs

2   you to do contractual obligations, usually 13-week contracts

3   at different hospitals, and sometimes those contracts are

4   extended.

5   Q      And where did you do that contract work?

6   A      I've done that here at Eastern Maine Medical Center, in

7   Hawaii, in the Florida Keys, in parts -- different cities in

8   Florida, and I think that's all, yeah.

9   Q      Okay.  How did you get to Florida?

10  A      How did I get to Florida?

11  Q      Yeah.

12  A      Um --

13  Q      Why'd you move there?

14  A      When I was 20, my best friend, her boyfriend was

15  stationed at MacDill Air Force Base in Tampa, and she moved

16  out here to live with him, and then a year later, I moved out

17  here to live with her.

18  Q      Okay.  Ms. Roland, how is it that you became so

19  discouraged and depressed that in 2012 you were -- you were

20  looking for cyanide?

21  A      Well, in 20 -- 2011, I was diagnosed with

22  schizoaffective disorder, schizophrenia, and I was homeless.

23  I was unable to work, so I was homeless, and, um --

24  Q      Where -- where -- where -- where were you?  What state

25  at that point?

1    A    Florida.

2    Q    Okay.

3    A    Fort Lauderdale.

4    Q    Yeah.

5    A    Yeah, and, um, I actually at the time, in 2012, I had

6    already begun receiving SSDI -- SSDI benefits, and I was not

7    homeless.   I was living in an apartment, and I was receiving

8    mental health care and medication, but, you know, sometimes

9    schizophrenia can be refractory, it can be difficult to treat,

10   and I was having difficulty, even though I was on medication,

11   with, um, a lack of ability to sleep.   I was unable to sleep

12   for almost a month really, and I was not eating, and I was

13   having side effects from the psychological medications that

14   were affecting my motor skills to the point where it became

15   excruciatingly hard just to turn over in bed.

16        And I was very -- um, I was in severe distress when I

17   started looking for cyanide on the computer.

18   Q    Why -- why cyanide?

19   A    Because in my training, I -- I know that cyanide is

20   lethal, that it's basically, um, untreatable, it's

21   irreversible, and it's quick, hm-hmm.

22   Q    Where'd you look for it?

23   A    Online.

24   Q    Did you find it?

25   A    I did.   That is how I found the suicide blog and

1   Mr. Kilmartin, yeah.

2   Q      So --

3   A      I was searching the Internet for cyanide and eventually

4   found the Web site where he had his information, he had posted

5   about it.

6   Q      Do you remember what that Web site was?

7   A      I don't.

8   Q      Can you describe what it looked like in any way?

9   A      No, not really at this point.

10  Q      Okay.

11  A      No.

12  Q      Well, what -- what happened?  Did you -- did you reach

13  out to him?  Did you --

14  A      I -- I did.  I reached out to him with the e-mail

15  address that I found online, and I e-mailed him that I wanted

16  cyanide.

17  Q      And what happened?

18  A      I'm a little -- not as clear on this as I could be, but

19  he responded and that he did have cyanide, and, um, I

20  eventually arranged to Western Union him $250 to purchase it,

21  and he agreed to send it to me after he received the money.

22  Q      Did he ever send it to you?

23  A      No, he e-mailed me several times that -- um, excuses,

24  that the -- he had run out of supply, that he was getting more

25  supply, and that it was in the mail, and, um, that it was

1  coming, and he had apologized for the late parcel, and he kept

2  reassuring me that he was going to send it.

3  Q     But you never got anything from him?

4  A     I never got it, no.

5  Q     How did you feel about that?

6  A     I was upset.  I feel like he was -- you know, rather

7  than just scam me and, you know, take my money and then not --

8  not reply or not contact me anymore, which is what I would

9  think, you know, most people would do, he drew it out and --

10  and made me believe that he really was going to send it, and I

11  -- I was very angry that he kept, you know, kept toying with

12  me, I felt like he was toying with me.

13  Q     Did you -- did you threaten him?

14  A     I didn't threaten him.  I called him some expletives.

15  Well, actually, no, I might -- I think I did threaten to

16  report him to authorities.  I think I did, yeah.

17  Q     Did you actually report him?

18  A     I did.  I -- I logged onto the FBI Web site, and through

19  their tip line, I did send an e-mail to the FBI.

20  Q     Anything ever come of that?

21  A     Not that I'm aware of, no.

22  Q     Did there come a time when a postal inspector reached

23  out to you?

24  A     Yes.

25  Q     And what happened?

ROLAND - DIRECT EXAMINATION/FRANK

1   A    They reached out to me and confirmed that I was the

2   Autumn Roland that they were looking for, and they flew to

3   Florida to interview me and get the details of -- of my

4   contact with Mr. Kilmartin.

5   Q    Do you remember who that inspector was?

6   A    Halsey Frank, right?

7   Q    Well, I'm Halsey Frank.

8   A    That wasn't you?  I don't remember.

9   Q    Oh, all right.  How -- how -- how is your memory?  Is

10  it --

11  A    Um, it -- it could be better, it could be worse.  I'm

12  bad with faces, and it was a while ago.  I can't remember the

13  names of the gentlemen who came out to visit me.

14  Q    Let me show you what's been marked as Exhibit 46 for

15  identification.

16  A    (Witness looking at exhibit.)

17  Q    Do you recognize --

18  A    Yes.

19  Q    Do you recognize Exhibit 46 for identification?

20  A    I do.

21  Q    What is this?

22  A    This is an e-mail from me to Mr. Kilmartin regarding my

23  -- my attempt to acquire cyanide.

24  Q    Did you keep your e-mails or some or all of them with

25  Mr. Kilmartin?

ROLAND - DIRECT EXAMINATION/FRANK

1   A     Well, when I send e-mails, they save in a sent folder,
2   and I never deleted them.
3   Q     So did you still have them when --
4   A     Yes.
5   Q     -- the inspector came to see you?
6   A     I did.
7   Q     And this Exhibit 46 for identification, this is a
8   multipage exhibit, correct?  Do you want to look through it
9   briefly?  You don't have to read them all, but just enough to
10  satisfy yourself you know what it is, if -- if -- if you can.
11  A     Yeah.  (Witness complying.)  Hm-hmm.
12  Q     Do you recognize this now?
13  A     Yeah, I do.
14  Q     Have you had enough chance to look at it?
15  A     Yeah.
16  Q     What -- what is this?
17  A     It's my communication with Mr. Kilmartin regarding my
18  attempt at purchasing cyanide.
19  Q     So it's a number of those e-mails?
20  A     Yeah, several.
21  Q     The ones that were still left in your mailbox?
22  A     Hm-hmm.
23  Q     There -- there are initials on that first page, aren't
24  there, and a date?
25  A     Yes.

ROLAND - DIRECT EXAMINATION/FRANK

511

1   Q      Whose -- whose initials are those?

2   A      Mine.

3   Q      And -- and that date, is that your handwriting?

4   A      Yes.

5   Q      And -- and so do you recognize this as a copy of the

6   e-mails that were in your mailbox and that you provided to the

7   postal inspector when he came to see you?

8   A      Yes.

9          MR. FRANK:  Your Honor, I'd move Government's

10  Exhibit 46 into evidence.

11         THE COURT:  Any objection?

12         MR. RIDGE:  Yes, Your Honor, subject to the same

13  cautionary instruction, no objection.

14         THE COURT:  Right.  I will admit 46.  However,

15  ladies and gentlemen, that same cautionary instruction applies

16  to this exhibit that I've given you earlier.

17         MR. FRANK:  I'll take it back.  Thank you.

18     The court's indulgence, Your Honor?  Your Honor, I have

19  no further questions for this witness.

20         THE COURT:  Cross-examination?

21         MR. RIDGE:  No questions, Your Honor.  Thank you.

22         THE COURT:  Thank you.  You may stand down, ma'am.

23     (The witness left the witness stand.)

24         MR. FRANK:  Your Honor, may we approach?

25         THE COURT:  Yes.

1          (At sidebar on the record.)

2                  MR. FRANK:  Your Honor, I'm out of witnesses at the

3      moment.  They're trying to get more, but --

4                  THE COURT:  Want to send them away for the day?

5                  MR. FRANK:  We could.  I mean, I've done nine today.

6                  THE COURT:  Yeah.

7                  MR. FRANK:  I -- my next witness is going to be Gail

8      Coates.  She should be a long witness, and that would be my

9      preference, if --

10                 MR. RIDGE:  I agree.

11                 THE COURT:  Okay.

12                 MR. FRANK:  Thank you, Your Honor.

13                 THE COURT:  Okay.  Thank you.

14         (End of discussion at sidebar.)

15                 THE COURT:  Ladies and gentlemen, I was just

16     informed by Mr. Frank that he's essentially run out of

17     witnesses for today, and that means school's out a little

18     early.  I don't see anybody's very sad about that.

19         Anyway, ladies and gentlemen, you've already heard my

20     diatribe about what you can and can't do and what you can and

21     can't say, and I'm sure you're following those instructions.

22     I'm going to ask you to continue to follow them, and I look

23     forward to seeing you no later than 8:30 tomorrow morning.

24         Thank you.

25         (Jury exited at 1:29 p.m.)

1          THE COURT:  Turning to the jury instructions, I just
2    wanted to alert you, Mr. Ridge, that in an effort to be as
3    consistent as I can, I used the same definition of knowledge
4    throughout the course of the instructions.  I think one of
5    your proposed or a couple of your proposed instructions had a
6    slightly nuanced definition of knowledge, and I thought it
7    might be confusing to the jury to use two different
8    definitions of the same term.
9       So I just wanted to alert you that I've used that single
10   definition throughout the course of the instructions so that
11   you could focus on it and let me know whether you have any
12   suggestions.
13          MR. RIDGE:  Thank you, Your Honor.
14          THE COURT:  All right.  Anything further?
15          MR. FRANK:  Your Honor, the only thing is I was
16   planning to put in the plea and/or prosecution version
17   tomorrow, and I don't know if the court has any guidance for
18   me in that regard.  I haven't had a chance to discuss it in
19   detail with Mr. Ridge yet, and perhaps we could agree to
20   something.
21          THE COURT:  Well, I'm not going to do your job for
22   you, Mr. Frank.  I think that's something you need to discuss
23   with Mr. Ridge.
24          MR. FRANK:  In the first instance I will, Your
25   Honor.

1          THE COURT:  Okay.  Thank you.

2      Court will stand in recess.

3      (Proceedings concluded at 1:31 p.m.)

4                    CERTIFICATION

5      I certify that the foregoing is a correct transcript from

6  the record of proceedings in the above-entitled matter.

7

8

9  /s/ Julie G. Edgecomb                    February 14, 2017
   Julie G. Edgecomb, RMR, CRR             Date
10  Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25