1      UNITED STATES DISTRICT COURT

2       DISTRICT OF MAINE

3

4  UNITED STATES OF AMERICA  )
             )
5           )   CRIMINAL ACTION
     vs.      )
6           ) Docket No. 1:14-cr-00129-JAW-1
             )
7  SIDNEY P. KILMARTIN,   )    JURY TRIAL
             )
8      Defendant.  )

9

10        VOLUME IV OR VI

11      TRANSCRIPT OF PROCEEDINGS

12    Pursuant to notice, the above-entitled matter came on

13  for JURY TRIAL before the HONORABLE JOHN A. WOODCOCK, JR.,

14  in the United States District Court, Bangor, Maine, on the

15  6th day of October, 2016, at 8:37 a.m.

16

17

18  APPEARANCES:

19  For the Government:      Halsey B. Frank, Esquire

20  For the Defendant:      Martin Ridge, Esquire

21

22

23      Julie G. Edgecomb, RMR, CRR
       Official Court Reporter
24

25  Proceedings recorded by mechanical stenography; transcript
  produced by computer.

INDEX OF PROCEEDINGS

                                                      Page:

Testimony:  (see below)

Stipulation:                                            711

INDEX OF WITNESSES

                                                      Page:

GAIL COATES  (called by Mr. Frank)

Direct Examination by Mr. Frank                        526
Cross-Examination by Mr. Ridge                         552

MICHAEL BARRETT  (called by Mr. Frank)

Direct Examination by Mr. Frank                        559
Cross-Examination by Mr. Ridge                         588

HELEN COWLEY  (called by Mr. Frank)

Direct Examination by Mr. Frank                        593
Cross-Examination by Mr. Ridge                         606
Redirect Examination by Mr. Frank                      609

JONATHAN BIRT  (called by Mr. Frank)

Direct Examination by Mr. Frank                        611
Cross-Examination by Mr. Ridge                         623

COLIN STEVEN JORDAN  (called by Mr. Frank)

Direct Examination by Mr. Frank                        626
Cross-Examination by Mr. Ridge                         639

STEVEN MORRIS  (called by Mr. Frank)

Direct Examination by Mr. Frank                        643
Cross-Examination by Mr. Ridge                         650

GRAHAME MARK KAY  (called by Mr. Frank)

Direct Examination by Mr. Frank                        652
Cross-Examination by Mr. Ridge                         677

EDITH COLLINS  (called by Mr. Frank)

Direct Examination by Mr. Frank                          685
Continued Direct Examination by Mr. Frank               695
Cross-Examination by Mr. Ridge                          701

DONNA GREGORY  (called by Mr. Frank)

Direct Examination by Mr. Frank                          702
Cross-Examination by Mr. Ridge                           709

ALAN HUTCHINGS  (called by Mr. Frank)

Direct Examination by Mr. Frank                          713

<u>INDEX OF EXHIBITS</u>

Government's
Exhibit No.      Description                    Offered   Admitted

| Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 27 | Stipulation | 520 | 520 |
| 32 | Stipulation | 520 | 520 |
| 41 | Stipulation | 520 | 520 |
| 47 | Printout of wantdeathblogspot Recovered from Scene of Denton's Death | 646 | 646 |
| 48 | Printout of Answer Bag Recovered from Scene of Denton's Death | 647 | 648 |
| 51 | 11/16/12 Mailer from Kilmartin to Denton Recovered from Scene of Denton's Death | 605 | 606 |
| 54 | Andrew Denton's IC3 Complaint Recovered from Scene of Denton's Death | 648 | 648 |
| 55 | Certified Copy of Denton's IC3 Complaint | 706 | 706 |
| 56 | 12/11/12 Mailer from Kilmartin to Denton Recovered from Scene of Denton's Death | 548 | 548 |
| 59-1 | Photograph | 631 | 631 |
| 59-2 | Photograph | 631 | 631 |
| 59-3 | Photograph | 631 | 631 |
| 59-4 | Photograph | 631 | 631 |
| 59-5 | Photograph | 631 | 631 |
| 59-6 | Photograph | 631 | 631 |
| 59-7 | Photograph | 631 | 631 |
| 59-8 | Photograph | 631 | 631 |
| 59-9 | Photograph | 631 | 631 |
| 59-10 | Photograph | 631 | 631 |
| 59-11 | Photograph | 631 | 631 |
| 59-12 | Photograph | 631 | 631 |
| 59-13 | Photograph | 631 | 631 |
| 59-14 | Photograph | 631 | 631 |

518

| | | | | |
|---|---|---|---|---|
| 1 | 59-15 | Photograph | 631 | 631 |
| | 59-16 | Photograph | 631 | 631 |
| 2 | 59-17 | Photograph | 631 | 631 |
| | 59-18 | Photograph | 631 | 631 |
| 3 | 59-19 | Photograph | 631 | 631 |
| | 59-20 | Photograph | 631 | 631 |
| 4 | 59-21 | Photograph | 631 | 631 |
| | 59-22 | Photograph | 631 | 631 |
| 5 | 59-23 | Photograph | 631 | 631 |
| | 59-24 | Photograph | 631 | 631 |
| 6 | 59-25 | Photograph | 631 | 631 |
| | 59-26 | Photograph | 631 | 631 |
| 7 | 59-27 | Photograph | 631 | 631 |
| | 59-28 | Photograph | 631 | 631 |
| 8 | 59-29 | Photograph | 631 | 631 |
| | 60 | Warning Note Please Read First Recovered from Scene of Denton's Death | 649 | 649 |
| 9 | | | | |
| | 62 | Denton's Suicide Note Pauline Recovered from Scene of Denton's Death | 548 | 548 |
| 10 | | | | |
| | 63 | Handwritten Note of Transaction with Kilmartin Recovered from Scene of Denton's Death | 649 | 650 |
| 11 | | | | |
| 12 | 64 | Laptop Recovered from Scene of Denton's Death | 620 | 620 |
| 13 | 65 | Motorola Cell Phone Recovered from Scene of Denton's Death | 620 | 621 |
| 14 | 66 | HTC Cell Phone Recovered from Scene of Denton's Death | 621 | 621 |
| 15 | 67 | Memory Stick Recovered from Scene of Denton's Death | 622 | 622 |
| 16 | 68 | Beaker Recovered from Scene of Denton's Death | 622 | 622 |
| 17 | 70 | Denton's Nationwide Bank Card Recovered from Scene of Denton's Death | 623 | 623 |
| 18 | 71 | Paramedic Patient Report Form | 581 | 581 |
| | 72 | Paramedic Recognition of Life Extinct Form and EKG Printout | 581 | 582 |
| 19 | | | | |
| | 73 | Smiths Detection Printout | 672 | 675 |
| 20 | 84 | 1/2/13 E-Mail Between Shanda Collins and Skip Martin | 698 | 699 |
| 21 | 85-A | Collins' IC3 Complaint | 699 | 700 |
| | 94 | Stipulation | 520 | 520 |
| 22 | 104 | Stipulation | 520 | 520 |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

1          (Defendant present with counsel in open court.)

2               THE COURT:  Good morning.

3               MR. FRANK:  Good morning, Your Honor.

4               MR. RIDGE:  Good morning, Your Honor.

5               THE COURT:  Would you bring the jury in, please.

6               MR. FRANK:  Your Honor, may I -- may I address one

7     or two matters?

8               THE COURT:  All right.

9               MR. FRANK:  We did achieve a stipulation regarding

10    the prosecution version, which I was proposing to read at the

11    outset.

12              THE COURT:  Okay.

13              MR. FRANK:  And I also wanted to just put on the

14    record that I have again provided counsel with supplemental

15    Jencks from last night's meetings with witnesses.

16              THE COURT:  Okay.

17              MR. FRANK:  Thank you, Your Honor.

18              THE COURT:  Is that correct, Mr. Ridge?

19              MR. RIDGE:  Yes, Your Honor.

20              THE COURT:  Okay.  Thank you.

21         Would you bring the jury in, please.

22         (Jury entered at 8:36 a.m.)

23              THE COURT:  Good morning, ladies and gentlemen.

24              THE JURY:  Good morning.

25              THE COURT:  Mr. Frank?

1          MR. FRANK:  Thank you, Your Honor.

2      Your Honor, at the outset, I would like to move into

3  evidence Exhibits -- Government's Exhibits 27, 32, 41, and 94,

4  those being stipulations that I read to the jury yesterday.

5          THE COURT:  Any objection?

6          MR. RIDGE:  No, Your Honor.

7          THE COURT:  Each is admitted.

8          MR. FRANK:  Thank you, Your Honor.

9      And then I would move admission of Government's

10  Exhibit 104, which is a stipulation the parties reached

11  regarding the defendant's plea of guilty -- or pleas of

12  guilty.

13          THE COURT:  Any objection?

14          MR. RIDGE:  No objection, Your Honor.  Thank you.

15          THE COURT:  104 is admitted.

16          MR. FRANK:  And, Your Honor, I'd request permission

17  to read that to the jury at this time.

18          THE COURT:  You may.

19          MR. FRANK:  Thank you, Your Honor.

20      The parties hereby agree and stipulate that on Monday,

21  October 3rd, 2016, in the process of pleading -- pleading

22  guilty to Counts 2 through 4, 6, 8 through 11, and 13 of the

23  superseding indictment in the above-captioned case, Defendant

24  Sidney P. Kilmartin admitted the following facts were true to

25  his own personal knowledge.

1      Between April of 2012 and May of 2013, Sidney P.

2  Kilmartin devised a scheme to defraud suicidal persons and to

3  obtain money and property by means of material false and

4  fraudulent pretenses, representations, and promises, by

5  pretending to sell such persons cyanide when, in fact, he was

6  selling them Epsom salts.  Kilmartin executed the scheme by

7  e-mailing with such persons about cyanide, accepting payments

8  by wire transfer for cyanide, and by mailing Epsom salts to

9  persons around the country and the world.

10      Between November of 2011 and February of 2013, Kilmartin

11  lived at 25-5 Village Drive in Manchester, Maine, near the

12  Manchester post office located at 31 Readfield Road, the Rite

13  Aid Pharmacy located at 943 Western Avenue, the Mulligan's

14  convenience store located at 936 Western Avenue, the Subway

15  sandwich shop at 865 Western Avenue, and a short drive from

16  the Hannaford Supermarket 29 Whitten Road, The UPS Store at

17  60 Western Avenue, the Augusta post office at 40 Western

18  Avenue, and the Hannaford Supermarket at 118 Cony Street.

19  Kilmartin would pass the house located at 88 Pond Road driving

20  from Village Drive into Manchester and Augusta.

21      During the time of the scheme, Mr. Kilmartin had a

22  TracFone with telephone No. 207 ending in 7827.  He used the

23  e-mail account skiptin@gmail.com, amongst others.  Amongst the

24  Google services he subscribed to were Blogger, which is a free

25  Weblog publishing tool for sharing text, photos, and video,

1    and which enabled him to post on blogs hosted by Google and

2    located at blogspot.com, a subdomain on the Internet.

3    Mr. Kilmartin had bank accounts at the Maine State Credit

4    Union and at TD Bank.  He had three accounts with PayPal that

5    were linked to his TD Bank account so that money paid to him

6    through PayPal was deposited into his TD Bank -- TD Bank

7    account.  Kilmartin's Village Drive address and TracFone

8    number were listed on his PayPal and bank accounts.

9        Potassium cyanide is poison whose lethality is rated at

10   LD50 of 2 -- at a -- at a LD50 of 200 to 300 milligrams,

11   meaning that 50 percent of people who ingest between 200 and

12   300 milligrams of potassium cyanide will die.  It is not

13   readily available to the public.  Postal service regulations

14   prohibit mailing cyanide with limited exceptions, such as for

15   legitimate industrial, scientific, and governmental uses.

16       In September of 2012, Sidney P. Kilmartin posed as a

17   goldsmith business, S&K Goldsmith, and used his account at the

18   Maine State Credit Union to order 100 grams of potassium

19   cyanide for $127.56 from Fisher Scientific, brokered through

20   the Capricorn Group located in California.  Fisher is an

21   international company that, among other things, sells

22   chemicals to industry.  Fisher shipped a -- a package of

23   cyanide to Kilmartin at The UPS Store in Augusta.  Thereafter,

24   Kilmartin posted notice on a Web site devoted to suicidal

25   persons named wantdeathblogspot that he had industrial grade

1    potassium cyanide for sale.

2         Between about September of 2012 until about May of 2013,

3    using the e-mail address skiptin@gmail.com, Kilmartin

4    communicated about cyanide with numerous persons around the

5    United States and the world.  He agreed to sell cyanide to

6    several of those persons, including those named in the

7    indictment -- Walter Cottle, Stacey Williams, Derek Jorgensen,

8    Autumn Roland, Cynthia Kirschling, and others.  A search

9    warrant executed on Kilmartin's Gmail account yielded copies

10   of some of these e-mails.  Cottle and Roland kept copies of

11   some of their e-mail with Kilmartin and provided those copies

12   to investigators.

13        Kilmartin accepted payments from several of those

14   persons, including payments by PayPal from Walter Cottle and

15   payments by Western Union wire transfer from Stacey Williams,

16   Derek Jorgensen, Cynthia Kirschling, and others.  Kilmartin

17   collected his Western Union payments at the Hannaford stores

18   located at 29 Whitten Road and 118 Cony Street and at the Rite

19   Aid located at 943 Western Avenue.  In -- in the process of

20   collecting these payments, Kilmartin would provide his true

21   name and Village Drive address.  He would identify himself

22   with his Maine state driver's license and sign a receipt.  The

23   Western Union agent would note Kilmartin's state driver's

24   license number, ending in 3115, on the receipt for the wire

25   transfer.

1      PayPal records show Kilmartin receiving payments from

2  Dona -- from Cottle and Donalee Wolfe.  Western Union records

3  show Kilmartin receiving 17 payments between October of 2012

4  and May of 2013 at the two Hannaford Supermarkets and the Rite

5  Aid Pharmacy near 25 Village Drive, including payments from

6  Stacey Williams, Derek Jorgensen, Jessica Wolfe, Jeremy

7  Katzmier, Noel Heim, Autumn Roland, Sunnie Kim, Rita Foster,

8  Cynthia Kirschling, and others.

9      More specifically, using the e-mail address

10  skiptin@gmail.com, Kilmartin corresponded about cyanide with

11  Cottle between about September 16th, 2012, and about May 21st,

12  2013.  On about October 12th, 2012, he received a $242.54

13  payment from Walter Cottle of Georgia via PayPal, which was

14  deposited into his account at TD Bank.  Kilmartin received

15  payments via Western Union of $250 from Stacey Williams of

16  Colorado on about October 14th, 2012; $150 from Derek

17  Jorgensen of Hull, England, on about November 6th, 2012; and

18  $150 from Cynthia Kirschling of California on about

19  January 31st, 2013.

20      By United States Mail, Kilmartin mailed substances from

21  Maine to Walter Cottle in Georgia on about October 13th, 2012;

22  to Stacey Williams in Colorado on about October 15th, 2012; to

23  Derek Jorgensen in Hull, England, on about November 7th, 2012;

24  and to Cynthia Kirschling in California on about January 31st,

25  2013.  On those mailings, Kilmartin handwrote the return

1    address Skip Martin, 88 Pond Road, Manchester, Maine or

2    S. Martin, 88 Pond Road, Manchester, Maine.  Cottle took a

3    picture of the mailer showing the return address.  Williams

4    kept a copy of the Western Union receive form showing that

5    Kilmartin collected her payment.  Kirschling tore off the

6    return address and kept it.

7        Cottle, Williams, Jorgensen, and Kirschling all kept the

8    substances that Kirschling -- that Kilmartin mailed them.

9    Investigators recovered those substances and brought them to

10   the Maine Center for Disease Control, Health and Environmental

11   Testing Laboratory, where Chemist James Curlett tested them

12   and determined they were magnesium sulfate heptahydrate,

13   commonly known as Epsom salts.  Epsom salts are readily

14   available to the public.  Among other things, Epsom salts may

15   be used topically, diluted in bath water, and taken internally

16   as a laxative.

17       Thank you, Your Honor.

18           THE COURT:  Thank you.

19           MR. FRANK:  And now with that, the government calls

20   Gail Coates, who is also known as Gail Waters.

21           THE CLERK:  Please raise your right hand.  Do you

22   solemnly swear that the testimony you shall give in the matter

23   now in hearing shall be truth, the whole truth, and nothing

24   but the truth, so help you God?

25           THE WITNESS:  I swear.

```
 1              THE CLERK:  Please be seated.

 2              THE WITNESS:  Thank you.

 3              THE CLERK:  Please state your name and spell your

 4    last name for the record.

 5              THE WITNESS:  Gail Coates, C-o-a-t-e-s.

 6              MR. FRANK:  Thank you, Your Honor.

 7    GAIL COATES, having been duly sworn, was examined and

 8    testified as follows:

 9                      DIRECT EXAMINATION

10    BY MR. FRANK:

11    Q     Good morning, Ms. Coates.

12    A     Good morning.

13    Q     Ms. Coates, where are you from?

14    A     Hull.

15    Q     Where is that?

16    A     England.

17    Q     How did you get here?

18    A     Airplane.

19    Q     Did we -- did we bring you here?

20    A     Yes.

21    Q     To testify in this matter?

22    A     Yes.

23    Q     Okay.  And what is Hull?

24    A     It's a town where I used to live.

25    Q     Okay.  Where -- where specifically are you living now?
```

1    A    Lincoln.

2    Q    Lincoln?

3    A    Yes.

4    Q    Where is Lincoln relative to Hull?  Is it nearby?

5    A    It's about 50 miles away.

6    Q    Okay.  And how long have you been living in the

7    Hull-Lincoln area?

8    A    About a year and a half.

9    Q    Uh-huh.  Where did you live before Lincoln?

10   A    Hull.

11   Q    In the city itself?

12   A    Yes, East Hull.

13   Q    East Hull.  Where in East Hull?

14   A    Holderness Road.

15   Q    Can you spell that for us?

16   A    H-o-l-d-e-r-n-e-s-s.

17   Q    I won't try and pronounce it myself.  All right.  And

18   how long did you live there?

19   A    All my life.

20   Q    Okay.  So you grew up --

21   A    Yeah, I was born in Hull.

22   Q    All right.  What do you do for -- are you working?

23   A    Yes.

24   Q    What do you do for work?

25   A    I look after people with dementia.

1    Q      And where do you do that work?

2    A      Lincoln.

3    Q      Is it at a hospital or a --

4    A      No, it's a residential home, 34 residents.

5    Q      A residence?

6    A      Yes.

7    Q      And how many people live there?

8    A      34.

9    Q      34?

10   A      Yes.

11   Q      Okay.  And what sort of services do you provide them?

12   A      I oversee the care, I administrate medication, and

13   things like that.

14   Q      All right.  And how long have you been doing that work?

15   A      On and off for nine years.

16   Q      Do you have special education for that work?

17   A      Yes, yes.

18   Q      What sort?

19   A      Um, I'm trained in med -- giving medication.  I've got

20   NVQ Level 3.  I'm currently doing my NVQ Level 5, management.

21   Q      What do those stand for?  Do they stand for something?

22   A      It's just a national qualification to say that you can

23   do the job and you've trained.

24   Q      All right.  And --

25   A      And you've got the knowledge in care.

```
1    Q     Do they test you to make sure --

2    A     Yeah, yeah.

3    Q     -- that you're qualified?

4          Okay.  Can you describe your family situation for us?

5    A     I've got four children.  I'm currently a single mom,

6    living alone, and obviously my mom and my three children live

7    in Hull, and Matthew lives with me in Lincoln.

8    Q     How old is Matthew?

9    A     9.

10   Q     How old are the other three?

11   A     Oh, God, 28, 26, and 25.

12   Q     Ms. Coates, how are you related to Andrew Denton?

13   A     I'm his niece.

14   Q     And can you explain -- what -- who -- who's your --

15   who's your common link to Andrew Denton?

16   A     My mom.

17   Q     What's your mom's name?

18   A     Pauline Dibnah.

19   Q     Can you spell her last name for us?

20   A     D-i-b-n-a-h.

21   Q     Okay.  Did Mr. Denton have other family besides?

22   A     No, just my mom and obviously my children, his

23   great-nephews and nieces.

24   Q     Who of the family was closest to Mr. Denton?

25   A     I was.
```

1    Q    Can you describe your relationship to him?

2    A    Um, in the six months leading up to his death, I was

3    extremely close to him.  I saw him on a daily basis.

4    Q    Were you not as close before that?

5    A    Not as close because he was in a relationship, so it was

6    like Joanne was his only care.

7    Q    Who was Joanne?

8    A    His girlfriend.

9    Q    Okay.  What happened to her?

10   A    Andrew found her dead in a flat.  She'd died of a heart

11   attack.

12   Q    And -- and when was that?

13   A    I think it was July.

14   Q    Of 2012?

15   A    Yes.

16   Q    So about five or six months before he himself --

17   A    Yes.

18   Q    -- died?

19   A    Yes.

20   Q    Okay.  And it was during that time that you became even

21   closer to him?

22   A    Yes.

23   Q    Is that fair to say?

24   A    Yeah.

25   Q    What sort of a fellow was he?  Can you describe him for

1   us?

2   A     He was antisocial.  He had no social skills at all.  He

3   didn't know how to communicate with people around him apart

4   from his family.  He felt comfortable with his family, but he

5   didn't with anybody else.

6   Q     Was he an educated man?

7   A     Not to the degree that it's on paper, but he was clever.

8   Q     Okay.  What sort of education did he have?  Do you know?

9   A     I think it was just basic.

10  Q     And by basic, are your schools similar as ours?  Do you

11  have a high school or a college?

12  A     Yeah, we call it GCSE, but I'm not -- again, I'm not

13  quite sure of what he left with.

14  Q     Okay.  Can -- did he -- did he work?  Did he --

15  A     Um, not really.  He didn't a hold job down for very

16  long.

17  Q     Okay.

18  A     Again, because he had to socialize with his workmates,

19  his colleagues.

20  Q     Did he have many friends?

21  A     Maybe one, two, but no one -- nobody that used to go

22  around for a cup of tea or go out drinking with, no.

23  Q     But he did have his girlfriend Joanne.

24  A     Yes.

25  Q     And how long were they together before she died as

1  you've described?

2  A     About -- I'd say about eight or nine years, something

3  like that.

4  Q     Did you -- did you spend time with them when they were

5  together?

6  A     Yeah, yeah, yeah, because he lived the next street to

7  where I lived.

8  Q     Oh, did he?

9  A     Yes.

10  Q     Where was -- where was he living when he died?

11  A     Holland Street.

12  Q     And at that time, where were you living?

13  A     Sherburn Street, the next street, which is two minutes.

14  Q     Two minutes by -- by foot, walking?

15  A     Yes, by foot.

16  Q     And you were telling us a little bit about his

17  relationship with Joanne, and you thought that they had been

18  together for about eight -- eight or nine years; is that

19  right?

20  A     Yes.

21  Q     Do you know how they met?

22  A     On a dating site online.

23  Q     Uh-huh.  And was she in poor health?  Did she have --

24  A     Yes.

25  Q     -- health --

1   A      Yes, she had her own issues.  Hers were more physical.

2   Q      What -- from your observation, how would you describe

3   their relationship?

4   A      Odd.

5   Q      Odd?

6   A      (Nodding head up and down.)

7   Q      Why do you say odd?

8   A      Because obviously with Andrew, he was antisocial, and

9   you wouldn't associate Andrew in a relationship.  He was just

10  -- he was one of them people that you wouldn't associate with

11  being in a relationship with somebody, and she was -- she was

12  quite outgoing, whereas Andrew was quite submissive.  He was

13  -- she was the one that --

14  Q      Can you tell us a little bit about your uncle's mental

15  state over the years?  Are you familiar with that?

16  A      Yes, he's always suffered with mental health issues.

17  Well, I -- it's not -- I mean, like I say, it's not -- he

18  didn't come across as depressed on a daily basis.  He was just

19  adamant that he wanted to commit suicide.

20  Q      Really.

21  A      Yeah.

22  Q      I mean, for how long?

23  A      For as long as I can remember.

24  Q      And would he speak about this?

25  A      Yes, especially in the six months from when Joanne died,

1    he told me everything.  It was never before; it was always

2    after and during his attempts.

3    Q    So what are you referring to there?  Did he make prior

4    attempts to -- to kill himself?

5    A    Yes.

6    Q    And then tell you about them afterwards?

7    A    Yes.

8    Q    Can you tell us about some of those?

9    A    At one point, he tried to kill himself by using liquid

10   nicotine.

11   Q    And he told you about this?

12   A    Yes.

13   Q    What did he tell you about that?

14   A    That he purchased liquid nicotine off the Internet and

15   wrapped himself in cling film so his body could absorb the

16   liquid nicotine.

17   Q    And --

18   A    Apparently it's supposed to kill ya.

19   Q    I take it it did not.

20   A    No.

21   Q    Did he describe other attempts to you?

22   A    At one point, he got on a bus and gone to -- I can't

23   remember -- somewhere like Gloucestershire -- that's in the

24   UK -- and he'd taken tablets at the start of the journey --

25   well, I don't know what it was, but because he was a creature

1  of habit and I couldn't get in contact with him on that

2  specific day, I knew something was wrong.

3      So I was ringing and ringing, and eventually he picked

4  his phone up, I could tell that he'd taken something, so I

5  managed to persuade him to give his mobile phone to somebody

6  on the bus, and she alerted the bus driver, so he alerted the

7  paramedics, and the paramedics was at the other side waiting

8  for the bus when it stopped.

9  Q    And I take it he survived that attempt?

10 A    Yes.

11 Q    Do -- are you aware of other attempts?

12 A    I know that -- I mean, I -- I -- he didn't tell me this.

13 I mean, he told me, but he told me way after the fact -- after

14 he tried it.  He said that he drank that much water.  He tried

15 to drown himself.

16 Q    By just -- by just poisoning himself with water?

17 A    By drinking water, yeah.

18 Q    Okay.  Well, how about focusing on the year of 2012 in

19 particular.  I take it that that's the year that his

20 girlfriend Joanne died --

21 A    Died.

22 Q    -- in July?

23 A    Yes.

24 Q    What -- how did he -- how did he take that?

25 A    He was devastated, absolutely devastated.  When it

1    happened, he wrote a note to my mom with 500 -- he put it in

2    an envelope with 500 pound and posted it to my mom.  So my mom

3    read it, rang me, and that's when I went to Andrew's house.

4    He was found in the back garden smoking, which I wasn't aware

5    that he even smoked at that point because it was just so -- I

6    just didn't know.  And -- and that was the point that he said

7    I'm going to kill myself, die any way, I'm going to do it.

8    Q    And this was after Joanne's death?

9    A    Yes.

10   Q    When -- when relative to Joanne's death did he try to

11   kill himself with nicotine as you've described?

12   A    This was after Joanne's death.

13   Q    Did he have any medical help to deal with these issues?

14   A    I rang -- I rang the crisis team, but he just knew how

15   to work the system, he knew what to say.  He was admitted to

16   Newbridge -- Newbridge Mental Hospital.  He was admitted to

17   Castle Hill Mental Hospital.

18   Q    So I take it he did have some help, but it didn't --

19   A    Yeah.

20   Q    -- it didn't seem to help him?

21   A    No, it didn't work.  He just told them basically what he

22   thought they needed to hear so he could come out and do it

23   again.

24   Q    Are you aware of him trying to commit suicide in early

25   December of 2012?

 1   A      Yes.

 2   Q      What do you know about that?

 3   A      I know that he -- he rang me and asked me to come around

 4   because he wanted to talk to me, and when I got there, he was

 5   really upset.  He was -- he was crying.  He was -- he was

 6   really, really angry.  I've never, ever seen him angry.  And

 7   then he got me -- he got his mobile phone out and said that

 8   he'd been on a suicide forum and been talking to somebody

 9   called Martin.

10             MR. RIDGE:  Excuse me, Your Honor.  May we approach

11   sidebar?

12             THE COURT:  Yes.

13         (At sidebar on the record.)

14             MR. RIDGE:  Your Honor, I'm not sure if this

15   evidence was included in your order of last week or not, but I

16   would object to the statements made by Mr. Denton to

17   Ms. Coates about Mr. Kilmartin regarding the early December

18   effort at suicide as hearsay.

19             MR. FRANK:  I think forfeiture by wrongdoing --

20             THE COURT:  You don't -- you don't need to whisper.

21   They've got the white noise.

22             MR. FRANK:  I think that forfeiture by wrongdoing

23   covers this testimony.  I mean, he's not here because

24   Mr. Kilmartin killed him, and this is his representative and a

25   way of -- of speaking, so I think that it should be covered by

1    that waiver.

2          MR. RIDGE:  I understood the court's ruling

3    regarding that.  I obviously don't agree that Mr. Denton isn't

4    here because Mr. Kilmartin killed him.

5          THE COURT:  Right.  I mean, that's the issue we're

6    trying to struggle with.  But I think that the government has

7    laid out sufficient evidence to allow for the admission on

8    that basis at this point.

9          MR. RIDGE:  Okay.  Can I ask the court --

10         THE COURT:  Yes.

11         MR. RIDGE:  -- whether or not that is going to be a

12   broad ruling that's going to cover all of the subsequent

13   conversations between Ms. Coates and Mr. Denton, so I don't

14   have to keep jumping up?

15         THE COURT:  Right.  Unless there's something

16   unusual -- I mean, I don't know what she's going to testify

17   to -- but it is a broad ruling that will include statements by

18   Denton that she is testifying to unless there's some other

19   basis for objection.

20         MR. RIDGE:  Okay.  So I need not object each and

21   every time.

22         THE COURT:  Right.

23         MR. RIDGE:  Okay.  Thank you.

24         THE COURT:  Yes.

25         MR. FRANK:  Thank you, Your Honor.

1          (End of discussion at sidebar.)

2                MR. FRANK:  May I proceed, Your Honor?

3                THE COURT:  You may proceed.

4   BY MR. FRANK:

5   Q     Ms. Coates, when we -- when we broke, you were telling

6   us about your uncle who was telling you about this attempt to

7   commit suicide in early December of 2012, and I think we left

8   off at the point where he was speaking about someone named

9   Martin, correct?

10  A     Yes.

11  Q     Tell us what he told you about Martin.

12  A     That he'd been speaking to him on the -- on the suicide

13  forum and that he had purchased what he thought was cyanide,

14  and obviously he'd taken it.  Apparently he'd booked himself

15  into a hotel room, paid 50 pounds for this hotel room, and

16  obviously it didn't work.

17  Q     You say obviously because he was there speaking to you.

18  A     Yes.

19  Q     And did he tell you how he reacted to that experience?

20  A     He was absolutely devastated.  It was to the point of --

21  I mean, he said that he put a complaint into the FBI and --

22  because I said to him you're crazy.  I said not only are you

23  going to get done for trying to get cyanide in the country,

24  but they're going to put you in a straight jacket.  I mean,

25  crazy.  There's simpler ways of trying to commit suicide than

1   getting cyanide.  And he just said, well, if it had worked, I

2   don't care, I wouldn't have cared.

3   Q     Did he show you this -- this complaint or his e-mails

4   with -- with --

5   A     Yes.

6   Q     -- Martin?

7   A     Yes.

8   Q     Can you -- on his computer, on his phone, or --

9   A     On his phone.

10  Q     Okay.  Well, how about after that occasion?  I mean, did

11  you continue to have regular contact with him --

12  A     Yes.

13  Q     -- later in December?

14  A     Yes.

15  Q     What sort?

16  A     On a daily basis, whether it was ringing or he used to

17  come round to my house, have a cup of tea, play with Matthew,

18  take him to school.

19  Q     And how would you describe his frame of mind?

20  A     Okay, better than it was.

21  Q     Hm-hmm.  Tell us -- tell us about the days leading up to

22  or between Christmas and -- and New Year's of 2012 and what --

23  what sort of dealings you'd had with your uncle during that

24  time.

25  A     It's -- I mean, I -- I was working a lot over Christmas,

1  but I did -- I can't remember what day it was when he came to

2  see me and Matthew.  But looking back on it, it was like, you

3  know, like Matthew, if you could go on holiday anywhere in the

4  world, where would it be?  You know, Matthew said, Disneyland

5  Paris.  One day, your mom will be able to take ya, and it was

6  like -- looking back, it was -- it was like saying good-bye,

7  so --

8  Q     So this was something that your -- your uncle asked your

9  son?

10 A     Yes.

11 Q     I see.

12 A     Yes.

13 Q     All right.  Did you make plans with him for the holidays

14 in any way?

15 A     No, not really because I was like working all over

16 Christmas, and I think it was Christmas -- Christmas night or

17 Boxing night -- I'm not quite sure -- I can't remember -- that

18 Mom took Andrew around some food because obviously he didn't

19 want to spend Christmas with anybody because it was his first

20 Christmas without Joanne, so he wanted to be alone.  So we

21 took him some food.  He came out.  He seemed okay.

22 Q     Okay.  He came down -- when you say he came out, did you

23 go to his apartment?

24 A     Yes.

25 Q     And he came down to meet you?

1   A   Yes.

2   Q   And you gave him the food?

3   A   Yes, I didn't go in his house.

4   Q   That was the extent of your dealings with him on that

5   occasion?

6   A   Yes.

7   Q   Well, what -- what -- when -- when next did you speak or

8   -- or see him?

9   A   The 31st of Jan -- December.

10  Q   Well, tell us about that day.

11  A   My mom had come around for a cup of tea, and we sat

12  around my living room table, and she's like, why don't you

13  ring Andrew and ask him to come around for a cup of tea.  So I

14  rang him, and then obviously I had the telephone message.

15  Q   What message are you talking about?  Can you describe it

16  for us?

17  A   Mark, if you read -- if you're hearing this message,

18  expect the worst.  My keys are in the letterbox.

19  Q   And who is Mark?

20  A   He's -- he aids mental health care, he used to talk to.

21  Q   Okay.  So what -- what did you do about that message?

22  A   And obviously I -- I relayed it to my mom, and I said,

23  I'm going round and then went round.

24  Q   To his apartment?

25  A   Yes.

1  Q     And tell us what happened there.

2  A     And I took the keys out of the letterbox.  I entered his

3  house, and everything, of course, spotless, nothing out of

4  place, the curtains was open, the kitchen door was shut.  I

5  opened his kitchen door, and the two -- he had two dogs.  They

6  was in the kitchen, and the smell was just, you know, dog poo

7  and --

8  Q     Okay.

9  A     I shouted Andrew.  He didn't answer me.  I went

10 upstairs, went into his bedroom, and he wasn't in his bedroom.

11 So I went into the spare -- as I walked towards the spare --

12 the spare bedroom, I could see his feet hanging over the bed.

13 Q     So he was lying in the bed in the spare bedroom?

14 A     Yes, on top of the quilt.

15 Q     What did you -- did you -- did anything appear to be

16 amiss or out of place?

17 A     No, spotless.

18 Q     What did you do?

19 A     I called 999.

20 Q     What is 991 (sic)?

21 A     Yes.

22 Q     Is that your emergency number?

23 A     Yes.

24 Q     Okay.  And what happened?

25 A     And they -- they asked me to do CPR on him, and I said

1    no.

2    Q    Why not?

3    A    Because he was dead.  He looked dead.

4    Q    Okay.  All right.  What happens?

5    A    And then the paramedics arrived.  I -- I let the

6    paramedics in.  I went upstairs with the paramedics, and then

7    the police arrived.

8    Q    Okay.  Did you stay in the apartment?

9    A    Yes.

10   Q    Did you see what was going on there?

11   A    Yes.

12   Q    What was going on?

13   A    Obviously, the paramedics went back upstairs with the --

14   the police, and then I -- on the -- on the mantelpiece in the

15   living room, I saw a letter addressed to Pauline, and I opened

16   it, read it, it was a suicide letter, and then I -- I don't

17   even know why I went to the drawer, and there was a bag in the

18   drawer.

19   Q    What drawer are we talking about?

20   A    In the living room, like a cabinet, and in there, there

21   was a bag.

22   Q    A bag?

23   A    And then it just clicked, and I knew that he'd taken --

24   he must have got cyanide.

25   Q    Can you describe this bag?

1   A     Brown -- brown Jiffy bag.

2   Q     What's a Jiffy bag?

3   A     Like a -- an envelope, but it's bigger.  It's a bit

4 more.

5   Q     Did you -- did you know anything -- did you notice

6 anything about it?  Could you read the addresses or --

7   A     Yeah, there was obviously Andrew's address, and then in

8 the corner, there was another address.

9   Q     Do you remember what that address was?

10   A     Just the Maine on it.

11   Q     It said Maine?

12   A     (Nodding head up and down.)

13   Q     Okay.  What -- what -- did you notice anything else?

14   A     And inside it, there was a clear bag with white powder

15 in it.

16   Q     Did you tell anybody about that?

17   A     Yes.

18   Q     Who did you tell?

19   A     I think it was a paramedic or the police.  I can't

20 remember who, but I said I think this is the cyanide that he's

21 taken his life with.

22   Q     I'm sorry.  I had trouble hearing you there.  I don't

23 mean to be difficult, but --

24   A     That's all right.  Then I said -- I said, I think this

25 is the cyanide.  He must have got some more cyanide.

1    Q      And you told someone there that.

2    A      (Nodding head up and down.)  Yes.

3    Q      What happened after that?

4    A      I was advised to leave the property, so I went back

5    home, and Helen Crowley (phonetic) followed me.

6    Q      And who is Helen Crowley?

7    A      Police officer that was there.

8    Q      Okay.  What happened back at your apartment?

9    A      She'd taken statements and everything, and paramedics

10   advised me to go to hospital to get checked out because I --

11   you know, I was in close contact with cyanide -- or what they

12   thought was cyanide.

13   Q      In the days following, did you go back to the apartment?

14   A      Yes.

15   Q      And did you find things there?

16   A      Yes.

17   Q      What sort of things did you find there?

18   A      I found -- I think there was about four or five pieces

19   of paper with e-mail communication to -- I can't -- Martin,

20   whoever, Kilmartin.

21   Q      You found, what, printed-out e-mails?

22   A      Yes.

23   Q      That you thought were significant?

24   A      Yes.

25   Q      Did you find other things besides e-mails?

1    A      I can't remember.

2    Q      Whatever it was that you found, what did you do with it?

3    A      And I rang the police, and then they came and picked it

4    up.

5    Q      And you -- was that Helen Cowley or somebody else, or do

6    you remember?

7    A      Steve -- Steven Morris, he picked the e-mail

8    communication.

9    Q      The other things that you -- that you found?

10   A      Yes, I mean, that -- the e-mail communication stuck in

11   my mind because I actually read it, and so that's why it stuck

12   in my mind.

13   Q      Do -- do you remember what it said?

14   A      Just basically that the -- he told Andrew how to drink

15   it, when to drink it, the best time to drink it to have the

16   best effect.

17   Q      Let me try it this way.  Let me show you -- Ms. Coates,

18   let me show you what's been marked as Exhibit 62 for

19   identification, ask you to take a look at that.  Do you

20   recognize that?

21   A      Yes.

22   Q      What is 62 for identification?

23   A      Suicide note.

24   Q      Is that the one that you were speaking of?

25   A      Yes.

1   Q      And whose handwriting is that?  Do you recognize it?

2   A      Andrew's.

3            MR. FRANK:  Your Honor, I'd move 62 in evidence.

4            THE COURT:  Any objection?

5            MR. RIDGE:  None other than what I've stated

6   previously, Your Honor.  Thank you.

7            THE COURT:  Okay.  Thank you.  The objection's

8   overruled.  The -- Exhibit 62's admitted.

9   BY MR. FRANK:

10  Q      Let me show you what's been marked as Exhibit 56 for

11  identification, ask you to take a look at this, and tell us if

12  you recognize it, please.

13  A      Yep.

14  Q      What -- what is 56 for identification?

15  A      The Jiffy bag that was in the drawer.

16  Q      In the drawer?

17  A      (Nodding head up and down.)

18           MR. FRANK:  Your Honor, I'd move 56 into evidence.

19           THE COURT:  Any objection?

20           MR. RIDGE:  No, Your Honor.

21           THE COURT:  It's admitted.

22  BY MR. FRANK:

23  Q      And let me show you what's been marked as Exhibit --

24  Exhibits 59-2 and 3.  Do you recognize Exhibit 59-2?

25  A      Yeah.

1    Q    So -- so start -- this is a picture, isn't it?

2    A    Yes.

3    Q    A picture of what?

4    A    Of an envelope on the mantelpiece.

5    Q    In your uncle's apartment?

6    A    Yes.

7    Q    Which envelope is that?

8    A    What do you mean?

9    Q    Is it -- is it 56?

10   A    No, no.

11   Q    Which one is that?

12   A    I don't --

13            THE COURT:  Ma'am, you're going -- I'm sorry to

14   interrupt.

15            THE WITNESS:  That's all right.

16            THE COURT:  You're going to have to scooch up a

17   little bit and talk more into the microphone.  Thank you.

18            THE WITNESS:  Sorry.

19   BY MR. FRANK:

20   Q    All right.  Let me --

21   A    There's two envelopes.

22   Q    There are two envelopes.  Tell us -- tell us about the

23   two envelopes.  Let's do it that way.  So there's the first

24   envelope you've already described, correct?

25   A    Yes.

1   Q    Okay.  And you looked inside that envelope and saw what?

2   A    A clear bag with white powder in it.

3   Q    All right.  And what did you -- do you know what -- and

4   you may not know.  I mean, do you know what happened to that

5   envelope?

6   A    (Shaking head side to side.)

7   Q    Okay.  But there's a second envelope?

8   A    Yes.

9   Q    Tell us about the second envelope.

10  A    I just looked -- I didn't look -- I can't remember

11  looking in it.

12  Q    Okay.  So you saw it, but you did not look inside it?

13  A    Not that I can remember.

14  Q    All right.

15  A    But everything's --

16  Q    And where did you -- I'm sorry.  Where did you see it?

17  A    The envelope on the mantelpiece.

18  Q    Okay.  And -- and that's the second envelope?

19  A    Yes.

20  Q    All right.  So there was one in the drawer and one on

21  the mantelpiece?

22  A    Yes.

23  Q    All right.  And did -- and you looked inside one of them

24  and saw the bag.

25  A    Yes.

1    Q    All right.  And did you move either of the two of them

2    that you recall?

3    A    Not that I can recall.  I just -- I mean, after I said,

4    I think this is the cyanide, I don't know what the police did

5    with it.

6    Q    Okay.  Did somebody take it from you at that point?

7    A    I think so.  I can't remember.

8    Q    Okay.  All right.  And then you spoke about going back

9    to the apartment in the days after and finding additional

10   items that you gave to Officer Morris.

11   A    Yes.

12   Q    And at least one of those items was some e-mail,

13   correct?

14   A    E-mails, yes.

15   Q    Let me show you what's been marked as Exhibit 49 for

16   identification, ask you to take a look at that, and tell us if

17   you recognize it, please.

18   A    Yep.

19   Q    What is 49 for identification?

20   A    The e-mails.

21   Q    That you were speaking of?

22   A    Yes.

23   Q    That you found in the days after?

24   A    Yes.

25   Q    And that you gave to Officer Morris?

1    A    Yes.

2    Q    And they -- they're actually -- they were printed out at

3    the time?

4    A    Yes.

5    Q    On this -- this -- and your paper over there is slightly

6    larger than our paper here, isn't it?

7    A    I think the size -- A4, size A4, but I don't know.

8    Q    A4, is that a -- is that a standard size --

9    A    Yes.

10   Q    -- of paper in the UK?

11   A    Yes.

12   Q    All right.

13            MR. FRANK:  Your Honor, I'd move Exhibit 49 into

14   evidence.

15            THE COURT:  Any objection?

16            MR. RIDGE:  None other than the objection I had

17   previously.

18            THE COURT:  Okay.  49 is admitted over objection.

19            MR. FRANK:  The court's indulgence, Your Honor?

20   Your Honor, I have no further questions for this witness.

21            THE COURT:  Cross-examination, Mr. Ridge.

22            MR. RIDGE:  Thank you, Your Honor.

23                        CROSS-EXAMINATION

24   BY MR. RIDGE:

25   Q    Good morning, Ms. Coates.

1 A Good morning.

2 Q My name is Marty Ridge, and I represent Mr. Kilmartin in

3 this matter, and if at any time you don't understand my

4 questions, please just let me know that.

5 A Okay.

6 Q And if at any time you want to take a break, let me know

7 that, as well.  Okay?

8 A Okay.

9 Q Ms. Coates, I just wanted to start with the question

10 about the envelope, and I believe --

11   MR. RIDGE:  May I approach, Your Honor?

12   THE COURT:  You may.

13 BY MR. RIDGE:

14 Q I believe you were shown Government's Exhibit 59-2?

15 A Yes.

16 Q Okay.  And is -- is this white envelope leaning up

17 against the clock --

18 A Yes.

19 Q -- the envelope that you gave to the police that day?

20 A I can't remember if I give -- give the police that one

21 or the one in the drawer.

22 Q Okay.  So this one was on the mantel, and there was a

23 different envelope in the drawer?

24 A Yes.

25 Q Okay.  And were both of those found by you on December

1  31st?

2  A    Yes.

3  Q    Okay.  And this white envelope that appears in

4  Exhibit 59-3 appears to be a close-up of the white envelope in

5  59-2.

6  A    Yep.

7  Q    Is that fair?

8  A    (Nodding head up and down.)

9  Q    Do you recall what you -- well, strike that.

10       The envelope that was in the drawer, did you give that

11  to the police on the day that Mr. Denton was found?

12  A    Yes.

13  Q    Okay.  So there were two envelopes given to the police

14  by you on December 31st?

15  A    I don't -- I can't -- I can't recall.  I can recall I --

16  obviously I saw one envelope.  I looked in the bag and saw a

17  clear -- clear bag with white powder in it.  I'm not -- you

18  know, with everything that happened, everything, it was a

19  blur.  I just remember seeing one bag -- well, not -- I mean,

20  I know there was two, but I can remember holding one bag that

21  had a clear bag in it and giving it to the police.

22  Q    Okay.  But you didn't look inside the envelope that was

23  in the drawer.

24  A    The one in the drawer, yeah --

25  Q    Okay.

1   A      -- I think.  I mean, I know I looked in one of the bags.

2   Q      Okay.  But you don't recall --

3   A      You're confusing me.

4   Q      I'm sorry?

5   A      I said, you're confusing me.

6   Q      I'm not trying to confuse you, believe me.  I'm just

7   trying to figure out what you did in response to seeing those

8   two envelopes.

9   A      Right.

10  Q      And your recollection is -- and correct me if I'm wrong

11  -- your recollection is the envelope that was on the

12  mantelpiece you gave to the police?

13  A      No.

14         MR. FRANK:  Actually, Your Honor, I'm going to

15  object.  I think her testimony was the envelope with the bag

16  inside is the one that she gave the police.

17         MR. RIDGE:  My mistake.

18  BY MR. RIDGE:

19  Q      I thought you -- which envelope was the bag in?

20  A      The brown one, I think.

21  Q      Okay.  And that was located where?

22  A      In the drawer, I think.  You confused me.

23  Q      Ms. Coates, I'd like to go back for just a moment to

24  Mr. Denton's history of suicide attempts.  You wrote for the

25  police sort of a summary of what you knew about Mr. Denton 's

1    life.

2    A    Yes.

3    Q    And you initialed that and that was used for whatever

4    purposes in the UK.  Mr. Denton had first attempted suicide to

5    your knowledge in the year 2003?

6    A    Yes.

7    Q    Okay.  And that was when he tried to kill himself using

8    gas?

9    A    Yes.

10   Q    And then in 2006 or '7, he made another attempt.  He

11   tried to hang himself?

12   A    Yes.

13   Q    And he made numerous efforts to end his own life by

14   taking pills?

15   A    Yes.

16   Q    And then you told us about the July of 2012 episode

17   after Joanne died and that involved wrapping himself in a

18   soaked sheet with liquid nicotine?

19   A    With nicotine, yes.

20   Q    And there was another episode when he tried to drink too

21   much water to kill himself?

22   A    Yes.

23   Q    And then the episode on the bus was in September of

24   2012?

25   A    Yes.

1    Q     Okay.  Did you get to the point where you believed that

2    Mr. Denton was going to kill himself and it was just a matter

3    of when and how?

4    A     Yes.

5    Q     During the time leading up to Mr. Denton's death, he was

6    seeing his counselors, and you were interacting with him.

7    A     Yes.

8    Q     And did it appear that he was in pretty good spirits in

9    those days?

10   A     Yes.

11   Q     Did you give any e-mails to the police on the 31st, or

12   was that on January 1st?

13   A     I can't remember what day it was.  All I know is that I

14   found the -- the e-mails around the place and they came to

15   pick it up.

16   Q     Okay.  And did you turn over all of the e-mails that you

17   found?

18   A     Yes.

19   Q     Okay.  Do you know whether or not the police ever

20   conducted a search of Mr. Denton's home?

21   A     I think so.  I don't know.

22   Q     Okay.  Did your family become kind of worn down by

23   Mr. Denton's suicide efforts and --

24   A     No.

25   Q     No?

1    A      No, it was my uncle.  No matter what he did -- no.

2    Q      Okay.  Did you write that you had had enough of Andrew's

3    constant pleas for help and empty threats?

4    A      It was -- it was draining because I was working

5    full-time and looking after Matthew as a single parent, and it

6    was mentally draining.  But I was always there for him.

7    Q      Okay.  Mr. Denton was a very organized person?

8    A      Yes.

9    Q      Everything had to be in its place?

10   A      Yes.

11   Q      And was in its place for a reason?

12   A      (Nodding head up and down.)

13          MR. RIDGE:  Thank you very much.  That's all I have.

14          THE COURT:  Redirect?

15          MR. FRANK:  No, Your Honor.

16          THE COURT:  Thank you.  You may stand down, ma'am.

17          THE WITNESS:  Thank you.

18      (The witness left the witness stand.)

19          THE COURT:  Next witness?

20          MR. FRANK:  Is Michael Barrett, Your Honor.

21          THE CLERK:  Please raise your right hand.  Do you

22   solemnly swear that the testimony you shall give in the matter

23   now in hearing shall be the truth, the whole truth, and

24   nothing but the truth, so help you God?

25          THE WITNESS:  I do, I so swear.

1            THE CLERK:  Please be seated.

2            THE WITNESS:  Thank you.  Thank you.

3            THE CLERK:  Please state your name and spell your

4   last name for the record.

5            THE WITNESS:  My name is Michael Barrett,

6   B-a-r-r-e-t-t.

7            MR. FRANK:  Thank you, Your Honor.

8   MICHAEL BARRETT, having been duly sworn, was examined and

9   testified as follows:

10                      DIRECT EXAMINATION

11  BY MR. FRANK:

12  Q    Good morning, Mr. Barrett.

13  A    Good morning, sir.

14  Q    Mr. Barrett, where are you from?

15  A    I'm currently resident in a small town on the east coast

16  of Yorkshire call Hornsea.

17  Q    Hornsea?  And is that in the United Kingdom?

18  A    Yes, it is, sir.

19  Q    And how long have you lived there?

20  A    12 years now.

21  Q    And how is it that you got here?  Did we -- did we bring

22  you here?

23  A    Yes, sir, in connection with a detail on Holland Street

24  in Hull.

25  Q    An incident that happened there?

1    A       Yes, sir.

2    Q       Okay.  Mr. Barrett, are you working these days?

3    A       Retired.

4    Q       How long have you been retired?

5    A       Since a year last May.

6    Q       And what are you retired from?

7    A       I was a paramedic with the Yorkshire Ambulance Service

8    NHS Trust.

9    Q       And what is HS (sic) Trust?

10   A       Oh, I'm sorry.  NHS Trust, National Health Service

11   Trust.  It's an organization.  It's a parent organization for

12   the ambulance service in that county.

13   Q       Okay.  And how long were you a -- in -- in the National

14   Health Service at --

15   A       Altogether, I started in 1995, and I worked in the

16   control room at Birkenshaw, near Bradford.  Transferred out to

17   Leeds and then eventually wound my way out further out towards

18   the coast and ended up in Hornsea.

19   Q       Okay.

20   A       On the day of the events, of course, we were in working

21   in Hull, just on the way back.

22   Q       All right.  But before we get to the -- the day in

23   question, tell us how the -- the health service and the

24   ambulance service works.  How does that work in -- in the UK?

25   A       The ambulance service is -- well, the UK is divided up

1    into regions that don't quite equate to U.S. states, but if

2    you imagine that you divide the whole of the UK into about 12

3    parts.  Yorkshire is one of the Shire counties, and it is the

4    largest geographical county, and it has its own ambulance

5    service, but they're on national guidelines and a national

6    registration process that govern what the paramedics do.

7         So the training is all to the national standard, but the

8    local medical director will change, alter, approve, or not

9    approve some drugs that varies slightly from the national

10   standards because each NHS Trust is a discrete body, and

11   that's the way it's all organized.

12        So there are 12 ambulance services, or thereabouts, in

13   the UK, each of which is autonomous in terms of hiring,

14   firing, doing their own human resource issues, but the

15   training is a national standard governed by the Health Care

16   Professions Council.  So in the same way that a doctor was

17   found guilty of malpractice, negligence, they could be struck

18   off the register and not work again, it's the same sort of

19   arrangement for paramedics.

20   Q    Okay.

21   A    Sorry.  I'm very dry.  I'm a bit nervous.

22   Q    Do -- do you have some water there?

23   A    Thank you.

24   Q    Would that help?  Okay.  And -- and what's the job of a

25   paramedic over there?

1   A      Probably very similar to the paramedics here.  My job,

2   which I loved for a lot of years, was to be a bit of

3   everything really.  One day -- one job you could be a social

4   worker, but not qualified.  The next one you have to be a

5   firefighter, but not qualified.  Sometimes you're a policeman

6   wrestling with the drunks, not qualified.  We would treat

7   medical cases.  Well, just anything you could read about, any

8   story in the newspaper where an ambulance has attended will be

9   up to us to sort out.

10         And the way that works in practice is that because of

11  the training that we get, we will go and effectively we will

12  formulate a working diagnosis, so we will examine you

13  ourselves, two of us in a crew.  We will then, if necessary,

14  formulate a treatment regime.  We will prescribe from a

15  certain list of prescription-only medications.  We will

16  administer those medications through a variety of routes.  We

17  can also carry out some skills like intubation, cannulation,

18  and we don't need to refer to any other physician or doctor.

19  We just have to explain hopefully that we're doing the right

20  thing after the events.

21  Q      Do --

22  A      So anything and everything that would require somebody

23  somewhere to call, in our case, 999, or 911, and -- and ask

24  for help, that's what they would send us to.  We would get the

25  address and a rough idea of what it was, and then we were

1   responsible then for sorting out their problems, whatever that

2   problem may be.

3   Q     Okay.  And when you referred to doing a number of things

4   that you weren't qualified for, let me just make sure I

5   understand correctly.

6        I take it you find -- this is all in connection with

7   working as a paramedic --

8   A     Yes.

9   Q     -- that you find yourself in these situations where you

10  may have to provide bereavement --

11  A     Yeah.

12  Q     -- consolation to -- to -- to someone on the scene?

13  A     Yes.

14  Q     Correct?

15  A     That's correct.

16  Q     Or -- or even it sounded like, on occasion, act in a --

17  in a law enforcement capacity on the scene of some incident?

18  A     Yeah, if a drunk comes and swings at you during the

19  night, you will definitely try to avoid any conflict, and if

20  that doesn't work, you'll get one in quick and then run away

21  as fast as you can.

22  Q     All right.  And I take it these are all -- in your

23  almost 30-year career, you've had many of these --

24  A     Hm-hmm.

25  Q     -- experiences.

1   A       Yeah, yeah.

2   Q       But you, in the first instance, were trained and

3   qualified --

4   A       Yeah.

5   Q       -- in the --

6   A       In this national system.

7   Q       -- in the system that you've -- you've described --

8   A       Yes.

9   Q       -- as a paramedic.

10  A       Yeah.

11  Q       And can you tell us a little bit what that training is?

12  A       Well, it keeps changing.  Every five minutes, they seem

13  to change the rules.

14          In my case, I -- it was a very strict regime where you

15  started -- in my case, I started in the control room and just

16  moved outpatients for outpatient appointments.

17          Then after that, I progressed on to -- not so highly

18  qualified, but I was able to deal with patients -- is what

19  they called an ambulance technician.

20          And then from that, the progression was up to paramedic,

21  and then my career went into supervisory work and acting

22  manager at one point.

23          And then it just came time for my son to go to a

24  different school, and we didn't live in a good part of town,

25  and we decided we would head for the coast.  So I then stepped

1    back to the role of paramedic operationally on a vehicle.

2    Q     Back from a supervisor --

3    A     Yeah.

4    Q     -- to a paramedic?

5    A     Yeah.

6    Q     Okay.

7    A     Because it really suited, it was lovely.

8    Q     Because you enjoyed it so much?

9    A     I miss the job, I miss the job.  There were no

10   vacancies, to be fair, and mainly because they keep changing

11   the way they organize things.

12         And I was -- I applied for the job of station officer,

13   which is sort of two pips, and I got the job, and within

14   probably about three weeks, I think, they scrapped the whole

15   program with the up-station officers, and I'd just been

16   promoted back up again, so that was a disappointment.

17         The training regime is very good.  It makes you

18   independent; it makes you capable; and then on top of that,

19   it's the experience that you gain as you go along where you

20   repeatedly go out to details and you repeatedly do the same

21   thing over and over again.

22         But the way we work and -- and the reason we're

23   autonomous is that we've got very clear guidelines and

24   protocols.

25   Q     And, ultimately, it sounds like you have a good deal of

1    authority to actually treat patients --

2    A    Yes, yeah.

3    Q    -- on the scene of these incidents as you've described.

4    A    Yeah.

5    Q    So let me direct your attention to December 31st of 2012

6    and ask you how it is that you became involved in this

7    chemical suicide of Andrew Denton on Holland Street in Hull.

8         Was that within your area of geographic responsibility

9    at the time?

10   A    Yes, sir, the whole of Yorkshire now is -- is all our

11   territory in the sense that if you're the nearest vehicle,

12   regardless of how far you've traveled to get to the hospital,

13   even if just visiting, if you are the nearest vehicle to the

14   next emergency, then you will be sent.

15   Q    And was that the case?

16   A    That was the case this time.  We started work about

17   15 miles away.  We dropped a patient off at the local hospital

18   15 miles away from where we started, and we were actually on

19   the way back to the station.  And we were only, I think from

20   memory, about four minutes away from Mr. Denton's house, so,

21   therefore, we were given the emergency call.

22   Q    And when you say we, who -- who is we?

23   A    Robert Colombari.

24   Q    So --

25   A    Robert Colombari was my colleague --

1    Q      Who was --

2    A      -- on the day.

3    Q      He -- he was your partner that day?

4    A      Yeah, he was an assistant practitioner.  Their role, if

5    you like, was mainly to drive and assist me in doing what I

6    was doing at that time.  That job's changed, as well, so,

7    historically, that would have been his role at that time.

8    Q      Okay.  So what happens?  You -- you -- you get the call?

9    A      Hm.  The details come up on the screen in the cab

10   where --

11   Q      There's a -- is there a radio or something?

12   A      There's a radio.  There's a -- a display screen, MDT

13   screen.  On that, you get the details, which, in this case,

14   were query sudden death at this address, and then we respond

15   by -- you just press the button on the dashboard and that

16   says, yes, we are mobile on this detail.

17   Q      Okay.

18   A      And all the times are taken from that.

19   Q      All right.  So you -- what happened when you got to the

20   scene at -- was it 117 Holland Street; is that right?

21   A      No, just 17.

22   Q      Just 17?

23   A      1-7, yeah.  We -- in response to a sudden death, we

24   won't take anybody else's word for it.  We will always take

25   our equipment in, ready for a full resuscitation attempt, and

1    it doesn't matter what state people say their relatives are.

2    We could not, in truth, go into the house expecting to find a

3    deceased person and then have to run back out to get our

4    equipment to come back in to start CPR.  That needs to be a

5    very rapid response and a thorough one.

6    Q    So what sort of equipment are we talking about?

7    A    Too much to carry often enough.  A large rucksack with

8    medical equipment and a defibrillator in one hand and then we

9    have another bag that we call a resus bag, which contains a

10   bag-valve-mask and the laryngoscope and endotracheal tubes,

11   breathing tubes that you put into somebody's windpipe.

12   Q    And the first item you mentioned, was that a rucksack?

13   A    It's a rucksack; it's a backpack.  Is that what you'd

14   call it?  Just a large haversack.

15   Q    Okay.  So you went in with your equipment?  What was the

16   situation there when you got there?

17   A    We were met by a lady who introduced herself by name as

18   Gail.  She made us aware that the deceased person upstairs --

19   was upstairs and that that was her uncle, so she identified

20   herself to me as the niece of the victim.

21        We said, thank you.  Can you show us where to go?  We

22   went up the stairs.  At the top of the stairs, we turned left

23   down a little hallway to the small bedroom, the diagonally

24   opposite left-hand corner on the first floor.

25   Q    Can you describe this apartment for us?  Is it -- is it

1   one level, two levels, ground level?

2   A      It's what we would call a two up, two down -- two rooms

3   downstairs, two rooms upstairs, a bathroom and a bit of a

4   kitchen, as well.

5   Q      Okay.

6   A      Small house.  It was immaculately clean.  As we walked

7   through the door -- this was New Year's Eve, but he'd bought

8   some Christmas presents for the rest of the family, all

9   wrapped beautifully in packets, and he'd gotten those in a

10  black bin bag on the sofa that was opposite, and there was a

11  red basket we later found out with -- all his documentation

12  was in that basket, everything we needed to know was in there.

13         So the house was beautifully clean.  The man lived

14  alone, and he'd obviously taken great pains to -- to put all

15  his affairs in order.  But that became apparent more later.

16  The initial approach is to get there as fast as you can --

17  Q      Okay.

18  A      -- and see what's --

19  Q      All right.  And what -- how did you assess the

20  situation?

21  A      We went into the bedroom.  So -- well, the body of a

22  male laid, fully clothed, on top of the bed, on top of the

23  bedding, not under the duvet or anything.  And -- and he was

24  -- we examined -- I examined him.

25  Q      All right.  And how did you examine him?

1   A     Well, first of all, the initial approach, you would have

2   a look.  He was unresponsive.  When I examined him, there was

3   no palpable pulse, so you would feel for the pulses.  There

4   were no breath sounds.  When I got my stethoscope out, there

5   were no heart sounds.  He was cold to touch.  And rigor mortis

6   was present.

7         At that point, we then need to complete our examination,

8   in this case, by doing an ECG trace -- is it EKG -- heart

9   trace, the electrical activity in the heart.

10  Q     How do you do that?

11  A     Attach the monitor leads, turn it on, and observe the

12  screen.  We do that for a minute because obviously he was cold

13  to touch.  He may just have been extremely hypothermic or --

14  so we would look to see whether there's a profound bradycardia

15  or not, and the original standards used to be for 30 seconds

16  but they upped it to a minute.

17        We then record a trace of the heart rhythm, in this

18  case, a flat line.  That's known as asystole.

19  Q     Known as what?

20  A     Asystole, a-y -- s-y-s-t-o-l-e.

21  Q     Asystolic?

22  A     He was asystolic.  Systolic system is working; asystolic

23  is not working -- prefix.

24  Q     Okay.

25  A     That's important because on our documentation, some of

1    the criteria that we have with regard to asystole and the

2    length of time and whether CPR has made progress or not, so we

3    record that strip, and then we include it with our

4    documentation that then goes on to the police officer usually

5    that we hand over to.

6    Q    And is there a protocol that you go through?  It sounds

7    like there is.  You described the beginning of it, correct?

8    A    Yeah.

9    Q    What -- what -- what is the protocol?

10   A    So we would document everything we've done, and I think

11   you'll probably have a copy somewhere of a thing called a PRF,

12   Patient Report Form -- this is actually a big form in size --

13   we fill in for every single patient encountered so all the

14   details go on there, all the observations that we take go on

15   there, and that's just standard for every job.

16        There are lots of little buttons, radio buttons because

17   they like us to do a lot of work, if they can get away with

18   it, so they make it quick for us to fill in these encounters.

19   There's also some free text space to make any notes or

20   observations.  And it's a standard form that would apply in

21   every circumstance, including a sudden death.

22        But when it's a sudden death, there's not that much to

23   fill in on the main form.  So you then move to a well-trodden

24   path, which is called Recognition of Life Extinct -- that's an

25   R-O-L-E, ROLE Form -- and that's very clearly laid out and

1    quite simple.  That's a document more for continuity for

2    recording purposes.  We've done what we were supposed to do,

3    we've found what we've found, and I've documented why I've

4    said this person is deceased or at least that life is extinct.

5    There's a legal distinction that I really don't understand.

6          But what it means is that I'm allowed to do that, so

7    that's what I do and I stick to that protocol and fill in that

8    form.  That records both my actions on the day and who I hand

9    Andrew, in this case, over to.  Then -- we usually call in for

10   an officer, and then they would go in there, as well.  So the

11   -- in evidence, we can say that I did arrive at that address

12   and there's the documentary proof, I did do what I said on

13   that form, and there's my proof, there's my evidence.  And

14   that follows on right through to the person I hand it over to,

15   in this case, a police officer.  So it follows a chain.

16   Q    All right.  And in this case, did you do that --

17   A    I did.

18   Q    -- with respect to Mr. Denton?

19   A    Yes, sir, I did.

20   Q    And what was your -- your determination or conclusion

21   ultimately?

22   A    Within two minutes of being there, we completed the

23   checks that we needed to do and we concluded that life was

24   extinct.

25   Q    All right.  And did you have further business there at

1    the -- at the --

2    A    Yeah.

3    Q    -- scene of Mr. Denton's death?  What was that?

4    A    Well, our first duty is always to the patient or the

5    victim.  So in terms of treatment, if there was any

6    discrepancy -- if there was a domestic abuse case and the

7    husband said that the wife didn't want to go, but she was the

8    victim, we don't care what he says, it's nothing to do with

9    him.  Our duty of care lies with the patient.  And that

10   happens and it is adhered to with every job, except for

11   something like this.

12        With every job, there's going to be collateral damage.

13   Relatives are going to be really distraught.  You are there

14   for them as much as being there to do the documentation and

15   doing what you need to do.  Once you've done the paperwork and

16   the routines that we need to do, which physically doesn't take

17   long, our main concern then is to look after the welfare of

18   the people, you know, whoever's on the scene.

19   Q    Who was that in this case?

20   A    Gail Coates, Mr. Denton's niece.

21   Q    Okay.

22   A    Yeah.

23   Q    And what did you do with Ms. Coates?

24   A    She helped us enormously.  She gave us some information,

25   some background information about Mr. -- sorry.  Is this loud

1    enough?

2        She gave us all the background information that we

3    required for the paperwork.  She told us a brief history of

4    his mental health.  She described a number of agencies and the

5    number of people who'd tried to help Andrew, and he was still

6    undergoing a treatment regime at that time, and she also

7    explained some of the circumstances that had led up to what

8    she believed the events of the day were.

9    Q    And what were those circumstances?

10   A    Very unusually.  She, having helped us as much as

11   possible, made reference to Andrew having had several previous

12   suicide attempts using different methods.  Unusually this

13   time, Andrew had presumably done some research and decided

14   that cyanide would be the best method of suicide for him.

15       So she said that he'd sent away to the U.S. for some

16   suicide (sic) -- it was an Internet transaction, I believe,

17   and that the cyanide, in inverted commas, had arrived, and

18   he'd taken the cyanide and it hadn't worked.

19       She said that he rang the U.S. and asked to speak to the

20   FBI, and he complained about this.  But it seems that he also

21   contacted the person who sold the cyanide to him.  It was a

22   financial transaction.  He'd contacted that person, and that

23   person apparently obtained, in this case, what she described

24   as cyanide and sent it through the post and it had arrived at

25   Mr. Denton's house.  It appears as though he took it.

1   Q     Did she -- did she point out the cyanide or what she

2   thought was the cyanide there in the -- in the apartment?

3   A     There was -- at the bottom of the stairs, in the bottom

4   left-hand corner, there was a bureau, what we'd call a bureau,

5   a sort of slopey writing desk with a drawer in it and

6   cupboards.  She went to the bureau, and she produced the

7   envelope.  My colleague, Rob, sort of had a look at it, and

8   she said, that's it, that's the envelope, that's the cyanide.

9   Q     And did you see the envelope?

10  A     I did.  I'm vague as to its contents now because it's

11  been some time, but I did see the envelope, and I thought

12  Robert put it back onto the mantelpiece over the fireplace,

13  the like countertop over the fireplace.

14  Q     So your colleague, Robert Colombari --

15  A     Handled it.

16  Q     -- put -- handled it?

17  A     Yeah.

18  Q     Strictly speaking, is that -- is that proper?

19  A     No, he was enthusiastic, he was fairly new, and he

20  wasn't -- well, my job really was looking after Gail and

21  getting the information.  His job didn't exist at that point

22  unless I asked him to do something.  He was -- stood next to

23  Gail, so he got ahold of the envelope.  I wouldn't have

24  touched it because it's evidence, and, you know, if there are

25  any fingerprints or anything on it, then we're told not to get

BARRETT - DIRECT EXAMINATION/FRANK

1    involved.

2         Gail also said that there was a suicide note, but I -- I

3    didn't see it.

4    Q    You mentioned a basket of --

5    A    Yeah.

6    Q    -- of -- of material.  What are you -- what are you

7    referring to there?

8    A    If you imagine a laundry basket, but a really small one,

9    the size of this screen, just like a little red plastic

10   basket, but in there was a pile of information, paperwork.

11   You can imagine all your bills would need to be paid, all the

12   bank would need to know, everything, all that sort of stuff,

13   along with his ID and his rent book or whatever and all the

14   paperwork you'll need was in there.

15   Q    Well, when you -- when you learned that cyanide might be

16   involved, I mean, did that change the situation for you at

17   all?

18   A    It came as a surprise.  We -- we'd been told that it was

19   a -- a sudden death.  There was no indication of it being a

20   chemical suicide.  In the bedroom, which was really sparsely

21   furnished, there was a single bed, and there was a glass -- an

22   empty glass, a drinking glass on the floor by the bed.

23   Q    This is the bedroom where --

24   A    This is the bedroom where the body was, yeah, and that

25   was the only evidence that we saw.  So given his mental health

1   state, it was intimated that it would be -- he's taken -- he's

2   taken an overdose.

3        At that point, we still didn't know that it was cyanide,

4   so we came downstairs.  Now, our risk assessment, if you like,

5   is a dynamic process.  We have a thing called Safety Triggers

6   for Emergency Personnel; it's a step one, step two, step

7   three.  Step one is if it's just one patient and you're going

8   into a known set of circumstances where there's already a

9   bystander on scene who's come to no ill harm, ill health,

10  hasn't suffered from being there, and, again, there were two

11  dogs in the kitchen of the house.

12  Q    Why is that significant to you?

13  A    Well, because it's like a canary down a pit, it helps

14  you form an opinion as to whether it's safe to even be there

15  or not.  It was very cold and gray and dismal weather, but

16  given that we'd been told that and yet the scene appeared

17  safe, you know, the wraps were still together, there was only

18  one glass that'd been used, we didn't know even then, even

19  though he'd sent for it, whether he'd taken it or not, we --

20  you know, we just didn't know.  But the cir -- the

21  circumstances on the scene were -- appeared safe.

22       Had it been mentioned to us that this was a chemical

23  suicide that we were attending, we wouldn't have even gone in.

24  We would have got Gail to come out, stand shivering in the

25  doorstep, or more likely put her in the vehicle to keep her

1   warm, and -- and then sent for the calvary.  No one would have

2   gone in.

3          But we were in, and we'd been in, and we'd handled the

4   body, and we'd done what we needed to do, and since we hadn't

5   keeled over immediately, we assumed that, well, you know, it's

6   probably safe to stick around.  So we did get the dogs

7   outside.  Rob took the dogs out.

8          And even then, there were two dog bowls with the dogs'

9   names on them, all the records, all the vaccinations for the

10  dogs.  It was all -- everything was very organized.  They went

11  outside into the yard -- to the backyard through the back door

12  to get some fresh air.  We sat by the front door because it

13  was really cold, and we just carried on with the front door

14  open on the edge of the sofa, just filling in the paperwork

15  and talking.

16  Q    Where were the police during --

17  A    We sent for the police within, I will say, about five

18  minutes of actually making the diagnosis, so that would have

19  been about 20 -- 20 past, 21 minutes past.

20         The delay there was we've still got ahold of Gail and

21  we've still got Gail.  So, you know, the first thing you're

22  going to do is turn around and tell Gail that's it, and

23  whatever response you get from that, you've got to deal with.

24  But then the next thing to do is to contact the police and say

25  we've got a sudden death, there may be suspicious

1   circumstances, and wait for them to arrive.

2   Q      And did they arrive?

3   A      About three-quarters of an hour later, I think, yeah.

4   Q      All right.  You were still there when they arrived?

5   A      Oh, yeah, yeah.

6   Q      How long after they arrived did you depart the scene?

7   A      Um, we were still there for quite a while because,

8   interestingly, the police officer who I handed it over to knew

9   Gail and knew the family and knew Andrew and had been involved

10  in the past.

11  Q      When you say who you handed over to, what -- what do you

12  mean?

13  A      Sorry.  That's an official thing where my duty of care

14  is to the patient.  Secondary to that, I have to document my

15  actions; that's a legal thing.  Subsequent to that, I have to

16  say at some point that my duty of care to that patient is

17  being discharged, so I'm no longer responsible now for what

18  happens to that person.  Normally that will take place in an

19  emergency department in a hospital where I would hand over --

20  officially hand over care for the patient to another clinician

21  or a nurse or whoever.

22  Q      After you have transported the patient?

23  A      After we've transported the patient and booked the

24  patient into the hospital.  Once we cross the threshold, we're

25  still responsible for the patient until we formally hand over

1    to another healthcare provider.

2        In this case, we were never going to do that.  So in

3    this case, the person I handed over responsibility to at that

4    point, having discharged my duty of care, was the police

5    officer who came next.  She then becomes the coroner's

6    officer.  It's a legal thing that happens in England, and --

7    but basically it means that she will be unsuitable to the

8    coroner and she will organize the file, as far as I'm aware,

9    until or unless it's handed over to someone senior.  But,

10   again, that will be documented so you've got the chain of

11   evidence and chain of who is responsible for what, where, and

12   when.

13   Q    Do you remember the name of that officer?

14   A    I do because I got it wrong in my statement.  I'd

15   written it -- I think it was -- I put WPC Cowley.  When I came

16   to write my statement after a month or so when I was asked, I

17   looked at a copy and I thought she was called Coffey, so my

18   statement says Coffey, but it's actually Cowley, I believe,

19   yeah, so she was the person that I then handed over to.

20       But we don't just draw a line in the sand.  There then

21   was some conversation and we've got to, first of all, identify

22   that this was a toxic substance if he'd taken it, and,

23   therefore, there was a health risk to anybody who examines the

24   -- the contents.  And in this case, with it being cyanide, it

25   was flagged as being something that really needed a lot of

581

1    dealing with, and -- and then the balloon went up from there.

2    Q     Mr. Barrett, I'm showing you what's been marked as

3    Government's Exhibit 71 for identification, ask you to take a

4    look at that, and tell us if you recognize it, please.

5    A     Thank you.  To do that, I should use the other specs.

6    Yes, that's a -- that appears to be a copy of the Patient

7    Report Form that I completed on the scene.

8    Q     In connection with this?

9    A     This event at Holland Street in Hull on the 31st of

10   December, 2012.

11        MR. FRANK:  And, Your Honor, I'd move Exhibit 71

12   into evidence.

13        THE COURT:  Any objection?

14        MR. RIDGE:  No objection, Your Honor.

15        THE COURT:  71's admitted.

16   BY MR. FRANK:

17   Q     And then let me -- I'm sorry.  Let me show you 72 for

18   identification, ask you to take a look at that, and tell us if

19   you recognize it.

20   A     That's a Recognition of Life Extinct Form that we would

21   fill in, and this one appears to be the one that I filled in

22   and signed on the 31st of December, 2012.

23   Q     Regarding Mr. Andrew Denton?

24   A     Regarding Mr. Andrew Denton, sir, yeah.

25        MR. FRANK:  And I'd move Government's Exhibit 72

1  into evidence.

2          THE COURT:  Any objection?

3          MR. RIDGE:  No objection, Your Honor.

4          THE COURT:  It's admitted.

5          MR. FRANK:  And request permission to publish them?

6          THE COURT:  You may.

7          MR. FRANK:  Starting with 71, please.

8  BY MR. FRANK:

9  Q    And, Mr. Barrett, if it would be helpful, you -- you can

10 highlight items by touching the screen.  But can you just

11 explain to the jury what -- what -- what you've done in this

12 form here?

13 A    Yes, sir, but it's very blurred, I think, on my copy.

14 I'm --

15 Q    Can you not make it out well?

16 A    Can't read my writing, but I can tell you basically --

17 oh, that's better, sir.  Thank you.  Who's doing that?  That's

18 better.

19 Q    Does that help?

20 A    Yes, sir.

21 Q    And how do you know what this form relates to?

22 A    This is a form that I used seven or eight times a day

23 every day during my -- latter part of my career since it was

24 published.  This is a Patient Report Form.  If you -- can I

25 highlight this or --

1    Q     Yes, you can by touching it with your finger.  For

2    example, I've circled the upper left-hand corner in green.

3    A     Good man.  That's the Patient Report Form designator.

4    Q     Okay.  In the top center?

5    A     Yeah, top center, and there's a version number next to

6    that, but these things come by the thousand and they're

7    printed in large numbers.

8          The top left-hand corner that you've put the details in

9    is a region of the form that's populated with having the

10   certificate of information, in this case, the top left, the

11   date, the incident number, which is a unique identifying

12   number, for this detail.  So any documentation that relates to

13   this case by the ambulance service all will be queried by that

14   number right there.

15   Q     Okay.  So that's in the top left-hand line?

16   A     That's it.

17   Q     Past the date?

18   A     Yeah.  This is page 1 of 2, and I don't know where that

19   says that.  It must be on there somewhere.

20   Q     Okay.

21   A     And -- and -- and these bits here, PAR is my designation

22   as a paramedic.  AP stands for assistant practitioner.  My

23   unique identifying number is 2466.  No one else in the

24   Yorkshire Ambulance Service has that number.  If that number

25   appears on any documentation, they will come to find me to

1    find out what it's all about.

2        Underneath that, there's another one there, which -- for

3    this form, I've left the number of my colleague, who also has

4    a unique identifying number, his is 3315, I've left that blank

5    because he didn't complete this form.

6        On page 2 -- and I would say page 2 is the Recognition

7    of Life Extinct Form -- his number does appear on there so

8    that, again, we were both involved in completing that process.

9    He witnessed the fact that I declared life extinct, following

10   protocol.

11   Q    And if I circle this area of the form --

12   A    Yeah.

13   Q    -- what does that signify?

14   A    Just above that, we can -- medical -- the address of the

15   incident, that can be the name of a pub, a junction.  In this

16   case, it says, 17 Holland Street, Hull.

17   Q    That's right there?

18   A    That's right there, and the post code for that is

19   HU9 2JB and that appears just there.  And that's a unique

20   locator for where the incident was, in this case, a house, so

21   it's quite straightforward.  But if you're three miles down a

22   ditch, you've got to do your best to approximate that.

23       The name underneath that, surname first and then Andrew

24   -- well, Denton, Andrew Robert is the information that we were

25   given about -- to identify the person that we'd seen upstairs,

1    and Gail Coates gave us this information, and we completed it

2    with his age and date of birth --

3    Q     Okay.

4    A     -- and sex.

5    Q     How about if we turn to the Recognition of Life Extinct

6    Form, Exhibit 72?  And can you do the same with us here?

7    Explain to us --

8    A     The top shaded-in portion -- well, first of all, it's a

9    Recognition of Life Extinct, ROLE -- this is version 9 --

10   Form.  It -- there's a note on there, just there, that says,

11   in addition to this form, the main PRF must be completed.

12   Q     And you've just done --

13   A     We've just done the PRF, yeah.

14   Q     Okay.

15   A     So, again, the same details go on for the resource

16   locators, in this case, 31st of December, 2012, job No. 1294.

17   Our call sign for the vehicle, which was 1635.  It's like an

18   engine number or a troop number.  Horn is the standard

19   abbreviation for Hornsea, which is our station, and this is

20   where it says, this is page 2 of 2.  Because it's the second

21   page and because Rob filled it in, it says, AP3315RC, that's

22   Robert Colombari's initials, and above that PAR, paramedic,

23   2466, Mike Barrett, that's me.

24   Q     All right.  And if we just --

25   A     The patient --

1   Q      -- scroll down --

2   A      Yeah.

3   Q      -- what -- what is documented here as we scroll down?

4   A      If you are seeing the same as me, just here, Denton,

5   Andrew Robert, again, identifying the patient that we found at

6   this location on this job; his age; his sex; the fact that the

7   49 relates to years as opposed to in months or weeks, the date

8   of birth of the patient, which is shown here; and, again,

9   fairly clearly, the patient address is 17 Holland Street,

10  Hull, which is in the County of East Yorkshire, and the very

11  scruffy-looking post code.  In this case, the patient's

12  address and the incident address were one in the same, so that

13  information was repeated across, just for completion, really.

14  Q      And how about this section here titled examination of

15  patient?

16  A      Yeah, that's -- that's the process effectively.  I've

17  documented there, with the little radio buttons here having

18  been checked, filled in, that there was no palpable pulse;

19  there were no heart sounds; there were no breath sounds; the

20  pupils were fixed and dilated; and there was an ECG showing

21  asystole taken at the time.  All that is confirmed.

22  Q      As you've described --

23  A      Yeah.

24  Q      -- previously, correct?

25  A      Yeah.

1    Q     And how about the next section here beginning police

2    requested?

3    A     Yeah, again, documentation for the continuity.  So did I

4    request the police?  Yes, so that was colored in.  Were the

5    police on scene when I left?  Yes.  The collar number of the

6    officer is there, 2485.  That would have been on the Patient

7    Report Form, as well.  GP contacted?  No, because I am able to

8    say life is extinct.  Was the GP on scene?  No, because we

9    didn't call the GP.

10   Q     GP stands for?

11   A     G -- sorry, general practitioner, that's the family

12   doctor that the patient's registered with.  It wasn't a

13   safeguarding issue.  There were no issues with the age.  All

14   the times that these things happened -- just a bit obstructed

15   -- but in there.

16   Q     On the boxes on the right?

17   A     Yeah, so at the time I made the call -- and I would not

18   do that not by telephone -- I would do that by my radio -- but

19   that was documented in control, the same -- there should be a

20   timestamp that says that call was made at 11:20 and we arrived

21   at 11:50.

22   Q     All right.  And last item in that box -- or the second

23   to last, what's the significance of that?

24   A     Where -- I'm sorry.  Where are we, sir?

25   Q     This -- this item here?

1   A     Oh, relatives or neighbors contacted.  I've put yes, but

2   we didn't contact them and ask them to come to the scene.

3   There -- there was a relative already on the scene, so I've

4   just noted that on the side.  So the time I gave for the

5   relative being on scene was 11:14, which must have been the

6   time we -- she believed arrived.

7   Q     Okay.

8   A     The last box is just the name of the doctor, the family

9   doctor, and the address of the surgery.

10            MR. FRANK:  Court's indulgence, Your Honor?

11            THE COURT:  Yes.

12            MR. FRANK:  I have no further questions for this

13   witness, Your Honor.

14            THE COURT:  Cross-examination, Mr. Ridge?

15                     CROSS-EXAMINATION

16   BY MR. RIDGE:

17   Q     Good morning, Mr. Barrett.

18   A     Good morning.  How are you?

19   Q     Mr. Barrett, after you examined Mr. Denton and reviewed

20   the scene --

21   A     Yeah.

22   Q     -- did you draw any conclusion as to whether or not this

23   death was planned?

24   A     Um, I'm not qualified to make that decision, but

25   everything we do is working on an assumption, so we don't make

1    a diagnosis.  We make a working diagnosis.

2         My assessment of that scene was that with evidence of a

3    suicide note, with preparations having been made for all the

4    affairs to be put into order, and with the general state of

5    the house -- clean, tidy, preplanned, the position of the body

6    fully clothed on the bed.  There was more information that

7    Gail gave us about the reason that Mr. Denton may have been --

8    may have been very depressed -- sorry -- in relation to his

9    girlfriend he met after quite a long time and suffering for a

10   long time from mental illness, met a girlfriend who used to

11   come and stay, but it was a platonic relationship.  She would

12   come stay for the weekend, but she would stay in that bedroom

13   that we found Mr. Denton in the single bed.  He would sleep in

14   his own room.  That bed where she used to stay is the -- is

15   the place that we found the body, and we were told that his

16   girlfriend had died suddenly.  But there was a long history we

17   were told of -- of mental illness.

18        So, yes, sir, I -- I would estimate, would guess that

19   that was a preplanned exercise.

20   Q    Okay.  Did -- did anybody handle the envelope that Gail

21   pointed out to your partner?

22   A    Gail handled the envelope as it came out of the bureau.

23   My colleague handled the envelope and -- and then replaced it

24   onto, I think, the mantelpiece, and then that was then handed

25   over, maybe even by Gail, to the police officer who came in

1    response to our call.

2    Q    Did anybody -- I'm sorry.  If you're not finished, I

3    didn't mean to cut you off.

4    A    No, that's fine.  Yeah, that's fine.

5    Q    Did anybody reach inside the envelope to remove the

6    baggie?

7    A    Not to my knowledge, sir, no.

8    Q    Okay.

9    A    I think it was sort of squeezed and opened, but nobody

10   -- I don't think anybody reached into it.  I'm a bit vague

11   after four years, but I don't believe so.

12   Q    Okay.  You wrote a report dated 12/31/2012, and my only

13   question about this report is why there was no mention about

14   your partner handling the envelope.

15   A    Our priority really is obviously preserve life, promote

16   recovery, look after people.  It's absolutely crystal-clear

17   that when we attend the scene such as this where there's

18   evidence involved, that that evidence will be seized by the

19   police, and it will be documented, and it will be presented

20   elsewhere.  We don't normally go looking for forensic detail

21   on scene.  Ours is much more of a human response.

22        We would, as in this case, note that such an object was

23   present in that room.  We would expect other witnesses or

24   police procedures to document and record and present that

25   evidence later on.  So we wouldn't really get involved in any

1    forensic aspects of it.

2    Q    But you recall your partner handling that envelope

3    today --

4    A    Yeah, yeah.

5    Q    -- even though you didn't include that fact in your

6    written report?

7    A    Yeah, yeah, I can tell you lots of details about the

8    house.  One of the things -- the written report, the written

9    report, the Patient Report Form, has to be brief because we

10   have another job to go to, and, you know, we're busy all day,

11   we're a scarce resource, and -- and we can't really be spared

12   for hours and hours on one scene.  So we are needed elsewhere

13   and that needs to be a fairly brief process.

14        The -- there's a longer written report that went to the

15   coroner.  I don't know if that's the one you're referring to.

16   That was a coroner's statement with a bit more detail in it.

17   But, again, even then, it's brief because the expectation from

18   our point of view is that we will be called to attend the

19   coroner's court because the coroner wants to know the

20   circumstances of the death and we're part of that process.

21        But if we haven't really anything useful much to say,

22   then ours is just for continuity, and a brief statement will

23   satisfy that requirement.

24   Q    Did you attend the coroner's court?

25   A    Yes, sir, I did, yeah.

1    Q    And what was the finding of that court?

2    A    Ah, well, we came out before the end.  I don't -- I

3    don't know.  I would guess the verdict was suicide.

4    Q    Okay.

5              MR. RIDGE:  Thank you very much, sir.

6              THE WITNESS:  You're very welcome, sir, and thank

7    you.

8              THE COURT:  Redirect?

9              MR. FRANK:  No, Your Honor.

10             THE COURT:  Thank you very much, sir.

11             THE WITNESS:  Thank you, sir.

12             THE COURT:  You may stand down.

13             THE WITNESS:  Thank you.

14         (The witness left the witness stand.)

15             THE WITNESS:  May I just ask, is that -- am I fine

16   to be dismissed?

17             THE COURT:  Yes, you are, sir.  Thank you.

18             THE WITNESS:  Thank you.

19             THE COURT:  Ladies and gentlemen, this is an

20   excellent time to take our midmorning break.  Why don't we

21   take a break for about 20 minutes.  I'll see you back here.

22   Don't discuss the case.  Thank you.

23         (Jury exited at 10:16 a.m.)

24             THE COURT:  Court will stand in recess.

25         (Court recessed from 10:17 a.m. to 10:43 a.m.)

1          THE COURT:  Would you bring the jury in, please.

2      (Jury entered at 10:43 a.m.)

3          THE COURT:  Mr. Frank?

4          MR. FRANK:  Thank you, Your Honor.  The government

5   calls Helen Cowley.

6          THE CLERK:  Please raise your right hand.  Do you

7   solemnly swear that the testimony you shall give in the matter

8   now in hearing shall be the truth, the whole truth, and

9   nothing but the truth, so help you God?

10          THE WITNESS:  I do.

11          THE CLERK:  Please be seated.

12          THE WITNESS:  Thank you.

13          THE CLERK:  Please state your name and spell your

14   last name for the record.

15          THE WITNESS:  It's Helen Cowley, C-o-w-l-e-y.

16          THE COURT:  Could you pull yourself up closer to the

17   microphone, ma'am?

18          THE WITNESS:  I'm sorry, sir.

19          MR. FRANK:  Thank you, Your Honor.

20   HELEN COWLEY, having been duly sworn, was examined and

21   testified as follows:

22                    DIRECT EXAMINATION

23   BY MR. FRANK:

24   Q      Good morning, ma'am.

25   A      Good morning, sir.

1    Q      Ms. Cowley, where are you from?

2    A      From Hull in England.

3    Q      And what is Hull?

4    A      It's a small town on the east coast.

5    Q      And how long have you lived there?

6    A      All of my life.  I was born there.

7    Q      And you're here today -- we brought you here to testify

8    in this trial, correct?

9    A      Yes, sir.

10   Q      What do you do in Hull?

11   A      I'm a police officer with the Humberside police.

12   Q      And -- and what do you do as a police officer?

13   A      I'm a front-line operational officer, predominantly

14   responding to emergencies.

15   Q      Do you wear a uniform?

16   A      I do, sir, yes.

17   Q      And how long have you been a front-line police officer

18   in Hull?

19   A      Since 2006.

20   Q      So about ten years?

21   A      Yes, sir.

22   Q      And what sort of -- what sort of matters do you deal

23   with as a front-line officer?

24   A      Everything and anything -- violence, sexual offenses,

25   thefts, burglaries, anything that's deemed an emergency.

1    Q    How big a place is Hull?

2    A    There's a population of 250,000, approximately.

3    Q    Do you have -- do you have special training to do your

4    work as a police officer?

5    A    Yes, sir, I do.

6    Q    What sort?

7    A    We have a -- an initial response training, and we have

8    self-defense training, what we call officer safety, and

9    also --

10   Q    What is the -- self-defense?

11   A    It's officer safety training.

12   Q    Officer safety?  Okay.

13   A    Just assists us with apprehending and restraining

14   offenders in incidents of violence.

15   Q    Okay.

16   A    I'm also what we call a SOIT officer, which is a sexual

17   offense-trained officer.

18   Q    Okay.  Have -- have you always been a police officer, or

19   have you done other things besides?

20   A    No, sir, before I was a police officer, I had two years

21   where I was a -- a parking enforcement officer.  And before

22   that, I had 24 years in the retail trade.

23   Q    In what?

24   A    In the retail.  I --

25   Q    Retail?

1    A    Yes, sir.

2    Q    Okay.  In connection with your duties as a police

3    officer there in Hull, were you involved in the investigation

4    of the death of Andrew Denton?

5    A    Yes, sir, I was.

6    Q    And -- and did you have experience with Mr. Denton prior

7    to his -- his death in December of 2012?

8    A    Not actual contact with him, but I did have some prior

9    knowledge of him.

10   Q    Okay.  Because of his prior suicide attempts?

11   A    Yes, sir.

12   Q    All right.  Well, tell us about how you became involved

13   on December 31st of 2012.  Were you on -- on patrol?

14   A    Yes, sir, I was on mobile patrol with my colleague, PC

15   Birt, when a call came in reporting the sudden death of a

16   male.

17   Q    When you say, mobile patrol, what -- what does that

18   mean?

19   A    We were in a marked police vehicle.

20   Q    Okay.  You and Birt were?

21   A    Yes, sir.

22   Q    All right.  And -- and you get the call.  What's the

23   call for?

24   A    It comes from our -- we have Airwave sets and that comes

25   from our command unit.  The command control unit received a

1  call from the ambulance to say that there was a report of a

2  deceased sudden death male, and because of my prior knowledge,

3  I recognized the name, I volunteered to attend the incident.

4  Q      Okay.  Is that the way it works?  Can you -- can you --

5  how do you decide who takes a call like that?

6  A      Our command unit actually -- they -- they have control

7  of who goes where, but usually if an officer has some

8  knowledge or -- it's just better if you can -- if you

9  volunteer to go yourself, it just makes it slightly easier.

10  Q      All right.  And you had some knowledge, so you

11  volunteered?

12  A      Yes, sir.

13  Q      And you and Birt responded?

14  A      Yes.

15  Q      Where did you go?

16  A      We went to 17 Holland Street.

17  Q      And what was the situation there when you arrived?

18  A      Upon arrival, there was family members at the address

19  already, and a paramedic was also there -- two paramedics.

20  Q      And what family members?  Did you know them or --

21  A      No, I didn't know them.  There were -- Ms. Coates was

22  there, and there was two males.  From memory, I think one was

23  her brother and one was her partner.

24  Q      Did they -- did the -- the men stay around?

25  A      Yes, they were setting in the living room.

1    Q     All right.  What happened?

2    A     Upon arrival at the address, I introduced myself to

3    Gail, Ms. Coates, and explained to her why we were here and --

4    because sometimes people are a little bit concerned about

5    police presence in -- in those situations, and then I went

6    upstairs with the paramedic and -- where the situation -- the

7    -- sorry -- the deceased was pointed out to me and the

8    circumstances were relayed.

9    Q     And what was your concern at that point?

10   A     My immediate concern is if there was any foul play

11   immediately obvious and we need to check the property for any

12   insecurities to make sure that nobody had broken in and also

13   to check the deceased to make sure there was no immediate and

14   obvious signs of foul play.

15   Q     And can you describe the apartment?  What sort of

16   condition was it in?

17   A     Okay.  It was a midterrace property and -- ground floor

18   and the first floor.  On the ground floor, there was a lounge

19   and a kitchen.  Up on the first floor, there was two bedrooms

20   and a bathroom.  It was immaculately clean inside; there was

21   nothing out of place; everything was just immaculate.  There

22   was just an overpowering smell of urine and dogs because there

23   were two very large dogs in the kitchen.

24   Q     The dogs were alive?

25   A     Yes, yes, they were well.

1   Q     But I take it they'd been there for a long time?

2   A     Apparently so, yeah.

3   Q     All right.  What else do you recall about the condition

4   of the apartment, anything?

5   A     Nothing other than what I've mentioned.

6   Q     How about the decedent, where was he?

7   A     The deceased was in the back bedroom, and he was laid on

8   the -- on a single bed.  And it was apparent it was the spare

9   room, and he was just laid on his back.  His legs was slightly

10  over.  He was fully clothed.  His legs was over with his feet

11  on a corner, and his elbows were bent, his hands on his chest.

12  Q     Did you notice any sounds of -- any signs of foul play

13  or that there was anything --

14  A     There was nothing immediately obvious that was a cause

15  of death at the time, and -- but then the paramedic heard --

16  when he was giving me the circumstances, the paramedic had

17  suggested that there might be a chemical involved.

18  Q     Did he say what chemical?

19  A     It's cyanide.

20  Q     All right.  And what did you do with that information?

21  Was that a concern to you?

22  A     It was, it was an immediate concern because of the

23  potential dangers to everybody else.  Upon receiving that

24  information, I went back downstairs and spoke to Ms. Coates

25  and -- to see what she could tell me about that information.

1    Q      And what did she tell you?

2    A      She pointed out to me an envelope that was on the

3    mantelpiece in the lounge, and she told me that she previous

4    -- prior to my arrival, she'd taken it out the sideboard, of a

5    drawer, and she handed me the envelope.  I looked inside, and

6    there was a -- a small wrap of white crystally powder, which

7    she told me she believed and thought was the cyanide

8    responsible for her uncle's death.

9    Q      And what did you do with that information?

10   A      I documented that in -- in my notebook, and I put the

11   envelope back where it was and sought more advice from a more

12   qualified officer than myself just to get some advice as to

13   what to do.

14   Q      And who was that that you consulted?

15   A      That was a PC Somerso (phonetic).

16   Q      And why -- why did you consult Somerso?

17   A      He is an officer of what we call CBRN trained, which is

18   a chemical, biological, radioactive, and nuclear-trained

19   officer, and he has a better knowledge and -- of chemicals and

20   their potential hazards.

21   Q      And how did you consult him?  Was he there on the scene,

22   or -- or did you consult him by radio or phone?

23   A      Initially it was through the radio.

24   Q      Okay.  Did he come to the scene or --

25   A      I --

1    Q      What happened?

2    A      I believe so.  And the information that was passed to me

3    was to -- to get everybody out of the house immediately, which

4    -- which is what we did.  We just cleared the property, and --

5    and I was instructed to take the family home, to tell the

6    family to go home, and I followed the family to capture with

7    some identification statements, etc., which is required for

8    the -- for the coroner and --

9    Q      Let me stop for you a minute.  What are -- what are

10   antecedents?

11   A      Antecedent is -- it was an identification statement --

12   sorry about that -- and we just need for the coroner a

13   statement of identification for the deceased before any --

14   anything can -- can begin to happen and the autopsy.

15   Q      Okay.  I -- did I hear you say a statement of

16   identification, not antecedents, correct?

17   A      Yes.

18   Q      Okay.  I misspoke.  I'm sorry.  And the coroner, who's

19   this coroner and what's their role in this?

20   A      The coroner is the -- is the -- under the call within

21   the English system, and they deal with these -- basically

22   coroner deals with deaths and -- unexplained deaths, and the

23   procedure is -- from a police officer's point of view is that

24   we work on their behalf just to do the initial inquiries, and

25   then they go on to do the postmortem and confirm cause of

1  death and then that leads to an inquest.

2  Q    What did you do at the family residence besides obtain

3  the statement of ID?  Anything?

4  A    Well, I supported the family, just explained the

5  procedure, again explained my reason for being there, and just

6  expressed that there's no cause for -- for them to be

7  concerned about the police being involved.

8  Q    Okay.  Did you return to the scene of death?

9  A    No -- well, I did much later, when everything was almost

10  coming to a close at the property.

11  Q    What -- what was going on when you got back there?

12  A    PC Birt was just in the process of just finalizing the

13  collection of some exhibits which he identified.

14  Q    When you say, exhibits, what do you mean?

15  A    Pieces of property, evidence that could assist with the

16  investigation.

17  Q    Do you remember what sort of things he was collecting?

18  A    I wasn't actually there, but I do know that there was

19  papers, mobile phones, envelopes, letters --

20  Q    Okay.

21  A    -- laptops, etc.

22  Q    Was Mr. Denton's body there when you got back?

23  A    No, sir, that had been taken to mortuary.

24  Q    Did you have further dealings with this matter in the

25  following days?

1    A    Nothing in the immediate days.  I did return back to

2    Ms. Coates' house to obtain what we call an antecedent

3    statement, which is more of a --

4    Q    That's -- so that's the antecedent statement.

5    A    Yes.

6    Q    Okay.  Tell us what that is.

7    A    An antecedent statement is just -- ah, it's -- it's a

8    brief history, a detailed account of Andrew's life.  It starts

9    off -- it's basically so the coroner can then get some kind of

10   story and get some knowledge of Andrew's life, and it starts

11   off with his family details, his education, his employment,

12   his lifestyle, his habits, and his friends, and so on.

13   Q    Okay.  And that included his history of prior suicide

14   attempts?

15   A    Yes, sir, it did.

16   Q    Did you also collect items from Ms. Coates?

17   A    No, sir, no.

18        MR. FRANK:  The court's indulgence, Your Honor?

19        THE COURT:  Yes.

20   BY MR. FRANK:

21   Q    Ms. Cowley, when you collect a piece of evidence in the

22   UK, how do you do that?  Do you -- do you make a record?

23   A    Yes, sir.

24   Q    What -- what sort of record do you make?

25   A    We give it an identification number.

1    Q    And what's -- what -- is there a code that you use or --

2    A    There is.  It's -- it's three letters.

3    Q    What three letters?

4    A    It's a makeup of your name, and it's your -- if you have

5    a middle name, my name is Helen Cowley, I've got no middle

6    name, so my -- it's the first letter of each name.  But if you

7    don't have a middle name, it's the first two letters of your

8    Christian name, so my identification number is HEC.

9    Q    All right.  And then if you collect a number of things,

10   do you assign the number?

11   A    Yes, then it's a slash and then 1, 2, 3, 4, etc.

12   Q    Okay.  Let me show you what's been marked as Exhibit 51

13   for identification and just ask you, do you -- do you

14   recognize that notation there?

15   A    Yes, sir, that's my Exhibit No. 1.

16   Q    Okay.  Does that -- does that refresh your recollection,

17   did you deal with this piece of -- of evidence?

18   A    I didn't take that from Ms. Coates.  I took that from

19   Mrs. Dibnah.

20          THE COURT:  Yeah.

21          THE WITNESS:  Sorry.

22          THE COURT:  I'm sorry, ma'am.  You're going to have

23   to -- when you turn away from the microphone, we can't hear

24   you.

25          THE WITNESS:  Oh, sorry, Your Honor.

1          THE COURT:  That's all right.  Just pull yourself up

2    a little closer to the microphone, and why don't you reask the

3    question.

4          MR. FRANK:  Yeah, yes.

5    BY MR. FRANK:

6    Q    So, Ms. Cowley -- Officer Cowley, you were telling us

7    that you do recognize your initials -- your -- your evidence

8    code on this --

9    A    Yes, sir, I do.

10   Q    -- this item, Exhibit -- I can't remember -- is it 50 --

11   A    HEC/1.

12   Q    This is 51, correct?  Yes.  All right.  And would you

13   tell us how you came to take custody of that?

14   A    This was as a result of attending the address of

15   Ms. Coates' mother at 402 Wentworth Way, and when I actually

16   attended Ms. Coates' property to get the antecedent statement,

17   she made me aware of an envelope which her mother had in her

18   possession.  So after I'd been to Ms. Coates' property and

19   obtained antecedent's details, I then went to her mother's

20   property and obtained this envelope.

21   Q    And that's HEC/1 that's marked as Exhibit 51?

22   A    Yes, sir.

23          MR. FRANK:  Okay.  I'd move 51 in evidence, Your

24   Honor.

25          THE COURT:  Is there any objection?

1              MR. RIDGE:  No, Your Honor.

2              THE COURT:  51's admitted.

3    BY MR. FRANK:

4    Q     Did you obtain any other items from either Ms. Coates or

5    Ms. Dibnah that you recall?

6    A     No, sir.

7              MR. FRANK:  The court's indulgence, Your Honor?

8              THE COURT:  Yes.

9              MR. FRANK:  Nothing further, Your Honor.

10             THE COURT:  Cross-examination, Mr. Ridge.

11             MR. RIDGE:  Thank you, Your Honor.

12                        CROSS-EXAMINATION

13   BY MR. RIDGE:

14   Q     Good morning, Officer Cowley.

15   A     Good morning, sir.

16   Q     I only have just a few questions for you.  When you

17   arrived at Mr. Denton's home, it did not appear as if any

18   third party had entered the home and caused harm to

19   Mr. Denton; is that correct?

20   A     That's correct, sir.

21   Q     And was it your conclusion that Mr. Denton had committed

22   suicide?

23   A     It's -- I couldn't possibly say that.  It was --

24   Q     Okay.

25   A     That's after further tests.

1   Q      Did it appear to you that the death was planned?

2   A      Not at the time.  I had no knowledge.

3   Q      Okay.  The envelope that Ms. Coates provided to you is

4   one that was a white airmail envelope?

5              MR. FRANK:  Objection, I think that's a

6   mischaracterization, Your Honor.  I think it was Ms. Dibnah.

7   A      The actual --

8   BY MR. RIDGE:

9   Q      Let me go -- let me --

10             THE COURT:  Why don't you rephrase the question.

11             MR. RIDGE:  I will.

12  BY MR. RIDGE:

13  Q      On December 31st --

14  A      Yes, sir.

15  Q      -- were you provided or did you see an envelope found by

16  Ms. Coates?

17  A      I did, yes, sir.

18  Q      Okay.  And what did that envelope look like?

19  A      It was a white cardboard envelope with a green label on

20  the front.

21  Q      Okay.  And where was that envelope when you saw it?

22  A      It was -- well, Ms. Coates showed me it.  She informed

23  me she'd removed it from a drawer in the sideboard, and she

24  placed it on the mantelpiece.

25  Q      Okay.

1   A      And upon my arrival, that envelope was on the

2   mantelpiece, but I didn't seize it.

3   Q      Okay.  You didn't see anything inside the envelope?

4   A      Yes, I looked inside.  It was a --

5   Q      Okay.  And that was when you saw the plastic baggie?

6   A      Yes, sir.

7   Q      Later on, Ms. Dibnah gave you a second envelope.

8   A      Yes.

9   Q      And that was on January 11th --

10  A      Yes.

11  Q      -- 2013?

12  A      Yes, it was, yes, it was.

13  Q      Do you know where that envelope was found?

14  A      No, I don't know.

15  Q      Did Ms. Dibnah tell you whether she found it at Andrew

16  Denton's home or at her own home?

17  A      It -- it originated from Andrew's home.

18  Q      I'm sorry?

19  A      It originated from Andrew's home.

20  Q      Originally from Andrew's home.

21  A      Yeah.

22  Q      But you went to her home to pick it up.

23  A      Yes.

24  Q      Okay.  And then after that, did you deal either with

25  Ms. Dibnah or Ms. Coates again?

1    A      I did return to Ms. Dibnah's property a couple of years

2    later to collect a further letter.

3    Q      And do you know what letter that was?

4    A      I don't, sir.  I didn't really have any dealings with

5    that.  It was just a letter that Andrew had written and his

6    mother (sic) -- his mother had possession of it.

7    Q      Why did you go back to get that letter?

8    A      Because DC Quinn requested me to do so.

9    Q      Okay.  Was Mr. Denton's home ever treated like a crime

10   scene so that people couldn't come and go as they wished?

11   A      I actually left the property.  Once we became aware of

12   the -- the danger -- the potential danger, I left the

13   property, and it was left in the -- the care and the control

14   of other officers.

15   Q      Okay.  So you -- you don't know the answer to that.

16   A      No, sir, I don't.

17   Q      Okay.

18          MR. RIDGE:  Thank you.  That's all I have.

19          THE WITNESS:  Thank you, sir.

20          THE COURT:  Redirect?

21          MR. FRANK:  Briefly, if I may, Your Honor.

22                     REDIRECT EXAMINATION

23   BY MR. FRANK:

24   Q    Ms. Cowley, I'm showing you what's been marked as

25   Exhibit 62.  I think it's in evidence.  I -- I'd ask you to

1   take a look at that and tell us if you recognize it, please.

2   A     Yes, I believe that was at the scene when we arrived.

3   Q     Let me direct your attention to the -- this is your

4   evidence control --

5   A     No, sir, that's not mine.

6   Q     Well, the form, though, isn't it?

7   A     No, sir, that's PC Birt's.

8   Q     Okay.  All right.  I just meant the form.  But -- all

9   right.  So -- and can you -- it's PC Birt's initials on this

10  signifying that he recovered this?

11  A     Yes, sir.

12  Q     Okay.

13              MR. FRANK:  All right.  I have no further questions

14  of this witness, Your Honor.

15              THE COURT:  Anything further?

16              MR. RIDGE:  No, Your Honor.  Thank you.

17              THE COURT:  Thank you.  You may stand down, ma'am.

18  Thank you.

19              THE WITNESS:  Thank you.  Thank you.

20        (The witness left the witness stand.)

21              THE COURT:  Next witness?

22              MR. FRANK:  Is Jon Birt.

23              THE CLERK:  Please raise your right hand.  Do you

24  solemnly swear that the testimony you shall give in the matter

25  now in hearing shall be the truth, the whole truth, and

 1    nothing but the truth, so help you God?

 2              THE WITNESS:  I do.

 3              THE CLERK:  Please be seated.  Please state your

 4    name and spell your last name for the record.

 5              THE WITNESS:  Jonathan Birt, B-i-r-t.

 6    JONATHAN BIRT, having been duly sworn, was examined and

 7    testified as follows:

 8                        DIRECT EXAMINATION

 9    BY MR. FRANK:

10    Q     Good morning, Mr. Birt.

11    A     Good morning.

12    Q     Mr. Birt, where are you from?

13    A     I'm from Hull in the United Kingdom.

14    Q     And I understand that you are here today -- you traveled

15    here to testify in this matter?

16    A     That's correct.

17    Q     What do you do in Hull?

18    A     I'm a police officer.

19    Q     And how long have you been a police officer there?

20    A     Just over 11 years now.

21    Q     And what do you do as a police officer?

22    A     I'm a basically a front-line police officer, responding

23    to emergency calls.

24    Q     And how long have you been doing this?

25    A     I'd say about 11 years now.

1    Q      And do you have special training?

2    A      Nothing specific.  It's just general police work,

3    general police duties.

4    Q      Do you go through an academy or some sort of initial

5    training?

6    A      Yeah, initial training, which runs normally six months,

7    followed by a two-year probationary period.

8    Q      All right.  And then for the next eight or so years

9    you've been on active duty?

10   A      That's correct, yeah.

11   Q      In connection with those duties, did you have occasion

12   to participate in the investigation in response to a -- the

13   death of Andrew Denton on Holland Street on December 31st,

14   2012?

15   A      I did, yes.

16   Q      And tell us how you became involved in that?

17   A      I was on routine patrol, and I was assigned to go to

18   that address with report of a sudden death at that address,

19   and it just comes through our dispatch center.

20   Q      Were you on patrol by yourself or with anyone else?

21   A      I was on patrol with PC Cowley.

22   Q      All right.  And what did you and Cowley do?

23   A      We attended the address.  As I said, we had reports of

24   this death at the address.

25   Q      And can you describe the situation when you got there?

1   A      Yeah, on arrival, there were, I believe, family members

2   at the address, relayed with the paramedics which were already

3   on scene, who were shown to the deceased's body, which was

4   located upstairs bedroom.

5   Q      Okay.  And what -- what did you do there?

6   A      Our initial inquiries are to assess the scene.  We

7   immediately try and find out if there's any crime, etc.  So

8   we're assessing to see if there's any third-party involvement,

9   there's any -- any signs of disturbance, etc.  Once we rule

10  that out, we go on to the next level.  Due to previous

11  intelligence on the address on Mr. Denton, we were quickly --

12  or quickly assumed that it could have been a suicide.

13  Q      All right.  And what was it about your intelligence

14  about the address that led you to believe it might be a

15  suicide?

16  A      Previous intelligence was that he'd researched online

17  committing suicide by various means, including cyanide and, I

18  believe, nicotine poisoning.

19  Q      And where did that information come from?

20  A      It comes from our intelligence system, record in our

21  computer systems.

22  Q      Okay.  Can you describe the -- the -- this apartment?

23  A      It was a -- a two-story house.  As you enter the front

24  door, you enter a very small hallway.  Off the hallway, you go

25  into a -- a living area.  To the rear of the living area is a

1    door to the rear kitchen, and then from the kitchen goes to

2    the garden.

3         In the corner of the living area, there's stairs going

4    up to the first floor.  To the right of the stairs is the main

5    front bedroom, to the left is the bathroom, and the rear

6    bedroom where Mr. Denton was.

7    Q    And how would you describe the condition of the

8    apartment?

9    A    I'd say it was very tidy, very clean, nothing out of

10   place.

11   Q    And did you notice anything of significance as you -- as

12   you moved through the apartment?

13   A    Nothing -- nothing stood out, no, not initially.

14   Q    So what happens?

15   A    Sorry?

16   Q    Did -- did others respond?  Did you process the scene?

17   Did you --

18   A    Yeah, once we assessed the scene, our sergeant and

19   supervisor were also there.  Due to previous intelligence and

20   what we found what we believed -- again, because of the

21   intelligence, what we found was possibly cyanide in an

22   envelope, our inspector, who was away from the scene, ordered

23   us to evacuate so we can assess -- assess the situation with

24   specially trained officers.

25   Q    Can you describe this material that you were concerned

1    might be cyanide?

2    A     Yeah, I can describe it.  It was in a very small plastic

3    wrapper, very white crystalline powder substance.

4    Q     Where was it?

5    A     It was on top of the fireplace when I saw it.

6    Q     And -- and was it just -- was it -- how was it packaged?

7    A     It was in a brown envelope or -- I think white on the

8    top.  Inside it was very loosely wrapped in a clear cellophane

9    wrapper.

10   Q     And how did you find that?

11   A     I can't remember how it was brought to my attention, but

12   I was aware of this envelope on the fireplace and the

13   possibility of it containing cyanide.

14   Q     All right.  All right.  And is it at some point after

15   that that your supervisor instructs you to evacuate the -- the

16   scene?

17   A     Yes, that's correct.

18   Q     And do you eventually go back in?

19   A     Yeah, once it was all cleared and it was safe to go in,

20   we went back in the address.

21   Q     Who gave you the all clear?

22   A     It was one of our -- I can't remember their title --

23   it's a specialist officer who can deal with chemicals, trained

24   to assess if a chemical's dangerous to us.

25   Q     All right.  But in any event, at some point you get the

1  all clear and you go back in, and what do you do?

2  A    Once we went back in the address, I start seizing

3  exhibits from the address.

4  Q    And what do you mean by exhibits?

5  A    Items which we believe are relevant to the incident.

6  Q    And how do you make that determination?

7  A    Just look for anything and my detective inspector at the

8  time asked me to look for anything to do with communication,

9  storage devices, letters, and obviously the envelope on the

10 fireplace.

11 Q    And who was your -- your -- this officer?

12 A    It was a Detective Inspector Miller, I believe.

13 Q    At that point?

14 A    Yeah.

15 Q    Okay.  All right.  And what -- do you remember what

16 things you -- you -- you seized?

17 A    Yeah, the first one was the envelope which I suspected

18 was containing the cyanide.  The second one I believe was a

19 laptop with a charging cable.  I think there was a mobile

20 phone, a USB storage stick, a bank card, a glass beaker, a

21 toothbrush, and I think a second mobile phone.

22 Q    Okay.  And how are you trained to keep track of those

23 items in this process?

24 A    As soon as I take hold of it and take ownership of it, I

25 record it in my notebook -- in my officer's notebook.

1   Q       And do you -- do you place some -- some mark on the

2   object itself or on a tag in order to keep track of it?

3   A       Yeah, we place what we call an exhibit number on the

4   item.  So one item will contain my initials followed by

5   numeral 1 for the first item, numeral 2 for the second item.

6   Q       Okay.  So let me show you -- well, first let me show you

7   Exhibit 56 in evidence and ask you to take a look at -- take a

8   look at that and tell us if you recognize it.

9   A       Yeah, that's my first exhibit, yeah, which I seized from

10  the fireplace, yeah, that's the one.

11  Q       All right.  So this is the envelope that you -- you

12  seized from the fireplace as you've described?

13  A       That's correct, yeah.

14  Q       And let me show you what's been marked as Exhibit 59-2

15  for identification, ask you to take a look at that, tell us if

16  you recognize it, please.

17  A       Yep, that's the -- the fireplace of the address where I

18  located that envelope.

19  Q       All right.  So 59-2 is a picture, correct?

20  A       It is, yeah.

21  Q       Of the -- the fireplace and mantel inside 17 Holland

22  Street on this occasion?

23  A       Yeah, that is the one.

24  Q       And does it depict where it was that you seized the

25  envelope that is Exhibit 56?

1    A      Yeah, that's how I remember it.

2             MR. FRANK:  And I'd move Government's Exhibit 59-2

3    in evidence.

4             THE COURT:  Any objection to 59-2?

5             MR. RIDGE:  No, Your Honor.  Excuse me.

6             THE COURT:  It's admitted.

7             MR. FRANK:  And request permission to publish it?

8             THE COURT:  You may.

9    BY MR. FRANK:

10   Q      And, Officer Birt, you can indicate with your finger by

11   touching the screen where something is here.  Can you circle

12   the envelope in this picture?  Do you see -- do you see where

13   it is?

14   A      I can here?  (Witness complying.)

15   Q      All right.  And then let me show you 59.3.  What is 59.3

16   for identification, if you know?

17   A      It is the envelope I seized --

18   Q      Is it a -- I'm sorry.

19   A      -- from the fireplace.  Sorry.

20   Q      Is it a closer view of the same envelope in the same

21   spot?

22   A      Exactly the same, just zoomed in, yeah.

23   Q      All right.

24             MR. FRANK:  And I'd also move 59-3into evidence,

25   Your Honor.

 1              THE COURT:  Any objection?

 2              MR. RIDGE:  No, Your Honor.

 3              THE COURT:  It's admitted.

 4              MR. FRANK:  And request permission to publish it?

 5              THE COURT:  You may.

 6   BY MR. FRANK:

 7   Q     Did you look inside the envelope?

 8   A     I did, yes.

 9   Q     And have you already described what you saw there?

10   A     I have, yeah.

11   Q     Let me show you what's been marked as Exhibit 59-10 for

12   identification, ask you to take a look at that and tell us if

13   you recognize it, please.

14   A     Yeah, that's what I saw inside the envelope when I had a

15   look.

16   Q     All right.  Is 59-10 a picture of what you saw inside

17   the envelope that is Exhibit 56 on this occasion as you've

18   described?

19   A     It is, yes.

20              MR. FRANK:  I'd move Exhibit 59-10 in evidence.

21              THE COURT:  Any objection?

22              MR. RIDGE:  No, Your Honor.

23              THE COURT:  It's admitted.

24              MR. FRANK:  And request permission to publish it?

25              THE COURT:  You may.

1   BY MR. FRANK:

2   Q    Let me show you what's been marked as Exhibit 64 for

3   identification, ask you to take a look at that, and tell us if

4   you recognize it, please.

5   A    Yep, the silver Toshiba laptop is the one I seized.

6   Actually, I'm not sure what the -- the orange folder is.

7   Q    All right.  But you recognize the laptop inside?

8   A    Yep, that's the laptop I seized, yeah.

9        MR. FRANK:  All right.  And I'd move the laptop,

10  Exhibit 64, into evidence.

11       THE COURT:  Any objection?

12       MR. RIDGE:  No, Your Honor.

13       THE COURT:  It's admitted.

14  BY MR. FRANK:

15  Q    So let me show you what's been marked as Exhibit 56 for

16  identification, ask you to take a look at that, and tell us if

17  you recognize it, please.

18  A    Yep, that's the red Motorola flip phone which I seized

19  from the address.

20  Q    Red Motorola flip phone?

21  A    Yeah.

22       MR. FRANK:  I'd move Exhibit 65 into evidence.

23       MR. RIDGE:  Excuse me.  65?

24       THE COURT:  Yeah.  I think you had referred to 56

25  before.  Is that 65?

1          MR. FRANK:  I'm sorry.  It's 65.

2          THE COURT:  All right.

3          MR. RIDGE:  65.

4          THE COURT:  Do you have any objection to 65?

5          MR. RIDGE:  No objection.

6          THE COURT:  65's admitted.

7    BY MR. FRANK:

8    Q     Showing you what's been marked as Exhibit 66 for

9    identification?

10   A     Yeah, yeah, I seized that one from upstairs in the

11   address.

12   Q     What is it?

13   A     It's an HTC mobile phone.

14   Q     Seized from the address as you've described?

15   A     It was, yeah.

16         MR. FRANK:  I'd move 66 into evidence.

17         THE COURT:  Any objection?

18         MR. RIDGE:  No, Your Honor.

19         THE COURT:  66 is admitted.

20   BY MR. FRANK:

21   Q     Showing you what's been marked as Exhibit 67 for

22   identification, do you recognize that?

23   A     Yep.

24   Q     What is 67 for identification?

25   A     It's the USB stick I seized from the living room.

1           MR. FRANK:  I'd move Exhibit 67 into evidence.

2           THE COURT:  Any objection?

3           MR. RIDGE:  No, Your Honor.

4           THE COURT:  It's admitted.

5   BY MR. FRANK:

6   Q     Showing you what's been marked as Exhibit 68 for

7   identification, ask you to take a look at that --

8   A     Yeah.

9   Q     -- and tell us if you recognize it, please.

10  A     Yes, certainly do.  It's the glass beaker I seized from

11  the upstairs bedroom again.

12          MR. FRANK:  And I'd move Exhibit 68 into evidence.

13          THE COURT:  Any objection?

14          MR. RIDGE:  Your Honor, I couldn't hear the witness'

15  response.

16          THE COURT:  Oh, okay.  Would you just repeat your

17  response as to what -- how you identified 68, sir.

18  A     Yes.  Sorry.  Yes, that is the glass beaker I seized

19  from the upstairs bedroom.

20          MR. RIDGE:  Thank you.  No objection, Your Honor.

21          THE COURT:  It's admitted.

22  BY MR. FRANK:

23  Q     And 70 for identification?

24  A     Yeah, that's the Nationwide Bank card I seized again

25  from the living room.

1           MR. FRANK:  And I'd move Exhibit 70 into evidence.

2           THE COURT:  Is there any objection?

3           MR. RIDGE:  No, Your Honor.

4           THE COURT:  70's admitted.

5           MR. FRANK:  The court's indulgence, Your Honor?

6           THE COURT:  Yes.

7           MR. FRANK:  I have no further questions for this

8  witness, Your Honor.

9           THE COURT:  Cross-examination, Mr. Ridge.

10                      CROSS-EXAMINATION

11  BY MR. RIDGE:

12  Q     Mr. Birt, good morning.

13  A     Good morning.

14  Q     I wasn't hearing everything that you said.

15  A     Oh, I'm sorry.

16  Q     Not because of you.  Because of me.  I'd like you to

17  look at Exhibit 59-10.

18  A     Sure, yeah.

19  Q     Is that a photograph down inside -- inside the envelope?

20  A     It is, yes.

21  Q     Okay.  And that's how you saw that baggie inside the

22  envelope.

23  A     That's exactly how I saw it, yeah.

24  Q     Okay.  Thank you.  Officer Birt, do you know whether or

25  not the police searched Mr. Denton's apartment on December

1   31st?

2   A      As part of our routine dealing with these incidents and

3   the instructions from my detective inspector, I searched for

4   the relevant items, again, which I seized.

5   Q      When you were searching for relevant items, did you

6   find another airmail envelope at Mr. Denton's home on December

7   31st?

8   A      No.

9   Q      And your testimony about a fear of cyanide was based

10  upon what Ms. Coates had told either you or another officer?

11  A      From my personal -- it was based on intelligence systems

12  and PC Cowley, who informed me that she'd had previous

13  dealings with Mr. Denton.

14  Q      Okay.  Once you gathered these exhibits and the

15  evidence, what happened to them?

16  A      Once I gather them all, they stay in my possession, my

17  control until I get to the police station.  Once at the police

18  station, I book them into our security property store where

19  they're left in a -- a secure room.

20  Q      Okay.  And those items stayed there until later removed

21  at some point?

22  A      Yeah, they go into what we call our temporary store.

23  It's a locked, very secure unit, and then our property staff,

24  who work during the daytime hours, sort it and file it into

25  their formal property store.

1   Q      Okay.

2            MR. RIDGE:  Thank you.  That's all I have.

3   Appreciate it.

4            THE COURT:  Redirect?

5            MR. FRANK:  No, Your Honor.

6            THE COURT:  Thank you.  You may stand down, sir.

7   Thank you.

8            THE WITNESS:  Thank you.

9        (The witness left the witness stand.)

10           THE COURT:  Next witness?

11           MR. FRANK:  The government calls Colin Jordan.

12           THE CLERK:  Please raise your right hand.  Do you

13  solemnly swear that the testimony you shall give in the matter

14  now in hearing shall be the truth, the whole truth, and

15  nothing but the truth, so help you God?

16           THE WITNESS:  I do.

17           THE CLERK:  Please be seated.

18           THE WITNESS:  Thank you.

19           THE CLERK:  Please state your name and spell your

20  last name for the record.

21           THE WITNESS:  Colin Steven Jordan.  That's Juliette

22  Oscar Romeo Delta Alpha November.

23           MR. FRANK:  Thank you, Your Honor.

24  COLIN STEVEN JORDAN, having been duly sworn, was examined and

25  testified as follows:

1                        DIRECT EXAMINATION

2    BY MR. FRANK:

3    Q      Good morning, Mr. Jordan.

4    A      Good morning.

5    Q      Where are you from?

6    A      I am from Kingston upon Hull in East Yorkshire, England.

7    Q      And how did you get here today?

8    A      We stay -- we've been staying over in a local hotel.

9    Q      All right.  But you've flown over --

10   A      Flown Sunday.

11   Q      -- from the United Kingdom in order to be a witness here

12   today?

13   A      That's correct.

14   Q      All right.  And what is it that you do in Hull?

15   A      I'm a crime scene investigator, just been promoted to be

16   a senior -- a supervisor in crime scene investigators.  But my

17   day job up to last year was examining crime scenes of various

18   natures.

19   Q      That was going to be my question.  What -- what does a

20   crime scene search actually do over there?

21   A      Any crime scene -- the police employ crime scene

22   investigators, specialists, evidence gatherers and recoverers,

23   carrying out field tests.  So every crime scene, be it from

24   volume crime, what we'd refer to it, be it burglaries,

25   criminal damage, assaults, injury photographs, right through

1   the spectrum of crime scenes up to sudden deaths, murders,

2   homicides.  So over my career, I've examined a great variety

3   of scenes.

4   Q     And how long overall have you been a crime scene search

5   officer?

6   A     I attended the College of Policing residential course in

7   1998 to do my initial training.

8         After my diploma in crime scene examination through

9   Durham University in England, I'm also a qualified crime scene

10  manager, and I've recently completed a crime coordinator's

11  course for general things.

12  Q     So is that since 1998?

13  A     That's all since 1998, yes.

14  Q     All right.  In connection with your duties as a crime

15  scene officer, did you participate in the investigation of the

16  death of Andrew Denton on December 31st, 2012, on Holland

17  Street in Hull?

18  A     Yes, I attended the scene at Holland Street.

19  Q     What was your role?

20  A     I -- all deaths in England are reported to the coroner.

21  The coroner has a responsibility to establish three things in

22  his inquiry:  Who the person is; where the person's died; and

23  the cause of death.  The coroner -- I don't know the system in

24  America, but the system in England is the coroner doesn't

25  employ directly any investigating officers.  So police staff

 1    and police officers are utilized by the coroner to carry out

 2    their investigation.

 3          So my job, part of my role as a crime scene examiner is

 4    to attend sudden deaths to establish the fact that there's no

 5    foul play that has taken place.  So in this instance, I

 6    examined the body for any injuries to indicate about

 7    third-party involvement, and if it'd been required to do so by

 8    the coroner would have taken fingerprints to formally identify

 9    the person.  However, that wasn't required in this instance.

10    Q     Why not?

11    A     We had antecedents, family members were able to identify

12    Andrew, so it didn't necessitate any fingerprint recovery.

13    Q     Okay.  So what did you do?

14    A     I attended the scene.  I had -- got -- the first task at

15    any scene is to gather as much background information as

16    possible.  Certain items were obviously relevant to this

17    instance, particularly envelopes and writings referred to

18    myself, the laptop computer, there's notes in the back.  As I

19    say, I was attending for the coroner to establish the

20    circumstances of Mr. Denton's death.

21          So there was a suicide note, so I'd photograph that, and

22    we'd photograph that to show where it was, where it -- what

23    item -- information was contained within the note, and there

24    was various actions that Mr. Denton had taken, preparing care

25    packages for his dogs, all indicate that there was -- leading

1    towards gathering information for the coroner to reach their

2    verdict as to how Mr. Denton had died.  So --

3    Q    Let me stop you for a minute.

4    A    All right.

5    Q    You mentioned envelopes.  What envelopes are you

6    referring to?

7    A    There was an envelope on the mantelpiece which was to

8    the side of the clock.  That was an airmail envelope, a white

9    envelope with a customs declaration on the front, and there

10   was a second airmail from America envelope and that was

11   located -- there's the mantelpiece -- sorry -- mantelpiece in

12   front of here, there's a drawer unit to the right-hand side --

13   that was in the drawer, and then on the top of the

14   mantelpiece, in front of the clock, there was a white envelope

15   which had the word -- I think it was Pauline written on the

16   front and that one contained Mr. Denton's suicide note.

17   Q    So what -- you've identified three envelopes?

18   A    Yeah.

19   Q    Okay.  All right.  And did you take pictures?

20   A    Yes.  As I say, my role is to record the scene for the

21   coroner, so I took photographs of the general scene in the

22   living room, and then the location of the notes, and then the

23   inscriptions, the writing on each envelope, and then -- and

24   the contents of the envelopes, remove -- remove the item.  We

25   photographed it, we photographed the contents, replaced the

1    items, and put it back, move on to the next envelope, move --

2    took it to the side, photographed it, replaced it, put it

3    back, and went through in sequence recording the -- the scene.

4        And then went up -- once upstairs in the bedroom, again,

5    photographed the -- Mr. Denton, the glass by the side of the

6    bed, and took general views and specific views to show the

7    items in situ.

8    Q    Did you recover any of those items?

9    A    I didn't recover anything.  Once we'd finished the

10   photographic recording of the scene, the noxious potential for

11   the items within determined at that point we withdrew from the

12   scene so that a formal risk assessment could be carried out so

13   that by examining at that point we aren't ourselves in any

14   danger, and experts were called in after I'd left to make the

15   items safe would be a generalization, but to ensure that there

16   was no contamination of ourselves from the items within.

17   Q    Let me show you what's been marked as Government's

18   Exhibits 59-1 through 29.  Most of these have -- are for

19   identification.  A few are already in evidence, but if you

20   could --

21   A    Yeah.

22   Q    -- look through those, and after you've had a chance to

23   look through them, let us know if you recognize them.

24   A    Yes, those are the -- those are the photographs that I

25   took at the scene.

1  Q      As you previously described?

2  A      Yes.

3  Q      At least some of them?

4  A      Yes.

5           MR. FRANK:  Your Honor, I'd move Government's

6  Exhibits 59-1 through 29 into evidence.

7           THE COURT:  Any objection?

8           MR. RIDGE:  No, Your Honor.

9           THE COURT:  Each is admitted.

10          MR. FRANK:  And request permission to publish them?

11          THE COURT:  You may.

12 BY MR. FRANK:

13 Q      So, Officer Jordan, if we can just go one by one, I'll

14 ask you if you can describe for the jury what each of these

15 photographs depicts.  Let's start with 59-1.  What is this,

16 59-1?

17 A      Before every -- every job, we take a name board to

18 identify myself, the address, the time, and the date that we

19 took the photographs, and also the number in the top

20 right-hand corner are my initials to identify those exhibits,

21 the album of photographs as CSJ/1, which is the -- our

22 protocol.

23 Q      Okay.  If we scroll to the next, 59-2, what is 59-2?

24 A      59-2 is the photograph of the mantelpiece in the living

25 room as described -- as I described, obviously the clock in

1    the center.  I described it as the airmail envelope to the

2    right-hand side of the clock, and in front is a white

3    envelope, which was the suicide note.

4    Q     Okay.  So if you touch the screen with your finger, you

5    can highlight items.

6    A     Yeah.

7    Q     What have you highlighted with this arrow?

8    A     That's the envelope which was addressed to Mr. Denton

9    and that was the envelope which I later examined and inside

10   was a wrap of white powder.

11   Q     Okay.  And how about what you've been describing as a

12   suicide note or envelope, where is that?

13   A     That's just there.

14   Q     Lying down on the mantel?

15   A     On the mantel, flat on the mantel.

16   Q     In front of the clock?

17   A     Yes.

18   Q     And is there a closer view of this?  Can we -- let's try

19   59-3.

20   A     Yeah, that's the close-up of the airmail envelope

21   showing the address of the sender as being Mr. Martin and the

22   recipient Andrew Denton, 17 Holland Street.

23   Q     And can you indicate where those addresses are located?

24   A     It's the address of the sender and the address of the

25   recipient.

1   Q     With -- with yellow arrows you've done so?

2   A     Yeah.

3   Q     How about the customs declaration that you described

4   earlier, in green?

5   A     Yeah, a green customs declaration.

6   Q     You circled it in yellow, but it's -- it's colored

7   green?

8   A     Okay.

9   Q     Okay.  How about if we move to 59-4, what is 59-4?

10  A     That's the general view.  Our process -- or my process,

11  police process in England is that we take a general view first

12  to locate things and then specific items are photographed

13  close up to show the relevant items.  So this is the general

14  view of the bedroom where Mr. Denton was laid.

15  Q     And that's Mr. Denton laying in the bed?

16  A     That's Mr. Denton laid -- laid on the bed.

17  Q     Okay.  59-5, please, another view of Mr. Denton?

18  A     Again, a general view just to show Mr. Denton in situ.

19  Q     Okay.  59-6?

20  A     Same thing, general views.  If possible, we quarter the

21  room to show it from as many angles.

22  Q     Okay.  59-7?

23  A     That's the envelope that we've earlier identified that

24  was next to the clock I placed on the side to take general

25  views to show the -- the addresses and the writing on the

1   envelope.

2   Q      Okay.  59-8?

3   A      The rear view of the envelope.

4   Q      Rear view?

5   A      The rear view of the -- literally turned over.

6   Q      Okay.  59-9?

7   A      Close-up of the postal service customs declaration.

8   Q      Okay.  And you can make out the date stamp on that

9   picture, can you?

10  A      Yes, December 12, 2014.

11  Q      That's this date, right here, that I'm circling?

12  A      That's the date, yes.

13  Q      And how do you read that date?

14  A      Sorry.  December 11, 2014.  Shall I go for a third time?

15  December 11th, 2012.

16  Q      Okay.  Well, the -- the stamp is there and is a little

17  bit hard to read; fair to say?

18  A      Yes, it is.

19  Q      Okay.  29-10 (sic)?

20  A      That is the --

21  Q      What is that?

22  A      -- envelope popped open to show -- squeezed open by one

23  hand to photograph the inside to show the wrap that was

24  contained within the envelope.

25  Q      59-11?

1    A       Placed the -- took the wrap out of the envelope, placed

2    it on the side, and photographed it with a scale to show the

3    item again.

4    Q       And the scale is there to give some idea of the size; is

5    that fair?

6    A       Yes, the size in -- in centimeters.

7    Q       Okay.  59-12?

8    A       That's the note removed from the mantel that was in

9    front of the clock and placed on the side so it could be

10   photographed to show the inscription on the envelope.

11   Q       Okay.  So this is a white envelope with handwriting on

12   it?

13   A       That's correct.

14   Q       Beginning Pauline X?

15   A       Yes.

16   Q       Okay.  59-13?

17   A       That's the contents of the envelope.  I took it out and

18   photographed the note itself, again, so it could be introduced

19   for the coroner, in coroner's court.

20   Q       All right.  And 59-14, 15, 16, 17 -- well, I'll stop at

21   16.  What are they?

22   A       They're the individual pages that were contained within

23   the envelope --

24   Q       Within that envelope?

25   A       -- addressed to Pauline.

1   Q     Okay.  59-17?

2   A     That's -- it doesn't show very well on the screen, but

3   by the side of the bed, there's a -- a glass next to the

4   carpet near the corner, and, again, that's to show like a

5   midview, to show the position of the glass in relation to

6   Mr. Denton.

7   Q     All right.  So this is back in the --

8   A     Back in the bedroom again, yes.

9   Q     Okay.  And the -- where is the glass relative to

10  Mr. Denton?

11  A     The glass is there next to the side of the bed.

12  Q     You've circled it in yellow?

13  A     Yeah.

14  Q     Okay.  59-18?

15  A     Again, it's a close-up of the same -- midview of the

16  same picture to show where the glass was.

17  Q     59-19?

18  A     Downstairs in the living room to the right of the mantel

19  was a set of drawers you can see on the larger photograph, and

20  that's a photograph to show the envelope that was within the

21  top drawer, to show it in position prior to removing it to

22  examine it.

23  Q     All right.  So this is the third envelope you've

24  identified?

25  A     That's correct.

1   Q      The first being the white airmail mailer on the mantel?

2   A      Yes.

3   Q      The second being the -- the white business-sized

4   envelope with the handwriting on it on the mantel in front of

5   the clock?

6   A      That is correct.

7   Q      And this third envelope is in the drawer as you've

8   described.

9   A      That's correct.

10  Q      Okay.   59-20?

11  A      Again, our protocol is to take things actually moved

12  closer so you can get a specific close-up to show details on

13  the envelope, but also of the wider view to show where it was

14  in the room itself.

15  Q      Okay.

16  A      So --

17  Q      Do -- do you recognize the -- the printed form

18  underneath the envelope?   Do you recognize that?

19  A      No, it was just within the -- within the drawer.

20  Q      All right.   But that's where it was when you found it?

21  A      Yeah, that's correct.

22  Q      And photographed it?

23  A      Yeah.

24  Q      Okay.   59-21?

25  A      Same form, same place, just flipped the envelope over to

1    photograph the rear of it.

2    Q    Okay.  59-22?

3    A    That's the bedroom.  Mr. Denton had two dogs, and he

4    prepared care packages for the two dogs, and on the worktop

5    are the packages which he prepared for care instructions.

6    Q    Okay.  Is this the bedroom or the kitchen?

7    A    That's the kitchen.

8    Q    Okay.  And where in the kitchen are these care packages

9    you've described?  Can you circle them or --

10   A    (Witness complying.)

11   Q    You've circled them in yellow?

12   A    I have.

13   Q    Okay.  59-23?

14   A    Again, a close-up.  The first one is generally

15   photographed to show the where, and then the second one is to

16   show the two packs.  To identify this one for Tia, that's one

17   dog's care package and feeding instructions.

18   Q    Okay.  And 59-24?

19   A    And Duggy being his second dog.

20            MR. FRANK:  The court's indulgence, Your Honor?

21            THE COURT:  Yes.

22            MR. FRANK:  I have no further questions for this

23   witness.

24            THE COURT:  Cross-examination?

25            MR. RIDGE:  Thank you, Your Honor.

1                      CROSS-EXAMINATION

2   BY MR. RIDGE:

3   Q      Good morning, Mr. Jordan.

4   A      Good morning.

5   Q      I'm going to have several questions for you, sir.  First

6   of all, do you know what -- what was seized from the house by

7   the police department?

8   A      No, I carried out my examination, which examine the

9   body, see if there was any injury, taking photographs of the

10  scene.

11         Once I got partway through, it became apparent that it

12  may be a poisoning and the items inside by carrying out the

13  examination -- the examination was stopped and everybody

14  withdrew from the scene so that we could carry out a risk

15  assessment to ensure that none of us were affected.

16  Q      Did you then go back in?

17  A      No, I obtained photographs of the items that were to be

18  recovered, and the police appoint a coroner's officer, again,

19  on behalf of the coroner, and he collects -- or he or she

20  collects the different statements and information around the

21  death, and there was no requirement for me to be involved in

22  the chain of continuity, and so to avoid an extra link in that

23  chain, an officer recovered the items rather than me staying

24  around.

25  Q      Okay.  We've been talking a little bit about the

1   envelopes in the --

2   A    Hm-hmm.

3   Q    -- in the apartment, and as I understand your testimony

4   and these photographs --

5   A    Yeah.

6   Q    -- there were two airmail envelopes found on the day

7   Mr. Denton was discovered; is that fair?

8   A    Yes, that's correct.

9   Q    Okay.  And I had a question about Exhibit 59-8 only

10  because I missed your answer.

11  A    Sorry.

12  Q    I'm showing you a photograph of that exhibit.

13  A    Yes, yes.

14  Q    And is that the back side of the white envelope found on

15  the mantel?

16  A    That's correct.  There's the front of it -- the front of

17  the envelope, we just turned it over --

18  Q    Okay.

19  A    -- to photograph the back.

20  Q    And just so we're clear, that's the white envelope that

21  was found on the mantel.

22  A    That's correct.

23  Q    The other airmail envelope was a brown Jif -- a brown

24  envelope.

25  A    Yeah.

1    Q    The photographs that you took, Mr. Jordan, of the

2    baggie, who removed the baggie from the white envelope?

3    A    It's -- two countries shared by a common -- divided by a

4    common language.  A baggie doesn't mean that much to me.

5    Q    I'm sorry, sir.

6    A    Like I say, it's two countries divided by a common

7    language, yeah.

8    Q    The white envelope --

9    A    Yeah.

10    Q    -- excuse me -- that was found on the mantel --

11    A    Right.

12    Q    -- as I understand it, had a --

13    A    Right, right.

14    Q    -- little clear baggie --

15    A    Yes.

16    Q    -- with some powdery substance in it.

17    A    Right.

18    Q    Who removed the clear baggie?

19    A    Baggie, yeah, we refer -- we refer to it as a wrap.

20    Q    Okay.

21    A    A wrap.

22    Q    A wrap.

23    A    So I opened the envelope, was aware there was something

24    inside by the search.  I pressed the envelope open to

25    photograph it, and then I put the baggie from the inside of

1   the envelope on the side and photographed it with the scale.

2   Then once I'd done the photograph, I put the baggie back into

3   the envelope again and put the envelope back onto the

4   mantelpiece.

5   Q    Okay.  So they were all taken at Mr. Denton's home --

6   A    They were all taken at Mr. Denton's home --

7   Q    -- all those photos?

8   A    -- all by myself, and then once I'd finished with that

9   envelope and then moved on to the next.

10  Q    Okay.

11  A    The images are out of sequence due to the way our system

12  applies things --

13  Q    Okay.  Thank you.

14  A    -- with the living room, then the kitchen, then the

15  bedroom.

16  Q    Okay.  Thank you.  Officer Jordan, did you indicate that

17  the airmail envelope that was found in the drawer was empty?

18  A    Yes, that's correct.

19  Q    Did you open that envelope?

20  A    Yes, I looked inside, but there was nothing there, sir.

21  Obviously, I didn't photograph anything.

22  Q    Okay.

23            MR. RIDGE:  That's all I have.  Thank you very much.

24            THE WITNESS:  Thank you, sir.

25            THE COURT:  Redirect?

1          MR. FRANK:  No, Your Honor.

2          THE COURT:  Thank you.  You may stand down, sir.

3   Thank you.

4       (The witness left the witness stand.)

5          THE COURT:  Next witness?

6          MR. FRANK:  The government -- government calls

7   Steven Morris.

8          THE CLERK:  Please raise your right hand.  Do you

9   solemnly swear that the testimony you shall give in the matter

10  now in hearing shall be the truth, the whole truth, and

11  nothing but the truth, so help you God?

12         THE WITNESS:  I do.

13         THE CLERK:  Please be seated.  Please state your

14  name and spell your last name for the record.

15         THE WITNESS:  Steven Morris.  It's M-o, double r,

16  i-s.

17         MR. FRANK:  Thank you, Your Honor.

18  STEVEN MORRIS, having been duly sworn, was examined and

19  testified as follows:

20                    DIRECT EXAMINATION

21  BY MR. FRANK:

22  Q    Good morning, Mr. Morris.

23  A    Good morning.

24  Q    Where are you from?

25  A    A little city called Hull in England.

1    Q      Okay.  And what do you do there?

2    A      I'm a police officer.

3    Q      And what are your duties as a police officer?

4    A      I'm a front-line community response officer.

5    Q      So what sort of matters does that mean you deal with?

6    A      It means we deal with anything from any of the calls for

7    service that members of the public make, which are around 700

8    a day, so it can be absolutely anything from minor to very

9    serious.

10   Q      How long have you been a police officer in Hull?

11   A      This is my 17th year.

12   Q      Do you have special training to be a police officer?

13   A      From the police college, police training center.  I've

14   got other skills, as well, which are possibly not relevant,

15   but you pick up as you go along from driving skills and things

16   like that.

17   Q      Okay.  In connection with your duties as a police

18   officer, were you involved in the investigation of Andrew

19   Denton's death?  He died on December 31st, 2012, at his

20   residence, 17 Holland Street in Hull.

21   A      Yes.

22   Q      What was your involvement?

23   A      I was asked to attend the family's address the following

24   day.  A lady called Gail had found some documents she thought

25   were relevant and we needed to look at.

1   Q      Who asked you to go there?

2   A      I think it was the duty sergeant at the time gave me a

3   private call on the police radio.

4   Q      Where did you go?

5   A      To 11 Sherburn Street.

6   Q      Who did you meet there?

7   A      The house -- there's quite a few family members there,

8   but it was a Gail Coates, who --

9   Q      And how was she related to Mr. Denton?

10  A      She's the niece.

11  Q      And what did you obtain from her?

12  A      Um, various documents, a series of e-mails was one of

13  them, and a complaint letter.  I think there's five in total.

14  Q      Let me show you what has been marked as Exhibit 47.

15         MR. FRANK:  The court's indulgence, Your Honor?

16         THE COURT:  Yes.

17  BY MR. FRANK:

18  Q      So, Officer Morris, I'm showing you what's been marked

19  as Exhibit 47 and -- for identification, and I'd ask you to

20  take a look at that and tell us if you recognize it, please.

21  A      Yeah, that's the -- the Google Internet search that I

22  seized.

23  Q      All right.  So this is a printout of a Google Internet

24  search; is that correct?

25  A      Yes, that's correct.

1    Q      And you -- this is one of the items that you seized from

2    Ms. Coates on -- as you've described previously in your

3    testimony?

4    A      Yes.

5    Q      And how is it that you can recognize it as that?

6    A      It's got my exhibit item number.  That's my handwriting,

7    and that's my signature.

8    Q      Okay.  All on the evidence bag?

9    A      All on the evidence bag that would have been seized at

10   the time, and I -- I recall it was top 20 suicide methods as

11   -- as the document.

12   Q      All right.

13              MR. FRANK:  I move Exhibit 47 in evidence.

14              THE COURT:  Any objection?

15              MR. RIDGE:  No, Your Honor.

16              THE COURT:  47's admitted.

17   BY MR. FRANK:

18   Q      Let me show you what's been marked as Exhibit 48 and 49.

19   It's in the same bag, so it's a bit confusing.  But can you

20   take a look at that and tell us if you recognize it, please?

21   A      (Witness looking at exhibits.)  Certainly, that's the --

22   the series of e-mails, and that's my police item number and

23   also my signature.

24   Q      All right.  So -- and if it helps, let's take them out

25   of the bag, beginning -- if we can, beginning with 48.  What

1   -- what is 48 for -- for identification?  Do you recognize

2   that?

3   A    I don't recognize it as something different to the --

4   for me, this was all part of the e-mail series.

5   Q    That you collected on this occasion?

6   A    Yes.

7   Q    All right.  And that you bagged in this bag together?

8   A    Yes, the documents were altogether.

9   Q    All right.  But that -- that -- that item that's

10  identified as 48 bears a heading answer bag, correct?

11  A    Correct.

12  Q    Okay.  And how about 49, how would you describe that,

13  49?

14  A    This is the printed e-mails between Andrew.

15  Q    And who?

16  A    And Skip Martin.

17  Q    Okay.  And that you obtained from Ms. Coates as you've

18  just described?

19  A    Yes, she -- she gave me a -- a read of that -- a read of

20  them and I seized them as evidence.

21  Q    All right.  And put them in the bag and put your

22  initials on it?

23  A    Yes.

24          MR. FRANK:  I'd move Exhibits 48 and 49 into

25  evidence.

1            THE COURT:  I think -- is 49 already in?

2            THE CLERK:  Yes.

3            THE COURT:  49's already in.  Any objection to 48?

4            MR. RIDGE:  No, Your Honor.

5            THE COURT:  48's admitted.

6    BY MR. FRANK:

7    Q     Showing you what's been marked as Exhibit 54 for

8    identification, ask you to take a look at that and tell us if

9    you recognize it.

10   A     Yeah, the -- the complaint letter that Mr. Denton had

11   made.  Again, it's my exhibit and my signature on the back.

12   Q     Signifying that you seized it from Ms. Coates on the

13   occasion you've been describing?

14   A     Yes.

15   Q     And what kind of a complaint is this?  It's a

16   printed-out copy, correct?

17   A     Yeah, my recollection is this was a complaint made to

18   the FBI.

19   Q     How is it titled?

20   A     Complaint referral form, an IC3.

21   Q     Okay.

22           MR. FRANK:  I'd move Exhibit 54 in evidence.

23           THE COURT:  Any objection?

24           MR. RIDGE:  No, Your Honor.

25           THE COURT:  It's admitted.

1  BY MR. FRANK:

2  Q     Showing you what's been marked as Exhibit 60, do you

3  recognize that?

4  A     Yes, this was the -- the white envelope with the

5  handwritten letter.

6  Q     Also seized from Ms. Coates on the occasion you've been

7  describing or some other?

8  A     No, exactly the same.  My first exhibit and my

9  signature.

10  Q     All right.  And what is this note?

11  A     This note was a suicide note.  My recollection from what

12  Ms. Coates had told me was the failed attempt and he left this

13  on his body.

14  Q     All right.

15            MR. FRANK:  I'd move Exhibit 60 in evidence.

16            THE COURT:  Any objection?

17            MR. RIDGE:  No, Your Honor.

18            THE COURT:  It's admitted.

19  BY MR. FRANK:

20  Q     And Exhibit 63 for identification, what is that?

21  A     This is the notebook with the address of Mr. Kilmartin.

22  Again, it's one of my exhibits with my signature.

23  Q     That you seized from Ms. Coates on this occasion?

24  A     From Ms. Coates, yes, exactly the same.

25            MR. FRANK:  I'd move Exhibit 63 in evidence.

1          THE COURT:  Any objection?

2          MR. RIDGE:  No, Your Honor.

3          THE COURT:  It's admitted.

4          MR. FRANK:  The court's indulgence, Your Honor?

5          THE COURT:  Yes.

6          MR. FRANK:  I have no further questions for this

7   witness, Your Honor.

8          THE COURT:  Cross-examination?

9          MR. RIDGE:  Yes, Your Honor.

10                    CROSS-EXAMINATION

11  BY MR. RIDGE:

12  Q     Good morning, Mr. Morris.

13  A     Good morning.

14  Q     I guess good afternoon.

15  A     Oh, good afternoon.

16  Q     When you -- you went to meet with Gail Coates and was

17  she the only person that you met with on January 1st, 2013?

18  A     She was the only person I spoke to.  There were other

19  family members --

20  Q     All right.

21  A     -- within the house in different rooms.

22  Q     And this was not at Mr. Denton's house.  It was at

23  Ms. Coates' home.

24  A     That's correct, yeah.

25  Q     Okay.  Did you have any conversation with Ms. Coates

1    about where she had found the items that you've been

2    identifying and we've been admitting into evidence?

3    A     They were in a blue tray, like a document store of what

4    I believe, in a different room.

5    Q     Do you know which building these were found in?  Were

6    they found in Ms. Coates' home or in Mr. Denton's home?

7    A     I can't recall.

8    Q     Okay.

9    A     To clarify the -- I think the nature of the call that

10   was passed to me was that she had found them while going

11   through his stuff.  So I think it was an assumption that that

12   was at his house, not hers.

13   Q     But she didn't tell you that.

14   A     No.

15   Q     Okay.

16              MR. RIDGE:  That's all I have, Your Honor.  Thank

17   you.

18              THE COURT:  Redirect?

19              MR. FRANK:  No, Your Honor.

20              THE COURT:  Thank you.  You may stand down, sir.

21              THE WITNESS:  Thank you, sir.

22        (The witness left the witness stand.)

23              THE COURT:  Next witness?

24              MR. FRANK:  The government calls Grahame Kay.

25              THE CLERK:  Please raise your right hand.  Do you

1    solemnly swear that the testimony you shall give in the matter

2    now in hearing shall be the truth, the whole truth, and

3    nothing but the truth, so help you God?

4              THE WITNESS:  I do.

5              THE CLERK:  Please be seated.  Please state your

6    name and spell your last name for the record.

7              THE WITNESS:  Grahame Mark Kay, K-a-y.

8              THE COURT:  Can you pull yourself up to the

9    microphone a bit, sir?

10             THE WITNESS:  Yes.

11             THE COURT:  Thank you.

12             MR. FRANK:  Thank you, Your Honor.

13   GRAHAME MARK KAY, having been duly sworn, was examined and

14   testified as follows:

15                       DIRECT EXAMINATION

16   BY MR. FRANK:

17   Q    Good afternoon, sir.

18   A    Afternoon.

19   Q    Where are you from?

20   A    I'm from England, Hull in England, and work for

21   Humberside Fire and Rescue.

22   Q    You work for Humberside Fire and Rescue?

23   A    Yeah.

24   Q    What do you do there?

25   A    I'm currently a watch manager, and I'm currently one of

1  the hazmat team, so the hazard -- the hazardous materials

2  officers.

3  Q    What does a manager do?

4  A    I supervise basically.  I, you know, supervise others,

5  and I'm currently employed at our headquarters and looking at

6  new systems of work.

7  Q    New systems of work?

8  A    Yes.

9  Q    What do you mean by that?

10 A    Just looking at better ways to do what we already do, so

11 better ways to fight fires, better ways, you know, to attend

12 incidents, and things like that.

13 Q    Okay.  And as a manager, do you supervise other people?

14 A    I do.  I supervise a small office of people.  I have

15 four people.

16 Q    And what does that office do?

17 A    It's a mixture really of health and safety and also

18 premises, looking after all the buildings.

19 Q    What -- what buildings do you look after?

20 A    All of the fire station buildings.

21 Q    Okay.  And -- but you're also a haz -- a hazmat officer?

22 A    I -- I am, yes.  So I attend -- yeah, I attend hazmat,

23 so chemical incidents and -- where there's chemicals involved,

24 to give advice on the best ways to deal with, you know, the

25 chemicals that are involved.

1    Q     And how long have you been a hazmat officer?

2    A     Just over four years, so four years seven months, I

3    think it is.

4    Q     Do you have special training to be a hazmat officer?

5    A     Yeah, I attended the Fire Service College on a

6    three-week course to do my initial training as the -- to

7    attend incidents, and then I've received further training on

8    all of the equipment that we use on the specialist vehicle.

9    Q     And do you also receive continuing education or

10   training?

11   A     Yeah, it's normally every six months we'll receive

12   further training on all of the equipment and we're also

13   revalidated, so tested and -- every six months, as well, to

14   make sure that we're still able and confident to use the

15   equipment.

16   Q     What sort of equipment are you talking about?

17   A     Various pieces of equipment really.  We've got the

18   HazMatID 360, which can identify unknown powders and liquids.

19   We've got Hapsite, which can detect vapors and -- and analyze

20   vapors.  And then various other, so gas monitors and other

21   pieces of equipment really that can help identify unknown

22   chemicals.

23   Q     So how -- if you can describe for the jury, tell us how

24   you would respond to a typical incident involving an unknown

25   chemical or --

1   A      Generally, I'd get a text message on my mobile phone,

2   and -- and it'd give a brief description of what the incident

3   was.  I'd then proceed to that incident in my car -- in a fire

4   service car, and -- and then we make a risk assessment once we

5   get all the information.  So once I'm on scene and spoken to

6   the OIC of the incident, the officer in charge, and get all

7   the information, I then come up with a tactical plan to be

8   able to deal with that incident.

9   Q      And do you do this alone, or do you have help?

10  A      Depending on what the incident is.  Where it's an

11  unknown chemical and we are to start testing that chemical,

12  then we will always have a second hazmat officer come with us,

13  and we'll have a third officer go to our service control, so

14  the control room, to do all of, you know, the phone calls or

15  anything.

16         Where it's a known chemical, then generally we will do

17  it alone unless we need assistance.

18  Q      Okay.  And why in the case of an unknown chemical do you

19  have so many people involved?

20  A      We need to be able to speak to each other, to question

21  each other really on the results that we're finding, and to

22  come up with the best plan, and -- and it's a risk

23  assessment-based process really, and it -- we need to identify

24  safely.

25         And whenever we test an unknown chemical, we go in

1   pairs so that we can look at the data, analyze the data,

2   discuss the data between us to make sure it's right.  Also,

3   should anything go wrong in that environment, then it's a

4   buddy system where we can rescue each other really or lead

5   each other to safety.

6   Q     Do you have special safety equipment that you use in

7   these situations?

8   A     Yeah, depending on the environments that we're going

9   into, we wear our full firefighting kit regardless.  And if

10  it's a gaseous environment, then we have gas protection suits,

11  and where it's a powder environment or a crystalline

12  environment, then we will wear a disposable overall and that

13  can be disposed of in the buildings or in the area of the

14  chemicals.

15  Q     This HazMatID 360, what is that?

16  A     It's a small machine and -- where we can test white

17  powders or liquids, and it's a spectrograph machine, powered

18  by an infrared light source, and -- which basically, and very

19  basically, shines an infrared light source through the

20  chemical and identifies it through the amount of light that

21  will go through a chemical, and then it compares that to a

22  onboard library of chemicals, presents that comparison on a

23  small screen in the form of a spectrograph.

24  Q     And what is a spectrograph?

25  A     It's the conversion of the light that has gone through,

1    and it's basically just a series of lines, so up-and-down

2    lines, you know, for want of a better word, and -- but it's

3    different wavelengths.  So -- and from them wavelengths, it

4    will identify or try to identify the chemical wipes that --

5    that we placed on the machine.

6    Q    So let's say you have a hypothetical unknown white

7    powder.  What do you do with it?  How big is this machine?

8    A    It's small, so about this size, and it's -- and it's

9    held in its own suitcase.

10   Q    Okay.

11   A    So depending on the environment that we go into, we will

12   make a decision as to whether we take the machine in with us

13   and run it off a battery or whether we go into the environment

14   and collect a sample and bring it back out again.  And,

15   generally, where we collect the sample and it's where the

16   environment that we're going into is contaminated so there's a

17   lot of the product around the room, so -- and what we don't

18   want to do is contaminate the equipment.

19        So we will go and collect the sample and then retreat to

20   a safe area, a clean area, a sterile area where we can test

21   the samples.  Or if it's a small sample and -- where it's not

22   been spilled anywhere and where there's no risk of

23   contamination, we will take the machine in with us and do a

24   sample in situ.

25   Q    And do you actually take a little bit of the powder and

1    put it on the machine?

2    A     Yeah, generally, we will always try and do three

3    samples.

4    Q     Hm-hmm.

5    A     And the reason for that is cross-contamination or

6    contamination with other products out there.  So we will

7    always try and do three tests to verify what we've got, and if

8    all three tests then state that is that product, then it gives

9    us a high -- a high degree of confidence that that is the

10   product that we think it is.

11   Q     And how physically does it work?  I mean, is there -- is

12   there a little dish or something or tray?

13   A     There's a very small prism just -- just on the top of

14   the machine, and depend -- again, depending on whether it's

15   powder or whether it's granulated or anything like that, we

16   will put a very, very small sample onto the prism, and then

17   we'll put a small hammer down to make sure it's good contact

18   and then set the machine into the analyzing mode.

19   Q     And that's when the infrared light is shined through the

20   powder?

21   A     And that's when -- yeah, it comes through -- it goes

22   through the prism, and then after about 10 or 15 seconds, it

23   displays the results.

24   Q     All right.  And there's -- what is there on the machine

25   that displays the results?

1    A    Just a small onboard computer.  So it's a small screen,

2    approximately 9 inches across.

3    Q    A video screen?

4    A    Yes, yeah.

5    Q    And what does -- what does the result look like that it

6    produces, generally?  Is it a graph, a line graph?

7    A    It's -- yeah, it's just a graph, and -- but next to

8    that, as well, we will get a number of chemicals that it

9    thinks -- so it'll tell us what it thinks it is in word

10   format, and then we click on what -- what we think it may be

11   and then compare the graphs to the onboard library.

12   Q    Okay.  So let's take it one step at a time.

13   A    Yeah.

14   Q    The first step is you place the powder on the -- on the

15   prism.

16   A    Yeah.

17   Q    Lower the hammer on the -- on the powder.

18   A    Yeah.

19   Q    So shine infrared light through it.

20   A    Yeah.

21   Q    And then the machine generates a graph representing the

22   spectra of that --

23   A    Of --

24   Q    -- unknown powder.

25   A    Yes, yes.

1   Q      And that comes up on a little video screen --

2   A      Yeah.

3   Q      -- on the suitcase-sized device.

4   A      Yes.

5   Q      Now, I -- there's something else in this device, right?

6   There's an onboard database?

7   A      Yes, there's an onboard database with approximately

8   8 and a half thousand, so 8,500, chemicals listed in that

9   database.

10  Q      All right.  And what about those chemicals is in there,

11  inside of the machine, in its database, there's a spectrograph

12  of each of those?

13  A      Yes, yeah, basically, it's been done by the company that

14  it's produced by, which is Smiths ReachBack.  So then --

15  Q      Okay.  Hang on, hang on.

16  A      Oh, sorry.

17  Q      That's okay.

18  A      Yeah.

19  Q      But it's -- but it's -- but it's a little bit

20  complicated --

21  A      Yes.

22  Q      -- so let's take our time.

23  A      Yeah, that's fine.

24  Q      The first point is this suitcase-sized device --

25  A      Yeah.

1  Q      -- contains a -- a large database.

2  A      Yes.

3  Q      And that database -- and correct me if I'm wrong --

4  A      Yeah.

5  Q      -- but what's in that database?

6  A      Just a list of 8 -- 8,500 chemicals.

7  Q      All right.  But it's more than just a list of names,

8  right?

9  A      It's all the spectrographs for them chemicals, yeah.

10 Q      Known spectrographs.

11 A      Yes.

12 Q      That -- and all of that is set up by the company that

13 makes the device?

14 A      Yes, yeah.

15 Q      And what's the name of that company?

16 A      It's called Smiths -- Smiths ReachBack.

17 Q      And that's -- it's an American company, correct?

18 A      Yes, to my knowledge, yes.

19 Q      Okay.  All right.  And so what happens once the

20 spectrograph of the unknown powder has been generated by the

21 infrared light?  Does the computer make a comparison?

22 A      It makes a comparison of what it thinks the chemical

23 will be.

24 Q      Is it comparing it to the known spectrograph?

25 A      It's comparing it to the 8 and a half thousand chemicals

1   -- or that spectrographs for them chemicals.

2   Q    In its database.

3   A    Yes.

4   Q    And then what it proposes?

5   A    It then -- it looks at them and it -- it will basically

6   give us a -- a list of one, two, or maybe ten different

7   chemicals that it thinks that it is.

8   Q    All right.  And -- and how does that list appear, in

9   words or in --

10  A    Yes, no, it's in words, yeah.

11  Q    All right.  And then what do you do?  Do you call you --

12  you up the spectrographs?

13  A    Yes, yeah, we will then select what we think, you know,

14  the best match for it.  It will give us a score basically.

15  Q    A what?

16  A    A score, so it'll say between one and a hundred.

17  Q    So it will make a determination --

18  A    Yes.

19  Q    -- of how likely the match is --

20  A    Yes, yeah.

21  Q    -- on a scale of one to ten.

22  A    Yes.

23  Q    But then you -- what, you click on each of those to call

24  up?

25  A    Yeah, we'll then compare.  So we'll click on the top hit

1  basically.

2  Q    The most like --

3  A    Yeah.

4  Q    The one that the machine thinks is most likely.

5  A    Yes.

6  Q    All right.  And what happens on the machine at that

7  point?

8  A    At that point, then we will get two spectrographs.  So

9  we'll get a spectrograph of the chemical and the spectrograph

10 of the hit, so what it thinks it is.

11 Q    Okay.  Let me stop you and make sure I understand

12 correctly.

13 A    Yeah.

14 Q    You already have the spectrograph of the unknown

15 chemical --

16 A    Yes.

17 Q    -- that's been generated as you've described.

18 A    Yes.

19 Q    And you get this list of suggestions from the computer,

20 its database, and then you -- you typically start with the one

21 that says is most likely.

22 A    Yes, yeah.

23 Q    And, what, that brings up a spectrograph of that

24 chemical --

25 A    Yes.

1    Q      -- from the database?

2    A      Yes.

3    Q      And then what do you do?

4    A      And we'll then compare it.  So we'll look at both

5    spectrographs.  They're both in different colors, and so I

6    think --

7    Q      I'm sorry.  Wait a minute.

8    A      Yeah.

9    Q      They're both in different colors?

10   A      Yes, yeah.

11   Q      Okay.  Which is which color?

12   A      The onboard one is the blue, and then ours will be the

13   pink.

14   Q      And the which is pink?

15   A      The unknown chemical.  Sorry.

16   Q      The unknown is pink?

17   A      Yeah, yeah.

18   Q      And the -- the known from the computer is blue.

19   A      Yes.

20   Q      Are they on the same screen or --

21   A      They're on the same screen and stacked one above each

22   other.

23   Q      To make it easier to make a comparison?

24   A      Yes, yeah.

25   Q      All right.  And then what happens?

1    A      We'll then look at it and make a determination as to

2    whether we think it's correct, and we can then overlay, as

3    well, so we can actually stack one on top of the other, and --

4    and it will give you the better picture of if there's any

5    extras, you know, where we can say, no, it's not that, or,

6    yes, it is that chemical.

7    Q      Okay.  How often have you made use of this machine?

8    A      Over the past four and a half years, I couldn't really

9    guess.  But I -- I'm -- I am revalidated on it every three

10   months by an external company who will come back and test me.

11   I would say maybe 30 or 40 times over the four years.

12   Q      Okay.  And you've already said you -- your protocol

13   calls for you to do this three times?

14   A      Yes.

15   Q      Do you -- do you -- do you take further efforts to -- to

16   confirm your identification besides those three times?

17   A      Yes, we will -- if it is an unknown chemical, if it's a

18   quite serious case, then we will take the spectrograph and

19   download it onto a USB stick so that we can then e-mail it to

20   Smiths ReachBack facility to confirm our findings.

21   Q      Okay.  And how will they do that?

22   A      They'll take the spectrograph that we've sent them, and

23   then they'll compare it to their libraries.  They have a more

24   substantive library than we do, and they have a lot more

25   qualified people than myself to be able to confirm or deny the

1    product.

2    Q     All right.  And what do you get back from then?

3    A     And we'll get an e-mail back from them with another

4    spectrograph that we can display on our computer screen, and

5    it will -- and it will -- we'll also get an e-mail back

6    explaining their findings, as well.

7    Q     Were you called upon to test the substance in connection

8    with the death of Andrew Denton that occurred on December 31st

9    of 2012?

10   A     I was, yes.

11   Q     How did you get involved in that matter?

12   A     I received a phone call on January 1st, 2013, and that

13   was from one of my hazmat colleagues to say that he'd also

14   received a phone call from the police to say that we -- we

15   would be required later on in the day to attend Clough Road

16   Fire -- Police Station to test an unknown substance.

17   Q     And what did you do?

18   A     And I then made a phone call to another colleague that

19   was on duty with me at the time, which was Tyson Truelove, and

20   explaining what had gone on and explaining the phone call I'd

21   received.  I then made a phone call to my superior officer to

22   tell him that we had an interagency incident and that we would

23   be attending Clough Road at six o'clock in the evening.

24   Q     And Clough Road is what?

25   A     Clough Road is a police station.  It's the -- it's the

1    police station headquarters.

2    Q     All right.  What did you and Tyson Truelove do?

3    A     And we held -- we had a quick call, a chat about the

4    incident and about what we were then going to proceed to do,

5    made a decision on the equipment that we'd need, and then put

6    all of that in place to rendezvous at Clough Road Police

7    Station at 5:00 p.m.

8    Q     What happened there?

9    A     We then briefed the whole crew, because whenever we get

10   the equipment down, it comes down with a -- with a safety

11   crew, as well, which are a firefighter and appliance, and

12   between then myself, Tyson, and another called Jules Holme,

13   who was a hazmat officer -- or was at the time, we came up

14   with a plan of action to be able to test the substance.

15   Q     What was that plan of action?

16   A     Myself and Tyson would enter the evidence room where the

17   substance was being held.  We would wear full firefighting

18   kit, and we would wear paper suits and breathing apparatus,

19   and then this would all be observed by Jules Holme from --

20   from a remote location to ensure that everything that we did

21   was correct and as per our policies.

22   Q     Okay.  Did you don your -- your equipment?

23   A     Yeah, we donned, as I say, the full firefighting kit,

24   the paper suits, and breathe apparatus, and we entered the

25   room with the HazMatID 360.

1  Q    What did you do inside?

2  A    Prior to going in, we was informed by one of the police

3  officers where the packet was and how it was labeled so that

4  we could identify the correct packet and then start to do the

5  testing.  And --

6  Q    Let me stop you for a minute.

7  A    Yeah.

8  Q    Can you describe it?  I mean, what was the packet?

9  A    And the evidence packet had been wrapped up in three

10  police evidence bags to my knowledge, and then inside, there

11  was a small cellophane packet and -- with a small amount of

12  granulated white powder.

13  Q    All right.  And what did you and Mr. Truelove do?

14  A    And we set up the HazMatID 360, and prior to opening any

15  of the packet or anything, we performed a validation test on

16  the machine.

17  Q    What's a validation test?

18  A    It's basically a test to ensure that the equipment is

19  working within its parameters and that it is -- everything is

20  settled for it to test correctly.

21  Q    And is that standard protocol?

22  A    We will do that before any testing, yes.

23  Q    Okay.  And was it working properly?

24  A    It was, yes.

25  Q    All right.  What did you do?

1    A      And -- well, after the validation test?  Sorry.

2    Q      Yes.

3    A      Yeah, yeah.  And then Tyson Truelove, my colleague,

4    proceeded then to open up the evidence packet and document in

5    what -- what we was doing at the time.  It was then noted and

6    -- that there was a very small amount of the granulated powder

7    and we --

8    Q      Why was that significant?

9    A      Pardon?

10   Q      Why was that significant?

11   A      And due to it being such a small amount, we then had a

12   discussion as to how we was going to proceed with the testing.

13   The police were very keen to maintain some of the sample for

14   any further testing.

15          So we decided, depending on the hits that we were

16   getting and any identification, that we'd only do two tests to

17   try and ensure that we would leave some of the granulated

18   powder for evidence for the police.

19   Q      Okay.

20   A      Which is what we proceeded to do.  So we placed the

21   powder onto the HazMatID 360 and performed the first test.

22   Q      And what was the result?

23   A      And it came up with a spectrograph, and it came up with

24   a number of hits, and prior to going in, we were informed that

25   it was possibly potassium cyanide.

1   Q      Okay.

2   A      And so we looked to the various hits and the various

3   scores that we got from them, and I believe, from memory,

4   although I could be mistaken, in that potassium cyanide was

5   the second hit.

6   Q      Hm-hmm.

7   A      And we then clicked on the spectrograph for potassium

8   cyanide, overlaid it onto the sample product, and it gave a

9   good match for potassium cyanide.

10  Q      Okay.

11  A      We then cleaned off the machine, using chemical wipes

12  that are supplied, and conducted the test a second time, and

13  the second test came up with the same results.

14  Q      All right.  And in your experience, was it a good match?

15  A      It was a good match and -- for potassium cyanide, but

16  there was also the presence of water, as well.

17  Q      What's the significance of that?

18  A      And it -- it will basically give us a slightly different

19  reading to what would be expected, although we do know what

20  water looks like on the spectrograph and we know where it

21  appears on the spectrograph, and it just -- it changed the

22  look of the spectrograph where it was for potassium cyanide.

23  So there was an extra lump where water was present.

24  Q      Okay.  And how does water get into the potassium

25  cyanide?  Do you know?

1   A    Potassium cyanide's a salt, and so generally I --

2   although I cannot comprehensively confirm it, I would have

3   thought it was coming from the atmosphere because the packet

4   at some stage had been opened.

5   Q    And salt absorbs water --

6   A    Yes.

7   Q    -- in your experience?

8   A    Yeah, yes.

9   Q    Okay.  All right.  Did you send off the digital file to

10  Smiths Detection for confirmation as per your protocol?

11  A    Yes, and it wasn't myself.  It was Jules Holme who --

12  Q    Jules Holme?

13  A    Yeah.

14  Q    One of the three people that --

15  A    It was one of my colleagues that was observing

16  everything we was doing, and he sent it off the next day.

17  Q    Right.  And -- and you -- the three of you work in a --

18  or at least a team of two, in this case a team of three?

19  A    Yes.

20  Q    And that's your standard operating procedure?

21  A    It is, yeah.

22  Q    Maybe a little bit extra in this case with the third

23  person, correct?

24  A    No, no, generally, we -- where the DIM vehicle has been

25  deployed, which is our Detection, Identification, and

672

1    Monitoring vehicle, we will try to have three people.

2    Q     All right.  So this was -- and this was per your

3    standard protocol.

4    A     Yes, yes.

5    Q     Okay.  And what was the response from Smiths Detection?

6    A     They -- they analyzed the spectrograph that was sent,

7    and it came back that -- and said that it was consistent with

8    potassium cyanide, although it did show a low absorbency

9    grading, and -- but this was possibly due to degradation.

10   Q     Did they also show water as you did?

11   A     They did, yes.

12   Q     Okay.  And have you seen the printout of that

13   spectrograph?

14   A     I have, yes, yeah.

15   Q     Okay.  Let me show you what's been marked as

16   Government's Exhibit 73 for identification, ask you to take a

17   look at that, and tell us if you recognize it, please.

18   A     Yes, I do recognize it.

19   Q     What is 73 for identification?

20   A     It is the spectrograph that was sent back from -- from

21   Smiths ReachBack.

22   Q     Confirming your identification of this unknown substance

23   as potassium cyanide?

24   A     It did, yeah.

25         MR. FRANK:  I'd move Exhibit 73 in evidence.

1              THE COURT:  Any objection?

2              MR. RIDGE:  Yes, Your Honor.  I think that somebody

3     from Smith Detection should be here to introduce this

4     particular exhibit.  That this witness can certainly testify

5     as to what he did and what his analysis of the substance

6     showed, but I think he's testifying about what the results of

7     somebody else's analysis was, and I don't think it's

8     appropriate for him to do that.

9              THE COURT:  I'll see counsel.

10        (At sidebar on the record.)

11             THE COURT:  I guess my first question is, isn't the

12    cat already out of the bag?  Didn't you -- I mean, hasn't he

13    already testified to what Smiths' results were?

14             MR. RIDGE:  He has testified, yeah.

15             THE COURT:  Without objection?

16             MR. RIDGE:  Yeah.

17             THE COURT:  So what's the -- I mean, so the -- isn't

18    the exhibit cumulative then?

19             MR. RIDGE:  Well, it may be, but I think for the

20    jury to have this it's not appropriate.

21             THE COURT:  All right.

22             MR. FRANK:  Your Honor, I -- I think that this is a

23    matter of authentication under Federal Rule of Evidence 901(b)

24    -- (b)(9), and I think I've laid the foundation that this is a

25    -- a -- an accurate and reliable process that produces a -- an

1    accurate and reliable result, and we've gone through his

2    training on this machine and how they verified that it was

3    operating properly, and, you know, this is all part of their

4    standard protocol.

5         So that I think that's the -- the -- the issue for its

6    admissibility is that.  Is it accurate and reliable, and has

7    it been adequately described and identified?  I don't think

8    there's any hearsay aspect to this because I don't think this

9    is the statement of a human being.

10             THE COURT:  The standard for authen -- is your

11   objection authentication?

12             MR. RIDGE:  Well, it is, yes, yeah.  I don't think

13   this -- excuse me.

14             THE COURT:  Go ahead.  But the -- the standard for

15   authentication under 901(a) -- or (b)(1) is that the proponent

16   is required to produce testimony from the witness with

17   knowledge that the item is what it is claimed to be, right?

18             MR. RIDGE:  Hm-hmm.

19             THE COURT:  So my sense is that the government has

20   satisfied that part of the rule that requires somebody with

21   knowledge who is familiar with these graphs to demonstrate

22   that it is what it purports to be, namely, the graph of the --

23   is it Smith ReachBack?  Is that the name of it?

24             MR. FRANK:  The service is Smiths ReachBack ID.  The

25   company is Smiths Detection.

1          THE COURT:  Okay.  In any event, I think he has

2    established that -- that -- through this witness that it is

3    what it purports to be.

4          MR. RIDGE:  All right.

5          THE COURT:  Okay.

6      (End of discussion at sidebar.)

7          THE COURT:  The objection's overruled.  73 is

8    admitted over objection.

9          MR. FRANK:  And, Your Honor, I'd request permission

10   to publish 73?

11         THE COURT:  You may.

12   BY MR. FRANK:

13   Q    Officer Kay, can you explain for the jury what -- what

14   they're seeing here?  Which -- which of these spectrographs is

15   the spectrograph of the unknown white powder that you and

16   Tyson Truelove --

17   A    It's the sample spectrum, so it's the one in red.

18   Q    Can you -- can you -- if you touch the screen with your

19   finger, it will -- it will highlight, or if I do it.

20   A    Yeah, so it's the -- so that piece showing the water

21   spectrum from that, even though it's part of the spectrum, but

22   the red line basically is showing potassium cyanide.

23   Q    Okay.  The red line is the graph of the unknown

24   substance?

25   A    Yes.

KAY - DIRECT EXAMINATION/FRANK

1    Q    All right.  And where is the reference graph from Smiths
2    Detection?
3    A    And it's the black line, just there, so as that runs
4    through --
5    Q    Okay.
6    A    -- and then it's the black line there.
7    Q    And can you trace where it matches that gives you
8    confidence that this is potassium cyanide?  What is it about
9    the two -- the two graphs?
10   A    So it's --
11   Q    That first peak?
12   A    So it's that first peak, just there.
13   Q    At the -- at the frequency -- what is that 2,000?
14   A    I believe it's 2,200.
15   Q    Okay.  And -- and how about the second large peak?
16   A    And the second large peak is an unknown substance at
17   this point.
18   Q    Okay.  And where is water on this?
19   A    Water is shown by -- I think it was green originally,
20   and it's that peak there.
21   Q    That's the water.
22   A    Yeah.
23   Q    All right.  And it's echoed above in red; is that fair
24   to say, in the -- in the --
25   A    It is showing up in red because of it -- it's shown up

1   in red because of it being absorbed into the potassium

2   cyanide.

3   Q     That's what leads you to believe that this particular

4   sample of cyanide had water in it?

5   A     Yes, yeah.

6   Q     That there's this -- this hump in -- in that red graph?

7   A     Yes.

8           MR. FRANK:  I have no further questions of this

9   witness, Your Honor.

10          THE COURT:  Cross-examination?

11          MR. RIDGE:  Yes, Your Honor.

12                      CROSS-EXAMINATION

13  BY MR. RIDGE:

14  Q     Good afternoon, Mr. Kay.

15  A     Good afternoon.

16  Q     Your testimony, I think, was that generally you do three

17  tests, and in this instance, you did two?

18  A     That's correct.

19  Q     And why did you vary your usual process?

20  A     Due to the -- such a small amount left in the sample,

21  and the police, prior to entering, asked us, if possible, that

22  we maintain the sample for evidence later on.

23  Q     Is there any concern on your part that doing two samples

24  rather than three --

25  A     Given --

1   Q      -- calls into question the legitimacy of the result?

2   A      No, given the results were the same on both occasions,

3   then no.

4   Q      Is this an infrared analysis?

5   A      It is, yes.

6   Q      And you know -- I'm not trying to be critical of you at

7   all, trust me.  You know how to run this machine?

8   A      I do, yes.

9   Q      What do you have for a scientific background?

10  A      Just -- just the training that we've had on the

11  equipment and the training that we received from the Fire

12  Service College.

13  Q      Okay.  Do you know whether an infrared analysis can

14  determine the presence of potassium?

15  A      Of -- sorry?

16  Q      I'm sorry?

17  A      Sorry.  Could you repeat the question?

18  Q      Yes.  Do you know whether or not an infrared analysis

19  can determine the presence of potassium?

20  A      It cannot, no.

21  Q      It cannot.

22  A      It's a salt, so the -- this particular piece of

23  equipment cannot find --

24  Q      Okay.

25  A      -- cannot identify potassium.

1    Q      Okay.  Because potassium's a metal?

2    A      It's a salt, yeah.

3    Q      It's a salt.

4    A      Yeah.

5    Q      But the in -- in the infrared analysis -- or is -- salt

6    is not absorbed by the infrared analysis.

7    A      That's right, yeah.

8    Q      So would it be fair to say that what this shows us is

9    that there is the presence of cyanide?

10   A      That's correct, yes.

11   Q      But it doesn't show us the presence of potassium.

12   A      What it shows is when Smiths ReachBack put in the

13   chemical database is that they put in potassium cyanide as

14   part of that database, and the product that we have tested on

15   that machine is consistent with potassium cyanide.

16   Q      But if -- if the machinery cannot identify potassium,

17   how can we conclude that this sample is potassium cyanide as

18   opposed to some other kind of cyanide?

19   A      I can't answer that, unfortunately.

20   Q      Okay.  We can't -- you can't explain how that --

21   A      I can't, no, no.

22   Q      Okay.  There are other kinds of cyanide.

23   A      Yes, correct.

24   Q      And is it always a -- a salt or a metal that's connected

25   to the --

1    A    Generally, to my knowledge, yes, yeah.

2    Q    Okay.  And it's that second piece that can't be

3    identified by this type of testing.

4    A    Yes, yeah.

5    Q    Okay.  And wouldn't it be fair to say that sodium

6    cyanide would show up pretty much the same as this?

7    A    Without seeing -- without testing sodium cyanide, again,

8    I couldn't answer that.

9    Q    Okay.  What other hits did you get?

10   A    I -- I don't know is the honest answer.  It was some

11   years ago, and we didn't take that list down.

12   Q    But there were, I think you said, ten?

13   A    No, I said there could be up to ten.

14   Q    I'm sorry?

15   A    There could be up to ten.

16   Q    Oh, I'm sorry.

17   A    And -- but I'm not sure at that point of how many hits

18   we got.

19   Q    But you got more than one hit.

20   A    Yes.

21   Q    And did you follow up on the other hits that you got?

22   A    We -- we looked at the other hits that were on at the

23   time --

24   Q    Hm-hmm.

25   A    -- and dismissed them as not the product.

1   Q       Okay.   And you knew before you did the testing that the

2   suspicion was that this was potassium cyanide that had killed

3   Mr. Denton?

4   A       We were informed, yes, that it was possibly potassium

5   cyanide.

6   Q       Is the test that you performed deemed a preliminary test

7   or a field test?

8   A       It's a field test.

9   Q       It's a field test?

10  A       Yes.

11  Q       And does that mean that it is generally followed up by

12  further, more specific analysis?

13  A       Only in the fact that we will send the spectrum to

14  ReachBack.

15  Q       Okay.

16              MR. RIDGE:   Thank you.

17              THE WITNESS:   Okay.

18              THE COURT:   Redirect?

19              MR. FRANK:   No, Your Honor.

20              THE COURT:   Thank you, sir.   You may stand down.

21              THE WITNESS:   Thank you.

22         (The witness left the witness stand.)

23              THE COURT:   Ladies and gentlemen, this is a good

24  time to take our second break.   We'll take a break for about

25  20 minutes.   Don't discuss the case, and we'll see you back

1    here.  Thank you.

2              (Jury exited at 12:38 p.m.)

3              THE COURT:  A couple of matters on the jury

4    instructions.

5         First, I've -- in light of the testimony here, I've

6    changed one of the instructions just to -- or the final

7    instructions to add a statement about exhibits containing

8    drugs, and typically what we do -- they're treated sort of

9    like in the same way we treat firearms, and we obviously don't

10   want the jury, for a lot of reasons, to bring into the jury

11   room itself something that they may be concerned about, so --

12   in particular, the possibility that some of it is cyanide.

13        So what I've done is I've added a statement that

14   basically says, you have the right to review the exhibit if

15   you wish to.  The drug exhibits will not be brought into the

16   jury room initially, but if you want them, you have a right to

17   review them, let me know, and we'll have an officer bring them

18   to you for your inspection, but don't discuss the case while

19   the officer's present.  It's a very typical type of

20   instruction in a case like that.  I just thought I'd alert you

21   to the -- to the change.

22             MR. RIDGE:  Thank you, Your Honor.

23             THE COURT:  The -- the other question I had on jury

24   instructions is this.  It -- from your initial opening,

25   Mr. Ridge, it struck me that your -- and through your

1   questioning just -- just now, that you're differentiating

2   between the allegation in the indictment, which is potassium

3   chloride -- cyanide, and evidence that the government has

4   brought to bear that it may be cyanide, but they haven't

5   proven it was potassium cyanide itself.

6       I'm wondering -- the jury may need some assistance on how

7   it is supposed to view, as a matter of law, a variation in

8   proof from what is set forth, if they do find it, what is set

9   forth in the indictment, and typically we instruct them, for

10  example, that on the on or -- on or about date or on about

11  date, that it's not necessary for the government to prove the

12  specific date, but something close to the date is sufficient.

13      But I -- I'm not sure whether you have some authority

14  that you'd like to present the court on what I should instruct

15  the jury as to a -- as to this narrow issue on the difference

16  between the indicted charge of potassium chloride and --

17  cyanide -- I'm sorry -- potassium cyanide and the proof, if

18  the jury finds it, of cyanide alone.

19              MR. RIDGE:   I don't have any authority to give to

20  the court today.

21              THE COURT:   Okay.  No, I -- you're -- you're good,

22  Mr. Ridge, but you're not that good.  But what I'm suggesting

23  is that over the weekend or something, you could research that

24  issue and give me some potential instructions.  I think the

25  jury will be a little lost on -- if I don't give them some

1    general instruction as to the elements in the case and how to

2    make -- what to make of the argument that there is a

3    variation.

4              MR. RIDGE:  Thank you, Your Honor.  I would need the

5    weekend because I can't do research in my hotel room.

6              THE COURT:  No, and that's why I'm mentioning it

7    now.

8              MR. RIDGE:  Okay.

9              THE COURT:  So that you'll have an opportunity to do

10   that.

11       And, Mr. Frank, I'd ask that you get all the minions at

12   the U.S. Attorney's Office to see if you can come up with an

13   instruction that would help the court tell the jury how it's

14   to evaluate that argument as a matter of law.

15             MR. FRANK:  Yes, Your Honor.

16             THE COURT:  Okay.  Thank you.  Court will stand in

17   recess.

18       (Court recessed from 12:44 p.m. to 1:07 p.m.)

19             MR. FRANK:  Your Honor, if I may?  The witnesses

20   from the United Kingdom who have testified had asked if they

21   might be able to sit in on the testimony.  I said I had to ask

22   you because we've invoked the rule on witnesses and

23   sequestered them.

24             THE COURT:  Right.

25             MR. FRANK:  I asked Mr. Ridge.  I don't think he

1   objects to the ones who have testified, but I -- I know I have

2   to seek your --

3             THE COURT:  Sure.

4             MR. RIDGE:  I don't object to that, Your Honor.

5             THE COURT:  Okay.  Well, you can tell them that they

6   can come in and watch the proceedings now that they've

7   testified.  That's fine.

8             MR. FRANK:  Thank you, Your Honor.

9             THE COURT:  Would you bring the jury in, please.

10        (Jury entered at 1:07 p.m.)

11            THE COURT:  Next witness?

12            MR. FRANK:  Is Edith Mae Collins.

13            THE CLERK:  Do you solemnly swear that the testimony

14  you shall give in the matter now in hearing shall be the

15  truth, the whole truth, and nothing but the truth, so help you

16  God?

17            THE WITNESS:  I do.

18            THE CLERK:  Please be seated.  Please state your

19  name and spell your last name for the record.

20            THE WITNESS:  Edith Collins, C-o-l-l-i-n-s.

21            MR. FRANK:  Thank you, Your Honor.

22  EDITH COLLINS, having been duly sworn, was examined and

23  testified as follows:

24                      DIRECT EXAMINATION

25  BY MR. FRANK:

1    Q    Good afternoon, ma'am.

2    A    Good afternoon.

3    Q    Where do you live?

4    A    I live in Silver Springs, Nevada, which is an hour

5    outside of Reno.

6    Q    And how long have you lived in Nevada?

7    A    Since 1987.

8    Q    What do you do there?

9    A    I am an office manager for a drug and alcohol treatment

10   program for youth.

11   Q    And what does that mean that you do?

12   A    I -- well, I pay the bills and make sure everything

13   keeps running, but I also work with the clients, as well.

14   Q    And what sort of work do you do with the clients?

15   A    They're in the recovery process, so I might -- basically

16   a peer support type of thing.

17   Q    And how long have you been doing that?

18   A    I started as an on-call in March of --

19   Q    What is an on-call?

20   A    Basically a sub, a sub -- I started as a subcounselor,

21   and in March of last year, and then they -- then I went into

22   the office management position as a temp in August, and then

23   as of this October, I'll be there a year in the office

24   management position, so --

25   Q    Okay.  Do you have other work experience besides?

1    A    I do.  I worked for 23 years in Lyon County School

2    District.  I was the -- I started as a school bus driver, went

3    to a driver trainer, and then I was the manager -- the

4    supervisor for 11 years.

5    Q    Now, Ms. Collins, did you file an IC3 complaint against

6    skiptin?

7    A    I did, yes, sir.

8    Q    Why?  What happened?

9    A    Um, my granddaughter --

10             MR. RIDGE:  Your Honor, I hate -- I hate to

11   interrupt, but I need to object because I think the witness is

12   going to provide us hearsay information about a statement made

13   by her granddaughter, not made by her, and her granddaughter's

14   not here, and as I understand will not be here, for

15   presentation at trial.

16        So, therefore, I think because it's hearsay and because

17   we have no opportunity to confront the witness, it should be

18   excluded.

19             THE COURT:  All right.

20             MR. FRANK:  Your Honor, I was at this point just

21   eliciting some background information about Ms. Collins'

22   granddaughter.  I mean, ultimately, my goal is to admit the

23   e-mail between the granddaughter and skiptin and the related

24   complaint, and I don't think -- I think the defendant's side

25   of the e-mail is not hearsay.  I think it's the nonhearsay

1  statement of a party-opponent, and I think the granddaughter's

2  side of the e-mail is at least admissible for the purpose of

3  context, putting -- putting the nonhearsay defendant's

4  statement in context so that it can be properly understood.

5       The overall thrust of the testimony, though, is the

6  filing of the complaint and the lack of retaliation as its

7  value for disparate -- disparate treatment -- disparate --

8  yeah.

9            MR. RIDGE:  Well, I think, Your Honor, first of all,

10  the comment from the prosecutor went a little bit beyond what

11  he needed to provide to argue this particular motion in front

12  of the jury.

13            THE COURT:  Right.

14            MR. FRANK:  May we approach, Your Honor?

15            MR. RIDGE:  But --

16            THE COURT:  Well, why don't we -- why don't we ask

17  the jury to leave and then we can air it out.

18       Okay.  Ladies and gentlemen, before you leave, you just

19  heard statements by lawyers.  I already told you -- and I'm

20  sure that you're following my instructions -- that statements

21  by lawyers are not evidence.  So whatever you just heard being

22  argued is not evidence and you're not to consider it as

23  evidence for purposes of arriving at your verdict.

24       With that admonition, you may go into the jury room for a

25  period while we resolve this issue.  Thank you.

1      (Jury exited at 1:14 p.m.)

2           THE COURT:  So let's -- let's try and figure out

3  what's going on here.  One thing I think that Mr. Ridge has

4  raised that is correct is that I'm not sure how much of what

5  this witness is going to testify actually will echo what her

6  granddaughter told her happened and that may be problematic

7  under the hearsay rule and also under the confrontation

8  clause.  So you have a -- you have an issue there.

9      It's a different question as to whether or not the e-mail

10  itself gets in, the e-mail string gets in.  I've already ruled

11  on that, and that's been teed up well by the parties, and I've

12  also issued an order, so that is -- I see no reason to change

13  that earlier ruling.

14      But I'm a little leery of how the government plans to get

15  the evidence that would lead to the e-mail in.  Do you want to

16  tell me how you plan to do that?  So, for example, I don't

17  know what she's going to testify.  I -- my grand -- I -- my

18  granddaughter came to me.  She told me she was having problems

19  with depression.  I asked her about it.  She told me that she

20  was on an e-mail string with -- or had been in contact over

21  the Internet with a potential supplier of cyanide.  I asked

22  her not to do it.  She told me she was going to do it anyway,

23  blah, blah, blah.  I don't know what she's going to say, but

24  that conversation would not be admissible because it would be

25  hearsay, and it would also present problems for confrontation

1    clause purposes.

2           MR. FRANK:  Your Honor, I wasn't intending to elicit

3    any of that kind of conversation.  I was going to ask

4    Ms. Collins about her granddaughter, who was troubled and --

5           THE COURT:  She -- she can testify to that.

6           MR. FRANK:  And -- and how I think at one point

7    things got -- that her granddaughter came to live with them

8    because she had bounced around a number of places with these

9    troubles, came to live with them from the age of 13 to 16 and

10   -- and, you know, continued to be somewhat troubled.  They had

11   just given her permission to use her computer -- to use a

12   computer that her stepfather had given her for Christmas --

13   we're talking about now January of 2013 -- and they noticed

14   that she had posted a Facebook picture of herself hanging,

15   took away the computer, got her into -- got her into a -- a

16   treatment facility, and then they, as parents sometimes do,

17   looked at her Internet history and saw this e-mail exchange

18   between their granddaughter, Shanda, and skiptin, and then she

19   filed a complaint with IC3.

20      So that's it.  I really was not planning to elicit, I

21   don't think, any hearsay from Shanda.

22           THE COURT:  Okay.  What's -- what's your position on

23   that?

24           MR. RIDGE:  Well, Your Honor, if the court's ruling

25   about Mr. Kilmartin having a part of a two-parted statement

1   and that makes it admissible, then I'm not going to push that

2   because I understand what the ruling is.

3            THE COURT:  Right.

4            MR. RIDGE:  I don't know that this has any

5   particular relevance to this case, however, and would ask that

6   if this information's going to come in, that the jury be

7   provided the same instruction that you've been giving them up

8   until now.

9            THE COURT:  Oh, sure, yeah, I will definitely do

10  that.  What -- how do you see -- I haven't seen the e-mail

11  string.  So what's the relevance of the e-mail string and the

12  complaint?

13           MR. FRANK:  Well, Your Honor, the -- the e-mail

14  string is Shanda's looking for cyanide to end her life and

15  skiptin says, I can hook you up or I've got it.  The -- the --

16  so it's a brief -- it's a brief exchange.

17           THE COURT:  Okay.

18           MR. FRANK:  I think --

19           THE COURT:  I got that.  And how about the

20  complaint?

21           MR. FRANK:  Well, the complaint is my granddaughter

22  -- you know, this guy was offering to sell my granddaughter

23  cyanide, and I -- online, and my point is it's during the

24  period of the charged conspiracy, and I think it's --

25           THE COURT:  Charged conspiracy?

1                    MR. FRANK:  I'm sorry.  The charged --

2                    THE COURT:  That's a big difference, though.

3                    MR. FRANK:  No, no, no, I don't mean conspiracy.  I

4        mean this charged scheme.

5                    THE COURT:  Right.

6                    MR. FRANK:  The charged fraud scheme.  This -- this

7        e-mail exchange occurs in January '13.  The complaint is filed

8        then.  The scheme is charged from -- through May of '13.  And

9        I think that this is at least 404(b) evidence of intent to

10       retaliate or tamper in that it's one of these extraordinary

11       situations where we actually almost have evidence of disparate

12       treatment.  We've got an example in Andrew Denton of someone

13       who filed an IC3 complaint with federal authorities about a

14       federal offense, told the defendant he -- he did so, and got

15       retaliated against, and here we have someone who did almost

16       the same thing, except not, you know, inform the defendant,

17       and no retaliation.

18            And we also have in -- in Autumn Roland, the in-between

19       case, where she -- she threatened to him that she would

20       complain, and I -- her testimony was actually she called the

21       tip line.  But Donna Gregory, the IC3 representative, will say

22       we have IC3 complaints from Denton and Collins, but no IC3

23       complaint from -- from Roland.  So I think it's sort of an

24       extraordinary situation where it's somewhat analogous to

25       employment retaliation, evidence of retaliation in that you

1   have disparate treatment.

2           THE COURT:  All right.  What -- I haven't seen the

3   complaint.  So do you object to the complaint itself?

4           MR. RIDGE:  Well, I do, yes --

5           THE COURT:  Right.

6           MR. RIDGE:  -- on the same basis.

7           THE COURT:  On the -- on the basis of hearsay?

8           MR. RIDGE:  Yes.

9           THE COURT:  And -- and why wouldn't the complaint

10  itself contain hearsay?

11          MR. FRANK:  Well --

12          THE COURT:  Not -- not the fact that she filed the

13  complaint, but the substance of the complaint itself.

14          MR. FRANK:   I think the substance is -- again, I

15  think all of this is for its value with respect to the

16  defendant's intent or state of mind, but the substance of it I

17  think is important only -- well, to the extent that it's a

18  complaint about the same thing, the thing for which he

19  retaliated against Denton for, which is, you know, turning him

20  in --

21          THE COURT:  No, you're -- you're telling me

22  precisely why you think it's relevant, and I agree that it's

23  relevant.

24      My question is hearsay, whether it's hearsay because

25  she's relating information that she -- I haven't seen the

1   complaint, so I don't know the substance of the complaint.

2   But it sounds to me like she's relating more than simply the

3   e-mail string.

4            MR. FRANK:  Well, I don't think it's much more.  I

5   think it's just I think I'm -- I'm complaining that this

6   person is trying to sell my -- my daughter (sic) cyanide.

7            THE COURT:  What exhibit number is it?

8            MR. FRANK:  It's 85-A and B.  The certified copy

9   from IC3 is 85-B, and it's really just a recitation of the

10  e-mail exchange.

11           THE COURT:  Yeah.  What do you --- what's your

12  position on that?  It looks like it virtually is already what

13  will be admissible, Mr. -- Mr. Ridge.

14           MR. RIDGE:  I'm sorry, Your Honor?

15           THE COURT:  It looks to me -- I mean, she says in

16  the complaint, basically she relates what is in the e-mail

17  string.  There isn't anything more other than Shanda's

18  15 years old, which isn't hearsay, I don't think.  It's

19  something she knows.

20           MR. RIDGE:  If the e-mail comes in, I expect the

21  complaint should come in because I agree that it does not

22  expand upon the e-mail.

23           THE COURT:  Okay, okay.  Good.  All right.  Well, I

24  think we -- we know -- just -- just be careful to avoid having

25  her testify about statements that Shanda made to her other

1    than what is set forth in the e-mail string.  All right?

2              MR. FRANK:  Yes, Your Honor.

3              THE COURT:  Would you bring the jury back in.  Thank

4    you.

5         (Jury entered at 1:24 p.m.)

6              THE COURT:  Mr. Frank?

7              MR. FRANK:  Thank you, Your Honor.

8                   CONTINUED DIRECT EXAMINATION

9    BY MR. FRANK:

10   Q    Ms. Collins, before we broke, I was asking you about

11   this -- this IC3 complaint you filed against skiptin.  What

12   was that complaint about?

13   A    It was an exchange between the skiptin person and my

14   granddaughter.

15   Q    Was skiptin trying -- offering to sell your

16   granddaughter cyanide?

17   A    Yes.

18   Q    Okay.  Let's -- let's talk about it.  Who is your

19   granddaughter?

20   A    Shanda Collins.

21   Q    And how is it that she came to live with you in Nevada?

22   A    She had had some traumatic things happen in her life.

23   Her mom died when she was 12 and went to live with biological

24   dad and that didn't work out, so then she moved to maternal

25   grandparents and grandma died, and then she went to a girls'

1    home, and then from there, she ended up in my home.

2    Q    All right.  And -- and who is in your home?

3    A    My husband and myself.

4    Q    And when was this that she came to live with you?

5    A    December of 2011.

6    Q    And how old was Shanda at the time?

7    A    I believe that would have made her 13.

8    Q    Sounds right to me.

9    A    13, yeah.

10   Q    Okay.  And how did it go in your mind?  How did things

11   work out?

12   A    Um, it was very rough.  Shanda had a lot of different

13   issues that she was dealing with, and so it was extremely

14   hard.

15   Q    Okay.  What happened in December of 2012 to January of

16   2013?

17   A    Well, we had Christmas, and Shanda was given a -- like a

18   little Kindle, iPad type of thing from her biological dad,

19   which she had not been allowed to have one or be on the

20   Internet because she couldn't be trusted on it.

21   Q    Okay.

22   A    But because she had -- he had given it to her for

23   Christmas, it was kind of like, okay, we'll try this again.

24   So we gave it to her, and just obviously a short time after

25   that is we discovered that she has posted a picture of herself

1   with a scarf around her neck like she was hanging herself.

2   Q     Did that concern you?

3   A     Very much so.

4   Q     What did you do about that?

5   A     We called the local -- it's called West Hills Hospital,

6   and we called them and spoke with them.  It was just like a

7   psychiatric hospital, and we took her in, and they admitted

8   her.

9   Q     Okay.  And while she was admitted, what -- what did you

10  discover about her Internet activity?

11  A     Um, well, we came home and we started looking through

12  the history, and that's when we discovered an e-mail that she

13  had wrote to a skiptin address, and it basically said, hey,

14  man, I'm done with life, you know, help me out, man, kind of

15  thing, and in the response was that I'm a supplier of

16  potassium cyanide, get back to me for more info type of thing.

17  Q     What'd you do about that?

18  A     Um, first I called the local law enforcement to see what

19  could be done because I didn't know what to do.  I was

20  panicking, freaking out, and then they told me that basically

21  they couldn't do anything.  And then I went onto the Internet

22  and I said there's something -- I've got to be able to do

23  something, so that's when I did the -- did an IC3 complaint.

24  Q     Okay.  About that e-mail?

25  A     About -- about it, yes, sir.

1    Q      All right.  Let me show you what's been marked as

2    Exhibit 84 for identification.  Ask you to take a look at that

3    and tell us if you recognize it, please.

4    A      Yes, absolutely.

5    Q      What is 84 for identification?

6    A      84 is the e-mail correspondence between Shanda and the

7    skip -- from Skip Martin, skiptin@gmail.com.

8    Q      Okay.  And it's -- it's a paper copy of that e-mail?

9    A      Yes.

10   Q      Did you print this e-mail out?

11   A      I did.

12   Q      And -- and keep a copy for yourself?

13   A      I did.

14   Q      And did you also forward a copy to postal inspectors --

15   A      I --

16   Q      -- at some point?

17   A      Yes, I did.

18          MR. FRANK:  Your Honor, I'd move Exhibit 84 in

19   evidence.

20          THE COURT:  Any objection?

21          MR. RIDGE:  Well, Your Honor, I would object.  I'd

22   request the same cautionary instruction that you've been

23   providing previously, and that would go to No. 85, as well --

24          THE COURT:  Okay.

25          MR. RIDGE:  -- is my objection.

1              THE COURT:  Okay.  Thank you.

2         Ladies and gentlemen, this testimony is subject to the

3    same limiting instruction that I've given you earlier about

4    how you can and cannot use this evidence.  Again, at the end

5    of trial, I'll give you some formal jury instructions, and the

6    formal jury instructions will list for you exactly how you can

7    and how you cannot use this evidence.

8              MR. FRANK:  Thank you, Your Honor.

9              THE COURT:  And that includes both 84 and the next

10   exhibit, which will be 85.

11             MR. FRANK:  Thank you, Your Honor.

12   BY MR. FRANK:

13   Q    Let me show you the next exhibit, Ms. Collins, 85-A for

14   identification.  Do you recognize that?

15   A    I do.

16   Q    And what is 85-A for identification?

17   A    It's a complaint and referral form, or an IC3 form --

18   Q    Okay.

19   A    -- that I filed.

20   Q    Copy of the one that you've described filing about this

21   matter?

22   A    Correct.

23             MR. FRANK:  Your Honor, I'd move Government's

24   Exhibit 85-A into evidence.

25             THE COURT:  Any objection?

1           MR. RIDGE:  None other than what I've already

2   stated, Your Honor.

3           THE COURT:  All right.  I'm admitting it with those

4   same limiting instructions.

5           MR. FRANK:  And request permission to publish, Your

6   Honor?

7           THE COURT:  You may.

8           MR. FRANK:  And if we could bring up 80 -- 84.

9   BY MR. FRANK:

10  Q     So this is -- this is what you found or a copy of what

11  you found on Shanda's Kindle?

12  A     Yes, yes, it is.

13  Q     All right.  And could you read exactly what it says

14  there?

15  A     It says, hey, I read your post on the suicide Web site

16  and I'm done with life.  Please help me out, man.

17  Q     And who wrote that?

18  A     Shanda.

19  Q     And what was the response?

20  A     The response was, Shanda, I am a supplier of potassium

21  cyanide.  It is fast, reliable, and painless.  Get back to me

22  for more info, Skip.

23  Q     Okay.  Did you or -- or your granddaughter, Shanda, ever

24  experience any -- any repercussions from anyone because of

25  filing this complaint with the FBI?

1    A     No.

2              MR. FRANK:  I have no further questions for this

3    witness, Your Honor.

4              THE COURT:  Cross-examination?

5              MR. RIDGE:  Your Honor, just very briefly.

6                        CROSS-EXAMINATION

7    BY MR. RIDGE:

8    Q    Ms. Collins, the -- the e-mail that is Exhibit No. 84,

9    is that the only correspondence between skiptin and your

10   granddaughter that you were able to find on her computer?

11   A     Yes, that I'm aware of, yes, absolutely.

12   Q    Okay.  So you're not aware of any further requests or

13   solicitation for either cyanide or payment.

14   A     No.

15   Q    Okay.

16             MR. RIDGE:  Thank you.

17             THE COURT:  Anything further?

18             MR. FRANK:  No, Your Honor.

19             THE COURT:  Thank you.  You may stand down, ma'am.

20             THE WITNESS:  Thank you.

21        (The witness left the witness stand.)

22             THE COURT:  Next witness?

23             MR. FRANK:  Is Donna Gregory.

24             THE CLERK:  Do you solemnly swear that the testimony

25   you shall give in the matter now in hearing shall be the

1    truth, the whole truth, and nothing but the truth, so help you

2    God?

3              THE WITNESS:  Yes, I do.

4              THE CLERK:  Please be seated.  Please state your

5    name and spell your last name for the record.

6              THE WITNESS:  Donna Gregory, G-r-e-g-o-r-y.

7              THE COURT:  Now, can you pull the microphone down

8    towards you and pull yourself up a little bit, ma'am.  Thank

9    you very much.

10             THE WITNESS:  Yeah.

11             MR. FRANK:  Thank you, Your Honor.

12   DONNA GREGORY, having been duly sworn, was examined and

13   testified as follows:

14                       DIRECT EXAMINATION

15   BY MR. FRANK:

16   Q    Good afternoon, ma'am.  Ma'am, how are you employed?

17   A    I am the unit chief with the FBI at the Internet Crime

18   Complaint Center.

19   Q    And is that also known as IC3?

20   A    Yes.

21   Q    What does IC3 stand for?

22   A    Internet Crime Complaint Center.

23   Q    All right.  And what is the Internet Crime Complaint

24   Center?

25   A    We are a center that collects complaints from online

1    victims.  Victims file online at ic3.gov.  The complaints come

2    into our center.

3    Q     And what do you do with them?

4    A     We review the complaints that come in, look for

5    commonalities, look for trends, and then collectively look for

6    additional complaints and provide those to -- if warranted,

7    provide those to law enforcement for further investigation.

8    Q     Specifically, the FBI?

9    A     No, we -- to all -- all law enforcement -- federal,

10   state, local.

11   Q     Okay.  Including the FBI.

12   A     Including the FBI, yes.

13   Q     All right.  And when you say you look for commonalities

14   and -- what do you mean by that?

15   A     We look at the information provided by the victim or the

16   filer of the complaint to where it may be e-mail accounts, IP

17   addresses, bank account numbers, addresses, unique identifiers

18   of the subject to see if we have other complaints that would

19   match that information.

20   Q     And what happens if you find other complaints that are

21   common in that way?

22   A     What we do is we link those complaints together.  We

23   review every complaint until we have -- have looked at all of

24   our resources that we cannot find any additional information,

25   and then we will collectively take those complaints and

1   provide them to law enforcement.

2   Q    And what's your job as supervisor?

3   A    I -- my job is I run the unit.  I'm the unit chief, so I

4   have -- I have 47 staff that work for me that range from

5   supervisors to IT staff to analytical support.

6   Q    And how busy are you?

7   A    We receive -- we have about 3 -- over -- almost 3 and a

8   half million complaints in our database.  We receive about 800

9   to a thousand complaints a day.

10  Q    How long have you been -- how long has IC3 been in this

11  line of business?

12  A    I -- IC3 was founded in May of 2000.  I have been at the

13  IC3 since June of 2000.

14  Q    And do you have -- have you worked for the FBI longer

15  than that?

16  A    Yes, I have been with the FBI for 22 years.

17  Q    And in what capacities?

18  A    Prior to being at the IC3, I worked in our criminal

19  justice division, where I did -- I've done everything.  I --

20  prior to that, I did background checks for firearms.  I was

21  the supervisor in one of those units where we -- we actually

22  -- it's called the NICS program, where we do gun checks.

23  Q    Okay.  Can you describe the process a typical IC3

24  complaint goes through?

25  A    Once -- once a filer files a complaint, we look for --

1   we ask -- on filing a complaint, we ask for the victim's

2   information, but we also ask for the -- what they know about

3   the subject.  One of the areas of the complaint is a free-form

4   text, so you can actually put the information and tell your

5   story, cut -- cut and paste e-mails, transactions, information

6   in there.

7          When a complaint comes in, the system automatically

8   looks through some of the fields to try to find commonalities

9   and link those complaints together and bring them to the

10  attention of the analyst that's reviewing them.  But we also

11  review every complaint.  We put eyes on every complaint that

12  comes in to look at them for more of trending information, but

13  also for -- because we are an Internet-facing Web site, we

14  receive complaints across the board on all fraud types.  So we

15  may see complaints against -- on terrorism, child pornography,

16  so we -- we look at every one so that we can address it

17  immediately when it comes in

18  Q     And how often do you refer things for further action?

19  A     On a daily basis.  We -- we are constantly referring

20  information.

21  Q     Do you keep records of these complaints and your

22  actions?

23  A     Yes, we have all -- all complaints filed since we came

24  into existence are in our database.

25  Q     Let me show you what's been marked as Exhibit 55 for

1    identification.  It's a certified copy.

2            MR. FRANK:  And it's a certified record, Your Honor,

3    so I'd move it directly into evidence.

4            THE COURT:  Any objection to 55?

5            MR. RIDGE:  No, Your Honor.

6            THE COURT:  55's admitted.

7    BY MR. FRANK:

8    Q    And, Ms. Gregory, I'm showing you what's been marked as

9    Exhibit 55 in evidence.  I'd ask you to take a look at that

10   and tell us if you recognize it, please.

11   A    Yes, I do.

12   Q    What is 55 in evidence?

13   A    55 is a complaint that was received at our center in

14   December of 2012 from a -- a victim by the name of Andrew

15   Denton.

16   Q    And who was Andrew Denton complaining about?

17   A    Um, the -- the person that victimized him in his

18   complaint he listed as Sidney Kilmartin of Manchester, Maine.

19   Q    And what was the nature of his complaint?

20   A    He advised that he was looking on a site that was

21   selling potassium cyanide, and Mr. Martin, which he -- he went

22   by skiptin, s-k-i-p-t-i-n, appeared on several of them.  He

23   sent an e-mail name.  Can I just read this to make it easier

24   or --

25   Q    I think --

1          MR. FRANK:  If the court will allow?

2          THE COURT:  If you're going to read something, read

3    it slowly.

4    A    Okay.  He said to e-mail him.  This I did, and he told

5    me he had the chemical and it was U.S. industrial grade,

6    99 percent pure, and that it was $250 for a gram.  I got his

7    payment details and sent him the money on November 10th, 2012,

8    via Western Union, MTCN No., which is the Western Union

9    number, 9953125284.  He picked up the money on 11/11/2012.

10         On 11/30/2012, I received a Jiffy bag No. 0 from USPS

11   Augusta, Maine.  All right.  I will skip over the -- he lists

12   the zip code and the number.  It was -- customs declaration on

13   it saying it contained cosmetic jewelry valued at $50.  The

14   chemical I got was not potassium cyanide.  It did not work.

15         By his own admission in one of his e-mails to me, he has

16   sent shipments lots of times to the UK and had no problems

17   getting them through.  He told me he had just got a couple

18   through the Canadian customs.  Due to getting them -- due to

19   the nature of what he is selling or he says he is, people will

20   be reluctant to complain to the authorities.  Me, I don't like

21   being ripped off, hence my complaint to you.  I just want what

22   I paid for or my money back.

23   Q    Now, was there any further activity on this com -- on

24   this particular complaint?

25   A    Yes, we allow -- we currently do not allow this now, but

1    in the past, we allowed victims to come back in and update

2    their complaint up to three times.  The victim did come back

3    in, updated the complaint on December 9th, 2012.

4    Q    And how did he update it?

5    A    His update said, I note in the FAQ section that you

6    cannot close a complaint once this has been sent to you.  I

7    have since contacted the seller mentioned in my complaint, and

8    I am happy that this issue has now been resolved.  I no longer

9    wish to pursue my original complaint.

10   Q    Now, did you -- did you do your -- your normal practice

11   with respect to this complaint and look for commonalities and

12   similar complaints?

13   A    Yes, we -- we had reviewed this complaint and -- and

14   linked it to, I believe, one additional complaint.

15   Q    And let me show you what's been marked as Exhibit 85-B,

16   also a certified record of IC3, correct?  Do you recognize

17   this certification?

18   A    Yes, sir.

19   Q    What is 85-B?

20   A    85-B is a complaint that was also filed at the IC3 in

21   January of 2013 against Edith -- or -- I'm sorry -- from Edith

22   Mae Collins.

23   Q    And against whom?

24   A    Against an individual by the name of Skip Martin, using

25   the e-mail address starting with the skiptin@gmail.com, the

1  same e-mail address as the previous complaint.

2  Q    All right.  So that's my question.  How does this IC3

3  complaint relate to the one that is Exhibit 55?

4  A    The link is the e-mail address, the same e-mail address

5  was used in the 2012 complaint as the 2013.

6  Q    All right.  Is that one of those commonalities that you

7  -- you look for?

8  A    Yes, sir, it is.

9        MR. FRANK:  The court's indulgence, Your Honor?

10        THE COURT:  Yes.

11 BY MR. FRANK:

12 Q    Did you find any other linked complaints to skiptin?

13 A    No, those are the only two complaints we have in our

14 database.

15        MR. FRANK:  I have no further questions for this

16 witness, Your Honor.

17        THE COURT:  Cross-examination Mr. Ridge?

18        MR. RIDGE:  Thank you, Your Honor.

19                  CROSS-EXAMINATION

20 BY MR. RIDGE:

21 Q    Good afternoon, Ms. Gregory.

22 A    Good afternoon.

23 Q    Excuse me.  How many complaints that are filed with the

24 IC3 actually get referred to active investigations?

25 A    I can't really give an exact number.  Probably out of

1    the 26,000 a month we get, probably about 1,500.

2    Q     I've seen nothing to indicate that either of these

3    complaints were moved on or referred to a formal investigation

4    of the person who is named in both complaints; am I correct

5    about that?

6    A     Excuse me.  I mean, can you repeat that?  I'm sorry.

7    Q     Probably a terrible question.  I apologize.  I am

8    unaware that IC3 took any action on either of these complaints

9    by way of starting an investigation; is that correct?

10   A     Correct.

11   Q     So there -- IC3 has had no reach-out to

12   skiptin@gmail.com advising that person of any investigation

13   being initiated.

14   A     No, the IC3 does not do investigations.  We only -- we

15   serve as a referral or an analytical resource for law

16   enforcement.

17   Q     Okay.  So it could go -- you -- I don't mean to be flip,

18   but you ship it out to whoever the appropriate authorities

19   might be?

20   A     Correct, we don't interact back with the victims or the

21   subjects.

22   Q     Okay.  And what impact does it have for IC3 purposes

23   when an alleged victim follows up a complaint and says I have

24   resolved my complaint with the person that I named in my

25   complaint?

1    A      That really has no emphasis on what we do.   I mean, we

2    look at their original complaint as it -- as it stands.   We

3    will -- if we have referred that complaint to somebody, we

4    will follow up with them to let them know, you know, here's

5    additional information.

6    Q      Okay.   That wasn't done in this case because it hadn't

7    been referred out.

8    A      Correct.

9    Q      Okay.

10              MR. RIDGE:   Thank you.

11              THE COURT:   Anything further?

12              MR. FRANK:   No, Your Honor.

13              THE COURT:   You may stand down, ma'am.   Thank you.

14         (The witness left the witness stand.)

15              THE COURT:   Next witness?

16              MR. FRANK:   Your Honor, may I have a moment to see

17   if I have one?

18              THE COURT:   Yes.

19              MR. FRANK:   Actually, Your Honor, I do have a

20   witness, and I would like to read two stipulations before I

21   put him on.

22              THE COURT:   All right.

23              MR. FRANK:   The first is -- the first is Exhibit 75,

24   which reads that, the parties hereby agree and stipulate that

25   on about January 1st, 2013, Humberside Police Constables Paul

1   Sutton and Jamie Powdrill followed the body of Andrew Denton

2   as undertakers transported it from the scene of his death,

3   17 Holland Street, Hull, United Kingdom, to the mortuary at

4   Royal Hull Infirmary on Anlaby Road in Hull, where it was

5   handed over to Senior Technician Leanne Marsham.

6       And then Exhibit 77 reads that, the parties hereby agree

7   and stipulate that on about January 2, 2013, Andrea Mellor,

8   Mortuary and Bereavement Services Manager at the Hull Royal

9   Infirmary on Anlaby Road in Hull, United Kingdom, drew a

10  sample of blood from the body of Andrew Denton.

11      On about January 3, 2013, John Spinks of BloodFast took

12  possession of the sample and provided it to his partner Stuart

13  McLean.  McLean transported the sample to Cardiff Toxicology

14  Laboratories at the University Hospital Llandough in the Vale

15  of Glamorgan, Wales, United Kingdom, where he delivered it to

16  Dr. Alun David Hutchings.

17      And, Your Honor, with that, the government calls Dr. Alun

18  David Hutchings -- or David Alun Hutchings.

19              THE CLERK:  Do you solemnly swear that the testimony

20  you shall give in the matter now in hearing shall be the

21  truth, the whole truth, and nothing but the truth, so help you

22  God?

23              THE WITNESS:  I do.

24              THE CLERK:  Please be seated.  Please state your

25  name and spell your last name for the record.

1        THE WITNESS:  My name is Alun Hutchings, and my last

2    name is spelled H-u-t-c-h-i-n-g-s.

3        MR. FRANK:  Thank you, Your Honor.

4    ALUN HUTCHINGS, having been duly sworn, was examined and

5    testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. FRANK:

8    Q    Good afternoon, Dr. Hutchings.

9    A    Good afternoon.

10   Q    Dr. Hutchings, where are you from?

11   A    I'm from a village called Fandock (phonetic), and --

12   just outside Cardiff in South Wales in the United Kingdom.

13   Q    And what do you do there?

14   A    I run a clinical toxicology laboratory.  This services

15   -- serves the National Health Service.  It's part of Cardiff &

16   Vale University Health Board.

17   Q    And what are your -- do you have a title there?

18   A    I'm a consultant analytical toxicologist.

19   Q    And what does that mean that you do?

20   A    It means I'm responsible for the whole laboratory that

21   delivers the clinical service to Cardiff and beyond for

22   toxicology services.  I oversee the professional development

23   of my staff, along with overseeing the techniques that are

24   used in the laboratory's performance and quality.

25   Q    Do you also perform tests yourself?

HUTCHINGS - DIRECT EXAMINATION/FRANK

1   A     Some -- some tests I do perform myself.

2   Q     And how long have you been -- how long have you been

3   doing this?

4   A     I've been doing this work since 1970.

5   Q     Always there at Cardiff or --

6   A     Always in the region, not -- not in the hospital I

7   currently work, but in a variety of hospitals in that period.

8   But I -- I started in a hospital five miles west of where I

9   currently work, and that's basically where the toxicology unit

10  was born and has moved in interceding years.

11  Q     And always as a toxicologist?

12  A     Yes.

13  Q     And do you have special training and education to be a

14  toxicologist?

15  A     My education centered around medical laboratory

16  sciences, specifically, biochemistry, but then -- and also

17  medical informatics, and -- but my Ph.D. was in clinical

18  pharmacology, and -- which is ideal for my job, for clinical

19  toxicology, because it -- the work deals principally with the

20  disposition of drugs in the human body, drugs and other

21  compounds in the human body, so pharmacology is ideal training

22  for clinical toxicology.

23  Q     And what do we mean by clinical toxicology as opposed

24  to, for example, forensic toxicology?

25  A     Clinical toxicology aims at the study of drugs and other

1    compounds in -- in patients being treated in the National

2    Health Service.

3         So that could be monitoring certain drugs used in

4    therapy where the concentrations in their blood, for example,

5    are critical to their management.

6         It could be associated with the identification of

7    illicit drugs in persons who have drug addiction and they are

8    being treated for that, and we test for their abstinence from

9    the drugs they have been taking and compliance with the drugs

10   they've been prescribed.

11        It's also involved with the measurement of toxic

12   compounds, such as glycols and alcohols, for example, in

13   patients where the level will have a bearing on how that

14   patient is managed.

15   Q    Okay.  And does it also involve identifying poisons,

16   such as cyanide, on occasion?

17   A    It does.  We -- we measure cyanide principally for those

18   patients that have been exposed in house fires or automobile

19   fires, where there have been plastics involved and they can

20   get cyanide exposure as a result of that.

21        Also, with patients that are managed on a drug called

22   sodium nitroprusside, which gives rise to very high cyanide

23   levels.  Patients taking apricot kernels or exposed to other

24   cyanogenic plant materials.  These are the common reasons we

25   measure cyanide.

1     More rarely, of course, extremely rarely, where there

2  are exposures to cyanide salts or cyanide gas.

3  Q    I was going to -- I was going to ask, how common is

4  that?

5  A    Very, very rare.  In my career, it's only happened once.

6  Q    How did you become involved in this matter involving the

7  death of Andrew Denton?

8  A    I was contacted by the -- the agent coroner service in

9  Hull in, I think it was, very early January 2013.  They had a

10  case that they were fairly confident was a cyanide death.

11  They had good reason to believe it was a death arising from

12  cyanide.

13     And undertaking postmortems on cases of severe poisoning

14  from -- arising from cyanide is potentially dangerous to those

15  in the autopsy room because when cyanide -- cyanide present in

16  the stomach, the acidic contents of the stomach will basically

17  turn that cyanide into a gas, and so dissecting the body will

18  release cyanide gas and make it very dangerous to be there.

19     So because they had good cause to suspect there was

20  cyanide involved, they wanted to get a cyanide blood level

21  done, and if that confirmed what they -- they thought, they

22  wouldn't take it any -- they wouldn't take the postmortem any

23  further.  And so they looked around for a laboratory that

24  routinely performed cyanide analysis, and I think my

25  laboratory's the only laboratory in the UK that does it.

1  Q      Okay.  So did -- what happened?  Did a sample of

2  Mr. Denton's blood come to you for analysis?

3  A      A sample of blood arrived on the 3rd of January, 2013,

4  for -- specifically for cyanide analysis, and that -- we were

5  instructed to do that urgently and telephone the results as

6  soon as we had it and to do further work on the samples to

7  look for toxic alcohols, glycols, and other drugs.

8         And we measured the cyanide on the 4th of January, got a

9  high result of 17 milligrams per liter, telephoned the -- the

10 result through to the coroner's office, and then over the, I

11 think, further three days, we undertook other work to look for

12 any other possible compounds that may have had an impact.

13 Q      Did you find any other impactful compounds?

14 A      The only thing we found was a drug called sertraline,

15 which is an antidepressant drug, that Andrew Denton was being

16 prescribed.  We found it at concentrations consistent with

17 therapeutic use.  It was an unremarkable finding.

18 Q      How -- how do you make these determinations?  How -- how

19 do you determine -- how did you determine the 17, was it,

20 milligrams per liter --

21 A      17 milligrams per liter, the cyanide.

22 Q      -- yes -- that you found?  How do you do that?

23 A      The -- what we do -- forgive me if I get technical, but

24 we -- first of all, we have to acidify the blood sample to

25 make sure that the cyanide is -- is converted to a gas.  In

1    blood, cyanide binds avidly to hemoglobin and binds the blood

2    cells, and so --

3    Q     Is that how it suffocates?

4    A     Well, it just -- it does.  It -- it binds to something

5    called cytochrome oxidase, and so any organs that -- that use

6    oxygen, utilize oxygen to a great extent will be poisoned, and

7    that's particularly the -- the brain, the heart, and the

8    lungs, these -- these all use a lot of oxygen, high-oxygen

9    demand, and, in fact, it's cerebral death is what results in

10   the death of the -- the individual.

11         So we -- we have to acidify the sample.  We do this in a

12   closed vessel.  We acidify the sample to turn any cyanide

13   there into hydrocyanic acid, which is a gas.  Then that --

14   this is all done at a controlled temperature, 50 degrees

15   centigrade, and we sample that gas in the space above the

16   blood sample.  As I say, it's in a sealed vessel, and -- and

17   that sample is then injecting -- injected into something

18   called a gas chromatograph.

19         A gas chromatograph consists of an instrument containing

20   a 30-meter column -- coil column that the sample enters into,

21   is heated, and the components of that sample, whatever's in

22   that gas, go through the column and they separate, according

23   to their relative affinity for the column.  And -- and as

24   these compounds emerge from the other end, they're detected by

25   something called an electron capture detector.

1    Now, an electron capture detector won't detect many

2  things.  It will only detect things called halogens and

3  pseudohalogens.  Halogens are things like chlorine, flourine,

4  bromine.  Pseudohalogens are things like cyanogens, that we

5  call cyanogen, and I should have said when we inject our

6  sample into the column, we convert the cyanide into cyanogen

7  by passing it through something called Chloramine-T, which

8  does that, it basically joins two cyanide molecules together

9  to form cyanogen.

10    And so the detection is by separating out all the

11  compounds in the sample that we inject on the column and by

12  employing a very selective detector at the other end that will

13  only detect one or two things.  So it's a very, very specific,

14  very selective form of detection.

15    I'm sorry if that sounded a bit long-winded.

16  Q    All right.  But that's what you did in this case?

17  A    Yes.

18  Q    And that's how -- and what did you determine was in his

19  blood as a result?

20  A    We found cyanide there.  In fact, we had to undertake

21  the assay on three -- three separate occasions because it --

22  we've never seen a cyanide that high because, as I said, we --

23  this is the first time we've ever had a sample where -- that

24  arose from somebody poisoning themselves with a cyanide salt,

25  and so --

1   Q     This is the one time that you referred to before?

2   A     That's right.

3   Q     Okay.

4   A     And so it was basically too high for us to detect.

5   Well, we detected it.  It was -- we just couldn't measure it.

6   It was just off the scale as it were.  So we had to dilute the

7   sample, repeat it.  That was still too high.  We had to dilute

8   it another time, repeat it, and that time we got results that

9   we could then calculate the final concentration of

10  17 milligrams per liter.

11  Q     And in your opinion, was that a lethal concentration?

12  A     Oh, yes, it is.  The -- it's difficult to be exact about

13  what a lethal concentration is, but it's generally regarded

14  the concentrations above 5 milligrams per liter would be

15  lethal.

16  Q     Okay.  5 milligrams per liter?

17  A     5 milligrams per liter.

18  Q     In blood?

19  A     In blood, yes, so this was nearly four times that.

20  Q     And did you report that to the coroner?

21  A     Yes, I did.

22            MR. FRANK:  The court's indulgence, Your Honor?

23            THE COURT:  Yes.

24            MR. FRANK:  I have no further questions for

25  Dr. Hutchings, Your Honor.

1          THE COURT:  Cross-examination, Mr. Ridge?

2          MR. RIDGE:  I have no questions, Your Honor.  Thank

3  you.

4          THE COURT:  Thank you, sir.  You may stand down.

5          THE WITNESS:  Thank you.

6      (The witness left the witness stand.)

7          MR. FRANK:  Your Honor, may we approach?

8          THE COURT:  Yes.

9      (At sidebar on the record.)

10          MR. FRANK:  Your Honor, I think I'm out of witnesses

11  again.  I can check, but I -- I think I am.  Shall I go check?

12          THE COURT:  Well, let me ask you a question.  You

13  seem to be running through pretty quickly.  Is tomorrow the

14  last day?

15          MR. FRANK:  Yes, I expect to finish tomorrow, yes.

16          THE COURT:  And are you going to present evidence?

17          MR. RIDGE:  I don't expect to, Your Honor.

18          THE COURT:  Okay.  Well, when tomorrow do you think

19  you'll be done?

20          MR. FRANK:  Can I look at my notes for a minute,

21  Your Honor?

22          THE COURT:  Sure.

23      (Mr. Frank left sidebar and returned.)

24          MR. FRANK:  Your Honor, at most, I have five more

25  witnesses, and I may cut at least one of those.

1           THE COURT:  Okay.

2           MR. FRANK:  So I think I would be done by noon at

3  the latest.

4           THE COURT:  So are we going to the jury tomorrow?

5           MR. FRANK:  I don't know.  I mean we might.

6           MR. RIDGE:  Is this a preference or -- my preference

7  would be not to.

8           THE COURT:  Why?

9           MR. RIDGE:  Well, because I have to prepare the

10  witnesses and then apparently write a closing tonight, as

11  well.  It's just a matter of preparation, and that's the only

12  reason.

13          MR. FRANK:  I don't know what to say.  I'm a little

14  bit in a fog anyway, Your Honor.  I -- I mean, if I had to, I

15  could probably close tomorrow, but I'm not -- I'm not jumping

16  up and down for it, but I -- I defer to you, Your Honor.

17          THE COURT:  Well, I see it both ways.  I hate to --

18  you're -- the government's going to close.  You'll close on

19  Friday, and then they've got a three-day weekend, which isn't

20  ideal for them.

21      On the other hand, you haven't had access to legal

22  research.  I did ask for some assistance on the question of

23  significance, if I should charge the jury as to something

24  about the significance of the difference between cyanide and

25  potassium cyanide in the indictment.

1      Well, why don't we do this.  I'll tell the jury that,

2  although it isn't a promise, that it looks like the

3  government's going to be closing around noon tomorrow and that

4  they can expect to come back on Tuesday, depending on whether

5  the defendant -- the defendant always has the opportunity to

6  present --

7            MR. RIDGE:  Right.

8            THE COURT:  -- evidence so I don't want to tell them

9  that won't happen.

10           MR. RIDGE:  Okay.

11           THE COURT:  But that they can expect to come back on

12 Tuesday and hear closing arguments and have the case go to

13 them for deliberation.  That will give us a chance to -- well,

14 let me think about this.

15     Why don't we bring them in at 10:00 on Tuesday.  My

16 concern is that I -- I'm going to have to get the information

17 you folks are able to present on that question.  My thought is

18 to have an initial charge conference on Friday afternoon, wrap

19 everything up except for this one issue, and then hear from

20 counsel over the weekend and make a determination, but the

21 problem then is if I have to change the instructions, we'll

22 have to have them copied, so it'll take a little time.  So why

23 don't we do it that way.

24           MR. RIDGE:  That's fine.  Thank you.

25           MR. FRANK:  Thank you, Your Honor.

1              THE COURT:  All right.

2         (End of discussion at sidebar.)

3              THE COURT:  So, ladies and gentlemen, as with

4    yesterday, we're going to break a little bit early.  We

5    usually break about 2:30, but it's 2:10 now.  So the

6    government has some additional witnesses that will be

7    presented to you tomorrow.

8         I just consulted with the lawyers to see if I -- we could

9    predict the future, and what I've been told is that the

10   government may well complete its evidence around noon

11   tomorrow.  The defendant, of course, has the right to present

12   evidence, just as the government did.

13        What you should anticipate then is that at some point

14   tomorrow the evidence may close, and we discussed whether it's

15   something we can get to you tomorrow, but resolved that the

16   better thing to do is to hold it over until Tuesday.  On

17   Tuesday, I would anticipate that the -- that you will come in,

18   that all the evidence may well have been completed, and that

19   the case will be argued.  I'll give you jury instructions, and

20   the matter will be handed over to you for deliberation and

21   verdict on Tuesday.

22        I'll remind you of this on -- before you leave on Friday,

23   but we need to finalize the jury instructions on Tuesday

24   morning, and because of that, I don't want you to come in here

25   at 8:30 and, you know, cool your heels in the other room

1    waiting for us to finish up the jury instructions.
2    Unfortunately, we can't do that in advance.  So what I'm going
3    to ask you to do is come in no later than 10:00 on -- ten
4    o'clock on Tuesday and be prepared at that time for closing
5    arguments, jury instructions, and deliberations.
6         I can't tell you how long you will need to deliberate.
7    You don't know yourselves.  You will take the time you need as
8    a jury to arrive at a fair and impartial verdict, whatever
9    that time may be.  So I can't tell you how long you will be
10   here on Tuesday.  That is a matter that you will have to
11   resolve during the course of your deliberations.  I can tell
12   you that, in all likelihood, the matter will be -- all the
13   evidence will be completed tomorrow.
14        So with that, ladies and gentlemen, you know the
15   instructions I gave to you about what you can and can't do.
16   You are permitted specifically to watch the Red Sox tonight.
17   Other than that, I'm not going to give you any orders.  Thank
18   you.
19        (Jury exited at 2:13 p.m.)
20            THE COURT:  So what I'll do is I'll have my judicial
21   assistant send you the most updated set of jury instructions.
22   They'll be the same as you've had previously, but they will
23   contain that additional statement about drug exhibits, and we
24   certainly don't want the jury to have cyanide in the jury
25   room.  They might be extremely nervous about it.  So that's to

1    alleviate any concern that they may have.

2        Is there anything further before we break?

3            MR. FRANK:  No, Your Honor, not from the government.

4            MR. RIDGE:  No, Your Honor.  Thank you.

5            THE COURT:  Thank you.  Court will stand in recess.

6        (Proceedings concluded at 2:14 p.m.)

7                        CERTIFICATION

8        I certify that the foregoing is a correct transcript from

9    the record of proceedings in the above-entitled matter.

10

11

12   /s/ Julie G. Edgecomb                February 14, 2017
     Julie G. Edgecomb, RMR, CRR            Date
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25