| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:14-cr-00129-JAW |
| | ) | |
| SIDNEY P. KILMARTIN | ) | |

## ORDER ON MOTIONS FOR JUDGMENT OF ACQUITTAL
## AND NEW TRIAL

In December 2012, Sidney Kilmartin of Manchester, Maine mailed Andrew Denton of Hull, England, who was profoundly depressed and suicidal, enough potassium cyanide to kill him, and Mr. Denton took the cyanide and committed suicide. On December 9, 2015, a federal grand jury issued a fifteen-count superseding indictment, charging Mr. Kilmartin with two counts of wire fraud and one count each of mail fraud, mailing injurious articles resulting in death, witness tampering, and witness retaliation for his alleged conduct with respect to Mr. Denton.

Mr. Denton was not Mr. Kilmartin's first victim. The remaining nine charges in the superseding indictment alleged that Mr. Kilmartin perpetrated mail and wire fraud against four additional depressed individuals, who ordered and paid for cyanide from Mr. Kilmartin but instead, he sent them harmless Epsom salts.

After a six-day trial on the charges involving Mr. Denton, on October 11, 2016, a jury convicted Mr. Kilmartin of two counts of wire fraud and one count each of mail fraud, mailing injurious articles resulting in death, and witness tampering; it acquitted him of one count of witness retaliation. Just before trial began, Mr.

Kilmartin pleaded guilty to nine counts of mail and wire fraud against the four other individuals named in the superseding indictment.

Mr. Kilmartin now moves for judgment of acquittal on the mailing injurious articles resulting in death and witness tampering counts. He also moves for a new trial based on the admission of evidence of his scheme to defraud individuals other than Mr. Denton. Mr. Kilmartin accepted the guilty verdicts on the wire and mail fraud counts and his motions for acquittal and new trial do not include his convictions for those crimes.

The Court denies the Defendant's motions because it concludes that the evidence is sufficient to sustain the convictions on the witness tampering and mailing injurious articles resulting in death counts, and because it concludes that it properly admitted the evidence of his scheme to defraud others under Federal Rules of Evidence 404(b) and 403.

I.      BACKGROUND[1]

A.      The Scheme

Sidney Kilmartin may have thought he had devised and was perpetrating the perfect crime. Between April 2012 and May 2013, Mr. Kilmartin designed a scheme to defraud suicidal persons by pretending to sell them cyanide when in fact he sent them Epsom salts. *Revised Prosecution Version* at 1 (ECF No. 140). In September 2012, posing as a goldsmith, Mr. Kilmartin ordered and obtained 100 grams of

---

[1]      In reciting these facts, the Court has applied the standard applicable to post-verdict motions for acquittal, has viewed "the evidence, both direct and circumstantial, in the light most hospitable to the government[,] and [has] draw[n] all reasonable inferences in the government's favor." *United States v. De La Cruz*, 835 F.3d 1, 9 (1st Cir. 2016).

potassium cyanide for $127.56 from Fisher Scientific, a large supplier of chemicals for industrial and scientific purposes. *Id.* at 2. Mr. Kilmartin then posted a notice on a website devoted to suicidal persons called "wantdeathblogspot" that he had industrial grade potassium cyanide for sale. *Id.*; *Gov't Ex.* 8 *web capture of wantdeathblogspot.co.uk.* From September 2012 to May 2013, Mr. Kilmartin used an email address, skiptin@gmail.com, to communicate with numerous people around the United States and internationally, and he agreed to sell them potassium cyanide, accepting payment through PayPal and Western Union. *Revised Prosecution Version* at 3. The payments ranged from $125 to $250 for about 500 milligrams. *Id.* at 4; *Gov't Ex.* 19 (agreeing to sell Walter Cottle 500 milligrams for $125). However, instead of sending more expensive fatal cyanide to his customers, he mailed them inexpensive Epsom salts, and he pocketed the cost difference. *Revised Prosecution Version* at 4–5.

The scheme must have seemed fool-proof. Having paid for and received supposed cyanide, the suicidal persons might well have second thoughts and decide not to take what they thought was a lethal dose of poison, keep the alleged cyanide for another dark day, or throw it out. Alternatively, if suicidal persons actually took the supposed poison, the surviving customers could hardly complain that it did not work. After all, they would still be alive. Moreover, upon reflection, many would be relieved that Mr. Kilmartin had not sent the real item, some would be too embarrassed to complain, and for the rare protester, he or she would not be in much a position to complain because the harm would be continued life. Furthermore, the

chances of being found out as the actual perpetrator would be remote given the anonymity of the internet and the complexity of tracking internet sales.

To perpetrate the mail and wire frauds, Mr. Kilmartin did not need to actually possess real cyanide. He only needed to make depressed customers think he had it. But at some point, Mr. Kilmartin actually went to the trouble and expense of obtaining cyanide from Fisher Scientific. In fairness to Mr. Kilmartin, there is no direct evidence as to whether he purchased actual cyanide as part of his mail fraud scheme; however, once Mr. Kilmartin had actual cyanide, if a customer persisted, demanded to be sent what he paid for, and threatened to report him to the authorities for fraud, Mr. Kilmartin could make good on his part of the bargain by sending the person real poison. Once the customer received exactly what he or she ordered, there could be no continuing claim of fraud, and if he or she took a lethal dose, the customer's complaints would be silenced by death.

In mid-November 2012, Mr. Kilmartin filled an online order for cyanide from Andrew Denton of Hull, England and sent him Epsom salts. Mr. Denton received the packet from Mr. Kilmartin on November 30, 2012, and unsuccessfully tried to commit suicide with the Epsom salts. *Gov't Ex.* 55, *Andrew Denton Online Report of Internet Crime Victim* at 3 (Dec. 7, 2012) (*Denton IC3 Compl.*). When his suicide attempt failed, Mr. Denton became irate with Mr. Kilmartin, complained directly to him by email, and accused him of "ripping me off." *Gov't Ex.* 103, *Email from Andrew Denton to Skip Martin* at 1 (Dec. 7, 2012). Significantly, Mr. Denton told Mr. Kilmartin that if he did not get a quick reply, he would "start firstly by filling in the FBI online form."

*Id.* On December 7, 2012, Mr. Denton went ahead and filed an online complaint with the Internet Crime Complaint Center (IC3), a multi-agency federal task force that receives complaints about cyber-crime. *Denton IC3 Compl.*

At some point, Mr. Kilmartin became aware that Mr. Denton had gone ahead and filed a complaint with the IC3 and Mr. Kilmartin mailed Mr. Denton potassium cyanide, which Mr. Denton received on December 19, 2012. *Gov't Ex.* 102, *Email Correspondence between Kilmartin and Denton.* On December 20, 2012, Mr. Kilmartin emailed Mr. Denton, acknowledging that the "FBI" was "aware of his goings" and asking him to "do something with your hard drive before your event." *Id.* On December 31, 2012, Mr. Denton used the cyanide Mr. Kilmartin supplied to kill himself.

## B.    The Charges and the Guilty Pleas

On December 9, 2015, a grand jury returned a fifteen-count superseding indictment charging Sidney P. Kilmartin with twelve counts of fraud for a scheme in which he defrauded suicidal persons by pretending to send them potassium cyanide and instead sending Epsom salts, and with one count each of mailing injurious articles resulting in death, witness tampering, and witness retaliation for killing one of the fraud victims, Andrew Denton, in an effort to prevent Mr. Denton from complaining to law enforcement or to retaliate against him for his having done so. *Superseding Indictment* (ECF No. 85). On the morning of October 3, 2016, right before jury selection, Mr. Kilmartin pleaded guilty to the nine counts of fraud in the superseding indictment that did not involve the decedent Andrew Denton, leaving

only the Denton counts for trial.  *Min. Entry* (ECF No. 142).  The victims of the nine fraud counts to which Mr. Denton pleaded guilty were Walter Cottle of Georgia, *Superseding Indictment* at 2, Stacey Williams of Colorado, *id.* at 2, 3, Derek Jorgensen of Hull, England, *id.* at 3, 4, and Cynthia Kirschling of California.  *Id.*

This left the following charges for trial all involving Andrew Denton: (1) Count One, mailing injurious articles resulting in death, an alleged violation of 18 U.S.C. § 1716(j)(3); (2) Count Five, wire fraud occurring in November and December 2012, an alleged violation of 18 U.S.C. § 1343; (3) Count Seven, wire fraud, occurring on November 11, 2012, another alleged violation of 18 U.S.C. § 1343; (4) Count Twelve, mail fraud occurring on November 16, 2012, an alleged violation of 18 U.S.C. § 1341; (5) Count Fourteen, witness tampering, an alleged violation of 18 U.S.C. § 1512(a)(1)(A), (C); and (6) Count Fifteen, witness retaliation resulting in death, an alleged violation of 18 U.S.C. §§ 1513(a)(1)(B), (a)(2)(A), and 1111.

### C.    The Trial

Trial began on October 3, 2016, directly following Mr. Kilmartin's guilty pleas and jury selection.  *Min. Entry* (ECF No. 142).  Twenty-eight witnesses testified, *Witness List* (ECF No. 150), and over 100 exhibits were received into evidence.  *Ex. List* (ECF No. 151).  On October 11, 2016, a jury convicted Mr. Kilmartin of one count of mailing injurious articles resulting in death, two counts of wire fraud, one count of mail fraud, and one count of witness tampering.  *Jury Verdict Form* at 1–2 (ECF No. 153) (*Verdict Form*).  The jury acquitted Mr. Kilmartin of one count of witness retaliation.  *Id.* at 2.

On October 25, 2016, Mr. Kilmartin moved for judgment of acquittal under Federal Rule of Criminal Procedure 29 and for a new trial under Federal Rule of Criminal Procedure 33. *Def.'s Mot. for J. of Acquittal and New Trial* (ECF No. 162) (*Def.'s Mot.*). The Government opposed Mr. Kilmartin's motions on November 1, 2016. *Opp'n to Mot. for Acquittal and New Trial* (ECF No. 167) (*Gov't's Opp'n*). The Court held oral argument on the motion on December 15, 2016. *Min. Entry* (ECF No. 176).

On March 20, 2017, before the Court issued a ruling on the motions, the Court granted a motion to withdraw by Mr. Kilmartin's then-counsel, Attorney Martin Ridge, and appointed Attorney Bruce Merrill to represent Mr. Kilmartin. *Mot. to Withdraw* (ECF No. 190); *Order* (ECF No. 191). The Court allowed Attorney Merrill time to familiarize himself with the case and on July 10, 2017, Mr. Kilmartin filed a supplemental memorandum in support of his motion for acquittal and new trial. *Def.'s Suppl. Mem. of Law in Supp. of Mot. for J. of Acquittal and New Trial* (ECF No. 204) (*Def.'s Suppl. Mem.*). The Government filed its supplemental memorandum on July 31, 2017. *Gov't's Suppl. Mem. Regarding Def.'s Mots. for Acquittal and New Trial* (ECF No. 205) (*Gov't's Suppl. Mem.*). Mr. Kilmartin replied on August 12, 2017. *Def.'s Reply to Gov't's Suppl. Mem. of Law Regarding Def.'s Mot. for Acquittal and New Trial* (ECF No. 209) (*Def.'s Suppl. Reply*). The Court held a second oral argument on August 16, 2017. *Min. Entry* (ECF No. 211).

## II.    RULES 404(b) & 403: AN EVIDENTIARY ISSUE

Throughout trial, the defense pressed a significant evidentiary issue: whether other victims of Mr. Kilmartin's fraudulent scheme would be allowed to testify about their dealings with him.  To place this issue in context, just before Mr. Kilmartin pleaded guilty to the nine counts of fraud, the Court raised with counsel whether it should advise Mr. Kilmartin that the fact of the fraud convictions and the facts underlying those convictions might be admissible as evidence in the trial on the remaining Denton counts.  *Chambers Conf.*, *Tr. of Proceedings* 2:11-17 (Oct. 3, 2016) (ECF No. 163).   Both counsel agreed that the fact of the convictions would be admissible, but defense counsel had qualms about the exact facts alleged in the written prosecution version that the Government had submitted in anticipation of the guilty pleas.  *Id.* 2:18-3:19.  At the Court's suggestion, counsel met and resolved the facts to which Mr. Kilmartin was prepared to admit at the Rule 11.  *Id.* 3:20-4:17.  During Mr. Kilmartin's Rule 11 just before jury selection, the Court warned Mr. Kilmartin not only that the guilty pleas, but also that the facts underlying the guilty pleas might be admissible as evidence during the trial on the Denton counts.[2]  At the Rule 11, Mr. Kilmartin expressly agreed that the contents of the Revised Prosecution Version were true.  The Court accepted Mr. Kilmartin's guilty pleas to the nine fraud counts.

---

[2]    During the Rule 11 hearing, the Court also warned Mr. Kilmartin that he could be precluded from asserting defenses to the remaining Denton charges that would be inconsistent with his guilty pleas and his admission of the truth of the facts in the revised prosecution version.

At a second chambers conference just before opening statements, defense counsel indicated to the Court that he intended to refer in his opening statement to Mr. Kilmartin's guilty pleas to the nine fraud counts, and he asked whether either the Court or the Government objected to his doing so. *Chambers Conf.*, *Tr. of Proceedings* 11:13-23 (Oct. 3, 2016) (ECF No. 164). The Government did not object and the Court allowed defense counsel to discuss Mr. Kilmartin's guilty pleas in his opening statement. *Id.* 11:24-13:5.

Throughout the trial, the Government introduced evidence of Mr. Kilmartin's fraud against victims other than Mr. Denton (the non-Denton fraud evidence). For example, by stipulation, the Government read into record the Revised Prosecution Version of events underlying Mr. Kilmartin's pleas of guilty. In addition, the Government presented the testimony of Walter Cottle, Stacey Williamson, and Cynthia Kirschling, three of the four victims of the nine counts of fraud to which Mr. Kilmartin pleaded guilty. These victims described how they became suicidal to the point of seeking cyanide, how they met Mr. Kilmartin online, how they corresponded with him about cyanide, how they paid for the cyanide, and how the defendant packaged, addressed and mailed them a white substance they believed was cyanide but that later tested as Epsom salts. It also presented the testimony of Stuart Quinn, a UK law enforcement officer, about the fourth named victim, Derek Jorgensen. Mr. Quinn described Mr. Jorgenson's prior attempts at suicide and dealings with Mr. Kilmartin.

In addition, the Government introduced evidence concerning victims other than those charged in the superseding indictment. For example, it presented evidence of email correspondence with 247 different email addresses in which Mr. Kilmartin described the quality of his cyanide and explained how much it took to kill, how its effectiveness could be increased, how much it cost, how to pay for it, how to ship it, and where he lived. The Government also presented testimony from Autumn Roland, who was similarly defrauded but never received any package from Mr. Kilmartin. It presented evidence that the grandmother of a victim, Edith Collins, filed an IC3 complaint against Mr. Kilmartin without his knowledge.

Mr. Kilmartin had a continuing objection to the admission of this non-Denton fraud evidence based on Rule 404(b), arguing that it was improper evidence of other crimes or wrongs. The Court overruled the objections, finding that the evidence had special relevance to motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident, but instructed the jury regarding the limited use to which it could put the evidence.

## III. *UNITED STATES v. FORD*

Three days after the jury verdict in Mr. Kilmartin's case, the First Circuit decided *United States v. Ford*, 839 F.3d 94 (1st Cir. 2016). In *Ford*, the defendant appealed from a conviction in this Court of conspiracy, manufacturing over 100 marijuana plants, maintaining a residence for marijuana manufacturing, and possessing a firearm as a felon, all of which related to a marijuana grow operation run by Mr. Ford, his wife, and his two sons in Maine. 839 F.3d at 98.

Mr. Ford had previously been convicted in 2002 in the commonwealth of Massachusetts of possession of marijuana with intent to manufacture, distribute, or dispense, a felony under Massachusetts law. *Id.* at 102. The evening of the execution of the search warrant in Maine, Mr. Ford had told law enforcement that he got "popped in Mass" as a result of his previous grow operation in Massachusetts and that he had ended up with "a frigging . . . felony conviction because they forced me to plea bargain." *Id.* at 98. Significantly, in his opening statement, defense counsel conceded that Mr. Ford had been growing marijuana in his Maine barn, but he denied that Mr. Ford had grown as much marijuana as the Government alleged or that he had been engaged in a conspiracy with other family members to grow the marijuana. *Id.* at 99.

At trial, the Government proposed to call James Bruce, a Massachusetts State Trooper, to testify about the facts underlying Mr. Ford's 2002 conviction. The First Circuit summarized Mr. Bruce's testimony at trial:

> Bruce testified that he executed a search warrant at 2 Fellsmere Avenue in Wakefield, Massachusetts on October 11, 2002. He discovered three rooms "devoted entirely to marijuana." The operation was "pretty impressive," with plants in different stages of maturity and a variety of equipment. During the search, [Mr. Ford] informed Bruce that he did not reside at the house but actually lived across the street at 5 Fellsmere Avenue. [Mr. Ford] consented to a search of that home, where Bruce discovered another grow operation. Bruce testified the operations were consistent with distribution, rather than personal use.

*Id.* at 102. Mr. Ford objected to the admission of this testimony at trial under Federal Rules of Evidence 404(b) and 403, arguing that the evidence was not relevant for any special purpose because Mr. Ford did not contest that he intentionally grew

marijuana in Maine. *Id.* at 101. However, this Court overruled the objection, finding it had a special relevance to Mr. Ford's motive, opportunity, intent, preparation, plan, and knowledge, and the Court provided the jury with a limiting instruction in an attempt to curb any prejudicial effect. *Id.* at 101–02.

In evaluating Mr. Ford's challenge on appeal, the First Circuit did not discuss this Court's determination that the facts underlying the 2002 marijuana conviction had the "special relevance" required by Rule 404(b)(2). *Id.* at 109 ("Even assuming Bruce's testimony was specially relevant for one or more non-propensity purposes"). Instead, the First Circuit focused on whether Trooper Bruce's testimony was properly admitted under Rule 403 and concluded that its admission was "questionable." *Id.* The First Circuit recited the familiar Rule 403 standard, namely whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *Id.* (citing Fed. R. Evid. 403).

The First Circuit acknowledged that even though Mr. Ford had not contested the Government's allegation that he had intentionally grown marijuana in Maine, the Government "still retained the burden to prove each element of the charges beyond a reasonable doubt and, as a general matter, was entitled to prove its case by evidence of its own choice." *Id.* (citation omitted). Nevertheless, the fact that Mr. Ford conceded this "central allegation" rendered "the probative value of Bruce's testimony significantly reduced." *Id.* The First Circuit observed that given Mr. Ford's concession and the "other evidence presented," the Government "arguably did not need the testimony regarding the Massachusetts growing operation." *Id.* The *Ford*

Court recited the rule that a trial court should "weigh the risk of unfair prejudice against 'the government's need for the evidence,' among other factors." *Id.* at 109–10 (citation omitted).

Another factor weighing against the probative value of the facts underlying the Massachusetts conviction was the "remoteness in time" of the prior conviction. *Id.* at 110. The First Circuit noted that the "Massachusetts bust occurred nine years before the search in Maine." *Id.*

Having concluded that the probative value of Trooper Bruce's testimony was minimal, the First Circuit turned to the risk of unfair prejudice and concluded it was "high." *Id.* The First Circuit conceded that Trooper Bruce's testimony was "not particularly shocking" and that there was "little danger that it swayed the jury toward a conviction on an emotional basis." *Id.* (citation omitted). Yet, the First Circuit opined that "the risk is that the jury used it to infer criminal propensity." *Id.* The First Circuit considered the risk "especially pronounced" because "the prior conduct is identical to the charged crime." *Id.* The *Ford* Court noted that the "grow operations were extremely similar; they were both large and highly sophisticated, with plants in different stages of growth and a variety of equipment." *Id.*

Finally, the First Circuit discounted the impact of the trial court's limiting instruction. *Id.* It wrote that "in view of the negligible probative value of the evidence, it is not clear the district court's limiting instructions were sufficient to curb its prejudicial effect." *Id.* Despite the First Circuit's expressed reservations about

the admissibility of Trooper Bruce's testimony under Rule 403, the First Circuit concluded that any error by the trial court was harmless. *Id.*

In light of the *Ford* decision, the Court ordered the parties to brief whether it erred in admitting the non-Denton fraud evidence and, if so, whether the error was harmless. *Order* (ECF No. 158) (*Ford Order*). The Government filed its memorandum in response to the Court's Order on November 1, 2016. *Gov't's Mem. Regarding the Effect of United States v. Ford* (ECF No. 166) (*Gov't's Ford Mem.*). Mr. Kilmartin filed his memorandum on November 15, 2016. *Def.'s Mem.* (ECF No. 169) (*Def.'s Ford Mem.*). The Government replied on November 23, 2016. *Gov't's Reply Mem. Regarding the Effect of United States v. Ford* (ECF No. 171) (*Gov't's Ford Reply*).

## IV. THE PARTIES' POSITIONS

### A. The Motions for Acquittal and New Trial

#### 1. Sidney Kilmartin's Motion[3]

Mr. Kilmartin states that under Rule 29 of the Federal Rules of Criminal Procedure, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." *Id.* at 2. Citing caselaw, Mr. Kilmartin explains that when a court evaluates whether the evidence is sufficient, it must "determine whether viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the

---

[3] Although Mr. Kilmartin was convicted of four crimes, his motion for acquittal and new trial is directed against only two of them: Count One, mailing injurious articles resulting in death, and Count Fourteen, witness tampering resulting in death. *Def.'s Mot.* at 1. Mr. Kilmartin is not challenging the convictions on Counts Five, Seven, and Twelve, wire and mail fraud, nor has he challenged his guilty pleas to the nine non-Denton counts. *Id.*

defendant guilty of the crime beyond a reasonable doubt . . . whether the evidence, if believed, would establish each element of the crime." *Id.* (citations omitted). Mr. Kilmartin then sets out the elements the Government needed to prove beyond a reasonable doubt to convict him of Counts One and Fourteen. *Id.* at 3. He contends that "there was insufficient evidence presented to the jury to sustain the convictions on these two counts." *Id.*

With regard to Count One, Mr. Kilmartin says that the Government introduced evidence of two mailings from Mr. Kilmartin to Mr. Denton, alleging that in the first Mr. Kilmartin sent Epsom salts, but that after Mr. Denton filed an IC3 complaint, Mr. Kilmartin sent a second package that contained potassium cyanide. *Id.* at 3–4. Mr. Kilmartin argues, as he did at trial, that "the evidence did not support the conclusion that the contents of the package was potassium cyanide because there was no scientific proof that the substance found at Mr. Denton's home was, in fact, potassium cyanide." *Id.* at 4. In addition, Mr. Kilmartin argues that "[t]he evidence was overwhelming that even if the item mailed was potassium cyanide, the article mailed did not itself kill Mr. Denton." *Id.* He points out that the item was delivered on or about December 20, 2012, but Mr. Denton died on December 31, 2012, as a result of his own actions. *Id.* He also states that the evidence showed that Mr. Denton had been suicidal for years leading up to 2012 and that he had made many attempts to take his own life. *Id.* Mr. Kilmartin argues that "[t]he act of mailing the item was so far removed from Mr. Denton's death as to make it not reasonable to conclude that the item resulted in Mr. Denton's death." *Id.*

Mr. Kilmartin also argues that the evidence does not support a conviction on Count Fourteen. *Id.* at 5–6. He acknowledges that the evidence established that Mr. Denton complained to IC3, but states that the evidence also establishes that Mr. Denton wrote back to IC3 recanting his complaint and stating that he had worked out the problem. *Id.* at 5. He argues that there was no evidence that the complaint was forwarded to law enforcement or anything was done with the complaint and therefore "[f]or the jury to conclude that there was a reasonable likelihood that such a communication would have been made to a federal law enforcement officer had to have been based upon speculation by the jury." *Id.* Mr. Kilmartin then states that his argument in Count One regarding the killing of Mr. Denton applies equally to Count Fourteen. *Id.* at 5–6. Finally, he contends that "[t]he inappropriateness of the jury's verdict in Count Fourteen is underscored by the fact that the same jury acquitted Mr. Kilmartin of Count Fifteen, which alleged that he killed Mr. Denton in retaliation for Mr. Denton having made the IC3 complaint." *Id.* at 6.

In addition to the motion for judgment of acquittal, Mr. Kilmartin moves for a new trial based on the admission of evidence of Mr. Kilmartin's scheme to defraud people other than Mr. Denton. *Id.* at 6–7. In his view, "[t]he evidence over and over again highlighted that Mr. Kilmartin had done many bad things to many victims in order to make money" and that the "jury was overwhelmed by the sheer volume of information and determined, as a result, to convict Mr. Kilmartin of a count that alleged he killed Mr. Denton." *Id.* He explains that the Court ordered the parties to brief this issue separately in light of the *Ford* decision and says that if the Court

concludes that the admission of the non-Denton fraud evidence was inappropriate, he should be granted a new trial under Federal Rule of Criminal Procedure 33, which provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." *Id.* at 7.

### 2. The Government's Opposition

The Government agrees that the standard for a judgment of acquittal is "whether viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt" but contends that in Mr. Kilmartin's case "there was ample evidence from which a reasonable jury could have done so." *Gov't's Opp'n* at 2.

In the Government's view, there was sufficient evidence to prove that the substance mailed by Mr. Kilmartin was cyanide. *Id.* It states that the evidence showed that Mr. Kilmartin ordered, paid for, and received 99.6% pure potassium cyanide from Fisher Scientific; that he advertised it for sale on the internet; that he corresponded about it via email; and that he mailed it to Mr. Denton after Mr. Denton complained about the first package. *Id.* Additionally, the Government says that there was evidence that the content of the second mailer was potassium cyanide, including a test of the residue from the mailer on the scene and testimony of the toxicologist who sampled Mr. Denton's blood. *Id.*

The Government also argues that there was evidence from which a rational jury could have concluded that Mr. Kilmartin killed Mr. Denton. *Id.* It claims that the evidence showed that Mr. Kilmartin intended and desired Mr. Denton's death in order to protect himself. *Id.* at 2–3. It also points to the testimony of the UK law

enforcement officers who responded to the scene of death and ruled out other possible causes and of the toxicologist who opined that Mr. Denton was killed by cyanide. *Id.* at 3.

As for the witness tampering charge, the Government argues that there was ample evidence to conclude that Mr. Kilmartin killed Mr. Denton with the intent to prevent a communication to a law enforcement officer. *Id.* It lists the evidence that it believes supported the conviction, including evidence that Mr. Denton complained to IC3 about the phony cyanide and told Mr. Kilmartin he had done so, that the IC3 is an online complaint referral service of the FBI, that Mr. Kilmartin had committed a federal offense in the form of an extensive scheme to defraud persons by pretending to send them cyanide, and that Mr. Kilmartin explicitly asked Mr. Denton to destroy evidence of their interaction because Mr. Kilmartin was concerned that "with the FBI aware of [his] goings on the last thing [he needed was] to give them more fodder." *Id.* Additionally, the Government argues that the acquittal on the witness retaliation charge can be explained by the fact that the jury had only circumstantial evidence of retaliation, but direct evidence of witness tampering, and therefore the acquittal for retaliation "does not compel the conclusion that the jury speculated about, or was confused with regard to, the tampering count." *Id.* at 3–4.

The Government also maintains that Mr. Kilmartin should not be granted a new trial based on the admission of the non-Denton fraud evidence. *Id.* at 4. The Government briefly argues that the evidence was admissible on several grounds and that its probative value was not substantially outweighed by the risk of any

prejudicial effect. *Id.* at 4–5. It incorporates its memorandum regarding the *Ford* decision by reference for a more extensive discussion of this issue. *Id.*

## B. The *Ford* Memoranda

### 1. The Government's Memorandum

In its memorandum regarding the *Ford* decision, the Government argues that the Court's 404(b) analysis was not erroneous. *Gov't's Ford Mem.* at 1. After providing an overview of the *Ford* decision and the Rule 404(b) test, *id.* at 9–11, the Government claims that *Ford* is distinguishable from Mr. Kilmartin's case in several respects. *Id.* at 11. First, the Government states that unlike Mr. Ford, Mr. Kilmartin did not concede any aspect of the six counts that were tried before the jury and he put the Government to its burden of proof, attacking specific points such as whether Mr. Kilmartin actually obtained the cyanide, whether he was the type of person who would kill, and whether there was an alternative suspect. *Id.* at 11–12.

Additionally, the Government claims that the non-Denton fraud evidence has special relevance. *Id.* at 12. It argues that the evidence is relevant to motive because it demonstrated that Mr. Kilmartin desired to profit from and toy with his victims, and demonstrated that he killed Mr. Denton to prevent him from further cooperating with authorities about the federal fraud in which he was engaged. *Id.* It claims that the disparate treatment of Mr. Denton relative to other victims who did not complain shows his intent to retaliate against Mr. Denton for having provided information to the FBI. *Id.* It also argues that the similarity between the Denton and non-Denton fraud evidence is relevant to identity. *Id.* Additionally, the Government points out that unlike in *Ford* where the evidence of the other act occurred nine years before,

reducing its probative value, the non-Denton fraud evidence in Mr. Kilmartin's case occurred contemporaneously with his scheme to defraud Mr. Denton, so there is less risk of propensity. *Id.* at 12–13.

Next, the Government argues that if the Court did err in admitting the evidence under Rule 404(b), the error was harmless because the evidence of Mr. Kilmartin's guilt was substantial. *Id.* at 13. The Government also points out that the Court repeatedly gave limiting instructions that the jury should not use the scheme evidence for its propensity value. *Id.* at 14. It notes that the jury had a split verdict and states that this "suggests that they carefully followed instructions, parsed the evidence, and found the circumstantial evidence of intent to retaliate lacking as compared to the direct evidence of intent to tamper." *Id.*

The Government further argues that the evidence was admissible as direct, intrinsic evidence of the crimes tried. *Id.* Citing caselaw, the Government distinguishes between extrinsic acts, or crimes, wrongs, or acts other than the ones for which a defendant is on trial, and intrinsic acts, which are "inextricably intertwined" with the crime charged. *Id.* at 14–15. It claims that the former type is disfavored, but that the latter is independently admissible and does not implicate Rule 404(b). *Id.* at 15.

The Government states that the superseding indictment charged Mr. Kilmartin with devising a scheme to defraud suicidal persons and claims that the evidence that Mr. Kilmartin used the same scheme to defraud other victims is not extrinsic evidence, but part and parcel of the crimes charged against Mr. Denton. *Id.*

at 16. Therefore, it argues that the non-Denton fraud evidence "did not carry with it the danger that the jury might convict Kilmartin for the fraud he was contesting at trial because of some other fraud he had committed at a different, remote time and place." *Id.* It compares Mr. Kilmartin's case to two First Circuit cases, *United States v. McGauley*, 279 F.3d 62 (1st Cir. 2002) and *United States v. Santagata*, 924 F.2d 391 (1st Cir. 1991), in which the First Circuit concluded that the evidence of similar fraudulent acts, even though not charged, was properly admitted as direct and independent evidence of the charged scheme. *Id.* at 16–19.

Additionally, the Government claims that the evidence is admissible under the doctrines of curative admissibility and fair reply. *Id.* at 19. It explains that the "doctrine of curative admissibility allows a trial judge to admit otherwise inadmissible evidence in order to cure the effect of improperly presented evidence" and that "[t]he related doctrine of fair reply entitles a party to make a fair response to an improper argument by his adversary." *Id.* (collecting cases). The Government also explains that a defendant in a criminal case may offer evidence of his pertinent character trait, but if admitted, the prosecution is entitled to rebut it. *Id.* (citing FED. R. EVID. 404(a)(2)(A)). It then claims that in the defense's opening statement, it "suggested that the defendant was an honest, peaceful and law abiding character who was willing to accept responsibility for the fraud that he committed but not the murder that he didn't." *Id.* at 20. The Government argues that by doing so, the defense opened the door to the Government rebutting the character evidence with specific instances and that the non-Denton fraud evidence did just that. *Id.*

Finally, the Government argues that the evidence's probative value was not substantially outweighed by any unduly prejudicial effect under Federal Rule of Evidence 403. *Id.* It argues that the scheme evidence was not needlessly cumulative given the Government's burden to prove an intentional killing motivated by desires to tamper with and retaliate against Mr. Denton, and that the evidence was necessary to convey the full extent of the scheme. *Id.* at 21. It also claims that it did not dwell on the victim's mental problems that might have caused the jury to decide the case on the basis of emotion and that the split verdict indicates the jury evaluated the evidence rationally and critically. *Id.*

### 2. Mr. Kilmartin's Memorandum

It is Mr. Kilmartin's position that "the evidence of other wrongs or other crimes was admitted improperly and that the effect was prejudicial to the defendant" and therefore a new trial should be ordered. *Def.'s Ford Mem.* at 2. Mr. Kilmartin states that prior to trial he pleaded guilty to the scheme allegations of all named victims except Mr. Denton, but that "[i]t was abundantly clear that while he did not plead guilty to the 'scheme' allegations involving Mr. Denton those allegations were not contested." *Id.* at 5.

In response to the Government's fair reply and curative admissibility arguments, Mr. Kilmartin states that the Court indicated on more than one occasion that statements of the lawyers, including opening statements, are not evidence and that providing a biographical sketch of the Defendant "is hardly the introduction of evidence that would entitle the government to introduce otherwise inappropriate evidence." *Id.*

Mr. Kilmartin also argues that none of the testimony about the other victims was needed to prove the Government's case. *Id.* at 6. He claims that the Government had more than enough evidence to prove the scheme as it pertained to Mr. Denton, as well as to prove the remaining three counts involving the death of Mr. Denton. *Id.* at 6–7. Mr. Kilmartin argues that the volume of information had to have a prejudicial impact upon the jury and made any limiting instruction insufficient. *Id.* at 7–8.

### 3. The Government's Reply

In its reply, the Government maintains that the non-Denton fraud evidence was specially relevant to Mr. Kilmartin's intent to defraud Mr. Denton, his identity as Mr. Denton's defrauder, and his motive and opportunity to tamper with and retaliate against Mr. Denton. *Gov't's Ford Reply* at 2. The Government claims that Mr. Kilmartin generally denied in his opening that he was the type of person to commit these crimes and affirmatively contested all of the counts at trial. *Id.* at 2–3.

The Government also maintains that the non-Denton fraud evidence did not pose a danger of propensity logic because those acts of fraud occurred contemporaneously with the offense that was the subject of the trial and because those acts of fraud are different in nature from the mailing injurious articles, tampering, and retaliation charges. *Id.* at 3. It claims that the fact that the jury acquitted Mr. Kilmartin of retaliation indicates that it was not overwhelmed by the evidence or swayed by propensity logic. *Id.* It adds that the Government bears the highest burden of proof and is not required to sterilize its case of all human aspect. *Id.* at 4–5. It argues that the non-Denton fraud evidence provided persuasive detail

that "cannot be conveyed otherwise than by the interplay of live testimony and physical evidence." *Id.* at 4.

### C. The Supplemental Memoranda

#### 1. Sidney Kilmartin's Supplemental Memorandum

In his supplemental memorandum, Mr. Kilmartin concedes that the non-Denton fraud evidence "may have been properly admitted as direct evidence of the 'mail and wire fraud scheme,'" but he does not agree that the evidence is direct evidence on the death counts. *Def.'s Suppl. Mem.* at 6. Mr. Kilmartin argues that the evidence, whether direct evidence or Rule 404(b) evidence, would still be subject to a Rule 403 analysis. *Id.* at 6–7. He then lays out the tests under Rules 404(b) and 403, and states that the First Circuit has encouraged district courts to "carefully consider the proponent's assertion of why a prior conviction has special relevance" and to consider "whether the evidence has been offered to prove an issue that is in genuine dispute, and whether the evidentiary point can be made with other evidence that does not present a risk of unfair prejudice." *Id.* at 7–8 (quoting *United States v. Henry*, 848 F.3d 1 (1st Cir. 2017)). Mr. Kilmartin also explains the Court's role as gatekeeper. *Id.* at 9.

Mr. Kilmartin sets out the elements for mail and wire fraud and argues that the stipulation introduced at trial as Government Exhibit 104 was sufficient for the jury to convict Mr. Kilmartin on the mail and wire fraud counts. *Id.* at 9–12. He argues that the additional testimony by Walter Cottle, Stacey Williams, Cynthia Kirschling, Autumn Roland, Edith Mae Collins, and Detective Quinn for Derek Jorgensen was unduly prejudicial and unnecessary for the Government to prove its

case. *Id.* at 12–13. He explains that these witnesses were "allowed to testify regarding their backgrounds and mental health issues that caused them to seek out ways to end their lives" and argues that the testimony was "both emotional and graphic on occasion." *Id.* at 13. Mr. Kilmartin goes on to provide specific examples of the emotional parts of the testimony, *id.* at 13–15, and argues that the evidence in this case was much more emotionally-charged than the wrongfully-admitted evidence in the *Ford* case. *Id.* at 16. Moreover, Mr. Kilmartin claims that the Government could have presented evidence from an alternative source that would have had the same probative value as the live testimony but no danger of unfair prejudice. *Id.* at 16–19. Mr. Kilmartin concludes that the testimony should have been excluded under Rule 403 because it was "unnecessary, cumulative, unduly prejudicial, and the limiting instruction was not sufficient to cure this error, nor was this error harmless." *Id.* at 20.

## 2. The Government's Supplemental Memorandum

In its supplemental memorandum, the Government first explains that this case was "the product of a long and complicated investigation that lasted three years" and that the scope of Mr. Kilmartin's scheme was extensive but that the Government only charged Mr. Kilmartin for five individuals and did not try to gain any unfair tactical advantage in preparing and presenting the case. *Gov't's Suppl. Mem.* at 2–3.

The Government maintains that the non-Denton fraud evidence was intrinsic evidence of the crimes contested at trial because it took place during the acts charged against Mr. Denton. *Id.* at 3, 5–6. It states that the witnesses described their mental health in order to explain how they became so despondent that they sought to end

their lives with cyanide and described how they found Mr. Kilmartin on the internet, how they corresponded by email, how they paid for the cyanide, and how and what they received. *Id.* The witnesses also identified and authenticated the packages they received from Mr. Kilmartin. *Id.* The Government argues that this testimony showed the similarities between all of the victims and Mr. Denton, and in doing so, provided direct evidence of several elements of the charges, including the existence of a scheme, willful participation in the scheme, identity, motive, intent, and the commission of a federal offense. *Id.* at 4–10. It contends that the typical concerns related to Rule 404(b) evidence are not implicated by this intrinsic evidence. *Id.* at 7–8.

The Government agrees that the evidence is subject to Rule 403, but it argues that the evidence carried no unfair prejudice because it was not unduly emotional, was disclosed in discovery, and had legitimate probative value. *Id.* at 10–12. The Government adds that "[s]ome elements are more difficult to prove than others" and contends that mental states of motivation and intention are examples of those elements that may require greater proof. *Id.* at 12–13.

### 3. Sidney Kilmartin's Reply

In reply, Mr. Kilmartin clarifies that he is not denying that the evidence has some intrinsic value with respect to the fraud counts, but instead he is arguing that it should have been excluded under Rule 403. *Def.'s Suppl. Reply* at 1. He cites *United States v. Varoudakis*, 233 F.3d 113 (1st Cir. 2000), for the proposition that although trial courts do not have the benefit of context when evidentiary issues arise,

the Government does and can analyze the limitations of Rules 404(b) and 403. *Id.* at 2–3.

He disagrees with the Government's contention that the live testimony was not "unduly emotional" and the Government's position that identity was at issue with respect to the mail and wire fraud counts. *Id.* at 3–4. Mr. Kilmartin also disagrees that the non-Denton fraud evidence was intrinsic evidence on the death counts and claims that it must have special relevance under Rule 404(b) to be admissible. *Id.* at 4.

## V. DISCUSSION

Mr. Kilmartin moves for both judgment of acquittal and a new trial. The Court will first discuss the evidentiary issue in Mr. Kilmartin's motion for new trial because the resolution of that motion will inform the Court's action on the motion for judgment of acquittal.

### A. Motion for a New Trial

Shortly after the First Circuit issued the *Ford* decision, the Court ordered the parties to address whether the Court erred in admitting the Rule 404(b) evidence in this case and, if so, whether the admission was harmless. *Ford Order.* The procedural vehicle for the Court to reconsider its admission of the Rule 404(b) evidence is the motion for new trial that Mr. Kilmartin filed on October 25, 2016, which is grounded on the Rule 404(b) issue.

### 1. New Trial Standards under Rule 33

Rule 33 of the Federal Rules of Criminal Procedure provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."

FED. R. CRIM. P. 33(a).  In general, a "district court has greater power to order a new trial than to overturn a jury's verdict through a judgment of acquittal." *United States v. Rothrock*, 806 F.2d 318, 321 (1st Cir. 1986).  At the same time, there are "definite limits upon a district court's right to upset a jury verdict."  *Id.* at 322.  The First Circuit has explained that the "remedy of a new trial is rarely used; it is warranted 'only where there would be a miscarriage of justice' or 'where the evidence preponderates heavily against the verdict.'"  *United States v. Andrade*, 94 F.3d 9, 14 (1st Cir. 1996) (quoting *United States v. Indelicato*, 611 F.2d 376, 386 (1st Cir. 1979)); *see also United States v. Del-Valle*, 566 F.3d 31, 38 (1st Cir. 2009).  The standards for a Rule 33 motion are rigorous, and "a trial judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result." *Rothrock*, 806 F.2d at 322.

## 2.  The *Ford* Analytic Framework

One reiterated lesson from the First Circuit's opinion in *Ford* is that in performing the Rule 403 part of the Rule 404(b) analysis, a trial court must weigh not only the apparent probative value of the proffered evidence and the danger of unfair prejudice, but also the Government's need for the contested evidence.  *Ford*, 839 F.3d at 109; *United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir. 2000) ("Under Rule 403, . . . th[e] risk of an improper criminal propensity inference should be considered in light of the totality of the circumstances, including the government's need for the evidence given other available testimony, to prove the issue identified pursuant to the 404(b) special relevance analysis").  This aspect of the trial court's balancing obligation is challenging because at the time of the ruling, no one knows how much

evidence is going to be enough to persuade the jury.  Furthermore, the trial judge must keep in mind that the prosecution is generally "entitled to prove its case by evidence of its own choice." *Ford*, 839 F.3d at 109 (quoting *Old Chief v. United States*, 519 U.S. 172, 186 (1997)).  Given the fluidity of a trial and the sequential presentation of evidence, what may appear obvious after the verdict is a work in progress when the ruling is made.  A trial court could provisionally admit the Rule 404(b) evidence, subject to a final ruling at the close of evidence.  *See United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977) (addressing the provisional admission of a statement in furtherance of a conspiracy).  However, if the trial court provisionally admits Rule 404(b) evidence, the danger that the jury will be unable to unring the bell and ignore the testimony, if struck, is apparent.

### 3. The Elements the Government Needed to Prove

Within the indictment, the Government brought two broad categories of crimes: (1) mail and wire fraud counts, and (2) death counts.  Regarding the first category, the First Circuit has written that "[t]o prove mail and wire fraud, the government must prove, beyond a reasonable doubt: (1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails or interstate wire communications in furtherance of the scheme." *United States v. Sawyer*, 85 F.3d 713, 723 (1st Cir. 1996).  Regarding Count One, the mailing injurious articles resulting in death count, the Government had to prove (1) that the defendant knowingly deposited for mailing, (2) something nonmailable, (3) that the defendant did so with the intent to kill or injure someone, and (4) that the injurious article mailed resulted in the death of a particular person.

29

*See* 18 U.S.C. § 1716(j)(2). For Count Fourteen, witness tampering, and Count Fifteen, witness retaliation resulting in death, the Government bore the burden not only of proving that Mr. Kilmartin killed Andrew Denton but also of proving his motivation for doing so, namely to prevent him from communicating with a federal official about the commission of a federal offense for Count Fourteen, and to retaliate against him for providing information to a law enforcement officer for Count Fifteen. 18 U.S.C. § 1512(a)(1)(A), (C); 18 U.S.C. §§ 1513(a)(1)(B), (a)(2)(A), 1111.

### 4. The Defendant's Opening Statement Concession

In *Ford*, defense counsel made an important concession in his opening statement: he conceded that Mr. Ford had been growing marijuana, and he was contesting only the quantity of marijuana and whether he had conspired with others to grow it. *Ford*, 839 F.3d at 99. It was in light of this concession that the First Circuit analyzed whether the government in *Ford* needed to present the Rule 404(b) evidence. *Id.* at 109–10.

Similarly, Mr. Kilmartin's counsel made an important concession during his opening statement. It is, however, important to be precise about what Mr. Kilmartin's counsel conceded and what he did not. During his opening statement, Mr. Kilmartin's counsel admitted that Mr. Kilmartin in fact had engaged in a scheme to defraud:

> Mr. Frank [the AUSA] pointed out that Mr. Kilmartin pled guilty to a number of counts in the superseding indictment and that is absolutely true. He pled guilty to the scheme. He pled guilty to allegations that he engaged in a course of conduct in which he negotiated for money from people and in exchange for that money, he did not provide to them that which the person thought he or she was purchasing, and that is fraud, and Mr. Kilmartin has admitted to the scheme. And that scheme rolls

over into the Andrew Denton counts, the nondeath counts. And the Government need only prove that Mr. Kilmartin took the steps necessary to make Mr. Denton a victim in that scheme of defrauding buyers.

*Partial Tr. of Proceedings*, *Opening Statement of Defense Counsel* 4:12-23 (ECF No. 174) (*Partial Tr., Defense Opening*). Later, defense counsel went on to say that "[t]he Government has piles and piles of documents that will prove the scheme. The Government has witness after witness, after witness who will prove the scheme. Mr. Kilmartin admits that he engaged in that scheme." *Id.* 8:1-4.

Turning back to the elements of the wire and mail fraud charges, Mr. Kilmartin's defense counsel conceded that he had engaged in a scheme to defraud, the "knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud" element. *Sawyer*, 85 F.3d at 723. But he challenged the Government to prove that he had actually carried out this scheme against Mr. Denton.

By contrast, Mr. Kilmartin's counsel did not concede any of the elements of the death counts. To the contrary, he maintained that Mr. Kilmartin "is just a joker. He is someone who tricks people, but he is not a killer." *Partial Tr., Defense Opening* 5:6-7. Defense counsel repeated that "he is not a killer and . . . the Government's evidence is not going to prove that he is a killer." *Id.* 5:10-12. He specifically challenged the Government to prove that Mr. Kilmartin "actually received the package of potassium cyanide from Fisher Scientific," *id.* 5:19-22, and that British law enforcement officials removed potassium cyanide, as opposed to cyanide, from Mr. Denton's home after his

death.  *Id.* 6:10-12.  He also argued that Mr. Denton committed suicide and Mr. Kilmartin did not kill him.  *Id.* 8:11-13.

### 5. The Government's Evidence Without the Non-Denton Fraud Evidence

To assess the Government's need for the non-Denton fraud testimonial evidence, the Court has isolated the evidence related to the charges directly involving Mr. Denton without that evidence.  The Government presented evidence that Sidney Kilmartin ordered and possessed potassium cyanide in the fall of 2012.  Specifically, in September 2012, a person named Sidney Kilmartin of Augusta, Maine operating a business called S&K Goldsmith ordered and received from Fisher Scientific, through an order placed with a broker called The Capricorn Group, 100 grams of potassium cyanide.  *Gov't Exs.* 2, 3; *Trial Test. of William Steven Loring* (*The Capricorn Grp.*) *& John Mitchell* (*Fisher Scientific*).  Sidney Kilmartin paid $127.56 to The Capricorn Group for the potassium cyanide on September 12, 2012, using his checking account at the Maine State Credit Union.  *Gov't Exs.* 2, 3, 8, 9.  The potassium cyanide was over 99% pure.  *Gov't Ex.* 4, 4.5, 5.  On September 14, 2012, Sidney Kilmartin picked up the package from Fisher Scientific containing the potassium cyanide at the UPS store in Augusta, Maine.  *Gov't Ex.* 6, 7; *Trial Test. of Michelle Tyne & William Milliken.*

The Government also presented evidence that Andrew Denton of Hull, England committed suicide on December 31, 2012, from ingesting potassium cyanide.  *Trial Test. of Leon Armstrong, Gail Coates, Michael Barrett, Helen Crowley, Jonathan Birt, Colin Jordan, Steven Morris, Grahame Kay, Dr. David Alun Hutchings.*

The Government produced evidence that Sidney Kilmartin was the source of the potassium cyanide that Andrew Denton ingested. Specifically, the Government showed that a person using the screen name "skiptin" had been in email contact with Andrew Denton of Hull, England about selling Mr. Denton potassium cyanide in November 2012. *See Gov't Ex.* 55. In fact, when Mr. Denton filed his online complaint to the IC3 on December 7, 2012, he wrote that he had wired Mr. Kilmartin $250 for a gram of potassium cyanide on November 10, 2012, and that Mr. Kilmartin had picked up the money on November 11, 2012. *Id.* at 3. Mr. Denton then complained that Mr. Kilmartin had sent him a package that "was not Potassium Cyanide" and "did not work." *Id.* Hence, Mr. Denton's complaint to the IC3 about being "ripped off." *Id.*

At Mr. Denton's home, British law enforcement found and photographed a USPS packet in a brown envelope that had been mailed on November 16, 2012, from S. Martin, 98 Pond Rd., Manchester, Me to Andrew Denton, 17 Holland St., Holderness Rd., Hull, United Kingdom. *Gov't Ex.* 59-19-20. The brown envelope rested on top of a Complaint Referral Form with the same complaint number as the IC3 complaint form the Government admitted into evidence. *Compare Gov't Ex.* 59-19, *with Gov't Ex.* 55. British law enforcement also found and photographed a USPS packet that was sent on December 11, 2012, from S. Martin of 98 Pond Road, Manchester, Maine to Andrew Denton of 17 Holland St., Holderness Rod. Hull, United Kingdom. *Gov't Ex.* 59-7-9.

In addition, the Government produced evidence of email exchanges between Mr. Kilmartin and Mr. Denton in December 2012. On December 20, 2012, Mr. Kilmartin asked Mr. Denton to do something for him "before your event." *Gov't Ex.* 102. Mr. Kilmartin wrote Mr. Denton, noting that "[w]ith the FBI aware of my goings on", the "last thing I need is to give them more fodder as you and I have had extensive conversations." *Id.* Mr. Kilmartin asked Mr. Denton to "do something with your hard drive" such as "[g]ive it to a friend or discard it." *Id.* In response, Mr. Denton promised to delete his emails but questioned whether it would be effective. *Id.*

Significantly, the Government presented a four-page stipulation concerning the facts underlying the wire and mail fraud counts not involving Mr. Denton. *Gov't Ex.* 104, *Stip.* at 1–4. The stipulation, which was signed by both the AUSA and defense counsel and which was admitted into evidence, confirmed that Mr. Kilmartin had engaged in a "scheme to defraud suicidal persons and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, by pretending to sell such persons cyanide when in fact he was selling them Epsom [s]alts." *Id.* at 1. The stipulation established that from September 2012 until about May 2013, Mr. Kilmartin communicated by email with "Walter Cottle, Stacey Williams, Derek Jorgensen, Autumn Roland, Cynthia Kirschling, and others." *Id.* at 3. It stated that Mr. Kilmartin accepted payments through PayPal and Western Union and that he received payments from "Stacey Williams, Derek Jorgensen, Jessica Wolfe, Jeremy Katzmier, Noel Heim, Autumn Roland, Sunnie Kim, Rita Foster, Cynthia Kirschling, amongst others." *Id.* It stipulated that Mr. Kilmartin

"mailed substances from Maine" to a number of individuals and he wrote his name and return address on the envelop either as "Skip Martin, 88 Pond Road, Manchester, Maine" or "S Martin, 88 Pond Road, Manchester, Maine." *Id.* at 4. Finally, it confirmed that Mr. Cottle, Ms. Williams, Mr. Jorgensen, and Ms. Kirschling all kept the substance that Mr. Kilmartin sent and that a laboratory established that the contents were consistent with Epsom salts. *Id.*

### 6. The Non-Denton Fraud Testimonial Evidence

During the trial, the Government called as witnesses a number of individuals who were victims of Mr. Kilmartin's Epsom salts fraud: Walter Cottle, Stacey Williams, Cynthia Kirschling, Autumn Roland, and Edith Mae Collins. In addition, by agreement, Officer Stuart Quinn testified about his conversations with Derek Jorgensen.[4] Each victim testified about his or her difficult mental state leading to dealings with Mr. Kilmartin. Although each witness's testimony differed, in general, they shared the following characteristics: (1) either they, or in one case the witness's granddaughter, had suffered from severe depression or similar serious mental health condition and were contemplating suicide, (2) they became aware of Mr. Kilmartin over the internet, typically though the "wantdeathblogspot," (3) Mr. Kilmartin represented to them that he had cyanide and would sell it to them, (4) the cost of the cyanide was between $150 to $250, (5) they paid Mr. Kilmartin by PayPal or Western Union, (6) they sent the payment to Sidney Kilmartin in Manchester, Maine, (7) after

---

[4] The Government represented that Mr. Jorgensen was in an extremely fragile mental state and, while preserving his right to object to any testimony about Mr. Jorgensen on Rule 404(b)/Rule 403 grounds, Mr. Kilmartin agreed that in lieu of Mr. Jorgensen's actual testimony, Officer Quinn could summarize his dealings with Mr. Jorgensen.

payment, the supposed cyanide typically came in a brown package, and (8) within the package was a clear baggie with a white substance. In addition, for some witnesses, the Government introduced the actual packaging that they had received from Mr. Kilmartin and the jury was able to compare the handwriting on the packages to assess whether it was similar. There was no evidence that Mr. Kilmartin actually sent any of these witnesses potassium cyanide; Walter Cottle's, Stacey Williams's, Cynthia Kirschling's, and Derek Jorgensen's packets from Mr. Kilmartin were tested as Epsom salts.

There was evidence that two of the witnesses complained or threatened to complain to the authorities. After describing her state of depression, Autumn Roland testified that she discovered Mr. Kilmartin on an online suicide blog and she ordered cyanide from Mr. Kilmartin in November 2012, sending $250 by Western Union to him around November 22, 2012. *Gov't Ex.* 46 (Email from Autumn Roland to Sidney Kilmartin on Nov. 22, 2012: "I see that you have picked up my payment"). When Mr. Kilmartin did not send anything to Ms. Roland, she demanded her money back and on December 15, 2012, she threatened to turn him into the FBI. *Id.* (Email from Autumn Roland to Sidney Kilmartin). On December 18, 2012, Mr. Kilmartin explained by email that his "supplier took ten days to get it to me" and that he had "mistakenly mailed two packages to the same customer," and Ms. Roland wrote back, "I dont believe you, and i want my money back." *Id.* The last email correspondence was from Autumn Roland on December 27, 2012: "YOU ARE A ROTTEN FAT PIECE OF SHIT AND I HOPE THE NEXT PERSON TO CONTACT YOU FOR CYANIDE

IS WITH THE FBI." *Id.* Ms. Roland confirmed that she had actually complained to the FBI's tip-line.

The other person who complained to the authorities was Edith Mae Collins. Ms. Collins testified that she has a granddaughter, who was troubled and came to live with her and her husband in December 2011. Her granddaughter stayed with them from the time she was thirteen until she was sixteen. In January 2013, Ms. Collins came upon email correspondence to Mr. Kilmartin from her granddaughter, then fifteen years old. Her granddaughter emailed Mr. Kilmartin on January 1, 2013, looking for cyanide. *Gov't Ex.* 85B ("hey i read ur post on the suicide website and im done with life please help me out man!!!!"). On January 2, 2013, Mr. Kilmartin responded, "[Granddaughter's name], I am a supplier of Potassium Cyanide. It is fast, reliable, and painless. Get back to me for more info. Skip"). *Id.* On January 9, 2013, Ms. Collins filed a complaint about "Skip Martin" with the IC3. *Id.* Ms. Collins testified that she did not inform Mr. Kilmartin that she had complained to the IC3.

### 7.    The Rule 403 Analysis

Mr. Kilmartin's main contention is that the non-Denton fraud evidence should have been excluded under Rule 403. Rule 403 requires a balancing of probative value and prejudicial effect. *United States v. Henry*, 848 F.3d 1, 9 (1st Cir. 2017). When assessing the probative value of evidence under Rule 403, "a court must consider both whether the evidence has been offered to prove an issue that is in genuine dispute, and whether the evidentiary point can be made with other evidence that does not present a risk of unfair prejudice." *Id.* (citing *Ford*, 839 F.3d at 109–10 and *United States v. Varoudakis*, 233 F.3d 113, 122–24 (1st Cir. 2000)).

### a.      Probative Value

### i.      Fraud Counts

Although initially characterized at trial as purely Rule 404(b) evidence, both parties agree, and the First Circuit makes clear, that the non-Denton fraud evidence was direct evidence of the existence of a scheme to defraud, an element of the mail and wire fraud counts, and therefore did not implicate Rule 404(b). *See United States v. McGauley*, 279 F.3d 62, 72–73 (1st Cir. 2002) (holding that 217 refund checks other than those charged in the indictment were admissible as proof of a broader scheme to defraud retail establishments); *United States v. Santagata*, 924 F.2d 391, 393–94 (1st Cir. 1991) (holding that evidence of clothing orders placed on dates not charged in the indictment was admissible as relevant to the existence of a scheme); *see also United States v. DeSimone*, 699 F.3d 113, 124 (1st Cir. 2012) ("Evidence intrinsic to the crime for which the defendant is charged and is on trial is not governed by Rule 404(b)").

At the same time, if Mr. Kilmartin effectively conceded that he had been involved in a scheme to defraud the probative value of admitting evidence of other frauds would, as in *Ford*, be lessened. During his opening statement, Mr. Kilmartin's counsel admitted that Mr. Kilmartin had in fact been engaged in a scheme to defraud:

> Mr. Frank [the AUSA] pointed out that Mr. Kilmartin pled guilty to a number of counts in the superseding indictment and that is absolutely true. He pled guilty to the scheme. He pled guilty to allegations that he engaged in a course of conduct in which he negotiated for money from people and in exchange for that money, he did not provide to them that which the person thought he or she was purchasing, and that is fraud, and Mr. Kilmartin has admitted to the scheme. And that scheme rolls over into the Andrew Denton counts, the non-death counts. And the Government need only prove that Mr. Kilmartin took the steps

necessary to make Mr. Denton a victim in that scheme of defrauding buyers.

*Partial Tr.*, *Defense Opening* 4:12-23.

In addition, the Government, by stipulation, introduced the Prosecution Version of the events underlying Mr. Kilmartin's guilty pleas into evidence, which stipulated that "[b]etween April of 2012 and May of 2013, Sidney P. Kilmartin devised a scheme to defraud persons and to obtain money and property by means of materially false and fraudulent pretenses . . . by pretending to sell such persons cyanide when in fact he was selling them Epsom Salts." *Gov't Ex.* 104, *Stip.* at 1.

Based on this concession and the stipulation, defense counsel argues that the Government did not need the live testimony of the other victims to prove the mail and wire fraud counts and that the evidentiary point could have been made with other evidence that does not present a risk of unfair prejudice. *See Henry*, 848 F.3d at 9; *Ford*, 839 F.3d at 109–10; *Varoudakis*, 233 F.3d at 122–24.

The Court does not agree. Although Mr. Kilmartin admitted the scheme, he did not admit that he made Mr. Denton a victim of that scheme and he expressly held the Government to its burden of proof on this issue. The live testimony from the non-Denton victims demonstrated a certain commonality among the victims that the other evidence did not provide. These commonalities included similarities among the packaging, the forms of payment, and the correspondence. Although the stipulation included some information about the address labels and forms of payments, and the Postal Inspectors who collected the evidence discussed the similarities in packaging materials, it is also true that this evidence was more convincing coming from the live

witnesses who were victims of the Kilmartin scheme than coming from an antiseptic stipulation.[5] Although Mr. Kilmartin insists that the Government could have presented much of the same evidence through witnesses other than the victims, the Government is still "entitled to prove its case by evidence of its own choice." *Ford*, 839 F.3d at 109 (quoting *Old Chief*, 519 U.S. at 186).

An important part of any scheme to defraud is the perpetrator's choice of victim. Here, there was a striking commonality among Mr. Kilmartin's victims, from the five live witnesses to Mr. Denton himself. Although each victim had a different story, they were all in fragile emotional states, making them more susceptible to Mr. Kilmartin's fraud scheme. Mr. Denton shared these characteristics. As Gail Coates, Mr. Denton's niece, testified, Mr. Denton, too, was in a vulnerable emotional state, having made several unsuccessful attempts to take his life in the past. The fact that Mr. Kilmartin defrauded a certain type of victim made it more probable that Mr. Denton, who shared the other victims' emotional characteristics, was also a victim of the scheme, which remained a genuine issue in the case. *See United States v. DeSimone*, 699 F.3d 113, 125 (1st Cir. 2012) (concluding that even if other fraud evidence had not been charged, it demonstrated the defendant's "modus operandi in duping victims").

---

[5] This assumes the evidence could have come in through the Postal Inspector. Obviously, the Postal Inspector was not the recipient of the Kilmartin envelopes, and the Postal Inspector's knowledge about them would have had to come from the victims. The other victims identified and authenticated the packages as the ones they had received from Mr. Kilmartin. Without the testimony of the victims, the Government could have been subject to foundational objections if it attempted to introduce the envelopes through a Postal Inspector witness.

## ii.    Death Counts

The non-Denton fraud evidence also has probative value with respect to the death counts.  The parties disagree over whether the testimony was direct, intrinsic evidence on these counts, or whether it was purely Rule 404(b) evidence, requiring special relevance in order to be admissible.  The First Circuit has set out the proper test for evaluating the admissibility of Rule 404(b) evidence:

> Under Rule 404(b), [e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character, i.e., as propensity evidence.  Evidence of other acts may be admissible, however, if it has special relevance, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

*Ford*, 839 F.3d at 109 (internal citations omitted).  However, the First Circuit has also stated that "in reality, 'direct evidence' and 'Rule 404(b) evidence' are not mutually exclusive categories, but loose labels that can sometimes plausibly be applied to the *same* conduct."  *United States v. Randazzo*, 80 F.3d 623, 630 (1st Cir. 1996) (emphasis in original).  It explained:

> The general rule, and the conditions, may be easily applied where the "other" crimes are reasonably distinct (*e.g.,* in time and place) from the crime charged in the indictment.  But where the "other" crimes are more closely entangled with the events that comprise the charged offense, a number of courts have declined to apply the label "other" or to require the limiting instruction.

*Id.*

This general rule is hard to apply when dealing with the death counts charged against Mr. Kilmartin.  On the one hand, the non-Denton fraud evidence involving Epsom salts is distinct from the witness retaliation, witness tampering, and mailing

injurious articles involving cyanide and resulting in Mr. Denton's death, suggesting that it would be "other" crime evidence subject to Rule 404(b)'s special relevance requirement.  On the other hand, the non-Denton fraud took place at the same time and occurred in the same place (via the internet and mail) as the Denton charges related to death, suggesting the testimony would not be labelled as an "other" crime and would not be subject to Rule 404(b).  *See United States v. Appolon*, 715 F.3d 362, 373 (1st Cir. 2013) ("The uncharged transactions also took place within the same general timeframe as the charged ones, further supporting the notion that they were part and parcel of the same scheme").  In fact, the non-Denton fraud scheme was the federal offense that the Government alleged was Mr. Kilmartin's motive for witness retaliation and tampering.   *See* 18 U.S.C. § 1512(a)(1)(A), (C); 18 U.S.C. §§ 1513(a)(1)(B), (a)(2)(A), 1111.

In any event, Rule 404(b) is not an absolute bar and evidence of other acts is admissible so long as there is at least one permissible inference and the Court concludes that there was at least one permissible inference as to the death counts. *See United States v. Tutiven*, 40 F.3d 1, 5 (1st Cir. 1994); *United States v. Ferrer-Cruz*, 899 F.2d 135, 138 (1st Cir. 1990).  The Court draws the distinction mainly because Rule 404(b) evidence is generally disfavored, since it carries with it the risk of propensity logic, and weighs into the Court's analysis of "unfair prejudice" under Rule 403.

Turning back to the probative value of the other victim evidence with respect to the death counts, the testimony of the non-Denton fraud bore directly on a number

of issues before the jury.  First was the issue of identity.  Mr. Kilmartin's counsel suggested that the cyanide could have come from another source, "brawnkelly," who had also communicated online with Mr. Denton, making identity a genuine issue in the case.  The testimony of the other victims provided first-hand evidence of the type of parcels used by Mr. Kilmartin, the tone and content of their communications, and the process for payment, all making it more likely that Mr. Kilmartin sent not only the first package to Mr. Denton but also the second package containing the cyanide. Moreover, as previously discussed, the live testimony demonstrated common characteristics among the victims in terms of their emotional states, characteristics that Mr. Denton shared.

Additionally, the non-Denton fraud evidence demonstrated both motive and intent to kill.  It highlighted the true gravity of the scheme and the fact that Mr. Kilmartin had reason to worry when Mr. Denton complained to IC3 that an investigation would reveal more than just the Denton fraud, but would lead to his entire pattern of conduct with multiple other victims.  In doing so, the evidence helped to explain why Mr. Kilmartin would want to kill Mr. Denton.

With this other victim evidence, the Government also sought to explain why Mr. Kilmartin did in fact send cyanide this time even though he had only ever sent Epsom salts in the past.  Two other victims, Edith Mae Collins and Autumn Roland, had also complained to IC3 but without Mr. Kilmartin's knowledge.  These two witnesses' testimony showed disparate treatment and demonstrated that Mr. Kilmartin chose to send real cyanide to Mr. Denton because he knew that Mr. Denton

had complained to IC3, evidence that bears directly on the witness tampering and witness retaliation counts.[6]  Also the parties had agreed to admit a stipulation into evidence that set forth some details for the other fraud convictions.  Thus, Mr. Kilmartin has never argued that the evidence of other frauds was inadmissible.  Whether the Court committed legal error in admitting the live witnesses is limited to the incremental impact of their live testimony as opposed to the written stipulation and the incremental impact of their testimony to the extent it was not already before the jury by agreement.  On this point, as the Court already discussed with respect to the fraud counts, the live testimony provided additional details about the nature of the victims' mental states and other matters, details not conveyed in the stipulation or through other evidence.[7]

### b.  Unfair Prejudice

The question remains whether the evidence's probative value is substantially outweighed by unfair prejudice.  In *Ford*, the First Circuit found that the risk of unfair prejudice stemming from the testimony regarding the Massachusetts operation was high.  839 F.3d at 110.  It explained:

> Although this evidence is not particularly shocking and [t]here is little danger that it sways the jury toward a conviction on an emotional basis, the risk is that the jury used it to infer criminal propensity . . . That risk is especially pronounced where, as here, the prior conduct is identical to the charged crime.

---

[6]      Autumn Roland testified that she threatened to report Mr. Kilmartin to the authorities and that she completed a complaint on the FBI tip line.  But, unlike Mr. Denton, there is no evidence that she informed Mr. Kilmartin that she actually had followed through on her threat to report him.

[7]      The Government also argues that the non-Denton fraud evidence is admissible under the doctrines of curative admissibility and fair reply because the defense opened the door to character evidence in its opening statement.  The Court does not reach this argument because it resolves the matter on different grounds.

*Id.* (internal citations omitted).  It added, "in view of the negligible probative value of the evidence, it is not clear that the district court's limiting instructions were sufficient to curb its prejudicial effect."  *Id.*

In this case, the risk that the jury would infer criminal propensity is much less pronounced than in *Ford*.  The fact that Mr. Kilmartin engaged in a scheme to defraud others could potentially lead the jury to believe that he is a bad person who would defraud and kill Mr. Denton.  However, the risk of propensity logic is significantly reduced, and arguably did not exist at all, by the fact that these schemes did not occur remotely but happened contemporaneously with the Denton fraud; they were a part of the same scheme.  *See DeSimone*, 699 F.3d at 124 ("Evidence intrinsic to the crime for which the defendant is charged and is on trial is not governed by Rule 404(b)").

At the same time, the risk that the evidence, in particular the testimony by the victims about their suicidal tendencies, would have an emotional impact on the jury is much higher in this case than it was in *Ford*.  For example, as pointed out by Mr. Kilmartin, some of the victims were visibly upset, such as Stacey Williams, and others described graphic details of the victims' suicide attempts, such as Detective Quinn who testified about how Derek Jorgensen placed a shotgun in his mouth and pulled the trigger, resulting in severe disfigurement.  The Court does not discount the emotional impact of this testimony.

However, the focus of the other victims' testimony was largely on identifying the mailers, describing the form of delivery and payment, and explaining how they communicated with Mr. Kilmartin, not on the inflammatory details, reducing the

chance that the testimony would elicit a purely emotional response from the jury. *See Appolon*, 715 F.3d at 374. Further, as pointed out by the Government, the prosecution is not required to present a case sterilized of all human aspect. In fact, narrative integrity is often integral to a party's case and written stipulations alone may not satisfy the jury, especially in a case such as this one where motive and intent to kill were at issue. *See Old Chief*, 519 U.S. at 183. It is also true that the Government did not choose Mr. Kilmartin's victims; Mr. Kilmartin chose Mr. Kilmartin's victims. The fact that they were suicidal and fragile was the reason Mr. Kilmartin's fraud was successful.

Although there was a danger of unfair prejudice by admitting this evidence, Rule 403 demands exclusion "only when its probative value is *substantially* outweighed by its potential unfairly to prejudice the defendant." *Appolon*, 715 F.3d at 373 (emphasis in original). As discussed above, the probative value of the evidence in this case is much higher than that of the evidence in *Ford*. Furthermore, the evidence has probative value independent of Rule 404(b) and arguably does not implicate the risk of propensity logic to the same extent as in *Ford*. Any risk of unfair prejudice was reduced by the closeness in time of the other acts to the charged crimes, and by the focus of the testimony on the transactions instead of the emotional details. Finally, the fact that the jury concluded that the Government failed to prove the witness retaliation charge in Count Fifteen suggests that the jury was not compelled by the emotional nature of some of the victim testimony to find Mr. Kilmartin guilty regardless of the strength of the Government's case. In sum, the Court concludes

that any risk of unfair prejudice by the evidence did not substantially outweigh the evidence's probative value.

### 8. Harmless Error

Finally, the Court concludes that even if the evidence should not have been admitted, the failure to exclude the evidence constituted harmless error. The First Circuit has held that "[a] non-constitutional evidentiary error is harmless (and, therefore, does not require a new trial) so long as it is highly probable that the error did not influence the verdict." *United States v. Piper*, 298 F.3d 47, 56 (1st Cir. 2002). It explained:

> There is no bright-line rule for divining when particular errors that result in a jury's exposure to improper evidence are (or are not) harmless. Rather, a harmlessness determination demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue.

*Id.* at 57 (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1182 (1st Cir. 1993)).

In *Ford*, the First Circuit concluded that although the testimony of the defendant's prior conviction had negligible probative value and a high risk of unfair prejudice, "the nature of [Mr. Ford's] defense and the overwhelming evidence of guilt render any error harmless." *Ford*, 839 F.3d at 110.

Here too, the Government introduced overwhelming evidence that Mr. Kilmartin was guilty of mail and wire fraud, witness tampering, and mailing injurious articles resulting in death. Mr. Kilmartin conceded through his guilty plea that he had engaged in the same scheme with respect to several other individuals.

Additionally, the Government introduced evidence of communications between Mr. Kilmartin and Mr. Denton regarding the purchase of cyanide and two envelopes addressed to Mr. Denton from Mr. Kilmartin, the second of which contained residue that tested positive for cyanide. It also introduced the IC3 complaint filed by Mr. Denton and the email communications in which Mr. Denton told Mr. Kilmartin about the complaint. It showed the jury emails between Mr. Kilmartin and Mr. Denton in which Mr. Kilmartin promised to send cyanide and explained exactly how to order it in case the mailer got lost. This description matched evidence of how Mr. Kilmartin had himself purchased cyanide from Fisher Scientific and had it delivered to a business address, the UPS store near his home. The Government introduced additional emails in which Mr. Kilmartin asked Mr. Denton to destroy all of the evidence of their interaction so as not to give the FBI "more fodder" and emails from Mr. Denton saying he retracted his complaint, which suggests that Mr. Kilmartin had followed through and sent cyanide the second time.

Given the overwhelming other evidence of Mr. Kilmartin's guilt on the Denton charges, any error in admitting the non-Denton fraud evidence was harmless. The Court admits that the volume of evidence introduced regarding the non-Denton fraud was significant, but the fact that the jury split its verdict and acquitted Mr. Kilmartin of witness retaliation suggests that the jury carefully considered the evidence and was not swayed to convict Mr. Kilmartin on an emotional basis or that it was overwhelmed or misled by the evidence.

### B.       Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29 instructs the Court to enter a judgment of acquittal if "the evidence is insufficient to sustain [the] conviction." FED. R. CRIM. P. 29(a).  In making this determination, the Court must "view the evidence and draw all reasonable inferences in the light most favorable to the verdict." *United States v. McGauley*, 279 F.3d 62, 66 (1st Cir. 2002).  The Court may not disturb the jury's verdict if "a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir. 1994); *United States v. Lipscomb*, 539 F.3d 32, 40 (1st Cir. 2008).  The Court must "consider all the evidence, direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict." *United States v. Carroll*, 105 F.3d 740, 742 (1st Cir. 1997).

### 1.       Count One

Count One of the superseding indictment charged Mr. Kilmartin with mailing injurious articles resulting in death in violation of 18 U.S.C. § 1716(j)(3).  To prove the underlying crime, the Government had to establish beyond a reasonable doubt that 1) Mr. Kilmartin knowingly deposited for mailing or delivery, or knowingly caused to be delivered by mail; 2) something declared nonmailable, in this case, potassium cyanide; 3) that Mr. Kilmartin did so with the intent to kill or injure another; and 4) that the injurious article mailed resulted in the death of any person, in this case, Andrew Denton.

Mr. Kilmartin argues that the evidence introduced by the Government is insufficient to sustain the conviction because it did not prove the second or fourth

element of the underlying crime. Specifically, Mr. Kilmartin contends that "there was no scientific proof that the substance found at Mr. Denton's home was, in fact, potassium cyanide" and that "the article mailed did not itself kill Mr. Denton." *Def.'s Mot.* at 4.

As for Mr. Kilmartin's first contention, the Court concludes that a rational factfinder could find, beyond a reasonable doubt, that the Government proved the substance mailed was potassium cyanide. The Government introduced evidence of two mailings from Mr. Kilmartin to Mr. Denton. The Government also introduced evidence of email communications between Mr. Kilmartin and Mr. Denton in which Mr. Kilmartin promised to send Mr. Denton actual cyanide after Mr. Denton told Mr. Kilmartin he complained to IC3 because the first package did not contain cyanide. These emails also provided specific details about how to order the cyanide from Fisher Scientific in case the second mailer got lost in transit. Additionally, there was evidence that Mr. Kilmartin had himself communicated with Fisher Scientific for the purchase of 99.6% pure potassium cyanide to be sent to a UPS store near his home. Though there was no direct evidence that Mr. Kilmartin picked up the cyanide from the UPS store, there was evidence that the package had been delivered and that Mr. Kilmartin was in the area of the UPS store on the date of the delivery. The Government also introduced evidence of Mr. Denton's death, including photographs of an empty beaker next to Mr. Denton's bed, testimony of a toxicologist who found that Mr. Denton's blood contained a lethal concentration of cyanide, tests of residue from the second mailer confirming the substance was cyanide, and a note written by

Mr. Denton warning any individual who found his body about the hazardous substance.

It is true that the Government did not do a test on the substance to prove scientifically that it was in fact the same potassium cyanide Mr. Kilmartin had ordered from Fisher Scientific and not some other kind of cyanide. However, the First Circuit has held that "proof based upon scientific analysis or expert testimony is not required to prove the illicit nature of a substance." *United States v. Robinson*, 144 F.3d 104, 108 (1st Cir. 1998) (quoting *United States v. Valencia-Lucena*, 925 F.2d 506, 512 (1st Cir. 1991)). Moreover, the Government's standard of proof is "beyond all reasonable doubt" not "to a scientific certainty." Given all of the evidence, direct and circumstantial, and viewing it in a light most favorable to the verdict, the Court concludes that a rational jury could infer that Mr. Kilmartin purchased cyanide from Fisher Scientific, picked up the cyanide from the UPS store, and sent that cyanide to Mr. Denton after he complained to IC3 about the first package.

The Court also concludes that a rational factfinder could have found that the cyanide resulted in the death of Mr. Denton. Mr. Kilmartin claims that because Mr. Denton committed suicide, a jury could not have reasonably concluded that Mr. Denton's death was caused by an act of Mr. Kilmartin. *Def.'s Mot* at 4–5. However, as explained to the jury in the final jury instructions, "resulted in" Mr. Denton's death means that Mr. Denton's death would not have occurred "but for" Mr. Kilmartin's conduct. To prove this element, the Government introduced testimony that Mr. Denton had been suicidal and unsuccessfully tried to end his life on several occasions,

photographs of the scene of Mr. Denton's death which showed an empty beaker next to Mr. Denton's bed, tests of the residue from the second mailer reporting the substance was cyanide, testimony from a toxicologist that Mr. Denton had a lethal dose of cyanide in his blood, and testimony from UK law enforcement officers who responded to the scene and ruled out other possible causes of Mr. Denton's death. Viewing all of this evidence in a light most favorable to the verdict, the Court concludes that a rational jury could find that the cyanide resulted in Mr. Denton's death.

In sum, the evidence is sufficient to sustain a conviction on Count One of the superseding indictment.

### 2. Count Fourteen

Count Fourteen of the superseding indictment charged Mr. Kilmartin with witness tampering in violation of 18 U.S.C. § 1512(a)(1)(A) and (C). To prove the underlying crime, the Government had to establish beyond a reasonable doubt that 1) on or about the date charged, Mr. Kilmartin knowingly killed Andrew Denton; and 2) that Mr. Kilmartin did so with the intent to prevent a communication about the commission of a federal offense to a law enforcement officer. The Government also had to show that there was a reasonable likelihood that the communication would be made.

Mr. Kilmartin argues that the verdict on Count Fourteen should be set aside because "[t]o conclude that a man who has committed suicide by his own voluntary actions was also murdered makes no sense" and because "[a] reasonable jury could not have found Mr. Kilmartin not guilty of retaliation, which did not require a

conclusion that a future act was reasonably likely to occur, and also find him guilty of witness tampering, which did require that a future act was reasonably likely to occur." *Def.'s Mot.* at 6.

The Court concludes that a rational factfinder could find that the Government proved the first element of the crime of witness tampering, knowingly killed Mr. Denton, beyond a reasonable doubt. The Court instructed the jury that one acts "knowingly" if he was "conscious and aware of his actions, realized what he was doing or what was happening around him, and did not act because of ignorance, mistake or accident." In this case, the Government introduced evidence that Mr. Kilmartin found individuals, including Mr. Denton, in suicide chatrooms, that he communicated by email with Mr. Denton who wanted to purchase cyanide to end his life, that Mr. Denton complained to IC3 when the first package Mr. Kilmartin sent did not kill him, and that he told Mr. Kilmartin about that complaint. The Government also introduced emails in which Mr. Kilmartin promised to send actual cyanide, and evidence that he did send a second mailer to Mr. Denton, which contained residue testing positive for cyanide. The Government also introduced evidence of the cause of Mr. Denton's death. This evidence is sufficient to prove that Mr. Kilmartin was conscious and aware that if he sent Mr. Denton the actual cyanide, Mr. Denton would use it to kill himself, and that Mr. Denton did in fact use it to kill himself.

Mr. Kilmartin insists that if an individual commits suicide, it is not reasonable to conclude that someone else killed him. However, courts, including the Supreme Court, have suggested that assisted suicides can be a form of intentional killing, *see,*

*e.g.*, *Vacco v. Quill*, 521 U.S. 793 (1997), and states have enacted laws imposing criminal penalties on individuals who assist another individual to commit suicide. *See, e.g.*, ALASKA STAT. § 11.41.120 ("A person commits the crime of manslaughter if the person . . . intentionally aids another person to commit suicide"). This suggests that a rational trier of fact could conclude that providing an individual with cyanide to kill himself is an intentional killing.

The Court also concludes that there was sufficient evidence to find that Mr. Kilmartin intended to prevent a communication about the commission of a federal offense to a federal law enforcement officer. The Government introduced evidence that Mr. Denton had filed a complaint with the FBI through IC3. It also introduced emails between Mr. Kilmartin and Mr. Denton in which Mr. Kilmartin explicitly asked Mr. Denton to destroy all evidence of their interaction because he was concerned that "with the FBI aware of [his] goings on the last thing [he needed was] to give them more fodder." *Gov't Ex.* 102. The Government also introduced evidence of the extent of Mr. Kilmartin's scheme to defraud individuals, including the Prosecution Version of the events underlying Mr. Kilmartin's guilty pleas, to demonstrate why Mr. Kilmartin wanted to prevent Mr. Denton from saying anything further. Taking all of the evidence and viewing in a light most favorable to the verdict, the Court concludes that a rational jury could find that Mr. Kilmartin sent the cyanide to Mr. Denton so that he would kill himself in order to prevent him from further communicating with the FBI about the scheme.

Mr. Kilmartin believes that this finding is inconsistent with the jury's finding that Mr. Kilmartin was not guilty on Count Fifteen for witness retaliation. However, witness retaliation requires that Mr. Kilmartin killed Mr. Denton "with the intent to *retaliate* against Andrew Denton for providing information to a law enforcement officer about the commission of a federal offense." The email communications between Mr. Denton and Mr. Kilmartin asked Mr. Denton to destroy evidence after he sent the cyanide because he did not want to give the FBI "more fodder." A rational factfinder could conclude that Mr. Kilmartin's intent was not to retaliate for the past complaint Mr. Denton sent, but rather that he intended to prevent Mr. Denton from providing further information about the scheme, namely their email communications and the physical evidence, to the FBI. As the Government points out, there was more evidence of an intent to tamper, namely the emails from Mr. Kilmartin asking Mr. Denton to destroy all evidence, than there was on the intent to retaliate. The Court does not see the inconsistency in these two findings and therefore concludes that the evidence was sufficient to sustain the conviction on Count Fourteen. The Court therefore denies the Defendant's motion for judgment of acquittal.

## VI.    CONCLUSION

The Court DENIES the Defendant's Motion for Judgment of Acquittal and New Trial (ECF No. 162).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR
UNITED STATES DISTRICT JUDGE

Dated this 24th day of August, 2017