1                   UNITED STATES DISTRICT COURT

2                      DISTRICT OF MAINE

3

4    UNITED STATES OF AMERICA    )

                           )

5                          )         CRIMINAL ACTION

           vs.                 )

6                          )   Docket No. 1:14-cr-00129-JAW-1

                           )

7    SIDNEY P. KILMARTIN,        )         ORAL ARGUMENT

                           )

8                 Defendant.    )

9

10

11                 TRANSCRIPT OF PROCEEDINGS

12       Pursuant to notice, the above-entitled matter came on

13 for ORAL ARGUMENT before the HONORABLE JOHN A. WOODCOCK, JR.,

14 in the United States District Court, Bangor, Maine, on the

15 16th day of August, 2017, at 10:07 a.m.

16

17

18 APPEARANCES:

19 For the Government:             Halsey B. Frank, Esquire

20 For the Defendant:              Bruce M. Merrill, Esquire

21

22

23             Julie G. Edgecomb, RMR, CRR

              Official Court Reporter

24

25 Proceedings recorded by mechanical stenography; transcript
produced by computer.

1          (Proceedings held in open court.)

2               THE COURT:  Good morning.

3               MR. FRANK:  Good morning, Your Honor.

4               MR. MERRILL:  Good morning, Your Honor.

5               THE COURT:  We're here in the matter of United

6     States versus Sidney P. Kilmartin, which is 14-cr-129-JAW.

7          Would counsel please enter their appearances.

8               MR. FRANK:  Halsey Frank for the United States.

9     Good morning, Your Honor.

10              THE COURT:  Good morning, Mr. Frank.

11              MR. MERRILL:  Good morning, Your Honor.  Bruce

12    Merrill on behalf of Sidney Kilmartin.

13              THE COURT:  Good morning, Mr. Merrill.

14         First, I would again like to thank counsel.  I found the

15    supplemental memorandum very helpful and well done.  I knew I

16    was going to get good briefing, and I appreciate the efforts.

17         I have a number of questions, but I don't want to

18    preclude you, Mr. Merrill, if you wish to speak first, that's

19    fine, and then, Mr. Frank, you can speak, or I can just go

20    right in on the questions.

21              MR. MERRILL:  Your Honor, in speaking to Mr. Frank,

22    first thanking him for sending me an e-mail over the weekend

23    or I would have never realized that I filed the motion for an

24    extension, but never filed a reply brief, so I apologize to

25    the court for that oversight on my part.

1      But I was also saying -- and I think that Mr. Frank

2  agrees -- that we've covered everything that I think the court

3  addressed in the December 15th hearing, and at least for

4  Mr. Kilmartin's part, I'm ready to answer any questions that

5  the court may have.

6          THE COURT:  All right.  How about you, Mr. Frank, do

7  you want to speak first, or do you want me to go right forward

8  into questions?

9          MR. FRANK:  I think I agree with Mr. Merrill, Your

10  Honor, if we proceed to questions directly and --

11          THE COURT:  All right.  I was going to see if I can

12  get on my computer here for a second.  Well, I guess that's

13  thinking for a little while.

14      So -- so this is the way I've approached the problem that

15  -- if you want to sort of divide the charges up into different

16  categories, first, we have a series of fraud cases, and that's

17  Count 5, Count 7, and Count 12; and then we had three death

18  cases involving Mr. Denton, and that's Count 1, Count 14, and

19  Count 15.  Count 15 Mr. Kilmartin was found not guilty on.

20      So if we take those crimes generally and discuss them as

21  the wire and mail fraud counts and then the death counts, I

22  want to first ask counsel about the fraud cases here.  Now,

23  one way to think about this case, it seems to me, is to think

24  about it as if it were separately tried on the fraud counts,

25  just taking the fraud counts and setting them aside and not

1   intermingling the fraud counts with the Denton death counts.
2   If we were just -- if -- if we were just handling a fraud case
3   -- wire and mail fraud, then what the government would have to
4   prove is -- was really set forth in the jury instructions, and
5   one of the elements that the government would have to prove on
6   all of those cases -- those three counts -- is that the
7   defendant entered into a scheme and that it was the defendant
8   himself, and not someone else, who perpetrated the mail and
9   wire fraud.
10          And it's -- it's complicated a little bit by the fact
11   that just before trial, the defendant pleaded guilty to the
12   other mail frauds, but I reviewed at the last oral argument
13   with Mr. Ridge exactly what he said to the jury at the time of
14   the opening about whether he was conceding the other -- the
15   fraud counts, and it seemed to me that he tiptoed around it,
16   but he really didn't concede.  He basically said the
17   government has to prove that Mr. Kilmartin was the one who
18   perpetrated those frauds.
19          So I guess for -- my first question for you, Mr. Merrill,
20   is, why wouldn't evidence of the other frauds be admissible as
21   direct evidence of the -- first, the scheme and then, in
22   addition to the scheme, the fact that Mr. Denton -- I'm sorry
23   -- Mr. Kilmartin was the one who perpetrated the scheme
24   involving the wire and mail frauds with Mr. Denton?
25               MR. MERRILL:  I -- I think that the First Circuit

1   has made it clear that as far as proving the scheme, that that

2   would be intrinsic evidence and would be admissible, and I

3   don't think that I have suggested in any of my papers

4   otherwise.  I -- Your Honor, at the December hearing, recited

5   the First Circuit case law in that area and I think it would

6   come in as intrinsic -- intrinsic evidence.

7        And the only point that I would make there and -- and

8   where I took issue with what the government was saying is even

9   if it comes in as intrinsic evidence, you still have to do a

10  403 analysis.  403's always in play.  403 just doesn't work as

11  404(b).  It's -- it's always --

12            THE COURT:  Sure.

13            MR. MERRILL:  -- in play.

14            THE COURT:  Yeah.

15            MR. MERRILL:  90 percent of the time when a defense

16  attorney's making an argument, it's on the basis that it's

17  unduly prejudicial to the client.  So I'm not making the

18  argument that this was just a fraud case and we're just

19  talking about a scheme that Mr. Frank may not have been able

20  to bring that evidence in as direct intrinsic evidence of the

21  scheme.

22            THE COURT:  All right.  If -- if we assume that

23  that's the case, then I agree with you that -- I mean, all

24  evidence is subject to a Rule 403 analysis.  But what I did is

25  I took a look -- the -- the defendant had agreed to a

1    stipulation, as you know, and that was placed into evidence,

2    and that -- the question that the First Circuit has asked in

3    404 -- 404(b) cases -- and I think it's probably equally

4    applicable to a 403 analysis anyway -- is, what did the

5    government already have in evidence?  What was agreed to?  And

6    was the additional evidence necessary in light of what was

7    already established and proven?  I think that's a fair point

8    in this case where you have a stipulation as to most of the

9    evidence.

10       But most of the evidence wasn't all of the evidence, and

11   what I did is I went through and I looked at what the

12   witnesses like Walter Cottle and Stacey Williams and Cynthia

13   Kirschling all said that was not just -- not the same and

14   didn't flesh out what was in the stipulation, but actually

15   added detail to the nature of the scheme that would have

16   allowed the jury to evaluate whether or not it was

17   Mr. Kilmartin involved in the scheme with Mr. Denton.

18       And to that end, each of these individuals, like

19   Mr. Denton, was suicidal.  Each of these individuals -- and

20   I'm saying one was the grandmother actually, but she was

21   really testifying about Mr. Kilmartin's dealings with her

22   granddaughter, so I'm really talking about the granddaughter,

23   although the testimony came in through the grandmother -- each

24   of these individuals, I believe, talked about getting onto the

25   blog site.  Each of these individuals had e-mail exchanges

1    with skiptin.  Each of the e-mails sent money -- each of these

2    individuals sent money to the person they thought was skiptin

3    through PayPal or Western Union.  When they got the packages,

4    the packages were all similar.  They were -- they had -- the

5    envelopes were similar.  When they opened it up, there was a

6    clear baggie in each of these packages.  The language that was

7    used in the e-mail exchanges between skiptin and these other

8    individuals had a certain tone; they were -- there was a

9    language that was used and content that was communicated,

10   including, in some instances, how much was needed in order to

11   cause death.

12        And then for these individuals, like Mr. Denton, they all

13   tes -- or some -- most of them -- some of them testified,

14   let's put it this way, that they didn't get what they had

15   ordered, that it turned out to be Epsom salts, and that was

16   established through -- when they turned the poison over -- or

17   what they thought was poison, it turned out to be Epsom salts,

18   at least according to the government.

19        So the -- the danger is the -- really, the emotional

20   nature of the testimony, and some of it, as I remember, was

21   quite emotional.  I remember, in particular, being impressed

22   with Stacey Williams, and there were some others who were

23   quite emotional.  Others were strangely sort of matter of fact

24   about the way they described this whole business.

25        But the -- the risk, it seems to me, was mostly this

1  infusion of emotion in the trial.  But why wouldn't all of the

2  additional pieces of cumulative evidence that I've indicated

3  there that were not contained in the stipulation have been

4  properly admissible under Rule 403 in proving the fraud?

5      MR. MERRILL:  Cognizant of the principle Old Chief,

6  that the government gets to prove its case, I don't take issue

7  with the court suggesting that there were parts of the

8  testimony that were relevant to proving the scheme -- who they

9  were dealing with, the e-mails back and forth, the bags that

10  it came in.

11     But all of that stuff had been turned over to the postal

12  inspectors and that information could have come in without

13  bringing out the fact of the pathetic nature -- and I say that

14  with all due kindness to these witnesses -- but their lives in

15  terms of what they described was pathetic that they had

16  reached the point where they wanted to die and they were going

17  on this Web site and explaining -- for example, Deputy

18  Constable Quinn, why was it necessary for him to describe that

19  Mr. Jorgensen had 20 years earlier tried to commit suicide by

20  putting a shotgun in his mouth and that when he went to see

21  him, he recognized him because of his disfigurement?  That

22  doesn't go to any element of mail or wire fraud.

23     The information that he had could have come in without

24  telling that story.  It didn't add anything to the

25  government's need to satisfy its burden of proof.  And so what

1    I'm saying is in recognition of Old Chief, yes, the government

2    gets to try its case, but if you look at what they say in

3    Varoudakis, I believe is how you pronounce the case, but

4    they're basically saying, unlike the court that gets hit with

5    this either in a motion in limine or even in the -- the heat

6    of trial, the government has the ability to do this analysis

7    ahead of time and figure out, is there a better way that we

8    can get this in and not run the risk?

9        And -- and the First Circuit cautions in Varoudakis that

10   they see this happening too often, that the government's not

11   doing its job of making sure that it can try its case, but

12   avoiding creating these issues that are unnecessary.

13       THE COURT:  Why wouldn't the kind of person that he

14   was dealing with be relevant for proving a fraud?  So what I'm

15   thinking is that -- I mean, if you -- if you just saw the

16   e-mails back and forth, you wouldn't get a real sense for who

17   these people were and why they were so susceptible to fraud.

18       MR. MERRILL:  I think that that could be done, in

19   all due respect, by having testimony that there is this black

20   site out there, and it's for people who are contemplating

21   suicide and having somebody testify to what this site is and

22   that these -- each of these people went to that site where

23   they made contact with this individual skiptin, without having

24   the people say I suffered a breakdown, I found my daughter --

25   my granddaughter's picture on her -- I forget whether it was a

1   phone or a laptop now -- with a scarf around her neck like she

2   was hanging herself.

3       That -- that's where I say you're gilding the lily.  You

4   don't need that to prove your case, and it -- it runs -- the

5   -- the danger -- and I think what's important here is they

6   talk about the risk of undue prejudice, the danger of undue

7   prejudice, or the potential to have the jury reach a verdict

8   on an improper basis.

9       It doesn't say you have to show it, and that's why I took

10  issue with the government's suggestion that the government

11  (sic) didn't decide this on an emotional basis.  How does the

12  government know that?  We don't know that.

13              THE COURT:  You mean the jury?

14              MR. MERRILL:  Nobody knows why the government -- I'm

15  sorry -- the verdict -- the jury reached the verdict they did,

16  but all of the case law says you have to protect against the

17  risk, the danger, the potential.  And when you have this

18  testimony that doesn't really add to the government's proof as

19  far as the elements are concerned, it's really over the top,

20  especially this.

21      And what I keep coming back to and -- and I have a

22  problem with is in the Ford case, they thought that a police

23  officer coming in and testifying about a prior conviction for

24  a marijuana grow, which is clearly not emotional testimony;

25  it's a statement of fact.  Now you compare that to Walter

1   Cottle, who couldn't remember anything and there was no

2   objection -- I don't know whether Mr. Ridge had agreed that

3   there'd be a little bit of leading -- but Mr. Frank said,

4   well, did this happen about the time of your breakdown?  Oh,

5   yeah.  Or -- or the -- the woman -- and I -- and I forget her

6   name, but it's in my brief, because I took their actual

7   questions where the government twice had to say, I'm sorry, I

8   don't mean to upset you.

9           THE COURT:  Right.

10          MR. MERRILL:  Again, I'm sorry I don't mean to upset

11  you.  I believe -- and I think this is what the Varoudakis

12  case is talking about -- that the government has its right

13  under Old Chief to prove its case, but there's still got to be

14  a limit, i.e., 403, as to what you can bring in and not

15  trigger that risk, that danger, that potential that you're

16  going to have a verdict based upon emotion rather than the

17  facts.

18          THE COURT:  He -- I mean, the -- you're giving an

19  example of precisely why I decided to appoint you to represent

20  Mr. Kilmartin because you do such a nice job in these cases,

21  Mr. Merrill.

22      So what we had is a fair amount of testimony about

23  Mr. Denton, and that testimony was mostly from his niece, and

24  she testified, at some length, about the struggles he had had

25  with mental health and depression and his continually

1   threatening to commit suicide and the -- the difficulty that

2   the whole family, including herself -- she sort of took on

3   this role as being her -- his caretaker, if you will -- and

4   that testimony was emotional, but it also sort of framed who

5   Mr. Denton was.  Mr. Denton was a depressive apparently; he

6   had severe mental health issues; and he was, accordingly,

7   vulnerable to somebody saying I'll send you something that

8   will relieve your troubles in this world.

9       And the other people who came before the court, I will

10  say some of them, as I've said, aren't -- were surprisingly

11  unemotional about this.  They simply, sort of matter of fact,

12  described I had this terrible problem, I was going through a

13  swoon in my life, and now I'm recovered and I'm glad I am.

14  But others were emotional; I think particularly Stacey

15  Williams, as I recall, was quite emotional.

16      But there -- there was a commonality at least in the way

17  Mr. Denton was described and the way these people described

18  themselves.  And doesn't that go to an important part of

19  fraud?  That -- fraud is -- part of fraud is picking your

20  victim, and picking your victim -- you know, you don't try and

21  perpetrate a financial fraud against somebody who's highly

22  sophisticated in financial matters.  You -- you seek out and

23  -- and -- or maybe they seek you out, as happened here, but

24  you go to places where you know that people who are attracted

25  to the Web site are going to be vulnerable.  And, basically,

1   why shouldn't that testimony be allowed?  I mean, after all,

2   these were not people that the government picked.  These are

3   the people that Mr. Kilmartin himself was dealing with; those

4   -- those were the people he -- he chose to defraud.

5        So I'm having a little trouble understanding -- I

6   understand that it's -- it hurts the defense case to have this

7   emotion in.  But why isn't that singular commonality of

8   individuals an appropriate thing for the jury to consider when

9   they're trying to figure out whether it was Mr. Denton who

10  perpetrated the scheme against -- Mr. Kilmartin who

11  perpetrated the scheme against Mr. Denton?

12           MR. MERRILL:  Two things, if I could.  As I

13  indicated, I read Mr. Ridge's opening statement a little bit

14  differently.  He talks about the scheme that Mr. Kilmartin

15  pled guilty to.  He said, he pled guilty to the allegations

16  that he engaged in a course of conduct in which he negotiated

17  for money from people, and in exchange for that money, he did

18  not provide to them that which the person thought he or she

19  was purchasing, and that is fraud, and Mr. Kilmartin has

20  admitted to that scheme.  And that scheme rolls over into the

21  Andrew Denton counts, the nondeath counts, and the government

22  need only prove that Mr. Kilmartin took the steps necessary to

23  make Mr. Denton a victim in that scheme --

24           THE COURT:  Right.

25           MR. MERRILL:  -- of defrauding buyers.

1          THE COURT:  So what -- what I understood that to be

2   -- and I think -- I don't think you and I disagree on this --

3   I'm going to suspect we don't -- I thought he admitted that

4   his client was involved in the scheme, but he didn't admit and

5   he put the government to its burden of proof that he was

6   involved in the scheme as regards Mr. Denton.

7          MR. MERRILL:  Correct.  He -- he said it rolls over

8   to Mr. Denton, and all the government need prove that he made

9   Mr. Denton a victim of that scheme.

10          THE COURT:  So he was -- he said, look, he

11   perpetrated -- and he -- it would have been impossible for him

12   to deny the scheme since he pleaded guilty earlier that day to

13   the scheme itself as regards the other individuals.

14          MR. MERRILL:  So if you take that statement, and

15   you've got the niece testifying, and the niece turns over the

16   e-mails where Mr. Kilmartin and Mr. Denton are conversing

17   about the first product that he sold him and that Mr. Denton

18   was very upset about that and he filed an IC3 complaint and

19   you're going to get what -- what's coming to you, and

20   Mr. Kilmartin said, no, no, no, I'll take care of it, gives

21   him a reason for why he didn't send him the right stuff, but

22   he's going to send it to him again.  Doesn't that make

23   Mr. Denton part of that scheme at that point?

24          THE COURT:  Well --

25          MR. MERRILL:  Why is it necessary to have all the

1    other witnesses come in with all of their emotional baggage,

2    and at what point does the court, as the gatekeeper, say,

3    you're -- you're risking that there is going to be an

4    emotional verdict or you're risking this undue prejudice

5    that's coming in?

6            THE COURT:  Right.  How about the issue that I

7    raised -- I get your point about -- I mean, that's why we're

8    here.  I think I -- I had raised the issue after I got the

9    Ford case, which seemed to me to be at least a -- perhaps a

10   higher and more intensive examination of 404(b) and 403 than

11   I'm used to, let's just put it that way.  But that may be a

12   signal from the First Circuit that it's looking at these

13   404(b) and 403 cases with a more critical eye.

14      But come back to my question about the commonality

15   between victims.  Why -- I'm still struggling as to why that

16   wouldn't be appropriate.  Why wouldn't -- you have the

17   testimony about who Mr. Denton was, and I think it's -- I

18   think my earlier statement that it's fair for a jury to

19   consider, in trying to evaluate whether someone perpetrated a

20   fraud, whether there was a commonality among the victims --

21   that seems to ring true here -- and I saw, when they

22   testified, by -- Mr. Denton unfortunately wasn't here to

23   testify, but his niece testified as to his characteristics,

24   which were very similar to the characteristics of these

25   witnesses here.

1    So why isn't that probative of -- and significantly

2    probative, of the fact that it was Mr. Denton who committed a

3    fraud -- jeez, I keep saying that -- that it was Mr. Kilmartin

4    who committed the fraud -- mail fraud against Mr. Denton?

5          MR. MERRILL:  And, again -- and I understand that --

6    that I'm kind of being a Monday morning quarterback here, but

7    -- but as I look at this, someone that was not there at the

8    trial, but when I looked at it, it just seems to me that it --

9    and I'm not disagreeing that it was commonality, it did

10   establish commonality.

11    But the question is, as I understand from reading all the

12   First Circuit cases, is, was there a better way to do it?  And

13   I think in the -- the Varoudakis case, they -- they take some

14   empathy with you, as the trial judge, by saying, you don't

15   know about it ahead of time, you've got to decide it in the

16   heat of, you know, what's the boilerplate 404(b) that we do

17   here, whereas the government has the time to analyze and

18   decide, is there a better way?  But yet they -- they -- they

19   put the burden on you and --

20         THE COURT:  How -- how would they have proven,

21   though, that commonality of personality characteristics?

22         MR. MERRILL:  Well, as -- as I was saying before,

23   your average common person, including the jurors, is not going

24   to go to that black site.  People that are going to go to that

25   black site, other than out of interest, are people that are

1    thinking of ending their life or that are so depressed that

2    they're looking for a way out.  You have to look to go to that

3    Web site to find it, and I think it was Walter Cottle, when he

4    was asked to describe it, said it's just this black screen.

5              THE COURT:  Right.

6              MR. MERRILL:  So I -- I think there were ways to

7    prove that the victims that Mr. Kilmartin chose were people

8    that were looking for something that he was going to be

9    willing to sell them, and there'd be a way of establishing

10   that without bringing in this emotionally-laden testimony.

11             THE COURT:  All right.

12             MR. MERRILL:  Almost like an antiseptic way of

13   establishing what the government needed without going over the

14   line.

15             THE COURT:  All right.  Well, I appreciate your --

16   do you want to be heard on this -- this issue, Mr. Frank?

17             MR. FRANK:  Your Honor, I'd be happy to answer any

18   questions.  I mean, I -- I think I -- it's such an awkward

19   position to be here posttrial with the defense second-guessing

20   and making suggestions about how the -- the government should

21   have better tried its case.

22             THE COURT:  But that's what the First Circuit -- I

23   mean, that's what appellate courts do all the time.  They

24   look --

25             MR. FRANK:  I --

1              THE COURT:  -- at the record and they say, you know,

2    what -- they have a perspective on the case that, you know,

3    we, when we're in the trenches, don't have.

4              MR. FRANK:  But -- but to go further than that and

5    suggesting that -- it's so contrary to the way we think about

6    things, Your Honor.  You know, when we're preparing a case,

7    I'm -- I'm trying to anticipate hearsay objections and -- and

8    exceptions.  And, here, I've got a defense attorney, after --

9    after the fact, after the trial, faulting me for not coming up

10   with hearsay methods of -- of proving -- that was the

11   awkwardness I'm speaking of.

12       And I think the government did in this case, as I've laid

13   out in the papers, think about these issues and -- and teed

14   them up, in some ways pretrial.  But even at that, you know,

15   when I went back and I read the transcript, Your Honor, I

16   think there is over 700 pages of testimony in this case.  Only

17   about 60 of those pages are -- are taken up by the testimony

18   of the five witnesses about which Mr. Merrill is complaining.

19   And I read those pages, and I think it's a pretty -- pretty

20   methodical examination.  I don't think I dwelled on -- on the

21   emotion; I don't think I repeated it excessively; I didn't

22   think -- I don't think I repeatedly went back and elicited it

23   time and time again.

24       And I think the bottom line is --

25              THE COURT:  I don't think his charge -- you can

1    correct me if I'm wrong -- I don't think there was anything in

2    the complaint that Mr. Merrill's raising that criticized the

3    actual way the testimony was handled.  I think that the -- the

4    -- the issue that Mr. Merrill has raised is whether they

5    should have been called at all.  Is that -- are --

6              MR. FRANK:  Well, I thought it was a little --

7              THE COURT:  Was there something about the way -- I

8    thought -- frankly, I agree with Mr. Frank that if you're

9    going to put these people on, he handled it in a very

10   professional and non -- he didn't try and draw out the

11   emotional testimony.  It came naturally to the extent it came

12   out.

13             MR. MERRILL:  Correct.  I'm not challenging the

14   questions that were asked.  I'm just raising the issue, was

15   there a better way that it could have been done?  And, again,

16   I'm not raising that sua sponte.  I'm basing it upon what I

17   read in the First Circuit.

18             THE COURT:  Right, right.

19             MR. MERRILL:  And -- and the Varoudakis case was

20   2000 -- in the year 2000.  And they say there, trial courts do

21   not have the benefit of context.  When evidentiary issues are

22   raised in limine before trial and when raised again at trial,

23   do not always have the time to assess critically the 404(b)

24   boilerplate formula for the admission of the evidence so often

25   invoked by the prosecution.  By contrast, the prosecution does

 1    have the advantage of context and time and can analyze

 2    rigorously whether the exception to Rule 404(b) and the

 3    limitations of Rule 403 apply to the facts.  The failure to

 4    engage in that analysis leads to the needless complications we

 5    find in this case and others.

 6          So -- so they're saying this -- this happens and -- and

 7    perhaps there's a better way of doing it.  Again, in

 8    acknowledgment of Old Chief, there's more than one way to skin

 9    a cat.  And so the question is not whether it was commonality,

10    but whether there was a better way to show that there's a

11    certain type of person that's going to be going to this type

12    of -- of -- of Web site.

13              THE COURT:  Yeah, I'm -- I'm a little -- it seems to

14    me that your proposal about what the government should have

15    done -- maybe they could have done it that way, but it would

16    not -- it would have been weak testimony.  It would have -- it

17    would not have -- you know, saying, well, of course,

18    Mr. Denton was depressed and that's why he was led to this Web

19    site, and the other individuals were also depressed and you

20    can infer that from the fact that they visited the Web site,

21    which is what you're saying, doesn't have the same convincing

22    power as somebody who says I was depressed in sort of the same

23    way, literally, that Mr. Denton was depressed and this is what

24    depression is like and this is what I felt, and it has -- you

25    know, I do think the admonition in Old Chief that the

1   government has a right to choose how to prove its case within

2   the constraints of 403 is still a pretty -- is still good law.

3            MR. MERRILL:  And I'm not challenging that, Judge,

4   and -- and that's why I said during our last conference -- and

5   I think it's reflected in the briefs -- in all due respect,

6   that's why we have a trial judge because the trial judge has

7   got to be the gatekeeper, and that's why Varoudakis is saying

8   it puts you in an untenable position because sometimes it's

9   not easy to read during the trial.  Where do you reach that

10  tipping point?

11           THE COURT:  Right.

12           MR. MERRILL:  So I'm not saying there isn't

13  commonality.  I'm not saying -- clearly, it makes for a better

14  case if they get to hear everything about those people, but

15  the question is, at what point does it become too much?

16           THE COURT:  Do you think that some of that testimony

17  -- is your -- is it your viewpoint that some of the testimony

18  would have been admissible, but not five witnesses?

19           MR. MERRILL:  Depending on who those witnesses were

20  and -- and maybe -- in hindsight, maybe Mr. Ridge should have

21  been willing to stipulate to certain things without the

22  necessity of the testimony coming in; I -- I don't know.

23  Again, that makes me a Monday morning quarterback.  I wasn't

24  here at the time.

25       But in -- in reviewing it, with the benefit of -- of

1    hindsight, which is always 20/20, it seems to me that there --

2    there would have been a better way that both sides could have

3    worked together to -- to present the case so that this issue

4    wouldn't be with us right now.

5          THE COURT:  All right.  Mr. Frank, do you want --

6    sorry.  I think I interrupted you.  Do you want to proceed?

7          MR. FRANK:  Your Honor, again, we -- we come back

8    again to this argument that the government should have done

9    more pretrial as counsel argues Varoudakis calls for.  I think

10   we did engage in this analysis, and I think --

11         THE COURT:  So --

12         MR. FRANK:  -- this --

13         THE COURT:  -- tell me -- tell me why it was then

14   that, having engaged in that analysis, you decided that it was

15   necessary, from the government's perspective, to call each of

16   these witnesses.

17         MR. FRANK:  Well, and that's -- that's the next

18   point I want to make.  I mean, I think there is an emotional

19   truth.  You know, we prove cases by telling stories through

20   witnesses, hopefully competent first-person testimony, not --

21   not third-person hearsay either through Stu Quinn or -- or

22   even Gail Coates, albeit in her case we didn't have any

23   alternative; Denton wasn't available.

24      But the idea that -- that this testimony was unduly

25   emotional it seems to me begs the question of what -- what's

1    appropriate emotion in this context?  As the court's pointed

2    out, we didn't -- the government didn't devise this scheme and

3    it didn't choose to pick on depressed-to-the-point-of-suicidal

4    people and -- and take advantage of them.  The defendant did

5    that.

6         And we're supposed to prove cases with competent, you

7    know, firsthand percipient witnesses, and, in fact, generally

8    it's disproved of -- disapproved of to prove, you know, our

9    case through third parties and hearsay.  And in this case, I

10   don't think it's fair to the government to expect that the

11   case be sanitized of the emotional content that it actually

12   has.  I mean -- and -- and that's where I come down to.  I

13   think the government tailored this case pretty carefully and

14   kept that to a minimum, didn't -- didn't -- didn't dwell,

15   didn't linger on it, didn't repeat it, but elicited the truth,

16   including the emotional truth, that was there and that formed

17   a common scheme.

18        I mean, as I argued at trial, this was really a pretty

19   unusual, almost to the point of being a signature crime, I

20   think, if not a signature crime, scheme.  I -- you know, this

21   idea of picking on people who are depressed to the point of

22   suicide -- and I actually believe it was both as I argued,

23   there was a monetary motive here, but I think there was also a

24   vindictive motive here, a sort of perverse one, but that's --

25   that's what the government believes actually happened here,

1  and those are some of the people who were actually victimized.

2      I mean, this scheme -- let's not forget when we're

3  talking about cumulativity and overemotionality, I mean, this

4  was a big scheme, much broader than we charged and much

5  broader than, you know, we proved in any great detail.  I

6  mean, there were hundreds of people around the world whom he

7  corresponded with, whom he targeted.  There were others with

8  whom he accept -- from whom he accepted money that we didn't

9  charge and didn't present, others to whom he sent things,

10 including a woman in California, Rita Foster, a dancer, who

11 got something, Epsom salts, from Mr. Kilmartin.  Because she

12 was a dancer, suspected they were Epsom salts.  Nevertheless,

13 drank them in an effort to kill herself.  It didn't work.  I

14 mean, we -- we were in touch with her through her husband, who

15 curiously is named Thompson Sharkey and is a criminal defense

16 attorney.  My point is only there was a lot of other evidence

17 here of this scheme, and some of it I've -- I've detailed for

18 you in my written submissions.

19     And going back to the Varoudakis argument that we didn't

20 -- we didn't exercise restraint here, we did exercise

21 restraint in -- in various ways and -- and others besides that

22 I haven't described for you.  So I -- and then I come back to

23 the argument that I had been making, which is, there is an

24 aspect to proving a case to a jury's satisfaction that

25 includes recognizing there's an expectation that people, you

1   know, respond with appropriate emotion to things.  And I

2   agree, it was interesting -- I think it's Walter Cottle you're

3   referring to who was sort of remarkably unemotional --

4            THE COURT:  Right.

5            MR. FRANK:  -- about his experiences, and I'm not a

6   psychiatrist, but I think -- my sense is that he's someone

7   whose senses have been dulled by just this roller coaster ride

8   of emotion that he's been on for so many years and appears at

9   the moment to have relatively under control through a course

10  of therapy, including medication.

11       But that's reality, and reality is messy, and I think

12  when we start -- I know we have to follow the law, and we have

13  to follow the guidance that we get from the circuit.  But,

14  still -- and we're proving it in a courtroom that is, in some

15  sense, separate from the real world, but we've still got to

16  prove that -- that case, and an aspect of proving a case is

17  that emotional truth, and I don't think in this case, given

18  the reality, that was overdone as Mr. Merrill is arguing.

19           THE COURT:  The -- the other -- I don't know if

20  counsel -- you weren't there, so you can't get a sense of

21  this, Mr. Merrill, but you were there, Mr. Frank.  I --

22  perhaps it's from years of sitting on the bench and also

23  practicing law, that my sensitivity to emotional matters is a

24  little bit blunted, and I don't mean that in a -- I'm not an

25  automaton or anything, but we get -- in the range of emotional

1    testimony, this was, in part, emotional.  People were talking

2    about, you know, their depression to the point where they were

3    committing suicide, and I -- I found some of them to be

4    emotional.

5         But they didn't come anywhere near the kinds of emotions

6    I've often seen playing out in other types of cases where you

7    have, for example, child pornography cases and victims coming

8    up and talking about the impact that early sexual intercourse

9    with an adult male, perhaps an uncle or a father or a

10   stranger, and being photographed and having those photographs

11   and videos placed on the Internet and what impact that has had

12   on their lives.  I mean, the level of emotion there is

13   extraordinary.

14        And one of the most emotional testimonies I've ever seen

15   was in a personal injury case where the nurse, who was a

16   hardened nurse with years of working at Maine Medical Center,

17   broke down and cried when she remembered treating this young

18   boy who came in with just horrific personal injuries.

19        I don't -- I didn't -- these were emotional, and I think

20   it's important to say they were emotional, but I don't think

21   that they -- given the range of emotions we see here in the

22   courtroom, even in many sentencings where mothers and fathers

23   are getting up and weeping about their children -- and you've

24   seen that time and time again -- that -- these people weren't

25   crying; they weren't unable to contain themselves; the jury

1  wasn't crying.  The jury was interested, but I've seen cases

2  where emotion is -- was far more dramatic than it was in this

3  case.

4      Do you want -- do you have any sense on that?  Do you

5  want to comment on that?

6          MR. MERRILL:  Well, A, I want to agree with you, I

7  think that anybody that is involved in the practice of trial

8  law, your senses are going to be dulled a little bit.  It's

9  almost like police officers, that they can't do their job if

10 they're going to react every time they come on a homicide

11 scene.  It's the same thing.  We hear things day in and day

12 out that most people, you know, shouldn't hear and don't want

13 to hear.

14          THE COURT:  Right.

15          MR. MERRILL:  So our senses might be a little bit

16 dulled.  But you'd asked before, what if there was only one

17 witness as opposed to five?  And when Mr. Frank was talking

18 about these witnesses testifying, at what point does it become

19 that propensity that you want to try to avoid?  For example,

20 if you've got a horrible case like that where a woman's been

21 sexually abused by a relative, how many other people are you

22 going to be able to bring in as 404(b) until the jury's going

23 to say, lock this person up and throw away the key, the world

24 would be better rid of their shadow?

25      But, again, as somebody that is learning this by reading

1    the transcript, somebody that I thought to me came across as

2    really pathetic was Walter Cottle, who Mr. Frank doesn't think

3    was all that bad, but when I read it, here's a guy that, you

4    know, rises through the ranks to basically be a supervisor of

5    all these great resorts, like in Amelia Island and Branson,

6    Missouri, and then the stress of the job gets to him, he

7    doesn't want to talk to his wife, he doesn't want to talk to

8    his child, that's clearly somebody that is depressed, and then

9    he talks about this cyanide that he carried around like it was

10   a security blanket.

11              THE COURT:  Right.

12              MR. MERRILL:  And, again, it just -- to me, I was

13   thinking what a pathetic situation he found himself in where

14   he couldn't feel the love of his child or his wife, but he

15   carried this -- this poison around as a security blanket until

16   he tells his doctor one day, and she basically said, look, you

17   either give it to me or I'm having you committed.  I mean, I

18   don't see how you can't walk away from that -- and I only read

19   it --

20              THE COURT:  Right.

21              MR. MERRILL:  -- thinking --

22              THE COURT:  The -- the difference was -- I agree

23   with everything you said about his testimony, but I found his

24   testimony interesting.  Now, I'm just talking personally, I

25   found it very interesting and intriguing, but he said it in

1    such a sort of matter-of-fact way, this is what I went

2    through.  I had this -- I had a great job, and I -- I found

3    myself wrapped up, particularly when I got to Las Vegas and I

4    was running this 5,000 room hotel, that it was just -- I was

5    too busy, and I was crying, and I couldn't handle myself

6    emotionally.  And the affect was very different.  It was sort

7    of like -- I -- I was very interested in what he had to say,

8    but I wasn't reacting emotionally, as you might have thought

9    based on the transcript itself.

10        The others -- the women who came forward, the grandmother

11   who came forward, it seems to me, were presenting a little

12   more emotional testimony, but that's -- you know, that's

13   neither here nor there.

14        Why don't we go on to the next question -- I want to be

15   sure that I have it correct.  You're not making a motion for a

16   judgment of acquittal or a new trial on those fraud counts; is

17   that right, or are you?  Because your prior counsel said he

18   was not.

19            MR. MERRILL:  No, not -- not on the fraud counts

20   them -- I think we're talking about the non -- the death

21   counts here.

22            THE COURT:  The two death counts that he was

23   convicted of, right?

24            MR. MERRILL:  Correct.

25            THE COURT:  Okay.  So let's turn to those death

1    counts.  And there is a -- there is some First Circuit law

2    that says that evidence can be both direct and intrinsic and

3    404(b), and, of course, what your point is on both whether

4    it's direct or 404(b), that the -- that the -- that there's

5    still a need to do a 403 analysis.

6              MR. MERRILL:  Correct.

7              THE COURT:  But it struck me that the testimony --

8    and I think I -- I was skeptical of Mr. Frank's argument that

9    the -- well, let's -- let's turn it this way.  Was there -- is

10   there something about -- assuming that this evidence was

11   404(b) evidence and not direct evidence that -- on the death

12   counts, do you think that the 404(b) analysis on this evidence

13   would preclude its admission as opposed to the 403 analysis?

14             MR. MERRILL:  I'm not sure that I can spine

15   (phonetic) the -- the first part of the test with regard to

16   the death counts and this testimony.  What was the special

17   relevance with regard to the death counts that allowed this to

18   come in as 404(b)?  I don't know what that special relevance

19   was before you even get to the point of whether its

20   probativeness was outweighed by its prejudice.  But why was --

21             THE COURT:  Well -- so assume for a moment that the

22   argument the government was making here was you don't put a

23   gun in the hand of somebody who's suicidal, basically.  I

24   mean, you don't put potassium cyanide in the mail to somebody

25   who has told you and has avowed that they're going to use it

1   to kill themselves.

2          MR. MERRILL:  And therein lies the rub because he

3   didn't send cyanide to any of the five people that testified;

4   they all got Epsom salts.  So where is the special relevance

5   to the death counts?

6          THE COURT:  Well, what -- what he knew from the

7   other individuals is that there is a class of individuals --

8   maybe it's something that we can assume, but I don't think you

9   can necessarily assume it -- there's a class of individuals

10  out there who are so depressed that they are not only

11  interested in killing themselves, but they visit Web sites

12  where they try and find out how to do it, and then they pay

13  somebody money to send them poison.  That there -- there is a

14  group of people out there who are so unhappy with life that

15  they're willing to buy death through the mail.

16      And his experience with these five demonstrated that

17  these people are -- are out there and they're so serious about

18  trying to kill themselves that if -- I guess the question

19  would be, doesn't that -- isn't that evidence of the kind of

20  person he knew he was dealing with?  Isn't it evidence that

21  there's this class of individuals, sort of like commonality of

22  victims that I was talking about earlier?  Why isn't that

23  appropriate evidence?

24          MR. MERRILL:  Because we don't have a scheme here

25  that you have to prove.  You just have to prove he did it to

1    this one individual.

2            THE COURT:  Right.  But the -- the testimony under

3    404(b) is allowable if it goes in for preparation and plan and

4    knowledge.

5            MR. MERRILL:  But he -- I guess the problem that I

6    have with it is he treats Denton differently than he treats

7    the others.  The others, he defrauds them.  Denton complains

8    about it, and that's when he sends Denton the cyanide the

9    second time around, you know, after this discussion about IC3

10   and what are you going to do and get rid of everything.  That

11   didn't happen with anybody else, and that was one of the

12   arguments that was made at the hearing in December.  I think

13   the grandmother talked about doing something, but didn't, but

14   nobody else had threatened him.  Now --

15           THE COURT:  Oh, well, somebody else did.  There was

16   -- Autumn Roland actually complained and told him.

17           MR. MERRILL:  After -- after the fact.

18           THE COURT:  Yeah, Edith Mae Collins --

19           MR. MERRILL:  Who is a grandmother, I believe.

20           THE COURT:  -- the grandmother complained, but

21   didn't tell.

22           MR. MERRILL:  But didn't tell.

23           THE COURT:  And then --

24           MR. MERRILL:  So it was either didn't complain or

25   complained after the fact, so there's no commonality there.

1          Denton is the only one that, when he complained,

2     Mr. Kilmartin did something about that.

3              THE COURT:  Right.  That's not the -- the --

4              MR. MERRILL:  And --

5              THE COURT:  That's not quite the point.  The point

6     was basically the kind of person he was dealing with.

7              MR. MERRILL:  The one that comes to mind that I

8     think would fit that was I think Stacey Williams because she

9     said I don't have the guts to use a gun and I don't want to

10    cut myself, so I was looking for something like cyanide.  And

11    that's not exactly on point because Mr. Denton apparently was

12    willing to try anything, including one time tried to poison

13    himself with nicotine, so he -- he was going to try anything

14    he could to try to end his life.  I mean, he was hellbent and

15    determined he didn't want to be here anymore, and when he lost

16    his girlfriend, to him, that was the last straw, that she

17    apparently had -- had given him some sense of balance --

18             THE COURT:  Right.

19             MR. MERRILL:  -- when she came into his life, and I

20    think there was some suicide prior to her, but she gave him a

21    sense of balance.  When he lost her, he didn't care anymore.

22    One way or the other, he was taking his life, and I think that

23    comes through with the testimony of the niece.  I -- I don't

24    know that anybody else quite fits his situation.

25             THE COURT:  Why wasn't the testimony of these other

1    individuals -- why isn't it direct testimony on a death claim?

2    And I'm thinking -- they had to prove -- they had to prove

3    everything on the death claim.  There wasn't -- necessarily

4    they didn't have to prove a scheme as such, but they had to

5    prove -- one thing Mr. Ridge did on the death claims is

6    basically say, you know, we're putting the government to its

7    proof on that.  And they -- each of these witnesses came in

8    and they said this is the type of baggie that I got, this is

9    the type of envelope, this is the handwriting on the envelope,

10   this is the type of parcel that I received, this is the e-mail

11   correspondence.  I went through that a little bit earlier.

12       And all of that, why doesn't that buttress directly the

13   identity of the individual, namely, your client, who actually

14   put the cyanide in the mail to Mr. Denton?  Why isn't -- why

15   isn't that fair game for direct evidence?

16           MR. MERRILL:  I guess the problem I have with that,

17   Your Honor, is that you've got a series of e-mails between

18   Mr. Denton and Mr. Kilmartin that I think clearly establish

19   identity, but, again, none of these other people were mailed

20   an injurious article; none of them were mailed cyanide.  They

21   were mailed Epsom salts.

22           THE COURT:  Right, but they --

23           MR. MERRILL:  So --

24           THE COURT:  Let me -- let me just focus on what I

25   had asked, and that is, there is not just the question of did

1    he put cyanide in the mail, but was it him anyway?  And for

2    that, you look at the handwriting on the packages; you look at

3    the e-mail correspondence and the tone of the e-mails.  We

4    know that people have screen names and who knows whether the

5    skiptin who was talking to Mr. Denton was the same skiptin who

6    were talking to these other individuals, and you wrap up all

7    these pieces of information to demonstrate that, yes, it was

8    Mr. Kilmartin who was involved in Denton just the way he was

9    involved in these other individuals.  Why isn't that probative

10   of identity?

11        MR. MERRILL:  Well, with regard to Walter Cottle, he

12   couldn't remember the name he was dealing with; he didn't know

13   it.  At the end, Mr. Frank shows him the items that he turned

14   over to the postal inspector, and he was able to identify

15   them, yes, this is what I turned over.  Why do you need

16   Mr. Cottle to do that?  Why can't you just have the postal

17   inspector testify that I received these from Walter Cottle,

18   this is the -- the bag -- baggie I got from him, this --

19   because Walter Cottle couldn't identify it.  He couldn't -- he

20   didn't make -- give any testimony that identified Sidney

21   Kilmartin as being skiptin.  He didn't remember any of it, but

22   he was able to identify the items that were moved into

23   evidence; I think it was 46.  But that could have been done

24   without him.  So what -- what did he add to the mix?  Why was

25   it necessary to actually put him on the witness stand to

1    testify?  And that's just one example.

2        But even if you say that it was direct intrinsic

3    evidence, there's still got to be some -- some connection

4    that's necessary that you get from this witness, and -- and I

5    don't see anything that you got from Walter Cottle that

6    satisfied that.

7              THE COURT:  All right.  All right.  Do you want to

8    be heard on that, Mr. Frank?

9              MR. FRANK:  Your Honor, in this line of questioning,

10   I -- I did have a -- a thought or two I wanted to contribute,

11   if I could.

12       I understood the point of departure was, what was the

13   special relevance --

14             THE COURT:  Right.

15             MR. FRANK:  -- the 404(b) special relevance of

16   the --

17             THE COURT:  Well, there were two questions:  One is,

18   wasn't it -- wasn't some of this evidence direct evidence,

19   it's not even 404(b) evidence?  And then the second question

20   is the special relevance under 404(b).  Thank you.

21             MR. FRANK:  Absolutely, Your Honor.  I mean, I think

22   my first position is it is direct intrinsic evidence of the

23   death counts every way you think about them, beginning with,

24   you know, it -- it happens during the same -- in the midst of

25   the -- the time frame charged in the indictment; it's relevant

1    to explicit elements in the death count charges.

2              THE COURT:  Which ones?

3              MR. FRANK:  Well, I'm thinking most particularly the

4    retaliation and the tampering charges.  One of the elements of

5    those charges is that there had been a federal offense, you

6    know, to retaliate against and tamper with, and the indictment

7    explicitly charges that federal offense is the fraud charged

8    above in the indictment against all the victims -- Denton and

9    otherwise.  So --

10             THE COURT:  So the thought is that Kilmartin's

11   sitting there thinking if this guy blows the whistle, I'm

12   going to be found out not only for what I've been doing with

13   Denton, I'm going to be found out with Stacey Williams and

14   with Mr. Cottle and all these other individuals.

15             MR. FRANK:  Yeah, absolutely, and those charges --

16   the tampering and the retaliation -- one of their elements is

17   effectively intent.  But in -- and this is where this -- this

18   -- this intrinsic/extrinsic analysis tends to dovetail because

19   one of the items of special relevance under 404(b) is intent

20   and --

21             THE COURT:  Right.

22             MR. FRANK:  -- you know, I -- I think you can think

23   of it both ways, frankly, as direct intrinsic evidence of the

24   crimes charged, and I think that's -- that's a pretty, of

25   course to me, persuasive argument.

1    But I think it's also 404(b) specially relevant to

2  opportunity, as you were describing it.  You know, these are

3  the people that he, you know, sought out because he sensed

4  that there was an opportunity there to take advantage of

5  people, for whatever reason, be it money or spite or both.  I

6  think it's probative of his intent.  You know, why does he

7  want to take advantage of these people and why does he want to

8  retaliate against -- why does he want to kill Denton?  It is

9  because he knows that -- where that leads and that leads to

10  big trouble for him, much bigger than just, look, his dealings

11  with Denton are trouble enough, but -- but he had a lot more

12  to worry about than just Denton, and he knew that.

13    And I think it's also probative of ID, which isn't --

14  which isn't explicitly an element of the offenses, but, of

15  course, always is and, coincidentally, is also one of those

16  items of special relevance under 404(b), and I think it's

17  probative of identity in a number of different ways,

18  including, as I argued, again, through intent and motive as in

19  a person with the intent or motive to retaliate against

20  someone or kill them is more likely to be their killer than

21  someone who doesn't have that motive.

22    But it's also, I think, probative because of this --

23  either -- there is this element of the common scheme that

24  points to Kilmartin as Denton's killer.  It's all those

25  features the court has identified, as well as the unusual

1   nature of this scheme that I've described, which is -- which

2   is, again, I think pretty unusual to pick on -- you know, to

3   decide that the people you're going to pick on are these

4   extremely-depressed-to-the-point-of-suicide victims.

5       As regards Mr. Merrill's argument about Mr. Cottle's

6   inability to identify Mr. Kilmartin, I'm not sure I completely

7   understand that argument.  But, look, no one here was able to

8   identify Mr. Kilmartin in the courtroom the way that an

9   eyewitness ID might be able to be made.  This is -- this is a

10   circumstantial case of identity in every -- in every sense,

11   but I think it's a powerful case -- circumstantial case, and

12   that's because the -- the accumulation of all these different

13   circumstances that I think we've identified up until this

14   point.

15       THE COURT:  Well, didn't -- didn't Mr. Ridge suggest

16   during the course of the defense that maybe it was somebody

17   else?

18       MR. FRANK:  And I think that's -- that -- yes, Brawn

19   Kelly, and I think that -- so there's another aspect -- I

20   don't think it's specifically identified as special relevance

21   under 404(b), but I think it's a fair reply to that

22   suggestion.  You know, he suggested that someone else -- Brawn

23   Kelly, whose name came up in an e-mail exchange, I think.

24       THE COURT:  Right.

25       MR. FRANK:  But there was no other evidence that

1   Mr. Kelly, you know, had any motive to kill Mr. Denton the way

2   there was all this evidence that Mr. Kilmartin did, which was

3   all that evidence of the scheme --

4           THE COURT:  And didn't --

5           MR. FRANK:  -- to defraud.

6           THE COURT:  -- didn't he also suggest that maybe he

7   didn't really get the cyanide?

8           MR. FRANK:  He suggest --

9           THE COURT:  There was some difficulty -- there was

10  some mistake that UP -- the postal service made or UPS made in

11  the delivery and it wasn't signed properly and maybe he didn't

12  really -- maybe he wasn't the one who really got it.  Wasn't

13  that part of the whole thing?

14          MR. FRANK:  I think that was an argument that was

15  made, and I think there was an argument at the beginning and

16  at the end -- again, I'm not sure I completely appreciate

17  it -- but that he -- what it was that was sent to Denton

18  didn't actually kill Denton.  I think that was a -- a thread

19  of argument throughout, too.

20      And I think, you know --

21          THE COURT:  There was a -- there was an argument

22  about potassium cyanide versus cyanide, right?

23          MR. FRANK:  And that the government had not proved

24  that what killed Denton was potassium cyanide.  On the front

25  end, it had evidence that he had obtained potassium cyanide

1   from Fisher Scientific through Capricorn Group, but at the

2   other end, the -- the -- the -- David Alun Hutchings, the --

3   the Cardiff toxicologist, could only opine it was cyanide, not

4   whether it was sodium or potassium, and then there was an

5   issue about the HazMat 360's --

6           THE COURT:  Right.

7           MR. FRANK:  -- ability to distinguish between

8   potassium and sodium cyanide, and I --

9           THE COURT:  So he -- he was defending, in part,

10  on -- you know, I'm not faulting him.  I mean, his job was to

11  try and pull the bricks out of the wall, I mean, that's what a

12  defense lawyer's job is, and yours is to build the wall, so he

13  was trying to pick whatever brick he could.

14       But one of the bricks was Fisher didn't really send him

15  -- there's -- the government hasn't proven that Fisher sent

16  Kilmartin --

17          MR. FRANK:  Or that it actually got all the way to

18  Kilmartin.

19          THE COURT:  That it actually -- yeah, right, that it

20  actually got to him when it could have been picked up by

21  somebody else, right?

22          MR. FRANK:  There was some -- there was some -- I

23  agree, that at the point of collection in Augusta --

24          THE COURT:  Right.

25          MR. FRANK:  -- at the UPS store, there was no

1    signature for -- no one signed for it is my recollection.

2              THE COURT:  Something like that, yeah.  There was --

3              MR. FRANK:  And I think -- and I agree with your

4    assessment, Your Honor, I think Mr. Ridge did.  I think he --

5    he looked for the weaknesses that he could find and he -- he

6    argued them.

7              THE COURT:  Right.  So the issue -- I mean, it may

8    not have been as strong a case, but it doesn't mean that the

9    -- you're bound by proving beyond a reasonable doubt; you've

10   got the highest standard of proof that is available under the

11   law.  And you're trying to nail down, yes, it was this

12   individual, it was no other individual who did this, correct?

13             MR. FRANK:  Yes, Your Honor, it is.

14             THE COURT:  Do you want to be heard on those things,

15   Mr. Merrill?

16             MR. MERRILL:  Just, Your Honor, to say, again, that

17   it becomes cumulative at some point.

18             THE COURT:  Right.

19             MR. MERRILL:  And I guess my last point is that in

20   the Henry case, the First Circuit case from 2016 -- '15 talks

21   about this -- that, again, was a Rule 404(b), it was a prior

22   drug conviction --

23             THE COURT:  That's right.

24             MR. MERRILL:  -- and the court said, well, there was

25   no objection made at -- at trial.

1          THE COURT:  Well, there was certainly objections

2     Mr. Ridge --

3          MR. MERRILL:  Right.

4          THE COURT:  -- clearly made.

5          MR. MERRILL:  And, here, there were objections, and

6     this goes to the limiting instruction.  I think you reach a

7     point where that limiting instruction really is not serving

8     its purpose anymore, and -- and so even if it could come in as

9     direct versus 404(b), I still -- I still think at the end

10    you've got the same problem.

11         THE COURT:  There are two other issues I want to

12    raise with counsel, and the first is the jury verdict itself.

13    The jury verdict, Mr. Kilmartin was found guilty of

14    everything, except one count, and on that one count, they

15    found him not guilty.

16         Now, is it fair to look at that as some indication that

17    the jury was not so emotional that they simply went in and

18    didn't consider the evidence and elected him with a running

19    clean straight -- convicted him on a clean slate instead of

20    parsing through the various counts and coming up with a not

21    guilty verdict?

22         MR. FRANK:  Your Honor, that's certainly my

23    argument, and I think I took that lead from Ford, which speaks

24    of telltale -- I think it was in the context of the harmless

25    error analysis, but, still, I think it applies here.  I think

1    it's a -- Mr. Merrill argued that we have no way of knowing

2    what the jury's basis was, and I agree to a certain extent,

3    although we -- the Court of Appeals speaks of there being

4    these type of telltales, and I do think it's possible to

5    understand the jury's split verdict here as one that really

6    was the product of some critical thinking, rigorous analysis,

7    and drawing the distinction between the retaliation count,

8    where what the government had basically was circumstantial

9    evidence of motive to retaliate in the form of disparate

10   treatment between Denton, who got lethal cyanide, and Collins

11   and Roland, who didn't, but then he didn't know -- you know,

12   neither -- you know, Denton's case, he actually did complain

13   and told Kilmartin he complained.

14        And that's in contrast to the evidence with respect to

15   the tampering count where the government did have and did

16   present direct evidence of tampering in the form of

17   Mr. Kilmartin's own words to Denton in e-mails, appealing to

18   him to destroy all evidence of their interaction before he had

19   his event.

20        So I do think it's possible, without too much difficulty,

21   to make logical sense of the split verdict here and to take

22   comfort from that split verdict that this jury really

23   deliberated and decided in a very responsible, rational, and

24   rigorous fashion.

25             THE COURT:  Isn't that a fairly sophisticated

1  distinction, and shouldn't we credit the jury with making that

2  distinction between tampering and retaliation and evaluating

3  that, and doesn't that indicate some -- that they -- that they

4  weren't overwhelmed with the emotion of these five witnesses?

5      MR. MERRILL:  Except that -- and I think Mr. Frank

6  spoke about this at the hearing in December -- it's not really

7  logical why they convicted Mr. Kilmartin of 14 and found him

8  not guilty of 15 because 15 was kind of the fait accompli,

9  retaliate for providing to a law enforcement officer

10  information.  He'd already done that; he'd already filed the

11  IC3 complaint.

12      So that would seem to be a fait accompli versus 14, which

13  says, to prevent the tes -- attendance and testimony of Andrew

14  Denton in official proceeding.  I think you talked about that

15  in December of 2015 -- '16, rather, in terms of the future

16  versus present, that it didn't make any sense because, one, it

17  was in the present, he already filed the IC3 complaint,

18  whereas 14 was to prevent him from doing something in the

19  future, and Mr. Denton had already indicated, I've notified

20  the FBI, I'm not taking any more action on it, so there'd be

21  no reason to suspect he was going to on the promise that he

22  was going to get what he originally bargained for.

23      So we don't know why jurors reach verdicts they do; we

24  don't know.  But, logically, you have a hard time

25  rationalizing how they could find him guilty of 14 and not

1    guilty of 15.  You don't understand what they reversed --

2             THE COURT:  Well, except that -- except I think

3    Mr. Frank has given us some pretty good suggestion of how --

4    they had direct evidence of tampering -- direct.  I mean,

5    destroyed all the evidence, that's tampering.  And

6    retaliation, they have to figure out what really was going on

7    in Mr. Kilmartin's mind and why he sent the potassium cyanide,

8    and maybe they just thought, you know, did he do it for spite?

9    Did he do it because he felt obligated, he'd taken the money,

10   and, therefore, if this guy complained, he really felt he had

11   to because that was the bargain that he'd made?  I mean, that

12   wouldn't be retaliation necessarily and spite wouldn't be

13   retaliation, but there was an element there where they could

14   have found retaliation; they just said it's not beyond a

15   reasonable doubt.

16            MR. MERRILL:  Right.  But -- but the problem is,

17   whichever argument you take, it's kind of like arguing how

18   many angels fit on the head of a pin.  We can argue about it

19   all day, but we're never going to have the answer because we

20   don't know why they did, but I don't think that it necessarily

21   suggests that they weren't emotional in deciding the other

22   counts against Mr. Denton.

23            THE COURT:  You'd have a better case if they'd done

24   a clean slate, right?

25            MR. MERRILL:  Yes.

1    THE COURT:  Right.  The -- the final thing I just

2  want you to touch on because oftentimes, as in <u>Ford</u>, the First

3  Circuit will look at these and say, well, the -- the -- we

4  wouldn't have done what the trial judge did, you know, and we

5  have the benefit of a cold record and the complete record and

6  we can analyze it, and as you suggested earlier, Mr. Merrill,

7  sometimes the perspective is different with a complete record

8  than it is trying to make decisions as each witness is called

9  forward, but they look at it and they say, well, we wouldn't

10  have done what the trial judge did, we think he may have made

11  a mistake, but the evidence here is so overwhelming that the

12  error must be deemed harmless.

13    Even if I accept all your arguments here, isn't the

14  evidence, the cumulative evidence, here, taking the same --

15  taking the witnesses out of it that you object to, isn't the

16  evidence that your client was guilty of the crimes for which

17  he was convicted virtually bulletproof?  Isn't it

18  overwhelming?  Why shouldn't I come to the conclusion that --

19  I mean, there -- I don't need to go through all the evidence,

20  but the evidence is -- was mountainous that, unfortunately,

21  Mr. Kilmartin was involved in this and that he did put cyanide

22  in the mail to a person who was highly depressed and that

23  person took that cyanide and killed himself.

24    MR. MERRILL:  With regard to the fraud counts, I

25  agree; 5, 7, and 12, I agree.  I'm not as certain with regard

1    to the death counts.

2         THE COURT:   What -- what is there about the death

3    counts, though?

4         MR. MERRILL:   A couple of things, and, again, just

5    reviewing last night for purposes of today's hearing, I was

6    rereading the testimony of Postal Inspector Taylor, and,

7    again, not having been there, I don't know how the whole thing

8    played out other than what I'm -- I'm reading, but there was

9    an issue about the fact that the government could have tested

10   this cyanide, but didn't do it over the course of three years,

11   and I believe that Mr. Ridge got Mr. Taylor to acknowledge

12   that they were aware that the company from which he obtained

13   the cyanide could test it, I think, within a millionth of a

14   part of a metal and would have been able to say whether it was

15   potassium cyanide or not.

16        There was also the issue about the fact that it was

17   delivered to UPS, but UPS had no record showing that

18   Mr. Kilmartin ever actually picked that up.  And then there is

19   the issue that Mr. Kilmartin stopped communicating with

20   Mr. Denton as of December 7th, but this -- this individual

21   Brawn Kelly apparently attempted to contact him on the 24th

22   asking if he was still interested in the cyanide.

23        And so I -- I think there's at least an argument there

24   that the government didn't connect all the dots.  It clearly

25   could have done the testing, but for some reason, even though

1   it was suggested in the UK and the UK said, no, we should let

2   the United States do it, they're going to prosecute it, it

3   goes from December 2012 until 2015 and it never gets tested,

4   and all Inspector Taylor can say is I don't know why that it

5   wasn't, but it clearly wasn't.

6        So I'm not as convinced as the government necessarily is

7   that there was overwhelming guilt with regard to the death

8   counts.  I think there are arguments you could make that there

9   were gaps there.

10            THE COURT:  Well, there has to be not just -- your

11  argument has to interrelate with the error that you contend

12  that the court committed, so -- correct?  In other words, in

13  order to be harmless, you look at the -- they look at the case

14  and they say, he committed an error, but did the error affect

15  the verdict?  And whatever error you contend I made didn't

16  address the question of potassium cyanide and whether it was

17  tested.

18            MR. MERRILL:  I apologize.  I thought you were

19  asking if I thought there was overwhelming evidence --

20            THE COURT:  Well --

21            MR. MERRILL:  -- as to those counts.

22            THE COURT:  Right.  But the context was harmless

23  error.

24            MR. MERRILL:  Oh, I'm sorry, I apologize.

25            THE COURT:  Okay.  So the question is harmless

1    error.  If I had -- if I committed an error in allowing these

2    five witnesses to testify, why shouldn't I conclude the jury

3    would have come to the same conclusion?

4              MR. MERRILL:  That the First Circuit would have come

5    to the same conclusion or the jury?

6              THE COURT:  No, well, I mean, if I excluded all --

7    if I'd done the right thing by your counts and I excluded

8    these five witnesses or allowed maybe one of them to testify,

9    the stipulation still would have gotten in, right?

10             MR. MERRILL:  Hm-hmm.

11             THE COURT:  And so it's the incremental amount that

12   they testified to that was different from the stipulation;

13   that's what we're focusing on.  And how can I come to the

14   conclusion that if that had been properly excluded from the

15   evidence, if that tes -- that additional testimony, the live

16   witnesses that you -- you are complaining about, if -- if I

17   hadn't introduced that, how do I come to the conclusion that

18   they wouldn't have already found him, based on the evidence

19   that was properly introduced, guilty as charged?

20             MR. MERRILL:  I guess my argument would be that you

21   still ran the risk that it had a propensity and that had it

22   not -- had they not decided that he was a bad person who had

23   done this before, so they were going to convict him now, which

24   is what propensity is, would they have necessarily convicted

25   him of this most serious charge, the death count, that he

1  mailed this article with the intention to murder Mr. Denton?

2  Meaning they may have found him guilty of the mail frauds, but

3  may not have found him guilty of this -- of this most serious

4  count, Count 1.

5       THE COURT:  So you -- you -- you think that the

6  evidence that was admitted that should not have been admitted

7  goes to motive?

8       MR. MERRILL:  I'm saying I don't believe the

9  evidence was that strong on Count 1 that without this other

10  evidence, whether it was intrinsic or 404(b) evidence that

11  kind of pushed it over the top, that made them decide --

12       THE COURT:  But, specifically, what was it about

13  that evidence that you contend was error that caused a --

14  specifically error that caused the jury to reach the wrong

15  verdict?

16       MR. MERRILL:  That they may have reached a point

17  that they just thought Sidney Kilmartin was a bad person.

18       THE COURT:  All right.  Mr. Frank?

19       MR. FRANK:  Your Honor, I -- the scheme evidence

20  does not have character or propensity effect as regards the

21  death counts, at least as I understand the First Circuit's

22  analysis, black letter, with my own gloss.  I mean, I'm

23  thinking of Ford, but also Santagata and McGauley.  I mean,

24  the scheme -- the concern is that either -- the concern about

25  character or propensity evidence is that either the

1  defendant's general bad nature, the jury's going to hold that

2  against him, he is generally a bad guy, a bad character, so he

3  must have killed Mr. Denton, or it is that, you know, we know

4  that he's done other different bad things in the past, and

5  based on that knowledge, we're going to conclude that he

6  killed Mr. Denton on this occasion.

7      The problem is that the scheme evidence occurs at the

8  same time.  It's not -- it's not other -- it's not either

9  other in time or other in character or -- and it is -- and it

10 is other in character or nature.  In other words, the greatest

11 risk of propensity is he did the same thing -- the same exact

12 thing a long time ago, we know that, and on the basis of that,

13 we think he has a propensity to do that bad thing, and we're

14 going to find him guilty of this bad thing for which he is on

15 trial today because of that bad thing then.

16     And that's not what we have here with the scheme

17 evidence.  The scheme evidence occurs at the same -- same

18 time.  I mean, the scheme is charged from April of '12 until

19 May of '13, and there was evidence -- in May of '13, there's

20 Collins -- I think that may be the last thing that we -- we

21 specifically proved -- and the -- the death counts all occur

22 in November and December.

23     So it's right in the middle of the time period, and it's

24 different -- it's drastically different in character.  I mean,

25 the idea that -- so both in terms of -- of a temporal

1  proximity and logical proximity, these two things are remote.

2  Temporal -- I'm sorry.  So -- so it happens at the same time,

3  so he's not -- he's -- it's not remote in time, and it's

4  different in character, nature, i.e., it's -- there's not as

5  much concern or risk of propensity that a jury's going to say,

6  hey, fraudster, oh, yeah, he -- you know, a guy who's willing

7  to defraud people is going to kill them.  I hope I'm making

8  sense, but --

9            THE COURT:  Well, that's what -- that's exactly what

10  Mr. Ridge had argued; basically, he's a fraudster, but he's

11  not a killer.

12            MR. FRANK:  He's not a killer, I think that's right.

13            THE COURT:  So just because somebody is willing to

14  -- has the moral blindness to go out and cheat people who are

15  mentally ill and are considering suicide and take money from

16  them and send them something that -- send them Epsom salt

17  instead of cyanide, I mean, that's -- that's one kind of

18  character, but it's a whole different thing to actually put

19  the cyanide in the mail.  He didn't need the cyanide in order

20  to perpetrate the fraud; all he needed was a jar of Epsom

21  salt.

22     So the -- the notion that because you're willing to take

23  money from people under false pretenses, that you're willing

24  to kill them seems to me to be a giant step in terms of

25  propensity.

1          MR. FRANK:  That would be my argument.

2          THE COURT:  Right?

3          MR. FRANK:  Yes, Your Honor.

4          THE COURT:  Okay.  Do you have anything in addition,

5    Mr. Merrill?

6          MR. MERRILL:  No, Your Honor.

7          THE COURT:  Again, I'd like to thank counsel.  This

8    was -- this has been well presented and well argued, and I've

9    tried to give it a lot of thought.  I have hopes of getting an

10   opinion out in the relatively near future.  And, again, I

11   appreciate, particularly you, Mr. Merrill, you came in in this

12   case by appointment after other lawyers had been terminated,

13   and you've done a very fine job for Mr. Kilmartin.  I'm sure

14   Mr. Kilmartin appreciates it, and I do, too.

15         MR. MERRILL:  Thank you, Your Honor.  Glad to be of

16   assistance to the court.

17         MR. FRANK:  Thank you, Your Honor.

18         THE COURT:  Court will be in recess.

19      (Proceedings concluded at 11:38 a.m.)

20

21

22

23

24

25

```
1                           CERTIFICATION

2          I certify that the foregoing is a correct transcript from

3     the record of proceedings in the above-entitled matter.

4

5

6     /s/ Julie G. Edgecomb                October 17, 2018
      Julie G. Edgecomb, RMR, CRR          Date
7     Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```