UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

_____

UNITED STATES OF AMERICA,          CRIMINAL ACTION

        Plaintiff          Docket No:

                      1:14-cr-129-JAW


       -versus-


SIDNEY KILMARTIN,

        Defendant
_____

Transcript of Proceedings


Pursuant to notice, the above-entitled matter came on for **Continued Sentencing** held before **THE HONORABLE JOHN A. WOODCOCK, JR.,** United States District Court Judge, in the United States District Court, Edward T. Gignoux Courthouse, 156 Federal Street, Portland, Maine, on the 22nd day of May, 2018 at 10:10 a.m. as follows:


Appearances:

For the Government:   Halsey B. Frank, Esquire
                        Assistant United States Attorney

For the Defendant:  Bruce Merrill, Esquire


Tammy L. Martell, RPR, CRR
Official Court Reporter

(Prepared from manual stenography and
computer aided transcription

```
 1                    (Open court.  Defendant present.)
 2            MR. FRANK:  Good morning, Your Honor.
 3            MR. MERRILL:  Good morning, Your Honor.
 4            THE COURT:  Good morning.  Good morning.  We're
 5      back here in the matter of United States versus Sidney
 6      Kilmartin which is 14-cr-129-JAW.
 7         Would counsel please enter their appearances.
 8            MR. FRANK:  Halsey Frank for the United States.
 9      Good morning, Your Honor.
10            THE COURT:  Good morning.
11            MR. MERRILL:  Good morning, Your Honor, Bruce
12      Merrill on behalf of Sidney Kilmartin.
13            THE COURT:  Mr. Kilmartin, would you stand
14      again, sir.  Mr. Kilmartin, I just want to make sure, as
15      I did the last time, that you are competent so that you
16      -- so I can assure myself that you understand these
17      proceedings.
18         Your name is Sidney Kilmartin; is that correct, sir?
19            THE DEFENDANT:  Yes, Your Honor.
20            THE COURT:  And, Mr. Kilmartin, how old are you?
21            THE DEFENDANT:  56.
22            THE COURT:  And you graduated from Cheverus High
23      School; is that right?
24            THE DEFENDANT:  Yes, Your Honor.
25            THE COURT:  And you told me the last time that
```

1   you had been prescribed a number of medications; is that

2   right?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  And have you taken all those

5   medications in their regular doses over the last 24

6   hours?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Do you believe yourself that you

9   understand what is happening here today?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  And you are able to follow the

12   proceedings?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  Mr. Merrill, have you had an

15   opportunity to speak to your client this morning?

16          MR. MERRILL:  Yes, I have, Your Honor.

17          THE COURT:  And do you have any concerns about

18   his competence?

19          MR. MERRILL:  No, I do not, Your Honor.

20          THE COURT:  Thank you.  You may be seated.  I do

21   find the defendant is competent based on my direct

22   observations, his responses, and his attorney's

23   responses.

24       I think when we broke I suggested to counsel that if

25   they wished to do so -- they were not required to do

```
 1   so -- they could file a memorandum telling me what to

 2   make of Dr. Voss's extended testimony the last time we

 3   convened, and I don't believe I received a -- a filing

 4   from the Government; is that right?

 5           MR. FRANK:  That's correct, Your Honor, I --

 6           THE COURT:  And none from the defendant?

 7           MR. MERRILL:  That's correct, Your Honor.

 8           THE COURT:  How do we wish to proceed?  What's

 9   next?

10           MR. MERRILL:  If -- if I might, Your Honor, as a

11   housekeeping matter.  When we broke the last time the

12   Court asked if I would number all of the exhibits we

13   have been referring to the last time.

14           THE COURT:  That's right.

15           MR. MERRILL:  And speaking with the clerk today

16   there are a couple of corrections.  On Exhibit 4A I am

17   advised that I never actually moved that in.  Now, 4A is

18   actually attached to Dr. Voss's third report which is

19   Exhibit 4 but I made it a separate exhibit, and I would

20   move it in as a separate exhibit.

21           THE COURT:  Sure.  Any objection?

22           MR. FRANK:  No, Your Honor.

23           THE COURT:  4A is admitted.

24           MR. MERRILL:  And apparently we referred to the

25   e-mails between Sidney Kilmartin and Andrew Denton.  And
```

1    that was a trial exhibit during the trial, Your Honor,

2    but apparently it wasn't marked, but I have marked that

3    as Exhibit 6.

4              THE COURT:  Any objection?

5              MR. FRANK:  No, Your Honor.

6              MR. MERRILL:  And --

7              THE COURT:  Is that already -- I'm sorry.

8              MR. MERRILL:  I'm sorry.

9              THE COURT:  Is that already admitted?

10             MR. MERRILL:  I thought it was, but I was told

11   not.  So if it isn't, I would move it at this time --

12             THE COURT:  Okay.

13             MR. MERRILL:  -- as Exhibit 6.

14             THE COURT:  Defendant's 6 is admitted.

15             MR. MERRILL:  And then they have listed it just

16   as a letter A the character letters, Your Honor, and I

17   broke them down as 7A through 7F.  There were two that

18   were submitted after the hearing.  I provided copies of

19   both to the clerk's office and to Mr. Frank.  I have the

20   originals here.  I would move them at this time, but I

21   just thought for clarity it was easier to mark them as

22   7A through 7F.  And the two I am moving in today are --

23   are 7E which is a character reference letter from

24   Mr. Kilmartin's father's sister Catherine E. Noel,

25   N-o-e-l, and 7F is a letter from Kevin Noel.

```
 1            THE COURT:  Any objection to 7E and F?
 2            MR. FRANK:  No, Your Honor.
 3            THE COURT:  Each is admitted.
 4            MR. MERRILL:  And lastly there was a letter that
 5   Mr. Kilmartin sent directly to the Court.
 6            THE COURT:  Right.
 7            MR. MERRILL:  And that wasn't given a number,
 8   but it is -- I have it as Defendant's Exhibit 8.
 9            THE COURT:  Any objection to eight?
10            MR. FRANK:  No, Your Honor.
11            THE COURT:  Eight is admitted.
12            MR. MERRILL:  And with that I think that all of
13   the defendant's exhibits are now in order and I will
14   turn these over to the clerk, Your Honor.
15            THE COURT:  Okay.  Thank you very much.
16            MR. MERRILL:  Thank you.
17            THE COURT:  So what -- what's next?
18            MR. FRANK:  I think allocution, Your Honor.
19            THE COURT:  Is that -- is that right?
20            MR. MERRILL:  I believe so, Your Honor.  All --
21   all of the -- we have no testimony today, it is just
22   counsel -- argument of counsel.
23            THE COURT:  There is someone who just raised his
24   hand in the back.
25            MR. PUNSKY:  Excuse me, I don't know if it is
```

1    proper or not, but I would like to speak to you and the

2    Court about Mr. Kilmartin.

3         THE COURT:  Do you know --

4         MR. MERRILL:  I have no idea who he is, Your

5    Honor.

6         THE COURT:  Why don't you talk to this -- both

7    talk to this gentleman.

8              (Discussion off the record.)

9         MR. MERRILL:  Your Honor, might I have -- I

10   believe this is John Ruminski.

11        MR. PUNSKY:  Steve Punsky.  Steve Punsky.

12        MR. MERRILL:  Steve Punsky.  I'm sorry, I

13   apologize.

14        THE COURT:  Sure.

15        MR. MERRILL:  And I would just like a moment to

16   be able to talk to him to see what he wants to address

17   the Court about.

18        THE COURT:  Sure.  You want -- you want to take

19   a break?

20        MR. MERRILL:  Yeah, if we could, and then I

21   could discuss it with Mr. Frank.

22        THE COURT:  Sure.  The Court will stand in

23   recess.

24     (A break was taken from 10:26 a.m. to 10:46 a.m.)

25        THE COURT:  You may be seated.  So where are we?

```
 1          MR. MERRILL:  Thank you for that opportunity to

 2    speak --

 3          THE COURT:  Sure.

 4          MR. MERRILL:  -- with Mr. Punsky.  Mr. Punsky

 5    apparently has known Mr. Kilmartin since he was in

 6    seventh grade and wanted to address the Court about his

 7    knowledge of Mr. Kilmartin, and with the Court's

 8    indulgence I would ask Mr. -- it is Steven Punsky,

 9    P-u-n-s-k-y, and he lives in Portland.

10          THE COURT:  Sure.  Mr. Punsky, would you come

11    forward and approach the podium there, sir.  Would you

12    state your name for the record.

13          MR. PUNSKY:  Steve Punsky, P-u-n-s-k-y.

14          THE COURT:  Yes, sir.

15          MR. PUNSKY:  Well, I would like to talk to you

16    about Mr. Kilmartin who is my -- a good friend.

17    Recently I had a -- somewhat of an accident, and got a

18    little bit out of control, and found myself with

19    Mr. Kilmartin, and he helped me out quite a bit.  I was

20    going to write you a letter.  But I thought no, I am

21    going to come in and look at you right in the eye and

22    tell you that he is a great man.  The only problem is

23    the depression sits in.  And I want to -- I want to

24    elaborate on it a little bit.

25        I have it with my son, my wife, her whole side of
```

1   their family, and it is pretty serious, you know.  And,

2   like I said, he is -- he is a brilliant man.  Probably a

3   little bit smarter than I am, but -- maybe not.  And I

4   told him I would be here for him, and I -- I hope that

5   you could take that in consideration when you are

6   sentencing him that he is a good man, that he suffers

7   from the -- the depression a little bit too much, you

8   know.  Like I said, I seen it.  My wife, my kids.  Came

9   out in my sons and it just ruins their lives.

10       And I am going to tell you he said something to me

11  one day, he said what are you going to give up now?

12  I'll never forget that sentence because I heard it once

13  before, and I figure I owe him a bunch of gratitude for

14  that.

15       And I didn't mean to interrupt your courtroom, but I

16  am the kind of guy when I want to say something I have

17  to say it, you know, and thank you for listening to me.

18           THE COURT:  All right.  Well, thank you very

19  much for coming here, Mr. Punsky.  I appreciate your

20  willingness to stand up and tell me what you know.

21           MR. PUNSKY:  Yeah.  Like I said, he is a good

22  man.  Thanks.

23           THE COURT:  Okay.

24           MR. MERRILL:  Thank you, appreciate it.

25           THE COURT:  So, what's next?

```
 1            MR. MERRILL:  I believe now we're at the point

 2    where Mr. Frank said that we're ready for the arguments

 3    of counsel and the allocution of Mr. Kilmartin.

 4            THE COURT:  Okay.  All right.  Mr. Kilmartin, as

 5    a defendant before the Court for determination and

 6    imposition of sentence, you have a constitutional right

 7    to address the Court at this time.  I want you to know,

 8    sir, that I have received your letter, and that has been

 9    marked and admitted into evidence; but you have a right

10    to tell me anything you want me to know in addition to

11    the letter, and you have a right obviously also not to

12    say anything.  It is up to you.

13         Do you have anything you would like to say to me at

14    this time, sir?

15            THE DEFENDANT:  Yes, Your Honor.

16            THE COURT:  Okay.  Why don't you place the

17    microphone right near you so we can pick you up, sir.

18            THE DEFENDANT:  Your Honor, I wanted to

19    apologize first for the Court for having to oversee this

20    drawn out process for something that was a result of my

21    pure just stupidness, and I am disgusted with myself.  I

22    am disgusted with the whole situation.  I am disgusted

23    at what I did to the fraud victims and what I put them

24    through.  I am disgusted what I have done to my kids and

25    put them through.  Anybody that knows me knows that I am
```

1   not a malicious person, and this was totally out of

2   character.

3       If you read the e-mails, then you will know that

4   there was no malice intended.  Him and I -- the victim

5   and I that we shared a common belief, and that was that

6   we couldn't take what society was doling out anymore,

7   and that the best possible way to get out of it was to

8   do what we spoke about and what -- what he eventually

9   did.

10      But I am -- I would like to say that this Court did

11  me no favors at all when it took the death penalty off

12  the table, and if it truly feels that I killed somebody

13  it shouldn't have taken the death penalty off.  It -- it

14  runs averse to the whole process.  And I have had

15  three-and-a-half years to think about this, and rotting

16  in prison for years isn't going to help the situation.

17      I have been rotting for 10 years now, and that has a

18  lot to do with what took place.  You can't ostracize

19  people and expect them to function normally.

20      I am not proud of the grounds for this sentencing,

21  but it is something you are born with and you have no

22  choice in the matter.  And once again I would just like

23  to apologize pretty much for everybody.  Thank you.

24          THE COURT:  Thank you.  Mr. Kilmartin, I just

25  want you to know -- because I think you may be under a

 1   misapprehension -- the decision on the death penalty was

 2   not my decision.  It is not the Court's decision.

 3   That's the prosecutor's decision.  So if you are

 4   thinking about the Court as the judicial system, that's

 5   a fair comment; but I didn't have anything to do with

 6   whether or not the Government would proceed with the

 7   death penalty.  That was the decision made by the

 8   Department of Justice itself.  Just so you understand.

 9         THE DEFENDANT:  Your Honor, if they truly

10   believe I killed somebody, they shouldn't have done

11   that.  They -- they shouldn't have done -- they didn't

12   do me any favors by doing that.  And there is not a

13   person in this courtroom right now that won't admit

14   Andrew Denton killed himself.  It can't -- it can't be

15   both.  You can't kill somebody that killed them self.

16   It is common sense.  Any reasonable person will agree

17   with that.  That's all I've got to say.  Like I said, I

18   am totally disgusted.

19         THE COURT:  All right.  Thank you.  Mr. Frank,

20   would you like to be heard on sentence?

21         MR. FRANK:  Thank you, Your Honor.  Your Honor,

22   I would like to start by addressing Dr. Carlyle Voss's

23   testimony, and I think the bottom line there is that I

24   don't believe that either his opinion or his testimony

25   deserves much credit.  I don't think that he is an

1    even-handed analyst.

2        About the only part of his testimony that I credit

3    is his testimony that the quality of his opinion depends

4    upon the quality of the information upon which it was

5    based, and by that measure his opinion is not worth

6    much.

7        I mean in particular he claimed that it was

8    important to obtain information about Mr. Kilmartin's

9    state of mind at the time of these offenses, and he

10   criticized the doctors at Fort Devens for relying on

11   information obtained or provided by the U.S. Attorney's

12   Office; but that information was information --

13   contemporaneous information about Mr. Kilmartin's state

14   of mind at the time of these offenses.

15       Most especially that information included the

16   complete records of Riverview Psychiatric Center where

17   Mr. Kilmartin was confined and later supervised as he

18   was engaged in these criminal activities.

19       I can't imagine there being much better

20   contemporaneous information about a person's state of

21   mind than that.  And it appears that Mr. -- Dr. Voss

22   made no effort to review that material even though the

23   defense had it.  I mean he did apparently review one

24   progress note by Dr. Manin because I think the

25   Government had pointed it out in some of its filings

 1    which was a progress note with respect to a meeting

 2    between Mr. Kilmartin and Dr. Manin, his supervising

 3    psychiatrist at Riverview, days after Mr. Denton had

 4    killed himself with the cyanide that Mr. Kilmartin

 5    provided, and just was remarkable in the way that it

 6    described Mr. Kilmartin's state of mind at that point in

 7    time which -- which, again, is -- is highly relevant.

 8         And beyond that, Your Honor, Dr. Voss did not make

 9    any effort to review the trial transcripts which

10    included transcripts of testimony of Mr. Kilmartin's

11    victims.  Again, people who dealt with him at the time

12    that these crimes were committed.

13         Really Dr. Voss didn't do much more than interview

14    Mr. Kilmartin himself whom even Dr. Voss had to

15    acknowledge might not be the most reliable reporter and

16    who repeatedly lied to him about significant events in

17    the history of -- of these offenses such as whether he

18    actually mailed cyanide to Andrew Denton.

19         Dr. Voss claimed to be objective, yet he would not

20    ask Mr. Kilmartin the obvious questions because Dr. Voss

21    said he didn't want him to incriminate himself or didn't

22    expect him to tell the truth.

23         Alternatively he explained away inconvenient facts

24    in the record such as that progress note by Dr. Manin

25    testifying that well of course Mr. Kilmartin had the

 1    wherewithal to -- to "hold it together" I think was the

 2    phrase that -- that Dr. Voss used for the short time of

 3    that interview and say self-serving things, things that

 4    -- that -- that Mr. Kilmartin knew would -- would

 5    continue his -- his community placement at -- at

 6    Riverview.  So I -- I -- the bottom line is I don't

 7    think that Dr. Voss's testimony or opinions amount to

 8    much in this case.

 9        And then beyond that, Your Honor, this case I think

10    has been going on for almost five -- five years,

11    four-and-a-half years since we filed the -- the original

12    charges.  I don't know how much there is left to say.

13        I think the bottom line is I don't think there is

14    much of redeeming value about Mr. Kilmartin.  I mean I

15    know that Mr. Punsky has stood up on his behalf.  I know

16    that others, such as his wife and brother-in-law and

17    cousin and aunt, all say that he is a -- a good man, a

18    good husband, a good father, a hard worker; but that is

19    not the impression that I get from the investigation and

20    the record in this case.

21        I mean beginning with it appears that we have, you

22    know, a person who had a significant substance abuse

23    problem which caused him to lose touch with, I think,

24    reality and control and frequently get aggressive and

25    hurt people.  And his conduct here certainly was

1   criminal, malicious, and, beyond that, despicable and

2   contemptuous of the law.

3       I mean Mr. Kilmartin sought out and picked upon the

4   most vulnerable people he could find.  I mean people who

5   were depressed to the point of suicide.  Who were so

6   determined to end their lives that they were looking for

7   cyanide online.  And he went on to kill one of them not

8   out of any sense of mercy but only, I think, because

9   that person, Andrew Denton, had the temerity to complain

10  to the authorities about him.  That's when he sent

11  cyanide to Andrew Denton.  The first time he sent him

12  Epsom salts, like everyone else, because he was enjoying

13  tormenting him.

14      And, of course, the contempt for law.  I mean it

15  isn't just tampering with the witness.  Which is what he

16  did, he didn't want Mr. Denton to be a witness against

17  him.  But we have a history of obstruction of justice in

18  this case which goes back to the very beginning of the

19  criminal activity here and which the Government has laid

20  out in detail.

21      You know, the -- the -- the effort that he, his

22  estranged wife and his brother-in-law made to obstruct

23  justice in a pending shoplifting case is remarkable and

24  again refutes any -- any suggestion that Mr. Kilmartin

25  is anything other than malicious.

1          He was convicted on the basis of overwhelming

2     evidence.  He is still not being honest about his guilt

3     or his drug use.  He still can't account for 95 grams of

4     potassium cyanide, and we're talking hundreds of lethal

5     doses of potassium cyanide, and he continues to blame

6     others for his situation.  Beginning with his knee

7     surgeon but continuing most recently, in his letter to

8     the Court, blaming his attorneys on giving him bad

9     advice about pleading not guilty by reason of insanity

10    to the assault of Henry Noring which is why he was at

11    Riverview, about his attorney in the trial in this case

12    for being ill-prepared in this case, about Riverview

13    retaliating against him.  Of course his -- his

14    criminality predated his -- his stay at Riverview.

15    Blaming Spring Harbor for releasing him too early.

16    Blaming the decedent, Andrew Denton in this case, for

17    taking him down.  Blaming mental illness.

18         But there is ample evidence in this case, Your

19    Honor, that he fully appreciated the wrongfulness of his

20    conduct and that he was capable of controlling his

21    conduct and acting in a goal-oriented fashion when it

22    suited him.  And I am thinking especially of obstructing

23    justice in the pending shoplifting case which just was a

24    remarkable, concerted, and protracted effort on his part

25    coupled with his estranged wife and his brother-in-law.

1       And, again, we -- we have laid that out how he

2  shoplifted the Preparation H because he couldn't get the

3  medicine he was getting at Riverview for free to treat

4  his hemorrhoids, about how he got caught red-handed

5  stealing Preparation H at the Dollar Store in Augusta,

6  how he falsely denied it, how he orchestrated a false

7  alibi because he didn't want to lose his newly-won

8  freedom from -- from Riverview on community confinement,

9  how he deceived the supervising court supervising that

10  commitment, how he hid his -- his -- his shoplifting

11  from his treatment team until he was forced to

12  acknowledge it.  And all the while I mean he is -- he is

13  forming this -- this plan to -- to take advantage and --

14  and torment depressed and suicide people he is meeting

15  online.

16       I mean and the facts of that again bespeak an

17  appreciation of the world and how to navigate it.  I

18  mean how he is able to -- to buy cyanide which is a

19  pretty tightly regulated substance, how he is able to

20  circumvent and figures out the rules there and figures

21  out how to circumvent that and get it delivered to

22  himself, how he uses a false return address on his

23  dealings with -- when he mails Epsom salts to his fraud

24  victims, all the way through his e-mail correspondence

25  with Andrew Denton when he is asking Denton to destroy

1    evidence of their interaction before killing himself

2    after he sends him real cyanide.

3        Again, I -- I -- I wouldn't be surprised -- I am not

4    an expert in these matters -- if -- if Mr. Kilmartin's

5    problems don't trace back to voluntary use of cocaine

6    years ago.  I mean I suspect that that underlies a

7    number of his earlier problems like his insomnia, his

8    delusions and hallucinations, his paranoia, the bar

9    fights, the involuntary commitment, the suicide

10   attempts.

11       But the bottom line is that in this case -- and I

12   don't think it was primarily money, I think it was

13   primarily spite -- he -- he tormented and defrauded

14   vulnerable, depressed, and suicidal persons, and he

15   intentionally killed one of them, and I think it does

16   warrant the harshest penalty.  It doesn't get much worse

17   than that.  That's all I have.

18           THE COURT:  Thank you very much.  Mr. Merrill.

19           MR. MERRILL:  Your Honor, preliminarily I just

20   want to state there is absolutely no evidence in the

21   Government's exhibits, specifically 30 or 31, that

22   suggests that either Deb Kilmartin or John Ruminski ever

23   discussed with Sidney Kilmartin what they were going to

24   do to help him with the -- the theft of the Preparation

25   H.

1      What Deborah Kilmartin testifies about in Exhibit 30

2  is that she knew that Mr. Kilmartin was petrified that

3  as a result of this charge he may have to go back to

4  Riverview, and because of that she took it upon herself

5  to lie about what happened and get her brother, John

6  Ruminski, involved in it.  And she even testified in the

7  Grand Jury that John Ruminski wasn't doing it for Sidney

8  Kilmartin, he was doing it to help his sister, Deborah

9  Kilmartin, because of the fact that she had lied.

10     So there is absolutely no evidence to suggest that

11  this was some conspiracy involving my client or that it

12  rises to obstruction of justice on my client's part.

13     And I would -- I would assume that if the county

14  prosecutor believed that, they wouldn't have offered a

15  filing and a fine to resolve this charge.  So I

16  vehemently disagree with the Government's assertion that

17  this amounts to obstruction of justice on the part of my

18  client.

19     Secondly, I also disagree with Mr. Frank.  Dr. Voss

20  testified here, and he is the one doctor in this case

21  that has dealt with my client for the longest period of

22  time, and he hasn't done it in a doctor-patient

23  relationship.  He was not a treating psychiatrist for my

24  client.  He was an evaluator.  And that makes a world of

25  difference, Your Honor, because he doesn't have a dog in

the fight.

The first evaluation done in 2008 was a Stage II evaluation that he did for the Court.  He -- he didn't represent the prosecutor.  He didn't represent Mr. Kilmartin.  He was asked by the Court to do a Stage II evaluation, and he did one.  And he indicates in the Stage II evaluation -- and this is in the Exhibit 2 -- diagnosis psychotic disorder not otherwise specified in remission.

And I just want to take a moment, Your Honor, I am sure the Court is aware, when -- when someone suffers from certain psychiatric illnesses the scientific construct is such that when we say somebody is in remission it is not saying that person is cured.  It just means that the symptoms aren't at the surface level at that time.  So he is basically giving him a major mental illness of psychiatric disorder not otherwise specified.

And, if you recall, Mr. Frank was surprised because he thought that that was the basis for the not criminally responsible verdict in that case, and as Dr. Voss testified no one ever asked him.  He prepared the report, and he was never -- never asked to testify.  Never gave his opinion in court.

Apparently the prosecutor and the defense attorney

1    at that time got together and agreed that on the basis

2    of the report they would agree that he was not

3    criminally responsible for that episode, but Dr. Voss

4    never testified.  He was never called to testify.  But

5    his report is there that in 2008 there is a major mental

6    illness.

7        Jim Billings then retains him in 2015 to do a second

8    evaluation.  Not treatment, but evaluation.  That's

9    Exhibit 3.  And there he finds that the diagnosis is

10   bipolar disorder with history of both manic and

11   depressed states with psychotic features.  Again, not

12   somebody that's got a run-of-the-mill mild psyche --

13   mental illness but somebody that is suffering from a

14   major mental illness.

15       And then I asked Dr. Voss to do a third evaluation

16   in January of this year.  And his diagnosis there -- and

17   this is Exhibit 4 and I am at page four -- he is

18   basically saying major mental illness, schizoaffective

19   disorder with bipolar features on bi -- or bipolar

20   disorder.  Nuances of diagnosis are not important.

21       And he exhibited -- what can be established is that

22   there were episodes of excessive energy with racing

23   thoughts, et cetera, reflection -- reflecting a manic

24   phase, but depression is much more of a problem for

25   Sidney Kilmartin.

1      And then he goes on to indicate talking about what

2  was going on at the time of the events leading up to the

3  death of Mr. Denton.  And he talked about the fact that

4  he read the e-mails, and I am going to get to in a

5  moment, and he talked about the fact that what was

6  happening to Mr. Kilmartin at this time was he was

7  decompensating mentally.  He was sliding into a

8  depression.

9      He said when he was moved into a house in

10  Manchester, still under the purview of Riverview, and as

11  a matter of fact technically, as Dr. Voss testified,

12  Mr. Kilmartin is still a ward of the state.  And

13  whatever happens here today, and whatever sentence he

14  gets, when that sentence is completed he will still be a

15  ward of the state.  He will still be under the control

16  of the State of Maine because of the not criminally

17  responsible back in 2008.  He has never been fully

18  discharged or terminated from Riverview.

19      But Dr. Voss goes on to say he moves into the

20  apartment in Manchester, he felt isolated, alone, and

21  had a recurrence of severe depression.  He withdrew from

22  contact.  He neglected his personal care.  He stopped

23  seeing his family.  He quit going to work and lost his

24  job.  He developed thoughts that he wanted to die.  He

25  researched ways on the Internet that would be the least

1   painful and most effective in taking his life and

2   identified potassium cyanide as the best choice.  He

3   learned ways he could obtain potassium cyanide for

4   industrial purposes and was successful in getting about

5   a hundred grams sent to a mailbox reported to be for a

6   company that had a legitimate use.  That was the jewelry

7   company that -- that Mr. Kilmartin created.

8        He said during this time Mr. Kilmartin also went on

9   websites for people with suicide impulses and questions.

10  He advertised he has cyanide he would provide people

11  with for about $250.  He had a number of people contact

12  him.  He responded by mailing them Epsom salts.  He had

13  no income and said he did it for money.  He may have

14  made about $2,500.

15       One of the people that he contacted was Andrew

16  Denton.  And, again, Dr. Voss reviews those e-mails and

17  suggests that you have two people here that are well

18  acquainted with suicide.  You have Mr. Kilmartin who at

19  an earlier point in his life was so depressed that he

20  takes an entire bottle of Zyprexa and washes it down

21  with a pint of antifreeze, and, as Dr. Voss testified,

22  he is surprised that he even sur -- that he even

23  survived that.  But it wasn't what some people think an

24  attempted suicide is a cry for help because, as Dr. Voss

25  said, he did it in an isolated place where no one would

1    find him meaning he wanted to die.

2         Then you have Andrew Denton who had tried several

3    times to commit suicide.  Ways that were new to me, but

4    this idea of wrapping yourself up in nicotine or

5    caffeine-soaked or nicotine-soaked things so that it

6    could get inside of your skin to kill you.  Not

7    successful, but showing you the extent to which they

8    were willing to go to end their lives.

9         And if I could just pull out Exhibit 6 here, Your

10   Honor.  Again, these were exhibits at the trial.  And

11   they begin on December 7th and they go until December

12   15th of 2012.  And what they talk about is that

13   Mr. Denton basically says, look, maybe the other people

14   are afraid to complain because they don't want people to

15   know that they are trying to commit suicide.  I don't

16   care, I want out of this life.  So you ripped me off, I

17   am going to report it to the FBI unless you tell me

18   what's going on.

19        But if you read the e-mails the first one which is

20   December 7th of 2012 at 6:28 p.m.  I am covering up for

21   you -- this is Andrew Denton to -- to Skip Martin who is

22   Mr. Kilmartin.  I am covering up for you this end.  If I

23   get a reply by Monday I will start firstly by filing

24   with the FBI online form.  I have printouts from where

25   you are.  I know your e-mail address.  I will go on the

1    line, I will tell everybody you ripped them off.  I

2    really do not want to be here, I have had enough.  I

3    have nothing to lose, and while I am here I will do my

4    best to see that you get what's coming to you.

5         And then you continue to the next page Mr. Kilmartin

6    asks him for his address and suggests to him that there

7    must have been something wrong with the sample that he

8    gave him.  And then Andrew Denton Saturday, December

9    8th, at 5:24 p.m., he finds out that Mr. Kilmartin is

10   thinking of committing suicide and he goes why are you

11   planning to take it, are you ill, more important when,

12   please answer, thanks.  And they start talking about the

13   fact that they are both wanting to end their life.

14   Mr. Kilmartin because he thinks he is going to have to

15   go back to Riverview as a result of the Preparation H

16   episode.  Mr. Denton because of the fact that apparently

17   the only thing that was keeping him around was his

18   girlfriend, and when she died that was the last straw

19   for him, and he -- and he just wanted out in any way,

20   shape or form.

21        And how do we know this?  If -- if we look at some

22   of these e-mails, he tells Mr. Kilmartin how lucky he is

23   because in the United States you have easy access to

24   guns which in England they do not, but he was saying

25   this would be so much easier if I had the things that

1   you do.

2       Mr. Kilmartin even suggests to him hey I will give

3   you the name of Capricorn Industries, you can get the

4   stuff yourself, and, again, Mr. Denton says would that

5   it were that it would be that easier here, but they --

6   they make us have anonymous PO boxes.  I wouldn't be

7   able to do it, they monitor everything.

8       The two of them are having this conversation about

9   how they can each end their lives.

10      Mr. Denton says -- and this is his e-mail of Sunday,

11  December 9, 2012, at 10:01 p.m.  Hello, Skip, by what

12  you said last night it sounds like you use your phone

13  for the Internet.  I have done a very large e-mail that

14  would require you using a laptop or computer.  If you

15  have access to one, I will send it to you.  It is far

16  too large for a phone.  It contains attachments.  I can

17  appreciate that you sent what you had got in good faith.

18  I don't blame you anymore.  You sound like a decent sort

19  of person.  I am sorry for doubting you.

20      Perhaps no one else complained as they have -- have

21  it as a last resort and have not got around to using it.

22  They could have taken it as a cry for help and are

23  pleased to still be here, who knows?  Me, on the other

24  hand, I did take it, and I was very, very mad,

25  disappointed, and extremely angry so I decided to set

1  things in motion next evening before you got back to me.

2  I am trying to get things stopped.  I have add it on my

3  complaint form that I have contacted you and resolved my

4  issues with you and no longer wish to pursue my

5  complaint.  That's all I can do at this stage.  I will

6  keep you informed if they get back to me.

7  I appreciate you giving me the supplier's info and

8  how you got your supply.  I cannot do it that way over

9  here as we have a scheme run by our post office called

10  PO box number.  It keeps you anonymous.  They have your

11  name but nothing else.  As far as I am aware, UPS don't

12  offer a service like yours over here.

13  The sites I can buy the stuff in the UK one claims

14  purity 99 percent and charges about 350 per kilogram

15  delivered in a metal canister, another makes no claims

16  as to purity and charges about $20 for a kilogram

17  delivered in a plastic tub.  I think your supplier might

18  be like the last one of my examples.  If you can get

19  hold of the genuine chemical, I would appreciate you

20  sending me some.

21  I did find an example of someone surviving, it said

22  they had a very low acidity level in their stomach.  I

23  have also read that if you drink 10 teaspoons of apple

24  cider vinegar it increases the hydrochloric acid in your

25  stomach.

1      And then they go on and exchange several other

2   e-mails about what's the most effective way to maximize

3   the -- the use of the potassium cyanide.

4      And -- and then he basically said when is -- when

5   are you going to send it, and they talked about the fact

6   that -- Mr. Denton tells Mr. Kilmartin, this is on

7   December 9, 2012, 11:16 p.m., I don't know if you have

8   looked into a site called the "Alternative Suicide

9   Holiday".  It gave you very good and descriptive

10  information where you can get things, et cetera.  Yes,

11  it got banned, but if you look hard enough some people

12  have hidden pages on the Internet.

13     Whatever you do, don't waste money on sleeping

14  pills.  The modern day ones are not lethal no matter how

15  many you take.  The best bet for you would be a visit to

16  a Mex -- to visit to Mexico there is a drug called

17  Nembutal that works.  It has been banned all over the

18  world because of the amounts of people it has killed.

19  The Mexicans are trying to get it banned.  Money talks.

20  You have to go to a veterinary practice and barter.  You

21  could drive there.  You are lucky living in the USA, you

22  can get ahold of firearms real easy.

23     Just got your new e-mail while writing this, you

24  don't want to know just yet.  If you are anything like

25  me you would worry, and I might have gotten things

1    stopped.  I hope I have, but you have got to realize I

2    have attempted to take my life at least four times and

3    the mental health service here are on my case.  There is

4    a limit to how many times I can have a go before they do

5    something.  Each and every time I don't succeed I regret

6    still being here.  I thought great now it is certain

7    with what I have got.  Look up my name on the Internet,

8    "Andrew Denton missing Hall U.K." I have wasted around

9    $2,000 on failed attempts.  I have run out of money and

10   patience so I was no pleased at all, to say the least,

11   when my last attempt failed.

12       And continuing at 11:51 p.m. on that same Sunday,

13   December 9, 2012, over here they believe in not locking

14   you away unless they have no choice.  They had me in two

15   mental health units over four months.  Now they are

16   trying to change my way of thinking to make me feel my

17   life has a purpose.  I am a nonbeliever and my life is

18   mine to do with as I wish.  I don't want it.  I have had

19   enough and at some point I will get what I want.  Only I

20   know how life is for me.  Anyway, it is nearly midnight

21   here, so I will end now.  I will send you an e-mail to

22   -- marked urgent please send it ASAP, it will be news of

23   what has happened regarding the complaint I filed.  Good

24   night.  And then it continues on.

25       And we know that Mr. Kilmartin thereafter mailed

1    potassium cyanide to Mr. Denton.  And not the day that

2    he received it, not the next day, but two weeks later, I

3    believe on New Year's Eve, he takes it and is finally

4    successful in committing suicide.

5        That, Your Honor, is not a premeditated murder as

6    the presentence report suggests.

7        More importantly, and the significance of what Dr.

8    Voss is testifying about and what I had mentioned last

9    time that we were here, is that Count 14 says that

10   Mr. Kilmartin killed Andrew Denton.  It doesn't say he

11   murdered Mr. Denton.  And therein lies the rub.

12       I cited in my objections to the presentence report a

13   quote by Justice Frankfurter in 1952 in Leland versus

14   Oregon where he expresses concept of a mental state more

15   graphically. "A muscular contraction resulting in a

16   homicide does not constitute murder.  Even though a

17   person be the immediate occasion of another's death, he

18   is not a deodand to be forfeited like a thing in the

19   medieval law.  Behind a muscular contraction resulting

20   in another's death there must be culpability to turn

21   homicide in to murder."  Leland versus Oregon 343 U.S.

22   790, 803 (1952).  It was the dissenting opinion.

23       And what that basically means, if you listen to what

24   Dr. Voss says, is that if Mr. Kilmartin's mental state

25   has been altered because of his depression so that his

```
 1   reality is altered, that he is not perceiving reality

 2   the way you might or I might or Mr. Frank might because

 3   of the mental illness, that impacts his intent as to

 4   what he is doing.

 5           THE COURT:  How -- how do I square that with the

 6   jury verdict?

 7           MR. MERRILL:  Because the -- the jury verdict

 8   said that he was trying to tamper with -- he killed him

 9   in order to tamper with him, and I am suggesting to the

10   Court --

11           THE COURT:  The verdict is wrong.

12           MR. MERRILL:  Well, I -- I am saying there are

13   -- I think there is a -- there is a very good

14   possibility that the -- the jury compromised on 14 and

15   15.  Because you can't really square how he can be not

16   guilty of 15 but guilty of 14, or vice-versa.  They are

17   both aimed at trying to prevent somebody from testifying

18   against you.

19           THE COURT:  No, I -- I see them as different.  I

20   see 15 as being retaliation for past action and 14 as

21   being an attempt to prevent future action.

22           MR. MERRILL:  But that --

23           THE COURT:  I think it is pretty clear.

24           MR. MERRILL:  -- that is belied by the e-mail.

25           THE COURT:  Well, let me -- you can't talk over
```

1   me --

2        MR. MERRILL:  I'm sorry, I apologize.

3        THE COURT:  -- Mr. Merrill.  The -- the

4   difference here to be -- seems to be quite clear to me.

5   I -- I -- I think the jury could rationally say that he

6   wasn't retaliating against him for what he had done in

7   the past but he didn't want him to be out there

8   potentially going to law enforcement and reporting on

9   him because he feared going back to jail or going back

10  to a mental institution.

11       MR. MERRILL:  Except that he already told him,

12  in one of the e-mails that's in Exhibit 6, that his

13  matter got resolved.

14       THE COURT:  Right, but that's --

15       MR. MERRILL:  He wouldn't be joining him on this

16  trip.

17       THE COURT:  Right, but that's a -- the argument

18  you are making strikes me as being a closing argument to

19  the jury as to whether or not they should have found him

20  responsible under Count 14, but they did find him

21  responsible under Count 14 beyond a reasonable doubt.

22     I have to accept the verdict for purposes of the

23  sentence here today.  I can't not accept the verdict.  I

24  have to give it appropriate deference.

25       You -- you have a different argument which is I

1    think under the guidelines and under Section 3553(a) I

2    am certainly allowed to take into account his mental

3    situation, his mental illness, Dr. Voss's view of his

4    mental illness, the records on his mental illness.  I am

5    -- I am allowed to do all of that.  But I can't do what

6    you are suggesting that I should do, and that is to defy

7    the jury verdict, I don't think, unless you think I can.

8    And if you think I can, you can tell me why you think I

9    can; but I -- I don't think I can.

10             MR. MERRILL:  I am not asking the Court to

11   ignore the jury verdict.  I understand at this stage we

12   have to accept it.  But what I am saying --

13             THE COURT:  How -- how does your argument then

14   -- assume the jury verdict, assume I have to accept the

15   jury verdict and I have to sentence him based on what

16   the jury found.  Assume that's the case.  How does your

17   argument -- where is the light between the verdict and

18   your argument?

19             MR. MERRILL:  The light is that what's driving

20   this train is not Count 14.  Count 14 doesn't get him to

21   a life sentence.  It is mailing injurious items

22   resulting in death.  Count 14 wouldn't -- wouldn't

23   result in a life sentence under the guidelines.  That's

24   not what's driving the bus here.  What's driving the bus

25   is Count 1, mailing injurious items resulting in death.

1    That's why we have a guideline where it is saying

2    life imprisonment.  It is not based upon Count 14, it is

3    based upon Count 1.  And -- and what -- what I am trying

4    to say is the count says he killed Andrew Denton.  I

5    accept that.  The jury said he killed him.  What I am

6    saying it wasn't a premeditated murder which is what

7    probation found under the statute that applies to 1716.

8         THE COURT:  Well, you know, I -- I have a great

9    deal of respect for you, Mr. Merrill, but I -- I am

10   finding it hard to square the argument that you are

11   making here today.  It says Count 14, which is the

12   witness tampering resulting in death, has a -- a

13   potential penalty under the statute of death or life

14   imprisonment.  It is a Class A felony.  And it just

15   strikes me that -- I am just suggesting to you the

16   better argument may not be to try and attack the jury

17   verdict straight on because I just don't think it gets

18   you very far, and I think that is really what you are

19   doing.

20   I -- I am allowed under the statute, and I think it

21   is proper for me both under the guideline and under the

22   statute, to consider the history and characteristics of

23   the defendant.  And that includes his long history of

24   psychological problems, his -- the fact that he was not

25   criminally insane for this brutal assault on an

1   85-year-old man, the fact that he spent so long in -- at

2   Riverview, the fact that he was out from Riverview under

3   conditions that were very, very difficult for him.

4       I can consider all of that; but what I can't do is

5   what you are trying to get me to do, and that is to say

6   well he really didn't intend to kill Mr. Denton.  That

7   was determined by the jury in Count 14.

8       I instructed the jury about the concept of knowing,

9   and the high standard for knowing, and they found that

10  he knowingly killed Mr. Denton.  So I can't erase that

11  and pretend that the jury didn't find that.  That's what

12  they found.

13          MR. MERRILL:  And --

14          THE COURT:  So I am suggesting to you a way of

15  making the argument that I think is appropriate; but I

16  think your argument, which asks me basically to

17  undermine the jury verdict, the way I read it, I -- I

18  just don't think I can go there.

19          MR. MERRILL:  I -- I don't mean to suggest that

20  we don't accept the jury verdict, but we have got a

21  mountain of psychological evidence that the jury never

22  got to hear because the Government basically said that

23  the day that Mr. Kilmartin withdrew his insanity defense

24  there could be no discussion about his mental health,

25  and I think that what I am trying to say is that it

1    impacts his intent in everything that he did.

2         So, yes, the jury found that based upon the evidence

3    they had, but they didn't get to hear anything about

4    Mr. Kilmartin's mental state.  And that's -- that's

5    something that will be fleshed out on appeal, but I do

6    think it is something the Court can take into

7    consideration.

8              THE COURT:  Well --

9              MR. MERRILL:  And I --

10             THE COURT:  -- are -- you can't -- so, Mr.

11   Merrill, I don't recall, during the course of the trial,

12   the defense suggesting that evidence should be brought

13   to bear regarding his psychological condition.  I don't

14   recall Dr. Voss being offered as a witness.  I don't

15   recall -- well, Mr. Kilmartin has a right not to

16   testify.  He chose not to testify, that's his right; but

17   he didn't alternatively take the stand and explain his

18   mental condition.  We had no witnesses at trial offered

19   by the defendant who presented this history of mental

20   troubles that has been revealed.  I can't go back and

21   retry the case at the time of sentencing.

22             MR. MERRILL:  I am not asking you to retry the

23   case, Your Honor.

24             THE COURT:  What are you -- what are you asking

25   me to do?

```
 1              MR. MERRILL:  I am asking you --
 2              THE COURT:  Are you saying that if I -- that I
 3      should calculate in the risk that the verdict will be
 4      flipped on appeal for purposes of imposing a sentence?
 5      Because that seems to me to be not a proper argument.
 6              MR. MERRILL:  No.  What I am suggesting is that
 7      when you -- you read the cases and the -- and the Court
 8      basically said we're in uncharted territory here because
 9      the statute doesn't specifically say it applies to
10      assisted suicide, okay, that -- that's Count 1, 1716.
11      It doesn't specifically say that, and yet we have a case
12      here that but for the fact that the U.S. mails were used
13      we wouldn't be here --
14              THE COURT:  Well, fine, well --
15              MR. MERRILL:  -- and so I am --
16              THE COURT:  -- you know, and raise that
17      argument -- and I am sure you will.  Raise the argument
18      to the First Circuit Court of Appeals.
19              MR. MERRILL:  I agree, but I am saying --
20              THE COURT:  But don't make that argument, don't
21      say well, Judge, you should alter your sentence based on
22      the -- the merits of the underlying verdict.  I don't
23      think that's correct.  We have to assume the verdict
24      today.
25          If you are right, the First Circuit Court of Appeals
```

1    is very capable.  You are very capable.  You may be able

2    to make an argument to convince them that I erred,

3    that's fine.  And if so, they can decide what to do

4    then.  But I can't do that here at sentencing, Mr.

5    Merrill.  You know that.

6         MR. MERRILL:  I -- and I am not trying to get

7    the Court to do that at --

8         THE COURT:  Okay.  Well, let's stick to the

9    argument, the issue right before us.  Not whether or not

10   you have a legitimate appeal.  Let's just stick to the

11   question of what the sentence should be --

12        MR. MERRILL:  And --

13        THE COURT:  -- based on the verdict.

14        MR. MERRILL:  And in my motion for a variant

15   sentence, that's the way I laid it out.

16        THE COURT:  Okay.

17        MR. MERRILL:  That under the factors the Court

18   has to consider under 3553(a).  I am just trying --

19        THE COURT:  That's the way to do it.

20        MR. MERRILL:  I am just trying to suggest that

21   there is a mental health issue here.  That when the

22   probation and the Government basically says, you know,

23   there is -- there is no redeeming social value left to

24   this man, he is not somebody that did this in the

25   absence of mental illness.  He had mental illness.  The

1    Court can take that into consideration.  He lived a

2    totally productive life up until the 1990s.

3            THE COURT:  Well, I just want it clear, I agree

4    with that argument.  The one you have just made.  I can

5    -- I can consider that, and I should consider it.  I

6    can't do what you urged me before.

7            MR. MERRILL:  I -- I understand that, Your

8    Honor.  I understand that.  And perhaps I was inartful

9    in presenting my argument.  But -- but as I laid out in

10   the motion for variant sentence, those factors are

11   relevant as to what sentence he should receive under

12   3553(a).

13       And what I am suggesting is that there -- there is

14   now testimony as to why he did the things that he did

15   that should impact the sentence that the Court should

16   impose.  And I base that upon the fact that the -- the

17   -- you have somebody that -- that worked for 28 years as

18   a meat cutter for Shaw's, raised a family, was -- was

19   happily married, and then mental illness entered his

20   life.  And it has never left his life since then, and it

21   has just been a series of problems.

22       And that's why I am saying that Dr. Voss's opinion,

23   okay, as a diplomat in forensic psychiatry, and in

24   psychiatry and neurology, bears some weight.  Because he

25   has been consistent since 2008 in saying that this man

1  suffers from a major mental illness which when he is in

2  the throes of a depression alters his perception of

3  reality and causes him to do things that maybe an

4  ordinary person wouldn't do.  And that it is well

5  documented, it is not something that's just being raised

6  for the first time.  He has had this since the 1990s.

7      If you read all of the records from -- from

8  Riverview, or even from Fort Devens' report, and Dr.

9  Voss's report, they talk about the problems that he is

10  having going back to the 1990s that he has not

11  successfully dealt with.

12      In fact, Dr. Voss I think indicated that some of his

13  use of cocaine was an attempt to either self-medicate or

14  to give himself the energy that he was lacking when he

15  was in this depressed state.  Well, Dr. Voss also said

16  that he thought that alcohol would be a -- a bigger

17  problem for somebody with this form of mental illness.

18  But the problem is he -- he went from somebody that

19  didn't have a criminal record, who was a law-abiding

20  citizen, and then mental health set in.  And I just do

21  not believe that that warrants giving this man a

22  sentence that is equated to a premeditated murder.

23      I think -- again, as I said last week, I think the

24  most analogous statute is the one in Alaska which

25  basically says if you intentionally assist somebody with

1    a suicide it is the equivalent of manslaughter.  If you

2    provide drugs to somebody and that person dies, it is

3    the equivalent of manslaughter.  Which carries a zero to

4    20 sentence.

5        Premeditated murder would require that he get a

6    sentence that's closer to what the guidelines are

7    calling for, and I just don't think that it is supported

8    in this case if you do a 33 -- 3553(a) analysis and take

9    into account the significant impact that mental illness

10   has had on this man's life going back until the 1990s.

11       And I think if it is considered in that light a more

12   appropriate sentence, as I have requested in the motion

13   for a variant sentence, would be sentence him to a

14   sentence that is the equivalent for manslaughter.  Give

15   him a 10-year sentence with three years of supervised

16   release.

17       But, again, whatever sentence he gets, Mr. Kilmartin

18   needs help.  He needs psychiatric help.  He needs

19   ongoing psychiatric help.  He needs counseling.  He

20   would probably benefit from the RDAP program, the

21   500-hour drug program, because he does have a problem

22   with -- with alcohol and cocaine.

23       But to just throw this man away because, as the --

24   the Government says, he is despicable I think misses the

25   point that, yes, he has done some terrible things.  But

1   there is a reason why he did it that goes to his intent,

2   because he was living in an altered reality at the time

3   that these happened.  Thank you.

4           THE COURT:  Thank you.  Mr. Frank, anything

5   further?

6           MR. FRANK:  Your Honor, I have a couple of

7   responses, if I may.  And I will take them in reverse

8   chronological order.  I mean, look, Mr. Kilmartin had

9   the benefit of treatment in this -- in this matter and

10  it didn't prevent him from committing extremely serious

11  crimes of fraud, and I -- what I -- I think is

12  unquestionably premed -- the equivalent of premeditated

13  murder.

14      The argument that -- I mean, look, it is clear that

15  you can take into account, certainly under the

16  sentencing factors, Mr. Kilmartin's mental state.  I

17  just disagree with counsel's assessment of what that

18  mental state was.  And I think there is in this record

19  ample circumstantial evidence -- which I have described

20  already -- that indicates that he was able to perceive

21  reality and able to function in the world in a way that

22  furthered his interest.

23      I mean, again, that note with Dr. Manin days after

24  Andrew Denton committed suicide.  I mean, you know, Dr.

25  Voss tried to explain it away, but the way he explained

1    it away was yeah he can hold it together well enough in

2    that circumstance, he knows what's in his, you know,

3    interest to say to, you know, an expert in that

4    circumstance, what it is he needs to say in order to

5    maintain his community release, and he was able to do

6    that.

7         And I disagree with counsel's assessment of what the

8    facts and circumstances tell us about, you know, the

9    shoplifting case.  And the action in concert in that --

10   in that matter, which the Government has -- has laid out

11   in 31 exhibits, there is no question about what was

12   going on there and what Mr. Kilmartin knew was

13   happening.  I mean it is all coordinated and he is --

14   you know, he, acting through his attorney, is making

15   misrepresentations to the prosecutor's office and to the

16   Court for the same reason, to try and -- to try and

17   avoid being returned to Riverview.

18        I mean this man is able to navigate the world at the

19   time in question in a highly sophisticated manner that

20   belies any claim that he is incapacitated or that he

21   suffers from a mental illness that diminishes his

22   capacity.

23        Just to clarify, the defense withdrew their notice

24   of insanity in this case after it received the reports

25   from Fort Devens.  I mean the Court can draw its own

1    conclusion about why it did that; but that, I assume,

2    was a fully considered and deliberated decision by the

3    defense.  And I am not aware of any attempt after that

4    to make Mr. Kilmartin's mental state an issue at the

5    trial until now.

6         As regards what's the most analogous offense here

7    for purposes of the sentencing guidelines, and, again,

8    ultimately I think in the regime we're in it is the

9    statutory factors that control but the guidelines are

10   good -- are good advice here, and the guidelines are a

11   mixed charge and offense system.

12        They take into account both -- both the elements of

13   the -- of what's charged and the -- the facts of what's

14   proved accurate -- what the Government proved actually

15   happened.

16        And both Counts 1 and 14 reference the -- the -- you

17   know, can be referenced to the -- the homicide

18   guidelines here.  And the question ultimately is one of

19   fact; what is the most analogous form of homicide?  And

20   there is no question but this is premeditated murder.  I

21   mean it is intentional.  It is -- basically the idea the

22   first degree premeditated murder is that you have to

23   form the intent to kill, it is an intentional killing;

24   and there is no question that's what this is.  I mean

25   that's what these two people were discussing at great

1    length in their e-mails.

2          THE COURT:  That's what the jury found.

3          MR. FRANK:  And that's what the jury found.  And

4    that's what the jury found.  Although I think the Court,

5    in applying the guidelines, can go beyond the elements

6    that the jury found as a matter of fact and -- and look

7    at the facts that were proved.

8          THE COURT:  Right.

9          MR. FRANK:  Beyond that what we have here -- and

10   then beyond that what premeditated murder is that you

11   turn that -- that you give it a second thought, and

12   that, that can happen in an instant.

13      I mean as -- as I recall the -- the -- the jury

14   instructions that applied to -- to premeditated murder,

15   that's all it takes.  You form the intent to kill

16   somebody and you give it a second thought.  One second

17   thought is enough.  It can happen in an instant.

18         THE COURT:  Oh, I don't -- yeah, I don't think I

19   gave quite that instruction.

20         MR. FRANK:  Oh, no, Your Honor, I don't think

21   you did either, and I am not arguing that.  I am saying

22   that when it comes to deciding what guideline applies I

23   think you can consider the facts and you can consider,

24   you know, the definition of premeditated murder.

25      We rarely see it in federal court because it is --

1    it is -- it is a common -- a common law crime; but --

2    but my point is only there is no question but that's

3    what this is here.  I mean that's what the facts of this

4    case that were proved at trial prove.  That's the form

5    of homicide that it -- that it -- that it -- that it

6    proved.

7        And -- and, again, both Counts 1 and 14 can give

8    rise to, you know, that -- that -- that guideline, the

9    premeditated murder guideline.

10       The last thing I will say, Your Honor, is, look,

11   Mr. Kilmartin had a hundred grams of lethal potassium

12   cyanide.  He dealt with numerous people about it on the

13   Internet.  Suicidal people.  Most of them that he

14   corresponded with, accepted money from, and mailed

15   packages to, received Epsom salts.  The only one he sent

16   real cyanide to was Andrew Denton, and that's because he

17   is the only one who had the audacity to complain to the

18   authorities and told him so.

19       THE COURT:  Is that right?  I thought that one

20   of the other people complained and told him so.

21       MR. FRANK:  One of the other people did

22   complain, Your Honor, it was the grandmother of the girl

23   out west; but she didn't -- nobody told Mr. Kilmartin

24   that.  I mean Denton is the one who tells him I have

25   complained.  You -- you may be thinking of --

```
 1            THE COURT:  I am thinking of --
 2            MR. FRANK:  -- of Autumn Roland.
 3            THE COURT:  Right.
 4            MR. FRANK:  Autumn Roland didn't -- she
 5    threatened to complain.  You are right, Your Honor, he
 6    -- he -- that's right, he did -- I think that's right, I
 7    think that is the evidence.
 8            THE COURT:  I think -- I think that's correct.
 9    I think Autumn --
10            MR. FRANK:  Okay.
11                (Counsel conferred with agent.)
12            MR. FRANK:  Okay.  I believe the evidence was
13    she -- she threatened to complain but she never actually
14    did complain.  So the only one who actually does
15    complain, and actually alerts him that they have
16    complained, is Denton.  I believe that's -- that's an
17    accurate statement.
18            THE COURT:  She -- my notes say -- and we can
19    check this, it is not really -- I mean it is not going
20    to make a great -- a difference here frankly, but my
21    notes say that she testified she threatened to report
22    the defendant to the authorities and she did complain to
23    the FBI tip line.
24                (Counsel conferred with agent.)
25            THE COURT:  Anyway, it --
```

 1          MR. FRANK:  Your Honor, I -- I -- I defer to the

 2   Court in that regard.  I -- I -- I defer to you in your

 3   -- your -- your recollection of what --

 4          THE COURT:  Okay.

 5          MR. FRANK:  -- the evidence was.

 6          THE COURT:  Do you -- do you have a memory of

 7   that, Mr. Merrill?  I don't -- I don't think it matters,

 8   but --

 9          MR. MERRILL:  The --

10          THE COURT:  -- I don't want a misstatement of

11   the evidence to go unrebutted.

12          MR. MERRILL:  I believe that's correct, and I

13   believe that there was some argument about it, and the

14   bottom line was that she may have done it but

15   Mr. Kilmartin was never aware of it.  He was never aware

16   of a second complaint.

17          THE COURT:  Okay.  Is there anything further

18   from the Government or from the defendant?

19          MR. FRANK:  No, Your Honor.

20          (Counsel conferred with defendant.)

21          MR. MERRILL:  No, Your Honor, thank you.

22          THE COURT:  Thank you.  The Court has carefully

23   reviewed the contents of the written presentence

24   investigation report as revised and takes those contents

25   into account in determining sentence.

1    The Court has considered what it has heard from

2    counsel in the course of these proceedings at the

3    presentence conference, the evidence presented at this

4    hearing including the contents of the allocution of this

5    defendant.  The Court has already made its guideline

6    calculations.

7    I have taken into consideration each of the factors

8    set forth in 18 U.S.C. Section 3553(a) including the

9    obligation to impose a sentence that is sufficient but

10   no greater than necessary to achieve the purposes of the

11   law.

12   Although I have considered each statutory factor, I

13   have focused on the history and characteristics of the

14   defendant, the nature and circumstance of the offenses,

15   and the need to protect the public from future crimes of

16   the defendant.

17   I have started with the guideline sentence range of

18   life which is advisory.  There are no statutory minimum

19   sentences.

20   Turning to the history and characteristics of the

21   defendant.  The defendant is a native of Portland,

22   Maine, and has spent most of his life in the Portland

23   area.  His father, Joseph Kilmartin, died about 10 years

24   ago from medical issues.  His mother, Bonnie Kilmartin,

25   is 76 and lives in Casco.  He has three siblings:

1   James, an older brother who lives in Seattle; Patricia,

2   an older sister who lives in Westbrook; and Pamela, a

3   younger sister who lives in Casco.

4        The defendant describes his family as, quote,

5   totally dysfunctional.  He says he has not spoken

6   regularly to his siblings since 2008.

7        As will be seen, the defendant was institutionalized

8   from September 2008 to May of 2011, and according to the

9   defendant's wife, Deborah Kilmartin, the Kilmartin

10  family was never close, and once he was

11  institutionalized the family removed themselves from his

12  life.  I will discuss the institutionalization in a

13  moment.

14       The defendant says his father was abusive and a

15  functioning alcoholic.  He describes his mother as an

16  enabler.  The defendant says his basic needs were met

17  but just barely.  Family he says was loveless and not --

18  he does not remember ever being hugged as a child.  In

19  addition his father was physically abusive to both his

20  mother and to him, and when he turned 16 his father

21  would deliberately pick fights with him.

22       When he was 18 his father kicked him out of the

23  house and he went to live with his grandmother.  He

24  stayed with his grandmother for about six years until he

25  bought a home with his wife Debby.

1      The defendant attended Cheverus High School in

2   Portland.  He graduated in June of 1980.  While at

3   Cheverus he was an excellent athlete.  He lettered in

4   four varsity sports:  football, basketball, swimming,

5   and tennis.

6      After Cheverus he entered into Shaw's supermarket in

7   the meat department as a meat cutter apprentice in 1980.

8   He also took some courses at the University of Southern

9   Maine, but he did not complete the degree.

10      The defendant turned out to work for Shaw's for 23

11   years from 2080 (sic) to 2003.  Much of that time he was

12   in management positions.  He left Shaw's in 2003 and he

13   joined Cisco Systems where he worked until 2007.

14      The defendant married Deb Kilmartin in 1993.  They

15   separated in 2007 after his assault charge.  Although

16   they have been legally separated, there are no plans for

17   divorce and they are in regular communication.

18      The defendant and Deb have three children, Ashley,

19   Michael and Matthew, who are all in school.

20      I have received letters from Deb and from Ashley in

21   support of the defendant.  I also received a letter from

22   David Golden who is the defendant's brother-in-law.  I

23   have received a letter from Paul McDermott, the

24   defendant's cousin who spoke at the April 27, 2018,

25   sentencing hearing.

1      The way the defendant's family sees it, the
2    defendant's life was going reasonably well until around
3    2001.  He had steady employment at Shaw's and Deb was
4    working in real estate buying and improving and
5    reselling houses, and the defendant was adept at
6    refurbishing the houses.  They had a camp on Embden Pond
7    and, as Deb recalls, they had 13 great years together;
8    but, as I mentioned, the first trouble came in April of
9    2001.
10     The defendant presented himself to Maine Medical
11   Center saying he was paranoid.  The defendant said he
12   was having difficulty with a coworker and was convinced
13   he was being videotaped, and he had -- he told the
14   people at Maine Medical Center that he threatened his
15   coworker and his neighbor.  The defendant was admitted
16   for three days and given an Axis I diagnosis of
17   psychotic disorder.
18     Then on December 2002 he was arrested and charged
19   with criminal trespass and assault.  The details of
20   these criminal offenses are not available, but he was
21   sentenced to 180 days incarceration with all but seven
22   days suspended.  Previously the defendant had only had a
23   few motor vehicle violations and an OUI.
24     In October 2004 he returned to Maine Medical
25   Center's Emergency Room because he thought he had been

poisoned.  The defendant was thought to be at risk for
suicide and he was transferred to Spring Harbor
Hospital.  The defendant thought his wife had put poison
in his cigarettes and someone had put microphones in his
car and his house.  He admitted drinking heavily and
using cocaine occasionally.  He was involuntarily
admitted to Spring Harbor and was discharged in less
than two weeks.

On September 18, 2006, he was then transported to
Maine Medical Center where he was found unresponse --
after he was found unresponsive by his family.  It
appears he had taken an entire bottle of Zyprexa and had
drunk antifreeze in an attempt to commit suicide.  He
was discharged on September 26, 2006, with a diagnosis
of delusional disorder.

At some point, it is not clear when, between 2001
and 2006 the defendant underwent surgery for knee pain.
The surgery was unsuccessful and he was prescribed
narcotic medication which he began abusing.

In January 2017 (sic) he was on bail conditions for
possessing a scheduled drug.  He was found to have
violated the prohibition against drugs and alcohol and
in April 2008 he was sentenced to seven days -- I may
have said January 2017, I meant 2007.  In April 2008 he
was sentenced to seven days in jail for violating the

1    condition of release.

2        Then on September 7, 2007, he was involved in an odd

3    episode at a Portland bar.  He went to the Portland bar

4    and he ordered five gin and tonics and he ran up a tab

5    of $35.  The bartender asked for payment, and he refused

6    to pay for the drinks.  And, in fact, he insisted

7    instead that the bartender make him a sixth gin and

8    tonic.  The bartender told him to leave and he refused

9    threatening to fight them.  They called the police.

10   When the police arrived, the defendant refused to leave

11   the bar and told them to take him to jail.  In the

12   arrest wagon he became aggressive and violent.  The

13   defendant later said that he was delusional and thought

14   he owned the bar.

15       On September 18, 2007, he was again involuntarily

16   admitted to Spring Harbor from the Maine Medical Center

17   ER.  He was transferred directly from jail due to a

18   psychotic episode -- due to the psychotic episode at the

19   bar.  He was found to have been extremely paranoid and

20   delusional.  And he was discharged on October 11, 2007,

21   but after discharge failed to take his medicine.

22       Then on October 16, 2007, a really terrible incident

23   occurred.  The defendant forced entry into the apartment

24   of his 60 -- 85 or 86-year-old neighbor.  The neighbor

25   had been a friend and a tenant of the defendant and was

```
 1   asleep at the time.  The defendant set upon this older
 2   man and brutally attacked him yelling get out of my
 3   house.  The victim ended up with three broken bones: A
 4   broken jaw, cheek, an eye orbit; bleeding in the brain;
 5   a possible fractured rib; and his broken jaw actually
 6   required surgery.
 7       The defendant was charged with aggravated assault
 8   and was found not criminally responsible and was
 9   committed to the commissioner of the -- of Maine Health
10   and Human Services in December 2007 and assigned to
11   Riverview Psychiatric Center in Augusta.
12       The defendant's family said he had a terrible time
13   over the next seven years.  He was institutionalized
14   from September 12, 2008, until May 19, 2011.  They say
15   he was overmedicated and treated with disrespect as a
16   patient.
17       He was released to convalescent status on May 19,
18   2011, to an apartment in Augusta.  The family again says
19   this was a very difficult time for the defendant because
20   he was separated from his home base in Portland and was
21   under a lot of restrictions.
22       On February 26, 2013, he was readmitted to Riverview
23   after testing positive for cocaine, and he was released
24   again to convalescent status somewhere -- sometime in
25   March of 2013.
```

1        During the year 2013 he was mostly on convalescent

2    status, but he was periodically returned to Riverside

3    (sic) with positive alcohol and drug tests, and in

4    October 2013 he was allowed to return to Windham on

5    conditions.

6        In January 2014 he was admitted to Maine Medical

7    Center for cocaine dependency, and he has been detained

8    since his arrest on November 15, 2014.

9        I have alluded to his substance abuse history, and

10   when he was only 17 he began trying marijuana, but he

11   didn't like it and he tried it only once.

12       He began drinking alcohol when he was 18, and he was

13   a social drinker until 2007.  And he says he had no

14   alcohol since then; although, the Court notes he was

15   convicted of OUI in 1990.

16       At age 28 he began using cocaine and he periodically

17   went on binges of cocaine.  The worst was in 2006 when

18   he was 34, and he relapsed in 2012, and the last year

19   was in May of 2013.  But he tested positive in October

20   3rd -- 2013 but denies using cocaine despite the

21   positive test.

22       He has had some drug abuse treatment from October of

23   2013 to July of 2014 at MaineGeneral Medical Center and

24   inpatient counseling from July 2013 to August 2013.

25       He is a Criminal History Category II.

1     Despite the defendant's somewhat troubled background

2  of psychological issues and substance abuse problems,

3  there is really nothing that would predict the

4  defendant's involvement in this terrible scheme to

5  defraud suicidal people in a scheme -- a scheme that led

6  to the death of Andrew Denton of Hull, England, in

7  December of 2012.

8     Turning to the nature and circumstances of the

9  offense, cyanide is well-known as a lethal poison

10  capable of causing death.  Doses as little as 200 to 300

11  milligrams will cause 50 percent of people to die.

12  Higher doses of 500 to 1,000 milligrams are even more

13  lethal and likely to cause death.

14     Naturally, because of its properties, cyanide is not

15  available to the general public, and the United States

16  Postal Service has regulations that strictly restrict

17  the mailing of cyanide.

18     Even given what is available on the Internet, it is

19  still surprising that there are websites devoted to

20  people who are commit -- who are contemplating suicide.

21  One such website is called wantdeathblogspot and it

22  features such posts as "top 20 suicide methods".

23     Returning to cyanide, cyanide is available even

24  through the mails for a limited number of legitimate

25  industrial, scientific, and governmental uses.  One of

1    the legitimate uses for cyanide, somewhat surprisingly,

2    is goldsmithing.  And according to John Mitchell, who

3    testified at the trial of this case, it is useful in

4    etching, but who realistically, not in the business of

5    goldsmithing, would ever know such a thing.  Well,

6    Sidney Kilmartin knew, or learned.

7        On September 11, 2012, he posed as the owner of a

8    fictitious company called S & K Goldsmith and he ordered

9    100 grams of cyanide through the Capricorn Group who

10   then brokered -- brokered the sale Fisher Scientific.

11   100 grams of cyanide is, of course, a staggering amount.

12   You will all recall that as little as 200 to 300

13   milligrams may cause death.

14       The defendant was careful not to have the cyanide

15   sent to his home address but to UPS in Augusta, and UPS

16   delivered the cyanide to the defendant in Augusta on

17   September 14, 2012.

18       I now return to wantdeathblogspot.  Within a couple

19   of days of receipt of the cyanide, the defendant

20   advertised cyanide for sale on the blog spot $150 for

21   500 milligrams and 250 for a thousand.  He told

22   potential customers the cyanide was "nearly pure".

23       From September 2012 to May 2013 the defendant

24   responded to at least 61 e-mail requests regarding

25   cyanide.  The defendant sold cyanide during this time

1   and received a total, according to the presentence

2   report, of $2,732.55 from a number of people some of

3   whom testified at his trial.

4        Many of these people had let the defendant know that

5   they were profoundly depressed and were contemplating

6   suicide and were ordering the suicide from the defendant

7   -- the cyanide from the defendant in order to kill

8   themselves.

9        However, instead of sending these suicidal people

10  cyanide, the defendant sent them Epsom salts.  In my

11  August 24, 2017, order I described the scheme as perhaps

12  the perfect crime.  The suicidal people might well

13  decide not to take the supposed cyanide and they, of

14  course, would never know whether it worked, whether it

15  was real.

16       For those who actually took the supposed cyanide and

17  did not die, like Mr. Denton, it would seem that they

18  could hardly rightfully complain if they were still

19  alive.  And, as the trial witnesses testified, the

20  defendant's scheme actually did work garnering him a

21  little over $2,500.

22       Then came Andrew Denton of Hull, England.  During

23  the defendant's trial Gail Coates, the -- Mr. Denton's

24  very admirable niece, testified.  Ms. Coates described

25  the awful problems with depression that her uncle,

1    Andrew Denton, suffered from.  In fact, Mr. Denton had,

2    as he himself said in his e-mails to the defendant,

3    previously tried to commit suicide unsuccessfully.

4        In June 2012 Mr. Denton's life went into a tailspin

5    when his long-term girlfriend died and he began

6    persistently threatening to kill himself thereafter.

7        On November 11, 2012, Mr. Denton sent Mr. Kilmartin

8    -- oh, Mr. Denton sent the defendant $249.01 for

9    cyanide, and, consistent with his prior practice, on

10   November 16, 2012, the defendant sent Mr. Denton a

11   packet of Epsom salts.

12       Mr. Denton was determined.  He actually rented a

13   hotel room in England on December 6, 2012, and he

14   attempted suicide by ingesting the packet of Epsom

15   salts.  Of course he did not die, and when he awoke he

16   was angry and distraught.

17       His niece visited Mr. Denton after this incident and

18   found him extremely upset, crying, and angry, and he

19   told her he was going to contact the FBI, and he did.

20       On December 7, 2012, Mr. Denton filed a complaint

21   with the FBI under the IC3 internet complaint site.  He

22   told the FBI that he had ordered cyanide from Sidney

23   Kilmartin and he did not get the cyanide.  He said as

24   follows:  "Due to the nature of what he is selling, or

25   says he is, people will be reluctant to complain to the

1    authorities.  Me, I don't like getting ripped off, hence

2    my complaint to you.  I just want what I paid for or my

3    money back."

4        Mr. Denton also complained to the defendant.  The

5    defendant e-mailed back telling Mr. Denton that this was

6    his first complaint and they both got ripped off by a

7    "clever duplicate".

8        On December 9, 2012, Mr. Denton told the defendant

9    that he had "set things in motion" but after the

10   defendant had responded he had tried to stop things and

11   had added to his complaint that the matter had been

12   resolved.

13       The defendant responded by asking Mr. Denton what he

14   did by setting things in motion, and the defendant and

15   Mr. Denton then went back and forth about how

16   effectively to use cyanide to commit suicide.

17       The defendant e-mailed Mr. Denton on December 10,

18   2012, asking exactly what he had done in the hotel room,

19   and Mr. Denton told the defendant about the IC3

20   complaint, and that it could not be canceled, and that

21   he had told the FBI he wanted to withdraw it.

22       Within an hour the defendant then e-mailed Mr.

23   Denton and told him the package would be in the mail in

24   the morning.  He advised Mr. Denton to put a do not

25   resuscitate sign on his chest.  Whether this com -- this

1    comment was in response to a suggestion to this effect

2    from Mr. Denton or a new suggestion from the defendant

3    is in dispute and does not really matter.  What matters

4    is that the defendant was encouraging Mr. Denton to put

5    a do not resuscitate sign on his chest to alert people

6    not to try and revive him because it shows that the

7    defendant clearly knew what was going to happen with the

8    cyanide once he put it in the mail.

9         On December 15, 2012, the defendant e-mailed Mr.

10   Denton and said he was "deleting the website" and as the

11   defendant had won his court case -- and this is the

12   Preparation H court case -- Mr. Denton would be quote --

13   would "be on your own on this one".

14        On December 20, 2012, the defendant e-mailed Mr.

15   Denton and asked the following:  "Is there any way I can

16   get you to do something with your hard drive before your

17   event?  With the FBI aware of my goings on, the last

18   thing I need is to give them more fodder as you and I

19   have had extensive conversations.  Can you give it to a

20   friend or even discard it?  You have me worried now.

21   Get back to me.  Sid."

22        As we know, the defendant actually e-mailed real

23   cyanide to Mr. Denton on December 11, 2012, and on

24   December 31, 2012, Mr. Denton's niece discovered his

25   body in the residence in -- in his residence in Hull,

1    England.

2        The Government provided expert testimony that

3    established that Mr. Denton had died from ingesting the

4    cyanide.

5        In addition to these underlying facts, the Court

6    will consider what happened in the defendant's case.  It

7    is -- it is a little bit complicated.  On October 3,

8    2016, just before trial, the defendant pleaded guilty to

9    Counts 2 through 4, 6, 8 through 11, and 13.  Then after

10   a six-day trial on October 11, 2016, the jury found the

11   defendant guilty of Counts 1, 5, 7, 12 and 14.  The jury

12   found the defendant not guilty of Count 15.  These

13   guilty pleas and verdicts and the not guilty verdict

14   take a little bit of explaining.

15       In the second superseding indictment dated December

16   9, 2015, charged 15 counts.  Count 1 was mailing

17   injurious articles resulting in death.  Counts 2 through

18   8 wire fraud, nine through 13 mail fraud, 14 witness

19   tampering, and 15 witness retaliation.

20       The nine crimes to which the defendant pleaded

21   guilty on October 3, 2016, were wire and mail fraud

22   crimes involving victims other than Andrew Denton, and

23   the prosecution version which is at ECF No. 657 reflects

24   that the defendant admitted that on -- the following:

25   That in September 2016 he posed as a goldsmith business

1    and used his account to order cyanide from Fisher

2    Scientific; that from September 2012 to May of 2013 he

3    communicated with people throughout the world that he

4    agreed to sell them cyanide; that he received payments

5    from these people through Pen Pal and Western Union; and

6    that four of these customers kept the substance the

7    defendant sent them and it turned out to be Epsom salt

8    and not cyanide; and the scheme involved victims Walter

9    Cottle, Stacey Williams, Derek Jorgensen, Autumn Roland,

10   Cynthia Kirschling, and others.

11       On October 11, 2016, the jury convicted the

12   defendant of five crimes involving Andrew Denton and

13   found him not guilty of one crime involving Mr. Denton.

14       Count 1 was knowingly depositing potassium cyanide

15   in the mail which resulted in Mr. Denton's death.

16       Counts 5 and 7 were wired fraud.  The defendant had

17   e-mailed Mr. Denton about buying cyanide and had not

18   sent Mr. Denton real cyanide, as we just heard, and that

19   Mr. Denton had sent him $249.01 via Western Union.

20       Count 12 was mail fraud.  He had sent Mr. Denton

21   Epsom salt -- the defendant sent Mr. Denton Epsom salts

22   on November 16, 2012, representing them to be cyanide.

23       And then Count 14, which I have discussed, is the

24   witness tampering count, and that alleged that the

25   defendant killed Mr. Denton knowingly and with intent to

1  prevent his attendance and testimony at an official

2  proceeding and to prevent Mr. Denton from communicating

3  with the federal law enforcement officer regarding the

4  commission of a federal offense, namely the wire and

5  mail fraud charges.

6      The jury found the defendant not guilty of Count 15

7  which is witness retaliation.  In other words, the

8  defendant -- the jury found the defendant not guilty of

9  killing Mr. Denton in order to retaliate against him for

10  his past report to the federal law enforcement.

11      The need to protect the public is something I will

12  discuss in a moment, but it seems clear the defendant

13  has committed one crime of extreme personal violence in

14  2007, the violent beating of this elderly sleeping man,

15  and this elaborate fraudulent scheme in 2012 resulting

16  in the death of a suicidal man in Hull, England, and the

17  need to protect the public from future crimes of this

18  sort, of which the defendant is obviously capable, is

19  obvious.

20      The way I have analyzed this is to separate out

21  these two offenses.  One of the things I am required to

22  do is consider, under 3553(a), the nature and

23  circumstances of the offenses and the history and

24  characteristics of the defendant.

25      I will also indicate that -- that the defendant has

1    requested that I give a downward departure under Section

2    5H1.3 of the guidelines for mental and emotional

3    conditions.  That provides that mental and emotional

4    conditions may be relevant in determining whether a

5    departure of warrant -- is warranted if such conditions

6    individually are -- in combination with other offender

7    characteristics are present to an unusual degree and

8    distinguish the case from the typical case covered by

9    the guidelines.

10       In 2010 the sentencing commission amended the

11   guidelines to make mental and emotional conditions a

12   potentially relevant factor if present to an unusual

13   degree and if they distinguish the case from the typical

14   case.

15       The defendant bears the burden of establishing his

16   entitlement to a downward departure under 5H1.3, and the

17   mental condition must have contributed to the commission

18   of the crime.  I will discuss the defendant's mental

19   condition in just a second.

20       In my analysis of the 3553(a) factors, I do conclude

21   that the defendant has a mental condition and -- but I

22   believe that the issue is better addressed under 3553(a)

23   because that part of the analysis will allow a broader

24   assessment of the defendant's entire history and

25   characteristics rather than isolating his mental

1    condition.  And, as the defendant has suggested, the

2    Court has the ability to include the defendant's mental

3    health in its 3553(a) analysis, and I will do so.

4        I will turn back to these two different types of

5    offenses.  They are distinct but interrelated.  One is

6    the Epsom salt fraud and then the other is the cyanide

7    crimes involving Mr. Denton leading to his death.

8        The Epsom salt frauds bear a number of similarities

9    to other types of fraud that the Court routinely sees.

10   The essence of the defendant's fraud was that he

11   promised to sell his customers a more expensive thing

12   but actually sold them something else that was cheaper,

13   and if the defendant -- this is similar to if the

14   defendant had promised to sell a fancy expensive baking

15   flour and sent Epsom salts instead.  Frauds with this

16   modus operandi are not uncommon and they merit

17   punishment for retribution purposes and deterrence.

18       There are, however, a number of factors that

19   separate out the defendant's Epsom salt frauds and make

20   them more egregious than the common fraud.  The first is

21   this highly unusual context, and what I am referring to

22   is that the defendant's chosen victims were all

23   suicidal.  The defendant's fraud uniquely focused

24   exclusively on people who are or were considering

25   suicide.  And it was even a smaller subgroup, people

1    serious enough about suicide to actually order what they

2    thought was cyanide.

3        The defendant has received a vulnerable victim

4    enhancement under the guidelines, and he richly deserves

5    it; but this two level enhancement understates the

6    seriousness of the crime, that it took advantage of

7    people whose mental state was so fragile and

8    destructive.

9        Second, the internet context I have considered.  The

10   Internet has obviously expanded the ability for people

11   who are unscrupulous to take advantage of others.  This

12   crime, because he went on the Internet, had an extremely

13   broad reach.  You already heard about Andrew Denton in

14   Hull England.  Walter Cottle who testified came from

15   Florida.  Stacey Williams from Cali -- Colorado.

16   Cynthia Kirschling lived in California at the time of

17   the incident.  Autumn Roland in Florida.  Edith May

18   Collins' granddaughter was a victim and she lived in

19   Nevada.  And then Derek Jorgensen curiously enough, one

20   of the other victims, also resided in Hull, England.  So

21   the scope of the defendant's use of the Internet and

22   trolling for suicidal people because of the Internet is

23   a factor I have considered.

24       I have also considered the anonymity of the

25   Internet.  The defendant was known only as

skipton@gmail.  The victims did not have to speak to
him, see his handwriting, even really know who he was in
order for the defendant to carry out the fraud.

I have considered the time period of the fraud.  The
prosecution version describes the time period as between
April 2012 and May of 2013.  Payments were received from
October 2012 to May of 2013, and this leads me to two
points.  This long period of time was plenty of time for
the defendant to reflect, to reconsider, and stop; but
he did not.

The defendant mailed Epsom salts to Cynthia
Kirschling on January 31, 2013, after Andrew Denton had
actually committed suicide.  It is not entirely clear
whether the defendant learned that Mr. Denton had killed
himself, but still it is notable that -- that the
defendant did not stop his fraud after his interchange
with Mr. Denton.

I have wondered about his motive.  I take as a
matter of course that one of his motives was money.  He
managed to obtain about $2,732 for selling small packets
of Epsom salts at 150 to $250 a mailing.  But the
defendant told Dr. Voss that he really did not need the
money, so it is something of a mystery.

There may have been an element of seeing whether he
could actually pull off the fraud.  Dr. Voss mentions

 1   the defendant has patterns of grandiose -- of a
 2   grandiose nature which would seem consistent with this
 3   motive.  The defendant was occasionally abrupt and
 4   impatient, even rude with his victims.  He would -- an
 5   inquiry would come in and he would respond he would say
 6   get back to me.  He got in a rather disturbing
 7   discussion with Autumn Roland in which he called her
 8   names.  And perhaps the defendant enjoyed exercising
 9   some authority and power online that he didn't have in
10   his real life, but it is really difficult for the Court
11   to draw any definitive conclusions about the defendant's
12   motive.
13       Dr. Voss asked the defendant directly why he sent
14   Epsom salts to these victims and the defendant,
15   according to Dr. Voss's report, "could not give a clear
16   answer".
17       It would be helpful for sentencing purposes if I
18   could figure out what caused the defendant to do these
19   crimes because it would then be clearer what risk he
20   presents to the public; but I have basically concluded
21   that it is unknowable, and it is -- it -- perhaps the
22   defendant himself does not know why he did all of this.
23       The overriding point, however, is that the defendant
24   sought out and cheated extraordinarily vulnerable people
25   in a fairly elaborate scheme which he himself concocted

1    and then perpetrated.

2        The defendant's cyanide dealings with Andrew Denton

3    are of a completely different order of magnitude.  The

4    initial Epsom salt fraud with Mr. Denton followed the

5    same pattern as other Epsom salt frauds.  However, once

6    Mr. Denton complained to the defendant, and the

7    defendant learned that Mr. Denton had complained to the

8    FBI, the defendant then consciously and deliberately

9    sent a man he knew, one, had previously tried to kill

10   himself with Epsom salts that the defendant had

11   previously sent; two, was angry with the defendant that

12   he had been cheated; three, was angry enough to file a

13   report with the FBI; four, when the defendant mailed

14   actual cyanide to Mr. Denton the defendant, in my view,

15   had every reason to believe that Mr. Denton would use it

16   to kill himself, and he did.

17       On the Denton cyanide crimes, as I have pointed out,

18   the jury found beyond a reasonable doubt that the

19   defendant knowingly deposited potassium cyanide into the

20   mail and it resulted in Mr. Denton's death, and that the

21   defendant killed Mr. Denton in order to prevent him from

22   acting as a source of information to law enforcement.

23   So the jury verdict tells us what the defendant did and

24   why he did it.

25       What the verdict doesn't really tell us, and is

1   still something of a mystery, is why the defendant would

2   have gone so far as to effectively kill Andrew Denton.

3   Again, this may simply be unknowable, but the

4   defendant's history of psychiatric problems and his

5   dread of returning to Riverview may well have played a

6   role.

7       Dr. Voss explained -- or examined the defendant in

8   June of 2008 after the defendant had brutally assaulted

9   this 85 or 86-year-old sleeping man, and in 2008 the

10  defendant was found not criminally responsible for the

11  assault and was sent to Riverview hospital for

12  two-and-a-half years.

13      Dr. Voss examined the defendant again in 2015 and he

14  told -- and the defendant told Dr. Voss that his

15  experience at Riverview was extremely difficult.  The

16  defendant told the doctor that he was assaulted, he was

17  surrounded by mentally ill people, by corrections

18  officers, and Dr. Voss concluded that the defendant was

19  extremely afraid of Riverview and he actually dreaded

20  returning there.

21      It is also important to note that in 2012-2013 the

22  defendant had managed to free himself from Riverview.

23  Although his release status was tenuous, he was very

24  hopeful even desperate to be released from his not

25  criminally responsible status.

1        This played out in this weird business involving the

2    shoplifting of the Preparation H.  The incident took

3    place in May of 2012, and the local district attorney

4    seemed set upon proceeding with it and actually brought

5    a charge on May 9, 2012.

6        Although it is disputed, it seems to me logical to

7    infer that the defendant was involved in getting his

8    brother-in-law John Henry Ruminski to take

9    responsibility for the crime in letters dated May 7,

10   2012, and July 2012 despite the fact the clerk at the

11   Dollar Store positively identified the defendant.

12       But on December 6, 2012, the defendant got very good

13   news that the district attorney had decided to file the

14   charge for the payment of restitution and a charitable

15   donation.  But it -- it seems logical that this

16   shoplifting incident revealed something about the state

17   of the defendant's mind and the lengths he was willing

18   to go, or have others go for him, in order to avoid

19   being sent back to Riverview.  Because if he had been

20   found guilty of the crime, he was probably going to head

21   right back to Riverview, a place he was afraid of and

22   detested.

23       So, I conclude the defendant was acting rationally

24   when he perpetrated all of these crimes, but his

25   long-standing mental health issues did contribute both

1  to the fraud crimes and to his killing of Andrew Denton.

2      At least on this point it is a mixed result because

3  the defendant's mental health history, which would be a

4  reason under 5H1.3 not to punish as severely, also

5  raises concerns about his continued danger to the public

6  upon his release.

7      I will say that what has struck me about this case

8  from the very outset is why the defendant got cyanide to

9  begin with.  Because when you think about the Epsom salt

10  fraud, there is no need to have cyanide in order to pull

11  off the Epsom salt scheme.

12      If someone, for example, develops a scheme to sell

13  fake Picasso paintings as real, the con artist does not

14  have to have the real Picasso just in case.  It may be

15  that the defendant bought the cyanide as a failsafe to

16  do what he did to Andrew Denton if someone complained.

17  It may be he bought the cyanide to sell, actually sell,

18  but then realized, after he got the cyanide, he could

19  sell Epsom salts instead and make the same money and

20  minimize the risk.  It may be that he bought the cyanide

21  to kill himself and then thought the better of it.

22      Whatever the defendant's thought sequence, by

23  December 2012 he was ready and did send enough cyanide

24  to Andrew Denton for Denton to take his life.

25      I am also not entirely convinced that it matters a

1   great deal toward sentencing what exactly his mental

2   state was in December of 2012.  It is clear he has an

3   underlying mental condition.  Was he in an actual manic

4   episode in December of 2012?  Had he returned to his

5   baseline?  These are, I think, virtually unknowable, and

6   I am not sure it makes a great difference in terms of

7   sentencing; although, the lawyers have argued about it.

8       I do think in an -- even in a period of relativism

9   there must be some lines, and this is clearly one of

10  them.  Society just can't allow people to give a loaded

11  gun to a person who wants to shoot himself.  They --

12  society can't allow people to yell jump to a woman

13  standing on the edge of a skyscraper.  And clearly you

14  can't sell cyanide to someone who is profoundly

15  depressed and suicidal.  And -- and particularly you

16  don't sell cyanide to someone who is profoundly

17  depressed and suicidal in order to prevent his going to

18  the police and complain about you.

19      So I have considered all of these factors in terms

20  of the nature and circumstances of the offense, the need

21  to protect the public from future crimes of the

22  defendant, and the history and characteristics of the

23  defendant in trying to arrive at the correct sentence to

24  impose on this case.

25      I have some final thoughts.  There are some crimes

1    that come before the Court that are victimless crimes,

2    or apparently victimless crimes.  If someone has a drug

3    addiction and has enough drugs onboard, or on their

4    person, to traffic in them, it is at least arguably a

5    victimless crime, for example.

6         But this is, by any account, a crime with victims,

7    and the victims that the defendant first defrauded were

8    extraordinarily vulnerable people.  By very definition

9    someone who is going on a website to seek out a way to

10   kill themselves is -- those people are tragically

11   vulnerable.  And we -- we saw them testify during the

12   course of trial, and some of their testimony was really

13   heartrending.  The second victim, of course, is Andrew

14   Denton, and Andrew Denton is dead.

15        So I have to consider that this -- this -- these

16   crimes, this whole series of crimes, were crimes that

17   had victims and, in fact, one of them was killed.

18        The second consideration is the mental health

19   consideration.  Even if the Court is sympathetic -- and

20   I have sympathy for anyone who suffers from mental

21   illness, including the defendant.  But I also have to

22   balance that with the need to protect the public, and I

23   still worry that the defendant presents a danger to the

24   public.

25        We have evidence that in psychotic states he set

1   himself upon a elderly sleeping man and broke his jaw.

2   And we know now, by virtue of the guilty verdict, that

3   he ended up killing a highly depressed person in

4   England.

5       I also think of the defendant as being intelligent,

6   and I think he is calculating, so I -- I am considering

7   the need to protect the public in fashioning my

8   sentence.

9       With those things said, I have a couple of things

10  that trouble me about imposing the sentence that's being

11  recommended by the Government which is a life sentence.

12  I do think that -- that Mr. Merrill makes a good point

13  in distinguishing this case between a flat out

14  premeditated murder.  This was different.  It is -- it

15  is not altogether different, but it is slightly

16  different.

17      The murder of Andrew Denton was not directly by the

18  defendant's hand, and I do think that there should be a

19  difference in sentencing between someone who hands a gun

20  to a suicidal person and someone who stands back, takes

21  the gun, aims it at the person, loads the gun, and

22  shoots him dead.  And the life sentence contemplates

23  first degree murder.  And that's close to what happened

24  here, but it is not quite what happened here.  So I am

25  taking that into consideration.

1     I am also taking into consideration the impact of a
2  life sentence both on the defendant and on the prison
3  system.  I have been a judge now for 15 years.  I have
4  imposed one life sentence, it was a mandatory life
5  sentence.  I have imposed what I think are -- would be
6  considered the equivalent of life sentences on a -- just
7  a handful of cases, but they were unusual cases mostly
8  involving child predators.  But I view the -- the
9  imposition of a life sentence as, first, having a
10 profound impact on the defendant because the defendant
11 then lives without any hope, and I -- I think it is a --
12 that's quite a sentence to impose upon someone.
13    I also think that it imposes an enormous burden on
14 the prison system as a whole to have someone -- not
15 someone who is 55 years old but someone who may be 95
16 years old lying in what amounts to a nursing home but in
17 a federal prison.
18    So I have to look not just at Mr. Kilmartin as he is
19 today but what he might be 10, 20, 30 years from now
20 lying in a bed, and I -- I wonder about imposing that
21 kind of sentence for this kind of case because 30 years
22 from now, or 40 years from now, whatever might be said
23 about Mr. Kilmartin he would probably be no realistic
24 threat and all that would remain is retribution.
25    I am not saying that life sentences should never be

1    appropriate, but I think they should be extremely rare.

2        At the same time I -- I view this series of crimes

3    as among the most heinous that have come before me, and

4    I think the sentence has to reflect the seriousness of

5    this crime and the need to protect the public.

6        Mr. Kilmartin's actions were not merely illegal,

7    they were perpetrated in a moral black hole.  It is just

8    an unmanageable amoral black well that these actions

9    took place in.  Focusing on people who exclusively were

10   suicidal and then actually killing someone by sending

11   them cyanide through the mail is just a appalling moral

12   vacuum, and it strikes me as meriting a -- a very severe

13   sentence, and I will impose a severe one.

14       What I am going to do is as follows:  I am going to

15   order restitution.  Restitution, among all the issues

16   here, is the least.  It is in the amount of $1,041.55,

17   and it basically compensates the individuals who have

18   been defrauded.

19       I am going to impose a special assessment of $1,400.

20   That's basically a hundred dollars for each of the

21   counts for which the defendant was convicted.

22       I am not going to impose a life sentence.  I will

23   impose a long sentence, but it means that I will impose

24   a period of supervised release.  That period of

25   supervised release will be five years.  I am actually

1   limited under the statute to five years as a combination

2   of the provisions of the law under which he was

3   convicted.

4       I am not going to impose a fine.  The defendant is

5   going to be in jail for a long time.  He is going to

6   have to pay restitution.  He is going to have to pay a

7   special assessment.  And I don't think he is going to be

8   capable of paying a fine.

9       I have thought a lot about the sentence I should

10   impose, and what I have decided to do is impose a

11   sentence of a total of 300 months which is 25 years

12   imprisonment.

13       The defendant will stand for the imposition of

14   sentence.  The defendant is hereby committed to the

15   custody of the United States Bureau of Prisons to be

16   imprisoned for a total term of 300 months on Counts 1

17   and 14.  I am not sure of the -- I will have to look for

18   a moment on -- and maximum for Counts 2 through 13 is 20

19   years, so that would be 240 months, and 240 months on

20   Counts 2 through 13 to be served concurrently.

21       The defendant is to be remanded to the custody of

22   the United States Marshal.

23       The Court does recommend the defendant be allowed to

24   participate in the 500-hour drug treatment program, if

25   available.

1          I gathered from what Mr. Kilmartin said that he

2     would like a recommendation to a federal correctional

3     institution in Pennsylvania; is that correct?

4               (Counsel conferred with defendant.)

5               THE DEFENDANT:  It don't matter.  Send me to

6     Colorado, Your Honor, okay?

7               MR. MERRILL:  He had originally said

8     Pennsylvania, Your Honor.

9               THE COURT:  All right.

10              MR. MERRILL:  Thank you.

11              THE COURT:  The defendant is -- the Court

12    recommends to the Bureau of Prisons that the defendant

13    be allowed to serve his sentence at a federal

14    correctional institution in the Commonwealth of

15    Pennsylvania.

16         Upon release from imprisonment, the defendant shall

17    be on supervised release for a term of five years on

18    Counts 1 and 14 and three years on Counts 2 through 13

19    to be served concurrently.

20         The Court imposes the following conditions on the

21    defendant:  One, you must not commit another federal,

22    state or local crime.

23         Two, you must not unlawfully possess a controlled

24    substance.

25         Three, you must refrain from any unlawful use of a

1    controlled substance.  You must submit to one test

2    within 15 days of placement on supervised release and at

3    least two additional drug tests during the period of

4    supervised release, but not more than 120 drug tests per

5    year thereafter as directed by the supervising officer.

6        Four, you must make restitution in accordance with

7    18 U.S.C. Section 3663 and 3663A or any other statute

8    authorizing a sentence of restitution.

9        Five, you must cooperate in the collection of DNA as

10   directed by the probation officer.

11       You shall comply with the standard conditions that

12   have been adopted by this Court as well as any other

13   conditions.

14       The Court imposes the following special conditions:

15   The defendant shall supply the supervising officer any

16   requested financial information.

17       Two, the defendant shall report to the supervising

18   officer any financial gains including income tax

19   refunds, lottery winnings, inheritances, and judgments,

20   whether expected or unexpected.  The defendant shall

21   apply them to any outstanding court-ordered financial

22   obligations.

23       Three, the defendant shall not incur new credit

24   charges or open additional lines of credit without the

25   supervising officer 's advance approval.

1        The defendant shall participate in mental health
2   treatment as directed by the supervising officer until
3   released from the program by the supervising officer.
4        The defendant shall pay or co-pay for services
5   during such treatment to the supervising officer's
6   satisfaction.
7        The defendant shall participate in mental health
8   treatment as directed by the supervising officer until
9   released from the program by the supervising officer.
10  The defendant shall pay or co-pay for services during
11  such treatment to the supervising officer's
12  satisfaction.
13       The defendant shall comply with the medication
14  program prescribed by a licensed medical practitioner.
15       The defendant shall not use or possess any
16  controlled substance, alcohol, or other intoxicant, and
17  shall participate in a program of drug and alcohol abuse
18  therapy to the supervising officer's satisfaction.  This
19  shall include testing to determine if the defendant has
20  used drugs or intoxicants.  The defendant shall pay or
21  co-pay for services during such treatment to the
22  supervising officer's satisfaction.  The defendant shall
23  not obstruct or tamper or try to obstruct or tamper in
24  any way with any tests.
25       The defendant shall inform any prescribing medical

1    practitioner that he has a history involving the illegal

2    diversion of narcotic medication and shall provide the

3    supervising officer with written proof of such notice.

4        The defendant shall participate and comply with the

5    requirements of the computer and internet monitoring

6    program which may include partial or full restriction of

7    any computers, Internet, intranet, and/or

8    Internet-capable devices, and shall pay for services

9    directly to the monitoring company.

10        The Defendant shall submit to periodic or random

11    unannounced searches of his computers, storage media,

12    and/or other electronic or internet-capable devices

13    performed by the probation officer.  This may include

14    the retrieval and copying of any prohibited data or, if

15    warranted, the removal of such systems for the purpose

16    of conducting a more comprehensive search.

17        The Court imposes a $100 special assessment on each

18    of the 14 counts on which he was convicted for a total

19    of $1,400.

20        The Court imposes restitution in the amount of

21    $242.54 on Count 3, $250 on Count 4, $150 on Count 6,

22    $249.01 on Count 7, $150 on Count 8, for a total of

23    $1,041.55.

24        The Court finds the defendant does not have the

25    ability to pay a fine, the Court will waive the fine in

1    this case.

2        The defendant shall make restitution to the

3    following payees.  Each payee shall receive an

4    approximately proportional payment.  W.C. $242.54, S.W.

5    $250, E.J. $150, A.D. four -- $249.01, and C.K. $150.

6        The Court finds the defendant does not have the

7    ability to pay interest and as ordered the interest

8    requirement is waived.

9        Payment shall be applied first to the assessment

10   and, two, to the restitution.

11       Payment of the total fine and other criminal

12   monetary penalties shall be due in full immediately.

13   Any amount the defendant is unable to pay now is due and

14   payable during the term of incarceration.  Upon release

15   from incarceration, any remaining balance shall be paid

16   in monthly installments to be initially determined in

17   amount by the supervising officer.  Said payments are to

18   be made during the period of supervised release subject

19   always to review by the sentencing judge on the request

20   by either the defendant or the Government.

21       Is there any objection to the terms of supervised

22   release on the part of the Government?

23           MR. FRANK:  No, Your Honor.

24           THE COURT:  On the part of the defendant?

25           MR. MERRILL:  No, Your Honor.

 1          THE COURT:  Mr. Kilmartin, I must advise you,

 2    you have a right to appeal the sentence and conviction

 3    if you wish to do so.  In order to effectively exercise

 4    that right of appeal, you must cause to be filed with

 5    the clerk of this court within 14 days of today, and not

 6    thereafter, a written notice of appeal.  Do you

 7    understand?

 8          THE DEFENDANT:  Yes, I do.

 9          THE COURT:  I advise you if you fail to timely

10    file the written notice of appeal, you will have given

11    up your right to appeal this sentence and conviction; do

12    you understand?

13          THE DEFENDANT:  Yes, I do.

14          THE COURT:  If you cannot afford to file the

15    appeal, you can appeal without cost to you, and on your

16    request the clerk will immediately prepare and file a

17    notice of appeal on your behalf; do you understand?

18          THE DEFENDANT:  Yes, I do.

19          THE COURT:  Is there anything further to come

20    before the Court at this time from the Government?

21          MR. FRANK:  Your Honor, does the Court require

22    anything further from the parties regarding the sealing

23    of the Grand Jury material in this case?  I am not

24    exactly sure where that stands, and maybe that's more

25    involved than we can take up now but.

1           THE COURT:  Yeah, I think it is more involved.

2           MR. FRANK:  I know we have had a lot of --

3           THE COURT:  Discussions about sealing.

4           MR. FRANK:  -- discussion and argument about

5      sealing, but I think -- I don't remember exactly where

6      that stands.

7           THE COURT:  I don't -- is it -- is it current --

8      I don't really remember, is it currently sealed?

9           MR. FRANK:  I think it is.  I think the thought

10     was that we might revisit it at the end of the case to

11     see where things stood in terms of the various

12     considerations.  I believe it -- I believe that it

13     largely stands sealed, and that's my recollection.

14          THE COURT:  Mr. Merrill?

15          MR. MERRILL:  My recollection as well, Your

16     Honor.

17          THE COURT:  Grand Jury information is a little

18     different than other types of documents.  Why don't you

19     consult with the clerk's office and file something about

20     the sealing in light of Kravetz and the other orders I

21     have issued, and I would invite Mr. Merrill to respond.

22     All right.

23        Is there anything further from the Government?

24          MR. FRANK:  No, Your Honor.

25          THE COURT:  Is there anything further from the

231

```
 1   defendant?
 2           MR. MERRILL:  No, Your Honor.
 3           THE COURT:  The defendant is herewith remanded
 4   to the custody of the United States Marshal for the
 5   execution of sentence imposed.
 6        Good luck, Mr. Kilmartin.
 7        The Court will stand in recess.
 8                  (TIME NOTED:  1:00 p.m.)
 9
10        _____
11
12               C E R T I F I C A T I O N
13        I, Tammy L. Martell, Registered Professional
14   Reporter, Certified Realtime Reporter, and Official
15   Court Reporter for the United States District Court,
16   District of Maine, certify that the foregoing is a
17   correct transcript from the record of proceedings in the
18   above-entitled matter.
19        Dated:  January 30, 2019
20               /s/ Tammy L. Martell
21               Official Court Reporter
22
23
24
25
```