UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

———————————————————

UNITED STATES OF AMERICA,        CRIMINAL ACTION

            Plaintiff              Docket No:

                                   1:14-cr-129-JAW


            -versus-


SIDNEY KILMARTIN,

                Defendant

———————————————————

Transcript of Proceedings


Pursuant to notice, the above-entitled matter came on for **Sentencing** held before **THE HONORABLE JOHN A. WOODCOCK, JR.,** United States District Court Judge, in the United States District Court, Edward T. Gignoux Courthouse, 156 Federal Street, Portland, Maine, on the 27th day of April, 2018, at 1:15 p.m. as follows:


Appearances:

For the Government:   Halsey B. Frank, Esquire
                      Assistant United States Attorney

For the Defendant:  Bruce Merrill, Esquire


Tammy L. Martell, RPR, CRR
Official Court Reporter

(Prepared from manual stenography and
computer aided transcription)

1              (Open court.  Defendant present.)

2          MR. FRANK:  Good afternoon, Your Honor.

3          THE COURT:  All right.  We're here in the matter

4   of the United States versus Sidney P. Kilmartin which is

5   14-CR-129-JAW.  Would counsel please enter their

6   appearances.

7          MR. FRANK:  Halsey Frank for the United States.

8   Good afternoon, Your Honor.

9          THE COURT:  Good afternoon.

10         MR. MERRILL:  Good afternoon, Your Honor, Bruce

11  Merrill on behalf of Mr. Kilmartin.

12         THE COURT:  Good afternoon.  Mr. Frank, have you

13  provided reasonable, accurate, and timely notice of this

14  proceeding to any victims?

15         MR. FRANK:  Yes, Your Honor, we have.

16         THE COURT:  Mr. Kilmartin, would you stand, sir.

17  Mr. Kilmartin, the purpose of the hearing this afternoon

18  is for me to sentence you.  Before I do that, I am going

19  to hear from your lawyer, and I will hear from the

20  prosecutor, and I will hear from you if you wish to

21  speak to me.

22      I am going to start by asking you some questions

23  because I want to be sure you are competent, and then I

24  am going to review with you certain portions of the

25  presentence investigation report.

1          Your name is Sidney Kilmartin; is that correct, sir?

2               THE DEFENDANT:  Yes, Your Honor.

3               THE COURT:  Mr. Kilmartin, I understand you

4     graduated from Cheverus High School; is that right?

5               THE DEFENDANT:  Yes, Your Honor.

6               THE COURT:  And you had some further education

7     at the University of Southern Maine?

8               THE DEFENDANT:  Very little, Your Honor.

9               THE COURT:  Mr. Kilmartin, have you used any

10    drugs or alcohol in the last 24 hours?

11              THE DEFENDANT:  No, I haven't, Your Honor.  Just

12    medication.

13              THE COURT:  Okay.  And have you taken the

14    prescribed medications that you have been taking in

15    their regular doses over the last 24 hours?

16              THE DEFENDANT:  I actually they -- they skipped

17    me this morning.  They forgot all about them and -- and

18    sent me here without them, so.

19              THE COURT:  Oh, okay, I'm sorry to hear that.

20              THE DEFENDANT:  I will be all right.

21              THE COURT:  So -- well, let me ask you how many

22    medicines are you on?

23              THE DEFENDANT:  Five.

24              THE COURT:  And do you know the names of those

25    medicines?

1          THE DEFENDANT:  I think I can come up with them,

2     Your Honor.  One of them is Lamictal.  One of them is

3     Geodon.  One of them is Bupropion.  One of them is

4     Seroquel.  And they stopped giving me one called

5     Klonopin.

6          THE COURT:  When did they stop that, sir?

7          THE DEFENDANT:  Back in -- when I was arrested

8     when I went to Somerset County.

9          THE COURT:  Oh.  Quite some time ago then?

10          THE DEFENDANT:  Yeah, I am on -- they have got

11     me on a analgesic for my back as well.  It is called

12     Mobic.

13          THE COURT:  So, you haven't taken the Klonopin

14     for quite some time, but the remaining drugs the last

15     time you took them was yesterday?

16          THE DEFENDANT:  Yes, Your Honor, last night.

17          THE COURT:  Oh, last night.  How often do you

18     usually take those drugs?

19          THE DEFENDANT:  Morning and evening.

20          THE COURT:  So you just missed the morning dose?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  Mr. Kilmartin, you -- by my looking

23     at you and talking to you, you seem to be aware of the

24     proceedings; and you have just come up, by your own

25     memory, with the drugs you have been taking.  Do you

1    think that the fact that you did not take these
2    medicines this morning has any impact on your ability to
3    understand these proceedings?
4           THE DEFENDANT:  I should be okay, Your Honor.
5           THE COURT:  All right.  Mr. Merrill, have you
6    had an opportunity to speak to your client today?
7           MR. MERRILL:  I have, Your Honor.
8           THE COURT:  Do you have any concerns about his
9    competence?
10          MR. MERRILL:  No, Your Honor.
11          THE COURT:  Based on my direct observations,
12   your lawyer's responses, and your own responses, Mr.
13   Kilmartin, I do find that you are competent.
14          THE DEFENDANT:  Okay.
15          THE COURT:  Now, Mr. Kilmartin, you are here
16   today represented by your attorney, Mr. Merrill; is that
17   right?
18          THE DEFENDANT:  Yes, Your Honor.
19          THE COURT:  Do you authorize Mr. Merrill to
20   speak for you?
21          THE DEFENDANT:  Yes, I do.
22          THE COURT:  Mr. Merrill, has your client
23   received a copy of the written presentence investigation
24   report?
25          THE DEFENDANT:  He has, Your Honor.

```
 1              THE COURT:  And the copy I have was revised on
 2    October 16, 2017.  Is that the report you have reviewed
 3    with him?
 4              MR. MERRILL:  Yes, Your Honor.
 5              THE COURT:  Mr. Kilmartin, have you read the
 6    report in its entirety?
 7              THE DEFENDANT:  Yes, I have, Your Honor.
 8              THE COURT:  Have you had enough time to discuss
 9    the contents of the report with your attorney?
10              THE DEFENDANT:  Yes, Your Honor.
11              THE COURT:  Do you know and understand
12    everything contained in the report?
13              THE DEFENDANT:  Yes, I do.  I don't agree with
14    it all, but I -- I -- I understand the contents.
15              THE COURT:  Yes.  What I am -- what I am going
16    to do is take you through the report; but in answering
17    the questions you realize, Mr. Kilmartin, that the
18    reason for the report is to give me information so that
19    I can try and determine the correct sentence to impose
20    upon you; you understand that?
21              THE DEFENDANT:  Yes, I do, Your Honor.
22              THE COURT:  And obviously it is very, very
23    important that the report be accurate because it may
24    affect your sentence; you understand that?
25              THE DEFENDANT:  Yes, Your Honor.
```

```
 1              THE COURT:  So the questions I am going to ask
 2     to you are in that context that you need to be sure it
 3     is accurate in order to impose the sentence today, so I
 4     am going to go through the report with you.
 5          Do you have a copy of the report, Mr. Merrill?
 6              MR. MERRILL:  I do, Your Honor.
 7              THE COURT:  And could you show it to your
 8     client?  We're going to go right through it.
 9              MR. MERRILL:  I didn't bring my glasses, Your
10     Honor.  I will do my best.
11              THE COURT:  Okay.  If you have trouble reading
12     it, you can -- you can let us know.  Let me turn to the
13     front page of the report itself.  That just basically
14     indicates the nature of the case and what you were
15     convicted of.  Do you see that, sir?
16              THE DEFENDANT:  Yes, sir.
17              THE COURT:  Now, I am going to turn to the
18     second page and then the third page which has a lot of
19     identifying data.  Does that third page -- is that third
20     page accurate?
21              THE DEFENDANT:  No one calls me Skip, Your
22     Honor.  That was an alias.  That was just something that
23     was -- that was done on the Internet.
24              THE COURT:  Okay.
25              THE DEFENDANT:  That's the only time I have ever
```

1   been known to as Skip.

2          MR. MERRILL:  And I would also note, Your Honor,

3   that he has since been transferred to the Cumberland

4   County Jail, so his residence address is Cumberland

5   County.

6          THE COURT:  Okay, thank you.  Anything else

7   there, sir?

8          THE DEFENDANT:  That's all I see, Your Honor.

9          THE COURT:  Okay.  Then part A describes the

10  offense, and the first part of that is charge and

11  convictions, and paragraphs one through five basically

12  track the history of the case from its very beginning

13  upon your indictment on November 4, 2014, and through

14  the jury verdict.  Is that all accurate?

15         THE DEFENDANT:  Well, Your Honor, I wish we were

16  going to -- I had known we were going to go through this

17  because I haven't read it in a year and I would have

18  been more prepared, and I don't have my glasses.  So

19  last I knew I didn't have much to contradict with this

20  report other than the fact that they compared it to pre

21  -- premeditated murder which wouldn't be further from

22  the truth.

23         THE COURT:  Okay.  Well --

24         MR. MERRILL:  If I can assist the Court for a

25  moment.  We did go through the original report that the

1    Court didn't see, and filed our objections, and those

2    objections are the only exceptions we took to the

3    report, and we have no exceptions to what I will

4    characterize as the procedural history which is

5    paragraphs one through five.

6           THE COURT:  Right.  So, Mr. Kilmartin, just to

7    -- to ease your anxiety -- I am sure it is not the

8    easiest thing to stand there -- but I am not going to

9    ask you about the offense conduct and I am not going to

10   ask you about legal issues.  That's why you have such a

11   fine lawyer.  I am just going to ask you about the

12   facts.

13          THE DEFENDANT:  Okay.

14          THE COURT:  Okay?

15          THE DEFENDANT:  Yep.

16          THE COURT:  And this basically states what

17   happened in your case.  When you were indicted, the fact

18   that you were named then in a subsequent superseding

19   indictment, and that you appeared before me and pleaded

20   not guilty, and then you had the jury trial and you

21   pleaded guilty just before the jury trial on a number of

22   counts.  I don't think -- do you remember reviewing

23   that?

24          THE DEFENDANT:  PSR?

25          THE COURT:  That -- that part of the PSR?

```
 1            THE DEFENDANT:  Oh, yeah, that comes to mind.
 2            THE COURT:  Okay.  And do you have any reason to
 3    believe any of that history that I have just related is
 4    inaccurate?
 5            THE DEFENDANT:  Nothing comes to mind, Your
 6    Honor.
 7            THE COURT:  Okay.  Now, I am going to skip over
 8    the offense conduct.  I want you to know the reason I am
 9    doing that.  You were -- you pleaded guilty to some
10    charges but you also were found guilty of other charges,
11    and you still, even as we're speaking, have a Fifth
12    Amendment right.  So I am not going to ask you about
13    that part of the report.  You understand?
14            THE DEFENDANT:  Yes, I do, Your Honor.
15            THE COURT:  I am going to skip right over it,
16    and I am going to skip over the victim impact and the
17    adjustment for obstruction of justice.  That's a legal
18    issue.  The acceptance of responsibility on page nine I
19    am going to skip over.  And I am going to skip over the
20    offense computations and get all the way to page 13
21    which is your criminal history.
22        Did you have a chance, at some point, to review with
23    Mr. Merrill the criminal history that's set forth in
24    this report?
25            THE DEFENDANT:  Yes, Your Honor, we have
```

1    reviewed the whole thing; but it was just, like I told

2    you, it was months ago.

3          THE COURT:  Right.  Is the -- is the criminal

4    history inaccurate in any way?

5          THE DEFENDANT:  Give me a minute to look at it,

6    and I will.

7          THE COURT:  Sure.

8          THE DEFENDANT:  That looks -- looks correct as

9    far as my recollection, Your Honor.

10          THE COURT:  Okay.  I am going to skip over the

11   criminal history, and I am going to turn on page 18 to

12   what they call offender characteristics, and this talks

13   about you.  Where you were born, who your father and

14   mother have been, your brother, your sisters, your

15   education, your childhood, your marriage to Debby, your

16   children, and it goes through your physical condition,

17   your mental and emotional health.  Basically all of the

18   things that involve you.

19      Do you have anything in the report -- that part of

20   the report you believe is in any way inaccurate?

21          THE DEFENDANT:  Once again, I can't read it,

22   Your Honor.  It is -- going from memory, something would

23   have stood out from earlier when I read it and nothing

24   comes to mind.

25          MR. MERRILL:  And, again, I will indicate, Your

1    Honor, that we did go over all of it and we had no

2    exceptions to the recitation of the family history.

3              THE COURT:  Right.

4              THE DEFENDANT:  Are you still on paragraph 56,

5    Your Honor, or have you gone beyond that?

6              THE COURT:  Oh, no, I am throughout the Part C

7    of the report which runs basically from -- it starts

8    talking about your personal and family data, but there

9    are a number of paragraphs that end up on page --

10             THE DEFENDANT:  That's a lot of ground to cover,

11   Your Honor, for a yes or a no question, especially when

12   I don't have my glasses; but, like I told you, nothing

13   comes to recollection as being inaccurate in my -- my

14   history, if that's what you are talking about.

15             THE COURT:  Yes, that's exactly what I am

16   talking about.  Well, let me -- let me preface this.  I

17   think that you went over -- Mr. Merrill just told me you

18   went over this report a long time ago with him --

19             THE DEFENDANT:  Right.

20             THE COURT:  -- in detail.

21             THE DEFENDANT:  Yeah.

22             THE COURT:  And then the purpose of his meeting

23   with you was to let me know whether there were any

24   issues with the report.

25             THE DEFENDANT:  Okay.

1          THE COURT:  And, as he indicated, he raised some

2     legal issues.  And there are some objections to certain

3     parts of it, but not this part of it.

4          THE DEFENDANT:  All right.

5          THE COURT:  And so assuming that you -- I take

6     it that if you notice something back along that was

7     inaccurate, you would have told him?

8          THE DEFENDANT:  Yeah, we -- there was some

9     inaccuracies, and they have been addressed; but as far

10    as being able to pull them out of a 30 or 40-page

11    document right now as you speak, not having read it for

12    months, I am simply not going to be able to do that

13    without my glasses especially.

14         THE COURT:  Right.  What do you suggest, Mr.

15    Merrill?  Do you want to find some glasses for him or

16    what -- do you have reading glasses, is that --

17         THE DEFENDANT:  Yes, we use 175 reading glasses.

18         MR. MERRILL:  Reading glasses, Your Honor.  Mine

19    didn't help him, Your Honor.

20         THE DEFENDANT:  I can stumble through it, Your

21    Honor, it is just going to take me more time than

22    probably what you would imagine.

23         MR. MERRILL:  If the Court wants to take a

24    break, I will go through it with him; but, again, I will

25    say that any factual inaccuracies in this part have

1    either been corrected between the initial report and the

2    amended report and the legal ones are contained in my

3    objections.

4         THE COURT:  Right.  Right.  Well, it is a -- it

5    is a serious case, Mr. Kilmartin, and -- but I will do

6    really what you want to do in it.  I am going to leave

7    it up to you.  If you think that by reviewing the report

8    you may come up with things I should know that may

9    affect my sentencing, I am glad to give you a moment.  I

10   will go upstairs and you and Mr. Merrill can review the

11   report together.

12        On the other hand, if you are satisfied that the

13   contents of the presentence report, having reviewed them

14   previously with Mr. Merrill, are likely accurate for

15   purposes of sentencing, we can proceed.

16        THE DEFENDANT:  Bruce knows my concerns with the

17   report, so we're on the same page as that.  And if I get

18   the opportunity to bring them up to you, I will.

19        THE COURT:  Okay.  Okay.  Fair enough.  So why

20   don't we proceed then.  Thank you.  You may be seated.

21        Counsel have done an outstanding job in this matter

22   isolating a number of issues for the Court to consider.

23   I very much appreciate the assistance of both the

24   Government attorneys and you, Mr. Merrill; and I have

25   isolated a series of objections which I understand are

1    at issue here concerning the guideline calculations; and

2    then of course, Mr. Merrill, you filed a motion for

3    downward departure and variant sentence which I can

4    address more generally.

5         My understanding of the remaining guideline issues

6    include the following:  One, what crime is the

7    defendant's conduct most analogous to.  The probation

8    office says that it is premeditated murder under Section

9    2A1.1, and the defendant believes it is either voluntary

10   manslaughter under Section 2A1.3 or second degree murder

11   under Section 2A1.2.

12        The second issue, as I understand it, is whether the

13   defendant should receive a two level increase for

14   vulnerable victim under Section 3A1.1.

15        The third is whether the defendant should receive a

16   two level increase for obstruction of justice under

17   Section 3C1.1.

18        And the fourth is whether the defendant should

19   receive acceptance under Section 3E1.1 for the crimes he

20   did plead guilty to.

21        Are those the issues that remain at this time?

22             MR. FRANK:  I believe so, Your Honor.

23             MR. MERRILL:  That's correct, Your Honor.

24             THE COURT:  Mr. Frank, would you like to be

25   heard on the first issue, and that is what crime the

1  defendant's conduct is most analogous to?

2       MR. FRANK:  Yes, Your Honor.  The Government's

3  position, as -- as stated in its filings and -- is in

4  agreement with the presentence report writer.  The

5  Government believes that the most analogous offense here

6  is premeditated murder.  Premeditated, intentional,

7  malicious murder.

8       I think there are a number of facts that support

9  that conclusion.  I mean I think the use of poison alone

10  frankly is -- is a fact that supports all three of those

11  conclusions that this was premeditated, intentional, and

12  malicious.

13       In fact, there was -- there was a time and place

14  when killing someone with poison was a separate category

15  of first degree premeditated murder, and I think I

16  identified that in one of my early filings in this case.

17       But there are many other facts and circumstances,

18  Your Honor, that -- most of which the Government proved

19  to the -- the jury at trial.  Beginning with the

20  evidence proved that Mr. Kilmartin killed Andrew Denton

21  to protect himself from being held responsible for the

22  extensive fraud that he had been committing for months

23  against the people around the country and the world.

24       And it wasn't just anyone, it was particularly --

25  particularly vulnerable people.  People who were

1   particularly vulnerable because they were so depressed

2   they were suicidal and looking for poison to end their

3   lives, all of which he knew.

4       He sought them out deliberately by advertising that

5   he had for sale deadly poison on a website devoted to

6   suicide for purpose -- for people so inclined.

7       He -- I think the Government at trial proved that

8   Mr. Kilmartin -- I think an accurate way to describe it

9   is toyed with these victims.  He pretended to have the

10  poison that they were seeking in order to end their

11  unhappy lives.

12      In fact, he did have deadly poison; but he chose not

13  to provide it to them and instead sent them Epsom salts.

14  And that indicates to me a maliciousness that's pretty

15  extreme.

16      He treated Andrew Denton the same way, and it was

17  only after Denton had -- I don't know what to describe

18  it, but we know what he did.  He -- he complained to

19  legal authorities that he had been defrauded in this --

20  in this unusual way, and he told Mr. Kilmartin that, and

21  Mr. Kilmartin pretends to this day that he was being

22  merciful to some sort of kindred spirit of his.  But

23  that's not what the facts in this case demonstrate, Your

24  Honor.

25      The facts in this case demonstrate that he only

1    killed Andrew Denton in order to protect himself from

2    being held responsible for the fraud he had been

3    committing.

4        It -- it really is remarkably malicious and --

5    malicious of other people and contemptuous of -- of law.

6    It doesn't get much worse than that, and it is fully

7    commensurate and analogous to first degree premeditated

8    murder.  And that's -- that's what's appropriate for

9    purposes of calculating the guidelines, and that's

10   what's appropriate for considering what's punishment

11   under the statutory factors.

12             THE COURT:  All right.  Thank you.  Mr. Merrill.

13             MR. MERRILL:  Your Honor, I couldn't disagree

14   with Mr. Frank more on this point.  We have a statute

15   that's a hundred years old and, as the Court pointed out

16   in the motion -- denying the motion to dismiss, there is

17   a dearth of case law over that hundred year period

18   regarding whether Section 1716(j)(3) is

19   unconstitutionally vague because of its failure to

20   expressly indicate whether it applies to death resulting

21   from assisted suicide.

22       This is kind of a question of whether we can fit

23   these facts into this statute, and throughout the long

24   history of this case the Court has been very cognizant

25   of that issue.  In the order on defendant's motion to

1    dismiss, the Court had indicated that -- and this is in

2    my sentencing memorandum addressing the objections.  The

3    Court was trying to analogize resulted in death to -- to

4    drug cases where a drug dealer sells drugs and the

5    person dies as a result of what they sold them, and the

6    Court gave four reasons why they thought that was

7    analogous.

8         Now, in -- in reading the cases that are out there,

9    one of the things you find out, and you hear it over and

10   over again, and I cite a supreme court case in there,

11   that whether we're talking about murder, second degree

12   murder, or manslaughter, it is the same physical act.

13   The difference is the intent of the perpetrator in

14   committing that physical act.

15        And I -- I submit to you, as I tried to lay out in

16   my motion, when you have somebody's mental state that

17   has been altered, in this case because of mental

18   illness, that impacts what that intent really was.

19        And I believe that if you look at the -- the e-mails

20   that I attached, which are a series of conversations

21   between Mr. Kilmartin and Mr. Denton, you really have

22   two individuals that are struggling with mental illness.

23        I mean there is -- can be no question in this case

24   that Andrew Denton wanted to die.  He had tried multiple

25   occasions to commit suicide.  Some ways that I had never

1   even known about before until I read all the various

2   ways that he tried to commit suicide.  The man was

3   unhappy, and with the loss of his significant other he

4   wasn't interested in being around anymore.

5        Mr. Kilmartin had also had a serious attempt to

6   commit suicide at an earlier point in his life by taking

7   an entire bottle of Zyprexa and washing it down with a

8   pint of antifreeze.  And as Dr. Voss points out he did

9   it in a space by himself where he clearly wasn't looking

10  for help, it wasn't a cry for help, he wanted to die,

11  and even comments that he is lucky that he is alive

12  today.  And except for the hemodialysis that he had to

13  go through, he probably wouldn't be.

14       So we have two individuals that are suffering from a

15  mental illness, and it is not beyond the pale to suggest

16  that in his mind at the time -- and Dr. Voss goes into

17  great detail about how Mr. Kilmartin's mental illness is

18  causing him to decompensate at that time -- that he

19  wasn't thinking correctly, and his perception of reality

20  wasn't correct.  That he thought he was helping

21  Mr. Denton accomplish what he wanted to accomplish for

22  which Mr. Kilmartin could empathize because at a certain

23  point Mr. Kilmartin was planning on committing suicide

24  also because of the Preparation H incident.  And it was

25  only after that matter was resolved with a filing, and

1    that he wasn't going to be returned to Riverview, and he

2    even says to Mr. Denton I won't be joining you on this

3    trip.  And to tie this in to say that it is malicious

4    because of Count 14.

5        In one of the e-mails that I sent to the Court --

6    bear with me for one moment.  It is the -- it is Exhibit

7    No. 10, and it is a copy of the IC3 complaint.

8            THE COURT:  Right.

9            MR. MERRILL:  Where at the bottom of page four

10   Mr. Denton says I note in the facts section that you

11   cannot close a complaint once it has been sent to you.

12   I have since contacted the seller mentioned in my

13   complaint and I am happy that this issue has now been

14   resolved.  I no longer wish to pursue my original

15   complaint.  And he had advised Mr. Kilmartin of that

16   fact.

17       And so I stand before the Court for sentencing

18   recognizing that we have to accept the jury's verdict,

19   but I submit to you that we don't know why they found

20   him guilty of 14 and not guilty of 15, and it very well

21   may have been a -- a compromise.

22       Because Mr. Denton had made it clear he was happy.

23   And he even goes on to say I believe you with the

24   reasons that Mr. Kilmartin gave him why the first

25   product that he sent him didn't work.

1      But clearly we have two individuals here that are

2 each suffering in their own hell, if you will.  They are

3 both suffering from mental illness.  And that doesn't

4 make it a malicious premeditated murder.

5      And I understand that probation went with what was

6 in the guidelines, but it brings me back to my original

7 argument.  We don't have anything in the guidelines that

8 addresses this factual case, an assisted suicide, and I

9 -- I looked.  I looked all over.

10      We can start in Maine.  Assisted suicide in Maine is

11 a misdemeanor.  And I thought to myself not going to go

12 there in front of Judge Woodcock, that's -- that's where

13 you become unreasonable.

14      So I looked for other statutes and I found one in

15 Alaska that I think is particularly pertinent to our

16 discussion here today because Alaska has a statute which

17 says if you intentionally assist someone in committing a

18 suicide, or if you provide somebody with drugs resulting

19 in death, that is manslaughter, and that can -- it is a

20 Class A felony under Alaska law which can carry a

21 sentence of up to 20 years.  And I think that is most

22 analogous to what we have going on here.

23      Clearly Mr. Kilmartin mailed the cyanide to

24 Mr. Denton.  And without getting into the issues of the

25 fact that there was a period of time before he actually

1    took it after it was delivered, and whether there were

2    superseding, intervening events, he mailed it to him so

3    it was intentional.

4        And so I think the Alaska statute comes closest to

5    the situation here where there was an intentional

6    assisting of a suicide.  And they also recognize that

7    that's analogous to somebody that sells drugs that

8    results in death, but it is not a premeditated malicious

9    act.

10       And unfortunately the guidelines aren't informed

11   enough, for lack of a better word, to address this issue

12   so you are right, Your Honor, we are in unchartered

13   territory.  And -- and I tried to find statutes that I

14   thought were most analogous to what we're talking about

15   here, and I think the Alaska statute that I cite in my

16   briefs is the one that's most analogous.

17       So I submit that if we're -- we're looking for

18   something that is analogous to this conduct that Mr.

19   Kilmartin did in this case -- putting aside right now

20   the issue of mental illness, just the physical act --

21   that it is most analogous to an intentional assisting of

22   a suicide under Alaska law which would carry a sentence

23   of zero to 20 years as opposed to the guidelines saying

24   well it is analogous to premeditated murder therefore

25   the guideline range is life.

1          And for that reason I submit to Your Honor that we

2     should -- we should go beyond the lack of a lot of case

3     law and the lack of guidance in -- in the guidelines

4     here, because they are only advisory, and look at other

5     analogous situations.  And I think if you do, I believe

6     that a manslaughter statute is most analogous to what

7     Mr. Kilmartin did in this case.

8          THE COURT:  All right.  Thank you very much, Mr.

9     Merrill.  Anything further, Mr. Frank?

10          MR. FRANK:  Your Honor, just briefly.  I mean I

11    think some of these arguments I have previously

12    addressed in writing.  Namely the argument that the --

13    the statute -- the mailing injurious articles statute is

14    vague.  I think I addressed that in my opposition to the

15    defense motion to dismiss the indictment early on in

16    this case.

17          In terms of this -- this argument that Mr. Kilmartin

18    -- it is some variation on he either isn't criminally

19    responsible or he had some sort of capacity --

20    diminished capacity as the result of mental illness, I

21    note that the defense in this case withdrew its insanity

22    defense after the defendant was -- was independently

23    examined by Government -- Government doctors.  The

24    defense had access to its own expert before doing so.

25          And I think most tellingly in that regard we have a

1   lot of contemporaneous evidence about what Mr. Kilmartin

2   was doing at the same time he was defrauding all these

3   people and killing Mr. Denton, and that evidence does

4   not indicate that he was so decompensated or depressed

5   that he was out of control.

6        In fact, what it indicates is that he was very much

7   in control of not only his actions but also the actions

8   of his estranged wife and his brother-in-law, and that

9   he fully appreciated the wrongfulness of his conduct in

10  this context but also in that related context.  There I

11  am referring to the -- the shoplifting case that was

12  pending all during this time and which Mr. Kilmartin

13  actively orchestrated a conspiracy to obstruct justice.

14       I mean there is no question but that this man had

15  significant capacity at all times contemporaneous with

16  these activities, and he does -- he did not -- he was

17  not criminally insane, and he did have the capacity, and

18  -- and, look, it is not a high bar.  I mean, you know,

19  the basic principle is if you understand the difference

20  between right and wrong, and you can control your

21  behavior, then you are criminally responsible.

22       In terms of the e-mail exchange, I mean that e-mail

23  exchange also includes a request by Mr. Kilmartin that

24  Mr. Denton destroy evidence of their interaction.  So he

25  continued to have concerns that Mr. Denton might --

1    might, you know, pose a threat to him, and those

2    concerns are even evident in the letter that he wrote

3    the Court earlier this week.

4        And I have already addressed the idea that somehow

5    the -- the -- the acquittal on the retaliation charge is

6    a cause for doubt here.  I think that's easily

7    understandable, Your Honor.

8            THE COURT:  All right.  The way I have in

9    general approached the guideline analysis here is

10   because the conclusion of the probation office is that

11   the guideline range is life I have been let's say --

12   just say I have particularly scrutinized each of these

13   issues that you have raised, Mr. Merrill, and -- because

14   of the significant -- potential significance for the

15   defendant, and this includes this question of analogous

16   crime.

17       The background is that under Section 2A1.1 if the

18   most closely-related conduct is first degree murder then

19   the base offense level is 43.  Under Section 2A1.2 if it

20   is second degree murder the base offense level is 38.

21   And if it is Section 2A1.3, voluntary manslaughter, the

22   base offense level is 29.

23       To constitute first degree murder, the hallmark of

24   that crime is premeditation.  To constitute second

25   degree murder the crime must not be otherwise defined as

1    first degree murder.  And to constitute voluntary

2    manslaughter the crime must be the unlawful killing of a

3    human being without malice.

4        As we've heard, the defendant's argument is they did

5    not -- he did not premeditate the death of Andrew

6    Denton, he only sent him cyanide that could cause the

7    death and Mr. Denton killed himself.  And the defendant

8    analogizes his situation, as we've heard, to drug

9    dealers who sell drugs to people and the drugs then

10   cause the buyer's death.

11       The major stumbling block, in my view, for the

12   defendant is the jury's conviction of him under Count

13   14.  I think the case would be a different one if it

14   were not for that; although, I think I would arrive at

15   the same result.

16       To explain, the jury convicted the defendant of

17   witness tampering under Count 14.  In preparation for

18   the sentencing hearing I looked up the jury instruction

19   that I gave the jury for Count 14.  This is on a filing

20   at ECF 181 at pages 33 and 34.

21       I told the jury and instructed them the following:

22   That in order to find Mr. Kilmartin guilty of Count 14 I

23   -- they would have to find beyond a reasonable doubt

24   that the defendant knowingly killed Andrew Denton.

25   That's the first element of Count 14.

1          And then the second element is the defendant did so

2    with intent to prevent a communication about the

3    commission of a federal offense to a federal law

4    enforcement officer.

5          I went in and looked at how I defined knowingly, and

6    that's at page 27 of the jury instructions.  And in

7    order to find that Mr. Kilmartin knowingly killed Andrew

8    Denton they had to find the following:  That the

9    defendant acted knowingly if he was conscious and aware

10   of his actions and realized what he was doing or what

11   was happening around him and did not act because of

12   ignorance, mistake, or accident.  That's the legal

13   definition of knowingly.  And the jury concluded that

14   beyond a reasonable doubt the Government had proven that

15   he had knowingly killed Andrew Denton.

16         Unfortunately for Mr. Kilmartin, I -- my conclusion

17   is that I am bound by that jury verdict.  I am required

18   to apply the jury verdict on Count 14 and to give

19   respect to the jury verdict during the course of the

20   sentencing, and that jury verdict includes that he

21   knowingly killed Andrew Denton.  And this, in my view,

22   necessarily satisfies premeditation for first degree

23   murder.

24         I will say that even without this legal conclusion

25   it seems clear, based on the record, that Mr. Kilmartin

1  sent Mr. Denton cyanide knowing that Mr. Denton would
2  kill himself.
3      The array of facts includes the following:  One, he
4  knew that Mr. Denton had tried to kill himself with the
5  Epsom salts that he had previously sent.  He knew that
6  because unlike many of his customers who took the Epsom
7  salts, thinking they were cyanide and put them away and
8  didn't try them, Mr. Kilmartin knew that Mr. Denton had,
9  in fact, rented a hotel room and had tried to kill
10 himself with the package of supposed cyanide.  He also
11 knew that Mr. Denton was irate.  Tragically irate that
12 he found himself still alive.
13     The e-mail correspondence between the defendant and
14 Mr. Denton actually discussed specifics about how to
15 make sure that when you take cyanide it is, in fact,
16 successful in achieving the desired end.  Namely, the
17 death of the person taking it.
18     In addition, the defendant urged Mr. Denton to cover
19 his tracks.  He encouraged Mr. Denton -- and I will
20 discuss this in another context -- to put a do not
21 resuscitate sign on his chest.
22     And with those facts, and based on Mr. Kilmartin's
23 obvious knowledge of the way cyanide works, it is simply
24 difficult to conclude other than the -- his actions were
25 premeditated.  So I do conclude that Section 2A1.1 first

1 degree murder is the most appropriate analogous section.

2 I don't do this with any pleasure, and I wish I didn't

3 have to.

4  I do want to respond briefly to Mr. Merrill's

5 argument concerning drug dealers who transfer illegal

6 drugs to individuals who then take the drugs, ingest the

7 drugs, and die.  And he -- Mr. Merrill is a very capable

8 lawyer, and he had noted that in an earlier order I had

9 remarked on the many similarities between the resulted

10 in death in 1716 and Section 841(b)(1)(A).  There is

11 one, however, obvious difference that seems so really

12 patently obvious, and that is that drug dealers don't

13 generally deliberately sell drugs to kill their clients.

14 Drug dealers would prefer to have continuing customers.

15  The reason that drug dealers sell drugs is to allow

16 the customer to get high and to feed their addiction and

17 to come back and buy more.

18  So there is an obvious contrast between selling

19 someone heroin, or even fentanyl, and hoping that they

20 will get their fix and come back, and selling someone

21 cyanide.  Because, to my knowledge, there is no joy in

22 taking cyanide.  There is no pleasure in it.  The only

23 purpose for taking cyanide is to kill yourself.  The

24 only purpose in selling cyanide to someone who wants to

25 kill themselves is to cause the death of the individual.

1    So that's the, I think, critical difference between

2    those cases.

3        I will only remark on one that Mr. Merrill has

4    pointed out because it is my case and I remember it.  It

5    is United States versus Rochelle Kenney, K-e-n-n-e-y,

6    which is 07-cr-66-JAW.  This was a very, very unusual

7    case.  It was an unusual proceeding.  It was a sister

8    who had sold her brother -- or transferred her brother,

9    I am not sure of the sale aspect, some illegal drugs.

10    Her brother took the drugs, got in a plane and headed

11    off to an island in Penobscot Bay.  When he got to the

12    island he collapsed and died.

13        And the plea agreement in this case was very, very

14    unusual, but it basically, for reasons that are

15    complicated, allowed me to make the determination more

16    probably than not as to whether the Government had

17    established that the brother's death was actually caused

18    by the ingestion of these drugs.  And then if I decided

19    that causation had been established there was one

20    sentence, and if I decided that causation had not it was

21    another.

22        And we had the state medical examiner on behalf of

23    the State of Maine testifying that there was a causal

24    relationship, and the defense called up a state medical

25    examining -- examiner from Philadelphia or Maryland, it

1    was Maryland, and he testified that in his medical

2    opinion there was not causation.

3        And I struggled with the issue, it was extremely

4    difficult, and I found that the Government hadn't proved

5    causation.

6        So in that situation it is really not analogous at

7    all when you look at the plea agreement and look at the

8    transcript of that case to this case because causation

9    was not found.  There is no issue here but that I accept

10   the jury's verdict, and that was pretty clear that the

11   cyanide had killed Mr. Denton.

12       I don't know the other cases, but I -- each of these

13   cases really has to stand on their own facts.

14       So with reluctance, and I say reluctance because of

15   the significance of this finding, I do -- I do conclude

16   that the most analogous crime under the guidelines is

17   first degree murder under Section 2A1.1.

18       The second issue here is vulnerable victim under

19   Section 3A1.1.

20       Would you like to be heard on that, Mr. Frank, it is

21   your burden.

22           MR. FRANK:  Your Honor, again, I -- I think it

23   is clear that -- that all -- all of the victims of Mr.

24   Kilmartin's crimes were vulnerable by virtue -- by

25   reason of their -- their depressed mental state,

1  depressed to the point of suicide, and that Mr.

2  Kilmartin full well knew that.  It was the reason that

3  he -- he targeted them.  So that I -- I -- and that's --

4  that's every bit as true of Mr. Denton as a victim of

5  the -- of the same fraud scheme as it is true of Denton

6  as a person depressed to the point of suicide who wants

7  to kill himself, so I -- I don't think it is a close

8  call.  I think it clearly applies.

9       THE COURT:  Thank you.  Mr. Merrill, would you

10  like to be heard on that issue?

11       MR. MERRILL:  I will rely on my brief other than

12  to say, Your Honor, that again with regard to the issue

13  of mental illness I don't believe that Mr. Kilmartin was

14  intentionally toying with these people as the Government

15  keeps implying.

16       THE COURT:  Okay.  Here there is a two level

17  increase if the individual who was the victim is what is

18  termed a vulnerable victim under Section 3A1.1.

19  Specifically the section is 3A1.1(b)(1).  And it says if

20  the victim is, quote, unusually vulnerable due to age,

21  physical or mental condition, and it also requires that

22  the defendant has to know the victim's vulnerability.

23       Frankly, I -- I don't -- I agree with Mr. Frank on

24  this one.  I -- I don't think this is a close call.

25  Andrew Denton seems to be the archetypal of vulnerable

1    victim under this definition.  He had a profoundly

2    complex and disturbing mental condition that had led him

3    to attempted suicide, and he -- his condition,

4    particularly as we have heard -- we heard the testimony

5    of his niece, Ms. Coates, who testified at length about

6    her relationship with her uncle and how profoundly and

7    deeply depressed he was.

8         She even, as I recall, came upon him after he had

9    attempted suicide with the Epsom salts, and she found

10   him irate and crying, in a rage about how he had been

11   cheated.  And the irony there was that he was cheated

12   from death.

13        It is hard to imagine a more vulnerable victim of --

14   and I do find that it is obvious that the defendant knew

15   that Mr. Denton was vulnerable for the reasons we've

16   already discussed.

17        So I find it difficult to conjure a victim whose

18   mental condition could make him more vulnerable than

19   Mr. Denton, and I am going to apply the vulnerable

20   victim enhancement.

21        Obstruction of justice.  This is your burden, Mr.

22   Frank.

23             MR. FRANK:  Yes, Your Honor, and I think the

24   find -- the jury's finding of guilt with respect to the

25   witness tampering count by itself warrants application

1    of the enhancement for obstruction, but beyond that I

2    mean there -- there are other facts including the fact

3    that the Government believes, through the submission of

4    its sentencing exhibits, Your Honor, and at some point I

5    should move those exhibits --

6              THE COURT:  Yeah, we'll get those in after these

7    arguments.

8              MR. FRANK:  -- into the record, but I mean I

9    think that that proves that he obstructed relevant

10   conduct, the investigation and prosecution of his

11   related shoplifting case.  I mean I -- I think there are

12   -- well, I think those facts alone warrant obstruction,

13   Your Honor.

14             THE COURT:  All right.  Thank you.  Mr. Merrill.

15             MR. MERRILL:  Your Honor, again as I indicated,

16   for purposes of sentencing we must accept the jury's

17   verdict, and in light of Count 14 I really think it is

18   hard to argue against obstruction of justice since

19   that's what tampering with the witness is.

20             THE COURT:  Right.  I agree.  I will say that

21   under Section 3C1.1 there is a two level increase for

22   obstruction of justice.  He was found guilty of witness

23   tampering, and that, from the Court's viewpoint, is

24   where the -- a defendant intends to prevent a victim

25   from communicating to law enforcement, at least in the

1    specifics of this case, or testifying.  And witness

2    retaliation, which they found him not guilty of, is a

3    situation where a defendant intends to punish a victim

4    for having communicated.

5        The conviction on Count 14 establishes that the

6    defendant sent Mr. Denton the cyanide in an effort to

7    permanently silence him.  He was aware that the

8    defendant had complained to the FBI, and this would

9    avoid any further complaint.  He urged the defendant to

10   destroy the hard drive.  He noted that he was urging him

11   to do so because Mr. Kilmartin felt he was already in

12   trouble with the FBI.  And under Section 3C1.1.4(d)

13   directing a person to destroy evidence material to an

14   official investigation is obstruction.  And obviously

15   threatening a witness, but it almost goes without saying

16   that causing the death of a witness has to be

17   obstruction as well.  So my view is that Section 3C1.1

18   must apply.

19       Acceptance.  Acceptance is your burden, Mr. Merrill,

20   would you like to be heard?

21       MR. MERRILL:  Yes, Your Honor.  I understand

22   that normally when you go to trial you are denied

23   acceptance of responsibility; but we do have the fact

24   here that Mr. Kilmartin, prior to trial, pled guilty to

25   nine of the 14 counts of mail fraud involving victims

1   other than Andrew Denton and went to trial solely on the

2   counts that related to Andrew Denton, and I believe that

3   he is entitled to get acceptance of responsibility.

4        And I understand that it is somewhat of a moot

5   argument because it is not going to change the guideline

6   range, but I still think that he should get credit for

7   the fact that those mail and wire fraud counts that

8   involved non-Denton individuals he accepted

9   responsibility for that and pled guilty for before

10  trial.  And I think there should be a separation where

11  somebody does something, acknowledges their guilt, and

12  preserves the right to go to trial on a different issue,

13  and that -- that basically the focus of my argument.

14       THE COURT:  No, I understand, Mr. Merrill.

15  Thank you.  Mr. Frank.

16       MR. FRANK:  Your Honor, except that the

17  obstruction here also pertained to and was motivated by

18  the -- the counts for which he pleaded guilty.  I mean

19  part of his reason for getting rid of Mr. Denton was to

20  avoid being held responsible for the larger fraud scheme

21  that Andrew Denton led to -- pointed to.  So I think it

22  -- it -- he is not entitled to acceptance even if he did

23  plead to those counts albeit on the eve of his trial.

24       MR. MERRILL:  Judge, if I could just comment on

25  that --

1              THE COURT:  Go ahead.

2              MR. MERRILL:  -- last point?  That's the

3    Government's theory.  We don't have a verdict finding

4    saying that the jury found that it was because he wanted

5    to keep the -- the other ones going, the other mail and

6    wire fraud counts going.

7         So I understand that the Government wants to say

8    that's their theory that that was the motivation for

9    wanting to kill Mr. Denton because he didn't want to

10   upset what he was doing with regard to the other ones,

11   but there is no finding of that.  The jury didn't

12   specifically find that he -- he killed Mr. Denton in

13   order to prevent the -- his other mail and wire fraud

14   scheme from continuing.

15             THE COURT:  Acceptance -- the acceptance

16   provisions under 3E1.1, as the defendant has pointed out

17   he pleaded guilty to nine of 15 counts, and he went to

18   trial on six of 15, he was found not guilty of one of

19   those remaining counts.

20        I think it is critical to acknowledge what the

21   probation office has pointed out, and that is that the

22   way the guidelines work acceptance is not calculated

23   based on a count-by-count determination.  It is -- as

24   the probation office has determined, you group the

25   counts.  So that's the first stumbling block.

1          The second is that, as the Government points out,

2     and it is really sort of reverse to what Mr. Frank just

3     argued, and that is that by denying the mail fraud

4     counts as to Denton the defendant denied relevant

5     conduct as to the counts for which he did plead guilty.

6          So it is -- I accept Mr. Frank's argument, but I

7     think it is a -- you look at it from the offenses that

8     he pleaded guilty to and ask yourself is it relevant

9     conduct to the offenses that he pleaded guilty to, and

10    Denton's -- the mail fraud on Denton is relevant conduct

11    to the mail fraud for the counts for which he pleaded

12    guilty.

13         So I conclude, based on those calculations, that --

14    or that -- those principles that acceptance was properly

15    denied.

16         I will say, Mr. Merrill, I think you have raised a

17    legitimate point.  He did not require the Government to

18    go and actually prove nine of the 15 counts.  And my

19    sense is the way to take that into consideration is to

20    take it into consideration under the 3553(a) factors

21    when I evaluate the 3553(a) factors, but I think the

22    guidelines themselves don't allow me or don't

23    contemplate that acceptance be given in this kind of

24    situation.

25         Have I addressed all of the legal issues that

1  counsel believe should be -- need to be resolved prior

2  to determining sentence?

3         MR. MERRILL:  Yes, Your Honor.

4         THE COURT:  Thank you.  Is there anything else,

5  Mr. Frank?

6         MR. FRANK:  Your Honor, I -- I -- I mean I think

7  there are the motions for downward departure and variant

8  sentence.  I don't know how you want to deal with them.

9  Again I am not asking to argue them unless the Court

10 has --

11        THE COURT:  No.

12        MR. FRANK:  -- would like to hear from me on

13 those, but -- because we have briefed them I think.

14        THE COURT:  I think it is -- I think the best

15 way to handle those is to handle them in the context of

16 the overall sentence.  I think they are sort of part and

17 parcel to what I am going to do at the end, and I think

18 counsel have raised some very fine arguments on both

19 sides of that as to what the ultimate sentence will be,

20 and I am going to address those after I have heard from

21 counsel.

22    Let me just make the guideline findings for you

23 before you begin your arguments on sentence.  Group one,

24 mailing injurious articles resulting in death and

25 witness tampering, the base offense level is 43.

1    Because the defendant knew or should have known that the

2    victim of the offense was a vulnerable victim two levels

3    are added bringing the offense level to 45.  As the

4    defendant obstructed justice, two levels are added

5    bringing the offense level to 47.

6        Group two, wire fraud and mail fraud.  United States

7    Sentencing Commission guideline for violation of 18

8    U.S.C. Section 1343 as found in Section 2B1.1(a)(1) is

9    this offense has a statutory maximum term of

10   imprisonment of 20 years, a base offense level is seven.

11   As the defendant knew, or should have known, that the

12   victims of the offense were vulnerable victims two

13   levels are added bringing the offense level to nine.

14       Multiple count adjustment.  The adjusted offense

15   level for group one is 47.  The adjusted offense level

16   for group two is nine.  The greater adjusted offense

17   level is 47 making the combined adjusted offense level

18   47.

19       In those rare instances where the total offense

20   level is calculated in excess of 43, the offense level

21   will be treated as level 43.

22       The defendant's criminal history category is

23   Category II.

24       For a total offense level of 43 and a criminal

25   history category of II, the applicable guideline range

1   for imprisonment is life.

2        The defendant is not eligible for probation.

3        The guideline range for supervised release on Counts

4   1 and 14 is two to five years.

5        The guideline range for supervised relief for Counts

6   2 -- release for Counts 2 through 13 is one to three

7   years.

8        Fine range is from 25,000 to $250,000.  The

9   defendant does not have ability to pay a fine.

10       Restitution is mandatory in the amount of $1,041.55.

11       A special assessment fee of $100 per count for a

12  total of $1,400 is mandatory.

13       Is there any objection to these findings on the part

14  of the Government?

15            MR. FRANK:  No, Your Honor.

16            THE COURT:  Is there any objection, other than

17  the objections previously raised, on the part of the

18  defendant?

19            MR. MERRILL:  No, Your Honor.

20            THE COURT:  Mr. Frank, would you like to be

21  heard on sentence?

22            MR. FRANK:  Yes, Your Honor.  May I have the

23  Court's indulgence for a moment?

24            THE COURT:  Sure.

25                      (Counsel conferred.)

```
 1          MR. FRANK:  Your Honor, I believe the defense
 2     intended to call a witness, and I --
 3          THE COURT:  Oh.  Oh, fine.  Yes.
 4          MR. MERRILL:  We think it might make more sense
 5     if we have Dr. Voss testify first.
 6          THE COURT:  Absolutely.  Yep.  Thank you.  Go
 7     right ahead, Mr. Merrill.
 8          MR. MERRILL:  Mr. Weare just went out to see if
 9     he is here.
10          THE COURT:  Okay.  Thank you.  Jen, may I speak
11     to you for a second.
12        (The Court conferred with the probation officer.)
13          THE COURT:  Good afternoon.
14          THE WITNESS:  Good afternoon, sir.
15          THE COURT:  Right over there.
16          THE WITNESS:  Yes.
17          THE CLERK:  Sir, would you raise your right
18     hand.  Do you solemnly swear that the testimony you will
19     give in the cause now in hearing shall be the truth, the
20     whole truth, and nothing but the truth so help you God?
21          THE WITNESS:  I do.
22          THE CLERK:  Thank you.  Please be seated.  State
23     your name and spell it for the record.
24        Sir, could you state your name.
25          THE WITNESS:  Yes, I will.  I just have to get
```

```
 1    settled in.  Carlyle Voss.  C-a-r-l-y-l-e.  The middle

 2    name is Bradley, B-r-a-d-l-e-y.  Last name Voss.  V, as

 3    in Victor, o-s-s.

 4         MR. MERRILL:  May I proceed, Your Honor?

 5         THE COURT:  You can proceed.

 6         MR. MERRILL:  Thank you.

 7                    DIRECT EXAMINATION

 8    BY MR. MERRILL:

 9    Q.   Afternoon, Dr. Voss.

10    A.   Good afternoon.

11    Q.   I would like to start by just going over a little

12    bit of your background and pedigree.  You are a medical

13    doctor; correct?

14    A.   Yes.

15    Q.   You are also a psychiatrist; correct?

16    A.   Yes, I am -- yes.

17    Q.   And you have been practicing as such for

18    approximately how long?

19    A.   I finished my training in 1971, came up to Maine,

20    and I have been here since.  I also had two years in the

21    public health service as a -- working in medical field,

22    basically psychiatry.

23    Q.   So it is fair to say --

24    A.   Since 1971, whatever that is, a long time.

25    Q.   In excess of 40 years; correct?
```

1    A.    Yes.

2    Q.    And you are board certified by the American Board of

3    Psychiatry and Neurology?

4    A.    Yes.

5    Q.    As both a psychiatrist and a forensic psychologist?

6    A.    Yes.  I have boards in general psychiatry and

7    forensic psychiatry.

8    Q.    And would you just explain to us briefly what the

9    difference is between the board certified in psychiatry

10   and being board certified in forensic psychiatry?

11   A.    Well, the forensic psychiatry is a subspecialty of

12   psychiatry that involves the interface between

13   psychiatric issues, psychiatric conditions, and legal

14   issues, and it is -- the legal issues may be disability,

15   injuries.  And then criminal issues as well.  Does the

16   person have a mental condition that affected or could

17   have affected their behavior.  It is -- it is very much

18   a clinical specialty in this in that it is -- I mean my

19   orientation is clinical.  I am doing assessments of a

20   person's mental and emotional state and how it affects

21   their functioning.

22   Q.    And you are a distinguished life fellow in the

23   American Psychiatric Association?

24   A.    Yeah.  That's a mouthful, but yes.

25   Q.    And one of your major areas is the assessment of

1  psychiatric disorders and related impairments?

2  A.   Yes.

3  Q.   And you have done evaluations over the years and --

4  A.   Yes, I have done many.  Several thousand.

5  Q.   And have you testified in the past regarding your

6  evaluations?

7  A.   Yes, numerous times.

8  Q.   And have you been qualified as an expert in

9  psychiatry in the past?

10  A.   Yes.

11  Q.   Have you been qualified as an expert in forensic

12  psychiatry in the past?

13  A.   Yes.  The testimony I have done as -- as an expert

14  typically for medical-legal reasons that's by far the

15  bulk of my work, and I would mention that my referral

16  sources have been from both sides.  Particularly in the

17  civil side where I was likely to be called by the

18  defense or the prosecution, but I am also within the

19  criminal arena, too.  I have been called by the district

20  attorneys in the state or the defense attorneys.

21  Q.   And what would you say the division is between

22  testifying for the state and testifying for a defendant?

23  Is it roughly 50/50?

24  A.   In criminal situations, it is probably more for the

25  defense.  Perhaps 60 percent for the defense, 60, 70

 1    percent.  In the civil arena, it is pretty much 50/50.

 2    Q.   And part of your career you have done Stage II

 3    evaluations for the State of Maine?

 4    A.   Yes.  That's done under the guidance of the Maine

 5    State Forensic Service which serves the courts.  They

 6    have a panel of psychiatrists and psychologists, mostly

 7    psychologists, who do independent examinations at the

 8    request of those from the court to the state forensic

 9    service to the panelists.

10    Q.   And would you just explain to us what a Stage II

11    evaluation is, please?

12    A.   Well, that's actually it is a term that's been

13    replaced, but the Stage IIs were for criminal

14    responsibility, or lack thereof.  They also included

15    other mental conditions.  That is, if a person had a

16    psychiatric disorder and did that affect their behavior,

17    but it may not have gone into the area of criminal

18    responsibility or lack of criminal responsibility.

19           MR. MERRILL:  Your Honor, I have attached Dr.

20    Voss's curriculum vitae as Exhibit 1 to my motion for a

21    variant sentence, and I would offer Dr. Voss as an

22    expert in the area of psychiatry and forensic psychiatry

23    at this time.

24           THE COURT:  Any objection?

25           MR. FRANK:  No, Your Honor.

```
 1              THE COURT:  I admit -- did you say this is No. 1
 2    or 2?
 3              MR. MERRILL:  No. 1, I believe.
 4              THE COURT:  No. 1 --
 5              MR. MERRILL:  On --
 6              THE COURT:  -- the curriculum vitae, and I
 7    certainly accept Dr. Voss's credentials as an expert.  I
 8    remember him well from my past life, and I have always
 9    found his testimony to be illuminating and intelligently
10    and knowledgeably based.
11              MR. MERRILL:  Thank you.
12              THE WITNESS:  Thank you, Your Honor.
13    BY MR. MERRILL:
14    Q.   Dr. Voss, during your career have you had the
15    opportunity to do a psychiatric evaluation of Sidney
16    Kilmartin?
17    A.   Yes.
18    Q.   And I understand you have explained to us that it is
19    no longer called a Stage II evaluation, but did you, in
20    fact, back in 2008 do a Stage II evaluation of Mr.
21    Kilmartin?
22    A.   Yes.
23    Q.   And what was the result of your evaluation of him
24    back in 2008?
25    A.    Well, this -- I found that he had a serious mental
```

1    disorder with psychotic features, mood swings, and he

2    had been variably diagnosed as having bipolar disorder

3    with psychotic features or schizoaffective disorder.

4    And we can get too hung up on the nuances of diagnoses.

5    The important thing is what are the symptoms and how do

6    they affect the person's mental, emotional, and

7    behavioral functioning.

8         So I saw him in regard to a -- he was charged with

9    an assault and did the evaluation.  I found that he did

10   have a serious mental condition that affected his

11   behavior, and he -- I understand -- I wasn't involved

12   with the trial but understand he was acquitted not -- as

13   not criminally responsible for that and was then put

14   into the state system as an NCR acquittee where he spent

15   the next several years at -- in the state hospital

16   Riverview and then was -- had been gradually moved to

17   less restrictive circumstances, but he was still under

18   the control of the court and was very tightly

19   supervised.

20   Q.   And I should have asked you this initially, but you

21   have never -- doctor -- I'm sorry, Sidney Kilmartin has

22   never been a patient of yours; correct?

23   A.   That's correct.

24   Q.   You have only seen him professionally in the context

25   of doing evaluations?

 1    A.    That's correct.   And they have been -- been single

 2    evaluations.

 3    Q.    And you recognize Sidney in the courtroom here

 4    today?

 5    A.    Yes.

 6    Q.    So you -- you have actually -- your first evaluation

 7    was in June of 2008?

 8    A.    Yes.

 9    Q.    And --

10          MR. MERRILL:   And -- and, Your Honor, for the

11    record that is Exhibit 2 on a motion for variant

12    sentence.

13          THE COURT:   Right.   Maybe we can take care of

14    the -- what people plan to admit.   Do you have a list of

15    exhibits you plan to admit?

16          MR. MERRILL:   Yes, Your Honor.   I plan to admit

17    the exhibits in my two motions.   And, I apologize, I

18    should have used the same numbering system, but in the

19    motion for downward departure this Stage II evaluation

20    of June of 2008 is Exhibit 1C, and it is in Exhibit 2 on

21    the motion for variant sentence, so there are duplicates

22    in there; but I would -- I would basically move all the

23    exhibits that I have appended to my motion for downward

24    departure and my motion for variant sentence.

25          THE COURT:   Do you have any objection to any of

1    those?

2          MR. FRANK:  No, Your Honor, I don't.

3          THE COURT:  And did you also --

4          MR. MERRILL:  I just note for the record, Your

5    Honor, that I have removed personal identifiers from two

6    of those documents.

7          THE COURT:  Thank you.  And did you have some

8    support letters as well?

9          MR. MERRILL:  Yes, I do, Your Honor.

10          THE COURT:  And do you want to admit those now?

11          MR. MERRILL:  Yes, I -- I will admit those as

12    well.  I believe there is five of them.  There is one

13    from Deborah Kilmartin.  There is one from Ashley

14    Kilmartin.  There is one from Paul McDermott, and there

15    is one from --

16          THE COURT:  One from Mr. Golden?

17          MR. MERRILL:  Yes, David Golden, Your Honor.

18    And then there is also a letter that I found out about

19    today which is a letter that my client mailed directly

20    to the Court --

21          THE COURT:  That's right.

22          MR. MERRILL:  -- dated April 18th.

23          THE COURT:  You admit that -- you want to admit

24    that as well?

25          MR. MERRILL:  Yes.

```
 1            THE COURT:  Okay.  Do you have any objection?
 2            MR. FRANK:  Your Honor, I have no objection.  I
 3   don't know that I have seen the letter from Debby
 4   Kilmartin.  I think I have seen all the other letters.
 5            MR. MERRILL:  My understanding is that -- my
 6   understanding, Your Honor, is that this is mailed
 7   directly to the Court, but I do have a copy --
 8            THE COURT:  Okay.
 9            MR. MERRILL:  -- that I can give to --
10            THE COURT:  And maybe you could review that as
11   time goes along.  I am going to admit each of those
12   letters.  Do you have any other exhibits?
13            MR. MERRILL:  I believe that's it, Your Honor.
14            THE COURT:  Okay.  And do you want to have those
15   admitted as a -- as a packet?
16            MR. MERRILL:  The character reference letters?
17            THE COURT:  Right.
18            MR. MERRILL:  Yes, they can be admitted as a
19   packet, yes.
20            THE COURT:  Okay.  So they will be admitted as
21   Defendant's Exhibit A.  And do you have copies that you
22   are going to put in?
23            MR. MERRILL:  I have copies --
24            THE COURT:  How do you wish to do that?
25            MR. MERRILL:  I'm sorry, Your Honor?
```

1          THE COURT:  How do you wish to proceed?  Are you

2   going to put copies of those in?

3          MR. MERRILL:  Yes, I can put copies of those in.

4   Now, the only clean copy I have of the Kilmartin letter

5   -- I will have to make another copy of that for the

6   Court.

7          THE COURT:  Okay.

8          MR. MERRILL:  But I have copies of the others.

9          THE COURT:  All right.

10         MR. MERRILL:  And Mr. McDermott will also be

11   speaking to the Court as well.

12         THE COURT:  Okay, very good.  Mr. Frank, do you

13   have any exhibits you would like to introduce?

14         MR. FRANK:  I -- I do, Your Honor, and they are

15   the 31 exhibits I submitted to the Court I think two or

16   three weeks ago, and I --

17         THE COURT:  Right.

18         MR. FRANK:  -- if now would be appropriate time,

19   I would move Government Exhibits 1 through 31 into the

20   record.

21         THE COURT:  Very good.  Do you have any

22   objection to those?

23         MR. MERRILL:  No, I don't, Your Honor.

24         THE COURT:  Each is admitted.  You may proceed.

25         MR. MERRILL:  Thank you, Your Honor.

1  BY MR. MERRILL:

2  Q.  So, Dr. Voss, you -- you first saw Mr. Kilmartin in

3  2008, and then were you asked by an earlier attorney of

4  his in this case to do an evaluation in March of 2015?

5  A.  I saw him in 2015.  I thought it might have been

6  February, but I'd have to -- I think that was the one in

7  the Somerset County Jail.

8  Q.  I -- I am just going by the date of a report that

9  you sent to James Billing.

10  A.  Okay.

11      MR. MERRILL:  And, again, Your Honor, this is

12  Exhibit 3 on the motion for variant sentence.

13      THE COURT:  Thank you.

14  BY MR. MERRILL:

15  Q.  It is dated March 14th of 2015.

16  A.  I did see him in 2015.  Sometimes the date of the

17  report is when it is finished versus when it was

18  actually done.  That is dated -- the cover letter is

19  dated March 14, evaluation was actually done on February

20  12.

21  Q.  And this was an evaluation you did at Somerset

22  County Jail?

23  A.  Yes.

24  Q.  And what was the purpose of this evaluation?

25  A.  Well, that was related to charges for which we're

1   now being--

2   Q.   The present charge?

3   A.   Yes, the present charges that he was charged with,

4   having sent cyanide to people and all the charges.   I

5   don't need to go through that, those are -- but I was

6   asked to evaluate his mental and emotional state

7   particularly with particular focus on the time around

8   the events occurred, before and after, but the -- his

9   condition -- his mental and emotional and behavioral

10  functioning around that time.

11  Q.   And what were your findings from that evaluation?

12  A.   I found that Mr. Kilmartin had gone into a serious

13  state of depression after he was charged with

14  shoplifting I think it was two tubes of Preparation H

15  from a Dollar Store.   He was alleged to have gone in and

16  left without the -- taking that, and that I guess was

17  finally decided that that's what happened, and he became

18  extremely afraid of being sent back to Riverview at that

19  point.   He had spent I think two or three years in the

20  inpatient unit.

21       That was a hard experience for him.   He was

22  assaulted at one point and had a fractured skull and

23  mandible, his jaw.   He was attacked by another patient.

24  The environment in psychiatric unit can be a high

25  stimulus environment, it is hard to get away.

1      And he was -- he had been moving towards getting the

2   NCR status reversed, and that -- as I understand it he

3   -- he was on the list to have that reviewed by the Court

4   when this event happened in April of 2012.  That he

5   expected if that was accepted, that that was the case,

6   that his progress towards being released from the hold

7   of the court for being NCR would -- would stop at that

8   point and he would be -- his status would -- as a --

9   under the hold of the Court would be continued, and he

10  did not know how long.  So when that happened, again in

11  April of 2012, he became very distressed.

12      At that point he was living in an apartment in

13  Manchester near Augusta.  He was living by himself but

14  he was working part-time in Sam's Club.  He had started

15  having more contact with his family.  His life was

16  generally had been progressing well to get out from

17  under the hold of the court, and he expected that if

18  that came to light that he would again be put back at

19  Riverview and the whole process of getting out from

20  under the hold of the court would be delayed.  He had no

21  idea things move quite slowly in that system.  I think

22  they are only reviewed every six months by the court.

23      So, anyway, he goes back to his apartment.  He

24  became increasingly isolated and depressed.  Mr.

25  Kilmartin has had episodes of excessive energy, the

1   so-called manic state, but he -- his major problem has

2   been one of depression.

3        And -- and while the immediate circumstances in 2012

4   and -- that were involved with these charges was

5   extremely important, it is also important to have

6   background information to see if it is consistent and

7   which -- and it was.

8        Mr. Kilmartin had made a very serious suicide

9   attempt a number of years before taking a bottle of

10  potent antipsychotic medicine and drinking a -- a

11  substantial amount of antifreeze which should have

12  killed him.  He had to go on dialysis and -- but that

13  would be lethal in almost -- in most cases.

14  Q.   In your opinion was that --

15  A.   Anyway --

16  Q.   -- a serious attempt to commit suicide?

17  A.   I'm sorry?

18  Q.   In your opinion was that a serious attempt on Mr.

19  Kilmartin's part to commit suicide?

20  A.   He expected to die.  He should have died, yeah.  I

21  mean he -- he did it -- he made sure he was alone and

22  somehow was found and got brought to -- for medical

23  attention soon enough to be able to survive; but, no,

24  we're talking to a person who should not be -- should

25  not have been here.

1          People survive very serious suicide attempts
2     sometimes, gunshots.  I have talked to a number of them.
3     Jumping off a building, that kind of thing.
4          Anyway, Mr. -- in the spring and the -- going
5     forward until into the early part of next year, the
6     winter of -- early winter, middle winter of 2013, his
7     condition, by his description and from the limited
8     information I have, appears to have deteriorated
9     markedly.  He became withdrawn.
10          He became -- he began to -- he neglected personal
11     care.  He was a person who liked to eat healthy foods
12     but just ate whatever he could get easily.  He said one
13     point there were only some -- I don't know, some Oreo
14     cookies in the refrigerator and something else to drink
15     maybe, I am not sure.
16          He quit his job, or was fired, and it is -- there is
17     mixed information about that, and -- from Sam's Club in
18     I think in October of 2012, and he developed increasing
19     suicidal thoughts and urges.
20          He went online to research ways of committing
21     suicide and found that the most effective and one of the
22     least painful ways to die was by cyanide and then
23     embarked on a way to acquire cyanide.  It is used in the
24     mining and jewelry business.  You can buy -- jewelers
25     can buy small amounts of it.  Used for I think cleaning

1   and whatever.

2       Anyway, he was ultimately successful in getting I

3   think a hundred grams of cyanide.  One gram is lethal.

4   And he kept a gram for himself and he put the rest away

5   somewhere.  I think in his wife's garage, but not

6   important.

7       In the course of his researching suicide and ways to

8   do it, and acquiring the cyanide, he got on websites of

9   people who are suicidal.  There are websites where

10  people struggling with those issues go for advice, for

11  whatever, consolation, et cetera, you know.  We all, I

12  guess, want to have some -- some contact with another

13  human no matter where we are.

14      Anyway, he learned that others were -- he said he

15  advertised that he had cyanide available and offered to

16  sell it to people, and had a number of people ask -- ask

17  to send them cyanide.  He charged them 150 or $200, I

18  think, and said he would send it to them; but the only

19  -- he substituted Epsom salts, which of course isn't

20  lethal.  May have some other medical effects, but

21  certainly doesn't kill them.

22      And I don't know how many times he did that.  I

23  would -- my sense is it was a half a dozen times, but he

24  -- he did that.  And he -- and that included sending

25  Andrew Denton, the person who died by cyanide poisoning,

1  he sent him Epsom salts in -- which was very

2  disappointing to Mr. Denton.  There are e-mails between

3  them that are quite illustrative.

4  Q.   How would you describe Mr. Kilmartin's state of mind

5  during this period of time?

6  A.   Very depressed, hopeless, very fearful, terrified of

7  going back to Riverview.  But that case was still

8  pending and he decided to hold off on committing the

9  final act, suicide, until he heard back.  And he said

10  that he was planning to go ahead anyway and then got

11  word from his attorney that the case had been resolved.

12  He paid a little fine and it was continued for three

13  months, and if he did okay for three months it would be

14  expunged.  So he would not have to go back to Riverview.

15  Q.   Is he acting rationally at this -- during this

16  period of time?

17  A.   I don't think so.  I don't -- I don't think taking

18  cyanide because you may have to spend another six months

19  in a state hospital killing yourself is -- is rational.

20  I have dealt with a number of people like Mr. Kilmartin

21  who should have died when the suicide attempt, and very

22  illustrative to hear how their thinking changed.  I

23  included a memo in one of my reports that is actually

24  for workers comp purposes but it describes the changes

25  in the person's thinking.  I think that's in the report

1  from 2015 or maybe it was a 2018.

2  Q.   Are you referring to Thought Disorders and

3  Misperceptions of Reality Related to Psychiatric

4  Disorders?

5  A.   Yes.

6  Q.   That's actually the addendum that you attached to

7  the report you did for the evaluation for me --

8  A.   Oh, okay, so 2018.

9  Q.   -- 2018.

10       MR. MERRILL:  And for the Court that is an

11  addendum to Exhibit 4 on the motion for variant

12  sentence.

13       THE WITNESS:  The point of the memo is to try to

14  describe, for people who haven't dealt with this, how

15  one's perceptions, beliefs, their sense of hope, their

16  sense of worth, becomes negative, everything is

17  hopeless.

18     We'd like to think our brains are pretty steady in

19  functioning, but the reality is that things can change.

20  Especially -- and again our perceptions, beliefs, that

21  type of thing, are -- are very subject to change.

22     I guess the common experience is having some alcohol

23  to drink and seeing how that can change your mental and

24  emotional functioning.

25       But, anyway, he became very depressed, said he

1    neglected self-care.  He isolated.  He also developed

2    psychotic symptoms, a recurrence of symptoms that were

3    quite similar to what he had in 2008 when he assaulted a

4    tenant in his building.

5        He had the perception that the tenant -- the people

6    that were living in an apartment below him were making

7    noises; rolling cans on the floor; they were walking,

8    stomping their feet to cause him mental distress; and he

9    began to retaliate by doing the same.  And he said they

10   moved out, and he thinks that may be because they -- may

11   have happened because they wanted to get away from him,

12   but anyway he was there.

13       His wife went to see him in December when she was

14   called by the woman who owned the building, the

15   landlady.  Mr. Kilmartin was getting into conflict with

16   the guy who plowed their -- the driveways in the -- this

17   apartment area.  He wouldn't -- he didn't move his car

18   on time and made it difficult.

19       Mrs. Kilmartin wasn't able to reach him, he wasn't

20   answering his phone, and she went up to see him.  She

21   talked to the landlady.

22       And there is very limited information -- I had very

23   limited information about that, but in her testimony

24   before the Grand Jury connected to the Preparation H

25   thing she said he -- he looked like he was in terrible

1   shape but did not elaborate and nor was she asked.

2       But that's a little piece of affirmation that --

3   that and his -- his behavior.  It is very clinically

4   consistent with the condition he had.  He knew he had a

5   serious mental illness, and these are the types of

6   symptoms and behaviors that are highly consistent with

7   that condition.

8           MR. MERRILL:  I would like to, if I could, Your

9   Honor, mark separately as Exhibit 4A which is the

10  memorandum that Mr. -- I'm sorry, Dr. Voss was speaking

11  of.

12          THE WITNESS:  As I said, there is a -- there is

13  a reference to a statute there.  That's a Maine workers'

14  comp statute because this was done in relation to

15  workers' comp claim on somebody who had committed

16  suicide.

17          MR. MERRILL:  May I approach the witness, Your

18  Honor?

19          THE COURT:  Sure.

20  BY MR. MERRILL:

21  Q.  Let me show you what's Defendant's Exhibit 4A, and

22  is that the two-page document you are referring to that

23  was attached to your January evaluation 2018 that you

24  did for me?

25  A.  Yes.

1    Q.   I want to ask you a couple of questions.  If you

2    look on the first page and it just says thought

3    disorders and misperceptions of reality related to

4    psychiatric disorders, and the one, two -- the fifth

5    paragraph down you write depression is the most common

6    psychiatric condition associated with suicide.

7    Perceptions, judgment, and beliefs are seriously

8    impaired by depression.  People with severe depression

9    may have clear psychotic symptoms in which they have

10   serious misperceptions of reality.

11        In your opinion was Mr. Kilmartin having

12   misperceptions of reality during this period of time

13   September to December 2012?

14   A.   Yes.  Yes, that's -- that's correct.  I believe that

15   was the case.

16   Q.   And in preparation for your testimony you have

17   reviewed some of the records from Riverview?

18   A.   Yes.

19   Q.   And you have seen the -- some of the Government

20   exhibits including the testimony of Deborah Kilmartin

21   that you were just referring to?

22   A.   Yes.

23   Q.   The next paragraph says the world of the person with

24   depression is devoid of pleasure and hope.  Negative

25   feelings and guilty ruminations about being bad and

1   worthless are common.  Suicidal thoughts and actions are

2   based on these distorted beliefs and perceptions, not on

3   the reality of the person's life and circumstances.

4   Suicide in these circumstances is not a willful act as

5   it is motivated by -- motivated by an irrational mind.

6   A.   Irrational mind, yes.

7   Q.   So the -- the person is not acting rationally at

8   this point and --

9   A.   No.

10   Q.   -- they have misperceptions of reality?

11   A.   That's correct.

12   Q.   And, again, in your medical opinion did

13   Mr. Kilmartin fall into this category during this period

14   of time?

15   A.   Yes.  Based on what he told me, what I know about

16   these clinical conditions, which I have dealt with many

17   times, and based on -- it was clinically plausible, and

18   based on his past history of having similar psychotic

19   symptoms.

20   Q.   Now that was the second evaluation that you did on

21   Mr. Kilmartin; is that correct?

22   A.   In -- in February of 2015, yes.

23   Q.   And then I asked you to evaluate him again in

24   January of this year?

25   A.   Yes.

1    Q.   And what were your findings with regard to the

2    evaluation that you did in January of this year?

3            MR. MERRILL:   And again, Your Honor, this is

4    Exhibit 4 the motion for variant sentence.

5            THE COURT:   Thank you.

6    A.   My findings were -- affirmed the prior clinical

7    impressions and conclusions that I had come to before.

8    There is a section towards the end of opinions in which

9    I give the basis of that.

10   BY MR. MERRILL:

11   Q.   And --

12   A.   That's --

13   Q.   -- I supplied you with two reports from the federal

14   medical facility at Fort Devens to review with regard to

15   this third evaluation; correct?

16   A.   Yes.

17   Q.   And what was your assessment of the evaluation done

18   at Fort Devens?

19   A.   I am critical of that -- of the assessment.  These

20   are extensive evaluations with a lot of history.  Both

21   before and after the allegations there is quite a bit of

22   history going from 2013 forward.  There is a lot of

23   focus on the actual criminal issues.  There is a short

24   review of his prior psychiatric history.  Or there is a

25   review of his prior psychiatric history.

1          What I am critical of is that an evaluation such as

2     this is done generally for the purpose of trying to

3     understand the person's mental and emotional state,

4     behavioral state, around the time of the allegations,

5     and there is very limited information about that in the

6     -- either the reports from the federal medical center.

7     Report was done by a psychology intern, but there was a

8     psych -- Ph.D. psychologist in attendance as far as I

9     can tell.

10         The report and the addendum is where his mental and

11    emotional state is addressed; but, again, there is, in

12    my judgment, insufficient information and insufficient

13    attention to what is the critical question, and that is

14    what -- what was his mental and emotional state like in

15    the months before and during his actions for which he

16    has been convicted now and in the period for a while

17    thereafter.

18         Certainly the background information going back to

19    is -- is -- is important, and seeing how he has done

20    since is also important.  But it is that period from --

21    basically from April of 2012 when he was accused of --

22    of stealing two tubes of Preparation H.  A tube of

23    Preparation H costs about 10 bucks, and Mr. Kilmartin

24    has funds.  He was on Social Security disability.  But

25    anyway -- so you talk about irrational acts.

1       But the April 2012 to the early winter after

2   Mr. Denton had passed away, this is the time that you

3   really need to focus on and try to understand what his

4   thinking and -- and functioning was like.

5       There is reference in the reports that they had a

6   phone interview with Debby Kilmartin, his wife; but

7   there is nothing in there that documents what -- what

8   she said.  Or minimal, minimal information there about

9   what she said.  In either report.

10  Q.   In -- in your last evaluation that you did for me,

11  which is Exhibit 4, you conclude that in your opinion

12  Sidney Kilmartin has been diagnosed with a major mental

13  illness diagnosed as schizoaffective disorder with

14  bipolar features or bipolar disorder.  Nuances of -- I

15  am on page four -- nuances of diagnosis are not

16  important.  What is established is that Mr. Kilmartin

17  has had episodes of excessive energy with racing

18  thoughts, et cetera, reflecting a manic phase.

19      Now, someone that has been diagnosed as being

20  bipolar is going to have both a depression side and a

21  manic side; correct?

22  A.   If we follow the -- if the person making the

23  diagnosis is -- follows the guidelines, yes; but the --

24  the mix is highly variable.  In order for bipolar, the

25  person has to have had clear episodes of manic kind of

1    thinking.  They may not have had a full-blown manic

2    episode, but the grandiosity which he would get these

3    ideas about getting houses and fixing them up -- and he

4    did that several times, and he made a little money, but

5    it wasn't -- I understand it wasn't much -- and racing

6    thoughts, the excessive energy, the euphoria that goes

7    along with a manic state, is -- can be very exciting to

8    the person.

9        And Mr. Kilmartin said something that was -- at one

10   of our meetings, he said he felt it was unfair to other

11   people that he was -- felt so good and felt so superior

12   during the manic state, that he was -- had an unfair

13   advantage in -- in the world.  And if you talk with

14   someone who is in the manic state, it is -- it is

15   obvious.

16   Q.   Is -- is it fair to say that that's a common

17   statement of people who are in a manic phase of a

18   bipolar --

19   A.   Yes, but -- but it may be just what the person is

20   thinking and feeling.  They may control it fairly well

21   or they may get out of control in the -- in the severe

22   high state and do things that get them committed to a

23   hospital because they are so out of control.

24   Q.   And so in December of 2012 at the time when

25   Mr. Kilmartin mails the potassium cyanide to Mr. Denton

1   is he in this manic phase of being bipolar?

2   A.   No, I think he was mostly in the -- he was in the

3   depressed state --

4   Q.   He was in a depressed state?

5   A.   -- starting in -- I think the shoplifting and the

6   fears of going back to the Riverview put him in a

7   depressed phase, and that was his major problem.  He had

8   the so-called hypomanic episodes.  Which is important in

9   the diagnosis, but he -- his main -- main problems were

10  with severe depression.

11  Q.   And in the period leading up to that, say from the

12  time of the charge of the Preparation H until December,

13  is Mr. Kilmartin decompensating at that point?  Is his

14  mental health deteriorating?

15  A.   Yes, clearly.  He was having he described clear

16  psychotic symptoms and behaviors related to that,

17  impaired functioning, not taking care of himself,

18  barricading himself because he thought people were doing

19  things that -- I can't remember the exact details, but

20  he had paranoid perceptions and beliefs.  I can find

21  that.  It is in that -- one of those two reports, 19 --

22  I mean 20 -- 2015 and 2018.

23  Q.   Now, I had also given you a -- a series of e-mails

24  that transpired between Mr. Kilmartin and Mr. Denton to

25  review for purposes of your January 2018 report; is that

1   correct?

2   A.   Yes.

3        MR. MERRILL:  And, again, Your Honor, those are

4   the same e-mails that are appended to the motion for

5   variant sentence.

6        THE COURT:  Thank you.

7        MR. MERRILL:  I'm sorry, that would have been,

8   I'm sorry, my objections to the presentence report, I

9   apologize.

10  BY MR. MERRILL:

11  Q.   And what -- what did you come away with after

12  reading those e-mails as it pertained to Mr. Kilmartin's

13  state of mind at that time?

14  A.   Well, actually the e-mails were pretty well

15  organized, that he was able to communicate rationally.

16  There were a number of them.  Mr. Denton was very

17  unhappy that he -- the first shipment that he received

18  was Epsom salts and didn't take his life, and he

19  threatened to report that as mail fraud.  He had paid

20  Mr. Denton I don't know what, how much, 150, 200 bucks.

21  And they went back and forth about that a number of

22  times.

23       The e-mails commenced in I think December 9 or 8,

24  somewhere in there; but, anyway, it goes -- they go

25  through to after -- somewhere after, of course, or right

1  around Christmas.  And Mr. Denton said he was very

2  unhappy.  Mr. Kilmartin said he was going to make it

3  right, don't worry about it, and commiserated -- they

4  commiserated together.  He felt -- he felt they had a

5  bond because they both struggled with suicidal feelings.

6      And the last e-mails from Mr. Denton indicated that

7  he was not going to report that as mail fraud, that he

8  had instructed the FBI to forget about it.  The mail

9  fraud would have been for sending Epsom salts instead of

10  cyanide.

11     The whole thing is crazy.  We're going to get you

12  for mail fraud for sending Epsom salts instead of

13  sending him the real thing that you promised.  Anyway --

14  it is kind of ironic.

15     Anyway, Mr. Denton's e-mails said that he was not

16  going to pursue that, that he had instructed the -- or

17  sent the letter to the FBI saying he was not going to

18  pursue it.

19  Q.   They also talk, during some of these e-mails, about

20  what was the best way to take cyanide to maximize the

21  chances that it would have its intended effect which

22  would be to kill the individual.  Was this unusual

23  between these two individuals?

24  A.   No.  The person who is struggling with suicidal

25  thoughts typically makes some careful plans.  If they

1    are really serious they make careful plans, and they can

2    be quite -- they conceal it from people who are going to

3    interfere.  Mr. Denton referred to that in his that

4    psychiatric people in Great Britain where he lived would

5    throw him in the hospital if he did this, but only for a

6    few days.

7        The people who are really serious about suicide

8    usually or often don't admit that because they know they

9    will be stopped.  One of the things we learn in

10   psychiatry is if someone who has been depressed and

11   suicidal -- depressed and quite suicidal suddenly starts

12   -- cheers up, that may be because they have decided to

13   take their life and they know how they are going to do

14   it and when.  It is a red flag.

15   Q.   So I -- I describe it in my brief to the Court that

16   it was like two people talking about a recipe to bake a

17   cake.  I mean it was just like this is the best way to

18   make it most effective, and yet they were talking about

19   each killing themselves.

20   A.   It was -- it was, yeah, very matter of fact.  Don't

21   take I think he said vinegar or something like that,

22   that it was acidic, because it could interfere with the

23   absorption of the cyanide, and how to take it on an

24   empty stomach.  And there were a number of details

25   there, but it is -- it is kind of chilling.

1    Q.   In your opinion were Mr. Kilmartin's mental

2    functions seriously impaired by his major depressive

3    symptoms at the time when he sent Mr. Denton the

4    potassium cyanide?

5    A.   Yes.

6    Q.   And do you believe that his reality of the world was

7    impaired at that time?

8    A.   Yes.  As I said, he reported clear psychotic

9    symptoms which are detailed in my reports that reflect a

10   serious impairment in his perceptions of reality.

11   Q.   On the last page, page six of your evaluation of

12   January 4th, 2018, which is Exhibit 4, bullet point you

13   say it is this examiner's opinion that Sidney

14   Kilmartin's mental and emotional functions were

15   seriously impaired at the time he acquired cyanide

16   initially for his own suicide and when he provided bogus

17   cyanide to a number of people who asked him to send them

18   cyanide.  The ultimate decision to send Mr. Denton

19   cyanide was more likely than not significantly affected

20   by his own struggles with depression and suicidal

21   impulses.  He made a very serious suicide attempt

22   several years before the incident problems.  And, again,

23   you are referring to the Zyprexa and the anti-freeze as

24   the suicide attempt?

25   A.   Yes.

1   Q.   And do you hold that opinion to a reasonable degree

2   of psychiatric certainty that Mr. Kilmartin's mental and

3   emotional functions were seriously impaired at that

4   point in time?

5   A.   Yes.  Based on the information I have had available,

6   my experience in treating many people with this, yes.

7   Q.   And -- and, again, the information available to you

8   included your review of your two prior evaluations in

9   2008 and 2015 as well as the records that were made

10  available to you from Riverview?

11  A.   Yes.

12  Q.   And also the evaluations done by FMC Fort Devens?

13  A.   Yes.

14  Q.   Mr. Kilmartin, by all accounts as far as we know,

15  led a fairly productive life until his mid 40s when this

16  mental illness began to manifest itself.  Is that

17  unusual that he would have been in his mid 40s before

18  there were any signs of this mental illness?

19  A.   It is not the typical pattern, but it is a

20  well-recognized pattern that psychotic symptoms and mood

21  disorders such as bipolar disorder can first show up in

22  midlife time, even late in life for some.  Mr. Kilmartin

23  also had -- drank alcohol quite heavily, and used

24  cocaine at times, which just confounds the picture of

25  just why -- why now.  It is very clinically credible

1    that he had the onset of these symptoms at that point.

2    He had symptoms some time before.  At work he thought

3    people who were at work were conspiring against him.  He

4    was a meat cutter at Shaw's for 20 something years.  He

5    punctured a radiator of one of his tormenter's --

6    perceived tormenter's vehicles.

7    Q.   So in your opinion it would not be unusual that the

8    onset of this mental illness didn't affect Mr. Kilmartin

9    until the mid 40s, 45 or so?

10   A.   No.  Again, it is -- it is clinically very

11   plausible.  This is a pattern we see.  People are very

12   different, you know, and how these disorders express

13   themselves and emerge is quite variable.

14   Q.   What is the -- strike that.

15        What -- what, in your opinion, can be done to keep

16   Mr. Kilmartin from -- from cycling between depression

17   and mayhem?

18        Is there medication that's available that has proved

19   successful in treating this type of mental illness?

20   A.   Yes.  There are a number of medications that are

21   helpful.  And he was on a combination of medications

22   when I saw him I think at Somerset but also certainly in

23   Cumberland County Jail, more recently, that he felt was

24   helpful.  Medication that had been the most helpful to

25   him was Lithium, but somebody stopped that because it

1  can cause kidney damage, but -- so that would -- that

2  would be an option if it is followed.

3      I think what Mr. Kilmartin also needs is some fairly

4  regular contact with mental health providers in order to

5  assure that he is not going back into a depressed state.

6  He was followed by the ACT team, that's the Assertive

7  Community Treatment, where the person is followed very

8  closely by a team of people.  They may go to the

9  person's residence if they don't show up, that type of

10  thing.  I think he needs that type of close follow-up if

11  he is going to not get sick again.

12  Q.   So you would recommend medication management?

13  A.   Yes.

14  Q.   And counseling?

15  A.   I -- it could involve counseling at times to deal

16  with issues, but it would especially be to monitor his

17  condition and assure that he is taking medications and

18  not drinking or using drugs.

19  Q.   Since Mr. Kilmartin had never been fully released

20  from Riverview Psychiatric Center, is it correct that he

21  still remains a ward of the state?

22  A.   As far as I know, yes.

23  Q.   So whenever he is finished with whatever sentence he

24  gets, the State of Maine will still have control over

25  him?

1    A.   I am not --

2    Q.   As a ward of the state?

3    A.   -- totally conversant in just how that plays out,

4    but it is my understanding that people put at NCR are

5    under the guidance of the state indefinitely, and that

6    being released from that is not all that common.

7         The person needs to convince the court, and the

8    people following him, that he no longer has the

9    condition for which he was acquitted NCR, and these are

10   often -- these are typically illnesses that affect the

11   person, or can affect them, the rest of their life, or

12   convince the -- the court that they are no longer

13   dangerous.  And I mean how do you assure that somebody

14   is not dangerous?  You can't prove a negative.  But it

15   is very -- the point is it is very difficult.

16        And the people providing the supervision --

17   typically goes through Maine Forensic Service -- are

18   quite cautious.  We've had some bad things happen in

19   this state that we are very cautious.

20   Q.   Is there -- I'm sorry.

21   A.   That's all right.

22   Q.   Is there anything else in your medical opinion that

23   you would recommend that would be beneficial to

24   Mr. Kilmartin when he is released?

25        Other than the medication management and oversight

```
 1   by a trained professional?
 2   A.   No.  The monitoring and checking in, probably doing
 3   blood testing for drugs.  I think, looking at the
 4   overall history, that's -- that's what needs to be in
 5   place.
 6   Q.   And -- and I think this is what you are saying, but
 7   basically some type of oversight for -- to make sure he
 8   is not abusing substances?
 9   A.   Yes.
10   Q.   Because that can impact his mental illness as well?
11   A.   It can -- yes, absolutely.  Put him into a
12   decompensated state.
13           MR. MERRILL:  Your Honor, I don't think that I
14   moved the exhibits that I had attached to my objections
15   to the presentence report, but included in there are the
16   e-mails.  And if the Court wants --
17           THE COURT:  I don't think those become a matter
18   of record.  You don't file those with the Court.
19           MR. MERRILL:  I didn't know only because I had
20   Dr. Voss refer to those e-mails and it was part of --
21           THE COURT:  That's right.  You don't file those
22   with the Court, so I -- I think I have read what you are
23   referring to, but I don't think they are a matter of
24   record with the Court.  Unlike the other exhibits that
25   you mentioned that are a matter of docket entry.  I
```

1    don't think objections to the presentence report are

2    filed with the Court.

3            MR. MERRILL:  Right.  So what I am asking the

4    Court is do you want me to file a separate exhibit with

5    just those --

6            THE COURT:  I think you have to.

7            MR. MERRILL:  -- e-mails?

8            THE COURT:  If you want a record of those for

9    purposes of this hearing, you have to make it.

10           MR. MERRILL:  I think because Dr. Voss relied

11   upon those I will submit a separate exhibit --

12           THE COURT:  All right.

13           MR. MERRILL:  -- with those e-mails.

14           THE COURT:  I think I have reviewed them.  Do

15   you have any objection to him doing so?

16           MR. FRANK:  No, Your Honor.  And I think they

17   are already in the -- in the court record because they

18   were evidence at trial, but I -- I -- I don't have any

19   objection.

20           THE COURT:  That may well be right, yeah.

21           MR. MERRILL:  But I -- I just want to make sure

22   that there is a record of the ones that I provided to

23   Dr. Voss and he relied upon.

24           THE COURT:  Right.  And -- and you need to make

25   that record.

1          MR. MERRILL:  Yep.  I will do that, Your Honor.

2     Thank you.

3          THE COURT:  Thank you.

4          MR. MERRILL:  Thank you, Dr. Voss.

5          THE COURT:  Cross-examination?

6          MR. FRANK:  Thank you, Your Honor.

7                     CROSS-EXAMINATION

8     BY MR. FRANK:

9     Q.   Good afternoon, Dr. Voss.

10    A.   Good afternoon.

11    Q.   Doctor, you have evaluated Mr. Kilmartin several

12    times; correct?

13    A.   Yes.

14    Q.   First in 2007-2008 in connection with his aggravated

15    assault of an 80-year-old man; correct?

16    A.   Yes.

17    Q.   You have described that in some length in your

18    direct testimony; right?

19    A.   I'm sorry?

20    Q.   You have described that assault at some length in

21    your direct testimony?

22    A.   Yes.

23    Q.   That's --

24    A.   Well, I described it at length in my report; but I

25    don't think we -- but it was a serious assault.

1    Q.   Okay.  That's -- that's the one where he -- he beat

2    his downstairs neighbor severely; correct?

3    A.   Yes.

4    Q.   And that's the one where you evaluated him and

5    opined that he was not criminally responsible?

6    A.   That's not correct.  I said he had a condition.  I

7    was never asked to testify or make comment about

8    criminal responsibility in that case.  That -- I made

9    the report and the next thing I heard he had been

10   acquitted NCR.  Which, frankly, surprised me a little

11   for several reasons.

12   Q.   Why did it surprise you?

13   A.   Because I -- I thought that his meeting the very

14   strict, stringent criteria for NCR were questionable,

15   and I also thought it was questionable that he would

16   take that route because of the implications; but, again,

17   I wasn't asked.

18   Q.   Questionable as a legal strategy?

19   A.   Well, questionable about how the person is -- life

20   is going to be going forward.

21   Q.   Because a civil commitment pursuant to a not guilty

22   by reason of insanity finding can be a long and

23   unpleasant experience?

24   A.   Yes.

25   Q.   You -- do you know that your report was a large part

1   of the basis for the -- the adjudication in that case?

2   A.   Again, I was not consulted, and I have no idea with

3   how the proceedings went.  The next thing I learned he

4   had been acquitted NCR.

5   Q.   But you evaluated him; right?

6   A.   Yes, sir.

7   Q.   You concluded that he suffered from a serious mental

8   disease or defect at the time of the offense; right?

9   A.   Yes.

10  Q.   And that that mental disease or defect affected

11  either or both his ability to appreciate the

12  wrongfulness of his conduct or to control his conduct?

13  A.   I didn't opine upon that that I recall.  I could

14  take a look at my opinions.

15  Q.   All right.  Well let me move on --

16  A.   I said he had a serious illness.

17  Q.   Okay.  Let me move on.  You have evaluated him twice

18  otherwise; correct?

19  A.   Yes.

20  Q.   Both of those occasions in connection with this

21  case; correct?

22  A.   Yes.

23  Q.   The first time in 2015; right?

24  A.   Yes.

25  Q.   And that was in connection with the consideration of

1    an insanity defense in this case; correct?

2    A.   That was mentioned, but my understanding was --

3    either at that time or in the course of this -- that

4    they were not going to pursue that.

5    Q.   All right.  But your -- you're a extremely

6    experienced medical doctor and forensic psychiatrist;

7    right?

8    A.   Thank you, yes.

9    Q.   Okay.  And you have done this many times; right?

10        You knew what this was for, right, in 2015; correct?

11   A.   I knew it was to assess his mental, emotional, and

12   behavioral state with a particular focus on -- around

13   the -- related to the allegations.

14   Q.   At the time of the offense, his mental state at the

15   time of the offenses; correct?

16   A.   Yes.

17   Q.   Okay.  And that typically is done in order to

18   evaluate the availability of an insanity defense; right?

19   A.   Of the -- I'm sorry, which?  The availability of?

20   Q.   Of an insanity defense.  A claim that the defendant

21   is not criminally responsibile for their conduct;

22   correct?

23   A.   That's -- that's one possibility.  I would say that

24   more often I am asked to opine about mental and

25   emotional conditions that could be part of the overall

1    picture and what might be done to -- going forward to

2    require the person to do to minimize future risk, that

3    type of -- so-called other mental conditions.

4    Q.   All right.  But that wasn't the case in this case.

5    I mean you knew why you were being asked to evaluate him

6    in this case; right?

7    A.   Well, it is in my report.  I can --

8    Q.   Well --

9    A.   It is -- no, I'm sorry, this is --

10   Q.   Well, Doctor, I am not asking you to read your

11   report.  If you don't recall, that's fine.  I will move

12   on, okay.

13        I take it you don't recall the reason that you were

14   asked to evaluate Mr. Kilmartin in 2015 in connection

15   with this case?

16   A.   No, that's not correct.  I didn't recall that I was

17   being asked to evaluate his mental, emotional condition,

18   his -- if that fit into his prior history of mental

19   illness that I had assessed in 2008.  But the specific

20   question of whether he was not criminally responsible, I

21   don't recall that being -- that I was being asked that.

22   That typically -- and also that would be a decision that

23   would be made in -- in court, not in my report.

24   Q.   All right.  Do you know that a notice was filed in

25   this case?

1    A.   As I say, once I made the -- sent the report in I

2    didn't hear anything else for a couple of years.

3    Q.   Okay.  Does that mean you did not know that a notice

4    had been filed?

5    A.   I'm sorry, I did not?

6    Q.   My question was did you know that a notice had been

7    filed in this case?

8    A.   Once I sent the report in I had no further contact

9    with it, so I was not involved with the case after that.

10   Q.   Okay.  But I still don't think you are answering my

11   question.  I mean did you or didn't you know that a

12   notice had been filed in this case?

13   A.   Well, that's -- no, I did not know.

14   Q.   Okay.  And the third time that you evaluated him was

15   in 2018 with respect to this sentencing; correct?

16   A.   Yes.

17   Q.   All right.  And so in -- in the course of those

18   evaluations you have -- you have interviewed him several

19   times; right?

20   A.   Yes.

21   Q.   And you have consistently found that he had, what,

22   average or above average intelligence; right?

23   A.   Yes.

24   Q.   That his mood was appropriate during your meetings

25   with him; correct?

1   A.   Yes.

2   Q.   That he -- that he wasn't, for example, experiencing

3   one of these manic or depressive episodes; right?

4   A.   At the time I saw him?

5   Q.   At the times that you saw him.

6   A.   At the times I saw him, that's correct.

7   Q.   Right.  That his thinking appeared to be rational

8   and linear; right?

9   A.   Yes.

10  Q.   That he was competent; right?

11  A.   I'm sorry?

12  Q.   In layman's terms that he was competent when he was

13  dealing with you; right?

14  A.   At the time I saw him, yes.

15  Q.   When you interviewed him; right?

16  A.   Yes.

17  Q.   You have interviewed him at least three times;

18  right?

19  A.   If we're going to go through my report, I will --

20  let me take -- refer to that.

21  Q.   I am not going through your report.  I am asking you

22  do you remember that you interviewed him three separate

23  occasions in connection with three separate evaluations?

24  A.   Yes.  But if you are going to ask me about specifics

25  in my report, I would like to see them in front of me.

1    Q.   Okay.  I don't think we're there yet, but if at any

2    point you want to refer to your report let me know;

3    okay?

4    A.   Okay.

5    Q.   All right.  And amongst the other things that he

6    consistently told you was that he really did not like

7    Riverview; right?

8    A.   He -- that's correct.

9    Q.   That he found that an extremely unpleasant place to

10   be; correct?

11   A.   Yes.

12   Q.   So now and -- and then let's talk a little more

13   specifically about the -- the most recent -- the 2015

14   interview; right?

15   A.   Okay.

16   Q.   And, you know, he -- he told you he was -- you know,

17   he had been -- he gave you a history during that -- that

18   interview; right?  You reviewed his history together?

19   A.   Yes.

20   Q.   And you have talked about this on direct

21   examination; right?

22        He -- he was found not guilty by reason of insanity

23   of the -- of the aggravated assault; right?

24   A.   Right.

25   Q.   He was committed to Riverview; right?

1    A.   That's my understanding, yes.

2    Q.   Right.  These are things that you discussed with

3    him; right?  That -- that he told you; right?

4    A.   Yes, I caught up on the history.

5    Q.   Okay.  Right.  And -- and -- and, as you described

6    in your direct testimony, the -- the terms of those

7    kinds of commitments are you -- you are there until you

8    demonstrate that you are no longer sick and dangerous,

9    in lay terms; right?

10   A.   Basically, yes.

11   Q.   Okay.  And that he had been making progress, right,

12   at Riverview?

13   A.   Yes.

14   Q.   Right.  That he had gotten a job working at Sam's

15   Club; right?

16   A.   Yes.

17   Q.   And that he had managed to get increased privileges

18   over time; right?

19   A.   Yes.

20   Q.   To the point where he was living off campus in a --

21   in a -- in an apartment in Augusta; right?

22   A.   Yes.

23   Q.   First a supervised apartment and then later on his

24   own --

25   A.   Correct.

1    Q.   -- right?  And then he -- he told you that he had

2    been falsely accused, right, of shoplifting the

3    Preparation H; right?

4    A.   Right.

5    Q.   That's what he consistently told you in your

6    interviews with him, too, 2015 and '18; correct?

7    A.   That -- yes.

8    Q.   All right.  You now know that isn't true; right?

9    A.   I have learned that, yes.

10   Q.   Okay.  And -- and one of the factors that affects

11   the quality of your opinions is the accuracy and

12   reliability of the information that they are based on;

13   right?

14   A.   Yes.

15   Q.   All right.  So in this respect at least you now know

16   that he -- if you didn't otherwise -- that he may not

17   always have been the most reliable reporter; right?

18   A.   He has in this case and -- yes.

19   Q.   I mean there are others --

20   A.   Although the federal report states he is a reliable

21   informant.  There is a statement in there about that.

22   Q.   All right.  You are referring to the Fort Devens

23   evaluations?

24   A.   Yes.

25   Q.   All right.  But now I am asking you about you, your

1    experience.  You know, at least at this point based on

2    your personal experience, that he is not -- I mean if

3    you didn't otherwise, he is not entirely a reliable

4    reporter; right?

5    A.   That's correct.

6    Q.   All right.  And then it was because of -- of getting

7    caught shoplifting that he became -- or that he -- he

8    becomes depressed; right?  That triggers a bout of

9    depression, a cycle of depression?

10   A.   Yeah, triggers his fears that he is going to be sent

11   back to --

12   Q.   Riverview?

13   A.   -- Riverview.

14   Q.   Which he really doesn't like?

15   A.   Really doesn't like.

16   Q.   Okay.  And, amongst other things, he quits his job;

17   right?

18   A.   Yes.

19   Q.   Right?  He is researching suicide online; right?

20   A.   Yes.

21   Q.   He is neglecting his appearance; right?

22   A.   That's what he told me, yes.

23   Q.   These are things that he told you in your

24   interviews; right?

25   A.   Yes.

1   Q.   Okay.  But -- but, for example, you know that during

2   this time he is being seen regularly by Riverview;

3   right?

4   A.   He was seen periodically.  I only have one record

5   from one -- I have very limited information from that

6   period of time from Riverview.

7   Q.   All right.

8   A.   I do have one note from one of his doctors.

9   Q.   All right.  So you don't have the complete Riverview

10  file of his -- of his commitment there?

11  A.   I just received this.  I don't -- I don't know if I

12  have the complete file or not, but I -- what I have is

13  limited.

14  Q.   You have only one report you say?

15  A.   There is one physician report and there are two or

16  three reports to the Court regarding his status.

17  Q.   All right.  But you are familiar with Riverview and

18  its operations; right?

19  A.   Well, a lot of it, yes.

20  Q.   I mean you have had substantial experience with --

21  with their operations, their commitments; right?

22  A.   Well, I am not sure what -- operations is a big

23  term, but any -- what part of the operations?

24  Q.   Well, the fact that they on an inpatient basis see

25  their patients regularly, and document those -- those

1  meetings and sessions, and that there are substantial

2  medical records especially of someone who has been

3  committed to Riverview for years; right?

4  A.   Yes.  I have -- I have seen a -- a number of those

5  records, that's correct.

6  Q.   In the course of the many evaluations that you have

7  conducted including for the state; correct?

8  A.   Yes.

9  Q.   Okay.  But -- and -- and you would expect that there

10 would be a substantial medical record from Riverview

11 with respect to Mr. Kilmartin's commitment; correct?

12 A.   I imagine the entire file is monumental.

13 Q.   Okay.  And you know that Fort Devens had a copy of

14 that file; right?

15 A.   Yes.

16 Q.   All right.  But you did not?

17 A.   I don't know if -- if they got the whole file or

18 what, but there is mention there.  They did list what

19 they had.

20 Q.   In their report?

21 A.   Yes.

22 Q.   Okay.  And it -- it -- in your experience when

23 Riverview -- when they are supervising someone in the

24 community, as you testified on direct examination, there

25 is an ACT team that follows them; right?

1    A.   Yes.

2    Q.   And -- and supervises them and makes records of

3    those supervisions; right?

4    A.   Yes.

5    Q.   All right.  And -- and typically there will be

6    periodic -- you said periodic meetings with the -- with

7    the supervising psychiatrist; right?

8    A.   With the, I'm sorry?

9    Q.   Typically they will -- the person in the community

10   will have regular meetings with the supervising

11   psychiatrist?

12   A.   I don't know just how that goes.  That's -- the one

13   medical note I got I think was from a psychiatrist.

14   Q.   I'm sorry, was what?

15   A.   It was from the psychiatrist.

16   Q.   The psychiatrist who was overseeing Mr. Kilmartin?

17   A.   Yes.

18   Q.   Okay.  Was that Dr. Manin?

19   A.   Yes.

20   Q.   Okay.  But that's -- that's typical in these

21   situations.  You know that from your experience apart

22   from this case; correct?

23   A.   Yes, there will be a number of people involved in

24   the team who follow the person as the ACT program is

25   typically a team approach.

1    Q.   All right.  And the team -- the team follows and

2    supervises the person in the community; correct?

3         And then typically there are also regular meetings

4    with the -- the -- the psychiatrist overseeing the case;

5    right?

6    A.   You are asking me details of things that I have not

7    been directly involved with.  I am going on the basis of

8    my experience with others.  I haven't worked with an ACT

9    team in -- at Riverview, but it would be typical that

10   the -- the team would have some supervisory input from a

11   medical doctor, yes.

12   Q.   Well, I think my -- all right.  Did you know that

13   Dr. Manin was seeing Mr. Kilmartin every two weeks

14   during this time?

15   A.   I didn't know the exact frequency.  I think

16   somewhere in the records I saw reference to that, that

17   he was being seen every two weeks.

18   Q.   Okay.  And would it surprise you to learn that Dr.

19   Manin didn't note I mean any psychotic symptoms during

20   the time that you have opined that Mr. Kilmartin was

21   experiencing this major illness that was affecting his

22   perception of reality and ability to, you know, perceive

23   and -- and relate to the -- the real world?

24   A.   Certainly if that -- that did not come to light,

25   from what I understand; and, yes, that would be

1    something that would be of some concern.  Although

2    having done this work for many years, and knowing the

3    circumstances with Mr. Kilmartin, it is plausible to me

4    that he concealed those symptoms because he didn't want

5    to be sent back to Riverview.  And if he tells them I am

6    really getting crazy again, he is put -- puts himself at

7    risk for being sent back.

8    Q.   But he --

9    A.   People often don't tell you the whole story.

10   Q.   All right.  But that would bespeak a certain amount

11   of self-control on Mr. Kilmartin's part, wouldn't it?

12   A.   Yes.

13   Q.   And appreciation of the situation, the reality of

14   his situation?

15   A.   Yes.

16   Q.   Now, going on with the -- the -- the history that

17   you discussed in the 2015 interview, I mean again you

18   have testified about this on direct how he researched

19   suicide online, how he found -- you know, how he found

20   the blog site devoted to suicide and through it met

21   other depressed people; correct?

22        How he figured out how to obtain actual potassium

23   cyanide; correct?

24   A.   Yes.

25   Q.   How he offered to sell it to some of these people

1  that he had met on the Internet; correct?

2  A.   Yes.

3  Q.   Right?  And how he -- he didn't send them Epsom salt

4  -- he didn't send them cyanide, he sent them Epsom salts

5  instead?

6  A.   Yes.

7  Q.   Right.  And he told you that; right?

8  A.   Yes, I -- I learned it from him and from others in

9  the -- in the records but.

10  Q.   Did you -- did you explore that with him?  Did you

11  press him on that?  Did you ask him why it was he -- he

12  was doing that?

13  A.   You are speaking of 2018 now at which point he had

14  been convicted, so he gave rather vague answers.  Or my

15  recall is that he gave somewhat vague answers about why

16  he did that.  He was getting money.  He was getting some

17  money for it, so that certainly was a plausible

18  recommendation.  I mean plausible explanation.

19  Q.   He told you about how he sent Denton Epsom salts at

20  first; correct?

21  A.   Yes.

22  Q.   And how Denton got angry?

23  A.   Yes.

24  Q.   Irate I think is the word you used; right?

25  A.   Could have been.  But, yes, Denton was quite upset.

1   Q.   All right.  And then in 2015 he told you he agreed

2   to send him cyanide to -- to -- to placate him, right,

3   but sent him Epsom salts the second time; right?

4        That's what he told you in 2015; right?

5   A.   Yes.

6   Q.   Okay.  Now that wasn't true either, right, you know

7   that now?

8   A.   I know that he has been convicted of sending him

9   cyanide.  My understanding is there were traces of

10  cyanide found in the packet that he sent Denton the

11  second time.

12  Q.   Yep.  Well, I mean do you believe that he was being

13  untruthful with you then in 2015 when he -- when he

14  claimed that he sent Denton Epsom salts the second time?

15  A.   You know, the jury heard the evidence, and they

16  decided that, and I defer to them.

17  Q.   Okay.  But I am interested in you and your opinions

18  and how this information affects you and your opinions.

19  A.   I understand that he denied sending him cyanide on

20  the second occasion.

21  Q.   But what about the fact that he denied it to you and

22  that appears to be untrue --

23  A.   Well, that was --

24  Q.   -- does that cause you any concern about the -- the

25  accuracy and the reliability of the opinions that you

1  have offered on the basis of information he provided

2  you?

3  A.   I am always -- there is always a concern about the

4  veracity of what a person is -- tells me.  It depends on

5  what they are saying and what the circumstances are.  In

6  the 19 -- in 2015 he was denying having sent cyanide to

7  Denton.  He was -- it was -- his defense was I didn't,

8  you know, do it, he must have gotten cyanide from

9  someone else.  And he is not going to tell an

10  independent examiner that, you know, my defense is a

11  lie, yeah, I did send him the cyanide.

12  Q.   Well, how about this, I mean doesn't that bespeak I

13  mean a certain understanding of his situation right and

14  wrong and an ability to act rationally at least in that

15  context in dealing with you; right?

16  A.   Yes, he -- he understood the -- absolutely.  I agree

17  with that.

18  Q.   All right.  So --

19  A.   Again, I was not asked to see him regarding issues

20  of criminal responsibility.  I can read you the reasons

21  he was -- I saw him in 2015 from my report if you --

22  Q.   All right.  Well, but in any event, putting it all

23  together here today and speaking of that moment in time

24  in 2015 when you're interviewing him, he -- he wasn't --

25  he wasn't suffering from an illness then, he -- you

1  know, it wasn't affecting his ability to understand his

2  situation right and wrong to perceive what was in his

3  interest and what -- how to act and what to tell you in

4  order to serve his self-interest; right?

5  A.   That's correct in this -- especially in this regard.

6  Q.   All right.  And then -- and then he -- he -- he told

7  you about this -- the shoplifting, right, and how

8  depressed he was, and how he was going to kill himself

9  with the cyanide that he had gotten because it might

10  mean he would have to go back to Riverview; right?

11      We've talked about that before and you have

12  testified about it before; right?

13  A.   Right.  And, again, he denied to me that he had

14  taken the Preparation H.  He said his brother-in-law had

15  done that, and that's what I -- he told me.  And I

16  understand that's been the focus of quite a bit of

17  discussion and it is now accepted that he did take the

18  Preparation H.

19  Q.   And -- and we've talked about that already in -- in

20  -- in our conversation here today.  He went on to tell

21  you then, though, in 2015 that he succeeded in getting a

22  favorable resolution of that shoplifting case; right?

23  A.   Yes.  In December he got word from his attorney the

24  case had been worked out.

25  Q.   And -- and that that lifted his spirits and he was

1   no longer considering committing suicide himself because

2   of that; right?

3   A.   Yes.

4   Q.   All right.  And as you have alluded I mean there has

5   been a fair amount of discussion about how it was that

6   he achieved that resolution of the shoplifting case;

7   right?

8   A.   Yes.  I have seen that testimony at the Grand Jury

9   and Mr. -- brother-in-law's testimony.

10  Q.   Okay.  Did you see the Government's exhibits

11  relating to this issue?

12  A.   I am not sure which --

13  Q.   Well, the Grand Jury testimony is -- that -- those

14  are some of the Government's exhibits.  Did you also see

15  any of the police reports regarding the shoplifting?

16  A.   I don't recall, but I understand that he -- it has

17  been accepted and -- as truth that he -- he was the one

18  who took this -- took the Preparation H.

19  Q.   All right.  How -- how about do you know that he

20  actively conspired with his wife and then brother-in-law

21  to put up a false defense to that shoplifting case?  Are

22  you aware of that?

23        MR. MERRILL:  Your Honor, I am going to object

24  to this.  I was going to mention it before, but the

25  Grand Jury transcripts do not support that there was a

1    conspiracy.  Deb Kilmartin and Mr. Ruminksi both

2    indicate it was their idea and they did it.  There is no

3    suggestion that Mr. Kilmartin was even aware of what

4    they were doing in the beginning.  So to suggest that

5    this was a conspiracy or that it was orchestrated by

6    Mr. Kilmartin is just not supported by the exhibits the

7    Government has submitted in this case.

8           THE COURT:  You may proceed.

9    BY MR. FRANK:

10    Q.  I mean have you read any of those exhibits?

11    A.  I read the Grand Jury testimony, the part that was

12    provided.  There is a section in the middle that's --

13    Q.  All right.  So you haven't seen, for example, I take

14    it, letters that Mrs. Kilmartin and Mr. Kilmartin's

15    brother-in-law wrote authorities asserting that it was

16    the brother-in-law who shoplifted the Preparation H?

17    You haven't seen those sort of writings?

18    A.  I don't recall seeing those.

19    Q.  Did you see an interview of the Dollar Store manager

20    who caught Mr. Kilmartin red handed?

21    A.  I don't recall seeing anything direct.  I understand

22    that he thought that the person -- that Mr. Ruminski was

23    not the person who he thought took the Preparation H.

24    Q.  The shot -- the shop -- the shop manager?

25    A.  Yes.

1    Q.   It was a woman, but -- but because -- do you -- do

2    you understand that Mr. Ruminski actually came back one

3    day and tried to persuade her that she had misidentified

4    him?

5         Did you see any reports to that effect?

6    A.   That came across in his deposition.

7    Q.   In his Grand Jury testimony he admitted that he went

8    back --

9    A.   Yes.

10   Q.   -- to the store and tried to -- to falsely persuade

11   the manager that she had misidentified him?

12   A.   That's my understanding, yes.

13   Q.   Okay.  From having read his Grand Jury transcript?

14   A.   Right.

15   Q.   Okay.  Well, I mean this is all happening the same

16   time as the fraud scheme, defrauding the other depressed

17   and suicidal people, isn't it?

18        You are aware of that, aren't you?

19   A.   Yes.  Well, the shoplifting happened earlier.  I

20   don't know -- that was in April of 2012, and I am not --

21   Q.   Well, the --

22   A.   I have to look at the -- when the -- when the

23   testimony was, but it was worked out at some point.

24   Q.   Well, you understand the basic sequence; right?  The

25   sequence is he -- he shoplifts the Preparation H and

1    gets caught and that's what triggers the depression that

2    causes him to go looking to kill himself which leads him

3    to meet the other depressed people he goes on to

4    defraud; right?

5        So that -- that's -- that's the -- the temporal

6    sequence; right?

7        And that -- that -- that he works together or -- or

8    -- it is my characterization, but I think it is

9    supported by the record, that he, his estranged wife and

10   brother-in-law all act in this concerted fashion to

11   persuade the district attorney that they have gotten the

12   wrong man to avoid Mr. Kilmartin being returned to

13   Riverview.  I mean if that's the case I mean does that

14   -- does that cause you any concern about your opinions?

15   A.   No.

16   Q.   In your 2015 interview Mr. Kilmartin told you that

17   Andrew Denton must have gotten the real cyanide from

18   someone else; right?

19   A.   Yes.

20   Q.   Okay.  And that wasn't true either, you know that

21   now; right?

22   A.   I understand that was the jury's findings, yes.

23   Q.   You have read the Fort Devens reports, right, and

24   you are critical of them; right?

25   A.   Critical of parts of them.  Parts of them are quite

1   well done, as I said.

2   Q.   Okay.  Specifically critical in that they didn't

3   seem to develop enough information about his mental

4   state at the -- the -- the key moments in time, that

5   being April of 2012 to about May of 2013, right, when

6   his criminal activity is -- is happening; right?

7   A.   Yes.

8   Q.   All right.  But you -- I mean if they had the

9   Riverview records during that time period, okay, they

10  had a lot more contemporaneous information than you did,

11  didn't they?

12  A.   If they had that, they would have had -- yes, they

13  would have had the information from whoever was

14  following him during that period of time.

15  Q.   Right.  And not just anybody but trained

16  professionals; right?  In the field; right?

17  A.   Yes.

18  Q.   Okay.  Presumably --

19  A.   He is back in Riverview in February, I believe, when

20  they tested positive for cocaine and alcohol.

21  Q.   Yeah, he winds up --

22  A.   There were a couple of admissions around that time.

23  Q.   He winds up getting revoked a couple of times for

24  testing positive for cocaine and alcohol, that's right;

25  but that's largely after the criminal activity that

1    underlies the federal criminal case, okay, and it is --

2    in any event, Riverview is seeing him on some basis all

3    during that time; okay?

4    A.    I -- I accept it --

5    Q.    All right.

6    A.    -- as probably true.

7    Q.    All right.  And --

8    A.    I haven't seen the records.

9    Q.    All right, you haven't seen the records.  But you

10   know their general practice.  They are professionals.

11   They document their -- their observations; right?  Keep

12   -- keep records; right?

13   A.    Yes.

14   Q.    In general; right?  And you are aware, at least from

15   your review of Fort Devens report, that they claim to

16   have received those records; right?

17   A.    I have to look at that.  I don't -- I don't know if

18   they listed just what they received.  There is -- there

19   is a -- just a very simple outline of the various

20   records they received without a lot of description of

21   what's in it or.

22   Q.    All right.  But if, in fact, they had all those

23   records, then they had contemporaneous records of

24   experienced professionals who are making observations at

25   the time; right?

1    A.    Right.

2    Q.    Okay.  And they had that information which you did

3    not?

4    A.    Okay.  What's -- I don't understand the question.

5    Q.    Well, I -- I -- I think -- I think if you agree with

6    my -- my premise, that's enough.

7          You have already said that they -- they interviewed

8    his estranged wife Debby.  Did you interview her?

9    A.    No, I have never met her.  There was a phone

10   interview I think that they listed.

11   Q.    All right.  You -- you have seen their report, you

12   have read their interview of Mr. Kilmartin?

13   A.    Yes, I have read both reports.

14   Q.    Did you note that they -- they found that he

15   reported starting using cocaine in his 20s and that by

16   the age of 30 he was using it three times a week?  Do

17   you recall that?

18   A.    Yes, I recall that his use of alcohol and cocaine

19   was serious.  I -- the exact dates I would have to look

20   at the report.

21   Q.    Okay.  And cocaine is particularly serious, isn't

22   it, for -- for a person in -- like Mr. Kilmartin?

23   A.    Well, alcohol -- it is -- alcohol is also very

24   dangerous; but, yes, cocaine is a serious drug.

25   Q.    One -- one is a depressive and the other is a

1   stimulant; right?

2   A.   Yes.

3   Q.   Okay.  And that's a bad combination for somebody who

4   has a tendency to be bipolar or manic depressive, isn't

5   it?

6   A.   Yes.

7   Q.   I mean it can trigger cycles, it can exacerbate

8   cycles; right?

9   A.   It can.

10   Q.   I mean you noted yourself that that could be an

11   explanation.  You thought -- you thought his -- his

12   problems started later in I think his 40s; right?  Or at

13   least on questioning by Mr. -- by Mr. Merrill that's

14   what you testified, wasn't it?

15   A.   The onset was later than we typically see; but it is

16   -- again, it is -- it happens fairly regularly.

17   Q.   All right.  And one of the things that can trigger

18   it is drug use and cocaine use in particular; correct?

19   A.   I am not sure I'd just say cocaine in particular

20   because serious alcohol use also is very destructive,

21   but they are both significantly increased risk for

22   mental and emotional problems and onset of possible

23   mental disorders.

24   Q.   All right.  And then their interview of

25   Mr. Kilmartin and his other -- is -- is largely

1  consistent with yours; isn't it?

2  A.   In terms of what?

3  Q.   Well, the history that he --

4  A.   That's a very broad statement.

5  Q.   In terms of the history that he provided of, for

6  example, the time period in 2012-2013?

7  A.   The history is -- yes, it is consistent with what I

8  understand.

9  Q.   By the way, Fort Devens also tested Mr. Kilmartin;

10 right?

11      They -- they -- they -- they had him take a variety

12 -- a battery of -- of psychiatric tests, did they not?

13 A.   They took a couple.  They took the MMPI-2 which is a

14 -- been around for a long time, widely used test.  I

15 think it is about 600 yes or no questions.  They also

16 did an abbreviated intelligence test.  Those are the two

17 that come to mind.

18 Q.   Did you test him?

19 A.   No, I don't -- I don't do testing.  I am a

20 psychiatrist.

21 Q.   And did you have him tested?

22 A.   No.

23 Q.   Amongst the results they noted in their report was

24 that he had a tendency to exaggerate his mental health

25 symptoms to portray himself as more disturbed than he

1  actually was.  Did you notice that finding in the

2  testing?

3  A.   Yes, I remember that, that he endorsed symptoms of

4  -- that are to a greater extent than is commonly seen;

5  but I also think they -- I also recall they said the

6  test results were valid.  There are questions that are

7  stated the same way in different parts of the exam to

8  test consistency and validity in the MMPI.

9  Q.   All right.  And the bottom line in their reports --

10 although they -- they largely agreed with your

11 diagnoses, right, that he was bipolar, for example;

12 right?

13 A.   Yes, we're -- again --

14 Q.   Largely consistent?

15 A.   -- where it -- which one you pick, schizoaffective

16 with bipolar or bipolar with psychotic features, people

17 may disagree but it is not important.  The important

18 thing is what are the symptoms and what are the effects

19 on behavior.

20 Q.   Okay.  And -- and they found him competent and

21 criminally responsible; right?

22 A.   Yes.

23 Q.   All right.  And in particular they -- they noted

24 that his claim to have been cycling in and out of

25 psychoses during the time period wasn't credible; right?

1   A.   Yeah, they made a statement about that that I don't

2   know if it was the intern, but she is wrong.  There are

3   people -- there is even a type of manic depressive

4   illness called rapid cycling, and people who have this

5   disorder are vulnerable to having fairly quick mood

6   shifts.  And, you know, I have seen people who come in

7   manic and two days later they are in a severe

8   depression, so I -- I would disagree with that.

9   Q.   All right.  And another component of their finding

10  was that one that I asked you about earlier, the fact

11  that he was being seen regularly all during this time,

12  being supervised in the community, seeing Dr. Manin

13  periodically, and that the evaluators at Fort Devens

14  found it hard to believe that Mr. Kilmartin would be

15  able to conceal from those experienced professionals,

16  you know, the kind of cycling in and out of deep

17  depression and manic highs that -- that, you know, that

18  would be hard for him to conceal that from them.

19  A.   Well, that's just not so.  Unless the person is

20  forwardly psychotic.  Unless the person is, as I say, in

21  a severe manic state or so depressed they can't move.

22  But it is very common if a person gets brought into the

23  emergency room, or comes in for an evaluation that they

24  don't really want or they object to, and put on a very

25  good face, and can pull it together for that time that

1   they are being observed.

2        Now, it is my understanding that he was -- he was in

3   good control also while he was at Fort Devens.

4   Presumably he wasn't drinking alcohol or smoking -- or

5   taking cocaine, he was on medication.

6   Q.   Although you -- you know, apparently from your

7   review of records or otherwise, that I mean shortly

8   after he kills -- he sends cyanide to -- to Denton I

9   mean he starts testing positive for cocaine and alcohol,

10  right, and gets revoked; right?

11  A.   That's correct.   That was long before he went to

12  Fort Devens.

13  Q.   Okay.   But in terms of -- in terms of, you know,

14  what might have been happening during the time that he

15  is committing fraud and -- and sending Epsom salts and

16  cyanide, I mean if he -- if he gets caught using cocaine

17  and alcohol shortly after that period I mean does it

18  cause you any concern that he might have been using it

19  earlier during the period that he was criminally active

20  and that it might have impacted that?

21  A.   I -- I would fully agree that it would be -- the

22  truthfulness of his not using alcohol and drugs during

23  that time is something to be --

24  Q.   Suspicious of?

25  A.   -- concerned about.   Again, if he was doing that he

1  would be subject to being returned to Riverview.  But,

2  yeah, I -- I would agree people are often not

3  forthcoming about their use of substances.

4  Q.   When you interviewed him the most recent time, the

5  third time in 2018 in connection with this proceeding, I

6  mean he again told you largely the same story he had

7  told you before, correct, in your interview; right?

8  A.   I have to --

9  Q.   You are not sure?  Well, I mean how about this, he

10  continued to deny sending cyanide to Denton the second

11  time; right?

12  A.   Yeah.  This was just a -- it was an -- basically an

13  interval evaluation.

14  Q.   A what evaluation?

15  A.   Interval.  You know, what had happened since I last

16  saw him and --

17  Q.   An update?

18  A.   -- and to see what his mental status was like.

19  Q.   Okay.  All right.  But he -- again you took some

20  history from him again, I take it, and he told you

21  largely that this -- the same story including denying,

22  even at that point, that he had sent Denton cyanide the

23  second time; correct?

24  A.   Could you point me to that?  I don't recall.  Well,

25  no, let's see.  Well, he denied that he sent him cyanide

1  to stop him from testifying.  That's on the bottom of

2  page five.

3  Q.   Okay.  Well, that would have been -- all right.  He

4  denied sending him cyanide.  So even --

5  A.   To stop him from testifying.

6  Q.   Yep.  Well, are you drawing a distinction there?

7       Did he admit sending him cyanide for some other

8  purpose at that point?

9  A.   Well, the other purpose would be to kill himself,

10  but it had nothing to do with his testifying.

11  Q.   Okay.  But what did he tell you?

12  A.   Well, that's -- that reflects what he told me, that

13  he did not send him cyanide to interfere with him as a

14  witness in this.

15  Q.   So he denied obstructing -- the motive to obstruct

16  justice?

17  A.   Yes.

18  Q.   Okay.  But did he claim he -- he -- did he admit he

19  sent him cyanide?

20  A.   I am not sure -- I don't recall pressing him on

21  that.  He had been convicted at that point --

22  Q.   You --

23  A.   -- of sending him cyanide.

24  Q.   You weren't concerned, you didn't think that that

25  was a significant enough point to press him on?

1  A.   Not at that point, he has been convicted.  I am not

2  going to try his case.  I am not the trier of fact

3  anyway on these.

4  Q.   Well, I understand that; but, again, are you -- how

5  concerned are you that -- I mean he is the primary

6  source of information on which you base your

7  conclusions, isn't he?

8  A.   He is -- yes, he is certainly one, but also the

9  prior history and --

10  Q.   Okay.  But all of that comes from him; right?

11  A.   No, there is records from Spring Harbor, there are

12  records from --

13  Q.   Did you review records from Spring Harbor in

14  connection with the 2015 and 2018 evaluations?

15  A.   I would have to -- I had them for the 2018, as I

16  recall.  I would have to look back for the 2015.

17  Q.   Okay.  But they wouldn't have had anything to do

18  with his mental state during 2012.  I mean they -- they

19  were years before; right?

20  A.   That's correct.  But if he has been psychotic and

21  had these symptoms in the past, and this is a chronic

22  illness that's prone to relapse, then that is very

23  relevant information.

24  Q.   Okay.  But, as I understood your earlier testimony,

25  of paramount importance to you is his mental state at

1   the time of the offenses; correct?

2   A.   Yes.

3   Q.   And your information about his mental state at the

4   time of the offenses comes almost entirely from Sidney

5   Kilmartin?

6   A.   That's -- that is correct.

7   Q.   Okay.  So aren't you --

8   A.   During that time frame.

9   Q.   Well, at all times.

10   A.   No, I have information from hospitalizations where

11   he was psychotic.

12   Q.   You are talking about the Riverview records?

13   A.   No, I am talking -- well, primarily from the prior

14   records from Spring Harbor.

15   Q.   Yeah, but that's -- that's years before the -- the

16   criminal events at issue in this case, and as I

17   understand you what is of paramount importance to you

18   and your opinions are the defendant's mental state at

19   the time of the offense.  We're talking about 2012

20   primarily, April to December of 2012; right?

21   A.   Yes.

22   Q.   Okay.  And the vast majority of your information

23   about his mental state at that time comes from him;

24   correct?

25   A.   Yes.

1   Q.   Okay.  So you should be concerned about his

2   reliability as a reporter; right?

3   A.   I am always concerned about the reliability, yes.

4   If there was reliable information to the contrary, if

5   somebody had gone into his place and saw he was doing

6   fine, and that's documented, then it would be of concern

7   to me, yes.

8   Q.   You didn't -- you didn't, for example, read the --

9   you know there are trial transcripts have been ordered

10  in this case so that there is a transcript of all the

11  witness testimony?

12  A.   No, I am not aware of that.

13  Q.   So you haven't read those, for example?

14  A.   No.

15  Q.   On direct examination you talked about how

16  Mr. Kilmartin's illness was affecting his perception of

17  reality during 2012; right?

18       You -- you believe it -- it was; correct?

19  A.   Yes.

20  Q.   All right.  But I mean at least in several

21  significant respects, at least significant to this case,

22  I mean he was pretty accurate; right?

23       I mean he understood that -- that he had jeopardized

24  his release from Riverview by -- by shoplifting the

25  Preparation H; right?  That -- that was accurate --

1   A.   Yes.

2   Q.   -- right?  And he acted in a rational, goal-oriented

3   manner in order to avoid that eventuality which he

4   disliked the prospect of; correct?

5   A.   Well, I -- as you brought up, his dealing with the

6   Preparation H accusations was initiated by his sister

7   and she enlisted her brother.

8   Q.   Okay.  So you have only read their Grand Jury

9   testimony.  You are not aware of any of the other

10  sources of information about that, is that -- that's

11  what you are saying?

12  A.   Well, I understood from you earlier that --

13  Q.   Well, no, my representations to you were that he

14  acted in concert with his ex-wife, estranged wife, and

15  brother-in-law to, you know, put forward this false

16  defense, and that ultimately he succeeded in getting a

17  favorable disposition; but, as I understand you, all you

18  know about that is what you read in the Grand Jury

19  testimony?

20  A.   As far as the resolution of that goes, yes.

21  Q.   You said specifically that in December of 2012 --

22  and this is when he sends real cyanide to Andrew Denton

23  and Andrew Denton kills himself with it -- that

24  Mr. Kilmartin told you he was in a highly depressed

25  state; right?

1    A.   Yes.

2    Q.   But you don't have the -- the Riverview records from

3    the time period; right?

4    A.   Just that one record from --

5    Q.   Which -- which one do you have?  Did you remember

6    whose note it was?

7    A.   Well, I have Dr. Manin, and there are a couple of

8    reports to the Court.  Now, you asked me to find it.

9    Let me do that.

10   Q.   Well, let me -- let me -- before we get --

11   A.   Well --

12   Q.   -- there let me just see.  You are the one who said

13   you recall one record; right?

14   A.   One record from the physician and several from the

15   -- I think it is from the state forensic service to the

16   Court.

17   Q.   Okay.  Which one do you recall?

18   A.   I recall one record from the physician.

19   Q.   Is that Dr. Manin?

20   A.   I think so --

21   Q.   Well, do you --

22   A.   -- but I would like to look at it.

23   Q.   Well, do you have a recollection of it?  What --

24   what do you recall about it?

25   A.   You said I could look at my file if I need to, and I

1   am asking to do that.

2   Q.   No, I -- I am happy to have you do so.

3   A.   Okay.

4   Q.   I just wondered if you recalled without having to

5   refresh your recollection?

6   A.   I recall seeing one record from Dr. Manin.

7   Q.   But -- but nothing --

8   A.   I don't know the date.

9   Q.   Or the substance?

10  A.   Oh, yes, the substance was he was doing fine.

11  Q.   Okay.  So let me ask you is that -- is that the --

12  the record from early January of 2013 where Dr. Manin

13  talked about how he met with the patient today for 15

14  minutes?

15  A.   That sounds familiar; but, again, I -- to confirm I

16  want to see it.

17  Q.   Okay.  And -- and he told Dr. Manin that he was

18  doing well, that he denied having any major problems,

19  and specifically denied any thoughts of harm to himself

20  or others.  Is that -- is that the record you are

21  recalling?

22  A.   That sounds familiar.

23  Q.   Let me do this, let me show you what's been marked

24  as Exhibit 6.

25          MR. FRANK:  May I approach, Your Honor?

```
 1              THE COURT:  You may.
 2   BY MR. FRANK:
 3   Q.   Doctor, let me show you what's been marked as
 4   Government's Exhibit 6, it is in the record.  Ask you to
 5   take a look at that.
 6   A.   Yes, this looks like the one that's in my file.
 7   Here, you want to take that?
 8   Q.   Well, have you found it in your file?
 9   A.   No.
10   Q.   Okay.  So I will leave it with you in case you want
11   to refer to it.  This is the record that you recall, I
12   take it?
13   A.   Yes.
14   Q.   All right.  And it -- it is dated January 4th, 2013;
15   right?
16   A.   Yes.
17   Q.   All right.  This is within days of Andrew Denton
18   having killed himself with the cyanide that Sidney
19   Kilmartin sent him, do you know that?
20   A.   Yes.
21   Q.   Because Andrew Denton killed himself on December
22   31st, right, of 2012?
23   A.   That's about -- that's the time frame that I recall.
24   Q.   All right.  Do you know Dr. Manin?  Do you know who
25   he is?
```

```
1    A.   No, I have never met him.

2    Q.   Okay.  Do you -- do you know that he is a medical

3    doctor?

4    A.   That's -- yes.

5    Q.   A psychiatrist?

6    A.   That's my understanding, yes.

7    Q.   Okay.  Who works at Riverview?

8    A.   Yeah.  Or works with them in some capacity, yes.

9    Q.   All right.  And that he was the psychiatrist who was

10   supervising Mr. Kilmartin during this time period?

11       Do you know that?

12   A.   Oh, I just have the one record and it -- and.

13   Q.   All right.  And -- and this -- I started asking you

14   if you remember this.  I mean did you remember that Dr.

15   Manin reported meeting with Mr. Kilmartin; right?

16   A.   Yes.

17   Q.   And that Kilmartin noted that he was doing well?

18   A.   Yes.

19   Q.   Right?  That he denied having any major problems;

20   right?

21   A.   Yes.

22   Q.   That he noted that the holidays went very well;

23   right?

24   A.   Yes.

25   Q.   He spent Christmas with his family and had a nice
```

1    dinner; right?

2    A.   That's what he told Dr. Manin.

3    Q.   Stayed up until --

4    A.   That's what he told -- that's what he told Dr.

5    Manin, yes.

6    Q.   Okay.  Stayed up -- stayed up to watch the New York

7    -- the -- the ball drop at Times Square; right?

8    A.   That's what he told Dr. Manin or Dr. Manin recorded,

9    yes.

10   Q.   Okay.  That he was getting along well with others;

11   right?

12   A.   Yes.

13   Q.   He was still frustrated by the shoplifting case;

14   right?  Do you see that?

15        It is middle of the second paragraph.  He -- he did

16   note that he can still be very frustrated when he thinks

17   about all the time that was lost dealing with his recent

18   legal issue that he was pulled into by his

19   brother-in-law; right?

20        Do you understand that to be a reference to the

21   shoplifting case?

22   A.   I think that's likely, yes.

23   Q.   All right.  He denied any thoughts of harm to

24   himself or others; right?

25   A.   Yes.

1   Q.   He was taking his medications as prescribed; right?

2   A.   That's what he told him, yes.

3   Q.   Felt that they were helpful?

4   A.   Yes.

5   Q.   Felt that his thoughts were working well?

6   A.   Yes.

7   Q.   That his moods were stable?  Right?

8   A.   Yes.

9   Q.   That he was eating and sleeping well?

10  A.   Yes.

11  Q.   And denied using any street drugs or alcohol; right?

12  A.   Yes.

13  Q.   I mean that is right around the time of this -- of

14  this homicide; right?

15  A.   Right around the time Denton died, yes.

16  Q.   I mean and there is no hint in this record from this

17  -- this psychiatrist of -- of any manic or depressive

18  state; right?

19  A.   That's correct.  In this -- in this note that is --

20  totally agree with you.

21  Q.   And likewise in the e-mail exchanges between Denton

22  and Kilmartin I mean they are very rational, calm, cool,

23  collected conversations, aren't they?

24  A.   The -- they are short -- they are short e-mails.

25  Some from Denton are a little longer, four or five

1    sentences; but, yes, they are organized and responsive.

2    Q.   Right.   I mean Kilmartin appears to be coherent;

3    right?

4        He is -- he is responding appropriately, if not

5    truthfully; correct?

6    A.   Yes.

7    Q.   I mean and that's all contemporaneous with --

8    A.   With the time in question, absolutely, I agree with

9    that.

10   Q.   I mean this -- this business of forensic psychiatry

11   is a -- it is not a hard science, is it?

12       It is not an exact science; right?

13   A.   No, we're not measuring numbers.

14   Q.   I mean it is -- it is -- especially when you are

15   relying upon people as your sources of information, I

16   mean it -- you know, it can be difficult to draw

17   conclusions and opinions that are -- that are accurate

18   and reliable, isn't it?

19   A.   Well, I wouldn't -- I don't agree with that.   I

20   think that there is a tremendous consistency within the

21   disorders that I am trained to treat and assess, but

22   each -- each individual has their own expression of it

23   and will also report things differently.   Some people

24   are -- elaborate, others are -- tend to deny what's

25   going on.

1    Q.   But I mean it is hard to predict who is going to get

2    sick, right, who is going -- who is going to fall

3    mentally ill; right?

4    A.   At what point?  When they are born or?

5    Q.   At any point in time.  With any precision to know

6    who is going to get sick, when they may get sick, what

7    they may get sick with, with precision?

8    A.   No.  I think if you have a person with some of the

9    illnesses, disorders, you can predict -- not a hundred

10   percent by any means, but that they may have other

11   episodes, that they are at high risk for other episodes.

12   And that would include psychotic disorder, mood

13   disorders, severe anxiety disorders, so forth.  There is

14   an amazing consistency clinically.  Anyway.

15           MR. FRANK:  I have no further questions, Your

16   Honor.

17           THE COURT:  Redirect?

18           MR. MERRILL:  Yes, Your Honor.

19                    REDIRECT EXAMINATION

20   BY MR. MERRILL:

21   Q.   Dr. Voss, with regard to Government Exhibit 6, do

22   you have that in front of you?

23   A.   Yes.  Actually, I found my copy, too.

24   Q.   You, in fact, contacted me last night about this

25   particular exhibit; correct?

A.   Yes.

Q.   And what was your concern about it?

A.   Well, the concern is I understood from my interviews with Mr. Kilmartin that he was having little or no contact with his family and that in this record it says that he went to his family's for the holidays, it went very well.  On Christmas he was with them and they had a nice dinner.  He was able to stay up and watch the New York Times Square ball drop at midnight.  Of course that would have been New Year's Eve.  He was getting along well with others.

So in this record, which is presumably based on what he told Dr. Manin, he was just doing extremely well.  This was in marked contrast to what I understood from him; that he was isolated in his home, not eating as he had, barricading the door at times, having some hallucinatory experiences episodic, was very depressed.  He had acquired, you know, with great -- with substantial effort the cyanide.

So I guess what would be of interest to me would be to see if -- if he acknowledged any of that to Dr. Manin or did he conceal it knowing that saying so would get him back into Riverview.

Q.   And -- and you asked me to clarify that with Mr. Kilmartin; correct?

1    A.    I did.

2    Q.    And did I tell you that I spoke to Mr. Kilmartin

3    today specifically about this?

4    A.    Yes.

5    Q.    And did I tell you that Mr. Kilmartin had said that

6    he told Dr. Manin what he needed to tell him in order to

7    stay out of Riverview?

8    A.    Yes.

9    Q.    And did I tell you that Mr. Kilmartin said that he

10   saw Dr. Martin (sic) two times per month and each time

11   Dr. Manin asked him the same five questions?

12   A.    Yes, and I think he told me that, too, at one of the

13   interviews; but that's my understanding --

14   Q.    Well --

15   A.    -- of what you learned from him also.

16   Q.    -- did he -- did he tell you that the questions were

17   are you homicidal? are you suicidal? are you taking your

18   medications? are you getting along with everybody? and

19   what's today's date?

20   A.    He -- I think that's in one of my reports that

21   that's what he represented Dr. Manin -- his contacts

22   with Dr. Manin were like, but that's -- and I understood

23   that --

24   Q.    Now, in --

25   A.    -- that's what he told you today.

1  Q.   -- in the condition that you say that Mr. Kilmartin

2  was in at this period of time, December, January --

3  December 2012, January 2013, would he, being

4  Mr. Kilmartin, be able to hold it together for 15

5  minutes, as Dr. Manin writes, to -- to basically suggest

6  to him that everything is hunky-dory in his life if he

7  wanted to try to stay out of Riverview?

8  A.   Yes.  And also having clear structure of what is

9  going to be asked and answering specific questions

10 rather than having to come up with your own productions

11 would make that easier to do.  And, again, I have -- was

12 -- I have been in this business a long time, and people

13 can pull the wool over your eyes if they need to.

14 Sometimes.

15 Q.   So does it surprise you that he might have lied to

16 Dr. Manin as to how well he was doing?

17 A.   I -- I think that's extremely -- very plausible as

18 again he was on the path for getting out from underneath

19 the court and did not want to go back to Riverview.

20 Motivation to cover that up was -- was understandable.

21 Q.   So does that change any of the opinions that you

22 have made here today?

23 A.   No.

24 Q.   Mr. Halsey asked you a number questions regarding

25 the 2015 interview --

1              THE COURT:  Mr. Frank.

2              MR. MERRILL:  I'm sorry?

3              THE COURT:  Mr. Frank.

4              MR. FRANK:  I answer to both, Your Honor.

5              THE COURT:  You said Mr. Halsey.

6              MR. MERRILL:  I'm sorry.  Mr. Frank, I'm sorry.

7              THE COURT:  Mr. Bruce.

8              MR. MERRILL:  I'm sorry.  Let me start again.

9    BY MR. MERRILL:

10   Q.   Mr. Frank asked you several questions about your

11   evaluation in 2015; correct?

12   A.   Yes.

13   Q.   And when you do an evaluation you make it clear to

14   the person you are evaluating that there is no

15   doctor-patient privilege that attaches to that

16   interview; correct?

17   A.   Correct.

18   Q.   And you make it clear to that person that you are

19   going to make known to both sides what the results of

20   your evaluation are; right -- correct?

21   A.   Well, I -- the state forensic -- the courts handle

22   it a little differently.  They typically make the report

23   available to the defense attorney to review, and if he

24   wants to, or she wants to, use that in the defense then

25   it goes to both sides.  My understanding the report can

1    be quashed if it not going to be used and the defense

2    wants to quash it.

3    Q.   But on page two of your 2015 evaluation -- which is

4    Exhibit 3, Your Honor -- you say Mr. Kilmartin was

5    interviewed at the Somerset County Jail.  At the

6    beginning of the evaluation Mr. Kilmartin was informed

7    that his participation was voluntary, he could end the

8    meeting at any time, he could decline to answer any

9    specific questions.  Mr. Kilmartin was informed I will

10   strive for objectivity and honesty in the evaluation.  I

11   will be paid for the evaluation or report by Mr.

12   Billings, who was his attorney, but I am not an advocate

13   for the defendant or the prosecution.  My findings could

14   be helpful or unhelpful for the defendant or

15   prosecution.  And my question to you is would it

16   surprise you that somebody that is going to trial, that

17   has entered a not guilty plea, might not admit to you or

18   confess to you that they did the crime?

19   A.   I think that's totally understandable.  He is not

20   going to tell me something -- the person I am

21   interviewing is not going to tell me something that

22   would blow up his defense.

23   Q.   But he knows this report is not private; correct?

24   A.   That's correct.

25   Q.   You advise him of that in the beginning?

1    A.   That's correct.  That's very -- that's a standard

2    disclaimer and explanation informed consent, if you

3    will, that I use and the other examiners use.

4    Q.   Mr. Frank also asked you if Mr. Kilmartin was a --

5    an intelligent person; do you recall that?

6    A.   Yes.

7    Q.   Is there any correlation between intelligence and

8    mental illness?

9    A.   No.  I mean -- no, not really, no.

10   Q.   I had provided you with these exhibits that the

11   Government has submitted, and we've talked about

12   Government Exhibit 6.  Government Exhibit 30 and 31 were

13   the Grand Jury -- partial Grand Jury transcripts of

14   Deborah Kilmartin and John Ruminksi; do you recall that?

15   A.   Yes.

16   Q.   And you reviewed those; correct?

17   A.   Yes.

18   Q.   Did you read anything in there that suggested that

19   they had made Mr. Kilmartin aware of what they were

20   doing to try to get him out of this problem with the

21   Preparation H?

22   A.   I didn't -- I don't recall seeing anything to that

23   effect.

24   Q.   And I had also sent to you --

25             MR. MERRILL:  And, Your Honor, this is Exhibit 5

1    in the motion for variant sentence.

2    BY MR. MERRILL:

3    Q.    I had sent you a information sheet from the World

4    Health Organization about premature death among people

5    with severe mental disorders?

6    A.    Yes.

7    Q.    Do you agree with what they say in there that the

8    lifespan of people with severe mental disorders is

9    shorter compared to the general population?

10   A.    Yes, statistics have shown that quite convincingly.

11   I just saw another summary of this article that confirms

12   that.

13   Q.    But, in general, mortality rates are higher for

14   people that suffer from severe mental illness?

15   A.    Yes.   They die younger.

16   Q.    Lastly, do you have any doubt about the validity of

17   the opinions you have issued here today as a result of

18   the questions that Mr. Frank asked you?

19   A.    No, I -- I stand by the opinions I have stated.   As

20   I told Mr. Frank, that if I have credible evidence that

21   -- to the contrary I would be happy to look at that and

22   amend my opinions if needed.   Or it would be -- could be

23   of a particular incident would be, for example, Dr.

24   Manin's notes around the time he was acquiring cyanide.

25   I mean those are defined dates, we know that.   And if he

1 is reporting these -- he is giving these glowing reports

2 that everything is just fine when he is online getting

3 cyanide, I mean that indicates that he is covering up

4 and for understandable reasons.

5       MR. MERRILL:  Thank you, Dr. Voss.  No other

6 questions, Your Honor.

7       THE COURT:  Mr. Frank.

8       MR. FRANK:  No, Your Honor, nothing further.

9 Thank you.

10       THE COURT:  Thank you.  You may stand down, sir.

11 Thank you very much.

12       THE WITNESS:  Thank you, Judge.  There are a

13 couple of exhibits here.

14       THE COURT:  Right.  The lawyers might have to

15 turn those over whosever those are.

16       MR. FRANK:  I think mine are already in the

17 record, Your Honor.  This was just a working copy that I

18 used during the examination.

19       THE WITNESS:  Yep, you guys figure it out.

20       THE COURT:  Thank you, sir.

21       MR. MERRILL:  Your Honor, this was the one I had

22 marked as 4A that I moved in.

23       THE COURT:  Right.

24          (Discussion off the record.)

25       THE COURT:  So are we going to finish today?  It

 1   is 4:30.

 2           MR. MERRILL:  I -- I have just one character

 3   witness, Your Honor, and then I think we're prepared to

 4   make our -- our arguments.

 5           MR. FRANK:  I don't think we're going to finish

 6   by five today.

 7           MR. MERRILL:  Oh, I don't think we'll finish by

 8   five.

 9           MR. FRANK:  That's -- I mean -- I mean I don't

10   have any witnesses, Your Honor, I just have allocution;

11   but I know you have another witness, you have

12   allocution, I think the defendant wants to speak.

13           MR. MERRILL:  Correct.

14           MR. FRANK:  So that's four, and then the Court

15   need to pronounce sentence so.

16           MR. MERRILL:  Could I at least have the

17   character witness --

18           THE COURT:  Oh, sure.  Yeah.  Yes.  Yeah.  Go

19   right ahead.

20           MR. MERRILL:  Call Paul McDermott.  Do you want

21   him up there or do you want him, Your Honor?

22           THE COURT:  I'm sorry.

23           MR. MERRILL:  Do you want him here or on the

24   witness stand?

25           THE COURT:  No, it is fine that he -- he speaks

1  from the podium.  That's fine.

2      Sir, would you state your name for the record and

3  spell your last name.

4          MR. MCDERMOTT:  Sure.  My name is Paul

5  McDermott.  Last name is spelled M-c-D-e-r-m-o-t-t.

6          THE COURT:  Yes, sir.

7          MR. MCDERMOTT:  Good afternoon.  Thanks for the

8  opportunity to address your court, Your Honor.  As I

9  said, my name is Paul McDermott.  I am Sid Kilmartin's

10  first cousin.  I have lived in the area with Sid my

11  entire life, except for a time during college, and I

12  know Sid very well.

13      Before I go too far, Mr. Frank, I very much enjoy

14  your columns in The Forecaster, but Sid and I go way

15  back.  I have a long-standing relationship with Sid.  I

16  have only known him to be a caring person.

17      He was a senior at Cheverus High School when I was a

18  freshman at Cheverus High School.  At Cheverus there is

19  a set of stairs known as the senior stairs.  Freshman

20  were forbidden from walking up or down that -- the

21  senior stairs.  One day I was late and took a chance and

22  I got caught.  Sid was walking by as some seniors were

23  about to throw me down the stairs, and it is about 16

24  stairs, cinder block walls.  It is not -- wouldn't be

25  anything fun.  Sid stopped them.  He didn't say stop, it

1    is my cousin, he just said stop.  And this is -- it put

2    Sid at risk, to be honest with you.  It doesn't sound

3    like much, but it really put Sid at risk.  And it talks

4    to his character because he was a varsity athlete on the

5    football team, he was well regarded within the school,

6    he was friends with everyone, and he had them stop -- he

7    stopped them from throwing me down the stairs.  Never

8    returned the favor, but maybe today it will be my turn

9    to do that.

10        In the past few years his wife, Debby, and Sid and

11    I, along with my wife, we rented a camp on Cliff Island,

12    so I have spent a long -- long time with Sid.  I know

13    him quite well.  Hunting camp up in Milo, fishing up

14    there.  Sid has always been a solid person.

15        I noticed what I will call some dips or some -- some

16    events in his life, and it seemed that they occurred

17    after initial diagnosis of reactive arthritis or writer

18    syndrome, osteoarthritis, and then his surgical

19    procedure on his knee for which he was prescribed

20    opioids.

21        From what I have heard today, there was no detection

22    of opioids in any of the toxicology tests; but I do know

23    at that point that Sid would -- Sid would change

24    somewhat.

25        I -- I know he was having a tough time when I

1    couldn't reach him.  This most recent event with the

2    cyanide he first came out in the first three weeks that

3    he was out of Riverbend (sic), or its environs, he -- he

4    and I would talk regularly.  He called me.  He wanted a

5    reference -- to serve as a reference for him.  Then all

6    of a sudden it is like he fell off the face of the

7    earth.  And at that time I think it is my -- I think he

8    was using illicit drugs again at that point.  Again

9    self-medicate, I am not sure.  But over time the events

10   as described in -- in this -- in these court proceedings

11   took place, and here we are today.

12       But I maintain in my own personal opinion that when

13   you talked about vulnerable people I maintain that Sid

14   is at the top of that pyramid of vulnerable people.

15       The whole episode with -- with the cyanide, he

16   wanted to use it to kill himself.  He had a previous

17   attempt on his life using a complete month's supply of

18   Zyprexa washed down with anti-freeze by himself, no one

19   was there.  That's not someone who is going to take

20   advantage of vulnerable people I don't think.  It was

21   something that he did with the Epsom -- with the Epsom

22   salts and the cyanide, and he was a vulnerable person.

23       I think that -- again, my opinion, I think that Sid

24   would do well to stay away from alcohol and stay with

25   prescribed medications and cognitive therapy.  Again, I

1    am not Dr. Voss; but I have seen Sid in his best, and I

2    have seen Sid at his worst.  Thank you for the

3    opportunity to address your court today.

4          THE COURT:  Thank you very much, Mr. McDermott.

5       Mr. Merrill.

6          MR. MERRILL:  Those are all the witnesses that

7    defense has, Your Honor.

8          THE COURT:  Okay.  Do you -- do you -- do we

9    want to proceed forward and see if we can get this done?

10          MR. MERRILL:  I agree with Mr. Frank, Your

11    Honor, it is -- it is not going to happen by 5:00.

12          THE COURT:  Right.

13          MR. MERRILL:  I imagine we'll probably need

14    another hour, hour and a half.

15          MR. FRANK:  Yes.  I mean I think no more than an

16    hour and a half, probably --

17          MR. MERRILL:  Oh, I --

18          MR. FRANK:  -- maximum hour and a half, but

19    probably --

20          THE COURT:  I don't -- I don't really think

21    that's fair to the people who are the employees here,

22    keep them here for -- until 6:00 on a Friday night.

23          MR. MERRILL:  I agree, Your Honor.

24          THE COURT:  Yep.  Not to mention the exhausted

25    judge.  We can try and reset this.  I think the best

 1   thing to do is work through the clerk's office and try

 2   and reset it quickly.

 3       If, in the interim, counsel would like to file

 4   something very briefly about what I should make of Dr.

 5   Voss's testimony.  There was a lot more testimony than I

 6   expected, frankly, and I am not sure what people think I

 7   -- I should glean from that.  But I am not going to let

 8   any memo delay the rescheduling.  So I will schedule it,

 9   and if you want to file something you can.  And if you

10   can't get to it, then that's all right as well.

11       Why don't we do this, why don't we ask counsel to be

12   in touch with the clerk's office and I will try and

13   prioritize this.  I am going to be away most of next

14   week, but I think the week after that.  I think it is

15   imperative for Mr. Kilmartin's own knowledge that he

16   knows what's going to happen in his life, and there is

17   never any, it seems to me, advantage in delaying

18   sentencing if it can be done promptly.  All right?

19           MR. FRANK:  Yes, Your Honor.

20           MR. MERRILL:  Yes, Your Honor.  And --

21           THE COURT:  One thing -- one thing --

22           MR. MERRILL:  -- I was --

23           THE COURT:  -- before we break, it is very

24   confusing what exhibits have been introduced and what

25   exhibits haven't been introduced.  You made reference to

1    things that are on the docket that you are sort of

2    incorporating by reference.  What I would suggest is

3    that prior to the time of the next hearing that the

4    Government file an exhibit list and the defense file an

5    exhibit list.  Make sure that the exhibit list

6    corresponds, to the extent it does, with what's on the

7    docket so that we know what's been incorporated.  And

8    then make sure that those things that are not on the

9    docket have been copied and marked and presented to the

10   clerk so that we have an accurate record of the

11   proceedings here.  All right?

12       Is there anything further from the Government before

13   we break?

14           MR. FRANK:  No, Your Honor.

15           THE COURT:  Anything further from the defendant?

16           MR. MERRILL:  No.  Can I leave Exhibit 4A with

17   the clerk now?

18           THE COURT:  Sure, yes, but why don't you file

19   the exhibit list so that --

20           MR. MERRILL:  No, I will.

21           THE COURT:  And check with the clerk and make

22   sure you know what she has because I don't think she

23   thinks she has what you think she has.  All right?

24           MR. MERRILL:  I will do that, Judge.  Thank you.

25               (TIME NOTED:  4:39 p.m.)

1          **C E R T I F I C A T I O N**

2          I, Tammy L. Martell, Registered Professional

3    Reporter, Certified Realtime Reporter, and Official

4    Court Reporter for the United States District Court,

5    District of Maine, certify that the foregoing is a

6    correct transcript from the record of proceedings in the

7    above-entitled matter.

8          Dated:  January 30, 2019

9                    /s/ Tammy L. Martell

10                   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25